IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
          :
In re:          :     Chapter 11
          :
EXIDE TECHNOLOGIES,     :     Case No. 13-11482
          :
          Debtor.[1]     :
          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DECLARATION OF PHILLIP A. DAMASKA IN SUPPORT OF
CHAPTER 11 PETITION AND FIRST DAY PLEADINGS**

    I, Phillip A. Damaska, being duly sworn, deposes, and says:

    1.    I am the Executive Vice President and Chief Financial Officer of Exide

Technologies ("Exide" or the "Debtor"), the debtor and debtor-in-possession in the above-

captioned case.[2]  Exide is a corporation organized under the laws of the state of Delaware.  To

minimize any disruption to the Debtor's business, preserve its enterprise value, and ensure a

smooth transition into chapter 11, the Debtor intends to request various types of relief in "first

day" applications and motions (collectively, the "First Day Pleadings") in connection with the

chapter 11 case (the "Chapter 11 Case").[3]  I submit this declaration in support of the Debtor's

(a) voluntary petition for relief under chapter 11 of title 11 of the United States Code (the

---

[1]    The last four digits of Debtor's taxpayer identification number are 2730.  The Debtor's corporate headquarters are located at 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

[2]    The Debtor's predecessor has a chapter 11 case currently pending in this District (Case No. 02-11125) (the "Previous Chapter 11 Case").  The Previous Chapter 11 Case was filed on April 15, 2002, and the Debtor and certain of its U.S. subsidiaries emerged from chapter 11 on May 5, 2004.  There is one claim remaining open in the Previous Chapter 11 Case.  In addition, there is a pending adversary proceeding in which a settlement agreement to allow a general unsecured, non-priority claim has been approved by this Court, but is awaiting final approval from the state chancery court to become effective.  The Debtor will confer with this Court regarding the disposition of the Previous Chapter 11 Case at the appropriate time.

[3]    Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the relevant First Day Pleadings.

"Bankruptcy Code") and (b) the First Day Pleadings.  I am over the age of 18, competent to testify, and authorized to submit this declaration (the "Declaration") on behalf of the Debtor.

2.      I have held my current positions with Exide since April 1, 2008.  As a result of my time with the Debtor, my review of relevant documents, and my discussions with other members of the Debtor's management team, I am familiar with the Debtor's day-to-day operations, business affairs, and books and records.  Except as otherwise noted, I have personal knowledge of the matters set forth herein and all facts set forth in the Declaration are based on my personal knowledge, my discussions with other members of the Debtor's senior management, my review of relevant documents, or my opinion based on my experience and knowledge of the Debtor's operations and financial conditions.  In making the Declaration, I have relied in part on information and materials that the Debtor's personnel and advisors have gathered, prepared, verified, and provided to me, in each case under my ultimate supervision, at my direction, and/or for my benefit in preparing the Declaration.  If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

3.      The Declaration is divided into two parts.  Part I provides background information about the Debtor, its business operations, its corporate and capital structures, its restructuring efforts, and the events leading up to the filing of this chapter 11 case.  Part II sets forth the relevant facts in support of each of the First Day Pleadings.

**PART I**

**BACKGROUND**

**A.      The Debtor's Business**

4.      The Debtor, Exide, which together with its direct and indirect subsidiaries (collectively, the "Company"), has operations in more than 80 countries, is a global leader in

stored electrical energy solutions and one of the world's largest producers and recyclers of lead-acid batteries.

5.      The Company's four global business groups—Transportation Americas, Transportation Europe and Rest of World ("ROW"), Industrial Energy Americas, and Industrial Energy Europe and ROW—provide a comprehensive range of stored electrical energy products and services for industrial and transportation applications.  The Company manufactures and distributes transportation and industrial batteries in North America, Europe, Asia, the Middle East, India, Australia, and New Zealand.  In the transportation segments, the Company distributes and markets transportation batteries, which include starting, lighting, and ignition batteries for cars, trucks, off-road vehicles, agricultural and construction vehicles, motorcycles, recreational vehicles, marine, and other applications to a broad range of retailers, distributors of replacement or after-market batteries, and automotive original equipment manufacturers ("OEM").  The Company's industrial batteries consist of motive power batteries and network power applications.  Motive power batteries are used in the material handling industry for equipment such as electric fork-lift trucks as well as in other machinery, including floor cleaning machinery, powered wheelchairs, railroad locomotives, mining equipment, and electric road vehicles.  Network power batteries provide energy storage solutions for critical systems that require uninterrupted power supply and are used to power, among other things, telecommunications systems, computer installations and data centers, hospitals, air traffic control systems, security systems, electric utilities, railways, and various military applications.  The Company has a diverse customer base comprised of a number of major end-user and retail customers, including market winners and industry leaders.

6.      The Debtor, headquartered in Milton, Georgia, operates 13 manufacturing facilities in the United States.  The Debtor also operates approximately 74 branches[4] throughout North America, which sell and distribute batteries and other products to customers, battery specialists, retail stores, and OEM dealers. In addition, branch locations collect spent batteries for the Debtor's recycling facilities.  Exide has five smelters, three of which are currently active battery collection and recycling facilities.[5]  These facilities reclaim lead by recycling spent lead-acid batteries, which are obtained for recycling from Exide's customers and outside spent-battery collectors.  In fiscal year 2013, approximately 530,575 tons of batteries, plant scrap, and range lead were recycled at Exide's smelters or by a third party at Exide's request, which efforts enabled Exide to better control the cost of the principal raw material—lead—used in making its products.  In the United States, the Debtor historically has obtained the vast majority of its lead requirements from its recycling operations.[6]

## B.      The Debtor's Workforce

7.      The Debtor currently employs approximately 3,600 employees in the United States (the "Employees"),[7] of which 1,100 are paid on a salaried basis and 2,500 are paid on an hourly basis, including 540 unionized hourly Employees (such unionized hourly

---

[4]    On average, branch locations are approximately 20,000 square feet in size and are generally leased for periods of 29 to 42 months.

[5]    The smelter furnaces melt lead from spent (i.e., expired) batteries to extract the lead so that it can be re-used to make new batteries.

[6]    In contrast, the Company obtains the majority of its lead requirements for its ROW operations on the open market from third-party suppliers.

[7]    Overall, the Company employs approximately 9,300 people globally.  Of this number, 5,700 are in Europe and ROW are not employed by the Debtor.

Employees, the "Union Employees").  In addition, the Debtor employs 16 full-time employees

based in Canada (the "Canadian Employees").[8]

8.      The Employees provide a variety of services to support the Debtor's

operations.  A little under one-third of Exide's salaried Employees are engaged in manufacturing,

distribution, and engineering functions, with the balance of the salaried Employees engaged in

sales, service, marketing, and administration.  The hourly Employees are all engaged in

manufacturing, distribution, and engineering functions.

9.      To supplement its workforce, Exide has approximately 210 individuals

who provide services on a contractual basis (collectively, the "Temporary Workers") and retains

approximately 20 independent contractors (collectively, the "Independent Contractors") to

provide a range of services including, but not limited to (a) engineering and design services,

(b) sales and marketing services, and (c) information technology consulting services.  In addition,

Exide engages approximately 30 agencies (collectively, the "Industrial Agencies") that provide

agents to sell Exide's Motive Power and Network Power products in territories and markets that

cannot support coverage by full-time sales representatives (collectively, the "Industrial Agents,"

and together with the Employees, Canadian Employees, the Temporary Workers, and the

Independent Contractors, the "Workforce").

C.      **The Debtor's Corporate and Capital Structure**

10.     Exide, a Delaware corporation organized in 1966, and the successor in

interest to a New Jersey corporation originally founded in 1888, is the parent corporation of

---

[8]     The Canadian Employees provide sales services to a division of the Debtor – GNB Industrial Power – which
manufactures and recycles large lead acid batteries.

seven Domestic Subsidiaries and five Foreign Subsidiaries.[9]  The Foreign Subsidiaries have

numerous direct and indirect subsidiaries and joint venture interests in various parts of the world,

including Asia, Europe, Australia, New Zealand, Mexico, and Canada.

11.     As of the Petition Date, the Debtor's principal debt obligations are as

follows: the "ABL Facility" and two issuances of bond debt—the "Senior Secured Notes" and

the "Convertible Notes" (each of which is defined and described below).

12.     The principal amount of the Debtor's prepetition indebtedness can be

summarized as follows:

|  | Funded Debt ($ millions) |
| --- | --- |
| The ABL Facility | $160[10] |
| The Senior Secured Notes | $675 |
| The Convertible Notes | $51.9 |
| **Total Funded Debt** | **$886.9** |

13.     <u>The ABL Facility</u>. On January 25, 2011, Exide, as the U.S. borrower, and

Exide Global Holding Netherlands C.V. ("<u>Exide C.V.</u>"), as the foreign borrower, various

financial institutions party thereto as lenders, and Wells Fargo Capital Finance, LLC, as

administrative agent, entered into that certain credit agreement dated as of January 25, 2011

(such credit agreement and additional documents and ancillary agreements, as amended, are

referred to herein collectively as the "<u>ABL Facility</u>").  Certain other non-debtor foreign

---

[9]     The seven Domestic Subsidiaries are all classified as "Excluded Subsidiaries" under the ABL Facility (defined below), because the book value of their total assets, taken together with all other "Excluded Subsidiaries" under the ABL Facility, does not exceed  $10 million in the aggregate.  None of the Domestic Subsidiaries is a debtor in the Chapter 11 Case at this time.

[10]     Includes amounts for issued and outstanding letters of credit, totaling approximately $47 million.

subsidiaries of the Debtor also guarantee the foreign borrowings (described below) under the ABL Facility.[11]

14.     The ABL Facility has commitments for an aggregate borrowing capacity of $210 million, including a letter of credit sub-facility of $75 million and a swingline sub-facility of $25 million.  The ABL Facility matures by its terms on January 25, 2016.  The ABL Facility (not including the swingline sub-facility) bears interest at a rate equal to (a) the base rate plus an interest margin or (b) LIBOR (for U.S. dollar or Euro denominated revolving loans, as applicable), plus an interest margin.  The interest margin is adjusted quarterly based on the average amount available for drawing under the ABL Facility.  As of the Petition Date, the LIBOR based interest rate was approximately 3.87%.

15.     The obligations of the Debtor, Exide C.V., and the other loan parties under the ABL Facility are secured by: (i) a first-priority lien on the ABL Priority Collateral (as defined in the Intercreditor Agreement (defined below), which includes, subject to certain exceptions, the Debtor's receivables, inventory, intellectual property rights, deposit accounts, tax refunds, certain intercompany loans, and certain other related assets and proceeds, and (ii) a second-priority lien on the Notes Priority Collateral (as defined in the Intercreditor Agreement and described below).[12]  In addition, the obligations of Exide C.V. and the Foreign Guarantors under the ABL Facility are secured by a first-priority lien on substantially all of the personal

---

[11]    Such non-debtor foreign subsidiaries are referred to herein as the "Foreign Guarantors," and include subsidiaries of the Debtor organized under the laws of Australia, Canada, England, New Zealand, and Wales.

[12]    Exide, the agent under the ABL Facility, and the trustee and collateral agent under the indenture governing the Senior Secured Notes (defined below) entered into that certain intercreditor agreement, dated as of January 25, 2011 (the "Intercreditor Agreement"), which sets forth the respective rights and remedies with regard to the common collateral securing both the ABL Facility and the Senior Secured Notes.

property of Exide C.V. and the Foreign Guarantors and the 35% of equity interests held by the

Debtor in Exide C.V. that does not constitute Notes Priority Collateral.

16.     The ability of the Debtor and Exide C.V. to obtain revolving loans and

letters of credit under the ABL Facility is subject to a domestic and foreign borrowing base. The

domestic borrowing base is comprised of 85% of the Debtor's eligible accounts receivable, plus

85% of the net orderly liquidation value of the Debtor's eligible inventory, subject to certain

reserves and limitations. The foreign borrowing base is comprised of 85% of the combined

eligible accounts receivable of the foreign guarantors, plus 85% of the net orderly liquidation

value of eligible inventory of the Debtor's Canadian subsidiary—Exide Technologies Canada

Corp.—subject to certain reserves and limitations.  The maximum amount of credit that will be

available under the foreign borrowing base attributable to foreign guarantors under the ABL

Facility (other than the Canadian guarantor) is limited to the U.S. Dollar equivalent of $40

million plus the availability generated by the eligible accounts receivable and inventory of Exide

Technologies Canada Corp.

17.     As noted, as of the Petition Date, the aggregate principal amount

outstanding under the ABL Facility was approximately $113 million of loans and approximately

$47 million of issued and outstanding letters of credit, plus additional amounts in respect of

accrued but unpaid interest, fees, costs, and other charges.  Of the $113 million in loans

outstanding as of the Petition Date, Exide C.V. had borrowings of approximately $55.9 million.

18.     <u>The Senior Secured Notes</u>.  Pursuant to an indenture dated as of January

25, 2011, the Debtor issued $675 million in aggregate principal amount of 8.625% senior

secured notes with a maturity date of February 1, 2018 (the "<u>Senior Secured Notes</u>").  The Senior

Secured Notes have a cash coupon interest rate of 8.625% annually, payable semi-annually in

arrears in February and August.  As of the Petition Date, the Senior Secured Notes had a remaining principal balance of $675 million outstanding, plus accrued and unpaid interest of approximately $20.86 million.  The Senior Secured Notes are secured by: (i) a first-priority lien on the Notes Priority Collateral, which includes, subject to certain exceptions, Exide's existing and after-acquired equipment, stock in Exide's direct Subsidiaries, including a 65% pledge from Exide of its equity interest in Exide C.V., certain intercompany loans, certain real property, and substantially all of Exide's other assets that do not secure the ABL Facility on a first-priority basis, and (ii) a second-priority lien on the ABL Facility Priority Collateral.  The Senior Secured Notes are not guaranteed by any of Exide's Subsidiaries.

19.     The Convertible Notes.  Pursuant to an indenture dated as of March 18, 2005, the Debtor issued floating rate convertible senior subordinated notes (the "Convertible Notes") with a maturity date of September 18, 2013.  The Convertible Notes bear floating interest at a per annum rate equal to the 3-month LIBOR, adjusted quarterly, minus a spread of 1.5%.  Interest is payable quarterly under the Convertible Notes.  The interest rate at December 31, 2012 was 0.0%.  The Convertible Notes are convertible into Exide's common stock at a conversion rate of 61.6143 shares per $1,000.00 principal amount at maturity, subject to adjustments for any common stock splits, dividends on common stock, tender and exchange offers by Exide for the common stock and third-party tender offers.[13]  The Convertible Notes are unsecured and are subordinate in right of payment to the ABL Facility and Senior Secured Note obligations.  As of the Petition Date, the Convertible Notes had a remaining principal balance of $51.9 million outstanding, plus accrued and unpaid interest, if any.

---

[13]     In the case of a change in control in which 10% or more of the consideration for the common stock is cash or – non traded securities, the conversion rate increases, depending on the value offered and the timing of the transaction, to as much as 70.2245 shares per one thousand dollars principal amount.

20.    <u>General Unsecured Debt</u>.  As of the Petition Date, the Debtor also has approximately $103.5 million in general unsecured debt primarily consisting of outstanding payments under various contracts and other arrangements for goods and services supporting its operations.

