IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                              :
In re:                                                        :        Chapter 11
                                                              :
EXIDE TECHNOLOGIES,                                           :        Case No. 13-11482
                                                              :
                              Debtor.[1]                      :
                                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEBTOR'S MOTION FOR ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105(a), 345(b), 363, AND 503(b), BANKRUPTCY RULES 6003 AND 6004, AND LOCAL BANKRUPTCY RULE 2015-2 AUTHORIZING (I) CONTINUED MAINTENANCE OF PREPETITION BANK ACCOUNTS AND PAYMENT OF RELATED PREPETITION OBLIGATIONS, (II) CONTINUED USE OF ITS EXISTING CASH MANAGEMENT SYSTEM, (III) CONTINUED USE OF EXISTING BUSINESS FORMS, (IV) CONTINUATION OF EXISTING INVESTMENT AND DEPOSIT PRACTICES, AND (V) CONTINUATION OF INTERCOMPANY TRANSACTIONS AND HONORING CERTAIN RELATED PREPETITION OBLIGATIONS

Exide Technologies ("Exide" or the "Debtor") hereby moves (the "Motion") this

Court for entry of an interim order (the "Interim Order") and a final order (the "Final Order"),

under sections 105(a), 345(b), 363, and 503(b) of title 11 of the United States Code (the

"Bankruptcy Code"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") and Rule 2015-2 of the Local Rules of Bankruptcy Practice and Procedure

of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy

Rules") authorizing, but not directing, the Debtor solely to the extent permitted under the DIP

Facility (as defined below), (i) to continue to maintain existing bank accounts, authorizing a

waiver of certain operating guidelines relating to bank accounts, and authorizing, but not

directing, the payment of related prepetition obligations; (ii) to continue to use its existing cash

---

[1]    The last four digits of the Debtor's taxpayer identification number are 2730.  The Debtor's corporate headquarters are 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

management system; (iii) to continue to use the Business Forms (as defined below); (iv) to continue to maintain and use its existing investment and deposit practices notwithstanding the provisions of Bankruptcy Code Section 345(b); and (v) to continue the Intercompany Transactions (as defined below) and honor certain prepetition amounts related thereto. The Debtor also requests that this Court authorize all banks with which the Debtor maintains accounts to continue to maintain, service, and administer such accounts on behalf of the Debtor. In support of the Motion, the Debtor relies upon and incorporates by reference the Declaration of Phillip A. Damaska in Support of Chapter 11 Petition and First Day Pleadings (the "First Day Declaration"), filed with the Court concurrently herewith. In further support of the Motion, the Debtor, by and through its proposed undersigned counsel, respectfully represents:

<strong>JURISDICTION AND VENUE</strong>

1.      This Court has jurisdiction to consider the Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of the case and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are Bankruptcy Code sections 105(a), 345(b), 363 and 503(b), Bankruptcy Rules 6003 and 6004, and Local Bankruptcy Rule 2015-2.

3.      Pursuant to Rule 9013-1(f) of the Local Bankruptcy Rules, the Debtor consents to the entry of a final judgment or order with respect to the Motion if it is determined that this Court would lack Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

# BACKGROUND

## A.     The Chapter 11 Case

4.     On the date hereof (the "Petition Date"), the Debtor commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case").[2]

5.     The Debtor continues to operate its business and manage its property as debtor and debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.     To date, no creditors' committee has been appointed by the United States Trustee.  No trustee or examiner has been appointed in the Chapter 11 Case.

## B.     The Debtor's Business

7.     The Debtor, Exide, which together with its direct and indirect subsidiaries (collectively, the "Company"), has operations in more than 80 countries, is a global leader in stored electrical energy solutions and one of the world's largest producers and recyclers of lead-acid batteries.

8.     The Company's four global business groups—Transportation Americas, Transportation Europe and Rest of World ("ROW"), Industrial Energy Americas, and Industrial Energy Europe and ROW—provide a comprehensive range of stored electrical energy products and services for industrial and transportation applications.  The Company manufactures and distributes transportation and industrial batteries in North America, Europe, Asia, the Middle East, India, Australia, and New Zealand.  In the transportation segments, the Company

---

[2]     The Debtor's predecessor has a chapter 11 case currently pending in this District (Case No. 02-11125) (the "Previous Chapter 11 Case").  The Previous Chapter 11 Case was filed on April 15, 2002, and the Debtor and certain of its U.S. subsidiaries emerged from chapter 11 on May 5, 2004.  There is one claim remaining open in the Previous Chapter 11 Case.  In addition, there is a pending adversary proceeding in which a settlement agreement to allow a general unsecured, non-priority claim has been approved by this Court, but is awaiting final approval from the state chancery court to become effective.  The Debtor will confer with this Court regarding the disposition of the Previous Chapter 11 Case at the appropriate time.

distributes and markets transportation batteries, which include starting, lighting, and ignition batteries for cars, trucks, off-road vehicles, agricultural and construction vehicles, motorcycles, recreational vehicles, marine, and other applications to a broad range of retailers, distributors of replacement or after-market batteries, and automotive original equipment manufacturers ("OEM").  The Company's industrial batteries consist of motive power batteries and network power applications.  Motive power batteries are used in the material handling industry for equipment such as electric fork-lift trucks as well as in other machinery, including floor cleaning machinery, powered wheelchairs, railroad locomotives, mining equipment, and electric road vehicles.  Network power batteries provide energy storage solutions for critical systems that require uninterrupted power supply and are used to power, among other things, telecommunications systems, computer installations and data centers, hospitals, air traffic control systems, security systems, electric utilities, railways, and various military applications.  The Company has a diverse customer base that includes a number of major end-user customers, retail and OEM, and includes market winners and industry leaders.

9.    The Debtor, headquartered in Milton, Georgia, operates 13 manufacturing facilities in the United States.  The Debtor also operates approximately 65 branches[3] throughout North America, which sell and distribute batteries and other products to customers, battery specialists, retail stores, and OEM dealers. In addition, branch locations collect spent batteries for the Debtor's recycling facilities.  Exide has five smelters, three of which are currently active battery collection and recycling facilities.[4]  These facilities reclaim lead by recycling spent lead-acid batteries, which are obtained for recycling from Exide's customers and outside spent-battery

---

[3]    On average, branch locations are approximately 20,000 square feet in size and are generally leased for periods of 29 to 42 months.

[4]    The smelter furnaces melt lead from spent (i.e., expired) batteries to extract the lead so that it can be re-used to make new batteries.

collectors.  In fiscal year 2013, approximately 530,575 tons of batteries, plant scrap, and range

lead were recycled at Exide's smelters or by a third party at Exide's request, which efforts

enabled Exide to better control the cost of the principal raw material—lead—used in making its

products.  In the United States, the Debtor historically has obtained the vast majority of its lead

requirements from its recycling operations.[5]

10.    Additional factual background information about the Debtor, including its

business operations, its corporate and capital structures, its restructuring efforts, and the events

leading to the filing of the Chapter 11 Case, is set forth in detail in the First Day Declaration.[6]

## RELIEF REQUESTED

11.    By the Motion, the Debtor seeks entry of an order, pursuant to Bankruptcy

Code sections 105(a), 345(b), 363(c) and 503(b) authorizing, but not directing, the Debtor (i) to

continue to maintain existing bank accounts; (ii) to be granted a waiver of certain operating

guidelines relating to bank accounts set forth in the *Region 3 Operating Guidelines and*

*Reporting Requirements for Chapter 11 Debtors and Trustees*  (the "U.S. Trustee Guidelines");

(iii) to continue using its existing cash management system (including as required under the

Debtor's proposed postpetition lending facility (the "DIP Facility") and the payment of related

prepetition obligations; (iv) to continue using the Business Forms; (v) to continue to maintain

and use its existing investment and deposit practices; and (vi) to continue the Intercompany

Transactions in the ordinary course of business and honor certain prepetition amounts related

thereto. The Debtor also requests that this Court authorize all banks with which the Debtor

---

[5]    In contrast, the Company obtains the majority of its lead requirements for its ROW operations on the open
market from third-party suppliers.

[6]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Day
Declaration.

maintains accounts to continue to maintain, service and administer such accounts on behalf of the Debtor.

12.     For the reasons set forth herein, the Debtor submits that the relief requested herein is in the best interest of the Debtor, its estate, its creditors, and other parties in interest, and therefore, should be granted.

## BASIS FOR RELIEF

**A.     Bank Accounts and Cash Management System**

13.     Pursuant to Bankruptcy Code sections 105(a), 345(b), and 363(c), the Debtor seeks authorization to maintain its existing bank accounts and continue using its existing cash management system (the "Cash Management System").  The Debtor's Cash Management System facilitates reporting, monitors collection and disbursement of funds, reduces administrative expenses by facilitating the movement of funds and the development of more timely and accurate balance and presentment information, and administers the various Bank Accounts (as defined below) required to effect the collection, disbursement, and movement of cash.  A flow chart that depicts the Debtor's Cash Management System is attached hereto as Exhibit A.  As discussed below, if the Debtor is not permitted to continue to use its Cash Management System, its operations will be severely hampered.

14.     Prior to the commencement of this Chapter 11 Case, the Debtor maintained, in the ordinary course of business, twenty-six (26) bank accounts, out of which it managed cash receipts and disbursements (the "Bank Accounts").  The Bank Accounts are maintained at Wells Fargo, N.A. ("Wells Fargo"), Citibank N.A. ("Citibank"), UMB Bank ("UMB"),  JP Morgan Chase ("JPM"), Toronto-Dominion Bank ("TD"), U.S. Bank, N.A. ("U.S.

Bank"), or Deutsche Bank AG ("<u>DB</u>").[7]  A list of Bank Accounts is attached hereto as <u>Exhibit B</u>.

The Bank Accounts consist of concentration accounts, disbursement accounts, lockbox accounts, standby trust accounts, and investment accounts. In addition, certain of the Debtor's affiliated non-debtor entities maintain three (3) domestic bank accounts (the "<u>Non-Debtor U.S. Bank Accounts</u>"), and 179 bank accounts throughout Europe and the rest of the world (the "<u>Non-Debtor Foreign Bank Accounts</u>").

15.    <u>The Master Concentration Account</u>.  All of the Debtor's receipts are channeled into a master concentration account (the "<u>Master Concentration Account</u>"), which is the heart of the Debtor's Cash Management System and maintained by Wells Fargo.  Direct draws from the Master Concentration Account are made by Ceridian, the Debtor's third-party human resource administrator, to fund payroll taxes.  Additional direct draws are made to directly fund various third-party accounts, including those that fund the Debtor's local and state sales taxes. The receipts deposited in the Master Concentration Account include all revenue from the Debtor's customer contracts and all borrowings from the Debtor's prepetition revolving credit facility.  The Master Concentration Account draws funds from an account maintained by Wells Fargo, which is used in connection with the Debtor's asset-based lending facility (the "<u>ABL Account</u>").

