IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
In re:                                        :       Chapter 11
                                              :
EXIDE TECHNOLOGIES,                           :       Case No. 13-11482
                                              :
        Debtor.[1]                            :
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEBTOR'S APPLICATION PURSUANT TO 11 U.S.C. §§ 327(a) AND 328 AND
FED. R. BANKR. P. 2014(a) AND 2016 AND DEL. BANKR. L.R. 2014-1 FOR ENTRY OF
AN ORDER AUTHORIZING EMPLOYMENT AND RETENTION OF GCG, INC. AS
ADMINISTRATIVE AGENT *NUNC PRO TUNC* TO THE PETITION DATE**

Exide Technologies (the "Debtor" or "Exide") hereby applies (the "Section 327

Application") for entry of an order pursuant to sections 327(a) and 328 of title 11 of the United

States Code (the "Bankruptcy Code"), rules 2014(a) and 2016 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 2014-1 of the Local Rules of

Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of

Delaware (the "Local Rules") authorizing the Debtor to retain GCG, Inc. ("GCG") as

administrative agent ("Administrative Agent"), in connection with the above-captioned chapter

11 case, effective as of the Petition Date (as defined below) on the terms and conditions set forth

in the Bankruptcy Administration Agreement by and between the Debtor and GCG, dated as of

May 8, 2013, a copy of which is attached hereto as Exhibit A (the "Bankruptcy Administration

Agreement"). In support of the Section 327 Application, the Debtor relies upon and incorporates

by reference (1) the Declaration of Phillip A. Damaska in Support of Chapter 11 Petition and

---

[1]    The last four digits of the Debtor's taxpayer identification number are 2730.  The Debtor's corporate
       headquarters are located at 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

First Day Pleadings (the "First Day Declaration"), filed with this Court concurrently herewith and (2) the Declaration of Emily S. Gottlieb in Support of Debtor's Application Pursuant to 11 U.S.C. §§ 327(a) and 328 and Fed. R. Bankr. P. 2014(a) and 2016 and Del. Bankr. L.R. 2014-1 for Entry of an Order Authorizing Employment and Retention of GCG, Inc. as Administrative Agent *Nunc Pro Tunc* to the Petition Date (the "Gottlieb 327 Declaration"), which is attached hereto as Exhibit B.  In support of the Section 327 Application, the Debtor respectfully represents:

## JURISDICTION AND VENUE

1. This Court has jurisdiction to consider the Section 327 Application under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of this case and the Section 327 Application in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2. The legal predicates for the relief requested herein are Bankruptcy Code sections 327(a) and 328, Bankruptcy Rules 2014(a) and 2016, and Local Rule 2014-2

3. Pursuant to Local  Rule 9013-1(f), the Debtor consents to the entry of a final judgment or order with respect to the Section 327 Application if it is determined that this Court would lack Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

## BACKGROUND

### A.    The Chapter 11 Case

4.    On the date hereof (the "Petition Date"), the Debtor commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case").[2]

5.    The Debtor continues to operate its business and manage its property as debtor and debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.    To date, no creditors' committee has been appointed by the United States Trustee.  No trustee or examiner has been appointed in the Chapter 11 Case.

### B.    The Debtor's Business

7.    The Debtor, Exide, which together with its direct and indirect subsidiaries (collectively, the "Company"), has operations in more than 80 countries, is a global leader in stored electrical energy solutions and one of the world's largest producers and recyclers of lead-acid batteries.

8.    The Company's four global business groups—Transportation Americas, Transportation Europe and Rest of World ("ROW"), Industrial Energy Americas, and Industrial Energy Europe and ROW—provide a comprehensive range of stored electrical energy products and services for industrial and transportation applications.  The Company manufactures and distributes transportation and industrial batteries in North America, Europe, Asia, the Middle East, India, Australia, and New Zealand.  In the transportation segments, the Company

---

[2]    The Debtor's predecessor has a chapter 11 case currently pending in this District (Case No. 02-11125) (the "Previous Chapter 11 Case").  The Previous Chapter 11 Case was filed on April 15, 2002, and the Debtor and certain of its U.S. subsidiaries emerged from chapter 11 on May 5, 2004.  There is one claim remaining open in the Previous Chapter 11 Case.  In addition, there is a pending adversary proceeding in which a settlement agreement to allow a general unsecured, non-priority claim has been approved by this Court, but is awaiting final approval from the state chancery court to become effective.  The Debtor will confer with this Court regarding the disposition of the Previous Chapter 11 Case at the appropriate time.

distributes and markets transportation batteries, which include starting, lighting, and ignition batteries for cars, trucks, off-road vehicles, agricultural and construction vehicles, motorcycles, recreational vehicles, marine, and other applications to a broad range of retailers, distributors of replacement or after-market batteries, and automotive original equipment manufacturers ("OEM").  The Company's industrial batteries consist of motive power batteries and network power applications.  Motive power batteries are used in the material handling industry for equipment such as electric fork-lift trucks as well as in other machinery, including floor cleaning machinery, powered wheelchairs, railroad locomotives, mining equipment, and electric road vehicles.  Network power batteries provide energy storage solutions for critical systems that require uninterrupted power supply and are used to power, among other things, telecommunications systems, computer installations and data centers, hospitals, air traffic control systems, security systems, electric utilities, railways, and various military applications.  The Company has a diverse customer base that includes a number of major end-user customers, retail and OEM, and includes market winners and industry leaders.

9.    The Debtor, headquartered in Milton, Georgia, operates 13 manufacturing facilities in the United States.  The Debtor also operates approximately 74 branches[3] throughout North America, which sell and distribute batteries and other products to customers, battery specialists, retail stores, and OEM dealers. In addition, branch locations collect spent batteries for the Debtor's recycling facilities.  Exide has five smelters, three of which are currently active battery collection and recycling facilities.[4]  These facilities reclaim lead by recycling spent lead-

---

[3]    On average, branch locations are approximately 20,000 square feet in size and are generally leased for periods of 29 to 42 months.

