### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| | Case No.  13-11482 (KJC) |
| EXIDE TECHNOLOGIES,[1] | |
| | **Hearing Date: July 24, 2013 at 11:00 a.m. (ET)** |
| Debtor. | **Objections Due: July 16, 2013 at 4:00 p.m. (ET)** |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO DEBTOR'S MOTION FOR INTERIM AND
FINAL ORDERS (I) AUTHORIZING DEBTOR (A) TO OBTAIN
POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361,
362, 364(c),(1), 364(c)(2), 364(c)(3), 364(d)(1), AND (B) TO UTILIZE CASH
COLLATERAL PURSUANT TO 11 U.S.C. § 363, (II) GRANTING
ADEQUATE PROTECTION TO PRE-PETITION SECURED PARTIES
PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364 (III) SCHEDULING
<u>FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)</u>**

The Official Committee of Unsecured Creditors (the "<u>Committee</u>") of Exide Technologies (the "<u>Debtor</u>" or "<u>Exide</u>"), the above-captioned Debtor[2] and Debtor-in-Possession, by and through its proposed counsel, submits this objection (the "<u>Objection</u>") to the *Debtor's Motion for Interim and Final Orders (I) Authorizing Debtor (A) To Obtain Post-Petition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and (B) To Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant To 11 U.S.C. §§ 363, §§ 361, 362, 363 and 364 and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)* (the "<u>DIP Motion</u>").  In support of this Objection, the Committee states as follows:

---

[1] The last four digits of the Debtor's taxpayer identification number are 2730. The Debtor's corporate headquarters are located at 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

[2] Defined terms used herein but not otherwise defined shall have the meaning ascribed to them in the DIP Facility.

## PRELIMINARY STATEMENT

1.      Pursuant to the DIP Motion the Debtor is seeking authorization to obtain up to $500 million in postpetition secured financing consisting of a (i) $225 million asset based loan and (ii) $275 million term loan (the "DIP Facility").  The proceeds of the DIP Facility will be used to repay the Prepetition ABL Facility (as defined below) in the approximate outstanding amount of $160 million (inclusive of approximately $47 million in letters of credit) and to fund the Debtor's operations and the operations of the Debtor's foreign non-debtor subsidiaries and affiliates.

2.      The Committee is not opposed in principle to the Debtor's request for DIP financing and the use of cash collateral.  However, there are key features and provisions of the DIP Facility that are extremely prejudicial to the interests of unsecured creditors and the Debtor's estate as a whole.  These objectionable provisions, including inappropriate case control and milestones that constrain the Debtor's fiduciary duty to file a plan of reorganization that maximizes value for all creditors and unduly slant the playing field in favor of both the DIP Lenders and Senior Secured Notes (as defined below), a significant portion of whom are also lenders under the DIP Facility.

3.      Exide, including its eighty (80) non-debtor subsidiaries (collectively, the "Company"), is one of the world's largest manufacturers and recyclers of lead acid batteries and has a vast and complex operational structure.  The Company, which operates 13 manufacturing facilities and has approximately 9,000 employees worldwide, currently faces numerous operational, financial and business challenges.  In addition, the Company is being pursued by regulators, class action claimants and certain other parties for alleged environmental violations.

4.      All these challenges will require significant analysis and vetting before a comprehensive, long-term and value maximizing strategy and business plan can be finalized.  Only after this business plan process is completed can the parties-in-interest engage in earnest in negotiating a plan of reorganization.

5.      The Debtor has acknowledged that there are a number of significant issues that need to be addressed, which issues could affect the Debtor's long term strategy and business plan.  The Debtor, in its filing with the SEC (form 10-K as of March 31, 2013) identified nine "key elements of the Company's underlying business plans and continued strategies":

(i)      Successful execution of the closure of the Company's Bristol, Tennessee transportation battery facility, including transitioning existing production to two of the Company's other facilities.

(ii)     Successful closure of the Company's Frisco, Texas facility and idling of secondary lead recycling operations at the Reading, Pennsylvania facility, and the sale of a portion of the Frisco location for anticipated net proceeds of approximately $37.0 million.

(iii)    Actions designed to improve the Company's liquidity and operating cash flow include working capital reduction plans, the sale of non-strategic assets and businesses, streamlining cash management processes.

(iv)     Implementing plans to minimize the cash costs of the Company's restructuring initiatives, and closely managing capital expenditures.

(v)      Continued factory and distribution productivity improvements through the Company's established Lean/Six Sigma program, as well as the Value Analysis Value Engineering ("VAVE") and initiatives.

(vi)     An enhanced focus on growth of the Industrial Americas business through increased new product offerings (Tubular Motive Power, High Frequency Chargers, etc.), increases in capacity, and a larger and more distributed sales and service team tied to the Transportation branch network.

(vii)    Continued investment in production capacity to meet evolving needs for enhanced batteries (AGM and MHF) required for the increasing numbers of Stop & Start and micro-hybrid vehicles.

(viii)   Continued research and development and engineering investments designed to develop enhanced lead-acid products as well as products utilizing alternative chemistries.

(ix)     Lifting the suspension order related to the Vernon, California secondary lead recycling facility.[3]

---

[3] While the suspension order has recently been lifted, much remains to be done with respect to environmental and other compliance issues.

6.      These nine items represent only those initiatives identified by management during the pre-petition timeframe.  Significant additional input and analysis will be required into the business plan from A&M and the Debtor's other professionals, the DIP Lenders, the prepetition secured lenders, the Committee and other key stakeholders.  It is expected that such analysis would encompass potential divestitures or acquisitions of assets, entering new markets or exiting existing ones, and a variety of restructuring initiatives affecting costs, revenues, and the Company's overall operational footprint.

7.      The Debtor's need to undertake major operating initiatives is further evidenced by, among other things, (i) the loss of significant customers such as Wal-Mart, NAPA Auto Parts, CSK Auto and Ford Motors, (ii) the Debtor's decision to reject customer supply agreements with Toyota, Nissan and Chrysler, and (iii) a 4% decline in annual revenue to $2.972 billion and a 42% decline in EBITDA to $104 million for the year ended March 31, 2013.

8.      Further, preparation of the business plan and financial projections requires analysis, evaluation and assessment of the potential impact of certain company, industry and general economic factors.  Again, the Debtor's own statements (10-K as of March 31, 2013) caution that certain factors that could cause actual results to differ materially from any forward looking statements include, among others, (i) the impact of significant fluctuations in lead pricing, (ii) the cyclical nature of the industries in which the Debtor operates, (iii) the impact of weather on the Debtor's business, (iii) the resolution of any litigation proceedings that the Debtor is subject to, (iv) competitiveness of the battery markets in the Americas and Europe, (v) risks involved in foreign operations such as disruption of markets, changes in import and export laws and currency restrictions or exchange rate fluctuations, (vi) ability of the Debtor to acquire goods and services and/or fulfill later needs at budgeted costs, (vii) general economic conditions, (viii) the Debtor's ability to successfully pass along increased material costs to its customers, and (ix) the impact of recently adopted U.S. lead emissions standards and the implementation of such standards by applicable states.

