IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                   :

In re:                           :    Chapter 11
                                   :

EXIDE TECHNOLOGIES,     :    Case No. 13-11482 (KJC)
                                   :

           Debtor.[1]     :
                                   :    **Hrg. Date: 8/15/13 at 1:00 p.m. (Eastern)**
                                   :    **Obj. Due:  8/8/13 at 4:00 p.m. (Eastern)**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### DEBTOR'S MOTION FOR ORDER (I) CONFIRMING ITS AUTHORITY TO IMPLEMENT ITS ORDINARY COURSE ANNUAL INCENTIVE PLAN, (II) APPROVING THE IMPLEMENTATION OF ITS KEY EMPLOYEE INCENTIVE PLAN, (III) APPROVING IMPLEMENTATION OF ITS NON-INSIDER KEY EMPLOYEE RETENTION PLAN, AND (IV) APPROVING CONTINUATION OF ITS PRE-PETITION INCOME PROTECTION PLAN

Exide Technologies ("Exide" or the "Debtor") hereby moves (the "Motion") this

Court for entry of an order, under sections 105 and 363(b) and (c) of title 11 of the United States

Code (the "Bankruptcy Code"), substantially in the form submitted herewith, confirming the

Debtor's authority to implement, in the ordinary course, its 2014 annual incentive plan,

authorizing, but not directing, the Debtor to implement the proposed key employee incentive

plan and the proposed non-insider key employee retention plan, and approving continuation of its

pre-petition income protection plan with respect to non-insider employees.  In support of the

Motion, the Debtor, by and through its undersigned counsel, respectfully represents as follows:[2]

---

[1]    The last four digits of Debtor's taxpayer identification number are 2730.  The Debtor's corporate headquarters are located at 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

[2]    In further support of this Motion, the Debtor submits the Declaration of John Dempsey in Support of the Debtor's Motion For Order (I) Confirming Its Authority to Implement Its Ordinary Course Annual Incentive Plan, (II) Approving Implementation of Its Key Employee Incentive Plan, (III) Approving Implementation of Its Non-Insider Key Employee Retention Plan, and (IV) Approving Continuation of Its Pre-Petition Income Protection Plan (the "Dempsey Declaration"), attached hereto as Exhibit A, and the Declaration of Robert M. Caruso in Support of the Debtor's Motion, For Order (I) Confirming Its Authority to Implement Its Ordinary Course Annual Incentive Plan, (II) Approving Implementation of Its Key Employee Incentive Plan, (III)

*(cont'd)*

**Preliminary Statement**

1.    Having successfully transitioned its operations into chapter 11, the Debtor
is now sharply focused on restructuring its business so that it may emerge from chapter 11 as a
profitable enterprise poised for long-term success.  At this incipient stage of the restructuring
process, it is critical to ensure that those employees who drive the economic success of the
Debtor's enterprise are appropriately compensated and incentivized to deliver superlative results.
In this regard, after substantial deliberation and consultation with compensation experts from
Mercer (US), Inc. ("Mercer"), the Organization and Compensation Committee (the
"Compensation Committee") of the Debtor's board of directors (the "Board") recommended, and
the full Board approved, the three employee compensation plans (collectively, the "Employee
Compensation Plans") that are the subject of this Motion: the 2014 Annual Incentive Plan (the
"AIP"); the Key Employee Incentive Plan (the "KEIP"); and the Non-Insider Key Employee
Retention Plan (the "KERP").  Additionally, the Motion seeks authority for the Debtor to
continue its pre-petition income protection plan (the "Income Protection Plan")—a severance
plan for salaried employees—as it applies to non-insiders.[3]

2.    Historically, the Debtor has implemented a compensation program
designed to attract and motivate superior talent and reward executive officers based upon
achievement of the Company's short-term and long-term strategic and operational goals, as well
as the achievement of increased shareholder return.  The elements of executive compensation

---

*(cont'd from previous page)*

Approving Implementation of Its Non-Insider Key Employee Retention Plan, and (IV) Approving Continuation
of Its Pre-Petition Income Protection Plan (the "Caruso Declaration"), attached hereto as Exhibit B.

[3]    The Debtor has kept the professionals for the Official Committee of Unsecured Creditors (the "Creditors'
Committee"), the DIP Financing lenders (the "DIP Lenders"), and the unofficial committee of senior secured
noteholders (the "Noteholders' Committee") apprised of the Employee Compensation Plans and has shared a
detailed presentation prepared by Mercer providing an overview of the Employee Compensation Plans.  The
Debtor expects to work collaboratively with these groups as the hearing date on the motion approaches and is
hopeful to secure their support of the Employee Compensation Plans and Income Protection Plan.

were based, in part, on the Debtor's performance objectives, as well as external competitive

market analyses that use a variety of sources, including compensation market survey data.  In

particular,  the Debtor has employed a philosophy of providing executives with compensation

opportunities slightly in excess of the market median and designing compensation opportunities

that are increasingly incentive-based as an employee's overall compensation opportunities

moved toward the upper end of the Debtor's pay scale.  Prior to bankruptcy, the compensation

opportunity package provided to the Debtor's executives and senior management included: (i)

base salary; (ii) short-term annual cash incentive compensation tied to certain annual corporate

and regional performance measures; and (iii) long-term incentive compensation ("LTIP") based

in part on three-to-five-year cycles and tied to, among other metrics, shareholder return.  The

annual incentive plan has historically applied to a broad base of corporate and regional

participants based on achievement of certain annual corporate and regional performance metrics.

By the Motion, the Debtor is proposing Employee Compensation Plans consistent with the

Debtor's overarching compensation philosophy and pre-petition programs, but modified where

appropriate to take into account the Debtor's chapter 11 restructuring.[4]

    3.  The Employee Compensation Plans are designed to align the overall

compensation opportunities available to the Debtor's key employees with market peers,

---

[4] Contemporaneously with the filing of the motion, the Debtor announced that Mr. James Bolch will be
transitioning from his role as President and CEO and will be replaced by the Debtor's current Chief
Restructuring Officer, Robert M. Caruso.  The Debtor will be filing separate papers seeking approval of Mr.
Bolch's transition services agreement and an amendment to Alvarez & Marsal's retention application.  None of
the Employee Compensation Plans subject of the Motion cover Mr. Bolch.  In addition, Mr. Paul Hirt, the
President – Americas, has resigned his position.  As announced, Mr. Hirt's responsibilities are to be shared by
Bruce Cole and Mr. Caruso.  The Debtor has left Mr. Hirt's position in the Employee Compensation Plans in
terms of total cost in the event that his position is later filled.

including comparable companies that have undergone chapter 11 restructurings.[5]  Indeed,

without both the AIP and the KEIP in particular, the Debtor's executive compensation level

would be **69%** below the market median for comparable companies.  With these plans in place,

the Debtor's executive compensation would still be at the relatively modest market position of

**22%** below the market median assuming target AIP and KEIP payouts and **6%** below the market

median assuming maximum AIP and KEIP payouts.[6]  Moreover, and as discussed in further

detail below, the metrics approved by the Debtor's board for both the AIP and KEIP are

challenging financial-based measures – i.e., EBITDA and free cash flow ("FCF") at both

corporate and regional levels – that are appropriate proxies for the success of an organization

operating in chapter 11.  Indeed, the corporate EBITDA target under the AIP is set at

approximately $30 million higher than EBITDA projections used to size and set covenants for

the Debtor's debtor in possession financing ("DIP Financing"), and the corporate FCF target

under the AIP is almost $60 million higher than the DIP facility's projections.  Consistent with

the Debtor's historical compensation practices, the KEIP metrics are set even higher – i.e., the

trailing twelve month EBITDA ("TTM EBITDA") target requires a $35 million EBITDA

improvement over the AIP EBITDA target, and the trailing twelve month FCF ("TTM FCF")

requires a $178 million improvement over the AIP FCF target.

---

[5]    In assisting the Debtor in developing the Employee Compensation Plans, Mercer conducted a comprehensive
review of 35 companies that filed for bankruptcy protection since January 1, 2009 and that implemented similar
Employee Compensation Plans while in bankruptcy.

[6]    At target levels, the total combined cost of the AIP and KEIP would be $16.1 million ($10.8 million for the AIP
and $5.3 million for the KEIP).  As discussed below, based on Mercer's comprehensive market survey,  this
total cost, both in actual dollar amount and as a percentage of revenue, is between the 25th percentile and 50th
percentile.  As a percentage of earnings before interest, tax, depreciation, and amortization ("EBITDA") and as
a percentage of assets, the total target cost of the AIP and the KEIP is between the market median and the 75th
percentile.

4.      The AIP is quite similar in scope and design to the Debtor's annual incentive plan covering pre-petition periods.  Consistent with historical practice, the AIP is broadly based, covering approximately 725 employees throughout the Exide enterprise, 258 of which are employees of the Debtor,[7] and ties award payouts to the achievement of certain annual financial performance metrics.[8]   In fact, the maximum payout available under the AIP is scaled back from previous years' iterations, providing for potential payouts of up to 150% of target awards down from 200%.  Moreover, the design and scope of the AIP is well within the parameters of industry standards for similar plans.  Thus, as a legal matter, the AIP falls well within both the horizontal and vertical components of the ordinary course of business test.[9]  And, as a result, no specific court approval of the AIP is required in the Debtor's view.[10] Nevertheless, in the interest of full disclosure and to provide the Debtor's employees with the reassurance that their efforts will be rewarded if the Debtor's financial performance exceeds plan metrics, the Debtor seeks entry of a court order confirming its authority to implement the AIP. Moreover, because the AIP covers certain "insiders," obtaining Court approval will eliminate such insiders' concerns regarding the limits of Bankruptcy Code section 503(c)  being implicated.[11]

---

[7]    The Debtor does not believe this Court's approval of the Employee Compensation Plans is necessary with respect to those employees who are employed by non-debtor entities.  In the interest of providing a full description of the Employee Compensation Plans,  however, the Motion contains facts relating to the non-debtor employees.