21.    <u>The Debtor's Common Stock</u>.  Exide is a publicly-traded company listed on The NASDAQ Global Market under the symbol "XIDE."  As of June 6, 2013, there were approximately 79,333,110 shares of common stock in the Debtor outstanding, with approximately 4,121 holders of record and a trading price of $0.34/share on NASDAQ.

**D.    Events Leading to Exide's Chapter 11 Filing**

22.    In recent years, a number of factors have contributed to a decline in Exide's earnings and liquidity position ultimately making this chapter 11 filing a necessary step for Exide to de-lever its balance sheet and implement an operational restructuring plan with the tools available to it under the Bankruptcy Code.  These forces have included:

- **Rising production costs resulting in compressed margins.**  The cost of lead currently represents approximately 46% of the Debtor's cost of goods sold.  The Debtor has generally managed this key cost driver through its recycling facilities.  However, higher spent-battery costs and lead-related price increases have put pressure on the Debtor's margins—exacerbated further by the shutdown of the Debtor's Vernon facility, discussed below.  Suppliers of raw materials have subjected Exide to pricing premiums, and Exide has been unable to pass along higher production costs to customers.

- **Intense competition.**  In recent years, competition in the battery industry has intensified, especially in the auto parts retail and mass merchandise channels where large customers are able to use their buying power to negotiate lower prices and longer payment terms, or move business elsewhere if their demands are not met.  In this regard, one of Exide's then major customers, Wal-Mart Stores Inc., designated Johnson Controls—Exide's principal competitor—its sole-source supplier of transportation batteries and stopped carrying Exide's transportation products.  This switch resulted in Exide's loss of approximately $160 million in annual revenue.  More significantly, in addition to the revenue lost from Wal-Mart sales, Exide also lost an important and reliable source of battery cores under a captive-core arrangement with Wal-Mart.

- **Exposure to European Market.**  With significant operations in Europe accounting for approximately 51.2% of the Company's worldwide revenue, Exide has been negatively impacted by the recent economic downturn that has persisted in Europe.

- **Constrained Liquidity.**  In the midst of market and competitive challenges, the Company recently has experienced additional pressure on its liquidity.  Downgrades by credit-ratings agencies, discussed below, resulted in less favorable credit terms with the Company's trade creditors and limited the Company's ability to receive new financing outside the context of chapter 11.  Constrained liquidity also has limited Exide's ability to invest in its businesses, primarily in North America, causing the Company to be at a competitive disadvantage relative to bigger, better-capitalized competitors.

23.     In early 2010, the Company began pursuing initiatives to address the significant loss of revenue and battery cores from Wal-Mart.  The Company engaged in efforts to cut costs, including reducing corporate and regional overhead costs and exiting unfavorable arrangements to sell lead to third parties.  In addition to its efforts to reduce expenses, the Company took steps to reposition its business and to consolidate its North American operations, including closing its Frisco, Texas plant[14] and idling the Reading, Pennsylvania smelting facility. Despite these efforts, the Debtor's financial position continued to decline, culminating in operating results for the fourth fiscal quarter of 2013 (for the period January 1 through March 31, 2013) that came in well below the Company's targets.[15]  Based on these results and the Company's declining liquidity, Moody's Investors Service downgraded Exide's corporate-family rating on March 12, 2013.

24.     To respond to the negative operating trends—and mindful that it was approaching its peak season for working-capital requirements—Exide engaged Deutsche Bank to explore financing options and Lazard Fréres & Company LLC to advise the Company on

---

[14]   The Debtor has reached an agreement to sell a portion of the land surrounding the Frisco plant.

[15]   For example, the Company had approximately $14 million EBITDA for the quarter, compared to approximately $45 million EBITDA for the same quarter in the preceding year.

strategic alternatives.  Exide suffered a significant setback, however, while considering its

various out-of-court restructuring alternatives.  On April 24, 2013, the California Department of

Toxic Substances Control ("CDTSC") issued an order suspending operations at its Vernon,

California secondary lead-recycling facility alleging that the facility's underground storm-water

system was not in compliance with state requirements and that the Company's furnace emissions

are not meeting applicable CDTSC health-risk standards.[16]  As a result of the Vernon shutdown,

Exide had to source lead requirements from its remaining recycling facilities, open-market

purchases of refined lead, and third-party lead recyclers to make up for the lost capacity

increasing its costs.  The Vernon shutdown will directly impact Exide's bottom line by

eliminating an estimated $24 million in projected EBITDA from its business plan for the six-

month period following the shutdown.  Approximately two weeks after the CDTSC order,

Standard & Poor's Ratings Service lowered its corporate credit rating of Exide to triple-C-plus,

which further constrained Exide's liquidity due to the tightened availability of trade credit.

       25.     As a result of the Vernon shutdown and the Company's poor financial

performance in the fourth fiscal quarter of 2013, it became apparent that a successful out-of-

court restructuring was unlikely.  Exide therefore retained Alvarez & Marsal North America,

LLC ("A&M") and Skadden, Arps, Slate, Meagher & Flom LLP to provide financial and legal

restructuring advice, respectively.  In short order, Exide took several significant steps, coupled

with previous restructuring initiatives, to address the challenges faced by the Company.  These

efforts included (a) suspending 401(k) safe-harbor and matching contributions, effective June 1,

---

[16]    Exide disputes the position taken by the CDTSC and is actively seeking revocation of the CDTSC's suspension order in a pending California administrative proceeding. The hearing on the dispute has been continued but a new hearing date has not been set by the administrative judge. While Exide is hopeful that the dispute will be resolved in the Company's favor and the plant will reopen soon, in the interim it has secured alternative sources for lead for the near-term and is simultaneously working towards securing long-term supply arrangements as a contingency to ensure that there is no battery production interruption.

2013; (b) suspending merit-based pay increases for employees not subject to collective-bargaining agreements; (c) discontinuing production of its Vortex line of batteries at its Bristol, Tennessee plant and preparing for closure of the plant by July 2013;[17] and (d)  implementing programs to improve efficiencies in its other existing facilities.

26.     Furthermore, with approximately $31 million in interest payments due in August 2013 under the Senior Secured Notes ($29 million) and the ABL Facility ($2 million), and the upcoming maturity of $51.9 million remaining in Convertible Notes due in September, Exide sharpened its focus on developing a restructuring plan with its advisors to address these near term liquidity events, as well as the long-term profitability of its enterprise.  As a crucial initial step to its restructuring plan, Exide sought to procure a sufficiently sized debtor-in-possession financing that would allow it to execute a comprehensive turnaround during the course of a chapter 11 case.

27.     The Debtor set up a comprehensive electronic data room and initiated discussions with 13 potential lenders, including its historic lenders, to solicit proposals for debtor-in-possession financing ("DIP Financing").  Seven of these institutions accepted the Debtor's invitation to conduct due diligence, including review of the information provided in the data room, attending management presentations, and engaging in discussions with the Company's senior management team and advisors.  Although none of these institutions were willing to extend financing outside of chapter 11, each of the seven institutions provided the Company with detailed term sheets for DIP Financing proposals.  Ultimately, after considering different structures with multiple parties, Exide determined that the DIP Financing package

---

[17]    Certain production activities have been transitioned from the Bristol plant to the Company's Salina, Kansas facility, creating substantial operational efficiencies.

provided by JPMorgan Chase Bank, N.A. ("JPMorgan") represented the best proposal available

to the Debtor.  The DIP Financing will enhance Exide's liquidity with $500 million in new

capital—comprised of a $225 million first-out asset-based revolving credit facility and a $275

million second-out term loan facility[18]—putting it on a path to achieve its restructuring goals.

JPMorgan has agreed to syndicate the term loan facility to holders of the Senior Secured Notes

and the Debtor anticipates that many of them will participate by lending new money and

supporting the Company in its restructuring efforts.  The Company projects an initial DIP

Financing need of $170 million upon approval of the DIP Financing.  The Company projects a

maximum DIP Financing draw of approximately $375 million in September 2013, driven largely

by seasonality in the Company's working capital cycle, and the DIP Financing draw is projected

to decline to $275 million by March 2014.

      28.     Therefore, after securing a fully-committed $500 million in DIP Financing,

the Debtor determined it was time to enter into chapter 11 and implement a restructuring that

would result in a de-levered balance sheet and a sustainable capital structure.  In addition, prior

to filing the Chapter 11 Case, Exide appointed A&M's Robert M. Caruso as its chief

restructuring officer.

## PART II

## FIRST DAY PLEADINGS

      29.     In furtherance of these objectives, the Debtor expects to file, and

respectfully requests that this Court approve, the First Day Pleadings.  I have reviewed each of

---

[18]  The DIP Facility is described more fully in the Declaration of Daniel Aronson in Support of Debtor's Motion for Interim and Final Orders  (I) Authorizing Debtor (A) to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364 and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c), filed concurrently herewith.

the First Day Pleadings and proposed orders (including the exhibits thereto) and the facts set

forth therein are true and correct to the best of my knowledge, information, and belief.  Moreover,

I believe that the relief sought in each of the First Day Pleadings (a) is vital to enable the Debtor

to make the transition to, and operate in, chapter 11 with minimum interruption or disruption to

its business or loss of productivity or value and (b) constitutes a critical element in maximizing

value during the Chapter 11 Case. The Debtor's attorneys have explained to me the customary

practices with regard to the requested relief in chapter 11 business reorganization cases and the

rationale for these pleadings.

**E.    Administrative Pleadings**

30.    **Schedules and Statement Motion**.  The Debtor seeks an extension of the

deadline to file its schedules and statement of financial affairs.  The Debtor has over 20,000

creditors (including current and former employees). The conduct and operation of the Debtor's

businesses require the Debtor to maintain voluminous books and records and a complex

accounting system.  Further, the Debtor has numerous foreign subsidiaries and affiliates that did

not file for relief under chapter 11 of the Bankruptcy Code. Much of the information and

documentation evidencing the Debtor's assets and liabilities, creditors and contracts are

consolidated with that of the Non-Debtor Foreign Entities. It will take a substantial amount of

time to clearly identify and separate which information relates to the Debtor and not to the Non-

Debtor Foreign Entities. Therefore, the Debtor requires additional time to assemble the necessary

information and documentation for the Schedules and Statements.

31.    Given the numerous critical operational matters that the Debtor's

accounting and legal personnel must address in the early days of the Chapter 11 Case, I believe

that with an additional thirty (30) day extension (for a total of sixty (60) days) from the Petition

Date, the Debtor will be able to focus the attention of key accounting and legal personnel on vital

operational and restructuring issues during the critical first weeks of filing the Chapter 11 Case while at the same time providing sufficient time to prepare and file the Schedules and Statement. As a result, the Debtor is requesting that this Court grant such an extension, without prejudice to the Debtor's right to seek any further extensions from this Court.

32.    **GCG Retention Application**.[19]  The Debtor seeks authority to retain GCG, Inc. as notice and claims agent in the Chapter 11 Case.  As noted above, the Debtor currently anticipates that there will be in excess of 20,000 creditors in the Chapter 11 Case.  I understand that such appointment is required by the rules of this Court.  Moreover, such relief is prudent in light of the thousands of creditors, potential creditors, and parties in interest to whom certain notices will be sent.  Accordingly, I believe that the most effective and efficient manner by which to give notice and process claims in the Chapter 11 Case is to engage GCG, an independent third party with significant experience in this role to act as an agent of the Court. Consistent with the Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c) of the United States Bankruptcy Court for the District of District of Delaware, the Debtor has obtained and reviewed engagement proposals from four (4) other Court-approved claims and noticing agents to ensure selection through a competitive process.

F.    **Operational Motions**

33.    **Cash Management Motion**.  The Debtor's Cash Management System facilitates reporting, monitors collection and disbursement of funds, reduces administrative expenses by facilitating the movement of funds and the development of more timely and accurate balance and presentment information, and administers the various Bank Accounts maintained at

---

[19]    Contemporaneously with the filing of the GCG Retention Application, the Debtor, by separate application, is also seeking entry of an order authorizing the employment and retention of GCG to provide certain administrative services to the Debtor.  The Debtor is not seeking to have the relief in the administrative services application granted on the "first day."

Wells Fargo, N.A., Citibank N.A., UMB Bank),  JP Morgan Chase, Toronto-Dominion Bank,

U.S. Bank, N.A., or Deutsche Bank AG.[20]  The Bank Accounts consist of concentration accounts,

disbursement accounts, lockbox accounts, standby trust accounts, and investment accounts. In

addition, certain of the Debtor's affiliated non-debtor entities maintain three (3) domestic bank

accounts, and 179 bank accounts throughout Europe and the rest of the world.  The Bank

Accounts include the following:

- The Master Concentration Account.  All of the Debtor's receipts are channeled into a master concentration account, which is the heart of the Debtor's Cash Management System and maintained by Wells Fargo.  Direct draws from the Master Concentration Account are made by Ceridian, the Debtor's third-party human resource administrator, to fund payroll taxes.  Additional direct draws are made to directly fund various third-party accounts, including those that fund the Debtor's local and state sales taxes. The receipts deposited in the Master Concentration Account include all revenue from the Debtor's customer contracts and all borrowings from the Debtor's prepetition revolving credit facility.  The Master Concentration Account draws funds from an account maintained by Wells Fargo, which is used in connection with the Debtor's asset-based lending facility.

- The ZB Disbursement Accounts.  The Master Concentration Account is linked to two zero-balance disbursement accounts.  Funds are automatically transferred from the Master Concentration Account to the ZB Disbursement Accounts as needed for immediate payment of the Debtor's obligations.  One of the ZB Disbursement Accounts is a payroll account, through which the Debtor funds its domestic payroll obligations.  The other is a general disbursement account through which the Debtor funds certain of its accounts payable for vendors that are paid by check.  The ZB Disbursement Accounts are zero-balance accounts, meaning that they do not carry a balance and are swept of all funds on a daily basis.

- The ACH Disbursement Account.  The Main Concentration Account is also linked to an automated clearinghouse disbursement account, which is maintained at Wells Fargo.  All of the Debtor's electronic fund transfers, including automatic deposit payroll obligations, trade payables, and utility obligations are disbursed through the ACH Disbursement Account.  In addition, the ACH Disbursement Account is used to fund two insurance accounts, each of which supports the Debtor in making payments for short-term disability and dental coverage for active participants, and medical and

---

[20]   As described below, the Debtor's account with DB is an idle investment account maintained through DB's subsidiary DWS Investment Services Company ("DWS").  In addition, the Debtor is in the process of closing this account.

pharmacy plan payments for retired employees.  The CIGNA Healthcare Impressed Accounts are maintained by Citibank.

- The Administered Plan Accounts.  The Master Concentration Account is also linked to two accounts that are disbursement accounts for the Debtor's administered benefits plans. One Administered Plan Account is maintained by UMB and is used to fund payments related to employee flexible spending accounts and health reimbursement accounts.  The second Administered Plan is maintained by JPM and is used to fund payments related to medical claims and wellness expense reimbursements for active participants.

- The Lockbox Account. The Main Concentration Account is also linked to a lockbox account, which is used as a collection account for Transportation Americas and Industrial Energy Americas receipts.