16.    <u>The ZB Disbursement Accounts</u>.  The Master Concentration Account is linked to two zero-balance disbursement accounts (the "<u>ZB Disbursement Accounts</u>").  Funds are automatically transferred from the Master Concentration Account to the ZB Disbursement Accounts as needed for immediate payment of the Debtor's obligations.  One of the ZB

---

[7]    As described below, the Debtor's account with DB is an idle investment account maintained through DB's subsidiary DWS Investment Services Company ("<u>DWS</u>").  In addition, the Debtor is in the process of closing this account.

Disbursement Accounts is a payroll account (the "Payroll Account"), through which the Debtor funds its domestic payroll obligations.  The other is a general disbursement account (the "General Disbursement Account") through which the Debtor funds certain of its accounts payable for vendors that are paid by check.  The ZB Disbursement Accounts are zero-balance accounts ("ZBAs"), meaning that they do not carry a balance and are swept of all funds on a daily basis.

17.    The ACH Disbursement Account.  The Main Concentration Account is also linked to an automated clearinghouse disbursement account (the "ACH Disbursement Account"), which is maintained at Wells Fargo.  All of the Debtor's electronic fund transfers, including automatic deposit payroll obligations, trade payables, and utility obligations are disbursed through the ACH Disbursement Account.  In addition, the ACH Disbursement Account is used to fund two insurance accounts (the "CIGNA Healthcare Impressed Accounts"), each of which supports the Debtor in making payments for short-term disability and dental coverage for active participants, and medical and pharmacy plan payments for retired employees. The CIGNA Healthcare Impressed Accounts are maintained by Citibank.

18.    The Administered Plan Accounts.  The Master Concentration Account is also linked to two accounts that are disbursement accounts for the Debtor's administered benefits plans (the "Administered Plan Accounts"). One Administered Plan Account is maintained by UMB (the "AonHewitt Administered Plan Account") and is used to fund payments related to employee flexible spending accounts ("FSA") and health reimbursement accounts ("HRA"). The second Administered Plan is maintained by JPM (the "UnitedHealthCare Administered Plan Account") and is used to fund payments related to medical claims and wellness expense reimbursements for active participants.

19.     <u>The Lockbox Account</u>. The Main Concentration Account is also linked to a lockbox account (the "<u>Lockbox Account</u>"), which is used as a collection account for Transportation Americas and Industrial Energy Americas receipts.

20.     <u>The Canadian Disbursement Accounts</u>.  The Master Concentration Account is also linked to two Canadian disbursement accounts maintained by TD (the "<u>Canadian Disbursement Accounts</u>").  The Debtor does business as GNB Industrial Power ("<u>GNB</u>") in Canada.  GNB is not a distinct legal entity from the Debtor, but generates the revenue to fund the Canadian Disbursement Accounts and all of GNB's disbursements are handled through the Canadian Disbursement Accounts.  Both Canadian Disbursement Accounts collect and disburse funds.  One of the Canadian Disbursement Accounts is used for U.S. dollar transactions and the other is used for Canadian dollar transactions.

21.     <u>The Investment Accounts</u>.  The Master Concentration Account is also linked to two (2) investment accounts maintained by Wells Fargo Advantage Funds (the "<u>Wells Fargo Investment Accounts</u>") and DB maintains one idle investment account through DWS (the "<u>DWS Investment Account</u>," and together with the Wells Fargo Investment Accounts, the "<u>Investment Accounts</u>").  The Debtor uses the Investment Accounts to invest excess funds pursuant to its Investment and Deposit Practices (as described below).

22.     <u>The Standby Trust Accounts</u>.  The Debtor is a party to a number of trust agreements with U.S. Bank regarding its environmental obligations to various states.  To remain in compliance with the trust agreements, the Debtor is required to keep standby trust accounts for all sites for which it has granted a surety bond or letter of credit.  Specifically, the Debtor has eleven standby trust accounts maintained by U.S. Bank in connection with its surety bonds or letter of credit (the "<u>Standby Trust Accounts</u>").  The Standby Trust Accounts have *de minimis*

9

balances and exist as a place holder for deposits if there is a draw on the surety bonds or letter of credit.

23.     The U.S. Non-Debtor Bank Accounts. The Main Concentration Account is also linked to two disbursement accounts used by non-debtor, non-operating entities Dixie Metals Company and Refined Metals Corporation and one standby trust account for Refined Metals Corporation  (the "U.S. Non-Debtor Bank Accounts") for payments related to environmental remediation expenses.  These accounts maintain a *de minimis* balance throughout the year except at those times when funded specifically to pay such remediation expenses.

24.     Funding Foreign Non-Debtors.  The Company's non-debtor foreign subsidiaries maintain the Non-Debtor Foreign Bank Accounts at various institutions throughout the world.[8]  As set forth below, intercompany transfers from the Bank Accounts maintained by the Debtor to those maintained by foreign non-debtor subsidiaries are critical to the operation of foreign subsidiaries and preserving the Debtor's going-concern value.

25.     The Debtor has used the basic structure of the Cash Management System for approximately four (4) years.  The Cash Management System is similar to those commonly employed by corporate enterprises comparable to the Debtor in size and complexity.  The widespread use of such systems is attributable to the numerous benefits they provide, including the ability to (a) tightly control corporate funds, (b) invest idle cash at higher returns, (c) ensure cash availability, and (d) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate account balance and presentment information.

26.     Moreover, the Debtor maintains detailed accounting records that track transfers of funds to and from the Bank Accounts, which is administered by a third-party

---

[8]     The Company's non-debtor affiliates do not seek relief to maintain the Non-Debtor Foreign Bank Accounts.

accounts payable agents (the "Third-Party Accounts Payable Agents").[9]  Alvarez & Marsal,

which employs personnel trained in chapter 11 cash management systems, is also working

closely with the Third-Party Accounts Payable Agents to ensure that the Debtor will continue to

maintain and administer these detailed accounting records postpetition.  These controls are

particularly important here given the significant amount of cash that flows through the Debtor's

consolidated Cash Management System on an annual basis.  In addition, subject to the terms of

the DIP Facility, the Cash Management System will be subject to a cash dominion structure

whereby cash will be swept from certain accounts on a daily basis into a collection account at the

DIP Agent and applied to outstanding advances under the revolving portion of the DIP Facility.

In addition, given the corporate and financial structure of the Debtor and its non-debtor affiliates,

it would be highly disruptive to the Debtor's operations to establish an entirely new system of

accounts and a new cash management system. Furthermore, preserving the "business as usual"

atmosphere and avoiding the unnecessary distractions that would inevitably be associated with

any substantial disruption in the Debtor's Cash Management System will facilitate the Debtor's

reorganization efforts.

**B.      The Business Forms**

               27.     In the ordinary course of business, the Debtor uses a number of checks,

business letterhead, purchase orders, invoices, envelopes, promotional materials, and other

business forms and correspondence (collectively, the "Business Forms").  Because the Business

Forms were used prepetition, they do not reference the Debtor's current status as a debtor in

possession.  To minimize expense to its estate, the Debtor also requests authority to continue to

use all Business Forms without reference to its "debtor in possession" status.  Most parties doing

---

[9]     Although the Debtor maintains its own accounting records tracking the transfer of funds, data entry is
        outsourced to third-party providers located in the United States and Bulgaria.

business with the Debtor undoubtedly will be aware of the Debtor's status as a debtor in possession as a result of the publicity surrounding this Chapter 11 Case, including a press release issued by the Debtor and the notice of commencement of the Chapter 11 Case that will be provided to parties in interest.  As with the existing Cash Management System, requiring the Debtor to change existing Business Forms would unnecessarily distract the Debtor from its restructuring efforts and impose needless expenses on the estates.

28.     The Debtor does not maintain pre-printed check stock; rather, the name of the payor entity is printed when the check is written.  The Debtor is in the process of ensuring that, within a reasonable period of time after the Petition Date, subsequently written checks bear the designation "Debtor in Possession" and the number of the Chapter 11 Case.  To the extent that there are potential delays implementing the changes to the Debtor's software, the Debtor seeks a thirty (30) day period with which to fully implement these changes, without prejudice to its right to seek additional relief from, or time to comply with, such requirement.

C.     **The Debtor Should Be Authorized to Continue Its Investment and Deposit Practices**

29.     Prior to the Petition Date, the Debtor invested excess cash with approved depositories,[10] which primarily invest in investments that are, or are backed by, U.S. Treasury obligations, or U.S. Government obligations (either issued or guaranteed by the U.S. Treasury or U.S. Government) (the "Investment and Deposit Practices").  The Debtor requests (i) authorization to continue to deposit and invest funds in accordance with its existing practices, subject to any reasonable changes to the Cash Management System that the Debtor may implement and (ii) a waiver of the investment and deposit requirements of Bankruptcy Code section 345(b) to the extent that such requirements are inconsistent with the Investment and

---

[10]    The Debtor's funds are currently invested solely through Wells Fargo Investment Accounts and no funds are invested through the DWS Investment Account.

Deposit Practices.  In particular, under the Investment and Deposit Practices, the Debtor has

determined that it is prudent and desirable to maintain its excess cash in conservative

investments.

**D.      The Intercompany Transactions**

30.      In the ordinary course of business, the Debtor has provided loans to its

non-debtor foreign subsidiaries and, in certain instances, the Debtor was the recipient of funds

loaned from non-debtor foreign subsidiaries (the "Intercompany Debt Transactions").[11]  Further,

in the ordinary course of business, the Debtor regularly participates in transactions with its non-

debtor foreign subsidiaries in which they purchase and sell goods or services (the "Intercompany

Trade Transactions," and together with the Intercompany Debt Transactions, the "Intercompany

Transactions").  Before the commencement of the Chapter 11 Case, the Debtor engaged in

Intercompany Transactions including, but not limited to, the following:

(a) Payment of Expenses: Expenses paid by the Debtor on behalf of a non-debtor
foreign subsidiaries (for example, payment of employee expenses, management
expenses, treasury services, tax and audit services, human resources, freight,
insurance), which are allocated among the beneficiaries of such payments. Such
transfers are recorded on intercompany accounts.

(b) Cash Management Systems: Transfers of cash among the Debtor and the Debtor's
non-debtor foreign subsidiaries via the Debtor's Cash Management System, which
are recorded on intercompany accounts.

(c) Product Sales: Ordinary course transactions involving product purchased by the
Debtor from a non-debtor foreign subsidiary and then re-sold to a customer.

(d) Products Purchases: Ordinary course transactions involving products purchased
by a non-debtor foreign subsidiary from the Debtor and then resold to a customer.

_____

[11]  Central to the non-debtor foreign subsidiaries' business operations is the cash pooling system in Europe (the
"European Cash Pool"), which has involved Exide making revolving loans to Exide Holdings Netherlands B.V.
("Exide Netherlands B.V.").  Exide Netherlands B.V. acts as a central banker for transactions among the
various non-debtor European subsidiaries that participate in European Cash Pool (the "European Cash Pool
Participants").  Consistent with the DIP Motion, the Debtor anticipates that the non-debtor foreign subsidiaries
will continue to have funding needs that will be met by the Debtor over the course of this case.