[4]    The smelter furnaces melt lead from spent (i.e., expired) batteries to extract the lead so that it can be re-used to make new batteries.

acid batteries, which are obtained for recycling from Exide's customers and outside spent-battery collectors.  In fiscal year 2013, approximately 530,575 tons of batteries, plant scrap, and range lead were recycled at Exide's smelters or by a third party at Exide's request, which efforts enabled Exide to better control the cost of the principal raw material—lead—used in making its products.  In the United States, the Debtor historically has obtained the vast majority of its lead requirements from its recycling operations.[5]

10.    Additional factual background information about the Debtor, including its business operations, its corporate and capital structures, its restructuring efforts, and the events leading to the filing of the Chapter 11 Case, is set forth in detail in the First Day Declaration.[6]

### RELIEF REQUESTED

11.    By the Section 327 Application, pursuant to Bankruptcy Code sections 327(a) and 328, Bankruptcy Rules 2014 and 2016, and Local Rule 2014-1, the Debtor requests entry of an order, substantially in the form attached hereto, authorizing the employment and retention of GCG to provide certain administrative services (the "Administrative Services") in connection with the Chapter 11 Case pursuant to the Bankruptcy Administration Agreement.[7]

### GCG'S QUALIFICATIONS

12.    As a specialist in claims management and legal administration services, GCG provides comprehensive administrative solutions for chapter 11 cases.  GCG is one of the

---

[5]    In contrast, the Company obtains the majority of its lead requirements for its ROW operations on the open market from third-party suppliers.

[6]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

[7]    Contemporaneously herewith and by separate application, the Debtor is also seeking entry of an order retaining GCG as a claims and noticing agent pursuant to section 156(c) of title 28 of the United States Code, Bankruptcy Code section 105(a), Bankruptcy Rule 2002(f) and Local Rule 2002-1 (the "Section 156(c) Application") in accordance with the Court's Protocol for the Employment of Claims and Noticing Agents Under 28 U.S.C. § 156(c).

country's leading chapter 11 administrators, with substantial experience in matters of all sizes and levels of complexity, including several large bankruptcy cases pending in both this District and other districts.  See, e.g., In re Central European Distribution Corp., Case No. 13-10738 (CSS) (April 2, 2013); In re SP Newsprint Holdings LLC, Case No. 11-13649 (CSS) (Bankr. D. Del. Nov. 15, 2011); In re Security National Properties Funding III, LLC, Case No. 11-13277 (KG) (Bankr. D. Del Oct. 13, 2011); In re Dallas Stars, L.P., Case No. 11-12935 (PJW) (Bankr. D. Del. September 19, 2011); In re Manistique Papers, Inc., Case No. 11-12562 (KJC) (Bankr. D. Del. Aug. 12, 2011); In re Vivaro Corporation, Case No. 12-13810 (MG) (Bankr. S.D.N.Y. Sept. 5, 2012); In re Arcapita Bank B.S.C.(c), Case No. 12-11076 (SHL) (Bankr. S.D.N.Y. Mar. 19, 2012); In re AMR Corporation, Case No. 11-15463 (SHL) (Bankr. S.D.N.Y. Nov. 29, 2011). Based on GCG's experience, the Debtor believes that GCG is well-qualified to serve as Administrative Agent in the Chapter 11 Case.

<strong>SERVICES TO BE PROVIDED</strong>

13.    The Debtor seeks to retain GCG to provide the following administrative services, among others, if and to the extent requested:

    (a)  Assist the Debtor in analyzing claims filed against its estate;

    (b)  Assist with the preparation and filing of the Debtor's schedules of assets and liabilities and statements of financial affairs;

    (c)  Generate and provide claim reports and claim objection exhibits;

    (d)  Manage the preparation, compilation, and mailing of documents to creditors and other parties in interest in connection with the solicitation of a chapter 11 plan (a "Plan");

    (e)  Collect and tabulate votes in connection with any Plan filed by the Debtor and provide ballot reports to the Debtor and its professionals;

    (f)  Generate an official ballot certification and testify, if necessary, in support of the ballot tabulation results;

(g) Manage any distributions made pursuant to a confirmed Plan;

(h) Provide such other related administrative services as the Debtor may require in connection with the Chapter 11 Case; and

(i) Perform such other administrative services as may be requested by the Debtor that are not otherwise allowed under the order approving the 156(c) Application.

14.    GCG's appointment as Administrative Agent will provide the Debtor with experienced professionals and services that are essential to a successful reorganization.  GCG will coordinate with the Debtor's other retained professionals in the Chapter 11 Case to avoid any unnecessary duplication of services.  Accordingly, the relief requested in the Section 327 Application is in the best interests of the Debtor's estate and all parties in interest.

## PROFESSIONAL COMPENSATION AND INDEMNIFICATION

15.    The Debtor proposes to compensate GCG on the terms and conditions set forth in the Bankruptcy Administration Agreement.  Before selecting GCG as its proposed noticing and claims agent and administrative agent, the Debtor solicited, received, and reviewed rates from four (4) other noticing and claims agents.  The Debtor submits that GCG's rates are competitive with the rates charged by GCG's competitors for the performance of similar services.  As such, the Debtor believes that GCG's rates are reasonable given GCG's extensive bankruptcy experience, expertise, and high quality of service.

16.    To the extent that GCG's duties exceed the scope of any order approving the Section 156(c) Application, GCG intends to apply to this Court for allowances of compensation and reimbursement of out-of-pocket expenses incurred after the Petition Date in accordance with any interim compensation procedures approved in the Chapter 11 Case, Bankruptcy Code sections 330 and 331, the Bankruptcy Rules, the Local Rules, and any further orders of this Court (collectively, the "Fee Guidelines").

7

17.     As also discussed in the Section 156(c) Application, GCG has received a $131,919.19 retainer.  GCG seeks to first apply the retainer to all prepetition invoices, and thereafter, to apply the retainer against the first bill issued to the Debtor for postpetition in connection with any order approving the Section 156(c) Application.

18.     In addition, as part of the overall compensation payable to GCG under the terms of the Bankruptcy Administration Agreement, the Debtor has agreed, subject to certain exceptions, to indemnify and hold harmless GCG and its directors, officers, employees, affiliates, and agents against any losses incurred by GCG arising out of, in connection with or related to (a) any judicially determined (the determination having become final) gross negligence, or willful misconduct by the Debtor, its employees, agents, or representatives, or any judicially determined (the determination having become final) misrepresentations made by such persons to third parties in connection with GCG's acts or omissions in connection with its rendering of the Services (as defined in the Bankruptcy Administration Agreement); (b) any breach of the Bankruptcy Administration Agreement by the Debtor; or (c) any erroneous instructions or information provided to GCG by the Debtor for use in providing services pursuant to the Bankruptcy Administration Agreement.

## DISINTERESTEDNESS

19.     To the best of the Debtor's knowledge, and except as disclosed in the Gottlieb 327 Declaration, GCG: (i) is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code; (ii) does not hold or represent an interest adverse to the Debtor's estate in connection with any matter on which GCG will be employed; and (iii) neither GCG nor any of its employees has any connection with the Debtor, its creditors, the U.S. Trustee or any other party in interest in the Chapter 11 Case.