9.      To evaluate and take into account the effect of the above factors, the Debtor will need to conduct in-depth analysis and assessment of the Company and its operating environment.  Only then can the parties-in-interest work together to develop an informed and reasoned recommended overall business strategy and business plan.

10.      With this factual backdrop, the DIP Motion seeks approval of a $500 million DIP Facility that has a maturity of no greater than 16 months and imposes on the Debtor, among other things, the obligation to finalize a business plan that must be acceptable only to the DIP Agent and Required Lenders by December 10, 2013 and file a plan of reorganization by March 10, 2014, which repays all obligations under the DIP Facility in cash and is otherwise acceptable only to the DIP Agent.

11.      While at first blush these deadlines may not appear unreasonable, in the context of this case where there are significant and challenging operational issues to be analyzed and then fixed and no realistic concern regarding the value of the lenders' collateral, the proposed case milestones represent artificial deadlines designed to force the Debtor to hastily develop and implement a business and restructuring plan before the Company's problems can be identified and addressed.  The Debtor in this case is not only aiming to fix its operations, but also the operations of its global enterprise.  Forcing the Debtor to come out of chapter 11 before it is truly ready benefits only the DIP Lenders and holders of the Senior Secured Notes and likely harms the Debtor's unsecured creditors and estate as a whole, and this should not be permitted.

12.      Given the size and complexity of the Company's business operations, it is unreasonable for the Debtor to agree to finalize a business plan that can dictate the outcome of this case within a six month time frame from the Petition Date (and less than five months from today).  This six-month time frame to deliver an acceptable business plan is deceivingly short.  It is likely that the Debtor will need to present its preliminary business plan and financial forecasts to its board of directors at the end of August or early September in order to meet the existing business plan approval milestone schedule.

13.     Equivalently unreasonable and troubling is the requirement that the business plan - which will in large part dictate valuation and plan distributions - must be acceptable in form and substance only to the DIP Agent and to Required Lenders.  Such a provision grants the DIP Lenders and Required Lenders undue and inappropriate control over the most critical aspect of the chapter 11 process and should not be approved.

14.     The Debtor's chapter 11 case is an "old fashioned" one.  It should not be about preparing a hasty and premature business strategy and plan that will drive the outcome of the case - but about a thorough assessment and vetting of the Debtor's operations and the best strategies to improve and maximize value.

15.     Furthermore, upon information and belief, although the Debtor purportedly communicated with a number of prospective DIP lenders, such lenders were initially asked to provide financing proposals that were materially different in structure (and size) than the ultimately agreed-upon DIP Facility.  After the Debtor, the proposed DIP Lenders, and the pre-petition lenders agreed upon the final structure of the DIP Facility, no other prospective DIP lenders were ever given an opportunity to counter the terms of the final DIP Facility.

16.     Upon information and belief, certain of these prospective lenders would likely have proposed a facility in similar size and structure to the DIP Facility but on better terms.  Having additional time to explore alternative opportunities will most likely generate more interest and a more competitive process.  For these reasons, final approval of the various fees payable to underwriters, arrangers and lenders under the DIP Credit Agreement and that certain Fee Letter should not be approved on a final basis.  The 1% prepayment penalty provision with respect to the Term Advances likewise is not justified.  Given the uncertainty around a potential replacement of the post-petition financing, the approval of approximately $24 million in fees and expenses on a final basis at this stage of the case is not appropriate.  Final approval of fees of this magnitude, as well as the approval of the prepayment penalties under the DIP Facility, has the potential of chilling the ability to secure alternative financing and provide a windfall to the current proposed lenders should their tenure in this case be short lived.

17.     In fact, the Committee's proposed investment banker, Guggenheim Securities, LLC ("Guggenheim") has been in communications with several prospective lenders to explore interest in an alternative financing proposal.  Guggenheim has prepared a draft term sheet that reflects improvements from the DIP Facility in several primary areas:  (i) longer maturity period (24 months vs. the current 16 months), (ii) elimination of the case milestones and related case control provisions, (iii) improved economics, including a lower interest rate, and (iv) more flexible financial covenants.  Based on less than two weeks of preliminary inquiries, there has been positive reaction to the term sheet from a number of qualified parties, including some of the pre-petition prospective DIP lenders that, as noted above, never received a chance to counter the final DIP Facility.  Although additional time is needed to fully explore and finalize an alternative and more favorable DIP, the prospects appear promising.  The DIP Facility, therefore, should not be approved on a final basis until a reasonable period of time is allowed for prospective alternative lenders to have the opportunity to counter the DIP Facility with more favorable terms.  And in accordance with this, any fees payable to the DIP Lenders under the interim DIP Facility should be prorated so that they alone do not constitute a bar to a truly competitive DIP process.

18.     Furthermore, in addition to the overly restrictive case controls and inappropriate milestones embedded in the DIP Facility, the DIP Facility includes a number of objectionable and over-reaching provisions including, among other things, (a) imposing significant covenant and budgetary limitations that pose unreasonable risk of default and operational limitations, (b)  granting of liens and superpriority claims on the proceeds of avoidance actions to both the DIP Lenders and to the prepetition lenders in the form of adequate protection, (c) requiring the Committee to obtain standing before filing a challenge to the claims or liens of the prepetition secured lenders or asserting a claim against the prepetition secured lenders (collectively, a "Challenge"), (d) requiring the Committee to file a Challenge (including filing a motion and obtaining an order authorizing standing) within 60 days of its formation and, (e) limiting the Committee's budget to $50,000 to investigate and determine whether a basis for a

Challenge exists with respect the Debtor's pre-petition transactions spanning the globe, and (f) impermissibly waiving the "equities of the case" exception contained in section 552(b) of the Bankruptcy Code.

## BACKGROUND

19.     On June 10, 2013 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.

20.     The Debtor continues to operates its business and manage its affairs and properties as a Debtor-in-Possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

21.     On June 18, 2013, the Office of the United States Trustee appointed the Committee pursuant to § 1102 of the Bankruptcy Code.

22.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. sections 157 and 1334.  This is a core proceeding pursuant to section 157(b).

A.     **The Debtor's Business:**

23.     The Debtor, together with approximately 80 direct and indirect subsidiaries is in the business of manufacturing and selling stored electrical energy solutions and is one of the world's largest producers and recyclers of lead-acid batteries.