[8]    The Debtor's Fiscal Year 2013 Annual Incentive Plan utilized metrics tied to earnings per share, operating income, and FCF.  The current AIP contemplates use of EBITDA and FCF.

[9]    See In re Nellson Nutraceutical, Inc., 369 B.R. 787, 796 (Bankr. D. Del. 2007).  Moreover, as Judge Sontchi recognized in Nellson, actions taken in the ordinary course require a "relatively light evidentiary burden of establishing that [a debtor] made a business judgment in good faith upon a reasonable basis." Id. at 800.

[10]    See 11 U.S.C. § 363(c); Nellson, 369 B.R. at 796.

[11]    See Nellson, 369 B.R. at 801-803.

5.       The KEIP, which covers a smaller group of employees (including 4 insiders),[12] 40 of whom are employed by the Debtor and 15 by non-debtor entities, is a critical component of the Debtor's compensation program that, as noted, sets the bar even higher for potential payouts.  The KEIP partially replaces the Debtor's pre-petition LTIP – primarily a stock-based compensation plan – by re-calibrating it for a chapter 11 restructuring scenario and replacing the stock consideration thereunder with cash.  While KEIP payouts would not be made until the Debtor emerges from chapter 11, the Debtor seeks this Court's approval of the program at this stage of the case to offer competitive compensation to its most critical employees and to assure KEIP participants that their hard work and success will be rewarded.  As a result, the Debtor believes that implementation of the KEIP is well within its sound business judgment.

6.       The Debtor also believes that adoption of the KERP, whose participants consist of a select group of 51 non-insider employees[13] ranging from the "Senior Director" to "Manager" level of the enterprise, is also a sound exercise of its business judgment.  The relatively modest cost of the KERP ($1.63 million[14] in allocated awards with an additional $375,000 reserved for future allocations) will ensure that key non-insider employees will continue to perform their critical functions as the Debtor moves down its restructuring path.

---

[12]    Of the four positions, three are the Debtor's employees and one is an employee of a non-Debtor affiliate.  As a result of current departures, there are two vacant positions at the Executive Vice President level that would be considered "insider" positions.

[13]    Twenty-six (26) of these employees are Debtor or corporate employees and 15 are employees of non-debtor affiliates.

[14]    The Debtor or corporate employees account for approximately $857,000 of the aggregate cost and non-debtor employees account for approximately $768,000 of the aggregate cost.

7.    Finally, the Debtor believes that continuation of its pre-petition Income

Protection Plan with respect to non-insiders is in the best interests of the estate:[15] the Income

Protection Plan will boost employee morale and focus to achieve the Debtor's restructuring goals

by reassuring its employees that they will have some financial safety net should their position be

eliminated during the Debtor's restructuring process.

## JURISDICTION AND VENUE

8.    This Court has jurisdiction to consider the Motion under 28 U.S.C. §§ 157

and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of this case and the

Motion in this district are proper under 28 U.S.C. §§ 1408 and 1409.

9.    The statutory predicates for the relief requested herein are Bankruptcy

Code sections 105 and 363(b) and (c).

10.    Pursuant to Rule 9013-1(f) of the Local Rules for the United States

Bankruptcy Court for the District of Delaware, the Debtor consents to the entry of a final

judgment or order with respect to this Motion if it is determined that this Court would lack

Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

## BACKGROUND

### A.    The Chapter 11 Case

11.    On June 10, 2013 (the "Petition Date"), the Debtor commenced a case by

filing a petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case").

12.    The Debtor continues to operate its business and manage its property as

debtor and debtor in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

---

[15]    The Debtor reserves the right to seek application of the Income Protection Plan or another severance plan
developed by the Debtor to additional employees, including insider employees by another motion.

13.    On June 18, 2013, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the Creditors' Committee in the Chapter 11 Case pursuant to Bankruptcy Code section 1102.  No trustee or examiner has been appointed in the Chapter 11 Case.

**B.    The Historical Compensation Programs**

14.    Historically, the Debtor has implemented a compensation program designed to attract, motivate, and retain superior talent, as well as reward employees for achievement of certain short-term and long-term strategic and operational goals.  In this regard, in addition to payment of base salary, the Debtor has historically employed an annual cash incentive plan, supplementing compensation opportunities for a broad employee base, and the LTIP, supplementing compensation opportunities for Exide's executives.

15.    Both the Fiscal 2012 Annual Incentive Plan and Fiscal 2013 Annual Incentive Plan provided compensation opportunities for eligible employees based on the achievement of certain corporate and regional metrics tied to earnings per share, operating income, and FCF, and achievement of certain individual objectives, as set by the participant and the participant's manager.  Additionally, under both programs, consolidated operating income acted as a plan trigger, such that no payment would be made under the annual incentive plan program if Exide did not achieve a certain level of operating income.  Because Exide did not achieve the necessary threshold operating income to trigger payouts under the plans, no payments were made to annual incentive plan participants for either fiscal year 2012 or fiscal year 2013.

16.    Additionally, since 2005, the Debtor has implemented the LTIP, which operates in three-to-five-year intervals, to provide the Debtor's executives with compensation opportunities designed to incentivize executives to achieve long-term corporate goals, align

executives' interests with those of their shareholders, and provide compensation opportunities in line with the opportunities provided to their peers in the market.  Because Exide's cumulative consolidated corporate earnings before interest and taxes fell below the necessary threshold level, fiscal year 2010 performance share awards were not earned and therefore cancelled. Additionally, because Exide's cumulative performance fell below certain threshold levels, performance cash awards were also not earned.  In 2012 and 2013, the Compensation Committee issued time-vested restricted stock awards for one-third the portion of compensation that was not tied to performance metrics.  Although restricted stock was paid out in fiscal years 2012 and 2013, subsequent to Exide's bankruptcy filing, Exide's common stock was delisted from the NASDAQ and as of market close on July 24, 2013 was quoted at $0.129 on the OTC market.

C.    **The Employee Compensation Plans**

17.    The Debtor, after extensive consultation with, and considering benchmarking analyses performed by, its employee benefits consultant, Mercer, developed and refined the three employee compensation programs that are the subject of the Motion: (i) the ordinary course AIP; (ii) the KEIP; and (iii) the KERP.  Specifically, the Debtor, Mercer, and the Debtor's other advisors designed the AIP, the KEIP, and the KERP to ensure certain employees and executives were being compensated commensurate with the market for the work being performed on day-to-day matters as well as for efforts related to implementing the restructuring and reorganization plan.

18.    The first iterations of the Employee Compensation Plans were presented to the Compensation Committee in June of 2013.  The Compensation Committee then worked with Mercer to refine the design of the Employee Compensation Plans to strike the appropriate balance between (a) motivating the Debtor's employees and (b) recognizing the financial constraints of the Debtor's business and interests of its creditors.

19.     The Compensation Committee held numerous meetings and deliberated at length regarding the structure and design of the Employee Compensation Plans to ensure that these plans would effectively accomplish the goals for which they are intended and were within normal market ranges.  On July 18, 2013, the Compensation Committee approved the Employee Compensation Plans and recommended the same to the full Board.  On July 25, 2013, the Board formally approved the Employee Compensation Plans.

### The Annual Incentive Plan

20.     The Debtor, in the ordinary course of its business, has regularly implemented a broad-based annual incentive compensation program for its salaried employees. In 2010, Exide formally memorialized its current incentive compensation practices by adopting the Annual Incentive Plan, which was amended and restated by the Fiscal 2013 Annual Incentive Plan.  The Fiscal 2013 Annual Incentive Plan has provided the framework for the AIP.  The annual incentive program is the Debtor's historical broad-based incentive compensation program covering employees from the top executive level  (for example, Executive Vice Presidents) to the professional and managerial levels (for example, Plant Engineer, Human Resources Manager, Production Supervisor) and is a key tool by which the Debtor drives operational and financial performance throughout its employee base.  Additionally, for employees at the managerial level and above, the AIP comprises a significant portion of such employee's total compensation opportunities.

21.     The Debtor's Compensation Committee worked in consultation with Mercer to determine the appropriate design and metrics for the AIP in order to accomplish specific financial performance objectives and maximize value of the Debtor's estate.  The objective was to design the AIP to be as consistent as possible with the 2013 annual incentive

plan[16] with certain adjustments to take into account the Debtor's current circumstances of operating in chapter 11.  Consistent with the Debtor's pre-petition plans, the AIP is designed to incentivize the participants thereunder by providing them with market-based opportunities to increase their compensation if Exide achieves or exceeds certain financial and operational goals. In particular, the AIP would compensate approximately 725 employees (the "AIP Participants"), approximately 258 of which are the Debtor's employees, and approximately 467 of which are employees of non-debtor affiliates.[17]  Compensation under the AIP is based upon the Debtor's achievement of targets set by Exide's Board related to EBITDA and FCF for the fiscal year ending March 31, 2014**.**

      22.      Consistent with its pre-petition annual incentive plans, which have always used financial performance metrics, such as earnings per share, operating income, and FCF, the Board, with the assistance of Mercer, has selected the EBITDA[18] and FCF[19] metrics for the AIP. These metrics are particularly appropriate in the chapter 11 environment because they are key financial metrics and ultimately drivers of the Debtor's enterprise value.