- The Canadian Disbursement Accounts.  The Master Concentration Account is also linked to two Canadian disbursement accounts maintained by TD.  The Debtor does business as GNB Industrial Power in Canada.  GNB is not a distinct legal entity from the Debtor, but generates the revenue to fund the Canadian Disbursement Accounts and all of GNB's disbursements are handled through the Canadian Disbursement Accounts.  Both Canadian Disbursement Accounts collect and disburse funds.  One of the Canadian Disbursement Accounts is used for U.S. dollar transactions and the other is used for Canadian dollar transactions.

- The Investment Accounts.  The Master Concentration Account is also linked to two (2) investment accounts maintained by Wells Fargo Advantage Funds and DB maintains one idle investment account through DWS.  The Debtor uses the Investment Accounts to invest excess funds pursuant to its Investment and Deposit Practices (as described below).

- The Standby Trust Accounts.  The Debtor is a party to a number of trust agreements with U.S. Bank regarding its environmental obligations to various states.  To remain in compliance with the trust agreements, the Debtor is required to keep standby trust accounts for all sites for which it has granted a surety bond or letter of credit.  Specifically, the Debtor has eleven standby trust accounts maintained by U.S. Bank in connection with its surety bonds or letter of credit.  The Standby Trust Accounts have *de minimis* balances and exist as a place holder for deposits if there is a draw on the surety bonds or letter of credit.

- The U.S. Non-Debtor Bank Accounts. The Main Concentration Account is also linked to two disbursement accounts used by non-debtor, non-operating entities Dixie Metals Company and Refined Metals Corporation and one standby trust account for Refined Metals Corporation for payments related to environmental remediation expenses.  These accounts maintain a *de minimis* balance throughout the year except at those times when funded specifically to pay such remediation expenses.

- Underline: **Funding Foreign Non-Debtors.**  The Company's non-debtor foreign subsidiaries maintain the Non-Debtor Foreign Bank Accounts at various institutions throughout the world.  As set forth below, intercompany transfers from the Bank Accounts maintained by the Debtor to those maintained by foreign non-debtor subsidiaries are critical to the operation of foreign subsidiaries and preserving the Debtor's going-concern value.

34.    The Debtor's ability to maintain and use the Bank Accounts will greatly facilitate the Debtor's smooth transition into chapter 11.  Also, to avoid delays in receipt of payment of debts incurred postpetition, the Debtor should be permitted to continue to maintain the existing Bank Accounts, and, if necessary, to open new accounts.  In addition, the Debtor has used the basic structure of the Cash Management System for approximately four (4) years.  I believe the Cash Management System is similar to those commonly employed by corporate enterprises comparable to the Debtor in size and complexity.  The widespread use of such systems is attributable to the numerous benefits they provide, including the ability to (a) tightly control corporate funds, (b) invest idle cash at higher returns, (c) ensure cash availability, and (d) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate account balance and presentment information.

35.    Moreover, the Debtor maintains detailed accounting records that track transfers of funds to and from the Bank Accounts, which is administered by a third-party accounts payable agents.[21]  Alvarez & Marsal, which employs personnel trained in chapter 11 cash management systems, is also working closely with the Third-Party Accounts Payable Agents to ensure that the Debtor will continue to maintain and administer these detailed accounting records postpetition.  These controls are particularly important here given the significant amount of cash that flows through the Debtor's consolidated Cash Management

---

[21]    Although the Debtor maintains its own accounting records tracking the transfer of funds, data entry is outsourced to third-party providers located in the United States and Bulgaria.

System on an annual basis.  In addition, given the corporate and financial structure of the Debtor

and its non-debtor affiliates, it would be highly disruptive to the Debtor's operations to establish

an entirely new system of accounts and a new cash management system. Furthermore, preserving

the "business as usual" atmosphere and avoiding the unnecessary distractions that would

inevitably be associated with any substantial disruption in the Debtor's Cash Management

System will facilitate the Debtor's reorganization efforts.

      36.    **The Business Forms and Checks**.  In the ordinary course of business, the

Debtor uses a number of checks, business letterhead, purchase orders, invoices, envelopes,

promotional materials, and other business forms and correspondence.  Because the Business

Forms were used prepetition, they do not reference the Debtor's current status as a debtor in

possession.  To minimize expense to its estate, the Debtor also requests authority to continue to

use all Business Forms without reference to its "debtor in possession" status.  Most parties doing

business with the Debtor undoubtedly will be aware of the Debtor's status as a debtor in

possession as a result of the publicity surrounding this Chapter 11 Case, including a press release

issued by the Debtor and the notice of commencement of the Chapter 11 Case that will be

provided to parties in interest.  As with the existing Cash Management System, requiring the

Debtor to change existing Business Forms would unnecessarily distract the Debtor from its

restructuring efforts and impose needless expenses on the estates.

      37.    The Debtor does not maintain pre-printed check stock; rather, the name of

the payor entity is printed when the check is written.  The Debtor is in the process of ensuring

that, within a reasonable period of time after the Petition Date, subsequently written checks bear

the designation "Debtor in Possession" and the number of the Chapter 11 Case.  To the extent

that there are potential delays implementing the changes to the Debtor's software, the Debtor

seeks a thirty (30) day period with which to fully implement these changes, without prejudice to its right to seek additional relief from, or time to comply with, such requirement.

38.     **Investment and Deposit Practices**.  Prior to the Petition Date, the Debtor invested excess cash with U.S. Trustee approved depositories,[22] which primarily invest in investments that are, or are backed by, U.S. Treasury obligations, or U.S. Government obligations (either issued or guaranteed by the U.S. Treasury or U.S. Government).  The Debtor requests (i) authorization to continue to deposit and invest funds in accordance with its existing practices, subject to any reasonable changes to the Cash Management System that the Debtor may implement and (ii) a waiver of the investment and deposit requirements of Bankruptcy Code section 345(b) to the extent that such requirements are inconsistent with the Investment and Deposit Practices.  In particular, under the Investment and Deposit Practices, the Debtor has determined that it is prudent and desirable to maintain its excess cash in conservative investments.

39.     **Intercompany Transactions**.  In the ordinary course of business, the Debtor has provided loans to its non-debtor foreign subsidiaries and, in certain instances, the Debtor was the recipient of funds loaned from non-debtor foreign subsidiaries pursuant to Intercompany Debt Transactions.[23]  Further, in the ordinary course of business, the Debtor regularly participates in transactions with its non-debtor foreign subsidiaries in which they purchase and sell goods or services pursuant to the Intercompany Trade Transactions.  To the

---

[22]     The Debtor's funds are currently invested solely through Wells Fargo Investment Accounts and no funds are invested through the DWS Investment Account.

[23]     Central to the non-debtor foreign subsidiaries' business operations is the cash pooling system in Europe, which has involved Exide making revolving loans to Exide Netherlands B.V.  Exide Netherlands B.V. acts as a central banker for transactions among the various non-debtor European subsidiaries that participate in European Cash Pool.

extent necessary to execute the Cash Management System and manage the day-to-day operations of its business, the Debtor requests authority to (i) pay for prepetition Intercompany Trade Transactions[24] the Debtor determines in its business judgment, are reasonably necessary to preserve the value of its non-debtor foreign subsidiaries and its ability to operate as a going concern for the benefit of the estate and (ii) continue to participate in Intercompany Trade Transactions and Intercompany Debt Transactions postpetition, in the ordinary course of business.

        40.    **Intercompany Netting**.  In the ordinary course of business, the Debtor accounts for Intercompany Transactions with the European Cash Pool Participants through a "netting system" by tracking and settling intercompany account balances that accrue through ordinary course transactions between entities (e.g. provision of goods and services)[25] among Exide and the European Cash Pool Participants.  On a monthly average, the Debtor accrues approximately $4.5 million in payables to the European Cash Pool Participants and approximately $3.5 million in receivables from the European Cash Pool Participants, which are "netted" as described herein.  Approximately $4.5 million in prepetition intercompany payables owed to European Cash Pool Participants remain outstanding as of the Petition Date.  As noted in the Cash Management Motion, Exide is owed approximately $61 million by Exide Netherlands B.V.  Exide Netherlands B.V. has made these funds available to the European Cash Pool Participants for their operating needs.  Through the netting system, the U.S. Loan will either increase or decrease based on whether Exide is a net payor or net receiver after Intercompany

---

[24]    As described below, the Debtor does not expect to pay or "net" more than $4.7 million in prepetition Intercompany Trade Transactions.

[25]    Typically, European Cash Pool Participants would provide specialized batteries to Exide for use in foreign vehicles.

Transactions are settled on a monthly basis with the European Cash Pool Participants.  For example, if the Debtor owed amounts to a European Cash Pool Participant, as a result of goods or services received, the Debtor would not actually pay money to settle its debt with the European Cash Pool Participant.  Rather, the U.S. Loan would be reduced by the corresponding debt owed by the Debtor to the European Cash Pool Participant.  The European Cash Pool Participant would be given a credit with respect to its outstanding loan with Exide Netherlands B.V.  Given the operational efficiencies that the Debtor and its affiliates gain through the netting system (as opposed to having entities directly pay one another), the Debtor seeks confirmation of its authority to continue the Intercompany Debt Transactions in the ordinary course of business.  This confirmation will help the Debtor's seamless transition into chapter 11 and preserve the value of the Debtor's foreign entities by allowing them to receive credit against the U.S. Loan.

41.    **Intercompany Trade Transactions**.  Apart from its transactions with the European Cash Pool Participants, Exide accounts for Intercompany Trade Transactions with its other non-debtor subsidiaries through an accounts payable system, which, on average, is cleared on a weekly basis for North American subsidiaries and on a quarterly basis for non-North American subsidiaries.  For example, if a non-debtor foreign subsidiary supplies Exide with products or services, the non-debtor will submit an invoice and Exide will pay for those products or services subject to payment terms.[26]  On a monthly average, outside of the European Cash Pool Participants, the Debtor owes approximately $235,000 to its other non-debtor foreign

---

[26]    In the ordinary course of business, the Debtor uses the Cash Management System to transfer money from the ACH Disbursement Account to an Exide Technologies do Brazil's disbursement account for services, local employee wages, expenses, and accounts payable.  The Debtor believes that Brazil represents one of its largest areas for future economic growth.  In addition, Exide acts as an internal third-party service provider in making disbursements from its non-debtor Canadian subsidiary, Exide Technologies Canada Corporation's accounts.  Exide Canada generates more receivables than payables and no Debtor funds are used to pay Exide Canada's creditors.

subsidiaries, while it is owed approximately $14 million from these same parties.

Approximately $155,000 in prepetition intercompany payables owed to non-debtor foreign

subsidiaries other than the European Cash Pool Participants remain outstanding as of the Petition

Date.  The Debtor maintains records of all fund transfers and can ascertain, trace and account for

Intercompany Transactions. At the same time, however, if the Intercompany Transactions were

to be discontinued, the Cash Management System and the related administrative controls would

be disrupted to the detriment of the Debtor's operations.  Accordingly, the Debtor seeks authority,

in its discretion, to pay for prepetition Intercompany Trade Transactions, if, in the exercise of the

Debtor's business judgment, it deems the payment necessary and in the best interest of the

Debtor's estate and other parties in interest.  For example, certain of the non-debtor foreign

subsidiaries may become financially distressed if the prepetition Intercompany Trade

Transactions are not satisfied.

42.    **Postpetition Intercompany Transactions**.  As noted above, in the

normal course of their operations, the Debtor's foreign entities[27] will require funding to meet

their working capital needs as the Company enters its inventory build season and to address other

cash needs precipitated by the Debtor's chapter 11 filing.  The Debtor believes in the exercise of

its reasonable business judgment that preservation of the going-concern value of the company as

a worldwide enterprise, including the maintenance of the non-debtor foreign subsidiaries, is

absolutely essential to the success of its reorganization efforts.  Accordingly, the Debtor seeks

the authority to continue to participate in Intercompany Trade Transactions and Intercompany

Debt Transactions postpetition, in the ordinary course of business and consistent with the DIP

---

[27]    As set forth in the DIP Motion, based on the Debtor's unaudited financial statements, in the year ended March 31, 2013 the Company's Europe and ROW businesses contributed more than $79 million in EBITDA for the fiscal year that ended March 31, 2013 (just under 75% of the Company's total EBITDA) and are projected to produce $70 million in EBITDA during the current fiscal year (almost 67% of the Company's total EBITDA).

Facility.  Consistent with its prepetition practice, the Debtor will maintain records of all transfers and can ascertain, trace and account for all Intercompany Transactions.

43.    **Employee Wages Motion**.  I believe that to ensure that the Debtor can continue to operate its business without interruption, to preserve value for the estate, and to maximize the value of the business as a going concern, it is important that the Debtor continues to pay its Employees and Canadian Employees certain prepetition wages, salaries, other cash and non-cash compensation, employee benefits, and reimbursable expenses.  I further believe that the majority of the Debtor's Workforce rely on their compensation, benefits, and reimbursement of expenses to satisfy their daily living expenses.  Consequently, they will be exposed to significant financial difficulties if the Debtor is not permitted to honor obligations for unpaid compensation, benefits, and reimbursable expenses.  Moreover, if the Debtor is unable to satisfy such obligations, Employee morale and loyalty will be jeopardized at a time when Employee support is critical.  In the absence of such payments, I believe that many members of the Debtor's Workforce may seek alternative employment opportunities, thereby hindering the Debtor's ability to meet their customer obligations, and likely diminishing customer confidence in the Debtor.  Moreover, it is my opinion that loss of valuable members of the Debtor's Workforce and the recruiting and training efforts that would be required to replace such members would be distracting at a time when the Debtor should be focusing on maintaining its operations.

44.    As stated above, the Debtor's Workforce consists of 3,600 Employees in the United States, of which 1,100 are paid on a salaried basis and 2,500 are paid on an hourly basis, including approximately 540 Union Employees; 16 full-time Canadian Employees; 210 Temporary Workers; 20 Independent Contractors; and 150 Industrial Agents.

45.     By the Employee Wages Motion, the Debtor requests authorization, but not direction, to: (a) pay and/or otherwise honor or perform, as applicable, prepetition obligations to or for the benefit of the Workforce, including accrued prepetition wages, salaries, and other cash and non-cash compensation claims; (b)(i) honor and continue in the ordinary course of business until further notice various employee benefit plans, programs, practices, policies, and procedures (but not assume under Bankruptcy Code section 365(a) any of the plans, programs, practices, policies, procedures, or any related employment or service agreement) and (ii) make prepetition contributions and pay any prepetition amounts associated with the Debtor's employee benefit plans, programs, practices, policies, and procedures the most significant of which are described below and to pay all fees and costs in connection therewith; (c) pay over to the appropriate party all prepetition withholdings, deductions, and payroll-related taxes from the Workforce associated with the Unpaid Compensation and the Employee Benefit Obligations; (d) reimburse the Workforce for prepetition expenses that the Workforce incurred on behalf of the Debtor in the ordinary course of business.

46.     The Debtor estimates that it owes approximately $16,900,000 on account of all of the Prepetition Employee Obligations.  If this Court enters the interim order, the Debtor estimates that approximately $10,800,000 will be paid on account of the Prepetition Employee Obligations in the Interim Period.

47.     In addition, the Debtor requests entry of an order authorizing, but not directing, Banks to receive, process and pay any and all checks drawn on the Debtor's payroll and general disbursement accounts and other forms of payment, including fund transfers and electronic payment requests, to the extent they relate to any of the foregoing and to rely on the

Debtor's direction to pay amounts authorized pursuant to this motion provided that sufficient funds are available in the applicable accounts to make the payments.