31.     To the extent necessary to execute the Cash Management System and manage the day-to-day operations of its business, the Debtor requests authority to (i) pay for prepetition Intercompany Trade Transactions[12] the Debtor determines in its business judgment, are reasonably necessary to preserve the value of its non-debtor foreign subsidiaries and its ability to operate as a going concern for the benefit of the estate and (ii) continue to participate in Intercompany Trade Transactions and Intercompany Debt Transactions postpetition, in the ordinary course of business.

32.     Intercompany Netting.  In the ordinary course of business, the Debtor accounts for Intercompany Transactions with the European Cash Pool Participants through a "netting system" by tracking and settling intercompany account balances that accrue through ordinary course transactions between entities (e.g. provision of goods and services)[13] among Exide and the European Cash Pool Participants.  On a monthly average, the Debtor accrues approximately $4.5 million in payables to the European Cash Pool Participants and approximately $3.5 million in receivables from the European Cash Pool Participants, which are "netted" as described herein.  Approximately $4.5 million in prepetition intercompany payables owed to European Cash Pool Participants remain outstanding as of the Petition Date.  As noted above Exide is owed approximately $61 million by Exide Netherlands B.V. (the "U.S. Loan").  Exide Netherlands B.V. has made these funds available to the European Cash Pool Participants for their operating needs.  Through the netting system, the U.S. Loan will either increase or decrease based on whether Exide is a net payor or net receiver after Intercompany Transactions are settled on a monthly basis with the European Cash Pool Participants.  For example, if the

---

[12]     As described below, the Debtor does not expect to pay or "net"  more than $4.7 million in prepetition Intercompany Trade Transactions.

[13]     Typically, European Cash Pool Participants would provide specialized batteries to Exide for use in foreign vehicles.

Debtor owed amounts to a European Cash Pool Participant, as a result of goods or services received, the Debtor would not actually pay money to settle its debt with the European Cash Pool Participant.  Rather, the U.S. Loan would be reduced by the corresponding debt owed by the Debtor to the European Cash Pool Participant.  The European Cash Pool Participant would be given a credit with respect to its outstanding loan with Exide Netherlands B.V.  Given the operational efficiencies that the Debtor and its affiliates gain through the netting system (as opposed to having entities directly pay one another), the Debtor seeks confirmation of its authority to continue the Intercompany Debt Transactions in the ordinary course of business. This confirmation will help the Debtor's seamless transition into chapter 11 and preserve the value of the Debtor's foreign entities.

33.     <u>Intercompany Trade Transactions</u>.  Outside of the European Cash Pool Participants, Exide accounts for Intercompany Trade Transactions with its other non-debtor subsidiaries through an accounts payable system, which, on average, is cleared on a weekly basis for North American subsidiaries and on a quarterly basis for non-North American subsidiaries. For example, if a non-debtor foreign subsidiary supplies Exide with products or services, the non-debtor will submit an invoice and Exide will pay for those products or services subject to payment terms.[14]  On a monthly average, outside of the European Cash Pool Participants, the Debtor owes approximately $235,000 to its other non-debtor foreign subsidiaries, while it is owed approximately $14 million from these same parties.  Approximately $155,000 in prepetition intercompany payables owed to non-debtor foreign subsidiaries other than the

---

[14]   In the ordinary course of business, the Debtor uses the Cash Management System to transfer money from the ACH Disbursement Account to an Exide Technologies do Brazil's ("<u>Exide Brazil</u>") disbursement account for services, local employee wages, expenses, and accounts payable.  The Debtor believes that Brazil represents one of its largest areas for future economic growth.  In addition, Exide acts as an internal third-party service provider in making disbursements from its non-debtor Canadian subsidiary, Exide Technologies Canada Corporation's ("<u>Exide Canada</u>") accounts.  Exide Canada generates more receivables than payables and no Debtor funds are used to pay Exide Canada's creditors.

European Cash Pool Participants remain outstanding as of the Petition Date.  The Debtor maintains records of all fund transfers and can ascertain, trace and account for Intercompany Transactions. At the same time, however, if the Intercompany Transactions were to be discontinued, the Cash Management System and the related administrative controls would be disrupted to the detriment of the Debtor's operations.  Accordingly, the Debtor seeks authority, in its discretion, to pay for prepetition Intercompany Trade Transactions, if, in the exercise of the Debtor's business judgment, it deems the payment necessary and in the best interest of the Debtor's estate and other parties in interest.  For example, certain of the non-debtor foreign subsidiaries may become financially distressed if the prepetition Intercompany Trade Transactions are not satisfied.  The Debtor has proposed to provide notice of any amounts paid on account of prepetition Intercompany Trade Transactions to the U.S. Trustee and any official committee appointed in the Chapter 11 Case within five (5) business days following such payment.

34.     _Postpetition Intercompany Transactions_.  As noted above, in the normal course of their operations, the Debtor's foreign entities[15] will require funding to meet their working capital needs as the Company enters its inventory build season and to address other cash needs precipitated by the Debtor's chapter 11 filing.  The Debtor's proposed DIP financing, which features a DIP ABL Facility and a DIP Term Loan, provides the mechanism for the Debtor's continued post-petition funding of its valuable foreign entities.  The Debtor believes in the exercise of its reasonable business judgment that preservation of the going concern value of the company as a worldwide enterprise, including the maintenance of the non-debtor foreign

---

[15]   As set forth in the DIP Motion, based on the Debtor's unaudited financial statements, in the year ended March 31, 2013 the Company's Europe and ROW businesses contributed more than $79 million in EBITDA for the fiscal year that ended March 31, 2013 (just under 75% of the Company's total EBITDA) and are projected to produce $70 million in EBITDA during the current fiscal year (almost 67% of the Company's total EBITDA).

subsidiaries, is absolutely essential to the success of its reorganization efforts. Accordingly, the

Debtor seeks the authority to continue to participate in Intercompany Trade Transactions and

Intercompany Debt Transactions postpetition, in the ordinary course of business and consistent

with the DIP Facility. Consistent with its prepetition practice, the Debtor will maintain records

of all transfers and can ascertain, trace and account for all Intercompany Transactions.


## APPLICABLE AUTHORITY

**A.    The Court Should Authorize the Debtor to Maintain Its Existing Bank Accounts and Use Its Existing Cash Management System and Grant a Waiver of Any Requirement to Close Existing Accounts**

35.    Although the Debtor maintains the Bank Accounts as part of an

established Cash Management System, the U.S. Trustee Guidelines require that debtors in

possession take certain actions with respect to prepetition bank accounts in order for the U.S.

Trustee to supervise the administration of the Debtor's Chapter 11 Case. As described in the

U.S. Trustee Guidelines, the requirements are designed to draw a clear line of demarcation

between prepetition and postpetition transactions and operations and prevent the inadvertent

postpetition payment of prepetition claims. The Debtor submits, however, that a waiver of

certain requirements is warranted, given the controls it has in place to ensure a clear line of

demarcation between prepetition and postpetition transactions.

36.    Specifically, all of the Bank Accounts are with financially stable banking

institutions. Indeed, the U.S. Trustee has identified Wells Fargo, JPM, Citibank, U.S. Bank, and

UMB as approved depositories for cases pending in this District. To protect against the

unauthorized payment of prepetition obligations, the Debtor represents that, if it is authorized to

continue to use the Bank Accounts, it will not pay, and will not instruct the Banks (as defined

below) to pay, any debts incurred before the Petition Date, other than as authorized by this Court.

Additionally, as noted above, prior to the filing, the Debtor and its advisors developed a training program to ensure detailed and accurate distinction of prepetition and postpetition obligations to ensure that the Debtor will not pay any prepetition claim unless authorized by this Court.

37.     Moreover, any new account that the Debtor opens will be (i) with a bank that is (a) organized under the laws of the United States of America or any state therein and (b) has executed, or is willing to immediately execute, a Uniform Depository Agreement with the U.S. Trustee; and (ii) designated a "Debtor in Possession" account by the relevant bank. Additionally, the Debtor will provide the U.S. Trustee with notice of any new accounts that are opened.

38.     Enforcement of the U.S. Trustee's requirements here would impair the Debtor's business and its reorganization efforts.  The Debtor's Cash Management System is highly automated and computerized, which allows the Debtor, with the assistance of the Third-Party Accounting Agents, to manage all of its cash flow needs and includes the necessary accounting controls to enable the Debtor, as well as creditors and the Court, to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable.  While the Debtor's case is pending, the Debtor, with the assistance of Alvarez & Marsal and the Third-Party Accounting Agents will continue to maintain and administer detailed records reflecting all transfers of funds.

39.     Accordingly, to avoid delays in payments to administrative creditors, and to ensure as smooth a transition into chapter 11 as possible, the Debtor must be permitted to continue to maintain its existing Bank Accounts and open new and close existing accounts as needed subject to the requirements noted above and the requirements under the Debtor's proposed DIP Financing

40.     Further, the Debtor requests that all applicable banks or other financial institutions (collectively, the "Banks") be permitted to debit the Debtor's accounts in the ordinary course of business without the need for further order of this Court for: (a) all checks drawn on the Bank Accounts which are cashed at the Banks' counters or exchanged for cashier's checks by the payees thereof prior to the Petition Date; and (b) all undisputed prepetition amounts outstanding as of the date hereof, if any, owed to the Banks as service charges for the maintenance of the Debtor's Cash Management System.  The Debtor further requests that the Banks be restrained from honoring any check, draft, wire, or electronic funds transfer presented, issued, or drawn on the Bank Accounts on account of a prepetition claim unless (i) authorized in an order of this Court, as represented to the Banks by the Debtor as set forth below; (ii) not otherwise prohibited by a "stop payment" request received by the Banks from the Debtor; and (iii) supported by sufficient funds in the Bank Account in question.

41.     Both as part of the Motion and in other motions that have been concurrently filed, the Debtor is requesting authority, but not direction, to pay certain prepetition obligations.  With respect to some of these obligations, the Debtor issued checks prior to the Petition Date that have yet to clear the banking system.  In other instances, the Debtor will create the relevant check once the Court enters an order permitting the Debtor to do so.  The Debtor intends to inform the Banks which such checks should be so honored.  Therefore, the Debtor requests that the Banks be authorized to rely on the representations of the Debtor with respect to whether any check or other payment order drawn or issued by the Debtor prior to the Petition Date should be honored.  The Debtor further requests that the Order specify that the Banks shall not have any liability to any party for relying on such representations.  This relief is reasonable and appropriate because the Banks are not in a position to independently verify or audit whether

a particular prepetition check may be honored in accordance with an order by the Court or otherwise.

42.     Allowing the Debtor to utilize its prepetition Cash Management System and engage in related routine transactions is entirely consistent with applicable provisions of the Bankruptcy Code and customary relief in chapter 11 cases of similar size and scope.  In particular, Bankruptcy Code section 363(c)(1) authorizes a debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c)(1).  The authority granted by section 363(c)(1) extends to a debtor in possession's continued use of its customary cash management system and, thus, supports the relief requested. See, e.g., Charter Co. v. Prudential Ins. Co. Am. (In re Charter Co.), 778 F.2d 617, 621 (11th Cir. 1985) (indicating that an order authorizing the debtor to employ a cash management system that was "usual and customary in the past" was "entirely consistent" with section 363(c)(1)) (internal quotation omitted).