20.     Prior to the Petition Date, GCG performed certain professional services for the Debtor in accordance with the Bankruptcy Administration Agreement.  The Debtor does not owe GCG any amount for services performed or expenses incurred prior to the Petition Date. In connection with its appointment as Administrative Agent in the Chapter 11 Case, GCG represents, among other things, that it will not employ any past or present employees of the Debtor in connection with its work as Administrative Agent in the Chapter 11 Case.

21.     GCG will conduct ongoing reviews of its files to ensure that no conflict or other disqualifying circumstances exist or arise.  If any new facts or circumstances are discovered that would require disclosure, GCG will supplement its disclosure to this Court.

22.     The Debtor proposes that to the extent there is any inconsistency between the Section 327 Application, the Bankruptcy Administration Agreement, the Fee Guidelines, and any Court order approving the Section 327 Application (the "Section 327 Order"), the Section 327 Order shall govern.

## BASIS FOR RELIEF

23.     Bankruptcy Code section 327(a) provides that a debtor, subject to Court approval:

> [M]ay employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the [debtor] in carrying out the [debtor]'s duties under this title.

11 U.S.C. § 327(a).

24.     Bankruptcy Code section 328(a) authorizes the employment of a professional person "on any reasonable terms and conditions of employment, including on a retainer."  11 U.S.C. § 328(a).  The Debtor may require GCG to render extensive administrative services, the cost of which may not be estimable.  Accordingly, it is necessary and essential for

9

the Debtor, as debtor in possession, to employ GCG to provide administrative services under a

general retainer to render the foregoing services.

25.     Bankruptcy Rule 2014(a) requires that an application for retention include:

[S]pecific facts showing the necessity for the employment, the name of the
[firm] to be employed, the reasons for the selection, the professional
services to be rendered, any proposed arrangement for compensation, and,
to the best of the applicant's knowledge, all of the [firm's] connections
with the debtor, creditors, any other party in interest, their respective
attorneys and accountants, the United States trustee, or any person
employed in the office of the United States trustee.

F. R. Bankr. P. 2014(a).

26.     In light of the size and complexity of the Chapter 11 Case, the Debtor

respectfully submits that GCG's retention and employment pursuant to the terms of the

Bankruptcy Administration Agreement is both necessary and in the best interests of the Debtor's

estate and all parties in interest to the Chapter 11 Case.  The Debtor also believes that the terms

and conditions of the Bankruptcy Administration Agreement are reasonable in light of the

number of creditors, equity security holders and other parties in interest that will be involved in

the Chapter 11 Case.

**NOTICE**

27.     Notice of the Section 327 Application will be given to:  (i) the Office of

the United States Trustee for the District of Delaware; (ii) the Office of the United States

Attorney for the District of Delaware; (iii) counsel to the agent under the proposed debtor in

possession financing; (iv) counsel to the agent for the Debtor's prepetition secured lenders; (v)

the indenture trustee for each of the Debtor's secured and unsecured outstanding bond issuances;

(vi) counsel to the unofficial committee of senior secured noteholders; (vii) the Internal Revenue

Service; (viii) the Securities and Exchange Commission; (ix) the parties included on the Debtor's

list of twenty (20) largest unsecured creditors; and (x) all parties entitled to notice pursuant to

Local Bankruptcy Rule 9013-1(m). The Debtor submits that no other or further notice need be provided.

### NO PRIOR REQUEST

28.     No prior request for the relief requested herein has been made to this or any other Court.

*Remainder of the Page Left Intentionally Blank*

**CONCLUSION**

WHEREFORE, the Debtor respectfully requests (i) that this Court enter an Order,

substantially in the form attached hereto granting the Section 327 Application; and (ii) such other

and further relief as may be just and proper.


Dated: Wilmington, Delaware
      June 10, 2013

EXIDE TECHNOLOGIES


*/s/ Phillip A. Damaska*
Name:  Phillip A. Damaska
Title:    Executive Vice President and
          Chief Financial Officer

## EXHIBIT A

**Bankruptcy Administration Agreement**



BANKRUPTCY ADMINISTRATION AGREEMENT

This Bankruptcy Administration Agreement (this "Agreement"), dated as of May 8, 2013, is between GCG, Inc., a Delaware corporation (the "Company"), and Exide Technologies, a Delaware corporation (the "Client").

The Client desires to retain the Company to perform certain noticing, claims processing, solicitation and other administrative services for the Client in its potential chapter 11 case anticipated to be filed in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and the Company desires to be so retained, in accordance with the terms and conditions of this Agreement.

In consideration of the mutual covenants herein contained, the parties hereby agree as follows:

1.      Services.  The Company agrees to provide the services necessary to perform the tasks specified in the pricing schedule that has been supplied to the Client and is attached hereto as Exhibit A. Such services are hereinafter referred to as "Services."  The Client agrees and understands that none of the Services constitutes legal advice.

2.      Payment for Services; Expenses.

2.1.    Compensation.  As full compensation for the Services to be provided by the Company, the Client agrees to pay the Company its fees as outlined in the pricing schedule that has been supplied to the Client and is attached hereto as Exhibit A, after taking into account additional agreed upon discounts (subject to Bankruptcy Court approval in the event of an unresolved dispute).  In some instances, these fees include commissions and/or markups.  Such commissions and/or markups are incorporated into the pricing schedule agreed upon by the Client and the Company and there shall be no additional commissions and/or markups beyond those incorporated into the agreed upon pricing schedule. Billing rates may be adjusted from time to time by the Company in its reasonable discretion, although billing rates generally are changed on an annual basis.  The Company will provide notice to the Client and obtain the written consent of the Client in advance of any adjustments to billing rates.  The Client and the Company intend that all fees and expenses incurred in connection with Services rendered by the Company pre-petition be paid in advance of or contemporaneously with the rendering of such Services. The Client agrees to pay the Company a retainer of $50,000 (which may be replenished from time to time), to be applied as follows:  (a) first against the contemporaneous and subsequent fees and expenses incurred by the Client in connection with Services rendered by the Company pre-petition; and (b) with respect to the portion of the retainer that remains outstanding, if any, after the petition is filed, first against any outstanding pre-petition fees and expenses incurred by the Client in connection with the Services, and then against the first invoice rendered by the Company to the Client for the post-petition fees and expenses incurred by the Client in connection with the Services.

2.2.    Expenses.  In addition to the compensation set forth in Section 2.1, the Client shall reimburse the Company for all out-of-pocket expenses reasonably incurred by the Company in connection with the performance of the Services (subject to Bankruptcy Court determination in the event of an unresolved dispute).  The out-of-pocket expenses will be billed on the expense (non-fee) portion of the Company's invoice to the Client and may include, but are not limited to, postage, banking fees, brokerage fees, costs of messenger and delivery service, filing fees and other similar expenses.  The

Company must receive prior approval from the Clients to travel in order to be reimbursed for travel related expenses. Staff overtime meal expenses shall only be reimbursed upon documentation justifying the need for after hours services. In some cases, the Company may receive a rebate at the end of a year from a vendor. The Client and the Company intend to satisfy all expenses incurred in connection with pre-petition Services from advance retainers or contemporaneous payments. The Client and the Company intend to satisfy all expenses incurred in connection with pre-petition Services from advance retainers or contemporaneous payments. All expenses shall be reimbursed at the actual cost billed by the vendor, and the Company shall not be entitled to any commission or mark-up upon such expenses.