24.     The Company operates four (4) business groups, namely Transportation Americas, Transportation Europe and Rest of World ("ROW"), Industrial Energy Americas, and Industrial Energy Europe and ROW.

25.     The Debtor is headquartered in Milton, Georgia, and operates thirteen (13) manufacturing facilities in the United States.  It also operates approximately seventy-four (74) branches throughout North America which sell and distribute other products to customers, battery specialists, retail stores, and OEM Dealers.  The branch locations collect spent batteries for the Debtor's recycling facilities, which include five (5) smelters, three of which are currently

active battery and recycling facilities.  The principal raw material used by the Company in making its product is lead.  In the United States, the Debtor has obtained the vast majority of its lead requirements from its own recycling facilities.

26.     The Debtor reports that it currently employs approximately 3,600 employees in the United States, of which 1,100 are salaried and 2,500 work on an hourly basis, including 450 unionized hourly employees.  Globally, the Company employs approximately 9,000 individuals.

**B.     The Debtor's Corporate and Capital Structure**

27.     Exide is a publicly-traded company listed on The NASDAQ Global Market under the symbol "XIDE."  As of June 6, 2013, the Debtor reported that there were approximately 79,333,110 shares of common stock in the Debtor outstanding, with approximately 4,121 holders of record.

28.     The Debtor reports that it is the parent corporation of seven (7) Domestic Subsidiaries[4] and five (5) Foreign Subsidiaries and that the Foreign Subsidiaries have numerous direct and indirect subsidiaries and joint venture interests in various parts of the world, including Asia, Europe, Australia, New Zealand, Mexico, and Canada.

29.     As of the Petition Date, the Debtor reports that it had approximately $990 million of outstanding funded debt consisting of (a) approximately $160 million in secured debt under its Prepetition ABL Facility (as defined below), (b) $675 million in secured debt outstanding under the Senior Secured Notes (as defined below), (c) $51.9 million in unsecured debt under the Convertible Notes (as defined below), and (d) $103.5 million in unsecured trade debt.

30.     <u>The ABL Facility</u>.  Prior to the Petition Date, the Company operated with financing from an asset-based loan facility (the "<u>Prepetition ABL Facility</u>") pursuant to the terms

---

[4]     The Debtor represents that the Domestic Subsidiaries are all classified as "Excluded Subsidiaries" under the Prepetition ABL Facility (defined below), because the book value of their total assets, taken together with all other Excluded Subsidiaries under the Prepetition ABL Facility, does not exceed $10 million in the aggregate.

of a certain credit agreement dated as of January 25, 2011 between the Debtor as the United States borrower, and Exide Global Holding Netherlands C.V. ("Exide C.V.") as the foreign borrower and various financial institutions party thereto as lenders.  Wells Fargo Finance, LLC ("Wells Fargo") is the administrative agent under the ABL Facility.  In addition to Exide C.V., certain other non-debtor Foreign Subsidiaries purportedly guaranteed the foreign borrowings under the Prepetition ABL Facility.

31.    The Prepetition ABL Facility, which matures on January 25, 2016, has an aggregate borrowing capacity of $210 million, inclusive of a letter of credit sub-facility of $75 million and a swing line sub-facility of $25 million.  The Debtor reports that as of the Petition Date, the aggregate principal amount outstanding under the Prepetition ABL Facility was approximately $113 million of loans and approximately $47 million issued in outstanding letters of credit, together with accrued but unpaid interest, fees, costs, and other charges.  Approximately $55.9 million of the $113 million loans outstanding under the Prepetition ABL Facility represents borrowings of Exide C.V.

32.    The obligations of the Debtor, Exide C.V., and the other loan parties under the Prepetition ABL Facility are allegedly secured by (a) a first priority lien on the ABL Priority Collateral, which includes, subject to certain exceptions, the Debtor's receivables, inventory, intellectual property rights, deposit accounts, tax refunds, certain inter-company loans and certain other related assets and proceeds, and (b) a second priority lien on the Notes Priority Collateral (as defined below).  In addition, the obligations of Exide C.V. and the Foreign Guarantors under the Prepetition ABL Facility are allegedly secured by a first priority lien on substantially all of the personal property of Exide C.V. and the Foreign Guarantors and the thirty-five percent (35%) of equity interests held by the Debtor in Exide C.V. that does not constitute Notes Priority Collateral.

33.    The Senior Secured Notes.  Pursuant to an indenture dated as of January 25, 2011, the Debtor issued $675 million in aggregate principal amount of 8.625% senior secured notes with a maturity date of February 1, 2018 (the "Senior Secured Notes").  The

Senior Secured Notes have a cash coupon interest rate of 8.625% annually, payable semi-annually in arrears in February and August.  As of the Petition Date, the Senior Secured Notes had a remaining principal balance of $675 million outstanding, plus accrued and unpaid interest of approximately $20.86 million.  The Senior Secured Notes are allegedly secured by:  (i) a first-priority lien on the Notes Priority Collateral, which includes, subject to certain exceptions, Exide's existing and after-acquired equipment, stock in Exide's direct Subsidiaries, including a 65% pledge from Exide of its equity interest in Exide C.V., certain intercompany loans, certain real property, and substantially all of Exide's other assets that do not secure the Prepetition ABL Facility on a first-priority basis, and (ii) a second-priority lien on the ABL Facility Priority Collateral.  The Senior Secured Notes are not guaranteed by any of Exide's Subsidiaries.

34.    The Convertible Notes.  Pursuant to an indenture dated as of March 18, 2005, the Debtor issued floating rate convertible senior subordinated notes (the "Convertible Notes") with a maturity date of September 18, 2013.  The Convertible Notes bear floating interest at a per annum rate equal to the 3-month LIBOR, adjusted quarterly, minus a spread of 1.5%.  The Convertible Notes are unsecured obligations of the Debtor.  As of the Petition Date, the Convertible Notes had a remaining principal balance of $51.9 million outstanding, plus accrued and unpaid interest.

35.    General Unsecured Debt.  As of the Petition Date, the Debtor also has approximately $103.5 million in general unsecured debt primarily consisting of outstanding payments under various contracts and other arrangements for goods and services supporting its operations.

**THE DIP MOTION**

36.    On the Petition Date the Debtor filed the DIP Motion.  On July 11, 2013, the Court entered an order approving the DIP Motion on an interim basis ("Interim DIP Order") (D.I. 79).  The Interim DIP Order authorized the Debtor to borrow $170 million under the DIP Term Facility (as defined below) and $225 million under the DIP ABL Facility and to use the

proceeds therefor to, among other things, repay the Prepetition ABL Facility. The essential terms of the proposed financing and use of cash collateral are set forth below.