      23.      In setting the EBITDA and FCF metrics, the Compensation Committee considered the EBITDA and operating cash flow projections used to size and set covenants for the Debtor's DIP Financing as a starting point.  To ensure that the AIP targets will be

---

[16]    Prior to its entry into bankruptcy, the Debtor had also developed and intended to implement a fiscal year 2014 annual incentive plan with certain performance metrics, including operating income, corporate working capital and environmental health and safety metrics.  This AIP was also designed to replace and be as consistent as possible with the pre-bankruptcy 2014 annual incentive plan.

[17]    The Debtor does not believe this Court's approval of the Employee Compensation Plans is necessary with respect to those employees who are employed by non-debtor entities.  In the interest of providing a full description of the Employee Compensation Plans, however, the Motion contains facts relating to the non-debtor employees.

[18]    The Debtor's EBITDA metric has been adjusted to exclude the impact of one-time events, such as non-operating gains and losses, asset impairments, and other reorganization-related expenses.

[19]    The Debtor's FCF metric has been adjusted to exclude any proceeds from acquisitions or divestitures.

incentivizing, the Compensation Committee set the corporate EBITDA target approximately $30 million <u>higher</u> than the projections used to size the DIP Financing and the corporate cash flow target almost $60 million <u>higher</u>.  Achieving the EBITDA and FCF targets will require the sustained efforts of Exide's employees to implement significant manufacturing cost reductions and productivity improvements in fiscal year 2014.  The achievement of the EBITDA and FCF targets will require the sustained efforts of Exide's employees to achieve certain price increases, extension of customer contracts, homologation of certain new products, the completion of certain footprint reduction programs, installation of new equipment, significant manufacturing cost reductions, and productivity improvements in the fiscal year 2014 and 2015.  The achievement of these targets are even more challenging given headwinds, including the Debtor's Vernon recycling plant not being operational for more than 2 months, forcing the company to purchase lead at a premium and inflationary headwinds and competitive market pressures in all of the Debtor's regions.  Accordingly, the bar is set high to achieve the EBITDA and FCF metrics.

        24.      Consistent with the Debtor's previous annual incentive plans, AIP Participants will be categorized as either "corporate" AIP Participants ("<u>Corporate AIP Participants</u>") or "regional" AIP Participants ("<u>Regional AIP Participants</u>")[20] based on their roles and responsibilities in the company and will either be subject to corporate or regional metrics accordingly. The EBITDA and FCF metrics will be weighted as follows:

---

[20]    Certain of the Debtor's lines of business are organized by geography and operate separately with respect to their unique markets.  Employees in these lines of business are considered Regional AIP Participants.  On the other hand, Corporate AIP Participants are those employees that work in lines of the Debtor's business that provide corporate-wide shared services and  support the overall business.

|  | Corporate Consolidated EBITDA | Regional EBITDA | Corporate Consolidated FCF | Regional FCF |
|---|---|---|---|---|
| **Corporate Annual Incentive Plan Participants** | 70% | --- | 30% | --- |
| **Regional Annual Incentive Plan Participants** | 20% | 50% | --- | 30% |

25.    The EBITDA and FCF performance targets and payouts are set forth in the charts below:

### Corporate Consolidated EBITDA

|  | Threshold | Target | Maximum |
|---|---|---|---|
| Corporate Consolidated EBITDA (in millions) | $99.2 | $124.0 | $148.8 |
| Payout | 50% Target Award | 100% Target Award | 150% Target Award |

### Regional EBITDA

|  | Threshold | Target | Maximum |
|---|---|---|---|
| North America EBITDA (in millions) | $51.3 | $64.1 | $76.9 |
| Europe EBITDA (in millions) | $51.0 | $63.7 | $76.4 |
| ROW EBITDA (in millions) | $11.7 | $14.6 | $17.5 |
| Payout | 50% Target Award | 100% Target Award | 150% Target Award |

13

**Corporate Consolidated FCF**

|  | Threshold | Target | Maximum |
|---|---|---|---|
| Corporate Consolidated FCF (in millions) | ($110) | ($70) | ($30) |
| Payout | 50% Target Award | 100% Target Award | 150% Target Award |

**Regional FCF**

|  | Threshold | Target | Maximum |
|---|---|---|---|
| North America FCF (in millions) | ($5) | $13 | $30 |
| Europe FCF (in millions) | ($65) | ($46) | ($27) |
| ROW FCF (in millions) | $8 | $11 | $14 |
| Payout | 50% Target Award | 100% Target Award | 150% Target Award |

26.     The Debtor believes achievement of the EBITDA and FCF metrics are key measures of the success of its businesses.  There will be no payouts for a particular metric if performance is below the "Threshold" level.  Importantly, the Debtor has also implemented the following payout limitations which ensure that AIP Participants only receive plan payouts if Exide's profitability is at an adequate level:

(a)     There will be no payouts under the plan to any AIP Participant if the Debtor's consolidated EBITDA is below $77.8 million.

(b)     For Regional AIP Participants, there will be no payouts under the Regional FCF metric if Regional EBITDA is below the "Threshold" level.

27.     Additionally, in designing the AIP and the contemplated payments thereunder, the Compensation Committee deemed it appropriate to reduce the maximum

payments under the plan, recognizing that the maximum cost of the plan should be limited due to the Debtor's bankruptcy.  In prior annual incentive plans, the maximum payout was 200% of the target payout, reflecting a notable reward for superior performance; under the AIP, the maximum payout for outperformance is limited to 150% of the target payout.

28.     Performance at the target level of each of the metrics would result in an aggregate payout under the AIP of approximately $10.8 million, approximately $6 million of which is attributed to the Debtor's employees and approximately $4.8 million of which is attributed to employees of non-debtor affiliates.  Of the $10.8 million, approximately 9% would be paid to insiders and approximately 91% would be paid to non-insiders.[21]  Performance at or above the maximum levels of the metrics (which will be quite challenging) would result in a maximum aggregate payout under the plan of approximately $16.2 million, approximately $9 million of which is attributed to the Debtor's employees and approximately $7.2 million of which is attributed to employees of non-debtor affiliates.

29.     The structure and potential payout opportunities under the AIP are both reasonable and market-based.  Mercer compared the structure of the AIP with the annual incentive plan of similarly-situated companies and found that the key elements of the AIP's design are common, including (a) the broad-based nature of the incentive program and (b) the use of an earnings-based metric, e.g., EBITDA.  Additionally, Mercer concluded that it is standard practice for companies of the Debtor's size and industry to have an annual incentive program.  The proposed plan is consistent with the Debtor's historical annual incentive plans.  Accordingly, the Debtor considers this annual incentive plan to be a normal course compensation

---

[21]   Of the approximately $6 million attributed to Debtor employees, approximately 11% would be paid to insiders and approximately 89% would be paid to non-insiders.

plan that falls within Bankruptcy Code section 363(c), which would not require this Court's

approval. Nevertheless, the Debtor is seeking entry of a court order confirming its authority to

implement the AIP to provide the Debtor's employees with the reassurance that their efforts will

be rewarded if the Debtor's financial performance exceeds demanding metrics and in the interest

of full disclosure.  Moreover, because the AIP covers certain "insiders," obtaining Court

approval will ratify the incentivizing nature of the program and ensure that none of the limits of

Bankruptcy Code section 503(c) are implicated.

<strong><u>The Key Employee Incentive Plan</u></strong>

(a)      <u>KEIP Design</u>

30.      Without the expertise of the senior management team to efficiently and

effectively operate the Debtor's business and the proper incentives to induce them to commit the

additional time necessary to successfully navigate the company through the Chapter 11 Case, the

Debtor's ability to successfully reorganize will be greatly hampered.  Therefore, it is critical that

the Debtor's senior managers—who continue to work against the backdrop of uncertainty

regarding their continued employment—be properly incentivized and motivated to work harder

than ever before to enhance the Debtor's operational performance and execute a comprehensive

restructuring so as to maximize value for all of the Debtor's constituents.  Furthermore, as a

result of the Chapter 11 Case, the compensation opportunities available to top executives of the

company have decreased dramatically from historical levels leading to a high risk of

disengagement and a severe loss of incentives for these key drivers of the business' success.

31.      Prior to the Petition Date, the Debtor, in the ordinary course of its

business, implemented the LTIP for its senior management employees, which was designed to

incentivize the participants under such program to meet certain corporate and other objectives.

This program was an important component of the KEIP Participants' overall compensation

16

package and was composed predominantly of equity-based compensation that was earned based on company performance.  However, the Debtor has not sought authority to continue the LTIP after filing for chapter 11.