48.      **Wages and Salaries.**  In the ordinary course of its business, the Debtor makes direct deposits to the Employees or pays the Employees via E-Cards[28] on a semi-monthly or weekly basis.  Salaried Employees are generally paid current on a semi-monthly basis on the 15th and last day of each month, and hourly Employees (i.e., production Employees in factories, distribution centers, and branches) are generally paid on a weekly basis (on Thursday for the previous week).  The Debtor estimates that the aggregate gross amounts are approximately $2,500,000 for the semi-monthly payroll, including payroll taxes, and $1,700,000 for the weekly payroll, including payroll taxes.

49.      On May 31, 2013, the Debtor made its most recent payroll for the period May 16, 2013 through May 31, 2013 for the semi-monthly payroll, and on June 5, 2013, the Debtor made its most recent payroll for the period May 26, 2013 through June 1, 2013 for the weekly payroll.  The Debtor estimates that as of the Petition Date, the Debtor owes approximately $5,400,000 on account of accrued and unpaid wages and salaries.[29]  I understand that, by the Employee Wages Motion, the Debtor requests authorization, but not direction, to pay any Employee Wage Claims up to the $12,475 limit provided for by Bankruptcy Code section 507(a)(4) pursuant to the interim order, and, pursuant to the final order, to pay such claims in the

---

[28]    E-Cards are a form of payment used for the Employees who do not have bank accounts. Specifically, the E-Cards are debit cards on which the Company puts payroll disbursements for certain Employees.

[29]    The Debtor estimates that as of the Petition Date, it owes an additional $48,600 to Canadian Employees, who are paid on a bi-weekly basis, with their last payroll period run on May 31, 2013, for the period of May 5, 2013 through May 18, 2013.  No one former Canadian Employee will exceed the $12,475 priority cap on account of their Employee Wage Claims.

ordinary course of business, including any amounts that were not paid under the interim order on account of the $12,475 limit.

50.    In addition to the wages and salaries paid to the Employees, the Debtor pays Staffing Providers, who refer the Temporary Workers.  The Debtor estimates that, as of the Petition Date, approximately $1,596,000 is accrued and unpaid on account of the Staffing Providers, which on average amounts to $7,600 for each Temporary Worker, which on average amounts to $7,600 for each Temporary Worker – an amount well below the $12,475 priority cap. I believe that if the Staffing Providers are not paid, the Staffing Providers may withdraw the Temporary Workers or refuse to provide the Debtor with replacement workers.  Although the Debtor could replace the Temporary Workers over time, the abrupt departure of the Temporary Workers could significantly disrupt the Debtor's business.

51.    I understand that the Debtor compensates Independent Contractors in a variety of ways including, but not limited to, (i) an hourly basis, (ii) upon the completion of projects or purchase orders, (iii) on a fixed fee arrangement, or (iv) on an invoice by invoice basis.  As of the Petition Date, the Debtor estimates that the Independent Contractors are owed approximately $80,000.  The Debtor believes that no Independent Contractor will receive more than the $12,475 priority cap.

52.    Through approximately 30 Industrial Agencies, the Debtor utilizes the services of approximately 150 Industrial Agents as sales people in areas of the country where the Debtor's employment of full-times sales representatives would be uneconomical.  The Industrial Agents are responsible for, on average, 25% of the annual sales of products in the Debtor's Motive Power product line and 20% of the Network Power product line.  The Industrial Agents' compensation, which is remitted to them from the Industrial Agencies after payment from the

Debtor, is commission-based.  Many Industrial Agents have a long-standing relationship with the Debtor and have developed a high level of expertise of the Debtor's products.  The Debtor believes that failure to pay any prepetition amounts owed to the Industrial Agencies for the Industrial Agents' services could cause the Industrial Agencies to stop providing Industrial Agents to the Debtor.  The loss of Industrial Agents could significantly decrease the Debtor's sales to the detriment of its estate.  Moreover, given their familiarity with the Debtor's products, the Debtor believes that it would take approximately two months to find and train new personnel to replace the Industrial Agents – a distraction and expense that would compound the potential loss of sales experienced without the services provided by the Industrial Agents.  Based on the credit terms provided by the various Industrial Agencies, the Debtor estimates that as of the Petition Date, approximately $1,223,000 is accrued and unpaid on account of the services provided by the Industrial Agents (i.e., $8,150 on average for each Industrial Agent) through their respective Industrial Agencies.  The Debtor requests authority, but not direction, to pay Industrial Agencies for outstanding prepetition amounts during the Interim Period, provided that such payments will not result in a single Industrial Agent receiving a payment above $12,475 during such period.

      53.    **Commissions.**  In the ordinary course of business, the Debtor pays various commissions to certain Employees to motivate them to develop and foster customer relationships, which are crucial to the continued success of the Debtor's business.  The commissions represent a percentage of the value of sales made by an Employee and are paid on a quarterly basis, with the next payment coming due no earlier than August 15, 2013 and, for Canadian Employees, coming due on August 23, 2013.

54.    Based on the historical commissions earned for the first quarter of the past three years, the Debtor estimates that the commissions due for the first quarter of 2013 will be approximately $275,000, with $180,000 accrued but unpaid prior to the Petition Date. Commissions are an important component of an Employee's overall compensation and provide substantial value to the Debtor's estate because they encourage Employees to achieve important performance and sales targets.  Additionally, although commission amounts vary widely, the commissions make up a substantial percentage of their overall compensation and, indeed, are essential to their livelihood.  At present, payments of the commissions to Employees are not currently due, and payments of the commissions for Canadian Employees are due on August 23, 2013.  For these reasons, the Debtor seeks authorization, but not direction, to pay commissions for eligible Employees and Canadian Employees pursuant to the final order in accordance with prepetition procedures.

55.    **Vacation Time.**  In addition to salaries, wages, commissions, and bonuses, the Debtor provides the eligible Employees with vacation time and paid time off.  Generally, length of employment determines the amount of the Vacation Time available to each eligible Employee.  Specifically, all full-time salaried Employees and full-time non-union hourly Employees are entitled to: (a) one week of vacation after at least six months, but less than one year of service; (b) two weeks of vacation after one year of service; (c) three weeks of vacation after eight years of service; and (d) four weeks of vacation after fifteen years of service.  Other hourly Employees are provided with vacation pay based on local practices and/or the applicable CBA.  Although the Debtor's Vacation Time policy permits certain Employees to carry-over unused vacation days, as of the Petition Date, no Employee (except possibly Employees in California where there is a statutory ban on "lost" vacation) has Vacation Time that was carried

over from last year.  Salaried Employees are only permitted vacation pay in lieu of taking

vacation for reason of termination, layoff, resignation, death, retirement, long-term disability, or

extreme circumstances.  In addition, some Employees are compensated for unused Vacation

Time at year end and earned-to-date Vacation Time upon termination.

56.    The Debtor anticipates that the Employees will continue to use any

accrued Vacation Time in the ordinary course of business, without resulting in any material cash

flow requirements beyond the Debtor's normal payroll obligations.

57.    **Severance.**  I understand that, in the ordinary course of its business, the

Debtor maintained severance policies available to Employees upon termination.  Currently, there

are approximately 78 former Employees, including 21 former Union Employees, who are

receiving payments due under the Severance Obligations.  The approximate aggregate amount of

such severance benefits is $446,834.  The Debtor believes that honoring the Severance

Obligations owed to the former Employees up to the priority cap who have already been

terminated prior to the Petition Date will minimize disruptions to Exide and smooth its transition

into bankruptcy.

58.    **Additional Non-Insider Compensation Programs.**  In the ordinary

course of business, the Debtor offers various additional programs to its non-insider Employees,

including some Union Employees under their relevant CBAs, outside of weekly or bi-weekly

payroll.  Each of the Non-Insider Compensation Programs are consistent with industry practices

and use a variety of benchmarks to determine the various non-insider participants' eligibility for

payments from, among others, performance, safety, sales volume, loyalty, lead core collection

volumes, and financial metrics.  Under the plans described below, approximately 2,325 of the

Employees are eligible or qualified to receive payment.  I understand that these programs are an

important component of an Employee's overall compensation and provide substantial value to the Debtor's estate because they encourage Employees to achieve certain performance targets. As of the Petition Date, approximately $1,634,000 is owed in the aggregate on account of the Non-Insider Compensation Programs.  The Debtor's Non-Insider Compensation Programs are described more fully below.

      (a)    **Bristol Incentive Plan.**  The Debtor is currently winding down its operations in Bristol, Tennessee  and intends to close the Bristol Plant by July 2013.  The efficient and timely closure of the Bristol Plant is crucial to the Debtor's continued operations. To ensure that the 130 remaining Employees responsible for the wind-down of the Bristol Plant complete their work on schedule and service the final customer orders at the Bristol Plant in a timely fashion, the Debtor has offered an incentive payment to be paid to the Bristol Employees upon the completion of their work at the Bristol Plant.  To receive such payment, the Bristol Employees must remain at the Bristol Plant for the required wind-down period.  The aggregate amount due under this incentive program, which requires the relevant Employees to meet certain environmental, health, safety, production, quality, shipments, and customer review targets, is $1,084,000, with such payments coming due between July 15, 2013 through July 31, 2013. Given the importance of the timely closure of the Bristol Plant to the Debtor's overall operations, It is beneficial to the estate and overall value to make these payments when and if they come due.

      (b)    **Branch Core Incentive Plan.**  The Debtor offers an incentive plan to certain of its branch Employees based on the volume of pounds of lead cores collected. Eligible personnel include branch managers, sales representatives, service managers, service supervisors, service technicians, and servicers.  The plan year runs from April 1, 2012 to March

31, 2013. The Debtor estimates that approximately 43 Employees have satisfied the criteria for payment eligibility under this plan for a total aggregate payment of $36,400 due on July 15, 2013.

(c)    **Motive Power Service Manager Incentive Program.**  The Debtor offers an incentive plan to five eligible Motive Power service managers based on profitability and branch service metrics.  The amount of the incentive payment is determined by the prior year's performance.  The Debtor estimates that, based on the April 1, 2012 to March 31, 2013 incentive period, approximately $2,000 is due under this incentive program on July 15, 2013 to one eligible Employee.

(d)    **Motive Power Branch Manager Incentive Program.**  The Debtor offers an incentive program to eligible Motive Power branch managers based on their personal goals, as well as branch profitability, and gross margin targets.  The Debtor estimates that, based on the April 1, 2012 to March 31, 2013 incentive period, four Employees have satisfied these metrics and have qualified for payment of approximately $77,500 due under this incentive program on July 15, 2013.

(e)    **Industrial Energy Americas Sales Incentive Program.**  In addition, the Debtor offers an incentive plan based on profitability targets and personal sales revenue quotas and gross margin percentage targets.  The Debtor estimates that, based on the April 1, 2012 to March 31, 2013 incentive period, thirteen Employees have satisfied these metrics, and qualify for payment of $201,200 due under this incentive program on July 15, 2013.

(f)    **Plant Level Incentive Programs.**  At certain of its plants, the Debtor offers various incentive programs that are based on achieving perfect attendance, remaining loyal to Exide, meeting various individual productivity and/or plant-wide safety or productivity metrics, or referring employees to Exide.  Depending on the applicable program,

payments are made on a weekly, quarterly, monthly or annual basis, except for the longevity

incentive program at the Vernon, California plant which increases hourly pay by $0.10 for

Employees with 10 to 19 years of service and by $0.20 for Employees with 20 or more years of

service.  Under these plans, approximately 1,700 Employees, of which 540 are Union Employees,

are eligible to receive payment, depending on various benchmarks related to, among other things,

performance, safety, and financial metrics.  As of the Petition Date, approximately $54,000 is

owed on account of the plant level incentive programs.

       (g)    **Quarterly Sales Incentive Plans.**  The Debtor offers various sales

incentive plans that are paid on a quarterly basis and apply to 250 of its Employees.  Employees

qualify under these plans by meeting certain targets that apply to sales volume and revenue,

gross margin, working capital, and accounts receivable turnover.  Some incentive plans also

depend on the Employees' branch locations or territories.  At three of the Debtor's locations

where battery cores are collected, one additional metric is the volume of such collections.  Based

on the metrics satisfied in April 2013, the Debtor estimates that $480,000 is due under these

incentive programs to approximately 250 eligible Employees on August 15, 2013.

       (h)    **Union Compensation Programs.**  There are several incentive

programs included within the CBAs.  One such program is the Fort Smith Loyalty Program,

which is designed to promote loyalty among the Union Employees located at the plant in Fort

Smith, Arkansas.  The Debtor believes that 190 Union Employees have qualified for this

incentive program, which will cost approximately $178,500 due in the Interim Period.  By this

Motion, the Debtor seeks to continue to honor its obligations, in the ordinary course of business

and consistent with its past practice, relating to its various Union Compensation Programs.

59.     **Employee Benefits.**  In the Employee Wages Motion, the Debtor additionally seeks authority, but not direction, to (i) make prepetition contributions and pay any prepetition amounts associated with certain employee benefits and (ii) continue its ordinary course employee benefit plans and programs during the postpetition reorganization process in the ordinary course in accordance with prepetition practices.  Based on its current Workforce, Debtor estimates the cost of such benefit maintenance to be approximately $24,873,000 annually. In the ordinary course of business, the Debtor maintains various customary plans and policies to provide the Employees with the Health Benefits, the Employee Insurance Benefits, the Other Employee Benefits, and the Retirement Benefits (each as defined herein), in addition to the costs associated thereto.

60.     In addition, the Debtor seeks authority, but not direction, to honor Employee Benefits for certain former Employees for a limited duration, commensurate with their prepetition expectations.  The Debtor estimates the cost of maintaining these benefits for these former Employees will cost the estate $270,700 and is a relatively modest expenditure to provide these former employees with the assurance that they have benefits coverage consistent with their prepetition expectations having suffered a loss in employment.  The Debtor believes that, in its sound business judgment, this proposed expenditure of estate assets reinforces its strong commitment to its Employee base and will buoy overall morale, which is critical as Exide enters into a chapter 11 case in which it will be seeking to execute an operational turnaround.

61.     **The Health Benefits.**  I understand that an important element of the Employee Benefits is the medical, dental, vision, and prescription drug insurance, which the Debtor provides for all its current Employees and certain former Employees primarily through a

variety of self-insured and premium-based insurance plans.[30]   Current salaried and non-union

hourly Employees pay approximately 26% of the total contributions to the Health Plans.  The

Debtor pays the remaining amount.  Contribution sharing ratios for the Union Employees are

dictated by each individual CBA, and vary slightly depending on the particular CBA.  The

Debtor estimates that as of the Petition Date, there was approximately $695,000 outstanding on

account of the Health Plans for approximately 2,900 current and former Employees.