43.     To the extent that use of the existing Cash Management System is outside the ordinary course of the Debtor's business, such use is permitted by sections 363(b)(1) and 105(a) of the Bankruptcy Code.[16]  Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Section 105(a) of the Bankruptcy Code further provides that the Court may "issue any order . . . that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code.  11 U.S.C. § 105(a).

---

[16]   The Debtor believes in the exercise of its reasonable business judgment that preservation of the going concern value of the Company as a worldwide enterprise, including the maintenance of the non-debtor foreign subsidiaries, is absolutely essential to the success of the Debtors.  As described in the DIP Motion, the Debtor has budgeted to fund the needs of the non-debtor foreign subsidiaries in the ordinary course of business.

44.     Where there is a valid business justification for using property outside the ordinary course of business, the law presumes that, "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (internal quotation marks omitted) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).

45.     Indeed, bankruptcy courts routinely permit large corporations to continue using their existing cash management systems, generally treating requests for such relief as *de rigueur* in chapter 11 cases.  See In re Columbia Gas Sys., Inc., 136 B.R. 930, 934 (Bankr. D. Del. 1992) (recognizing that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash"), aff'd in part, rev'd in part, 1992 U.S. Dist. LEXIS 9460 (D. Del. July 6, 1992), aff'd in part, rev'd in part, 997 F.2d 1039 (3d Cir. 1993), cert. denied sub nom. Official Comm. of Unsecured Creditors v. Columbia Gas Transmission Corp., 510 U.S. 1110 (1994); see also, In re LCI Holding Company, Inc., Case No. 12-13319 (KG) (Bankr. D. Del. Dec. 13, 2012) (granting interim relief); In re A123 Sys., Inc., Case No. 12-12859 (KJC) (Bankr. D. Del. Oct. 18, 2012) (granting interim relief); In re WP Steel Venture LLC, No. 12-11661 (KJC) (Bankr. D. Del. Jun. 1, 2012); In re DSI Holdings, Inc., Case No. 11-11941 (KJC) (Bankr. D. Del. June 28, 2011); In re E. Energy, L.P., Case No. 11-14138 (KJC) (Bankr. D. Del. Jan. 26, 2012); In re Satelites Mexicanos, S.A. de C.V., Case No. 11-11035 (CSS) (Bankr. D. Del. April 11, 2011); In re Neb. Book Co., Case No. 11-12005 (PJW) (Bankr. D. Del. June 28, 2011); In re L.A. Dodgers LLC, Case No. 11-12010 (KG) (Bankr. D. Del. June 28, 2011); In re Visteon Corp., Case No. 09-11786 (CSS) (Bankr. D. Del. May 29, 2009).

**B.     The Court Should Authorize the Debtor to Honor Certain Prepetition Obligations Related to the Cash Management System**

46.     In connection with the Cash Management System, the Debtor may incur fees and other charges, (collectively, all such fees and charges, the "Bank Account Claims") in connection with (a) Bank services (the "Service Charges"), (b) checks deposited with banks which have been dishonored or returned for insufficient funds in the applicable amount, and (c) any reimbursement or other payment obligations, such as overdrafts, arising under any agreements governing the Bank Accounts, including, without limitation, any prepetition cash management agreements or treasury services agreements (the "Bank Account Agreements"). The Debtor estimates that outstanding Bank Account Claims total less than $25,000 as of the Petition Date.

47.     As with the Cash Management System, payment of the Bank Account Claims will minimize disruption to the Debtor's operations and is therefore in the best interests of the estates.  Absent payment of the Bank Account Claims, the Banks might assert setoff rights against the funds in the Bank Accounts on account of the Bank Account Claims, freeze the Bank Accounts, and/or refuse to provide services to the Debtor.  The payment of Bank Account Claims generally will not prejudice unsecured creditors given that, as noted above, the Banks may have setoff rights with respect to the Bank Account Claims.

48.     Accordingly, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the Debtor seeks authority, in its sole discretion, to pay and/or reimburse the Banks in the ordinary course of business for any Bank Account Claims arising prior to or after the Petition Date.

49.     This Court and other courts have routinely granted the same or similar relief as requested in the Motion to chapter 11 debtors.  See, e.g., In re A123 Sys., Inc., Case No.

22

12-12859 (KJC) (Bankr. D. Del. Oct. 18, 2012) (granting interim relief); In re LightSquared Inc.,

No. 12-12080 (SCC) (Bankr. S.D.N.Y. Jun. 11, 2012); In re Friendly Ice Cream Corp., Case No.

11-13167 (KG) (Bankr. D. Del. Oct. 6, 2011); In re Visteon Corp., Case No. 09-11786 (CSS)

(Bankr. D. Del. May 29, 2009). The Debtor respectfully submits that such relief should be

granted here.

**C.     The Court Should Authorize the Debtor to Continue to Use Existing Business Forms and Checks**

50.     Local Bankruptcy Rule 2015-2(a) provides:

> Where the debtor uses pre-printed checks, upon motion of the debtor, the Court may, without notice and hearing, permit the debtor to use its existing checks without the designation "Debtor-in-Possession" and use its existing bank accounts. However, once the debtor's existing checks have been used, the debtor shall, when reordering checks, require the designation "Debtor-in-Possession" and the corresponding bankruptcy number on all such checks.

Del. Bankr. L.R. 2015-2(a).

51.     In order to minimize expenses to its estates, the Debtor also seeks

authorization to continue using Business Forms existing immediately prior to the Petition Date,

without reference to the Debtor's status as a debtor in possession.

52.     As noted above, most parties doing business with the Debtor undoubtedly

will be aware of the Debtor's status as a debtor in possession as a result of the press releases

issued by the Debtor and other press coverage. Each of the Debtor's known creditors will

receive direct notice of the commencement of this Chapter 11 Case.

53.     Finally, changing correspondence and business forms would be expensive,

unnecessary, and burdensome to the Debtor's estates and would not confer any real benefit upon

those dealing with the Debtor. For these reasons, the Debtor requests that it be authorized to use

its existing Business Forms without being required to place the label "Debtor in Possession" (or

any similar label) on each. As noted above, the Debtor will make reasonable best efforts to

ensure that, within a reasonable period of time after the Petition Date, subsequently issued

checks bear the designation "Debtor in Possession" and its case number.  However, printing such

designation could involve some process implementation time.  Accordingly, the Debtor requests

relief from compliance with such requirement for thirty (30) days and requests that any order be

without prejudice to its right to seek additional relief from, or time to comply with, such

requirement.

54.    This Court and other courts have routinely granted the same or similar

relief as requested in the Motion to chapter 11 debtors.  See, e.g.,  In re A123 Sys., Inc., Case No.

12-12859 (KJC) (Bankr. D. Del. Oct. 18, 2012) (granting interim relief);  In re WP Steel Venture

LLC, No. 12-11661 (KJC) (Bankr. D. Del. Jun. 1, 2012); In re DSI Holdings, Inc., Case No. 11-

11941 (KJC) (Bankr. D. Del. June 28, 2011); In re Friendly Ice Cream Corp., Case No. 11-13167

(KG) (Bankr. D. Del. Oct. 6, 2011); In re Neb. Book Co., Case No. 11-12005 (PJW) (Bankr. D.

Del. June 28, 2011); In re L.A. Dodgers LLC, Case No. 11-12010 (KG) (Bankr. D. Del. June 28,

2011).

**D.    The Court Should Authorize the Debtor to Continue Its Investment and Deposit Practices**

55.    Bankruptcy Code section 345(a) authorizes a debtor in possession to make

deposits or investments of estate money in a manner "as will yield the maximum reasonable net

return on such money, taking into account the safety of such deposit or investment." 11 U.S.C.

§ 345(a).  If a deposit or investment is not "insured or guaranteed by the United States or by a

department, agency, or instrumentality of the United States or backed by the full faith and credit

of the United States," Bankruptcy Code section 345(b) provides that the entity with which the

deposit or investment is made obtain a bond in favor of the United States that is secured by the

undertaking of an adequate corporate surety. See 11 U.S.C. § 345(b).

56.     This Court, however, has discretion to waive the foregoing section 345(b) requirements "for cause." 11 U.S.C. § 345(b).  In determining whether the "for cause" standard has been met, the Court should consider a "totality of the circumstances," utilizing the following factors:

(a)     The sophistication of the debtor's business;
(b)     The size of the debtor's business operations;
(c)     The amount of the investments involved;
(d)     The bank ratings (Moody's and Standard and Poor) of the financial institutions where the debtor in possession funds are held;
(e)     The complexity of the case;
(f)     The safeguards in place within the debtor's own business of insuring the safety of the funds;
(g)     The debtor's ability to reorganize in the face of a failure of  one or more of the financial institutions;
(h)     The benefit to the debtor;
(i)     The harm, if any, to the estate; and
(j)     The reasonableness of the debtor's request for relief from section 345(b) requirements in light of the overall circumstances of the case.

In re Serv. Merch. Co., Inc., 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999).

57.     The Debtor respectfully requests that this Court (a) authorize the Debtor to continue making investments and deposits in accordance with the Investment and Deposit Practices and (b) exercise its discretion to waive the requirements of Bankruptcy Code section 345(b) to the extent that the requirements are inconsistent with the Investment and Deposit Practices.

58.     The Debtor submits that the circumstances of these cases warrant such relief. The Debtor is a large, sophisticated entity with a complex Cash Management System that relies on multiple Bank Accounts on a daily basis.  The Investment Accounts are with all authorized depositories.  Furthermore, in light of the regular deposits and sweeps of the Master Concentration Account and the "as needed" funding structure of the overall system, requiring the posting of a bond to the extent that the balances of these accounts exceed FDIC insurance limits

at a given time would be especially disruptive, unnecessary, and wasteful. Nevertheless, to the extent that there are excess funds that could be invested during this Chapter 11 Case, the Debtor submits that investments in accordance with the Investment and Deposit Practices are prudent and safe.  As described above, the Debtor has invested excess cash in authorized depositories, which invest primarily in, or are backed by, U.S. Treasury obligations, or U.S. Government obligations (either issued or guaranteed by the U.S. Treasury or U.S. Government).  Moreover, if granted a waiver, the Debtor will not be required to incur the significant administrative difficulties and expenses relating to opening new accounts to ensure that all of its funds are fully insured or invested strictly in accordance with the restrictions established by section 345.