2.3.   Billing and Payment. Except as provided in Section 2.2, or specifically set forth below in this Section 2.3, the Company shall bill the Client for the Company's fees and expenses for Services performed under 28 U.S.C. § 156(c) on a monthly basis, and the Client shall pay the Company the undisputed portion of a bill within thirty (30) days of its receipt of each such bill in the ordinary course of business (subject to Bankruptcy Court approval in the event of an unresolved dispute). With respect to pre-petition invoices, the same will show application of advance and contemporaneous payments against subsequent and contemporaneous fees and expenses and state an advance amount to replenish the retainer. With respect to post-petition invoices, for Services performed outside the scope of 28 U.S.C. § 156(c), the Company shall apply for compensation and reimbursement of expenses in accordance with the procedures set forth in 11 U.S.C. §§ 330 and 331, the applicable Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the District of Delaware, any applicable orders of the Bankruptcy Court, the guidelines established by the United States Trustee for the District of Delaware and such other procedures that have been, or may be, fixed by order of the Bankruptcy Court. Unless otherwise agreed to in writing, the fees for print notice and media publication must be paid within three (3) business days of the date of the Company's invoice.

3.    Term and Termination.

3.1.   Term. The term of this Agreement shall commence on the date hereof and shall continue until performance in full of the Services, unless terminated earlier as set forth herein.

3.2.   Termination.

(a)    In the event of any material breach of this Agreement by either party hereto, the non-breaching party may apply to the Bankruptcy Court for an order allowing termination of this Agreement. Grounds for termination include: (i) failure to cure a material breach within thirty (30) days after receipt of such written notice by the non-breaching party or (ii) in the case of any breach which requires more than thirty (30) days to effect a cure, failure to commence and continue, in good faith, efforts to cure such breach, provided that such cure shall be effected no later than ninety (90) days after receipt of written notice of such breach. Waiver of any such default or material breach by either party hereto shall not be construed as limiting any right of termination for a subsequent default or material breach.

(b)    The Company shall be entitled to an administrative claim for all fees and reasonable expenses outstanding at the time of termination (subject to Bankruptcy Court approval in the event of an unresolved dispute).

(c)    In accordance with the Local Rules for the District of Delaware, the Bankruptcy Court's procedures and/or directives, or, in the absence thereof, as soon as practicable (i) following the entry of a final decree closing the chapter 11 case, or (ii) following the conversion of the chapter 11 case to chapter 7, the Company shall forward all original proofs of claim to the Federal Archives Record Administration. For all other documents in the Company's actual or constructive

2

possession (including, but not limited to, letters, e-mails, facsimiles, other correspondence and all undeliverable and/or returned mail), the Company shall retain paper copies and electronic copies for one (1) year (i) following the entry of a final decree closing the chapter 11 case, or (ii) following the conversion of the chapter 11 case to chapter 7. Following the one (1) year retention period, the Company shall have the right to destroy all such documents. This provision shall not affect the Company's normal course business processes for archives and back-up tapes.

4.      Independent Contractor.  It is understood and agreed that the Company, through itself or any of its agents, shall perform the Services as an independent contractor. Neither the Company nor any of its employees shall be deemed to be an employee of the Client. Neither the Company nor any of its employees shall be entitled to any benefits provided by the Client to its employees, and the Client will make no deductions from any of the payments due to the Company hereunder for state or federal tax purposes. The Company agrees that the Company shall be responsible for any and all taxes and other payments due on payments received hereunder by the Company from the Client. Nothing in this Agreement requires the Client to use the Company for any future work relating to the Services, and, in the event the Client decides to use another party for such future work, the Company agrees to cooperate fully with the Client to ensure a smooth transition to the new party.

5.      Accuracy of Client Supplied Information.  The Client is responsible for the accuracy of all programs, data and other information it submits to the Company and for the output of such information. The Company may undertake to place such data and information into certain systems and programs. The Company does not verify information provided by the Client.

6.      Confidential Information.

6.1.    Confidentiality.  In connection with this Agreement, the Client and the Company (as the case may be, the "Disclosing Party") may disclose to the Company or the Client (as the case may be, the "Receiving Party") certain information (a) that is marked or otherwise identified in writing as confidential or proprietary information of the Disclosing Party ("Confidential Information") prior to or upon receipt by the Receiving Party; or (b) which the Receiving Party reasonably should recognize from the circumstances surrounding the disclosure to be Confidential Information. The Receiving Party (x) shall hold all Confidential Information in confidence and will use such information only for the purposes of fulfilling the Receiving Party's obligations hereunder, and for no other purpose, and (y) shall not disclose, provide, disseminate or otherwise make available any Confidential Information to any third party other than for the purposes of fulfilling the Receiving Party's obligations hereunder, in either case, without the express prior written permission of the Disclosing Party. Notwithstanding the foregoing, the Receiving Party may disclose Confidential Information pursuant to a validly issued subpoena or order of a court of competent jurisdiction, provided, however, that the Receiving Party must provide the Disclosing Party with prompt written notice of such subpoena or court order so that the Disclosing Party may seek a protective order or other appropriate remedy, and the Receiving Party shall reasonably cooperate with the Disclosing Party's efforts to obtain same.

6.2.    Protection of Intellectual Property.  The Client acknowledges that the Company's intellectual property, including, without limitation, the Company's inventions (whether or not patentable), processes, trade secrets and know how are of ultimate importance to the Company. Accordingly, the Client agrees to use its best efforts to protect such intellectual property, and shall not, either during the term of this Agreement, or subsequent to its termination, utilize, reveal or disclose any of such intellectual property. The Client understands that the software programs and other materials furnished by the Company pursuant to this Agreement, and/or developed during the course of this Agreement by the Company, are the sole property of the Company. The term "program" shall include, without limitation, data processing programs, check printing programs, specifications, applications, routines, sub-routines,

3

procedural manuals and documentation. The Client further agrees that any ideas, concepts, know-how or techniques relating to the claims management software used or developed by the Company during the course of this Agreement shall be the exclusive property of the Company.