Lenders:        JPMorgan Chase Bank, N.A. ("JPMCB") and certain holders of Senior Secured Notes;

Borrowers:      Exide and non-debtor Exide C.V. with respect to DIP ABL Facility, and Exide with respect to DIP Term Facility.

Aggregate Commitment:  $500 million

- First out superpriority, secured, asset-based revolving facility in principal amount of $225 million ("DIP ABL Facility"), subject to increase to up to $325 million upon satisfaction of certain terms and conditions; and

- Second out superpriority, multiple-draw secured term loan in aggregate principal amount of $275 million ("DIP Term Facility").

The amounts due under the DIP Facilities will prime the amounts due to the Senior Secured Notes.

Term/Maturity:  The earliest of (a) the business day that is 16 months after the conditions to the initial funding are satisfied, (b) the acceleration of the advances and the termination of the commitments in connection with an Event of Default, (c) 45 days after the entry of the Interim Order if the Final Order has not been entered by the Court by such date, and (d) the substantial consummation of a reorganization plan that is confirmed pursuant to an order entered by the Court.

Significant Milestones and Events of Default:

The proposed DIP Facility contains several key milestones. The failure to meet the milestones will result in an event of default under the DIP Facility and permit the DIP Lenders to enforce remedies under the DIP Facility. These milestones are:

- By no later than six (6) months after the Petition Date (December 10, 2013), finalize a business plan in form and substance acceptable to the DIP Agent and the Required Lenders. (emphasis added)

- By no later than nine (9) months after the Petition Date (March 10, 2014), file with the Court a proposed Acceptable Reorganization Plan.

- By no later than twelve (12) months after the Petition Date (June 10, 2014), commence solicitation of acceptance for an Acceptable Reorganization Plan pursuant to a disclosure statement and solicitation procedures approved by the Court that are in form and substance reasonably acceptable to the DIP Agent and the Required Lenders.

- By no later than the first Business Day that occurs sixteen (16) months after the Closing Date, the effective date of an Acceptable Reorganization Plan shall have occurred and the order confirming the Acceptable Reorganization Plan shall not have been amended, modified, supplemented (or any portions thereof reversed, stayed or vacated) other than as agreed in writing by the DIP Agent and the Required Lenders.

"Acceptable Reorganization Plan" is defined to mean a chapter 11 plan that provides for the termination of the Commitments and the payment in full in cash of the obligations under the DIP Documents (other than contingent indemnification obligations not yet due and payable) on the effective date of such plan and, otherwise, reasonably acceptable to the DIP Agent.

<u>Interest Rates</u>:

The interest rate on the DIP ABL Facility is charged based upon the "Base Rate." The base rate is the greatest of (a) the Federal Funds Rate plus 0.5%, (b) the rate of interest per annum publicly announced from time to time by JPMCB as its prime rate, and (c) LIBOR plus 1.00%. The Borrowers have the option, however, of converting Base Rate Loans to LIBOR Loans, and vice versa, subject to certain conditions:

- LIBOR Rate Loans:  LIBOR + 3.25%

- Base Rate Loans:  Base Rate + 2.25%

- Swingline Loans LIBOR + 3.25%

The interest rate on the DIP Term Facility is 9.0%

<u>Expenses and Fees</u>:

- Letter of Credit Fees:  The product of (i) daily undrawn amount of all outstanding Letters of Credit times (ii) 3.25% per annum.

- Unused Line Fee:  The product of (i) 0.50% times (ii) the undrawn amount of the DIP ABL Facility (excluding Swingline Loans).

- Unused Commitment Fee:  0.50% per year on the portion of the DIP Term Facility not provided on an interim basis.

- Commitment Fee for Term Lenders:  3.50% of the amount of the DIP Term Facility paid in kind.

- Term Loan Commitment Fee:  0.75% of the DIP Term Facility.

- Other fees provided for in the confidential Fee Letter filed under seal.

- Aggregate fees to underwriters, arrangers and lenders are approximately $23.69 million or 4.7%.

Senior Secured Notes Adequate Protection

- Replacement liens against the Collateral that are junior only to (i) the liens granted to the DIP Agent and the DIP Lenders under the DIP Facilities (as well as any liens to which the liens provided under the DIP Facilities, by its terms, are junior) and (ii) the Carve out.

- Silent junior liens on certain foreign collateral of the Debtor's subsidiaries incorporated in the United Kingdom.

- Subject to the Carve Out, a superpriority claim under section 507(b) of the Bankruptcy Code that is immediately junior to the superpriority claims granted to the DIP Agent and the DIP Lenders and pari passu with the section 507(b) superpriority claim granted to the Pre-Petition ABL Lenders.

- Payment of the reasonable professional fees and expenses incurred by primary counsel and one local retained by the indenture trustee for the Senior Secured Notes in connection with the chapter 11 Case, on the condition that the indenture trustee supports and does not object to the relief sought in the DIP motion.

- With respect to the Unofficial Noteholder Committee, payment of reasonable fees and expenses incurred by the Unofficial Noteholder Committee's advisors (collectively, the "Notes Advisors"): (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel, (ii) Young Conaway Stargatt & Taylor, LLP, as local Delaware counsel, (iii) Houlihan Lokey, as financial advisor, (iv) Slaughter and May, as UK counsel, and (v) solely in the case of a conflict of interest with the DIP Agent, one additional counsel in each relevant foreign jurisdiction. Such payments to Houlihan Lokey include a financing fee payable upon entry of the Final Order in accordance with the terms of its engagement letter dated as of May 17, 2013, in an amount not to exceed $1,500,000.

Liens on Avoidance Actions:  Although not granted in the Interim DIP Order, the DIP Agent and prepetition lenders are seeking a lien on the proceeds of avoidance actions.

Section 506 (c) Waiver:  The DIP Facility provides for a waiver of rights under section 506 (c) of the Bankruptcy Code.

Challenge Period:  The earlier of 75 days from entry of interim order or 60 days from formation of creditors committee (or until August 17, 2013 ) or such date as agreed to by prepetition lenders or as authorized by Court, but the Committee is not granted standing to pursue any challenge.  Budget for Committee Professionals to investigate/prosecute challenges with respect to prepetition lenders is $50,000.

Credit Bidding:  DIP Agent and the holders of the Senior Secured Notes are granted rights to credit bid in connection with any sale of assets either through plan, 363 sale or otherwise.

## OBJECTION TO THE ENTRY OF THE FINAL DIP FINANCING ORDER

37.     Debtor-in-possession financing should only be approved if it "is in the best of interests of creditors generally."   In re Roblin Indus., Inc., 52 B.R. 241, 244 (Bankr. W.D.N.Y. 1985) (citing In re Texlon Corp., 596 F.2d 1092, 1098-99 (2nd Cir. 1979)).   And, the terms of the proposed DIP financing should only be approved if they are fair and reasonable under the circumstances, comport with basic notions of fairness and equity, and will ultimately inure to the benefit of the debtor's estate.   In re Aqua Associates, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991); In re Ames Department Stores, Inc., 115 B.R. 34, 37-40 (Bankr. S.D.N.Y. 1990).   A debtor, for the sake of obtaining DIP financing promptly, cannot abrogate its fiduciary duties to it Chapter 11 estate and its creditors.   Ames Department Stores, 115 B.R. at 38.