32.     Prior to the commencement of the Chapter 11 Case, the Debtor's senior managerial employees had three primary components to their compensation package: (1) base salary; (2) compensation opportunities under the annual incentive plan; and (3) compensation opportunities under the LTIP.  In the absence of replacements for items (2) and (3), target executive compensation opportunities are currently 69% below market median levels due to the lack of short- and long-term incentives.  The KEIP was designed to partly replace the compensation value of the LTIP to KEIP Participants.  Moreover, the KEIP is also designed to replace the long-term incentive and motivational value of the LTIP to the Debtor.  Where the previous LTIP was focused principally on long-term value appreciation and performance of the company, the KEIP is based on improvement of the Debtor's profitability and cash flow, so as to maximize the Debtor's enterprise value to the benefit of its creditors.  It is important to note that the plans are reasonable – and even modest – in their payouts; even with continuation of both the AIP and implementation of the KEIP, target "insider" compensation opportunities would remain at 22% below the market median.

33.     The KEIP is a narrowly-tailored program, designed to properly incentivize the 55 eligible employees, 40 of whom are Debtor employees and 15 of whom are employees of non-debtor affiliates, with awards that are: (a) market-based; (b) performance-linked; (c) cost-effective; and (d) in furtherance of the maximization of the estate's value.  In this vein, the KEIP provides for variable payouts tied to the Debtor's TTM EBITDA and TTM FCF upon emergence from chapter 11.  The KEIP award opportunities are weighted as follows:

| Performance Milestone | KEIP Weighting |
|---|---|
| **Total KEIP Weight** | **100%** |
| Target award portion subject to achievement of TTM EBITDA goals | 70% |
| Target award portion subject to achievement of TTM FCF goals | 30% |

34.     Each KEIP Participant is assigned a target opportunity level, expressed as a percentage of the individual's base salary.  The size of payments under the TTM EBITDA and TTM FCF metrics will be directly tied to the Debtor's achievement of these metrics over and above a minimum threshold value.  The TTM EBITDA and TTM FCF performance goals are directly tied to the Debtor's DIP Financing budget projections.  For illustrative purposes, if the Debtor emerges on September 30, 2013, the performance levels are as follows:[22]

### TTM EBITDA

|  | Threshold | Target | Maximum |
|---|---|---|---|
| TTM EBITDA upon Emergence | $134 | $158 | $182 |
| Payout | 50% Target Award | 100% Target Award | 125% Target Award |

### TTM FCF

|  | Threshold | Target | Maximum |
|---|---|---|---|
| TTM FCF upon Emergence | $92 | $108 | $124 |
| Payout | 50% Target Award | 100% Target Award | 125% Target Award |

35.     The TTM EBITDA and TTM FCF metrics undoubtedly pose a significant challenge to the eligible KEIP Participants.  Indeed, achieving the target TTM EBITDA metric will require achievement of an adjusted EBITDA more than 50% higher than the EBITDA

---

[22]   In the event of an emergence earlier than September 30, 2013, the performance goals would adjust according to the budget as of the relevant month-end.  To the extent the emergence date extends beyond September 30, 2013, the TTM EBITDA and TTM FCF would remain as illustrated in the charts above.

achieved in fiscal year 2013 and an improvement of $34 million versus the AIP EBITDA metric,

and achieving the TTM FCF metric will require an improvement of $178 million versus the AIP

FCF metric.  Therefore, achievement of the financial metrics under the KEIP will require the

implementation of significant operational initiatives over and above the operational initiatives

required to reach the challenging targets under the AIP.  Absent a sustained effort by KEIP

Participants, these goals cannot be realized and the financial metrics will not be attained.

Moreover, absent a sale or divestiture, KEIP payouts only occur upon the Debtor's emergence

from chapter 11.

36.     The maximum aggregate payments under the KEIP would be $6.6

million.[23]  Of this amount, approximately 31% would be paid to insiders and approximately 69%

would be paid to non-insiders.[24]

37.     In the event that a KEIP Participant is terminated due to job elimination,

such KEIP Participant will be entitled to payment of a pro-rata portion of such KEIP

Participant's award based on the Compensation Committee's projection of the Company's actual

performance against the KEIP metrics and assuming an 18-month case duration.  If a KEIP

Participant's employment with Exide is terminated due to a sale or divestiture, the KEIP

Participant would be entitled to a target KEIP award.  If a KEIP Participant voluntarily resigns or

is involuntarily terminated for cause or poor performance, he or she will no longer be eligible to

receive a KEIP payment.

---

[23]   Approximately $5.1 million of this maximum total cost is on account of the Debtor's employees and
approximately $1.5 million of this maximum total cost is on account of employees of non-debtor affiliates.  The
Debtor does not believe this Court's approval of the Employee Compensation Plans is necessary with respect to
those employees who are employed by non-debtor entities.  In the interest of providing a full description of the
Employee Compensation Plans, however, the Motion contains facts relating to the non-debtor employees.

[24]   With respect to the $5.1 million attributed to the Debtor's employees, approximately 29% would be paid to
insiders and approximately 71% would be paid to non-insiders.

38.    It is important to note that the KEIP is not a "pay to stay" retention plan. Absent achievement of emergence from the Chapter 11 Case <u>and</u> the financial and operating goals discussed herein, the KEIP Participants will not receive <u>any</u> compensation under the KEIP. Accordingly, the KEIP successfully aligns the interests of the Debtor, its employees, and its creditors and is a true incentive plan.

(b)    <u>Payouts are Market-Based</u>

39.    In assessing the design of the KEIP, the Debtor and Mercer sought to ensure that the resulting compensation levels for KEIP Participants would be appropriate based on market comparisons (considering the Debtor's industry and market for talent) as well as ensure that the KEIP design is in line with typical chapter 11 practice.  To guide the design of the KEIP and assess the design to market practice, Mercer conducted a comprehensive review of incentive-based programs implemented in other chapter 11 cases.  Mercer examined a population of 35 companies that filed for bankruptcy protection since January 1, 2009 and that implemented key employee incentive plans while in bankruptcy.  The proposed KEIP was compared to the results of this market analysis based on: KEIP eligibility, total cost, metrics, and payout timing. Specifically, Mercer found that the proposed KEIP falls below the market median with respect to proposed participation as a percentage of pre-petition employees, and is in line with market practice with respect to the absolute number of participants.  The proposed maximum cost of the KEIP is in line with market practice, and as a percentage of pre-petition revenue (which normalizes for size), Exide's proposed KEIP is below the 50th percentile.  The metrics used in the proposed KEIP are consistent with majority practice among the comparator companies.[25]

---

[25]    To facilitate a more appropriate cost comparison, Mercer used a subset of 11 of the total population of companies in Mercer's database that had pre-petition revenues of between $1 billion and $5 billion.

40.    Additionally, Mercer analyzed the reasonableness of the KEIP award opportunities for all eligible participants.  To assess the need for award opportunities for insiders, Mercer reviewed the compensation opportunities of top executives, relative to target opportunities provided previously. Mercer concluded that target executive compensation levels are currently 63% below pre-petition levels.  Additionally, Mercer analyzed the compensation opportunities of Exide top executives with opportunities at similarly-sized companies in Exide's industry (utilizing data provided by Pearl Meyer & Partners (the "Pearl Meyer Report"), the Compensation Committee's compensation consultant).  Based on the Pearl Meyer Report and its analysis thereof, Mercer concluded that in the absence of the KEIP and AIP, executive compensation falls 69% below market median compensation levels.  While the AIP and KEIP will raise executive compensation opportunities, it is important to note that if the Debtor's authority to continue the AI Program is confirmed and the KEIP is approved and implemented, the executives' base salary and target compensation opportunities will still be 22% below the market median in aggregate, and again, without it, the compensation opportunities will be 69% below median.

**The Non-Insider Key Employee Retention Plan**

41.    Since commencement of the Chapter 11 Case, the Debtor has identified 51 non-insider employees[26] from the "Senior Director" level to the "Manager" level that the Debtor believes are critical to driving the strategic objectives and operations of the company.  Attrition of these critical non-insider employees would be detrimental to the Debtor's ongoing business operations and the Debtor's ability to effectively reorganize.  In consultation with its

---

[26]    Twenty-six (26) of these employees are Debtor or corporate employees and 15 are employees of non-debtor affiliates.

compensation consultant, Mercer, the Debtor developed the KERP to ensure that these 51

selected non-insider employees of the Debtor (the "KERP Participants") would remain with the

Debtor throughout the restructuring process.

42.     The Debtor identified the KERP Participants using a criticality assessment

framework developed by Mercer and refined by the Debtor.  Critical roles were selected based

on the difficulty to replace a potential KERP Participant and the perceived risk of departure, as

determined by management.  In addition, the Debtor considered Performance Rating and Growth

Potential Rating within the Debtor's performance management system.

43.     Based on the results of this criticality assessment, potential participants

were then categorized into two "tiers" based on their level of criticality.  The KERP award level

is based on the participant's tier and current base salary:

Tier I: 30% of base salary (approximately 47% of total KERP population)

Tier II: 20% of base salary (approximately 53% of total KERP population)

44.     Based on the 51 participants and the award levels as determined by their

tiers, the Debtor estimates the total maximum cost of the KERP to be approximately $2 million.

The cost is comprised of $1.63 million[27] in allocated awards among the current participants and

approximately $375,000 available to the Debtor for future awards or adjustments to current

awards based on promotions or increased responsibilities.