(a)    **Self-Insured Health Plans.**  Under the Self-Insured Health Plans

(including medical, dental, and prescription drugs for certain Employees), an Employee submits

claims to a claims administrator, which then notifies the Debtor of the claims.  Upon receipt of a

wire transfer of funds from the Debtor, the administrator pays the health provider for the services

rendered to the Employee.[31]   There is typically a one to three month gap between when the

Employee receives the medical care and submits the claim, and there is also a lag time in the

Pipeline Self-Insured Claims.  The Debtor's average monthly cost for maintaining its Self-

Insured Health Plans is approximately $3,200,000, which includes costs of administration and

satisfaction of Pipeline Self-Insured Claims.  Based on the historical realization of claims for

---

[30]   The Debtor also offers the Vision Service Plan (the "VSP"). The VSP is an insured component that is added
onto the Debtor's Health Plan. It has a fixed price per Employee, which is funded by the Employees.

[31]   Pursuant to the requirements of the Consolidated Omnibus Budget Reconciliation Act of 1986, the Debtor
provides temporary continuation of healthcare benefits at group rates to former Employees, including former
Union Employees, and eligible dependents.  Because the Debtor's Health Plans are self-insured, the Debtor is
responsible for payment of amounts over the premiums paid by the former Employees.  In order to comply with
COBRA requirements, the Debtor requests that former Employees, and former Union Employees, and eligible
dependents retain the right to coverage under the Debtor's Health Plans in accordance with the requirements of
the terms of COBRA and request authorization to pay any obligations arising under such plans, regardless of
when such obligations accrued.  Based on the amount of COBRA Payments the Debtor has made from May 1,
2012 to April 1, 2013, the Debtor's average monthly COBRA Payments total approximately $48,000 for former
non-Union Employees and $30,000 for former Union Employees and their eligible dependents, for an aggregate
average monthly amount of $78,000.  Within that same timeframe, eligible former Employees contributed an
average monthly amount of $6,700 and former Union Employees contributed an average monthly amount of
$4,300 to continue these healthcare benefits.

medical care under the Self-Insured Health Plans during the processing period, the Debtor

estimates that, as of the Petition Date, the Pipeline Self-Insured Claims aggregate to

approximately $5,030,000.[32]

        (b)    **HRA and Wellness Plan.**  The Debtor offers salaried and non-

union, hourly Employees a health plan that includes a health reimbursement account.  Upon

enrolling in the HRA and Wellness Plan, each Employee's HRA account is credited in the

amount of $150.  Upon completing certain wellness activities, the eligible Employees can

receive additional incentives up to $350.  The Debtor contracts with a wellness provider who

administers a Wellness Plan and tracks completion of wellness activities by participants.  Upon

completion of an activity, the wellness provider sends the incentive amount to the claims

administrator.  The participant submits health-related claims to the claims administrator, and the

claims administrator notifies the Debtor of Employee claims.  Upon receiving a wire transfer of

funds from the Debtor, the claims administrator reimburses the Employee for the claimed

amount.  There is a lag time in processing claims and there is also usually a gap between when

the Employee incurs reimbursable expenses and submits a claim to the claims administrator.

The estimated annual cost to the Debtor for offering the HRA and Wellness Plan, including the

---

[32]    The Debtor also provides medical, dental, and prescription drug benefits to certain of its retired salaried employees. The Debtor is self-insured for the Retired Salaried Health Benefits.  The Debtor pays approximately $220,280 in annual claims for former salaried employees covered by these plans.  This plan is closed to new entrants.  The amounts owed for the Retired Salaried Health Benefits, as of the Petition Date, are included in the Pipeline Self-Insured Claims.  The Debtor also provides medical and prescription drug benefits to certain of its retired hourly employees. These benefits are provided as a result of United Auto Workers' contract negotiations related to its CBA.  There are no active hourly Employees covered by these agreements.  The amounts owed for the Retired Hourly Health Benefits, as of the Petition Date, are included in the Pipeline Self-Insured Claims discussed above.  At this time, the Debtor, subject to the requirements of Bankruptcy Code section 1114, proposes to honor any such benefits.

employee assistance plan, is $670,000.  As of the Petition Date, the Debtor estimates that the

HRA and Wellness Plan expenses outstanding are $56,000.[33]

62.    As with the Unpaid Compensation, the Employees and their families rely

on the Debtor to provide continuing health care.  Accordingly, by the Employee Wages Motion,

the Debtor seeks the authority, but not the direction, to continue the Health Plans, including the

Self-Insured Health Plans, the Pipeline Self-Insured Claims, the HRA and Wellness Plan, the

VSP, and the Union Health Plans, and to pay any premiums and claim amounts relating to the

Health Benefits to the extent they remain unpaid on the Petition Date.

63.    **Employee Insurance Benefits.**  The Debtor additionally seek to continue

certain insurance benefits it offers its Employees and Canadian Employees and to pay premium

amounts and claim amounts relating to these benefits to the extent they remain unpaid on the

Petition Date.  Specifically, the Debtor offers Life Insurance, AD&D, the Business Travel

Insurance, the International SOS Insurance, the Short-Term Disability Benefits, the Long-Term

Disability Benefits, and the Other Insurance Programs and certain Canadian Employee Insurance

Benefits (each defined herein below).

(a)    **Life Insurance and AD&D.**  The Debtor provides Employees

premium-based group term life insurance and accidental death and dismemberment insurance.

Salaried Employees receive coverage equal to one and one-half times current base salary.

Hourly Employees receive the greater of one times current base salary or a fixed level of

coverage based on the employee group.  Coverage levels for the Union Employees covered by

---

[33]    The Debtor also purchases health benefits for some of the Union Employees covered by United Steelworkers
and International Brotherhood of the Teamsters negotiated contracts. The Union Health Plans are held by the
unions, and the Debtor is required to pay a premium. The average monthly cost of these health benefits is
approximately $103,000. The Debtor typically pays the monthly premiums in the middle of the month they are
due.  As of the Petition Date, the Debtor does not owe any premiums for the Union Health Plans.

bargaining groups are dictated by the applicable CBA.  Additional coverage is available to the
Employees at their own cost.  On average, the Debtor pays approximately $33,200 per month for
Life Insurance coverage and $2,700 per month for AD&D for all the Employees.  As of the
Petition Date, the Debtor estimates that approximately $35,000 is owed for Life Insurance and
AD&D premiums.[34]

        (b)     **Short-Term and Long-Term Disability Benefits.**  The Debtor
also provides the Employees with short- and long-term disability benefits.  Short-Term Disability
Benefits are initially paid by a third-party administrator, and then are subsequently funded by the
Debtor.  Benefits for salaried Employees vary depending on years of service.  The benefit for
hourly Employees varies.  It may be a fixed weekly benefit or a percentage of pay.  As of the
Petition Date, the Debtor does not owe any amount for overhead to administer the Short-Term
Disability Benefits and there are approximately $110,000 of outstanding claims.[35]  Moreover, the
Union Employees at the Canon Hollow location are eligible for Long-Term Disability Benefits.
The Debtor pays 100% of the premium for Long-Term Disability Benefits for the Union
Employees at Canon Hollow.  The Debtor's portion of the premium for the Union Employees at
Canon Hollow is approximately $635 per month.  As of the Petition Date, the Debtor estimates

---

[34]    The Debtor also provides certain Employees with business travel accident insurance with a death benefit
ranging from $25,000 to $1,000,000 per person.  The Business Travel Insurance was renewed on January 1,
2013.  The Debtor pays approximately $6,800 annually for the Business Travel Insurance for all Employees.
The Debtor provides executives with international SOS insurance to provide emergency medical and evacuation
services when traveling abroad.  The Debtor pays approximately $24,000 annually in premiums, which are next
due on July 1, 2013.  As premiums are paid in advance, as of the Petition Date, the Debtor does not owe any
amounts for premiums for the International SOS Insurance.

[35]    In addition, the Employees are eligible for Long-Term Disability Benefits after 26 weeks of short term
disability and receive approximately 60% income replacement. One hundred percent of the premium for all
salaried and non-union hourly Employees is funded by the Employees through payroll deduction.

that the amount owed for the Cannon Hollow Long-Term Disability premium is approximately $635.[36]

64.     Canadian Employees are also eligible for certain Health Benefits.  The Canadian Employees have life insurance, accidental death and dismemberment, long-term disability, short-term disability, paramedical, medical and out-of-country care, vision, prescription drug, and dental coverage.  These Health Benefits, with the exception of long-term disability coverage, are wholly paid for by the Debtor, for the monthly amount of $9,200.

65.     **The Other Employee Benefits.**

(a)     **Flexible Spending Accounts.**  The Debtor offers Employees the opportunity to use tax-advantaged flexible spending accounts to use pre-tax dollars toward the payment of medical or dependent care expenses.  The Debtor deducts Employee contributions from the participant's earnings and holds the contributions in an account.  The participant submits claims to the claims administrator, and the claims administrator notifies the Debtor of the Employee claims.  Upon receiving a wire transfer of funds from the Debtor, the claims administrator reimburses the Employee for the claimed amount.  This program is sponsored by the Debtor, but also covers non-Debtor employees.  As of the Petition Date, approximately $570,000 is outstanding on account of the FSA.

(b)     **The Employee Vehicle Benefit Program.**  The Debtor maintains, in the ordinary course of business, a car lease program for certain Eligible Employees in the Debtor's sales force.  The Debtor pays approximately $127,000 per month to Enterprise on account of the Employee Vehicle Benefit Program.  As of the Petition Date, I believe that the

---

[36]  Moreover, the Debtor offers Employees the ability to purchase supplemental life insurance for the Employees and their dependents, legal services insurance, and property/casualty insurance (the "Other Insurance Programs").  The Other Insurance Programs are fully funded by the Employees through payroll deduction.

Debtor does not owe any accrued and unpaid amount on account of the Employee Vehicle Benefit Program.

(c)    **Employee Education Program.**  The Debtor offers the Employees educational benefits, including a scholarship program and a tuition reimbursement program . The Employee Education Programs are offered on a case-by-case basis to certain of the Debtor's Employees at no cost to the Employee.  As of the Petition Date, the Debtor owes approximately $57,000 for the Employee Education Programs.

66.    **Retirement Benefits.**

(a)    **Pension Plan.**  The Debtor sponsors one defined benefit pension plan, covering virtually all of the Debtor's active and former Employees, active and former Canadian Employees, former employees of Gould National Battery, which was purchased by Exide in 2000, and hourly Union Employees covered by certain CBAs.  The Pension Plan is closed to new entrants, and benefits under the Pension Plan are frozen for all participants.  The majority of administration and actuarial fees are paid from the pension trust.  As of the Petition Date, the Debtor owes $10,500 for administrative and actuarial fees in connection with the Pension Plan.[37]

(b)    **401(k) Plan.**  The Debtor additionally offers its current Employees the opportunity to participate in a 401(k) savings plan.  The Employees may contribute up to 50% of base pay.[38]  For certain Union Employee participants, the Debtor provides matching

---

[37]    Under the Employee Retirement Income Security Act of 1974, the Debtor is scheduled to make its next minimum funding contribution in connection with the Pension Plan in September 2013 in the amount of $320,000.

[38]    Prior to the Petition Date, the Debtor provides a 3% safe harbor contribution to all salaried and non-union hourly Employees and a 50% matching contribution on the first 6% of salary deferrals for salaried Employees. These safe harbor and matching contributions were suspended as of June 1, 2013.

contributions, as dictated by the Union Employees' CBAs.[39]  Administration and investment fees

for the union hourly 401(k) Plan are paid by the Debtor.[40]  Other than $5,000 in administrative

fees, the Debtor does not believe it owes any prepetition amounts related to the 401(k) Plan.

       67.     I believe that performing its obligations under the above-described

Employee Benefits is important for preserving the value of the Debtor's estate.  I understand that

any disruption in the benefits under such programs will call into question the Debtor's

commitment to its Employees, who are essential to continuing the operations of the Debtor.

       68.     **The Employee Withholdings.**  In connection with paying the Unpaid

Compensation and the Employee Benefit Obligations, the Debtor routinely deducts and/or

withholds from the Employee's paychecks amounts that the Debtor is required to transmit to

third parties, such as payroll taxes related to federal, state, and local income taxes, FICA, Social

Security, and Medicare taxes for remittance to the appropriate federal, state, or local taxing

authority; and employee contributions for health benefits and health care and dependent care

spending accounts.  The Debtor then forwards amounts equal to the Employee Withholdings

from general operating accounts to appropriate third-party recipients.  As of the Petition Date,

the Debtor does not owe any amounts for unremitted Employee Withholdings, including payroll-

related taxes and other withheld amounts.  These funds were deducted from Employee earnings,

but due to the commencement of the Chapter 11 Case, may not have been forwarded to the

---

[39]    The match for the Union Employees is contributed once a year, after the end of the plan year, which is
December 31.  It is estimated that the matching contribution for union-hourly participants for the plan year
ending December 31, 2013 will be approximately $17,300.

[40]    In addition, as of the Petition Date, I believe that the Debtor owes approximately $7,200 for calendar year 2013
hourly Employee match accrual. This amount, however, will not be funded until calendar year 2014.

appropriate third-party recipients.  Such withheld funds, to the extent they remain in the Debtor's possession, constitute moneys held in trust and therefore are not property of the Debtor's estate.

69.    **Employee Expense Obligations.** Prior to the Petition Date, and in the ordinary course of its business, the Debtor routinely reimbursed the Employees for certain approved, reasonable Employee Expense Obligations incurred in the scope of their employment, including expenses for travel, lodging, professional seminars and conventions, ground transportation, meals, supplies, miscellaneous business expenses, and relocation expenses. Currently, the Debtor has 555 Employees with corporate American Express credit cards issued in their personal names but used to charge business expenses.  Accordingly, all the Employee Expense Obligations were incurred with the understanding that they would be reimbursed by the Debtor.  Thus, I believe that the Debtor's ability to pay the Employee Expense Obligations has a significant effect, in particular, on the Debtor's sales force, which is on the road incurring expenses in the course of doing work to benefit the Debtor's business.

70.    There is a lag time between the time expenses are incurred and the time an expenses is processed and reimbursed.  Consequently, it is difficult to determine with precision the actual amount of incurred but not reported reimbursable expenses as of any particular time. Typically, however, the average aggregate monthly amount expended by the Debtor for aggregate Employee Expense Obligations is approximately $550,000 to $600,000.

71.    I believe that it would be inequitable to require the Employees to personally bear any approved business-related expenses they incurred in furtherance of their responsibilities to the Debtor.  Accordingly, to avoid harm to the Employees, the Debtor seeks to be authorized, but not required, to pay the prepetition Employee Expense Obligations and

continue such policies, including the Relocation Assistance Program, on a post-petition basis, in accordance with prepetition practice, in the ordinary course of business.

72.     For the reasons set forth above, I believe that the relief requested in the Employee Wages Motion is in the best interests of the Debtor's estate and will enable the Debtor to continue to operate its business in chapter 11 without disruption so as to avoid immediate and irreparable harm to the Debtor's estate.

73.     **Customer Programs Motion**.  Prior to the Petition Date, and in the ordinary course of its business, the Debtor engaged in certain practices to develop and sustain a positive reputation in the marketplace for its goods and services.  Such practices include, but are not limited to, rebates, warranties, a program pursuant to which the Debtor periodically exchanges certain batteries that customers have purchased but not used, and programs pursuant to which customers are issued credits in various circumstances.  The common goals of the Customer Programs have been to meet competitive pressures, ensure customer satisfaction, and generate goodwill for the Debtor, thereby retaining current customers, attracting new ones, and ultimately enhancing net revenue.  The Customer Programs also generally represent present practices that are common in the Debtor's industry.