59.    In similar chapter 11 cases, courts in this district and others have routinely granted requests to approve the continued use of investment and deposit guidelines that do not strictly comply with Bankruptcy Code section 345 but that, as here, nevertheless are safe and prudent.  See, e.g., In re A123 Sys., Inc., Case No. 12-12859 (KJC) (Bankr. D. Del. Oct. 18, 2012) (granting interim relief); In re WP Steel Venture LLC, Case No. 12-11661 (KJC) (Bankr. D. Del. June 1, 2012) (granting interim relief); In re Solar Trust of Am., LLC, Case No. 12-11136 (KG) (Bankr. D. Del. Apr. 3, 2012) (granting interim relief); In re E. Energy, L.P., Case No. 11-14138 (KJC) (Bankr. D. Del. Jan. 26, 2012); The Great Atlantic & Pacific Tea Co., Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. Feb. 7, 2011) (granting final relief and waiver of section 345 guidelines for investments with banks that invest in U.S. Government-backed securities that "carry the highest possible ratings" or are an "authorized depository").  The Debtor respectfully submits that such relief should be granted here.

**E.      The Court Should Authorize the Debtor to Pay Prepetition Amounts Related to Intercompany Trade Transactions and Continue the Intercompany Transactions in the Ordinary Course of Business.**

60.      <u>Prepetition Amounts Related to Intercompany Trade Transactions</u>. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, debtors in possession are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." <u>In re CoServ, L.L.C.</u>, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the fiduciary duties of any debtor in possession is the obligation to "protect and preserve the estate, including an operating business's going-concern value." <u>Id</u>.  As the <u>CoServ</u> court noted, there are instances in which a debtor can fulfill this fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." Id. The pre-plan satisfaction of prepetition claims is one such instance if the payment "is the only means to effect a substantial enhancement of the estate."  <u>Id</u>.

61.      Here, authorizing the Debtor, in its business judgment, to pay prepetition Intercompany Trade Debt will assist the Debtor to fulfill its fiduciary obligation to maximize the value of the estate for all creditors and thus is a valid exercise of sound business judgment.  As noted above, payment of certain prepetition Intercompany Trade Debt is essential to the continued going-concern operation of the Debtor's business.  Accordingly, to preserve the value of Exide throughout the world during this critical early stage of the Chapter 11 Case, the Debtor should be authorized, in its discretion, to pay prepetition Intercompany Debt Transactions. Moreover, the Debtor proposes to provide notice of any such payments to the U.S. Trustee and any official committee appointed in the Chapter 11 Case.  This Court, therefore, should authorize the Debtor to make such payments, in an amount not to exceed $155,000.  In addition, this Court should authorize the Debtor to continue its intercompany netting practice as described herein.

62.     Recognizing the global nature of the automotive supply industry, courts have in many cases granted automotive suppliers in chapter 11 relief, including authority to continue to fund and pay prepetition claims owing to foreign affiliates, to help maintain stability in their global operations.  See, e.g., In re A123 Sys., Inc., Case No. 12-12859 (KJC) (Bankr. D. Del. Oct. 18, 2012) (authorizing the payment of prepetition intercompany trade transactions and set off prepetition intercompany claims against foreign affiliates); In re Mark IV Industries, Inc., Case No. 09-12795 (SMB) (Bankr. S.D.N.Y. May 4, 2009) (authorizing debtors to set off prepetition intercompany claims against foreign affiliates and to fund foreign affiliates up to $15 million); In re Dura Auto. Sys., Inc., Case No. 06-11202 (KJC) (Bankr. D. Del. Nov. 20, 2006) (authorizing debtors to extend and repay loans and pay prepetition payables to or from foreign non-debtor affiliates); In re J.L. French Auto. Castings, Inc., Case No. 06-10119 (MFW) (Bankr. D. Del. Mar. 21, 2006) (authorizing debtors to loan estate property to foreign non-debtor affiliate, subject to a cap specified in the court's order); In re Delphi Corp., Case No. 05-44481 (RDD) (Bankr. S.D.N.Y. Oct. 8, Oct. 13, and Nov. 4, 2005) (debtors authorized to fund, via loans, foreign subsidiaries and affiliates in the ordinary course of business).

63.     Postpetition Intercompany Transactions.  Although the Debtor believes that engaging in Intercompany Transactions, including the maintenance of the European Cash Pool, on a postpetition basis would be within the ordinary course of its business, out of an abundance of caution and to provide assurance to the European Cash Pool Participants, the Debtor is seeking the relief requested herein pursuant to section 363(b) of the Bankruptcy Code. Section 363(b)(1) provides, in part, "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U. S.C. § 363(b)(1).

64.    Bankruptcy Code section 363(b)(1) authorizes a debtor in possession to use property of the estate other than in the ordinary course of business after notice and a hearing. Courts have held that there must be some articulated business justification for using, selling or leasing property out of the ordinary course of business before the bankruptcy judge may order such disposition under section 363(b). See, e.g., The Dai-Ici Kangyo Bank Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate . . . courts require the debtor to show that a sound business purpose justifies such actions").  In the event an order permitting the Debtor to continue engaging in the Intercompany Transactions is necessary, the Debtor believes that its business judgment to continue the Intercompany Transactions is sound because, among other reasons discussed herein, the Intercompany Transactions reduce the administrative costs of the Debtor and facilitate the satisfaction of the Debtor's obligations and are integral to the Debtor's daily operations.  In addition, the Intercompany Transactions received from its non-debtor subsidiaries is an important source of liquidity for the Debtor. Thus, the Debtor submits that continuation of the Intercompany Transactions is in the best interests of the Debtor's estates and their creditors.

65.    Moreover, the Bankruptcy Code affords debtors in possession the freedom to obtain unsecured credit and incur unsecured debt in the ordinary course of business without notice and hearing.  See 11 U.S.C. § 364(a); see also Mulligan v. Sobiech, 131 B.R. 917, 921 (S.D.N.Y. 1991).  The Debtor therefore seeks authority, to the extent necessary, to obtain unsecured credit and incur unsecured debt in the ordinary operation of its Cash Management System, including in connection with the Intercompany Transactions.

66.     If the Debtor cannot continue the Intercompany Transactions, the Debtor's ordinary-course operations would be unnecessarily and severely hindered.  As described above, the cessation of the Intercompany Transactions would require a debilitating increase in management expenses and overhead.  Furthermore, the Debtor's failure to continue the Intercompany Transactions consistent with the Cash Management System and past practices may impair the ability of the Company's non-debtor affiliates to meet their obligations, and the value of those non-debtor affiliates, both generally and to the Debtor, may decline.  Accordingly, if the Intercompany Transactions cannot continue, the Debtor would be virtually unable to operate its business during the Chapter 11 Case and the likelihood of a successful reorganization would decrease dramatically.  Avoiding such potentially crippling hindrances by continuing the Intercompany Transactions is, therefore, in the best interests of the estates.

67.     Additionally, pursuant to Bankruptcy Code sections 105(a) and 503(b), the Debtor requests that claims arising from postpetition Intercompany Transactions from non-debtor subsidiaries to the Debtor be granted administrative expense priority status.  Such Intercompany Transactions are consistent with and authorized by Section 364(a) of the Bankruptcy Code, which provides that, unless the court orders otherwise, the Debtors are authorized to incur unsecured debt in the ordinary cause of business allowable as an administrative expense under Section 503(b)(1).

68.     Accordingly, the Debtor requests that the Court authorize the Debtor to continue engaging in Intercompany Transactions in the ordinary course of business and in connection with its continued use of the Cash Management System.  As with the Cash Management System, authorizing the Debtor to continue the Intercompany Transactions is appropriate under sections 363(b) or 363(c) of the Bankruptcy Code and is an appropriate

exercise of the Court's equitable powers under section 105(a) of the Bankruptcy Code.  See, e.g.,

In re Gen. Growth Props., 412 B.R. 609, 610 (Bankr. S.D.N.Y. 2009) (holding that debtors were

authorized to continue prepetition cash management practices, including intercompany

transactions, pursuant to sections 105(a) and 363(c) of the Bankruptcy Code); Charter, 778 F.2d

at 621 (indicating that order authorizing continued use of cash management system that involved

funds transfers to non-debtor affiliates was "entirely consistent" with section 363(c)(1) because

the practice was "usual and customary in the past").

      69.     Authorization to engage in intercompany transactions, similar to the relief

requested here, is routinely granted in complex chapter 11 cases.  See, e.g.,  In re A123 Sys.,

Inc., Case No. 12-12859 (KJC) (Bankr. D. Del. Oct. 18, 2012) (granting interim relief); In re WP

Steel Venture LLC, Case No. 12-11661 (KJC) (Bankr. D. Del. Jun. 1, 2012); In re Satelites

Mexicanos, S.A. de C.V., Case No. 11-11035 (CSS) (Bankr. D. Del. Apr. 11, 2011); In re

Ambassadors Int'l, Inc., Case No. 11-11002 (KG) (Bankr. D. Del. Apr. 5, 2011); In re Local

Insight Media Holdings, Inc., Case No. 10-13677 (Bankr. D. Del. Nov. 19, 2010); In re OTC

Holdings Corp., Case No. 10-12636 (Bankr. D. Del. Aug. 27, 2010); see also In re LightSquared

Inc., No. 12-12080 (SCC) (Bankr. S.D.N.Y. Jun. 11, 2012).

      70.     For the reasons set forth above, the Debtor submits that the relief

requested in the Motion is in the best interest of the Debtor, its estates, creditors, stakeholders

and other parties in interest, and, therefore, should be granted.

### IMMEDIATE RELIEF IS NECESSARY TO AVOID IMMEDIATE AND IRREPARABLE HARM

      71.     Bankruptcy Rule 6003 provides that the relief requested in the Motion

may be granted if the "relief is necessary to avoid immediate and irreparable harm."  Fed. R.

Bankr. P. 6003; see also In re First NLC Fin. Servs., LLC, 382 B.R. 547, 549 (Bankr. S.D. Fla.

2008) (holding that Bankruptcy Rule 6003 permits entry of retention orders on an interim basis to avoid irreparable harm).  The Third Circuit has interpreted the language "immediate and irreparable harm" in the context of preliminary injunctions.  In that context, the court instructed that irreparable harm is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.  See, e.g., Norfolk S. Ry. Co. v. City of Pittsburgh, 235 F. App'x 907, 910 (3d Cir. 2007) (citing Glasco v. Hills, 558 F.2d 179, 181 (3d Cir. 1977)).  Furthermore, the harm must be shown to be actual and imminent, not speculative or unsubstantiated.  See, e.g., Acierno v. New Castle County, 40 F.3d 645, 653-55 (3d Cir. 1994).  The Debtor submits that for the reasons already set forth herein, the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtor.

## WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)

72.     The Debtor also requests that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtor seeks in the Motion is necessary for the Debtor to operate its businesses without interruption and to preserve value for its estates.  Accordingly, the Debtor respectfully requests that the Court waive the fourteen-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## NOTICE

73.     Notice of the Motion will be given to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the Office of the United States Attorney for the District

of Delaware; (iii) counsel to the agent under the proposed debtor in possession financing; (iv) counsel to the agent for the Debtor's prepetition secured lenders; (v) the indenture trustee for each of the Debtor's secured and unsecured outstanding bond issuances; (vi) counsel to the unofficial committee of senior secured noteholders; (vii) the Internal Revenue Service; (viii) the Securities and Exchange Commission; (ix) the Banks; (x) the parties included on the Debtor's list of twenty (20) largest unsecured creditors; and (xi) all parties entitled to notice pursuant to Local Bankruptcy Rule 9013-1(m) (collectively, the "Notice Parties"). The Debtor submits that no other or further notice need be provided.