6.3.    Scope.    The foregoing obligations in Sections 6.1 and 6.2 shall not apply to (a) information that is or becomes generally known or available by publication, commercial use or otherwise through no fault of the Receiving Party; (b) information that is known by the Receiving Party prior to the time of disclosure by the Disclosing Party to the Receiving Party; (c) information that is obtained from a third party who, to the Receiving Party's knowledge, has the right to make such disclosure without restriction; (d) any disclosure required by applicable law; or (e) information that is released for publication by the Disclosing Party in writing. The obligations set forth under Sections 6.1 and 6.2 shall survive the termination of this Agreement.

7.    Indemnification.    The Client hereby indemnifies and holds harmless the Company and its directors, officers, employees, affiliates and agents against any losses incurred by the Company arising out of, in connection with or related to (a) any judicially determined (the determination having become final) gross negligence or willful misconduct by the Client, its employees, agents or representatives, or any judicially determined (the determination having become final) misrepresentations made by such persons to third parties in connection with the Company's acts or omissions in connection with its rendering of the Services; (b) any breach of this Agreement by the Client; or (c) any erroneous instructions or information provided to the Company by the Client for use in providing the Services. Notwithstanding any provision in the Application (as defined herein) or this Agreement to the contrary, the Client has no obligation to indemnify the Company or provide contribution or reimbursement to the Company for any claim or expense that is either (a) judicially determined (the determination having become final) to have arisen from the Company's gross negligence, willful misconduct or fraud or (b) settled prior to a judicial determination as to the Company's gross negligence, willful misconduct or fraud, but determined by the Bankruptcy Court, after notice and a hearing, to be a claim or expense for which the Company should not receive indemnity, contribution or reimbursement under the terms of the Application and this Agreement, as modified by any order issued by the Bankruptcy Court (each, an "Order"). If, before the earlier of (a) the entry of an Order confirming a chapter 11 plan in this chapter 11 case (that Order having become a final order no longer subject to appeal), and (b) the entry of an Order closing this chapter 11 case, the Company believes that it is entitled to the payment of any amounts by the Client on account of the Client's indemnification, contribution and/or reimbursement obligations under this Agreement (as modified by an Order), including without limitation the advancement of defense costs, the Company must file an application therefor in the Bankruptcy Court, and the Client may not pay any such amounts to the Company before the entry of an Order approving the payment.

8.    Jurisdiction.    This Agreement is subject to the approval of the Bankruptcy Court, and the Bankruptcy Court shall retain jurisdiction over all matters regarding this Agreement.

9.    Force Majeure.    Whenever performance by either party of any of its obligations hereunder is substantially prevented by reason of any act of God, strike, lock-out or other industrial or transportational disturbance, fire, lack of materials, law, regulation or ordinance, war or war conditions or by reason of any other matter beyond the party's reasonable control, then such performance shall be excused and this Agreement shall be deemed suspended during the continuation of such prevention and for a reasonable time thereafter.

10.    Notice.    Any notice or other communication required or permitted hereunder shall be in writing and shall be delivered personally, or sent by registered mail, postage prepaid or overnight courier. Any such notice shall be deemed given when so delivered personally, or, if mailed, five (5) days after the

4

date of deposit in the United States mail, or, if sent by overnight courier, one (1) business day after delivery to such courier, as follows: if to the Company, to GCG, Inc., 1985 Marcus Avenue, Suite 200, Lake Success, New York 11042, Attention: David Isaac, Chief Executive Officer; and if to the Client, to Exide Technologies, 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004, Attention: Barbara Hatcher .

11.     Governing Law. This contract will be governed by and construed in accordance with the laws of the State of New York (without reference to its conflict of laws provisions).

12.     Severability. All clauses and covenants contained in this Agreement are severable and in the event any of them are held to be invalid by any court having competent jurisdiction, such clause or covenant shall be valid and enforced to the maximum extent as to which it may be valid and enforceable, and this Agreement will be interpreted as if such invalid clauses or covenants were not contained herein.

13.     Assignment. This Agreement and the rights and obligations of the Company and the Client hereunder shall bind and inure to the benefit of any successors or assigns thereto; provided that notwithstanding anything to the contrary in this Agreement, neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned or delegated, in whole or in part, by operation of law or otherwise, by the Company without the prior written consent of the Client.

14.     General. This Agreement supersedes and replaces any existing agreement entered into by the Company and the Client relating generally to the same subject matter, and may be modified only in a writing signed by the Company and the Client. The paragraph headings in this Agreement are included only for convenience, do not in any manner modify or limit any of the provisions of this Agreement and may not be used in the interpretation of this Agreement. Failure to enforce any provision of this Agreement shall not constitute a waiver of any term hereof. This Agreement contains the entire agreement between the parties with respect to the subject matter hereof. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one in the same instrument. The Client shall file one or more applications with the Bankruptcy Court seeking approval of this Agreement (each, an "Application"). If an order or orders is or are entered approving any Application (each, a "Retention Order"), any discrepancies between this Agreement, any Application and any Retention Orders shall be controlled by the Retention Orders.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year set forth above.

*EXIDE TECHNOLOGIES*

By: *Barbara A. Hatcher*
Name: *Barbara A. Hatcher*
Title: *EVP and General Counsel*

*GCG, INC.*

By:
Name: ANGELA FERRANTE
Title: VICE PRESIDENT, BANKRUPTCY

6

**EXHIBIT A**



# GCG Pricing

| **Services** | **Fees (Unit/Hourly)** |

### Set-Up Creditor File

Set-up fee .................................................................................................. Waived

Electronic import of creditor data .......................................................... No per creditor charge

Assist with production of Schedules and Statements of Financial Affairs .......................... Standard hourly rates

### Noticing

Notice printing / copies ........................................................................ $0.10 per page
(volume discounts apply)

Electronic noticing (e-mail) .................................................................. $50 per 1,000

Facsimile noticing (domestic facsimile) .............................................. $0.10 per page

Personalization/labels.......................................................................... $0.05 each

Legal publication of notice................................................................... Quote

Processing undeliverables ................................................................... $0.25 each

### Document Management

Sort and prep mail (including handling remails)................................... Standard hourly rates

Document scanning............................................................................... $0.12 per image

Monthly document storage   (paper) .................................................... $1.50 per box
                                        (electronic)............................................... $0.02 per image
(waived for first three months)

### Claims Administration

Association of claimant name and address to database......................... $0.15 per claim

Claim acknowledgement postcards....................................................... $0.10 each

Processing of claims, including non-conforming claims,
supervisory review and application of message codes........................... Standard hourly rates

### Public Securities / Balloting / Solicitation and Tabulation

Solicitation and Balloting (including coordination with nominees and Broadridge
and processing of master ballots, tabulation, verification and certification of vote)............ Standard hourly rates

### Web Site

Creating customized, interactive web site (including e-mail box for creditors) .................. Standard hourly rates