38.     Section 364 financing is not a "secured lenders act" allowing a postpetition secured lender to undo the level "playing field" contemplated by the Bankruptcy Code.   The Court in Ames Department Stores stated:

> Acknowledging that Congress, in Chapter 11 delicately balanced the hope of debtors to reorganize and the expectations of creditors for payment, the courts have focused their attention on proposed terms that would tilt the conduct of the bankruptcy case; prejudice, at an early stage, the powers and rights that the Bankruptcy Code confers for the benefit of all creditors; or leverage the Chapter 11 process . . .

Ames Department Stores, 115 B.R. at 37.   See also In re Tenney Village Co., Inc., 104 B.R. 562, 568 (Bankr. D. N.H. 1989) (financing terms must not "pervert the reorganization process from one designed to accommodate all classes of creditors . . . to one specially crafted for the benefit" of the secured creditor); In re Mid-State Raceway, 323 B.R. 40, 59 (Bankr. N.D.N.Y. 2005) ("[B]ankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender").

39.     Application of the legal principles to the facts of this case demonstrates that the terms of the DIP Facility are unduly prejudicial to the rights of unsecured creditors and not in the best interests of the Debtor's estate.  Accordingly, subordinating unsecured creditors to potentially $500 million in additional secured debt is unwarranted and, in its current form, the DIP Facility should not be approved.

**The Case Milestones and Term of the DIP**

40.     The most troubling and prejudicial features of the DIP Facility are the unreasonable case milestones, case controls and unreasonably short maturity date in light of the circumstances specific to this case.  This is not a case where the secured lenders' collateral is losing value each day Exide operates in chapter 11, and the Company should be allowed to proceed with a comprehensive operational reorganization with the chapter 11 process as it has set out to do.

41.     As outlined above, this case involves an extremely large, global and complex business that faces many operational hurdles.  A careful and comprehensive "bottom up" review must be undertaken before a viable and value maximizing business plan and projections can be developed for the benefit of all creditor constituencies - not just the DIP Lenders and holders of Senior Secured Notes many of whom are also the DIP Lenders.

42.     The milestones contained in the DIP Facility, however, do not allow sufficient time for the Debtor to undertake the necessary review and analysis or for the Committee's financial advisors to perform the necessary due diligence to vet the business plan that the Debtor is required to have approved by the DIP Agent and the Required Lenders by December 10, 2013 (and likely generated much earlier in order to comply with required internal approval and a vetting process with key parties-in-interest, as noted above).

43.     Exide has not been able to achieve its operational goals and there is no reason to believe that management, even with the assistance of its recently retained chief restructuring officer and his supporting team from Alvarez & Marsal North America LLC

(A&M), will be in a position to identify, evaluate, quantify and address all of the Debtor's operational issues and opportunities during the next few months in a manner designed to maximize value for all creditors.

44.    Furthermore, because the business plan must be acceptable to only the DIP Agent and Required Lenders, management is not incentivized to develop a strategy and model designed to maximize value for all constituencies.  Giving discretionary approval to the senior lenders to reject the business plan gives them undue influence over the type of plan that management can propose.  Under the terms of the DIP Facility, as long as the business plan and ultimate plan of reorganization are acceptable to the secured lenders, then the Debtor can proceed with its reorganization without fear of being in default.  This construct fails to allow management to develop a long-term business plan that will maximize value for all creditor constituent of the estate, and not just the secured lenders.

45.    In short, the case milestones are artificial deadlines that provide no benefit other than to the secured creditors by granting them unfair dominance and control over the most important aspect of any chapter 11 case – the negotiation and development of a business plan and ultimately a plan of reorganization.  If the Debtor's assets are not materially declining in value and if the lenders are adequately protected (as they are), such short milestones simply are unnecessary, unreasonable, and not in the best interests of the estate as a whole.  Unsecured creditors should not be subordinated to up to $500 million in new secured debt (or up to $340 million more than under the Prepetition ABL Facility), and the DIP Facility should not be approved, unless the case milestones are eliminated or substantially revised to take into account the best interests of all creditors.

**Critical Financial Covenants Are Unduly Restrictive and Controlling**

46.    As currently proposed in the DIP Facility, the Debtor is limited to capital expenditures ("Capex") of no more than (i) $25 million during any fiscal quarter and (ii) $85

million during any four consecutive fiscal quarters.  These limitations are unreasonable in light of the Debtor's past history and future needs.

47.    The Capex covenant should be revised to allow for a rolling four consecutive fiscal quarter limit of at least $100 million, with any amount not used in any quarter rolled over into subsequent quarters.  It is unjustified and imprudent to limit the Capex on a quarterly basis and discourage the Debtor from making investments at the time they are needed rather than encourage them to abide to a restrictive timeline.  Additionally, it is more likely that the Debtor will not (and perhaps shouldn't) start making capital investments until the business plan is developed and vetted, in which case, under the DIP Facility, will likely forgo a large portion of the allowed Capex at least in the first quarter ($25 million).  The increase would provide the Debtor with the additional and necessary flexibility to invest in the business in an amount which is consistent with historical capital expenditure levels and the needs of the business (note that the Debtor's capital expenditures in FY 2012 and FY 2013 were approximately $110 million (3.6% of revenues) and $102 million (3.4% of revenues, respectively, which are above the proposed limitation in the DIP Facility of $85 million, which represents a lower percentage of revenues based on the initial FY 2014 forecast.  Further, at this stage, when the business plan is yet to be developed, the Debtor should have the additional Capex flexibility in order to bring its facilities into a more competitive state.  The chapter 11 process should not be one where the Debtor is capital constrained and unable to invest in its business to sufficiently rehabilitate its operations. As with the restrictive case milestones, the Capex covenant improperly limits the Debtor's ability to maximize value for the long term benefit of the estate.

48.    In addition, the Committee proposes that any capital expenditures required for environmental regulatory compliance should be excluded from the Capex limitation.  These expenses are required in order to comply with certain regulatory requirements and represent investments necessary to bring the Debtors' assets to a minimum required level of operation (rather than growth) are typically non-recurring in nature.  The Capex limitation, was, hopefully,

not designed by the DIP Facility lenders to curtail the amount the Debtor requires to the bare minimum level to permit operation of its current business.