45.     The KERP Participants perform a wide variety of critical functions,

including customer sales and service, operational management, accounting, marketing,

purchasing and sales, tax, technical, and other tasks.  Many of the KERP Participants have

---

[27]     Of this amount, the 26 Debtor and corporate employees account for approximately $857,000 of the aggregate
cost and the 15 non-debtor employees account for approximately $768,000 of the aggregate cost.

developed institutional knowledge regarding the Debtor's business operations and relationships

with, among others, the Debtor's customers, trade partners, and advisors, which is critical to the

efficient administration of the Debtor's reorganization and continuing business operations.  The

loss of this key talent would be detrimental to the Debtor's ability to drive high levels of

performance and maintain value for the Debtor's stakeholders.

        46.     None of the KERP Participants are "insiders" within the meaning of

Bankruptcy Code section 101(31).  Indeed, no KERP Participant has a position in the company

higher than "Senior Director." "Senior Directors" report to "Vice Presidents," who report to

"Executive Vice Presidents."  None of these employees function as a member of the Board or an

officer and no employee at this level can set company policy.

        47.     KERP bonuses will be payable to each Participant upon the earlier of: (i)

the effective date of a plan of reorganization, (ii) termination of the KERP Participant without

cause, or (iii) in the event of a sale, the 90th day following transfer of the Debtor or its assets to

the buyer.

        48.     In the event that a KERP Participant's employment with the Debtor is

terminated due to job elimination, such KERP Participant will be entitled to payment of a pro-

rata portion of such KERP Participant's target award, assuming an 18-month case duration.  If a

KERP Participant's employment with Exide is terminated due to a sale or divestiture, the KERP

Participant would be entitled to such KERP Participant's target award.  If a KERP Participant

voluntarily resigns or is involuntarily terminated for cause or poor performance, he or she will no

longer be eligible to receive a KERP payment.

        49.     To ensure that the KERP was commensurate with retention plans

developed by similarly situated companies, the Compensation Committee worked closely with

Mercer in developing and refining the KERP.  The Debtor and Mercer engaged in a review of

other general industry non-insider retention plans approved by bankruptcy courts in this and

other districts and concluded that the KERP is comparable in design and scope.  Indeed, with

respect to the number of participants Exide is including in the KERP, Exide is close to the

median and close to the 25th percentile with respect to inclusion as a percentage of employee

population.  Additionally, Exide falls below the median with respect to both absolute projected

dollar cost and dollar cost as a percentage of revenue.

> **D.    The Income Protection Plan**

50.    Prior to the Petition Date, in the ordinary course of its business, the Debtor

maintained the Income Protection Plan for salaried employees who were terminated for reasons

other than cause, _e.g._, position elimination or reduction in staff.  By the Motion, the Debtor is

also seeking authority to continue its pre-petition Income Protection Plan solely as it applies to

non-insider salaried employees.  Payments under the Income Protection Plan are based on an

employee's length of service, salary grade, and position within the management structure, and

payments are made to a terminated employee in one lump sum.

51.    Salaried employees with at least one full year of service are eligible to

receive at least two (2) weeks of income protection payments.  Eligible salaried employees

("Eligible Salaried Employees") are also entitled to receive an additional one (1) week of pay for

every additional full year of continuous service up to a maximum of twelve (12) weeks of regular

base pay.  Additionally, Eligible Salaried Employees are entitled to receive medical and dental

benefits at the employee's current cost for a specified period of time.

52.    The Debtor consulted with Mercer regarding the continuation of the

Income Protection Plan.  Based on Mercer's experience with severance practices, Mercer

concluded that the Income Protection Plan is similar to those implemented by similarly-sized

companies in bankruptcy and that the proposed benefits under the Income Protection Plan are commensurate with the contribution that each covered employee makes to the Debtor's ongoing business operations and the success of the Chapter 11 Case.  In addition, the benefits under the Income Protection Plan will serve to minimize attrition and ensure maximization of employee focus and morale as the Debtor's employees work to achieve a successful restructuring of the Debtor's business.

53.     Given that the Debtor is not seeking authority to make payments to insiders covered by the pre-petition Income Protection Plan, Bankruptcy Code section 503(c)(2)'s limitations do not impact implementation of the Income Protection Plan.

**RELIEF REQUESTED**

54.     By the Motion, the Debtor seeks entry of an order under Bankruptcy Code sections 105 and 363(b) and (c): (i) confirming the Debtor's authority to implement, in the ordinary course, its AIP; (ii) approving and authorizing implementation of the KEIP; (iii) approving and authorizing implementation of the KERP; (iv) approving and authorizing continuation of the pre-petition Income Protection Plan, as it applies to non-insiders; (v) allowing all payments under the Employee Compensation Plans and Income Protection Plan as administrative expenses of the estate subject to the conditions of each of the Employee Compensation Plans and the Income Protection Plan.

**BASIS FOR RELIEF REQUESTED**

I.     **The Court Should Confirm the Debtor's Authority to Implement the AIP in the Ordinary Course**

55.     As an initial matter, the Debtor submits that the continuation of the AIP is an ordinary course activity that does not require approval.  Nevertheless, the Debtor has included the AIP in the Motion as a matter of full disclosure and to give its employees assurance that this

Court has authorized the program to reassure their expectation that they will receive compensation if they drive the business to the goals of the AIP.  Moreover, as an ordinary course plan, the 2014 AIP does not fall within Bankruptcy Code section 503(c)(3) and therefore is not limited by it.[28]   Moreover, the AIP is an incentive-based compensation program and is not retentive in nature.  Therefore, the AIP does not fall within, and is not limited by, Bankruptcy Code section 503(c)(1).

### A.    The AIP Obligations are a Continuation of the Debtor's Prepetition Compensation Practices in the Ordinary Course of its Business

56.    Bankruptcy Code section 363(c) allows a debtor in possession to enter into transactions in the ordinary course of business without notice or a hearing.  The Third Circuit has adopted a two-step test that analyzes the transaction from horizontal and vertical dimensions.  In re Roth Am., Inc., 975 F.2d 949, 952 (3d Cir. 1992); see also In re Nellson Nutraceutical, Inc., 369 B.R. 787, 797 (Bankr. D. Del. 2007).  Here, the AIP satisfies both the horizontal and vertical dimension test.

57.    Judge Sontchi of this district provided a detailed account of what facts a court should analyze to come to the determination that a debtor's alteration of a compensation plan was within the ordinary course.  In Nellson, the debtor reviewed whether a compensation plan was standard in the industry by examining 20 comparable companies, "based upon revenue, EBITDA and products."  Id. at 797-8.  The debtor then compared its own compensation plans with those of the comparable companies.  Id.  After the debtor showed that a majority of the

---

[28]    To the extent continuation of the AIP may be outside the ordinary course of business, which it is not, the Debtor believes that a strong business justification exists for implementation of the AIP and thus the section 363(b) standard would be satisfied.  In that case, the section 503(c)(3) standard would also be satisfied as an outside the ordinary course of business program justified by the facts and circumstances of the case, as discussed in more detail herein.  Accordingly, to the extent court authority is required, this Court should authorize the Debtor to implement the AIP.

companies had plans substantially similar to those of the debtor, the court held that the debtor's plan satisfied the horizontal dimension.  Id.  In addition, because the debtor presented evidence that its proposed modifications were consistent with its pre-petition practices, the court concluded that the debtor's modified compensation plan also satisfied the vertical dimension test. Id; see also In re Dana Corp., 358 B.R. 567, 579-81 (Bankr. S.D.N.Y. 2006) (finding that, because debtors' post-petition short term incentive plan was a "refinement" of its pre-petition short term incentive plan, which had been a "common component" of the debtors' compensation practices historically, that the debtor's proposed post-petition modifications were within the ordinary course); In re Global Home Products, LLC, 369 B.R. 778 (Bankr. D. Del. 2007) (same).

58.    Here the question is, first, whether the implementation of the AIP is the sort of action commonly undertaken by companies in the Debtor's industry, and second, whether creditors should expect the implementation of the AIP, focusing on the Debtor's pre-petition business practices and conduct.  See  Roth, 975 F.2d at 953.

59.    In Nellson, Judge Sontchi recognized that actions taken in the ordinary course require a "relatively light evidentiary burden of establishing that [a debtor] made a business judgment in good faith upon a reasonable basis."  Nellson, 369 B.R. at 800.

60.    The Debtor submits that like the ordinary course incentive plans approved in Dana and Nellson, the AIP, which was in place in some form since fiscal year 2003, is an ordinary course plan.  The vertical test is met because the Debtor has adopted an annual incentive plan every year since fiscal year 2003, and the AIP retains the essential characteristics of the Debtor's pre-petition annual incentive plans, including the use of financial metrics.  From a horizontal perspective, Mercer concluded that annual incentive plans are extremely common in companies of similar size and in the Debtor's industry – the rare case is a company that does not

have an annual incentive plan.  The AIP thus passes the light evidentiary burden required of ordinary course transactions, and the Debtor's authority to implement the program should be confirmed by this Court.  <u>Nellson</u>, 369 B.R. at 796-97, 800 (quoting <u>In re Curlew Valley Assocs.</u>, 14 B.R. 506, 513 (Bankr. D. Utah 1981)).