74.     By the Customer Programs Motion, the Debtor is requesting entry of an order (i) authorizing but not directing the Debtor to honor certain prepetition obligations to customers and to otherwise continue customer programs and practices in the ordinary course of business, and (ii) directing financial institutions to honor all related checks and electronic payment requests authorized pursuant to the Motion provided that sufficient funds are available in the applicable accounts to make the payments.  The following are general descriptions of the Debtor's principal Customer Programs.

75.    **Industrial Customer Rebate Program**.  The Debtor provides rebates to customers who purchase products designed for material handling applications from the Debtor's industrial business.  Rebates under the Industrial Customer Rebate Program are tied to the number of purchases made by customers as well as purchases of certain products.  In this way, customers are encouraged to purchase more goods from the Debtor to obtain a greater rebate, which results in larger net revenue for the Debtor.

76.    From an accounting perspective, in the ordinary course of business, the Debtor accrues liability with respect to the Industrial Customer Rebate Program as customers reach sales targets that would entitle them to rebates.  As of the Petition Date, the Debtor's estimated balance for obligations related to the Industrial Customer Rebate Program was approximately $733,870.

77.    **Industrial Warranty Program**.  Pursuant to the Debtor's prepetition customer practices, the Debtor's industrial business provided limited warranties, based on product and application, in respect of the Debtor's products for periods extending up to twenty (20) years (on a pro-rata basis)[41] from the date of a customer purchase of a particular product. As a general matter, such warranties protect against manufacturing defects in workmanship and materials contained in the products.

78.    Generally, the benefit of the warranty is limited to the original purchasing customer.  If a party submits a claim the Debtor may, at its option, either repair or replace the defective product, credit the customer based upon an approved claim, or, in some circumstances, refund the purchase price.  In most circumstances, honoring warranty claims involves non-cash

---

[41]    Generally, a 20 year warranty provides one year full warranty and 19 years pro-rata warranty. This type of warranty acknowledges that a portion of the useful life of the battery is lost as the battery ages. Depending on the age of the battery at the time a warranty claim is made, the useful life of the battery is determined based upon predetermined schedules and the customer is given partial credit for any warranty-based claim.

items such as repairing or replacing the defective goods. The benefits of each Industrial

Warranty Program is specific to that customer based upon its agreement with the Debtor.

79.      From an accounting perspective, in the ordinary course of business, the

Debtor accrues liability based on management's estimate of the amount that will eventually be

required to settle or discharge such warranty obligations.  As of the Petition Date, the Debtor's

estimated balance for the up to twenty year obligations related to the Industrial Warranty

Program was approximately $8.54 million.  Of that amount, the Debtor expects to incur only

approximately $3.38 million over the next year.

80.      **Transportation Customer Rebate Programs**.  The Debtor's

transportation business offers rebate programs to its customers.  These programs are related to

the Debtor's customer commitments for advertising and promotional funding, marketing support,

co-op advertising and volume incentives.  Rebates are calculated from the sale price paid by the

customer and are accrued on a monthly basis.  The amounts earned by the customers are paid in

the form of a check or credit memorandum on the customer's account.

81.      From an accounting perspective, in the ordinary course of business, the

Debtor accrues liability with respect to the Transportation Customer Rebate Program as

customers reach sales targets that would entitle them to rebates.  As of the Petition Date, the

Debtor's estimated balance for obligations related to the Transportation Customer Rebate

Programs was $7.41 million.

82.      **Transportation Warranty Program**.  Pursuant to the Debtor's

prepetition customer practices, the Debtor's transportation business provides limited product

warranties for periods extending up to four (4) years from the date of a customer purchase of a

particular product.  Such warranties protect against manufacturing defects in workmanship and materials contained in the products.

83.     Although the benefits of each warranty are specific to each customer based upon the customer's agreements with the Debtor, the Debtor's prepetition liability on account of the Transportation Warranty Program generally arises in one of three ways.  First, the Debtor has provided warranties with respect to Exide-branded batteries.  The benefit of the warranty for such products is generally limited to the original purchasing customer.  If such a customer submits a warranty claim, the Debtor may exchange the product, credit the customer based on the approved claim or, in some circumstances, refund all or a portion of the purchase price.[42]  In most circumstances, honoring these warranty claims involves non-cash items such as repairing or replacing the allegedly defective goods.

84.     Second, with respect to batteries sold to certain OEMs the Debtor provides warranties pursuant to which it agreed to compensate an OEM for a pre-specified percentage of the OEM's own battery-related warranty liability on an annual or quarterly basis.  The percentage of the OEM's liability which is covered is determined with each OEM periodically based on the performance of the Debtor's products.

85.     Third, some customers choose to receive discounts on their purchases in lieu of receiving a warranty.  These discounts take the form of either purchase price reductions off of the amount invoiced (in which case the Debtor does not believe that it has any prepetition liability) or are issued as credits at the end of each month.

---

[42]    Although the Debtor currently issues warranties that cover up to a four-year period and provide for the replacement of a defective product or a credit/refund for the full cost of the product, the Debtor also has some residual liability for older warranties that cover a longer period of time and provide for pro rata warranties after a specified amount of time.

86.    From an accounting perspective, in the ordinary course of business, the Debtor accrues liability based on management's estimate of the amount that will eventually be required to settle or discharge such warranty obligations.  As of the Petition Date, the Debtor's estimated balance for obligations related to the Transportation Warranty Program was approximately $8.87 million.  Many of the Debtor's obligations will be satisfied, however, by providing customers with replacement batteries, rather than by making cash distributions to customers.   Furthermore, the Debtor only expects to incur over the next year approximately $2.22 million (including non-cash expenditures).

87.    **Transportation Rotation Program**.  The Debtor's transportation business has agreed to periodically exchange batteries that customers have purchased but not resold within set time limits.  Under the Transportation Rotation Program, the Debtor will periodically replace customers' unsold batteries with newly formed batteries.  Many of the batteries that the Debtor receives in exchange can then be sold by the Debtor as either a first quality battery or a second quality battery, depending upon the battery's production date.  Rotated batteries that are recharged bear a sticker showing the date of recharge, and rotated batteries sold as second quality are clearly identified as such.

88.    Programs such as the Transportation Rotation Program are customary within the industry and an integral part of the Debtor's business strategy and bases for customer confidences.  If the Debtor is not allowed to honor its obligations under the Transportation Rotation Program, the Debtor will not stand on equal footing with its competitors, which can offer customers the benefit or similar programs.  In particular, absent the Transportation Rotation Program customers may conclude that purchasing from the Debtor is more risky than purchasing from a competitor that is willing to swap batteries that have lost their charge.  In addition, as

described above, the batteries that the Debtor receives in connection with the Transportation

Rotation Program are valuable to the Debtor, with the vast majority being able to be resold in the

ordinary course of business.

89.    **Prepetition Credits**.  Pursuant to the Debtor's prepetition customer

practices, the Debtor acquires from customers spent batteries, which the Debtor then recycles.

Customers that provide the Debtor with spent batteries pursuant to the Battery Recycling

Program are issued a credit on account of the batteries, which can be applied against future

purchases of the Debtor's products.  A minority of customers that maintain a consistent credit

balance are also paid by the Debtor, rather than simply being issued a credit.  In addition to

assisting customers with the disposal of their batteries, the Battery Recycling Program benefits

the Debtor because the debtor can use its smelters to recycle the batteries, providing the Debtor

with lead, the Debtor's principal raw material.  As of the Petition Date many customers had

outstanding credits on account of the batteries which they provided the Debtor with before the

Petition Date.

90.    Maintaining the Battery Recycling Program, including its crediting

component, is particularly important to maintaining the relationship between the Debtor and its

customers.  If the Debtor does not honor the credits that were issued with respect to the spent

batteries that the Debtor acquired prepetition, the customers that provided those batteries may

well opt to not only stop buying the Debtor's products, depriving the Debtor of revenue, but will

also to stop providing the Debtor with spent batteries, which would increase the cost of the

Debtor's operations.  This is so because it is less expensive for the Debtor to obtain lead by

recycling the spent batteries that the Debtor acquires in connection with the Battery Recycling

Program than it is to purchase lead on the open market.  Accordingly, to the extent that

customers no longer provide the Debtor with spent batteries, the Debtor will either have to purchase spent batteries on the open market (likely at a higher price than what the Debtor currently pays customers) or purchase lead on the open market.  In either event, the cost of the Debtor's operations would increase, decreasing the profitability of the Debtor's business and reducing the value available for the Debtor's creditors, stakeholders and other parties in interest.

91.     The Debtor also provides customers of both the transportation and the industrial business with credits in the ordinary course of business for a variety of reasons, including shipments that arrived with less than the number of batteries ordered, products returned by customers, and products which customers claimed were damaged being delivered to customers.

92.     As of the Petition Date, the Debtor estimates that the aggregate amount of unused prepetition credits that the Debtor had issued with respect to the Battery Recycling Program and the Miscellaneous Customer Credit Programs were approximately $6.24 million and $879,280, respectively.  Many of the customers that have been issued prepetition credits, however, also purchased goods from the Debtor before the Petition Date for which the Debtor has not yet received payment.  Accordingly, such customers may be able to offset the credits that they have been issued against their debts to the Debtor.  In fact, in many cases the amount of the credits issued before the Petition Date to a particular customer is smaller than the customer's prepetition debt to the Debtor.  Of those customers whose unused credits exceeds the amount that they owed the Debtor before the Petition Date, the aggregate amount by which the credits exceed the prepetition debts to the Debtor is approximately $1.59 million.

93.     There are several reasons why the Debtor believes that having the discretion to honor the Customer Programs, including prepetition obligations related thereto, will

benefit the Debtor's estate.  To begin with, the Customer Programs generally represent present practices that are common in the Debtor's industry.  If the Debtor cannot continue the Customer Programs it will be at a disadvantage in a competitive marketplace.  If the Debtor does not have the discretion to honor products' warranties, for example, the Debtor would not stand on equal footing with its competitors.  Second, if the Debtor is not allowed to honor rebates, warranties, and credits related to the prepetition period, the Debtor's customers would lose confidence in the Debtor and its products.  This could result in the alienation of a proven customer base as customers begin purchasing from the Debtor's competitors.  This is a particular risk with respect to programs such as rebates which are designed to promote customer loyalty and increase the Debtor's sales.  In fact, the Debtor believes that the costs of honoring the Customer Programs and the prepetition obligations related thereto will be more than offset by the revenue from sales made because the Customer Programs are in place.

94.     I believe that that the relief requested in the Customer Programs Motion is necessary and will enable the Debtor to capitalize on the goodwill that was built with consumers prior to the bankruptcy filing, and will help ensure that the Debtor has the broad customer base needed to drive the case through the reorganization process and beyond.  For these and other reasons set forth in the Customer Programs Motion, I submit that an order granting such relief is in the best interest of the Debtor, its estate, its creditors, and other parties in interest.

95.     **Taxes Motion**.  The Debtor, in the ordinary course of its business, incurs certain taxes, fees, and related obligations that the Debtor is obligated to pay or remit to various federal, state, county, and city taxing and licensing authorities.

96.     By the Taxes Motion, the Debtor is requesting entry of an order (i) authorizing, but not directing, the Debtor to remit and pay Taxes that the Debtor, in its

discretion, deems necessary to Taxing Authorities and (ii) directing financial institutions to honor all checks and electronic payment requests authorized pursuant to the Motion provided that sufficient funds are available in the applicable accounts to make the payments.

97.    The Debtor, in the ordinary course of its businesses, incurs various tax liabilities and has generally paid such tax liabilities as they became due.  As of the Petition Date, the Debtor was substantially current in the payment of assessed and undisputed Taxes; however, certain Taxes attributable to the prepetition period were not yet due.  Specifically, in the aggregate, the Debtor estimates that approximately $5.68 million in prepetition Taxes will become due and payable following the Petition Date.  The vast majority of prepetition Taxes that will become due and payable are current taxes, and not attributable to prior taxable years.

98.    The Debtor is subject to a number of Taxes, including, without limitation:

(i)    Sales and Use Taxes. In the normal course of its business, sales taxes accrue as the Debtor sells tangible goods or collects revenues for services, and are calculated on the basis of statutorily mandated percentages of the price at which the Debtor's products are sold and/or services are performed.  The Debtor also incurs and collects use taxes.  The Debtor estimates the prepetition liability for Sales and Use Taxes to be approximately $1.14 million. In addition, the Debtor expects, on average, to pay up to approximately $676,500 per month for pre- and postpetition Sales and Use Taxes during the pendency of the Chapter 11 Case.

(ii)    Franchise Taxes.  The Debtor must pay franchise taxes to certain of the Taxing Authorities so that the Debtor can operate its businesses in the applicable taxing jurisdiction.  Some states assess a flat Franchise Tax on all businesses and other states assess a Franchise Tax based upon some measure of income, gross receipts, net worth or other measure of value.  The Franchise Taxes are typically paid annually to the applicable Taxing Authorities.  The Debtor estimates the prepetition liability for Franchise Taxes to be approximately $253,000.  In addition, the Debtor expects to pay approximately $786,910 per year for pre- and postpetition Franchise Taxes during the pendency of the Chapter 11 Case.

(iii)    Property Taxes.  Various state and local governments in jurisdictions where the Debtor's operations are located have the

authority to levy property taxes against the Debtor's leased and
owned real and personal property.  The leased and owned real
personal property that the Debtor pays Property Taxes on includes
80 locations, including 13 manufacturing facilities.  The Debtor
typically pays Property Taxes annually or bi-annually depending on
how the relevant tax is assessed.  Many Property Taxes accrue,
however, in January of each year, but are not paid until the second
half of the year, accordingly the Debtor's accrued but unpaid tax
liabilities are typically highest in the first half of the year.  The
Debtor estimates the prepetition liability for Property Taxes to be
approximately $4.09 million.  In addition, the Debtor expects to pay
approximately $4.41 million per year for pre- and postpetition
Property Taxes during the pendency of the Chapter 11 Case.

(iv)    Business License and Patent Fees, Annual Report Taxes,
and Other Taxes and Fees.  The Debtor must pay fees for various
business licenses, permits, and certificates that the Debtor needs to
operate as well as to obtain and maintain patents.  Various Taxing
Authorities also require the Debtor to pay annual report taxes in
order to be in good standing for purposes of conducting business
within the state.  In addition to the Business License and Patent
Fees and the Annual Report Taxes, the Debtor also pays certain
other taxes and fees, such as certain filing fees, on an annual basis
in the ordinary course of business.  The Debtor estimates the
prepetition liability for Business License and Patent Fees, Annual
Report Taxes, and Other Taxes and Fees to be approximately
$199,250.  In addition, the Debtor expects to pay approximately
$1.54 million per year for pre- and postpetition Business License
and Patent Fees, Annual Report Taxes, and Other Taxes and Fees
during the pendency of the Chapter 11 Case.

99.    It is my belief that the continued payment of the Taxes on their normal due

dates will ultimately preserve the resources of the Debtor's estate, thereby promoting its

prospects for a successful reorganization.  To begin with, based on advice from counsel, the

Debtor believes some of the Taxes constitute trust fund obligations that are not property of the

Debtor's estate.  In addition, the Debtor believes that failure to pay the Taxes could have a

material adverse impact on its ability to operate in the ordinary course of business.  The Debtor

operates a transactional business and many disputes could impact its ability to conduct business

in a particular jurisdiction, which could have a wide-ranging effect on the Company as a whole.