## NO PRIOR REQUEST

74.     No previous request for the relief sought herein has been made to this Court or any other court.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court enter an order, substantially in the form annexed hereto, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated:  Wilmington, Delaware
          June 10, 2013

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

/s/ Anthony W. Clark
Anthony W. Clark (I.D. No. 2051)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: (302) 651-3000
Fax: (302) 651-3001

- and -

Kenneth S. Ziman *(pro hac vice admission pending)*
J. Eric Ivester *(pro hac vice admission pending)*
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Fax: (212) 735-2000

- and -

James J. Mazza, Jr. *(pro hac vice admission pending)*
155 N. Wacker Dr.
Chicago, Illinois 60606-1720
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Proposed Counsel for Debtor and Debtor in Possession*

**EXHIBIT A**

**CASH MANAGEMENT SYSTEM FLOW CHART**

**EXHIBIT A**
**Cash Management Flow Chart**



**EXHIBIT B**

**List of Bank Accounts**

**EXHIBIT B**

**List of Bank Accounts**

| Corporate Entity | Financial Institution | Account Type | Account Number | Estimated Current Balance |
|---|---|---|---|---|
| Exide Technologies | Wells Fargo N.A. | Master Concentration | xxxx5949 | **$12,632,861.03** |
| Exide Technologies | Wells Fargo N.A. | Transportation/ Industrial Receipts | xxxx5952 | **$0** |
| Exide Technologies | Wells Fargo N.A. | Lockbox | xx3479 | **$0** |
| Exide Technologies | Wells Fargo N.A. | ACH Disbursements (A/P & Payroll) | xxxx9039 | **$1,611,055.79** |
| Exide Technologies | Wells Fargo N.A. | Control- Disbursement - Payroll | xxxx9747 | **$0** |
| Exide Technologies | Wells Fargo N.A. | Control- Disbursement - A/P | xxxx9751 | **$0** |
| Exide Technologies | Wells Fargo Advantage Funds | 100% Treasury Money Market  - S-T Investment account | Fund # 008 (NWTXX), xxx1393 | **$180,080.32** |
| Exide Technologies | Wells Fargo Advantage Funds | Treasury PLUS Money Market  - S-T Investment account | Fund # 793 (PISXX), xxxx0026 | **$126,033.15** |
| Exide Technologies | DWS Investments Services Company[1] | ICT Treasury Portfolio Institutional Shares – S-T Investment | xxxx6616 | **$0** |
| Exide Technologies | CITIBANK NA | CIGNA Healthcare Impressed Cigna Account[2] | xxxx5807 | **$62,225.85** |
| Exide Technologies | CITIBANK NA | CIGNA Healthcare Impressed Cigna Account[3] | xxxx1716 | **$28,296.07** |
| Exide Technologies | UMB Bank | AonHewitt Administered Plan for Exide Technologies[4] | xxxx7943 | **$50,300.26** |
| Exide Technologies | JP Morgan Chase | UnitedHealthCare Administered Plan for Exide Technologies[5] | xxxx9696 | **$194,796.37** |
| Exide Technologies (d/b/a GNB Industrial Power) | Toronto Dominion | Disbursement Account CAD | xxxx1525 | **CAD $516,871.84** |
| Exide Technologies (d/b/a GNB Industrial Power) | Toronto Dominion | Disbursement Account USD | xxxx5255 | **$151,672.72** |
| Exide Technologies (d/b/a Exide Corporation) | U.S. Bank | Standby Trust Account | xxxx1952 | **$0** |
| Exide Technologies (d/b/a Exide Corporation) | U.S. Bank | Standby Trust Account | xxxx5000 | **$0** |
| Exide Technologies (d/b/a Exide Corporation) | U.S. Bank | Standby Trust Account | xxxx3371 | **$0** |
| Exide Technologies (d/b/a Exide Corporation) | U.S. Bank | Standby Trust Account | xxxx1925 | **$0** |
| Exide Technologies | U.S. Bank | Standby Trust Account | xxx94000 | **$0** |
| Exide Technologies | U.S. Bank | Standby Trust Account | xxxx4100 | **$0** |
| Exide Technologies | U.S. Bank | Standby Trust Account | xxx64000 | **$0** |
| Exide Technologies (d/b/a Exide Corporation) | U.S. Bank | Standby Trust Account | xxxx1943 | **$0** |
| Exide Technologies (d/b/a Exide Corporation) | U.S. Bank | Standby Trust Account | xxxx1765 | **$0** |
| Exide Technologies (d/b/a Exide Corporation) | U.S. Bank | Standby Trust Account | xxxx3870 | **$0** |
| Exide Technologies | U.S. Bank | Standby Trust Account | xxxx64NS | **$0** |

[1]    The DWS Investment Account is an idle account with a zero balance.

[2]    The purpose of this account is for payments related to short-term disability.

[3]    The purpose of this account is for payment related to dental coverage for active participants and medical and pharmacy plans for reti⋯ employees.

[4]    The purpose of this account is for payments related to employee FSA and HRA.

[5]    The purpose of account is for payments related to medical claims and wellness expense reimbursements for active participants.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                               :

| | |
|---|---|
| In re: | Chapter 11 |
| | |
| EXIDE TECHNOLOGIES, | Case No. 13-11482 |
| | |
| Debtor.[1] | **Related Docket No. _____** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**INTERIM ORDER GRANTING DEBTOR'S MOTION FOR ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105(a), 345(b), 363, AND 503(b), BANKRUPTCY RULES 6003 AND 6004 AND LOCAL BANKRUPTCY RULE 2015-2 AUTHORIZING (I) CONTINUED MAINTENANCE OF PREPETITION BANK ACCOUNTS AND PAYMENT OF RELATED PREPETITION OBLIGATIONS, (II) CONTINUED USE OF ITS EXISTING CASH MANAGEMENT SYSTEM, (III) CONTINUED USE OF EXISTING BUSINESS FORMS, (IV) CONTINUATION OF EXISTING INVESTMENT AND DEPOSIT PRACTICES, AND (V) CONTINUATION OF INTERCOMPANY TRANSACTIONS AND HONORING CERTAIN RELATED PREPETITION OBLIGATIONS**

Upon the motion (the "<u>Motion</u>")[2] of the Debtor for an order, pursuant to sections

105(a), 345(b), 363, and 503(b) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"),

Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"),

and Local Bankruptcy Rule 2015-2 authorizing, but not directing, the Debtor (i) to continue to

maintain existing bank accounts, authorizing a waiver of certain operating guidelines relating to

bank accounts, and the payment of related prepetition obligations; (ii) to continue to use its

existing Cash Management System; (iii) to continue to use existing Business Forms; and

(iv) continue the Intercompany Transactions in the ordinary course of business and pay certain

prepetition obligations related to Intercompany Transactions; and upon the First Day

---

[1]    The last four digits of the Debtor's taxpayer identification number are 2730.  The Debtor's corporate headquarters are located at 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

Declaration; and due and sufficient notice of the Motion having been given under the particular circumstances; and it appearing that no other or further notice need be provided; and it appearing that the relief requested by the Motion is in the best interests of the Debtor, its estates, its creditors, its stakeholders, and other parties in interest; and after due deliberation thereon, and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED AND DECREED that:**

1.      The Motion is GRANTED on an interim basis as set forth herein.

2.      The Debtor is authorized, but not directed, to continue using the Cash Management System as described in the Motion, subject to the limitations in this Order and solely to the extent permitted under the terms of the DIP Financing.  The Debtor may transfer funds into, out of, and through the Cash Management System, using ordinary transfer methods in accordance with the Debtor's prepetition practice, as modified by the cash dominion or other provisions of the DIP Facility.  In connection with the ongoing utilization of its Cash Management System, the Debtor shall continue to maintain records with respect to all transfers of cash so that all transactions may be readily ascertained, traced, and recorded properly and the Debtors shall provide reasonable access to such records to the administrative agent under the DIP Facility (the "DIP Agent").  Except as otherwise set forth herein, the Debtor is further authorized to implement any changes to the Cash Management System that it deems appropriate; *provided* that any material change to the Cash Management System shall require the prior written consent of the DIP Agent.

3.      Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the Debtor, in its discretion, is authorized, but not directed, to (i) designate, maintain, and continue to use any and all of its Bank Accounts in existence as of the Petition Date, with the same account numbers, including the accounts identified in Exhibit B annexed to the Motion, and need

2

not comply with certain operating guidelines relating to bank accounts set forth in the U.S. Trustee Guidelines; (ii) close existing accounts, including, without limitation, any inactive accounts; and (iii) treat the Bank Accounts for all purposes as accounts of the Debtor in its capacity as a debtor in possession; provided, however, that the Debtor is only authorized to open new bank accounts or close existing bank accounts (a) after (x) providing prompt notice to the U.S. Trustee and any official committee appointed in this Chapter 11 Case and (y) obtaining the prior written consent of the DIP Agent to such opening or closure; (b) with a bank that (x) is organized under the laws of the United States of America or any state therein and (y) has executed, or is willing to immediately execute, a Uniform Depository Agreement with the Office of the United States Trustee for the District of Delaware; and (c) that are designated "Debtor in Possession" accounts by the relevant bank.

4. To the extent that the U.S. Trustee Requirements otherwise conflict with (a) the Debtor's existing practices under the Cash Management System, or (b) any action taken by the Debtor in accordance with this Order or any other order entered in the Chapter 11 Case, such U.S. Trustee Requirements are and shall be waived.

5. The relief granted in this order is extended to any new bank account opened by the Debtor after the date hereof, which account shall be deemed a Bank Account, and to the bank at which such account is opened. To the extent the Debtor opens or closes bank accounts, it shall provide notice to the United States Trustee, the DIP Agent, and any official committee appointed in this Chapter 11 Case.

6. The requirements of the U.S. Trustee Guidelines that the Debtor close all existing bank accounts and open new debtor in possession accounts are hereby waived. Further,

3

the requirements of the U.S. Trustee Guidelines that the Debtor establish specific bank accounts for tax payments are hereby waived.

7.      The Bank Accounts are deemed debtor in possession accounts.  The Debtor is authorized, but not directed, to maintain and use the Bank Accounts in the same manner and with the same account numbers, styles, and document forms as those employed prior to the Petition Date, including, without limitation: (i) to deposit funds in, and, to the extent the Debtor has good funds standing to its credit,  withdraw funds from, the Bank Accounts by all usual means, including checks, wire transfers, automated clearinghouse ("ACH") transfers, drafts, electronic fund transfers, and other debits or items presented issues or drawn on the Bank Accounts; (ii) to pay postpetition ordinary course bank fees and service fees in connection with the Bank Accounts; (iii) to perform its obligations under the documents and agreements governing the Bank Accounts, including without limitation, any prepetition cash management agreements or treasury services agreements; and (iv) to treat the Bank Accounts for all purposes as accounts of the Debtor in its capacities as a debtor in possession.