Monthly maintenance fee....................................................................... $200 per month

Providing updates to website ............................................................... Standard hourly rates



| Services | Fees (Unit/Hourly) |
| --- | --- |

**Contact Services**

Case-specific voice-mail box for creditors ........................................................... No charge

Interactive Voice Response ("IVR") ..................................................................... $1,900 set up
$0.39 per minute

Customer Service Representatives ....................................................................... $0.95 per minute

Monthly maintenance charge .............................................................................. $100 per month

Management of Call Center (including handling of claimant
communications, call backs, e-mails, and other correspondences) ...................................... Standard hourly rates

**Miscellaneous Expenses**

Travel ................................................................................................................. At cost

Postage, courier, etc ......................................................................................... At cost

Copying, facsimile ........................................................................................... $0.10 per page

**Hourly Billing Rates**[*]

| Title | Standard Hourly Rates |
| --- | --- |
| Administrative, Mailroom and Claims Control | $45-$55 |
| Project Administrators | $70-$85 |
| Project Supervisors | $95-$110 |
| Graphic Support & Technology Staff | $100-$200 |
| Project Managers and Senior Project Managers | $125-$175 |
| Directors and Asst. Vice Presidents | $200-$295 |
| Vice Presidents and above | $295* |

---

[*] For this engagement, GCG agrees to provide discounted hourly rates as reflected in the chart above and to cap its highest hourly rate at $295. Expert services provided by Vice Presidents, Angela Ferrante and Jeff Stein, the latter in connection with solicitation (including of public securities) and tabulation will be at a rate of $310 per hour.  Any additional services not covered by this proposal will be charged at GCG hourly rates including any outsourced work performed under GCG supervision and controls. GCG will not charge overtime for any of its hourly rates.

# **EXHIBIT B**

**Gottlieb 327 Declaration**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                            :
In re:                                                      :        Chapter 11
                                                            :
EXIDE TECHNOLOGIES,                                         :        Case No. 13-11482
                                                            :
                                 Debtor.[1]                 :
                                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DECLARATION OF EMILY S. GOTTLIEB IN SUPPORT OF DEBTOR'S
APPLICATION PURSUANT TO 11 U.S.C. §§ 327(a) AND 328 AND
FED. R. BANKR. P. 2014(a) AND 2016 AND DEL. BANKR. L.R. 2014-1 FOR ENTRY OF
AN ORDER AUTHORIZING EMPLOYMENT AND RETENTION OF GCG, INC. AS
ADMINISTRATIVE AGENT *NUNC PRO TUNC* TO THE PETITION DATE**

Emily S. Gottlieb, being duly sworn, deposes, and states:

1.      I am an Assistant Vice President of GCG, Inc. ("GCG"), and I am authorized to make and submit this declaration on behalf of GCG. This declaration is submitted in support of the *Debtor's Application Pursuant to 11 U.S.C. §§ 327 (a) and 328 and Fed. R. Bankr. P. 2014(a), and 2016 and Del. Bankr. L.R. 2014-1 for Entry of an Order Authorizing Employment and Retention of GCG, Inc. as Administrative Agent Nunc Pro Tunc to the Petition Date* (the "Section 327 Application")[2] in connection with the above-captioned chapter 11 case (the "Chapter 11 Case") and in accordance with the terms and conditions of the Bankruptcy Administration Agreement, attached to the Section 327 Application as Exhibit A (the "Bankruptcy Administration Agreement"). The statements contained herein are based upon personal knowledge.

---

[1]      The last four digits of the Debtor's taxpayer identification number are 2730. The Debtor's corporate headquarters are located at 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

[2]      Capitalized terms used but not otherwise defined herein have the meanings given to them in the Section 327 Application.

2.      GCG is one of the country's leading chapter 11 administrators with expertise in all areas of bankruptcy administration, including, but not limited to, balloting administration, and distribution, and GCG is well-qualified to provide administrative services in connection with the Chapter 11 Case.  GCG has been retained as the administrative agent in a number of large chapter 11 cases in both this and other jurisdictions, including:  See, e.g., In re Central European Distribution Corp., Case No. 13-10738 (CSS) (April 9, 2013); In re SP Newsprint Holdings LLC, Case No. 11-13649 (CSS) (Bankr. D. Del. Nov. 15, 2011); In re Security National Properties Funding III, LLC, Case No. 11-13277 (KG) (Bankr. D. Del Oct. 13, 2011); In re Dallas Stars, L.P., Case No. 11-12935 (PJW) (Bankr. D. Del. September 19, 2011); In re Manistique Papers, Inc., Case No. 11-12562 (KJC) (Bankr. D. Del. Aug. 12, 2011); In re Vivaro Corporation, Case No. 12-13810 (MG) (Bankr. S.D.N.Y. Sept. 5, 2012); In re Arcapita Bank B.S.C.(c), Case No. 12-11076 (SHL) (Bankr. S.D.N.Y. Mar. 19, 2012); In re AMR Corporation, Case No. 11-15463 (SHL) (Bankr. S.D.N.Y. Nov. 29, 2011).

3.      The Debtor selected GCG to serve as the administrative agent ("Administrative Agent") for the Debtor's estate, as set forth in more detail in the Section 327 Application filed contemporaneously herewith.  To the best of my knowledge, neither GCG, nor any of its professional personnel, have any relationship with the Debtor that would impair GCG's ability to serve as Administrative Agent.  GCG does have relationships with some of the Debtor's creditors, but they are in matters completely unrelated to the Chapter 11 Case, either as vendors or in cases where GCG serves in a neutral capacity as a class action settlement claims administrator or bankruptcy administrator.  GCG's assistance in the cases where GCG acts as a class action settlement claims administrator has been primarily related to the design and dissemination of legal notices and other administrative functions in class actions.

4.      I have been advised that Paul Kinealy, a Director at GCG, and Jamie Strohl, a Senior Project Manager at GCG, were formerly employed by Alvarez & Marsal North America, LLC ("A&M").  Mr. Kinealy was employed as a director by A&M from October 2006 through September 2009 and Mr. Strohl was employed as a consultant by A&M from January 2008 through September 2012.  I have also been advised that while employed at A&M, Mr. Kinealy and Mr. Strohl did not work on any matters involving the Debtor.  In fact, Mr. Kinealy and Mr. Strohl were no longer employed by A&M when the Chapter 11 Case was filed. Additionally, Sarah Bryan, a Senior Project Manager at GCG, is married to a Senior Director employed by A&M.  This relationship is of a personal nature and completely unrelated to the Chapter 11 Case.