49.     Furthermore, under the existing DIP Facility, the definition of EBITDA limits the add-back of non-recurring costs and expenses incurred in connection with environmental compliance to $5 million.  This limit should be increased to at least $25 million because it is probable that the Debtor will incur these types of expenses in excess of the $5 million.  The Debtor is currently in the process of addressing several environmental issues related to its facilities and has already estimated that it would reach the $5 million limitation.  Again, the incurrence of any such cost is at the Debtor's discretion, but increasing the limit to more reasonable levels will allow it the necessary flexibility to make prudent business decisions without having to make the choice of complying with regulatory rules or tripping a covenant and triggering a default.

50.     Finally, as currently structured, the minimum cumulative EBITDA covenant is tested monthly from and including June 1, 2013 to and including September 30, 2013 and on each subsequent month-end through and including May 31, 2014.  Thereafter, a trailing twelve-month EBITDA is tested monthly for the periods ending June 30, 2014 through September 30, 2014.  The required minimum levels of EBITDA increase at a very significant rate during months 12 through 16 of the DIP Facility period, rising by 40% over this period.  This covenant test is unduly restrictive and could potentially trigger an event of default under circumstances where the lenders are not at any increased or meaningful risk.  The existing EBITDA covenant provides very little margin of error for any variances in timing and unforeseen events, putting an unnecessary burden on the Debtor to meet tight monthly tests and potentially make short term decisions which are adverse to the business, in order to comply with the covenants.

51.     Rather than a monthly test, (i) EBITDA should be tested on a quarterly basis only and (ii) there should be a straight line increase in the minimum required EBITDA

from the $90.25 million covenant level as of May 31, 2014 to $126 million as of the ultimate maturity date.[5]

**The DIP Facility Improperly Grants Liens and Superpriority Claims on Proceeds of Avoidance Actions**

52.     The DIP Facility includes a provision requiring the final DIP financing order (the "Final DIP Order") to grant the DIP Lenders a lien and superpriority claim on the proceeds of avoidance actions.  This provision is objectionable and should not be included in the Final DIP Order.  Avoidance actions and their proceeds should be preserved for the benefit of the Debtor's general unsecured creditors.

53.     It is well established that avoidance actions can only be exercised for the benefit of the Debtor's estate.  Bear Stearns Sec. Corp. v. Gredd, 275 B.R. 190, 194 (S.D.N.Y. 2002).  The intent underlying the avoidance powers is to allow a debtor's estate to recover payments on behalf of all creditors.  In re Integrated Testing Prods. Corp., 69 B.R. 901, 904 (D.N.J. 1987) (finding that only the trustee, acting on behalf of all creditors, has a right to recover preference payments); In re Sweetwater, 884 F.2d 1323, 1328 (10th Cir. 1989) ("[P]ost-petition avoidance actions should be pursued in a manner that will satisfy the basic bankruptcy purpose of treating all similarly situated creditors alike . . ."

54.     Given that avoidance actions and their proceeds are designed to protect the interests of all creditors, the Final DIP Order should not grant the DIP Lenders liens and superpriority claims on avoidance action proceeds, especially where, as here, there is no evidence that the balance of the collateral granted to the DIP Lenders is not sufficient to protect their interests.

---

[5] The $126 million represents under the DIP Facility the required EBITDA covenant level as of September 30, 2014, the maturity month of the existing DIP Facility.  The changes requested in this Objection are to set the minimum EBITDA covenant at the same $126 million on the maturity date, as extended.

**The Prepetition Lenders Are Not Entitled To The "Adequate Protection Package" As Currently Structured**

55.    The Interim DIP Order provides the prepetition lenders a plethora of benefits and payments under the guise of "adequate protection."  See Interim DIP Order, ¶ 15. For example, the Senior Secured Notes are obtaining liens on the proceeds of avoidance actions. The Indenture Trustee under the Senior Secured Notes is receiving – without any review or scrutiny – reimbursement of fees and expenses of its professionals.  Similarly, the Unofficial Noteholder Committee representing holders of the Senior Secured Notes is provided reimbursement of all fees and expenses of their Notes Advisors, including a $1.5 million "financing fee" to their investment banker.  See DIP Motion, ¶ 53.  These payments are also proposed without the review and scrutiny of the Committee and the Office of the United States Trustee.

56.    The adequate protection package is too generous under the circumstances. The purpose of adequate protection is to ensure that a secured creditor is protected from a diminution in the value of its collateral during the bankruptcy case.  In re WorldCom, Inc., 304 B.R. 611, 618-19 (Bankr. S.D.N.Y. 2004) (citations omitted); In re Pine Lake Vill. Apartment Co., 19 B.R. 819, 824 (Bankr. S.D.N.Y. 1982) ("Neither the legislative history nor the [Bankruptcy] Code indicate that Congress intended the concept of adequate protection to go beyond the scope of protecting the secured claim holder from a diminution in the value of the collateral securing the debt."); see also, In re George Ruggiere Chrysler-Plymouth, Inc., 727 F.2d 1017, 1019 (11th Cir. 1984).  Adequate protection is intended to preserve a secured creditor's proprietary interest following the commencement of a bankruptcy case - not to enhance that creditor's position.  In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) (citations omitted).

57.    A court's inquiry in determining whether proposed adequate protection is sufficient is relatively narrow in focus.  "To determine whether an entity is entitled to adequate protection and the type and the amount of adequate protection required, a court must determine the value of the collateral, the creditor's interest in the collateral and the extent to which the

value will decrease during the course of the bankruptcy case." In re Megan-Racine Assocs, 202 B.R. 660, 663 (Bankr. N.D. N.Y. 1996) (citations omitted).

58.     For the same reasons discussed above with respect to the DIP Lenders, the prepetition lenders are not entitled to liens and superpriority claims on the proceeds of avoidance actions. The prepetition lenders, including the Unofficial Noteholder Committee, are also not entitled to payment of unlimited fees and expenses of their numerous professionals under the guise of adequate protection.

59.     Based on the above, the prepetition lenders, and in particular the Unofficial Noteholder Committee, are not entitled to the reimbursement of an unlimited amount of professional fees and expenses, including the $1.5 million "financing fee."[6] Here, the prepetition lenders have failed to show that payment of professional fees and expenses is required or necessary to protect them against the diminution in the value of their collateral. At bottom, prepetition lenders are entitled to adequate protection only with respect to the actual and proven diminution in the value of their collateral from the Petition Date through some future event. To the extent they are entitled to the reimbursement of any fees and expense, their detailed invoices for reimbursement must be capped, reasonable, and subject to the Committee's review prior to payment.

**Provisions Relating To The Challenge Period and Investigation Should Not Be Approved**

60.     As outlined above, the DIP Facility includes provisions that would require the Committee to assert a Challenge within 60 days of the Committee's formation (the "Challenge Deadline") and would further limit the ability of the Committee to assert a Challenge by requiring the Committee to first obtain an order granting it standing to assert such a Challenge.