      **B.**      **The AIP is Incentivizing and Thus Not Governed by Bankruptcy Code Section 503(c)(1)**

      61.      As this Court recognized in <u>Nellson</u>, the Bankruptcy Code confers upon a debtor the authority to implement an ordinary compensation program without court involvement. This authority is subject to one exception provided for in Bankruptcy Code section 503(c)(1). By its plain language, Bankruptcy Code section 503(c)(1) pertains solely to retention payments to insiders. Thus, it is inapplicable to performance-based incentive plans such as the AIP, which only make payments, including payments to insiders, on account of their contribution to enhancing the company's value through the successful achievement of certain operational and financial goals.  <u>See, e.g.</u>, <u>Nellson</u>, 369 B.R. at 803 (finding that section 503(c)(1) applies only to retention programs with "the primary purpose of inducing [an employee] to remain with the [d]ebtor's business"); <u>In re Nobex Corp.</u>, No. 05-20050 (CSS) (Bankr. D. Del. Jan. 12, 2006), Hr'g Tr. at 67 (Bankruptcy Code section 503(c)(1) does not apply to incentive programs); <u>In re Werner Holding Co., Inc.</u>, Case No. 06-10578 (KJC) (Bankr. D. Del. July 20, 2006; Aug. 22, 2006 and Dec. 20, 2006) (ordering various relief requested in connection with debtors' incentive bonus plans pursuant to Bankruptcy Code sections 363(b) and 503(c)); <u>Dana Corp.</u>, 358 B.R. at 576 (applying Bankruptcy Code section 503(c)(3) to evaluate management incentive plan in absence of applicability of Bankruptcy Code sections 503(c)(1) or 501(c)(2)); <u>In re Calpine Corp.</u>, No 05-60200 (Bankr. S.D.N.Y. Apr. 26, 2006), Hr'g Tr. at 84-85 (Bankruptcy Code sections 503(c)(1) and 503(c)(2) do not apply to incentive programs).  Moreover, Bankruptcy

Code section 503(c)(1) is also inapplicable to the vast majority of the AIP Participants because only 4 participants are insiders, 3 of which are Debtor employees and one of which is an employee of a non-debtor affiliate.[29]

62.     The AIP comprises only targeted incentive payments based on challenging EBITDA and FCF targets. Achieving these metrics will require substantial efforts from Exide's employees.   Specifically, achieving the EBITDA and FCF targets will require the sustained efforts of Exide's employees to implement significant manufacturing cost reductions and productivity improvements in fiscal year 2014.  The achievement of the EBITDA and FCF targets will require the sustained efforts of Exide's employees to achieve certain price increases, extension of customer contracts, homologation of certain new products, the completion of certain footprint reduction programs, installation of new equipment, significant manufacturing cost reductions, and productivity improvements in the fiscal year 2014 and 2015.  The achievement of these targets are even more challenging given headwinds, including the Debtor's Vernon recycling plant not being operational for more than 2 months, forcing the company to purchase lead at a premium and inflationary headwinds and competitive market pressures in all of the Debtor's regions.  Therefore, the bar is set high to achieve the EBITDA and FCF metric.

63.     Accordingly, the Debtor respectfully submits that Bankruptcy Code section 503(c)(1) does not apply to the AIP.

**C.     The AIP is Justified by the Facts and Circumstances and is Not Limited by Bankruptcy Code Section 503(c)(3)**

64.     Even though it need not do so as an ordinary course program, the AIP also satisfies Bankruptcy Code section 503(c)(3).  Nellson, 369 B.R. at 791 ("section 503(c)(3) is

---

[29]   As a result of current departures, there are two vacant positions at the Executive Vice President level that would be considered "insider" positions.

specifically limited to transactions outside of the ordinary course of business . . .").  Bankruptcy Code section 503(c)(3) provides:

> [There shall neither be allowed, nor paid--] (3) other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.

11 U.S.C. § 503(c)(3).

65.     Courts have held the requirement that transfers or obligations be "justified by the facts and circumstances of the case" is a reiteration of the business judgment test incorporated into Bankruptcy Code section 363(b).  See Global Homes, 369 B.R. at 784; Dana Corp., 358 B.R. at 576; In re Dura Auto Sys., Case No. 06-11202 (KJC), Hr'g Tr. 40:17-41:2 (Bankr. D. Del. Apr. 25, 2007).

66.     The Debtor has articulated valid business reasons for implementing the AIP.  Since the Debtor's filing, the AIP Participants have incurred increased responsibilities and burdens as a result of the chapter 11 process.  Accordingly, the AIP is designed to incentivize the AIP Participants to achieve the designated EBITDA and FCF targets, which will enhance the overall enterprise value of the Debtor's business, and reward the AIP Participants for their ongoing significant efforts to orchestrate a successful and value-maximizing restructuring process.  Given the substantial benefits from a successful restructuring process and the size of the Debtor's estate, the overall cost of the AIP is reasonable.

67.     In assessing a Debtor's business judgment regarding the implementation of incentive programs, courts, including this one, have looked to the factors laid out by Judge

30

Lifland in <u>Dana</u> for guidance to evaluate a proposed incentive program under Bankruptcy Code section 503(c)(3).[30]

68.    <u>First</u>, the AIP is calculated to achieve the desired performance – specifically, improved financial performance measured by EBITDA and FCF.  As described above, the EBITDA metric is based on an aggressive budget, which requires the participants of the plan to implement significant manufacturing cost reductions and productivity improvements. <u>Second</u>, as explained above, the cost of the AIP is reasonable and well justified given the size of the Debtor's business and the value that achievement of the performance targets would bring to the estate.  <u>Third</u>, the scope of the AIP is fair and reasonable given its broad-based nature.  The AIP applies to approximately 725 of the Debtor's salaried and management employees.  <u>Fourth</u>, the AIP is also consistent with industry standards, as evidenced by Mercer's comparison to other similarly-situated businesses in the Debtor's industry.  <u>Finally</u>, consistent with past practice, the Debtor closely consulted with  the Compensation Committee in formulating the AIP and received outside independent market advice from Mercer to ensure the plan meets the company's historic goals of incentivizing a broad employee base.

69.    Moreover, courts in this and other districts have authorized the implementation of similar incentive programs.  <u>See, e.g.</u>, <u>In re Visteon Corp.</u>, Case No. 09-11786 (CSS) (Bankr. D. Del. Feb. 18, 2010) (confirming authority of debtor to implement annual incentive program in ordinary course); <u>In re KB Toys, Inc.</u>, Case No. 08-13269 (KJC) (Bankr. D. Del. Jan. 14, 2009) (approving an incentive plan based on successfully completing of identifiable

---

[30]    The <u>Dana</u> factors are: (a) whether a reasonable relationship existed between the proposed plan and the desired results; (b) whether the cost of the plan was reasonable in light of the overall facts of the case; (c) whether the scope of the plan was fair and reasonable; (d) whether the plan was consistent with industry standards; (e) whether the debtor had put forth sufficient due diligence efforts in formulating the plan; and (f) whether the debtor received sufficient independent counsel in performing any due diligence and formulating the plan.  <u>In re Dana Corp.</u>, 358 B.R. at 576-77.

"tasks" consistent with targets); see also In re Movie Gallery, Inc., Case No. 07-33849 (DOT)

(Bankr. E.D. Va. Feb. 29, 2008) (approving a key employee incentive plan under which

management received payments based on performance and non-insiders received payments

based on completion of certain tasks associated with their respective positions).

       70.     Accordingly, although not necessary for the Debtor to establish here, the

AIP fulfills the Dana factors and satisfies the business judgment standard, and therefore, the AIP

is not limited by Bankruptcy Code section 503(c)(3).[31]

## II.     THE COURT SHOULD AUTHORIZE THE DEBTOR TO IMPLEMENT THE KEY EMPLOYEE INCENTIVE PLAN

       71.     The Debtor seeks authority pursuant to Bankruptcy Code section 363 to

implement and honor obligations to KEIP Participants under the KEIP.  The Debtor respectfully

submits that the KEIP will provide the necessary incentives to the KEIP Participants to drive an

expeditious chapter 11 process and maximize value for the Debtor's estate.

### A.     Authorization of the KEIP is Appropriate Pursuant to Bankruptcy Code Section 363(b)(1)

       72.     As set forth above, the Debtor has articulated valid business reasons for

implementation of the KEIP.  The Debtor has determined in its reasonable business judgment

that implementation of the KEIP is in the best interests of the Debtor's estate and the

stakeholders in the Chapter 11 Case.  In addition to their normal day-to-day responsibilities

managing the Debtor's business and maintaining relationships with its employees, key

customers, and key suppliers, the KEIP Participants serve as the driving force to bring the

Chapter 11 Case to its ultimate resolution.  The KEIP Participants are being asked to take on

considerable additional responsibilities, yet, as a result of the chapter 11 filing, the KEIP

---

[31]    To the extent that the AIP is outside the ordinary course of business, the Debtor submits that for the foregoing reasons, the AIP is an exercise of the Debtor's sound business judgment.

Participants are not currently offered incentive opportunities to compensate them for their

enhanced responsibilities, as would be consistent with market practice and the Debtor's past

practice.

73.    The KEIP aligns the interests of the KEIP Participants with the Debtor's

other stakeholders.  Because payments under the KEIP will only be made if KEIP Participants

achieve challenging financial metrics and achieve emergence from chapter 11, the KEIP is

calibrated to incentivize the KEIP Participants to enhance the profitability of the Debtor's estate.