This is particularly true since some portions of the Debtor's business are highly regulated (e.g., the transportation of batteries).

100.     Furthermore, if such obligations are not timely paid, it is my understanding that the Debtor could be required to expend time and money to resolve a multitude of issues related to such obligations, each turning on the particular terms of each Taxing Authority's applicable laws.  The Debtor desires to avoid unnecessary disputes with the Taxing Authorities – and expenditures of time and money resulting from such disputes – over a myriad of issues that are typically raised by such entities as they attempt to enforce their rights to collect the Taxes.  The Debtor may suffer clear and irreparable harm if the prepetition Taxes are not paid when they become due and payable.  Additionally, the Taxing Authorities may cause the Debtor to be audited if the Taxes are not paid immediately.  Such audits will unnecessarily divert the Debtor's attention away from the reorganization process.  If the Debtor does not pay such amounts in a timely manner, the Taxing Authorities may attempt to revoke the Debtor's licenses and permits, suspend the Debtor's operations, and pursue other remedies that will harm the estate. In all cases, the Debtor's failure to pay Taxes could have a material adverse impact on its ability to operate in the ordinary course of business.  I have also been advised that the federal government and many states in which the Debtor operates have laws providing that the Debtor's officers, directors, or other responsible employees could, under certain circumstances, be held personally liable for the payment of certain Taxes.  In such event, collection efforts by the Authorities would be extremely distracting for the Debtor and its directors and officers in their efforts to bring the Chapter 11 Case to an expeditious conclusion.

101.     **Utilities Motion**.  In connection with the operation of its business and its facilities and the management of its properties, the Debtor obtains water, sewer, electricity, gas,

telephone, waste disposal, and similar utility products and services from various utility

companies. The Debtor filed the Utilities Motion requesting that this Court (a) approve the

Debtor's proposed form of adequate assurance of postpetition payment to the Utility Companies,

as that term is used in section 366 of the Bankruptcy Code; (b) approve procedures for resolving

any objections by the Utility Companies relating to the Proposed Adequate Assurance and (c)

prohibit the Utility Companies from altering, refusing, or discontinuing service to or

discriminating against the Debtor, because such Utility Services are critical to the Debtor's going

concern value. The Proposed Adequate Assurance will consist of, for each Utility Company, a

deposit into a newly-created, interest-bearing, segregated account equivalent to approximately

one half (1/2) of one month of Utility Services. Based on the average monthly cost of the Utility

Services, the aggregate of all such deposits will be approximately $2.04 million.

      102.    It is vitally important to the Debtor's reorganization efforts that utility

services continue uninterrupted after the expiration of the stay period mandated by Bankruptcy

Code section 366. If the Utility Services are discontinued or altered, even briefly, the Debtor's

ability to continue operations could be jeopardized. Such a result could potentially impair the

Debtor's reorganization effort and, ultimately, the value of the Debtor's business. In my opinion,

it is critical that Utility Services continue uninterrupted during the Chapter 11 Case. I believe

that the procedures the Debtor has proposed for the Utility Companies adequately protect the

Utility Companies' rights that I have been advised are provided to the Utility Companies under

the Bankruptcy Code, while also protecting the Debtor's need to continue to receive, for the

benefit of its estate, the Utility Services upon which its business depends.

      103.    **Insurance Motion**. In the ordinary course of the its business, the Debtor

maintains in current effect numerous insurance policies providing coverage for, among other

things, general liability, workers' compensation, directors and officers liability, umbrella liability, automotive liability, pollution and remediation, crime, special risk, fiduciary liability, legal liability, property, and nuclear liability.  The Insurance Policies are essential to the preservation of the value of the Debtor's business, property and assets.  Not only are some of the Insurance Policies required by various regulations, laws, and contracts that govern the Debtor's commercial activities, I have been advised by counsel that section 1112(b)(4)(C) of the Bankruptcy Code provides that "failure to maintain appropriate insurance that poses a risk to the estate or to the public" is "cause" for mandatory conversion or dismissal of a chapter 11 case.

104.    Moreover, I have been advised by counsel that the Operating and Reporting Guidelines Issued for Debtors in Possession and Trustees by the Office of the United States Trustee for the District of Delaware require the Debtor to maintain insurance coverage throughout the pendency of the Chapter 11 Cases.  For the policy period of 2012 to 2013, the total annual premiums under the Insurance Policies equaled approximately $9.9 million.  As of the Petition Date, prepetition amounts due and owing pursuant to the Insurance Policies are approximately $1.2 million.

105.    It is not always economically advantageous for the Debtor to pay the premiums on all of its insurance policies on a lump-sum basis. Accordingly, in the ordinary course of its business, the Debtor finances the premiums on some of its policies pursuant to premium financing agreements with third-party lenders.  The Debtor currently has two outstanding PFAs with AFCO Premium Credit LLC.  Under the first PFA, which covers a policy period of December 15, 2012 through December 14, 2013, the Debtor is obligated to make, in addition to a down payment of $33,400, a total of nine monthly installment payments of $33,400 to AFCO on the 15th of each month.  The first monthly installment payment for the current

policy period of the first PFA was due on January 15, 2013.  Under the second PFA, which

covers a policy period of September 1, 2012 through August 31, 2013, the Debtor is obligated to

make, in addition to a down payment of $256,000, a total of ten monthly installment payments of

$527,500 to AFCO on the first of each month.  The first monthly installment payment for the

current policy period of the second PFA was due on October 1, 2012.

106.    If the Debtor is unable to continue making payments on the Insurance

Policies or the Existing PFAs, I have been advised by counsel that the Debtor's providers may

seek relief from the automatic stay to terminate such Insurance Policies.  If that were to happen,

the Debtor would be required to obtain replacement insurance on an expedited basis and at a

significant cost to the estates.  If the Debtor is required to obtain replacement insurance and to

pay a lump sum premium for such insurance policy in advance this payment would be likely

greater than what the Debtor currently pays.  Even if the Debtor's insurance providers were not

permitted to terminate the agreements, it is my opinion that any interruption of payment would

have a severe, adverse effect on the Debtor's ability to finance premiums for future policies.

107.    In light of the importance of maintaining insurance coverage with respect

to its business activities and preserving liquidity by financing its insurance premiums, I believe it

is in the best interest of the Debtor's estate to receive Court approval to honor the Debtor's

obligations under the Insurance Policies and PFAs and, as necessary, renew or enter into new

such agreements.

108.    Additionally, I have been advised by counsel that under the laws of the

various jurisdictions in which it operates, the Debtor is required to maintain policies and

programs to provide Employees with workers' compensation benefits.  The Debtor's primary

workers' compensation insurance is provided by Zurich American Insurance Company  under a

high deductible program and is administered by TristarREM.[43]  In connection with the WC

Policy, the Debtor pays monthly premiums to March USA of approximately $978,300 (including

surcharges), which are subsequently disbursed to Zurich.  The Debtor has also posted a letter of

credit in favor of Zurich, of which the amount outstanding is $20,868,000 for claim runoff

collateral.  As of the Petition Date, approximately 300 claims were pending for which the Debtor

had reserved approximately $13,377,000.[44]  As administrator of the WC Policy, TristarREM

pays the total of all benefits, damages and expenses resulting from any accident or disease for

which the Debtor is legally liable.  The Debtor reimburses TristarREM each month for all such

payments made on its behalf (up to the deductible and/or policy year limits).

109.    In accordance with this obligation, the Debtor maintains workers'

compensation insurance policies in all jurisdictions where it operates.  I have been advised by

counsel that failure to maintain workers' compensation insurance could result in administrative

or legal proceedings against the Debtor and its officers and directors.  Accordingly, the Debtor

seeks authority to pay all workers' compensation obligations, including any outstanding

insurance premiums and any other amounts related to prepetition workers' compensation claims

as they become due in the ordinary course of the Debtor's business.  In addition, the Debtor

seeks to honor the Workers' Compensation Benefits and continue the Workers' Compensation

Benefits in the ordinary course on a postpetition basis in accordance with prepetition practices.

110.    **Critical Vendor Motion**. With the assistance of its advisors, the Debtor

has spent significant time reviewing and analyzing its books and records, consulting operations

---

[43]    To the extent that any claim predates the Debtor's relationship with TristarREM or a claim is for over $1,000,000, Zurich manages such claims and is paid directly by the Debtor on a monthly basis.  At this time, there are no claims exceeding $1,000,000.

[44]    This is amount is unfunded and reflects reserves less the prepaid amounts as of March 31, 2013.

management and purchasing personnel, reviewing contracts and supply agreements, and

analyzing applicable laws, regulations, and historical practice to identify certain critical business

relationships and/or suppliers of goods and services—the loss of which could materially harm its

businesses, reduce its market share and its enterprise value, and/or impair its going-concern

viability.  In this process, the Debtor examined stringent criteria, including:

- whether a vendor is a sole- or limited-source or high-volume supplier of materials, parts, or services for production or delivery of critical inventory;

- whether alternative vendors are available that can provide requisite volumes of similar goods or services on equal (or better) terms and, if so, whether the Debtor would be able to continue operating while transitioning business thereto;

- the degree to which replacement costs (including, pricing, transition expenses, professional fees, and lost sales or future revenue) exceed the amount of a vendor's prepetition claim;

- whether an agreement exists by which the Debtor could compel a vendor to continue performing on prepetition terms; and

- whether certain specifications or other customer preferences prevent the Debtor from obtaining goods or services from alternative sources.

111.    Following this analysis, the Debtor identified the following types of goods

and service providers as critical to the Debtor's continued operation: (a) raw material providers;

(b) parts suppliers; (c) suppliers of manufacturing tools, (d) transportation providers; (e)

regulatory compliance service providers, and (f) packaging companies.  Most of the Critical

Vendors likely will be sole-source suppliers without whom the Debtor could not operate or could

not be replaced within a reasonable time on terms as beneficial to the Debtor as those already in

place.  All of the Critical Vendors would cause future revenues or profits of the Debtor to suffer

if the Critical Vendors did not continue to supply their goods or services.  Because the Critical

Vendors provide their goods or services at favorable costs and at beneficial payment terms,

replacing the Critical Vendors would result in higher costs for the Debtor in terms of cost of

goods purchased and the cost of funds used to purchase such goods.  If the Debtor can benefit from maintaining lower costs of goods purchased during the postpetition period, it is prudent for the Debtor to pay selected Critical Vendors some or all of their prepetition claims, provided that such vendors continue generally to sell their goods at the same reduced prices and on at least as favorable terms on a going forward basis as were in effect during the prepetition period.

112.    **Critical Vendor Claims**.  Based on its books and records and past experience, the Debtor estimates that it has outstanding prepetition trade claims totaling approximately $104 million, which represents actual trade accounts payable as of the Petition Date.  The Debtor's estimate of outstanding prepetition claims also includes projected liabilities for certain goods and services which are not reflected in its accounts payable because they have not yet been invoiced for goods already received.

113.    The Debtor seeks authority, in its sole discretion, to pay the Critical Vendor Claims, in the aggregate amount of $7 million on an interim basis, and in the aggregate amount of approximately $10 million on a final basis as a Trade Claims Cap.  In determining the amount of the Trade Claims Cap, the Debtor carefully reviewed all of its Vendors to determine which types of Vendors could potentially meet the stringent criteria used to identify a universe of potential Critical Vendors.  After analyzing this information, the Debtor estimated the amount that it would be required to pay to ensure the continued supply of Critical Goods and Services.  Put another way, the Trade Claims Cap represents the Debtor's best estimate of how much in prepetition trade claims can be paid to creditors to ensure continued supply of critical goods and services and maintenance of favorable trade terms.  Of the $10 million Trade Claims Cap, based on an in-depth review of its outstanding accounts payable, the Debtor estimates that

approximately 35% would be entitled to priority treatment under Bankruptcy Code section 503(b)(9).

114.    The Trade Claims Cap represents less than 10% of the Debtor's estimate of aggregate prepetition trade claims, which total approximately $104 million.  Given the nature of the Debtor's business, the demonstrated benefits of paying the Critical Vendor Claim, the detailed protocol described herein for determining whether to make a critical vendor payment, and the risks associated with non-payment, the Debtor submits that this is a reasonable and appropriate cap on the expenditure of estate funds to satisfy certain prepetition claims.

115.    **Proposed Conditions To Payment Of Critical Vendor Claims**.  As a *quid pro quo*, the Debtor proposes that Critical Vendors whose claims are paid under the authority requested in the Critical Vendor Motion, also continue providing goods and services to the Debtor on Customary Trade Terms, as discussed in the Motion, for at least one year following the date of the agreement.  The Debtor will work closely with its professionals to manage Critical Vendor payments and liquidity.

116.    **Contract Counterparty Claims and Procedures**.  The Debtor anticipates that some Contract Counterparties could take aggressive positions and refuse to perform unless the Debtor first satisfies their prepetition claims. To the extent these suppliers threaten to disrupt the Debtor's supply chain, the Debtor seeks the authority to provisionally pay certain Contract Counterparty Claims pursuant to the procedures outlined in the Critical Vendor Motion.

117.    **<u>Foreign Vendor Motion</u>**.  In connection with its chapter 11 preparation, the Debtor, with the assistance of its professionals, developed a narrowly-tailored foreign vendor program.  Based on this analysis, the Debtor estimates the need to pay approximately $2 million

in Foreign Vendor Claims.  Although the Debtor believes that many of its Foreign Vendors may continue to do business with the Debtor after commencement of the Chapter 11 Case, the Debtor identified certain Foreign Vendors that may: (a) refuse to deliver goods and services without payment of their prepetition claims or (b) refuse to deliver goods and services on reasonable credit terms absent payment of prepetition claims, thereby effectively refusing to do business with the Debtor.

118.    Importantly, the Debtor only seeks to pay the Foreign Vendor Claims of the Foreign Vendors that to the best of the Debtor's knowledge lack minimum contacts with the United States and, thus, based on advice from counsel, may not be subject to the jurisdiction of this Court or the provisions of the Bankruptcy Code that otherwise protect the Debtor's assets and business operations—particularly the automatic stay.  Based on the knowledge of the Debtor's personnel regarding the Foreign Vendors, the Debtor believes there is a material risk that the Foreign Vendors holding Foreign Vendor Claims against the Debtor may consider themselves to be beyond the jurisdiction of this Court, disregard the automatic stay, and engage in conduct that disrupts the Debtor's operations, or may simply be confused by the chapter 11 process, particularly those in countries with liquidation-oriented insolvency procedures.

119.    Foreign Vendors may also sue the Debtor in a foreign court to recover prepetition amounts owed to them.  If they are successful in obtaining a judgment against the Debtor, the Foreign Vendors may seek to exercise post-judgment remedies including seeking to attach the Debtor's foreign assets or withhold vital supplies and services from the Debtor.  Since the Debtor would have limited, if any, effective and timely recourse and no practical ability to remedy this situation (absent payment of amounts sought), its businesses could be irreparably harmed by any such action to the detriment of its estate and its creditors.