8.      The Banks are authorized without the need for further order of this Court to: (i) continue to administer, service, and maintain, the Bank Accounts as such accounts were administered, serviced, and maintained prior to the Petition Date, without interruption and in the ordinary course; (ii) receive, process, honor, and pay any and all checks, drafts, wires, ACH transfers, electronic fund transfers, or other items presented, issued, or drawn on the Bank Accounts (collectively, the "Disbursements"); (iii) debit the Bank Accounts for all undisputed postpetition bank and service fees consistent with the terms of the applicable deposit agreement; (iv) "charge back" to the Debtor's accounts any amounts incurred by the Bank resulting from returned checks or other returned items, and the Debtor is authorized to pay any fees and

4

expenses owed to the Banks, in each case regardless of whether such items were deposited prepetition or postpetition or relate to prepetition or postpetition items; and (v) debit the Bank Accounts for all prepetition bank and service fees outstanding as of the date hereof, if any, owed to the Banks; provided, however, that, subject to paragraph 12 hereof, no checks, drafts, wires, or electronic fund transfers (excluding any electronic fund transfers that the Banks are obligated to settle), or other items presented, issued, or drawn on the Bank Accounts prior to the Petition Date shall be honored, unless (i) authorized by order of this Court; (ii) not otherwise prohibited by a "stop payment" request received by the Banks from the Debtor; and (iii) supported by sufficient good funds standing to the Debtor's credit in the applicable accounts.

9.    Notwithstanding any conflicting terms of any deposit agreement between a Bank and the Debtor, such Bank is not required to honor disbursement requests for anything other than those requests supported by sufficient funds in the Bank Accounts in question.

10.    Any payment from a Bank Account at the request of the Debtors made by any of the Banks prior to the Petition Date (including any ACH (EFT) such Bank is or becomes obligated to settle), or any instruments issued by any of the Banks on behalf of the Debtor pursuant to a "midnight deadline" or otherwise, shall be deemed to be paid prepetition, whether or not actually debited from such Bank Account prepetition.

11.    All obligations of the Debtor incurred to any of the Banks or the Debtor's proposed post-petition secured lenders or any of their respective affiliates (each a "Senior Obligee") before or after the Commencement Date that result from ordinary course transactions under the Cash Management System shall continue to be secured by any cash collateral to the extent provided for in any account agreements between the Debtors and any Senior Obligee, all in accordance with and subject to the terms and conditions of the DIP Facility.

5

12.     Nothing contained herein shall prevent the Banks from modifying or terminating any Bank Accounts or related services in accordance with the agreements governing such accounts or services.

13.     The Banks are authorized to rely on the representations of the Debtor as to which Disbursements are authorized to be honored or dishonored, whether or not such Disbursements are dated prior to, on, or subsequent to the Petition Date, and whether or not the Banks believe the payment is authorized by an order of the Court.  Any request for a Disbursement, whether oral or in writing, is deemed a representation upon which the Banks are authorized to rely.  The Banks shall not be deemed in violation of this Order and shall have no liability for honoring any Disbursement that is subject to this Order either (i) at the direction of the Debtor to honor such prepetition Disbursement, (ii) in the good faith belief that the Court has authorized such prepetition Disbursement to be honored, or (iii) as a result of an innocent mistake.  To the extent that the Debtor directs that any Disbursement be dishonored or the Banks inadvertently dishonor any Disbursements, the Debtor may issue replacement Disbursements consistent with the orders of this Court.

14.     The Banks are further authorized to (i) honor the Debtor's directions with respect to the opening or closing of any Bank Account and (ii) accept and hold, or invest, the Debtor's funds in accordance with the Debtor's instructions, and the Banks shall have no liability to any party for relying on such representations or instructions.

15.     To the extent any other order is entered by this Court authorizing the Banks to honor checks, drafts, ACH transfers, or other electronic funds transfers or any other withdrawals made, drawn, or issued in payment of prepetition claims, the obligation to honor such items shall be subject to this Order, provided, however, that, notwithstanding anything to

the contrary contained herein, any payment to be made, or authorization contained, hereunder shall be subject to the requirements imposed on the Debtor under any approved order regarding the use of cash collateral or postpetition financing and any budget in connection therewith.

16.    The Debtor is authorized, but not directed, to enter into any deposit control agreements or similar instruments required to effectuate the cash dominion provisions or any other requirement of the DIP Facility, pursuant to and in accordance therewith, without further order of the Court.  To the extent that a Bank enters into a deposit control agreement for an account in connection with the DIP Facilities, the terms of such deposit control agreement shall supplement the terms of this Order with respect to such account.

17.    The Debtor shall serve a copy of this order on the Banks within five (5) business days of the entry of this Order, and upon any bank at which the Debtor opens a new bank account, immediately upon the opening of such new account.

18.    The Debtor is authorized, but not directed, to continue to use its existing Business Forms without alteration or change and without the designation "Debtor in Possession" imprinted upon them; provided, however, that, within thirty (30) days following the Petition Date, subsequently issued checks bear the designation "Debtor in Possession" and its case number; provided further that the foregoing shall be without prejudice to the Debtor's right to seek further relief from this requirement or additional time to comply.

19.    The Debtor is authorized, to the extent permitted under the DIP Facility, to deposit and invest funds in accordance with their established Investment and Deposit Practices in effect as of the commencement of this chapter 11 case and, to the extent such deposit practices are not consistent with the requirements of Bankruptcy Code Section 345(b) or the United States Trustee Operating Guidelines for Chapter 11 Cases, such requirements are waived.

7

20.     To the extent permitted under the DIP Facility and to the extent necessary to execute the Cash Management System and manage the day-to-day operations of its business, the Debtor is authorized to (i) pay for prepetition Intercompany Trade Transactions in an amount not to exceed $155,000, (ii) net prepetition Intercompany Trade Transactions, and (iii) continue to participate in Intercompany Trade Transactions and Intercompany Debt Transactions postpetition, in the ordinary course of business; provided, however, that all Intercompany Transactions comply with the requirements of the DIP Facility and the terms of the subordinated master intercompany note executed by and among the Debtor and certain of the Debtor's non-debtor foreign subsidiaries in connection therewith. The Debtor shall continue to maintain records with respect to all transfers of cash or property (including pursuant to such transactions) so that all Intercompany Transactions may be readily ascertained, traced, and recorded properly on applicable intercompany accounts (whether under the subordinated master intercompany note or otherwise) and shall provide reasonable access to such records to the DIP Agent.

21.     Subject to and pursuant to the terms of the DIP Facility and this Order, the Debtor is authorized to continue engaging in Intercompany Transactions in the ordinary course of business, including transferring funds to non-debtor subsidiaries through the Cash Management System.

22.     To the extent that there may be any inconsistency between the terms of the interim or final order approving the proposed debtor in possession financing, if and when entered, and this Order, the terms of the interim or final order approving the proposed debtor in possession financing, as applicable, shall govern.

23.     Claims arising from postpetition Intercompany Transactions from non-debtor subsidiaries to the Debtor shall be granted administrative expense priority status.

8

24.     To the extent applicable, the Court finds and determines that the requirements of Bankruptcy Rule 6003 are satisfied and that the relief requested is necessary to avoid immediate and irreparable harm.

25.     Notwithstanding Bankruptcy Rule 6004(h), this order shall be effective and enforceable immediately upon entry hereof.

26.     The Debtor shall serve notice of the Motion (to the extent not already provided) and entry of this Order on the Notice Parties and all parties that have filed prior to such service date requests for notice pursuant to Bankruptcy Rule 2002 in accordance with Local Rule 9013-1(m). The notice shall provide that any objections to the relief granted in this Order must be filed with the Court and served on counsel for the Debtor no later than seven days prior to the final hearing with respect to the Motion (the "Objection Deadline"). In the event that no objections to this order are received by the Objection Deadline, the Debtor's counsel shall file a certification of counsel to that effect attaching a final form of order. The final hearing with respect to the Motion shall be held on _____, 2013, at _:___ _.m.

27.     The Debtor is hereby authorized to take such actions and to execute such documents as may be necessary to implement the relief granted by this Order. This Order, and all acts taken in furtherance of or reliance upon this Order, shall be effective notwithstanding the filing of an objection, pending the entry of a final order by this Court.

28.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this order.

Dated:  Wilmington, Delaware
        _____, 2013


        _____
        UNITED STATES BANKRUPTCY JUDGE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
In re:                                    :    Chapter 11
                                          :
EXIDE TECHNOLOGIES,                       :    Case No. 13-11482
                                          :
                    Debtor.[1]            :    **Related Docket No. _____**
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**FINAL ORDER GRANTING DEBTOR'S MOTION FOR ORDER PURSUANT TO
BANKRUPTCY CODE SECTIONS 105(a), 345(b), 363, AND 503(b), BANKRUPTCY
RULES 6003 AND 6004 AND LOCAL BANKRUPTCY RULE 2015-2 AUTHORIZING
(I) CONTINUED MAINTENANCE OF PREPETITION BANK ACCOUNTS AND
PAYMENT OF RELATED PREPETITION OBLIGATIONS, (II) CONTINUED
USE OF ITS EXISTING CASH MANAGEMENT SYSTEM, (III) CONTINUED
USE OF EXISTING BUSINESS FORMS, (IV) CONTINUATION OF
EXISTING INVESTMENT AND DEPOSIT PRACTICES, AND
(V) CONTINUATION OF INTERCOMPANY TRANSACTIONS
<u>AND HONORING CERTAIN RELATED PREPETITION OBLIGATIONS</u>**

Upon the motion (the "<u>Motion</u>")[2] of the Debtor for an order, pursuant to sections

105(a), 345(b), 363, and 503(b) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"),

Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"),

and Local Bankruptcy Rule 2015-2 authorizing, but not directing, the Debtor (i) to continue to

maintain existing bank accounts, authorizing a waiver of certain operating guidelines relating to

bank accounts, and the payment of related prepetition obligations; (ii) to continue to use its

existing Cash Management System; (iii) to continue to use existing Business Forms; and

(iv) continue the Intercompany Transactions in the ordinary course of business and pay certain

prepetition obligations related to Intercompany Transactions; and upon the First Day

---

[1]   The last four digits of the Debtor's taxpayer identification number are 2730.  The Debtor's corporate
      headquarters are located at 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

[2]   Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

Declaration; and due and sufficient notice of the Motion having been given under the particular circumstances; and it appearing that no other or further notice need be provided; and it appearing that the relief requested by the Motion is in the best interests of the Debtor, its estates, its creditors, its stakeholders, and other parties in interest; and after due deliberation thereon, and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED AND DECREED that:**

1. The Motion is GRANTED as set forth herein.

2. The Debtor is authorized, but not directed, to continue using the Cash Management System as described in the Motion, subject to the limitations in this Order and solely to the extent permitted under the terms of the DIP Financing.  The Debtor may transfer funds into, out of, and through the Cash Management System, using ordinary transfer methods in accordance with the Debtor's prepetition practice, as modified by the cash dominion or other provisions of the DIP Facility.  In connection with the ongoing utilization of its Cash Management System, the Debtor shall continue to maintain records with respect to all transfers of cash so that all transactions may be readily ascertained, traced, and recorded properly and the Debtors shall provide reasonable access to such records to the administrative agent under the DIP Facility (the "DIP Agent").  Except as otherwise set forth herein, the Debtor is further authorized to implement any changes to the Cash Management System that it deems appropriate; *provided* that any material change to the Cash Management System shall require the prior written consent of the DIP Agent.

3. Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the Debtor, in its discretion, is authorized, but not directed, to (i) designate, maintain, and continue to use any and all of its Bank Accounts in existence as of the Petition Date, with the same account numbers, including the accounts identified in Exhibit B annexed to the Motion, and need

2

not comply with certain operating guidelines relating to bank accounts set forth in the U.S.

Trustee Guidelines; (ii) close existing accounts, including, without limitation, any inactive

accounts; and (iii) treat the Bank Accounts for all purposes as accounts of the Debtor in its

capacity as a debtor in possession; provided, however, that the Debtor is only authorized to open

new bank accounts or close existing bank accounts (a) after (x) providing prompt notice to the

U.S. Trustee and any official committee appointed in this Chapter 11 Case and (y) obtaining the

prior written consent of the DIP Agent to such opening or closure; (b) with a bank that (x) is

organized under the laws of the United States of America or any state therein and (y) has

executed, or is willing to immediately execute, a Uniform Depository Agreement with the Office

of the United States Trustee for the District of Delaware; and (c) that are designated "Debtor in

Possession" accounts by the relevant bank.

4.      To the extent that the U.S. Trustee Requirements otherwise conflict with

(a) the Debtor's existing practices under the Cash Management System, or (b) any action taken

by the Debtor in accordance with this Order or any other order entered in the Chapter 11 Case,

such U.S. Trustee Requirements are and shall be waived.

5.      The relief granted in this order is extended to any new bank account

opened by the Debtor after the date hereof, which account shall be deemed a Bank Account, and

to the bank at which such account is opened.  To the extent the Debtor opens or closes bank

accounts, it shall provide notice to the United States Trustee, the DIP Agent, and any official

committee appointed in this Chapter 11 Case.

6.      The requirements of the U.S. Trustee Guidelines that the Debtor close all

existing bank accounts and open new debtor in possession accounts are hereby waived.  Further,

the requirements of the U.S. Trustee Guidelines that the Debtor establish specific bank accounts for tax payments are hereby waived.

7.    The Bank Accounts are deemed debtor in possession accounts.  The Debtor is authorized, but not directed, to maintain and use the Bank Accounts in the same manner and with the same account numbers, styles, and document forms as those employed prior to the Petition Date, including, without limitation: (i) to deposit funds in, and, to the extent the Debtor has good funds standing to its credit,  withdraw funds from, the Bank Accounts by all usual means, including checks, wire transfers, automated clearinghouse ("ACH") transfers, drafts, electronic fund transfers, and other debits or items presented issues or drawn on the Bank Accounts; (ii) to pay postpetition ordinary course bank fees and service fees in connection with the Bank Accounts; (iii) to perform its obligations under the documents and agreements governing the Bank Accounts, including without limitation, any prepetition cash management agreements or treasury services agreements; and (iv) to treat the Bank Accounts for all purposes as accounts of the Debtor in its capacities as a debtor in possession.

8.    The Banks are authorized without the need for further order of this Court to: (i) continue to administer, service, and maintain, the Bank Accounts as such accounts were administered, serviced, and maintained prior to the Petition Date, without interruption and in the ordinary course; (ii) receive, process, honor, and pay any and all checks, drafts, wires, ACH transfers, electronic fund transfers, or other items presented, issued, or drawn on the Bank Accounts (collectively, the "Disbursements"); (iii) debit the Bank Accounts for all undisputed postpetition bank and service fees consistent with the terms of the applicable deposit agreement; (iv) "charge back" to the Debtor's accounts any amounts incurred by the Bank resulting from returned checks or other returned items, and the Debtor is authorized to pay any fees and

4

expenses owed to the Banks, in each case regardless of whether such items were deposited

prepetition or postpetition or relate to prepetition or postpetition items; and (v) debit the Bank

Accounts for all prepetition bank and service fees outstanding as of the date hereof, if any, owed

to the Banks; provided, however, that, subject to paragraph 12 hereof, no checks, drafts, wires, or

electronic fund transfers (excluding any electronic fund transfers that the Banks are obligated to

settle, or other items presented, issued, or drawn on the Bank Accounts prior to the Petition Date

shall be honored, unless (i) authorized by order of this Court; (ii) not otherwise prohibited by a

"stop payment" request received by the Banks from the Debtor; and (iii) supported by sufficient

good funds standing to the Debtor's credit in the applicable accounts.

        9.      Notwithstanding any conflicting terms of any deposit agreement between

a Bank and the Debtor, such Bank is not required to honor disbursement requests for anything

other than those requests supported by sufficient funds in the Bank Accounts in question.

        10.     Any payment from a Bank Account at the request of the Debtors made by

any of the Banks prior to the Petition Date (including any ACH (EFT) such Bank is or becomes

obligated to settle), or any instruments issued by any of the Banks on behalf of the Debtor

pursuant to a "midnight deadline" or otherwise, shall be deemed to be paid prepetition, whether

or not actually debited from such Bank Account prepetition.

        11.     All obligations of the Debtor incurred to any of the Banks or the Debtor's

proposed post-petition secured lenders or any of their respective affiliates (each a "Senior

Obligee") before or after the Commencement Date that result from ordinary course transactions

under the Cash Management System shall continue to be secured by any cash collateral to the

extent provided for in any account agreements between the Debtors and any Senior Obligee, all

in accordance with and subject to the terms and conditions of the DIP Facility.

12.     Nothing contained herein shall prevent the Banks from modifying or terminating any Bank Accounts or related services in accordance with the agreements governing such accounts or services.

13.     The Banks are authorized to rely on the representations of the Debtor as to which Disbursements are authorized to be honored or dishonored, whether or not such Disbursements are dated prior to, on, or subsequent to the Petition Date, and whether or not the Banks believe the payment is authorized by an order of the Court.  Any request for a Disbursement, whether oral or in writing, is deemed a representation upon which the Banks are authorized to rely.  The Banks shall not be deemed in violation of this Order and shall have no liability for honoring any Disbursement that is subject to this Order either (i) at the direction of the Debtor to honor such prepetition Disbursement, (ii) in the good faith belief that the Court has authorized such prepetition Disbursement to be honored, or (iii) as a result of an innocent mistake.  To the extent that the Debtor directs that any Disbursement be dishonored or the Banks inadvertently dishonor any Disbursements, the Debtor may issue replacement Disbursements consistent with the orders of this Court.

14.     The Banks are further authorized to (i) honor the Debtor's directions with respect to the opening or closing of any Bank Account and (ii) accept and hold, or invest, the Debtor's funds in accordance with the Debtor's instructions, and the Banks shall have no liability to any party for relying on such representations or instructions.

15.     To the extent any other order is entered by this Court authorizing the Banks to honor checks, drafts, ACH transfers, or other electronic funds transfers or any other withdrawals made, drawn, or issued in payment of prepetition claims, the obligation to honor such items shall be subject to this Order, provided, however, that, notwithstanding anything to

the contrary contained herein, any payment to be made, or authorization contained, hereunder shall be subject to the requirements imposed on the Debtor under any approved order regarding the use of cash collateral or postpetition financing and any budget in connection therewith.

16.    The Debtor is authorized, but not directed, to enter into any deposit control agreements or similar instruments required to effectuate the cash dominion provisions or any other requirement of the DIP Facility, pursuant to and in accordance therewith, without further order of the Court.  To the extent that a Bank enters into a deposit control agreement for an account in connection with the DIP Facilities, the terms of such deposit control agreement shall supplement the terms of this Order with respect to such account.

17.    The Debtor shall serve a copy of this order on the Banks within five (5) business days of the entry of this Order, and upon any bank at which the Debtor opens a new bank account, immediately upon the opening of such new account.

18.    The Debtor is authorized, but not directed, to continue to use its existing Business Forms without alteration or change and without the designation "Debtor in Possession" imprinted upon them; provided, however, that, within thirty (30) days following the Petition Date, subsequently issued checks bear the designation "Debtor in Possession" and its case number; provided further that the foregoing shall be without prejudice to the Debtor's right to seek further relief from this requirement or additional time to comply.

19.    The Debtor is authorized, to the extent permitted under the DIP Facility, to deposit and invest funds in accordance with their established Investment and Deposit Practices in effect as of the commencement of this chapter 11 case and, to the extent such deposit practices are not consistent with the requirements of Bankruptcy Code Section 345(b) or the United States Trustee Operating Guidelines for Chapter 11 Cases, such requirements are waived.

20.    To the extent permitted under the DIP Facility and to the extent necessary to execute the Cash Management System and manage the day-to-day operations of its business, the Debtor is authorized to (i) pay for prepetition Intercompany Trade Transactions in an amount not to exceed $155,000, (ii) net prepetition Intercompany Trade Transactions, and (iii) continue to participate in Intercompany Trade Transactions and Intercompany Debt Transactions postpetition, in the ordinary course of business; provided, however, that all Intercompany Transactions comply with the requirements of the DIP Facility and the terms of the subordinated master intercompany note executed by and among the Debtor and certain of the Debtor's non-debtor foreign subsidiaries in connection therewith. The Debtor shall continue to maintain records with respect to all transfers of cash or property (including pursuant to such transactions) so that all Intercompany Transactions may be readily ascertained, traced, and recorded properly on applicable intercompany accounts (whether under the subordinated master intercompany note or otherwise) and shall provide reasonable access to such records to the DIP Agent.

21.    Subject to and pursuant to the terms of the DIP Facility and this Order, the Debtor is authorized to continue engaging in Intercompany Transactions in the ordinary course of business, including transferring funds to non-debtor subsidiaries through the Cash Management System.

22.    To the extent that there may be any inconsistency between the terms of the interim or final order approving the proposed debtor in possession financing, if and when entered, and this Order, the terms of the interim or final order approving the proposed debtor in possession financing, as applicable, shall govern.

23.    Claims arising from postpetition Intercompany Transactions from non-debtor subsidiaries to the Debtor shall be granted administrative expense priority status.

24.     To the extent applicable, the Court finds and determines that the requirements of Bankruptcy Rule 6003 are satisfied and that the relief requested is necessary to avoid immediate and irreparable harm.

25.     Notwithstanding Bankruptcy Rule 6004(h), this order shall be effective and enforceable immediately upon entry hereof.

26.     The Debtor is hereby authorized to take such actions and to execute such documents as may be necessary to implement the relief granted by this Order. This Order, and all acts taken in furtherance of or reliance upon this Order, shall be effective notwithstanding the filing of an objection, pending the entry of a final order by this Court.

27.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this order.

Dated:  Wilmington, Delaware
_____, 2013


_____
UNITED STATES BANKRUPTCY JUDGE