5.      I have been advised that Brian Karpuk, an Assistant Director at GCG, Denise Kaloudis, a Senior Consultant at GCG, and Mark Brown, a Bankruptcy Consultant at GCG, are attorneys who were formerly associated with the Debtor's proposed bankruptcy counsel, Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), and that Jeffrey Demma, a Project Manager at GCG, was also formerly associated with Skadden.  Mr. Karpuk, Ms. Kaloudis, Mr. Brown, and Mr. Demma were employed by Skadden from October 2000 through June 2006, October 2004 through April 2009, April 2001 through March 2004, and February 1998 through March 2009, respectively.  I have also been advised that while associated with Skadden, Mr. Karpuk, Ms. Kaloudis, Mr. Brown, and Mr. Demma did not work on any matters involving the Debtor.  In fact, Mr. Karpuk, Ms. Kaloudis, Mr. Brown, and Mr. Demma were no longer associated with Skadden when the Chapter 11 Case was filed.

6.      I have been advised that Paula Galbraith, a Consultant at GCG, formerly served as a law clerk for Judge John C. Akard.  Judge Akard initially presided over the Previous

Chapter 11 Case.  While serving as a law clerk, Ms. Galbraith may have worked on matters involving the Debtor, but she was no longer serving as a law clerk at the time the Chapter 11 Case was filed.

7.      I have been advised that Adam Gorman, a Senior Project Manager at GCG, was a paralegal with Kirkland & Ellis LLP ("Kirkland") which acted as the Debtor's counsel in the Previous Chapter 11 Case.  Mr. Gorman was a paralegal at Kirkland from June 2003 through January 2012.

8.      In addition, GCG personnel may have relationships with some of the Debtor's creditors; however, such relationships are of a personal, financial nature and completely unrelated to the Chapter 11 Case.  GCG has working relationships with certain of the professionals retained by the Debtor and other parties herein, but such relationships are completely unrelated to the Chapter 11 Case.  GCG (i) has represented, and will continue to represent, clients in matters unrelated to the Chapter 11 Case and (ii) has had, and will continue to have, relationships in the ordinary course of its business with certain vendors and professionals in matters unrelated to the Chapter 11 Case.

9.      Since 1999, GCG has been a wholly owned subsidiary of Crawford & Company.  I am advised that Crawford & Company has no material relationship with the Debtor, and while it may have rendered services to certain creditors, received services from certain creditors or have a vendor relationship with certain creditors, such relationships were (or are) in no way connected to GCG's retention by the Debtor in the Chapter 11 Case.

10.     GCG is a "disinterested person," as that term is defined in section 101(14) of the Bankruptcy Code, in that GCG and its professional personnel:

a.      are not creditors, equity security holders or insiders of the Debtor;

      b.    are not, and were not within two years before the date of the filing of the Chapter 11 Case, directors, officers, or employees of the Debtor; and

      c.    do not have an interest materially adverse to the interests of the Debtor's estate or any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtor.

11.    GCG has not been retained to assist any entity or person other than the Debtor on matters relating to, or in connection with, the Chapter 11 Case.  If GCG's proposed retention is approved by this Court, GCG will not accept any engagement or perform any services for any entity or person other than the Debtor in the Chapter 11 Case without the prior express consent and authority of the Debtor; provided, however, that if approved by this Court GCG will serve as claims and noting agent in the Chapter 11 Case;[3] provided, further, that GCG may provide professional services to entities or persons that may be creditors or parties-in-interest in this Chapter 11 Case, which services do not relate to, or have any direct connection with, this Chapter 11 Case or the Debtor.

12.    As referenced in the Section 156(c) Application, GCG has received a $131,919.19 retainer from the Debtor and will apply such retainer first against all pre-petition fees and expenses, and second, against the first postpetition bill for fees and expenses that GCG will render during this Chapter 11 Case.

13.    GCG represents, among other things, that:

      a.    It will not consider itself employed by the United States government and shall not seek any compensation from the United States government in its capacity as Administrative Agent;

---

[3]   Contemporaneously herewith, the Debtor filed the Application of the Debtor for Entry of an Order  Authorizing Employment and Retention of GCG, Inc. as Claims and Noticing Agent, Pursuant to 28 U.S.C. § 156(c), 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 2002 and Del. Bankr. L.R. 2002-1(f) Nunc Pro Tunc to the Petition Date. An order approving that application has not been entered as of the filing of this declaration.

b.  By accepting employment in the Chapter 11 Case, GCG waives any right to receive compensation from the United States government;

c.  In its capacity as Administrative Agent, GCG will not be an agent of the United States and will not act on behalf of the United States; and

d.  GCG will not employ any past or present employees of the Debtor in connection with its work as Administrative Agent.

14.  Subject to this Court's approval, the Debtor has agreed to compensate GCG for professional services rendered pursuant to section 327(a) of the Bankruptcy Code in connection with the Chapter 11 Case according to the terms and conditions of the Bankruptcy Administration Agreement.

15.  To the extent that GCG's duties exceed the scope of any order approving the Section 156(c) Application, GCG intends to apply to this Court for allowance of compensation and reimbursement of out-of-pocket expenses incurred after the Petition Date in accordance with sections 330 and 331 of the Bankruptcy Code; the Bankruptcy Rules; the Local Rules; and any further orders of this Court.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed on this 10th day of June, 2013 at Chicago, Illinois.

/s/ Emily S. Gottlieb
Emily S. Gottlieb
Assistant Vice President, Midwest Operations

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                              :
In re:                                                        :      Chapter 11
                                                              :
EXIDE TECHNOLOGIES,                                           :      Case No. 13-11482
                                                              :
                        Debtor.[1]                            :
                                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ORDER PURSUANT TO 11 U.S.C. §§ 327(a), 328, FED. R. BANKR. P. 2014(a)
AND 2016 AND DEL. BANKR. L.R. 2014-1 AUTHORIZING EMPLOYMENT
AND RETENTION OF GCG, INC. AS ADMINISTRATIVE AGENT
_NUNC PRO TUNC_ TO THE PETITION DATE**

Upon consideration of the application (the "Section 327 Application")[2] of the

above-captioned debtor and debtor in possession (collectively, the "Debtor"), pursuant to

sections 327(a) and 328 of title 11 of the United States Code (the "Bankruptcy Code"), rules

2014(a) and 2016 of the Federal Rules of Bankruptcy Procedure  (the "Bankruptcy Rules"), and

rule 2014-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States

Bankruptcy Court for the District of Delaware authorizing the Debtor to retain GCG, Inc.