61.     In the context of this case, where the Debtor's capital and organizational structure is extremely complex and spans the globe, the proposed Challenge Deadline is

---

[6] It is important to note that the DIP Lenders are also receiving a "financing fee", as is the Debtor's court retained professional, A&M.

unreasonably short and the added impediment of first obtaining a standing order is grossly overreaching. The Committee and its professionals have been and are in the process of reviewing the validity, extent, priority and enforceability of the claims and liens under both Prepetition ABL Facility and Senior Secured Notes. However, given the global reach of the Debtor and the many other tasks to be performed, it is unreasonable to expect and require the Committee to complete its review in 60 days. Moreover, the requirement of first obtaining a standing order effectively reduces the 60 day Challenge Deadline even further and makes the Challenge Deadline particularly oppressive and inequitable.

62.     The Challenge Period should be extended to 120 days from after Committee formation (subject to further extension upon consent or court order) and the Final DIP Order should grant the Committee standing to assert any Challenge without the need to first file a motion to obtain an order granting standing (or at a minimum, the Challenge Period should be tolled once a standing motion is filed). Courts have routinely approved agreements that grant standing to the creditors' committee without the need for a standing motion. See, e.g., In re 155 Route 10 Associates, Case No. 12-24414 (Bankr. D. N.J. June 2012) at ¶ 35; In re American Safety Razor, LLC, Case No. 10-12351 (Bankr. D. Del. Aug. 27, 2010) at ¶ 6; In re Pliant Corp., Case No. 09-10443 (Bankr. D. Del. Mar. 20, 2009) at ¶ 19; In re Quebecor World (USA) Inc., Case No. 08-10152 (Bankr. S.D.N.Y. Apr. 1, 2008) at ¶ 21; In re Dana Corp., Case No. 06-10354 (Bankr. S.D.N.Y. Mar. 29, 2006) at ¶ 25.

63.     Similarly, and for the same reasons, the proposed $50,000.00 investigation cap is plainly insufficient and unreasonable and should not be approved. In other large and complex cases creditors' committees have not been subject to budgetary restrictions to perform the investigation of lender claims. See, e.g., In re TOUSA, Inc., Case No. 08-10928 (Bankr. S.D. Fla. Jan. 9, 2009) (Second Stipulated Final Order Authorizing Use of Cash Collateral) (Docket No. 2355) (providing for no cap on use of cash collateral to conduct investigation); In re Quebecor World (USA) Inc., Case No. 08-10152 (Bankr. S.D. N.Y. Apr. 1, 2008) (providing for no restriction on the use of postpetition loan funds to conduct investigations into claims against

prepetition lenders); In re Tropicana Entertainment, LLC, Case No. 08-10856 (Bankr. D. Del. May 5, 2008); In re Radnor Holdings Corp., Case No. 06-10894 (Bankr. D. Del. Sept. 2, 2006); In re Delta Airlines, Inc., Case No. 05-17923 (Bankr. S.D. N.Y. Oct. 6, 2005) (no cap).

64.    In addition to being unnecessary and atypical, the financial cap on lien investigation proposed by the DIP Lenders forces the Committee's professionals to finance matters related to the Debtor's reorganization and harms the adversary system characteristic of the chapter 11 process.  See Tenney Vil., 104 B.R. at 568-69 (finding cap on fees unacceptably limited the right of debtor's counsel to payment for bringing actions against the prepetition lenders, creating an economic incentive to avoid bringing such actions in disregard of its fiduciary duties toward the estate, and therefore, refusing to approve the post-petition financing); In re Channel Master Holdings, Inc., No. 03-13004, 2004 Bankr. LEXIS 576, at *8-9 (Bankr. D. Del. Apr. 26, 2004) (refusing to enforce a $75,000 cap on committee's professional fees under a post-petition financing facility, finding such cap unreasonable in light of the much larger caps on the other professionals in the case and, after a thorough review of all the actions of the committee's professionals, determining that the cap on the committee's fees was inadequate to compensate for such activities).

**The Waiver of the "Equities of the Case" Exception Under Section 552(b) of the Bankruptcy Code and the Waiver of Rights Under 506(c) of the Bankruptcy Code Are Inappropriate**

65.    Given the unique facts of this case, the Committee objects to the provisions in the DIP Facility that provide that the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply.  The Court is not, at this early stage of the case, in a position to determine what the "equities of the case" may be or assess the impact of the elimination of such a remedy.

66.    For similar reasons, the Committee also objects to the waiver of the Debtor's and all parties-in-interest's ability to surcharge the prepetition secured lenders' collateral under section 506(c) of the Bankruptcy Code.  The effect of the section 506(c) waiver

is inappropriate, as it closes the door to a further avenue of recovery for the benefit of the Debtor's estate, without due regard for the principal purpose of section 506(c) of the Bankruptcy Code, and should not be permitted under the facts of this case.  See, e.g., Hartford Fire Ins. Co. v. Bank Minn (In re Lockewood Corp.), 223 B.R. 170, 176 (8th Cir. B.A.P. 1998) (holding that provision in financing order purporting to shield the post-petition lender from surcharges under section 506(c) was unenforceable); In re Colad Group, Inc., 324 B.R. 208, 224 (Bankr. W.D.N.Y. 2005) (refusing to approve post-petition financing agreement to the extent that the agreement purported to modify statutory rights and obligations created by the Bankruptcy Code by prohibiting any surcharge of collateral under section 506c)).

        67.    Moreover, the waiver contravenes the intent behind Section 506(c) of the Bankruptcy Code.  In re Codesco, Inc., 18 B.R. 225, 230 (Bankr. S.D. N.Y. 1982) ("The underlying rationale for charging a lienholder with the costs and expenses of preserving or disposing of the secured collateral is that the general estate and unsecured creditors should not be required to bear the cost of protecting what is not theirs.").  See also In re Visual Indus., Inc., 57 F.3d 321, 325 (3d Cir. 1995) ("[Section] 506(c) is designed to prevent a windfall to the secured creditor . . . . The rule understandably shifts to the secured party . . . the costs of preserving or disposing of the secured party's collateral, which costs might otherwise be paid from the unencumbered assets of the bankruptcy estate  . . . .") (internal citation omitted); Kivitz v. CIT Group/Sales Fin., Inc., 272 B.R. 332, 334 (D. Md. 2000) (creditors should not be required to bear the cost of protecting property that is not theirs; the secured party must bear the cost of preserving or disposing of its own collateral.); In re AFCO Enters., Inc., 35 B.R. 512, 515 (Bankr. D. Utah 1983) ("When the secured creditor is the only entity which is benefited by the trustee's work, it should be the one to bear the expense.  It would be unfair to require the estate to pay such costs where there is no corresponding benefit to unsecured creditors.").