Achievement of the targets necessary for the KEIP Participants to earn pay-outs under the KEIP

will require a great deal of work, which will result in both strengthened business performance

and significant cost savings.  Indeed, the achievement of the financial metrics under the KEIP

will require the implementation of significant operational initiatives over and above the

operational initiatives required to reach the challenging targets under the AIP.  Absent a

sustained effort by KEIP Participants, these goals cannot be realized and the financial metrics

will not be attained.

74.    Additionally, as set forth above and more fully in the Dempsey

Declaration, payment levels under the KEIP are reasonable and were determined based on a

thorough analysis of benchmarks performed by Mercer.  Moreover, the overall cost of the KEIP

is reasonable in light of the size of the Debtor's estate and the benefit from a successful

restructuring process. Accordingly, the Debtor believes that valid business reasons exist for the

implementation of the KEIP and, thus, that its implementation should be approved.

75.    This and other courts have approved similar employee incentive programs

as valid exercises of business judgment.  See, e.g., In re Mervyn's Holdings, LLC, Case No. 08-

11586 (KG) (Bankr. D. Del. Oct. 30, 2009) (approving a task and target based incentive plan for

33

certain members of the debtor's management); In re Midway Games Inc., No. 09-10465 (KG)

(Bankr. D. Del. Apr. 23,2009) (approving key employee incentive plan with payments tied to the

achievement of certain events tied to the debtors' business plan); In re Muzak Holdings. LLC,

No. 09-10422 (KJE) (Bankr. D. Del. Apr. 15, 2009) (authorizing key employee incentive plan

with payments based, in part, on achieving certain EBITDAR targets); In re KB Toys, Inc., Case

No. 08-13269 (KJC) (Bankr. D. Del. Jan. 14, 2009) (approving an incentive plan based on

successfully completing identifiable "tasks" consistent with targets, which plan applied to certain

members of the debtor's management); In re Linens Holding Co., Case No. 08-10832 (CSS)

(Bankr. D. Del. Oct. 21, 2008) (approving a wind-down incentive plan for certain members of

the debtor's management); In re Boscov's Inc., No. 08-11637 (KG) (Bankr. D. Del. Sept. 5,

2008) (approving senior executive incentive program tied to EBITDA targets); In re Buffets

Holdings. Inc., No. 08-10141 (MFW) (Bankr. D. Del, Apr. 28, 2008) (authorizing sale-related

incentive pay to President and COO pursuant to Bankruptcy Code sections 105(a), 363(b)(1),

and 503(c)(3)); In re Dura Auto. Sys., Inc., No. 06-11202 (KJC) (Bankr. D. Del. June 28, 2007)

(approving key employee incentive plan payable, in part, upon submission of a business plan,

filing of a plan of reorganization and disclosure statement, and confirmation of a chapter 11 plan

of reorganization); In re Werner Holding Co. (DE). Inc., No. 06-10578 (KJC) (Bankr. D. Del.

Dec. 27, 2006) (approving employee KEIP providing for cash payments as rewards for

attainment of collective operational restructuring goals and personal performance goals in

support); In re Global Home Prods. LLC, No. 06-10340 (KG) (Bankr. D. Del. May 30, 2006)

(authorizing payment of incentive bonus to certain management employees upon the closing of a

going-concern sale); In re Pliant Corp., No. 06-10001 (MFW) (Bankr. D. Del. Mar. 14, 2006)

(approving management incentive compensation plan providing for cash awards for achievement

of organizational performance goals); see also In re Chrysler LLC, No. 09-50002 (AJG) (Bankr.

S.D.N.Y. May 1, 2009) (authorizing the debtors to assign their incentive plans, including the pre-

petition and post-petition accruals thereunder, to the purchaser of substantially all of the debtors'

assets); In re Kimball Hill, Inc., No. 08-10095 (SPS) (Bankr. N.D. Ill. Dec. 17, 2008) (approving

management incentive plan in connection with the wind-down of the debtors' operations); In re

Calpine Corp., No. 05-60200 (Bankr. S.D.N.Y. Apr. 26, 2006) (approving a four-part incentive

plan, which included awards payable upon emergence).

> **B.     The Key Employee Incentive Plan is Incentivizing and Thus Not Governed
> by Bankruptcy Code Section 503(c)(1)**

76.     As noted above, Bankruptcy Code section 503(c) governs retention and

other payments to insiders. By its plain language, Bankruptcy Code section 503(c)(1) pertains

solely to retention payments to insiders and, accordingly, does not apply to performance-based

incentive plans such as the KEIP, which only make payments based on the successful

achievement of certain operational and financial goals and do not provide benefits to participants

upon termination of their employment with the Debtor.  See, e.g., In re Nobex Corp., No. 05-

20050 (CSS) (Bankr. D. Del. Jan. 12, 2006), Hr'g Tr. at 67; In re Werner Holding Co., Inc., Case

No. 06-10578 (KJC) (Bankr. D. Del. July 20, 2006; Aug. 22, 2006 and Dec. 20, 2006); In re

Dana Corp., 358 B.R. at 576; In re Calpine Corp., No 05-60200 (Bankr. S.D.N.Y. Apr. 26,

2006), Hr'g Tr. At 84-85.

77.     The KEIP is not intended to provide bonuses for retention.  In particular,

the KEIP comprises only targeted incentive payments to the Debtor's salaried employees who

are the most critical to maximizing the enterprise value of the Debtor's business.  The incentives

are based in large part upon achievement of minimum threshold TTM EBITDA and TTM FCF

metrics.  Although certain KEIP Participants are "insiders" within the meaning of the

35

Bankruptcy Code, the KEIP has been crafted with great care to ensure the metrics directly incentivize and motivate participants to meet the objectives set forth therein.

78.     Moreover, while the KEIP was not crafted with the goal of retaining the KEIP Participants, the fact that the KEIP may encourage the KEIP Participants to remain with the Debtor throughout the tenure of the Chapter 11 Case should not bar implementation of the KEIP.  Indeed, all successful incentive programs have the indirect benefit of incentivizing an employee to remain with the company.  See In re Global Homes Prods., LLC, 369 B.R. at 786. The primary purpose of the KEIP is to maximize enterprise value for the benefit of the Debtor's stakeholders.

79.     Accordingly, the Debtor respectfully submits that Bankruptcy Code section 503(c)(1) does not apply to the KEIP.

C.     The Key Employee Incentive Plan is Justified by the Facts and Circumstances and Satisfies Bankruptcy Code Section 503(c)(3)

80.     Applying the Dana factors, as set forth above, the Debtor submits that the KEIP is justified by the facts and circumstances of the case.

81.     First, in consultation with Mercer, after an extensive analysis of the programs implemented in other chapter 11 cases, the Debtor designed and refined the KEIP to motivate and reward KEIP Participants for their significant efforts and the increased demands placed upon them in connection with the chapter 11 process.  Specifically, the KEIP will motivate the KEIP Participants to achieve challenging TTM EBITDA and TTM FCF metrics, thereby maximizing value for the Debtor's estate.  Second, Mercer engaged in an extensive benchmarking analysis in assisting the Debtor with design of the KEIP.  The cost of the KEIP is in line with market practice based on the proposed maximum cost of the KEIP, and normalizing for size, the cost of the proposed KEIP is below the market median.  The cost is reasonable and

36

well-justified given the size of the Debtor's business and the value that achievement of the

performance targets would bring to the estate.  Third, the scope of the KEIP is fair and

reasonable.  As noted above, the proposed KEIP is in line with the market with respect to the

absolute number of participants of the KEIP.  Fourth, the KEIP is consistent with industry

standards with respect to eligibility, total cost, metrics, and payout timing.  Finally, consistent

with past practice, the Debtor closely consulted with  the Compensation Committee in

formulating the KEIP and received outside independent market advice from Mercer to ensure the

plan meets the company's goals of incentivizing its senior management.

82.    Accordingly, the Debtor respectfully submits that the KEIP is in the best

interests of the Debtor, its creditors, and parties-in-interest in the Chapter 11 Case.

## III.    THE COURT SHOULD AUTHORIZE THE DEBTOR TO IMPLEMENT THE KEY EMPLOYEE RETENTION PLAN

83.    The Debtor seeks authority pursuant to Bankruptcy Code section 363 to

implement and honor obligations to KERP Participants under the KERP.  While it is primarily a

retention plan, the Debtor respectfully submits that the KERP will provide the necessary

incentives to the KERP Participants to remain with the Debtor despite the commencement of the

Chapter 11 Case and will induce the KERP Participants to contribute to the Debtor's efforts

during the Chapter 11 Case.