120.    Finally, in return for payment of the prepetition Foreign Vendor Claims in the ordinary course of business, unless otherwise waived by the Debtor in its sole discretion, the Debtor requests authorization to require that the Foreign Vendors continue to provide goods and services to the Debtor on Customary Trade Terms.  Thus, payment of the Foreign Vendor Claims will further benefit the Debtor's estate by ensuring that the Debtor continues to receive the critical goods and services of the Foreign Vendors on favorable trade terms.

121.    **Shippers Motion**.  The Debtor relies extensively on its vast network of Shippers, including private trucking services and rail and air services, for transportation and delivery of products (i) from the Debtor's suppliers to the Debtor's manufacturing facilities, (ii) between the Debtor's manufacturing facilities, (iii) between the Debtor's manufacturing facilities and the Debtor's branches/distribution centers, and (iv) from the Debtor's factories to the Debtor's customers.  The Debtor also may rely on its Shippers to return goods, merchandise, and products from the Debtor's customers and/or to the Debtor's vendors.

122.    Additionally, the Debtor relies on certain Warehousemen to store goods and raw materials during the distribution process.  The Debtor is dependent upon the Warehousemen to access the property held in their warehouses.  The Shippers and Warehousemen serve as the Distribution Vendors in the Debtor's network for the transportation and delivery of its products.

123.    The Debtor identified from its vast network[45] of Distribution Vendors those that render services absolutely essential to the Debtor's continued operation.  The Debtor

---

[45]    Due the location of the Debtor's facilities, distribution centers, and customers, the Debtor utilizes numerous different Distribution Vendors to ensure the timely delivery of its products throughout the United States and abroad.  In addition, the Debtor has very favorable payment terms with the Distribution Vendors (e.g. most payments are not due until sixty (60) days after invoices are submitted), which results in large open accounts payable owed to the Distribution Vendors.

estimates that having authority to pay up to $9.2 million in prepetition Shipping Charges will ensure that it can continue to perform its customer commitments and keep its supply chain intact. With respect to these Shipping Charges, the Debtor and its advisors determined that the value of the goods or raw materials in the possession of the Distribution Vendor was significantly more than the prepetition Shipping Charges owed to such Distribution Vendors.

124.    Additionally, the services provided by these Distribution Vendors are critical to the day-to-day operations of the Debtor's business.  For example, unless the Debtor continues to receive delivery of raw materials and supplies on a timely and uninterrupted basis, its manufacturing operations may shut down immediately, thereby causing irreparable damage to the Debtor's business and the value of its estate.  Similarly, if the Debtor is unable to provide finished goods to customers on a timely basis, the Debtor could suffer a significant loss of credibility and customer goodwill, thereby causing substantial harm to the Debtor's business and reorganization efforts.

125.    Typically, the Debtor's agreements with the Distribution Vendors set forth agreed-upon rates for the services.  The Distribution Vendors are generally not paid in advance, but rather invoice the Debtor for shipping and storing services previously rendered, providing the Debtor with viable trade terms and, consequently, liquidity.  With respect to the Shippers, the Debtor uses the services of D2L to audit the Shippers' invoices and approve the invoices for payment on the Debtor's behalf.  The Debtor pays D2L by wire transfer and D2L then pays the Shippers, typically within a week of receipt of payment from the Debtor.  Importantly, however, D2L has no obligation to the applicable Shippers and is not an alternative source of payment in the event of nonpayment by the Debtor.

126.    The Debtor seeks to pay the prepetition Shipping Charges for several reasons.  First, delays in payment of Shipping Charges with respect to goods that are in the possession of the Distribution Vendors as of the Petition Date will likely result in the assertion, based on advice from counsel, under applicable law, of possessory liens upon the Debtor's property in the possession of such parties.  For instance, state statutes in which the Debtor operates its business provide that any common carrier engaged in the shipment of goods covered by a bill of lading is entitled to a lien on such goods for charges and expenses incurred thereupon. The perfection and maintenance of liens is, in most cases, dependent upon possession, so the Distribution Vendors would likely refuse to deliver or release such goods until their claims have been satisfied and the liens released.  The value of these goods generally exceed the amount of the outstanding Shipping Charges and thus, the Debtor believes that the Distribution Vendors will ultimately be entitled to be paid in full for the Shipping Charges.  Indeed, the Debtor, with Alvarez & Marsal, conducted an assessment of the value of goods and raw materials in transit through rigorous calculation and concluded that the total inventory currently being held by Shippers is valued at approximately $12 million.  Irrespective of the amount and validity of their liens, the mere assertion of possessory or other liens will delay delivery of goods both to the Debtor's factories and to its customers, thereby severely, if not irreparably, damaging the Debtor's business and prospects for a successful reorganization.

127.    Second, if the prepetition Shipping Charges are not paid, many of the Distribution Vendors may refuse to perform future services for the Debtor and withhold the shipment or release of essential goods currently in transit.  In such event, the Debtor will incur additional expenses (such as premium shipping costs) to replace the Distribution Vendors or the goods being withheld, which amounts will likely exceed the amount of unpaid prepetition

Shipping Charges that the Debtor requests permission to pay hereunder.  More importantly, locating entities to replace the Distribution Vendors will be difficult, if not impossible.  If the Debtor was required to switch to new Distribution Vendors, it would incur significant operational disruption and increased costs.

128.    At the very least, replacing a Distribution Vendor, in most cases, will delay the transport and delivery of goods to the Debtor's facilities and customers, including certain large customers that manage their inventory on a just-in-time basis.  Such delays could cause a material disruption in the Debtor's receipt of goods from suppliers and the delivery of products to customers and, thus, their ability to continue operating their business successfully.

129.    Third, as noted above, the Debtor utilizes a vast network of Shippers for the transport of goods and raw materials.  The Debtor relies upon the payment and auditing services provided by D2L as part of managing this vast network.  Absent these services, the Debtor would be required to negotiate with, and administer separate accounts with a variety of different Shippers.  Integration with D2L has allowed the Debtor to maintain leaner staffing levels and a lower cost structure, which are essential in the competitive market in which the Debtor operates.  If the Debtor was required to switch to another shipping invoice auditor, it would incur significant operational disruption and increased costs.

130.    The Debtor submits that the total amount it seeks to pay the Distribution Vendors is appropriate and reasonable in light of the importance and necessity of timely receipt of the goods in the possession of the Distribution Vendors and the losses the Debtor might suffer if its operations are disrupted.

131.    **Import/Export Claims**.  In the ordinary course of its business, the Debtor receives a variety of Imported Goods such as raw materials, parts, and components and finished

goods from companies located abroad.  The Debtor also exports various goods to its customers abroad.  Timely receipt of the Imported Goods and ensuring timely receipt by the Debtor's customers of the Exported Goods is critical to the Debtor's business operations.  Any disruption or delay in receipt of the Imported Goods and Exported Goods would adversely affect the Debtor's business operations.

132.    In connection with the import and export of goods, the Debtor may be required to pay various Import/Export Charges, including, but not limited to, customs duties, detention and demurrage fees, tariffs and excise taxes, freight forwarding or consolidation charges and other similar obligations.  Additionally, I am advised by counsel that due to the complexity of United States customs laws and regulations, it is customary for importers to use the services of professional customs brokers and freight forwarders as agents.  The Debtor uses the services of multiple Customs Brokers to take all actions necessary on the Debtor's behalf to facilitate the import or export of goods.  In most cases, the Import/Export Providers present invoices to a Customs Broker.  The Customs Broker then presents an invoice to and is reimbursed by the Debtor.  The Debtor pays approximately $350,000 annually in Import/Export Charges.  The estimated outstanding prepetition Import/Export Charges for goods currently in transit is approximately $123,000.

133.    The Debtor seeks authority to pay any and all necessary and appropriate Import/Export Charges incurred on account of prepetition transactions, including payment of the Debtor's Customs Brokers.  Payment of the Import/Export Charges is critical to ensure the uninterrupted flow of Imported Goods and Exported Goods.  Absent such payment, parties to whom Import/Export Charges are owed may have the ability to interfere with the transportation of such Imported Goods or Exported Goods.  If the flow of Imported Goods were to be

67

interrupted, the Debtor would be deprived of the materials necessary to complete orders already placed by its customers, which orders are worth far more to the Debtor (both in terms of future receipts and the maintenance of valuable good will) than the aggregate amount of incurred, but unpaid, Import/Export Charges.  Similarly the Debtor must continue to deliver the Exported Goods internationally in order to maintain valuable customer relationships abroad.

134.    Absent prompt payment, the United States Customs Service may implement various sanctions against the Debtor, including fines, monetary penalties, interest charges or denial of importing privileges. Additionally, if the Imported Goods remain in the custody of the Customs Service for, generally, five days, the Company will be charged for the storage of such Imported Goods in addition to a daily government holding fee after the five day grace period.  For the foregoing reasons, the Debtor submits that payment of the Import/Export Charges is necessary to preserve and enhance the value of the Debtor's business for the benefit of all parties in interest.

135.    **Mechanics and Materialmen Motion.**  The Debtor employs numerous contractors, subcontractors, mechanics, and materialmen, who provide essential goods and services that give rise to a right to payment that could become secured by perfected or potential mechanics' liens, materialmen's liens, or similar liens against or interests in the Debtor's property.  In certain cases, such goods and services are needed in connection with projects that were in process as of the Petition Date.  Such projects involve, among others, (a) performance of certain intermediary manufacturing processes on Debtor's materials and equipment prior to delivery to the Debtor, (b) repair or maintenance work necessary to insure the safety of the premises for employees and visitors or the continued functioning of plant machinery or equipment, and (c) repair of maintenance compliance with federal regulations and quality

controls.  Failure to properly and timely complete the projects could adversely affect the Debtor's financial condition and operations.

136.     The Debtor believes that the Mechanics and Materialmen involved in such pending projects may refuse to continue to provide essential goods and services, if their Lien Claims cannot be paid due to the chapter 11 filing.  In such situations, the Debtor must have the ability to pay the Lien Claims to insure the proper and timely completion of the projects, thereby avoiding harm to the Debtor's estate.  Moreover, the Debtor believes that the cost to replace the essential goods and services provided by the Mechanics and Materialmen outweighs any prepetition amounts owed to them.

137.     To prevent a breakdown in its manufacturing network and operation of its facilities, the Debtor is seeking the authority, but not direction, to pay such of the prepetition claims of Mechanics and Materialmen up to $10.4 million that, in its business judgment, the Debtor determines is necessary or appropriate to ensure the completion of the Debtor's pending projects. Indeed, as part of its rigorous analysis, the Debtor, with Alvarez & Marsal, after conducting an assessment of the value of goods and raw materials, concluded that the Mechanics and Materialmen are in possession of the Debtor's materials (e.g., lead, battery cores, tools, etc.) that are worth nearly double the prepetition amounts they are owed.  Moreover, failure to properly and timely complete the projects could adversely affect the Debtor's financial condition and operations. Therefore, I submit that the Mechanics and Materialmen Motion requests necessary relief, and is in the best interest of the Debtor, its estate, its creditors, and other parties in interest.

138.     **DIP Financing Motion.**   The Debtor is also requesting authorization to enter into that certain Superpriority Debtor-In-Possession Credit Agreement, dated June 9, 2013,

with JPMorgan as administrative agent.  As set forth above, poor fourth fiscal quarter 2013 operating results, exacerbated further by the shutdown of the Debtor's Vernon facility, lead the Debtor to pursue the DIP Financing.  In addition to Lazard's retention to help obtain financing, the Debtor retained A&M to assist in sizing an eighteen-month facility to fund the Debtor's continued operations.  Following a robust marketing process, the Debtor determined that the DIP Facilities represents the best available option for the Company to obtain essential post-petition financing.  The proposed DIP Facility satisfies the projected eighteen-month liquidity requirements and provides a substantial cushion for the Debtor to execute a chapter 11 restructuring.

139.    After consulting with the Company's advisors, I believe that the Debtor has an immediate need for adequate postpetition financing to continue operating its business in the ordinary course.  The Debtor was unable to obtain adequate unsecured credit allowable as an unsecured claim or superpriority administrative expense because nearly all of the Debtor's assets remain subject to prepetition liens.  The Debtor believes the DIP Facilities reflect the most favorable terms on which lenders were willing to offer financing, particularly after consideration of the costs associated with obtaining DIP financing on a non-consensual priming basis. I further believe that the proceeds from the DIP Financing will allow the Debtor to continue its operations in the ordinary course, maintain prudent cash balances, satisfy working capital requirements, fund restructuring costs, and otherwise meet its liquidity needs during the pendency of the Chapter 11 Case.

140.    As described above, the Company, of which the Debtor is the parent does business around the globe, manufacturing and distributing transportation and industrial batteries in North America, Europe, Asia, the Middle East, Australia, and New Zealand.  In fact, the

Europe and ROW business that Exide's foreign affiliates conduct is critical to the overall value

of Exide's business.  Based on Exide's unaudited financial statements, in the year ended March

31, 2013 the Company's Europe and ROW businesses contributed more than $79 million in

EBITDA for the fiscal year that ended March 31, 2013 (just under 75% of the Company's total

EBITDA) and are projected to produce $70 million in EBITDA during the current fiscal year

(almost 67% of the Company's total EBITDA).  Thus, these entities are extremely valuable to

the Debtor's overall operations.  Accordingly, it is critical that the foreign affiliates have access

to new financing so that they can continue to operate in the ordinary course of business,

particularly now that they are about to enter into a peak working capital season in which they

will be ramping up their inventory production in advance of fall and winter sales seasons.

   141. Finally, I believe, after consultation with the Debtor's advisors, that the

terms of the DIP Credit Agreement and other Credit Documents are fair and reasonable.

   142. **Equity Trading Procedures Motion.**  The Debtor has generated, and is

currently generating, a significant amount of NOLs for U.S. federal income tax purposes. As of

March 31, 2013, the Debtor had approximately $135 million of unlimited NOLs that were

available to offset taxable income and approximately $50 million of NOLs that were available to

offset taxable income but were subject to a Section 382 Limitation (as defined in the Equity

Trading Procedures Motion) due to a prior ownership change.  These NOLs and other tax

attributes could translate into potential future federal income tax savings for the Debtor.  The

Debtor's NOLs are a valuable asset because the Debtor generally can carry forward its NOLs to

offset its future taxable income and tax liability, thereby potentially freeing up funds to meet

working capital requirements and service debt.  In particular, the NOLs may be available to the

Debtor to offset taxable income generated by transactions completed during the course of the Chapter 11 Case, including the DIP Financing.

143.    It is my understanding that the Debtor's ability to use its tax attributes, however, could be severely limited under Section 382 of title 26 of the United States Code as a result of the trading and accumulation of its equity securities prior to consummation of a chapter 11 plan.  The Debtor thus seeks to establish procedures for continuously monitoring the trading of its equity securities, so that the Debtor can preserve its ability to seek substantive relief at the appropriate time, particularly if it appears that additional trading may jeopardize the use of its NOLs under Section 382.  Therefore, I submit that the relief requested in the Equity Trading Procedures Motion is necessary and in the best interests of the Debtor's estate, its creditors and other parties in interest.

I swear under penalty of perjury that the foregoing is true and correct.

Dated:        June 10, 2013


By:        /s/ Phillip A. Damaska
           Name: Phillip A. Damaska
           Title: Executive Vice President, Chief Financial
           Officer, and Authorized Officer