("GCG") as administrative agent ("Administrative Agent"),  in connection with the above-

captioned chapter 11 case, effective as of the Petition Date on the terms and conditions set forth

in the Bankruptcy Administration Agreement by and between the Debtor and GCG, dated as of

May 8, 2013 and attached a copy of which is attached to the Section 327 Application as Exhibit

A (the "Bankruptcy Administration Agreement"); and upon the declaration of Emily S. Gottlieb,

---

[1]    The last four digits of the Debtor's taxpayer identification number are 2730.  The Debtor's corporate
       headquarters are located at 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

[2]    Capitalized terms used but not otherwise defined herein have the meanings given to them in the Section 327
       Application.

attached to the Section 327 Application as <u>Exhibit B</u> (the "<u>Gottlieb 327 Declaration</u>"); and the

Court being satisfied, based on the representations made in the Section 327 Application and the

Gottlieb 327 Declaration, that GCG is "disinterested" as such term is defined in Bankruptcy

Code section 101(14), as modified by Bankruptcy Code section 1107(b), and as required under

Bankruptcy Code section 327(a); and that GCG represents no interest adverse to the Debtor's

estate with respect to the matters upon which it is to be engaged; and the Court having

jurisdiction to consider the Section 327 Application and the relief requested therein in

accordance with 28 U.S.C. §§ 157 and 1334; and consideration of the Section 327 Application

and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and

venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and

proper notice of the Section 327 Application having been provided; and it appearing that no

other or further notice need be provided; and a hearing having been held to consider the relief

requested in the Section 327 Application (the "<u>Hearing</u>"); and upon the record of the Hearing

and all of the proceedings had before the Court; and the Court having found and determined that

the relief sought in the Section 327 Application is in the best interests of the Debtor, its estate,

creditors and other parties in interest; and that the legal and factual bases set forth in the Section

327 Application establish just cause for the relief granted herein; and after due deliberation and

sufficient cause appearing therefor, it is hereby:

       **ORDERED** that, notwithstanding the terms of the Bankruptcy Administration

Agreement, the Section 327 Application is approved solely as set forth in this Order; and it is

further

       **ORDERED** that pursuant to Bankruptcy Code section 327(a) and Bankruptcy

Rule 2014(a), the Debtor is authorized to employ and retain GCG as Administrative Agent

pursuant to the terms and conditions set forth in the Bankruptcy Administration Agreement,

effective as of the Petition Date; and it is further

      **ORDERED** that GCG is authorized to perform all actions and services set forth

in the Section 327 Application, including, but not limited to, the following services:

(a)  Assist the Debtor in analyzing claims filed against its estate;

(b)  Assist with the preparation and filing of the Debtor's schedules of assets and liabilities and statements of financial affairs;

(c)  Generate and provide claim reports and claim objection exhibits;

(d)  Manage the preparation, compilation, and mailing of documents to creditors and other parties in interest in connection with the solicitation of a chapter 11 plan (a "<u>Plan</u>");

(e)  Collect and tabulate votes in connection with any Plan filed by the Debtor and provide ballot reports to the Debtor and its professionals;

(f)  Generate an official ballot certification and testifying, if necessary, in support of the ballot tabulation results;

(g)  Manage any distributions made pursuant to a confirmed Plan;

(h)  Provide such other related administrative services as the Debtor may require in connection with the Chapter 11 Case; and

(i)  Perform such other administrative services as may be requested by the Debtor that are not otherwise allowed under the order approving the 156(c) Application;

and it is further

      **ORDERED** that this Order shall not apply to any services GCG was authorized

to render pursuant to any order approving the 156(c) Application (the "<u>Section 156(c) Order</u>");

and it is further

      **ORDERED** that, to the extent that GCG's duties exceed the scope of the

Section 156(c) Order, GCG shall be compensated in accordance with, will file interim and final

fee applications for allowance of its compensation and expenses pursuant to, and shall be subject to, the Fee Guidelines; and it is further

**ORDERED** that GCG shall be reimbursed for reasonable and necessary expenses as provided in the Fee Guidelines; and it is further

**ORDERED** that GCG shall use its best efforts to avoid any duplication of services provided by any of the Debtor's other retained professionals in the Chapter 11 Case; and it is further

**ORDERED** that the Debtor shall indemnify GCG under the terms of the Bankruptcy Administration Agreement; provided that GCG shall not be entitled to indemnification, contribution, or reimbursement pursuant to this paragraph for services other than the services that GCG is being retained to provide pursuant to this Order, unless such services and the indemnification, contribution, or reimbursement therefor are approved by the Court; and it is further

**ORDERED** that notwithstanding anything to the contrary in the Bankruptcy Administration Agreement, the Debtor shall have no obligation to indemnify GCG pursuant to this Order, or provide contribution or reimbursement to GCG, for any claim or expense that is: (i) judicially determined (the determination having become final) to have arisen from GCG's gross negligence, willful misconduct, or fraud; (ii) for a contractual dispute in which the Debtor alleges the breach of GCG's contractual obligations if the Court determines that indemnification, contribution, or reimbursement would not be permissible pursuant to *In re United Artists Theatre Co., et al.*, 315 F.3d 217 (3d Cir. 2003), or (iii) settled prior to a judicial determination under (i) or (ii), but determined by this Court, after notice and a hearing, to be a claim or expense for

which GCG should not receive indemnity, contribution, or reimbursement under the terms of the

Bankruptcy Administration Agreement as modified by this Order; and it is further

   **ORDERED** that if, before the earlier of (i) the entry of an order confirming a

chapter 11 plan in the Chapter 11 Case (that order having become a final order no longer subject

to appeal), or (ii) the entry of an order closing the Chapter 11 Case, GCG believes that it is

entitled to the payment of any amounts by the Debtor on account of the Debtor's

indemnification, contribution, and/or reimbursement obligations under the Bankruptcy

Administration Agreement (as modified by this Order), including without limitation the

advancement of defense costs, GCG must file an application therefor in this Court, and the

Debtor may not pay any such amounts to GCG before the entry of an order by this Court

approving the payment; provided that this paragraph is intended only to specify the period of

time under which the Court shall have jurisdiction over any request for fees and expenses by

GCG for indemnification, contribution, or reimbursement, and not a provision limiting the

duration of the Debtor's obligation to indemnify GCG.  All parties in interest shall retain the

right to object to any demand by GCG for indemnification, contribution, or reimbursement; and

it is further

   **ORDERED** that the Debtor and GCG are authorized to take such other and

further actions necessary to comply with all of the duties set forth in the Section 327 Application;

and it is further

   **ORDERED** that to the extent that there may be any inconsistency between the

terms of the Section 327 Application, the Bankruptcy Administration Agreement, or this Order,

the terms of this Order shall govern; and it is further

**ORDERED** that this Court retains jurisdiction with respect to all matters arising from, or related to, the implementation of this Order.

Dated: Wilmington, Delaware

_____, 2013

_____
UNITED STATES BANKRUPTCY JUDGE