        68.    Indeed, courts routinely reject the waiver of surcharge rights under Section 506(c).  In re The Colad Group, Inc., 324 B.R. 208, 224 (Bankr. W.D. N.Y. 2005) (refusing to approve DIP Facility agreement to the extent that the agreement purported to modify statutory

rights and obligations created by the Bankruptcy Code by prohibiting any surcharge of collateral under Section 506(c)).  Courts in this district have also denied waivers of surcharge rights under section 506(c).  See e.g., In re Motor Coach Indus. Intl, Inc., Case No. 08-12136 (Bankr. D. Del. Oct. 22, 2008) (Final Order Authorizing Debtors to Obtain Postpetition Financing) (Docket No. 244) (removing a section 506(c) waiver from the final postpetition financing order after the creditors' committee objected to its inclusion); In re Fedders North America, Inc., Case No. 07-11176 (Bankr. D. Del. Oct. 5, 2007) (Final Order Authorizing Debtors to Obtain Postpetition Financing) (Docket No. 272) (a section 506(c) waiver in the interim postpetition financing order was removed from the final postpetition financing order after the creditors' committee objected to its inclusion).

**Express Right to Credit Bid**

69.    The DIP Facility grants the DIP Lenders the absolute right to credit bid the full amount of their claims in the event of a sale of their collateral under section 363 of the Bankruptcy Code or pursuant to a plan of reorganization.  Section 363(k) of the Bankruptcy Code includes certain requirements, as well as the ability of the Court, to disallow a credit bid for cause.  The secured lenders should be entitled to no more or less than what is afforded to them under section 363(k) of the Bankruptcy Code, not a preapproved determination of a right to credit bid.

70.    Even more egregious is the Debtor's proposal to enable the holders of the Senior Secured Notes to credit bid the amount of their claims.  See Interim DIP Order, ¶ 22(b). The holders of the Senior Secured Notes are not entitled to any benefit of the Final DIP Order other than adequate protection against any actual and provable diminution in the value of their collateral.  Granting them the right to credit bid may render moot the Committee's ability to pursue a Challenge against them and undercuts the purpose of section 363 of the Bankruptcy Code which requires that a credit hold an allowed secured claim in order to credit bid.  In re Merit Group, Inc., 464 B.R. 240, 252 (Bankr. D.S.C. 2011) ("The intent of section 363(k) is to

permit only those with a valid security claim in property to be sold to a claim a setoff"). "Without a valid interest, the property would be transferred to a putative secured creditor using a credit bid as part of the consideration, only to have that creditor's lien subsequently deemed invalid." <u>Id</u>.   In addition, section 363(k) of the Bankruptcy Code expressly grants the court discretion to deny a creditor's ability to credit bid "for cause."   Cause is a "flexible concept enabling a court to fashion an appropriate remedy on a case-by-case basis."   <u>In re NJ Affordable Homes Corp.</u>, Case No. 05-60442-DHS, 2006 WL 2128624 at *16 (Bankr. D.N.J. June 29, 2006).   The holders of the Senior Secured Notes have not established why the Committee's lien challenge rights provided in paragraph 19 of the Interim DIP Order should be stripped through their ability to credit bid through paragraph 22(b) of the Interim DIP Order.   As presently structured, the Interim DIP Order gives the Committee a right to challenge the liens underling the Senior Secured Notes and at the same time takes those right away in case of an asset sale.

**No Final Approval of Fees and Expenses and Prepayment Penalty Provision**

71.   Through the DIP Motion, the Debtor requests approval, on a final basis, of various fees and expenses of underwriters, arrangers and lenders under the DIP Credit Agreement and that certain Fee Letter.   These fees total approximately $24 million.   <u>See</u> DIP Motion, pg. 18.   The Debtor also seeks approval of a DIP Credit Agreement provision providing for a 1% prepayment penalty (defined in the DIP Credit Agreement as "Term Prepayment Premium") in the event the term loan portion of the DIP Facility is repaid prior to maturity.   <u>See</u> DIP Credit Agreement, § 2.4(d).   The Committee submits that alternatives to the DIP Facility may exist.   Alterative lenders may provide the Debtor with post-petition financing on better financial terms as well as with no or less stringent case control provisions.   Given the current uncertainty around a potential replacement of the post-petition financing, the approval of approximately $24 million in fees on a final basis at this stage of the case is not appropriate.   In fact, the approval of approximately $24 million in fees and prepayment penalties has the potential of chilling the ability to secure alternative financing.   In addition, approval of these fees on a final basis as well as the Term Prepayment Premium will provide a windfall to the current

proposed lenders should their financing be replaced.  As such, the Committee respectfully requests that, to the extent the Court is inclined to approve the request sought in the DIP Motion, the fees and expenses payable to the various parties under the DIP Credit Agreement, the Fee Letter and related documents be approved, if at all, on an interim basis only.  In addition, the Term Prepayment Premium provision of the DIP Credit Agreement should be stricken.

**No Waiver of Marshalling**

72.     The DIP Facility would entitle the DIP Lenders an exemption from marshalling with respect to collateral securing their claims.  Neither the Debtor nor the DIP Lenders have produced any evidence to demonstrate that the lenders should receive such favorable treatment.  The Committee submits that they do not and that any marshalling rights, as well as any defenses thereto, should be preserved.

### <u>RESERVATION OF RIGHTS</u>

73.     The Committee reserves the right to raise further and other objections or responses to the DIP Facility and any other form of order presented by the Debtor prior to or at final hearing to approve the DIP Facility.  All rights and remedies of the Committee are hereby expressly reserved.

[remainder of page intentionally left blank]

## CONCLUSION

**WHEREFORE,** the Committee respectfully requests that the Court deny the DIP Motion unless and until all the issues outlined in this Objection are addressed to the satisfaction of the Committee and that the Court grant such other and further relief as is just and appropriate.

Dated: July 16, 2013

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Erin R. Fay*
Robert J. Dehney (No. 3578)
Eric D. Schwartz (No. 3134)
Erin R. Fay (No. 5268)
1201 North Market Street, Suite 1600
Wilmington, DE  19801
Telephone:  (302) 658-9200
Facsimile:  (302) 658-3989

-and-

**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq.
Sharon L. Levine, Esq.
65 Livingston Avenue
Roseland, NJ  07068
Telephone:  (973) 597-2500
Facsimile:  (973) 597-2400

-and-

Gerald C. Bender, Esq.
1251 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 262-6700
Facsimile:  (212) 262-7402

*Proposed Co-Counsel to the Official Committee of Unsecured Creditors*