84.    As an initial matter, none of the KERP Participants is an "insider" of the

Debtor within the meaning of Bankruptcy Code section 101(31), as none of the KERP

Participants is a director, officer, person in control, or general partner of the Debtor, nor is any

KERP Participant a relative of any director, officer, person in control, or general partner of the

Debtor.  See 11 U.S.C. § 101(31).  In particular, none of the KERP Participants hold a title

higher than "Senior Director," who reports to a "Vice President," who reports to an "Executive

Vice President," and none of the KERP Participants exercise control over the Debtor.  See, e.g., In re 455 CPW Assocs., Case No. 99-5068, 2000 U.S. App. LEXIS 23470 (2d Cir. Sept. 14, 2000) (affirming a bankruptcy court's holding that a vice president of a limited partnership that was a limited partner of the debtor was not an insider because he was not "in control"); In re NMI Sys. Inc., 179 B.R. 357, 368 (Bankr. D.D.C. 1995) (concluding that a "vice president" was not an "officer" or a "person in control" within the meaning of insider in the Bankruptcy Code because the employee was not in a position to influence corporate policy); cf., Gold v. Sloan, 486 F.2d 340, 350-51 (4th Cir. 1973) (concluding, in the context of a section 16(b) Securities Exchange Act of 1934 lawsuit, that an officer's title was "merely titular" because such officer was a member of lower level management and did not have access to or could avail himself of inside information); C.R.A. Realty Corp. v. Crotty, 878 F.2d 562, 566 (concluding that a vice president was not an "officer" within the meaning of section 16(b) of the Securities Exchange Act of 1934 because, among other things, the officer did not have access to inside information). Accordingly, Bankruptcy Code section 503(c)(1), which by its plain language only applies to "insiders," does not apply to prohibit implementation of the KERP.

85.    The Debtor has articulated valid business reasons for implementation of the KERP.  See, e.g., In re Martin, 91 F.3d 389, 395 (3d Cir. 1996); In re Fed. Mogul Global, Inc., 293 B.R. 124, 126 (D. Del. 2003); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (Bankr. D. Del. 1999).  As discussed above, in identifying the KERP Participants, the Debtor conducted a criticality assessment, considering primarily the difficulty to replace the KERP Participant and the KERP Participant's perceived risk of departure.  The Debtor also considered Performance Rating and Growth Potential within the Debtor's performance management system.  The Debtor requires each KERP Participant's specific skills and focused

attention during the pendency of the Chapter 11 Case.  The KERP Participants are intimately familiar with the Debtor's business and have the experience and knowledge necessary to manage and coordinate the Debtor's intricate operations and logistics through the successful completion of the Chapter 11 Case.  Replacements for the KERP Participants would require extensive training in both technical and commercial terms.  Attrition of the KERP Participants would adversely affect the Debtor's business to the detriment of the Debtor's creditors.

86.    Additionally, this and other courts have previously approved programs in similar design and scope as the Debtor's KERP implemented by other similarly situated debtors. See, e.g., In re KB Toys, Inc., Case No. 08-13269 (KJC) (Bankr. D. Del. Jan. 6, 2009) (approving a retention plan for approximately 28 non-insider employees contemplating payments of approximately $300,000); In re Mervyn's Holdings, LLC, Case No. 08-11586 (KG) (Bankr. D. Del. Oct. 30, 2009) (approving a retention plan for approximately 93 non-insider employees and contemplating payments of approximately $1.3 million); In re New Century TRS Holdings, Inc., No. 07-10416 (KJC) (Bankr. D. Del. May 25, 2007) (approving a retention plan for approximately 92 non-insider employees contemplating payments of approximately $1.2 million); see also In re Circuit City Stores, Inc., Case No. 08-35653 (KRH) (Bankr. E.D. Va. Mar. 25, 2009) (approving a retention plan for approximately 137 non-insider employees contemplating payments of no more than $1.62 million); In re Linens Holding Co., Case No. 08-10832 (CSS) (Bankr. D. Del. Oct. 21, 2008) (approving a retention plan for non-insiders).

## IV.    THE COURT SHOULD CONFIRM THE DEBTOR'S AUTHORITY TO CONTINUE ITS INCOME PROTECTION PLAN FOR NON-INSIDERS

87.    The Debtor seeks authority pursuant to Bankruptcy Code section 363 to continue and honor obligations arising under the Income Protection Plan.  The Debtor respectfully submits that making payments, including payments made on account of pre-petition

accruals, under the Income Protection Plan is well within the Debtor's business judgment given the boost to employee morale and focus to achieve the Debtor's restructuring goals that the Income Protection Plan will offer.  Additionally, since the Debtor is not seeking authority to make any payments to insiders covered by the pre-petition Income Protection Plan, Bankruptcy Code section 503(c)(2) is not implicated, and therefore does not limit, the Debtor's continued implementation of the Income Protection Plan.  In particular, only one "Senior Vice President" who reports to an "Executive Vice President," is eligible to receive payments under the Income Protection Plan.  All other Eligible Salaried Employees are "Vice Presidents" and lower. Additionally, none of the Eligible Salaried Employees exercise control over the Debtor.  Thus, participants in the Income Protection Plan do not fall within the ambit of Bankruptcy Code section 101(31), and accordingly, Bankruptcy Code section 503(c)(2), which by its plain language only applies to "insiders," does not apply to limit implementation of the Income Protection Plan.

88.    The Debtor seeks to honor severance obligations that have accrued both pre- and post-petition under the Income Protection Plan.  As noted, a participant accrues severance per year of service up to 12 weeks of pay.  The Debtor believes the continuation of the Income Protection Plan is essential to maintaining employee morale and incentivizing its workforce to achieve the Debtor's restructuring goals by reassuring them that they will have some financial safety net should their position be eliminated during the Debtor's restructuring process.

89.    Additionally, the Income Protection Plan is well within industry standards, as supplied by Mercer's comparison to other similarly-situated businesses in the Debtor's industry.  In that regard, the income protection payments provided under the Income Protection

Plan are comparable to similar benefits that have been authorized in other bankruptcy cases.  See In re Flying J, Inc., No. 08-13384 (MFW) (Bankr. D. Del. Feb. 18, 2009) (approving of severance payments ranging from two to five weeks of salary plus one additional week of salary for each year of service over one year); In re Linens Holding Co., No. 08-10832 (CSS) (Bankr. D. Del. Aug. 28, 2008) (approving of severance payments ranging from one to twenty-six weeks salary for all hourly and salaried employees); In re Mervyn's Holdings, LLC, No. 08-11586 (KG) (Bankr. D. Del. Aug. 26, 2008) (approving of severance payments ranging from two to twenty-six weeks of salary); In re Aegis Mortgage Corp., No. 07-11119 (BLS) (Bankr. D. Del. Apr. 14, 2008) (approving of severance payments equal to the total number of months worked times the sum of 12% of the gross monthly income of the employee plus $750 per month); see also In re Calpine Corp., No. 05-60200 (BRL) (Bankr. S.D.N.Y. Mar. 1, 2006) (approving of severance payments ranging from two weeks of salary for each year of service to thirty-nine weeks of salary).

90.    Recognizing the valid need for debtors to maintain a meaningful level of stability and improve focus and morale among their workforce, courts in this and other districts have authorized payment of severance benefits, including those benefits that accrued prepetition. See In re Visteon Corp., Case No. 09-11786 (CSS) (Bankr. D. Del. May 29, 2009) (approving debtors' authority to continue to administer and honor obligations under pre-petition non-insider severance plan); In re Aegis Mortgage Corp., No. 07-11119 (BLS) (Bankr. D. Del. Apr. 14,2008) (authorizing debtors to make severance payments that accrued prepetition to employees terminated postpetition); In re FLYi, Inc., No. 05-20011 (MFW) (Bankr. D. Del. Jan. 23, 2007) (same); see also In re Chrysler LLC, No. 09-50002 (AJG) (Bankr. S.D.N.Y. May 1, 2009); (same); In re Kimball Hill, No. 08-10095 (SPS) (Bankr. N.D. Ill. June 18, 2008) (same); In re

Neumann Homes, Inc., No. 07-20412 (ERW) (Bankr. N.D. Ill. Feb. 20, 2008) (same); In re

Calpine Corp., No. 05-60200 (BRL) (Bankr. S.D.N.Y. Mar. 1, 2006) (same).

## NOTICE

91.    Notice of the Motion will be given to: (i) the Office of the U.S. Trustee;

(ii) counsel to the agent under the debtor in possession financing; (iii) counsel to the agent for the

Debtor's prepetition secured lenders; (iv) the indenture trustee for each of the Debtor's secured

and unsecured outstanding bond issuances; (v) counsel to the Noteholders' Committee; (vi)

proposed counsel to the Creditors' Committee; and (viii) all parties entitled to notice pursuant to

Bankruptcy Rule 2002. The Debtor submits that no other or further notice need be provided.

## NO PRIOR REQUEST

92.    No previous request for the relief sought herein has been made to this

Court or any other court.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**CONCLUSION**

WHEREFORE, the Debtor respectfully requests that this Court enter an order, substantially in the form annexed hereto, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated: Wilmington, Delaware
          July 25, 2013

                    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

                    /s/ Kristhy M. Peguero
                    Anthony W. Clark (I.D. No. 2051)
                    Kristhy M. Peguero (I.D. No. 4903)
                    One Rodney Square
                    P.O. Box 636
                    Wilmington, Delaware 19899-0636
                    Telephone: (302) 651-3000
                    Fax: (302) 651-3001

                    - and -

                    Kenneth S. Ziman *(admitted pro hac vice)*
                    J. Eric Ivester *(admitted pro hac vice)*
                    Four Times Square
                    New York, New York 10036-6522
                    Telephone: (212) 735-3000
                    Fax: (212) 735-2000

                    - and -

                    James J. Mazza, Jr. *(admitted pro hac vice)*
                    155 N. Wacker Dr.
                    Chicago, Illinois 60606-1720
                    Telephone: (312) 407-0700
                    Fax: (312) 407-0411

                    *Counsel for Debtor and Debtor in Possession*