IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| EXIDE TECHNOLOGIES,[1] | Case No. 13-11482 (KJC) |
| Debtor. | **Hearing Date: February 20, 2014 at 2:00 p.m. (ET)** |
| | **Objections Due: February 10, 2014 at 4:00 p.m. (ET)** |

**APPLICATION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF EXIDE TECHNOLOGIES FOR ENTRY OF AN ORDER
AUTHORIZING THE EMPLOYMENT AND RETENTION OF AN ECONOMIC
CONSULTANT AND RELATED RELIEF, INCLUDING A WAIVER OF CERTAIN
PROVISIONS OF LOCAL RULE 2016, _NUNC PRO TUNC_ TO JANUARY 16, 2014**

The Official Committee of Unsecured Creditors (the "**Committee**") appointed in the bankruptcy case of the above-captioned debtor and debtor-in-possession ("**Exide**" or the "**Debtor**") submits this application (the "**Application**"), pursuant to sections 105(a), 107, 328 and 1103(a) of title 11 of the United States Code, 11 U.S.C. §§ 101, _et seq._ (the "**Bankruptcy Code**"), Rules 2014(a), 2016, and 9018 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2014-1, 2016-2 and 9018-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), for the entry of an order, _Nunc Pro Tunc_ to January 16, 2014, substantially in the form attached hereto as **Exhibit B**, authorizing and approving the employment and retention of ▮▮▮▮▮▮ (the "**Consulting Firm**") to provide economic consulting services on behalf of the Committee pursuant to the Engagement Agreement (the "**Engagement Agreement**")[2] attached to the Declaration of ▮▮▮▮▮ (the "**Declaration**"), which is attached hereto as **Exhibit A** and is incorporated herein by reference. By this Application, the

---

[1] The last four digits of the Debtor's taxpayer identification number are 2730. The Debtor's corporate headquarters are located at 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

[2] The Engagement Agreement is entered into by the Consulting Firm and counsel for the Committee in an abundance of caution to protect and preserve privileges, including non-disclosure of privileged information or information which may reveal confidential litigation strategy. Fees and expenses incurred by the Consulting Firm will, however, be paid directly by the Debtor's estate.

Committee requests that the Consulting Firm be excused from certain requirements of Local Rules 2014-1 and 2016-2 and be granted permission to file under seal the Consulting Firm's Fee Statements (as defined herein below). In support of this Application, the Committee respectfully represents as follows:

## BACKGROUND

1.     On June 10, 2013 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

2.     The Debtor continues to operate its business and manage its property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.     No trustee or examiner has been appointed in the Debtor's bankruptcy case.

4.     On June 18, 2013, the Office of the United States Trustee appointed the Committee pursuant to section 1102 of the Bankruptcy Code.

## JURISDICTION

5.     The Court has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.     The statutory predicates for the relief sought herein are sections 105(a), 107, 328, 1102 and 1103 of the Bankruptcy Code, Bankruptcy Rules 2014, 2016, and 9018, and Local Rules 2014-1, 2016-2, and 9018-1.

## RELIEF REQUESTED

7.     As described in more detail below, by this Application the Committee seeks entry of an order authorizing and approving the retention and employment of the Consulting Firm to assist Committee counsel in its investigation of potential causes of action that the Debtor's estate may hold relating to potential price manipulation, including but not limited to price-fixing and/or

price stabilization in the lead market by, among others, the London Market Exchange, Ltd. ("**LME**") and large metal warehousing companies, and to assess the damages that the Debtor may have suffered as a result.[3]  The terms of the Consulting Firm's retention shall be in accordance with the terms and conditions set forth in the Engagement Agreement and herein, pursuant to sections 105(a), 107, 328 and 1103(a) of the Bankruptcy Code, Bankruptcy Rules 2014, 2016, and 9018, and Local Rules 2014-1, 2016-2, and 9018-1.

**THE CONSULTING FIRM'S QUALIFICATIONS**

8.     The Consulting Firm is an economic consulting firm offering a broad range of economic consulting and litigation services to, among others, Fortune 500 companies and government agencies.  The Consulting Firm employs more than ▆▆ professionals, more than half of whom hold PhDs and/or other advanced degrees.

9.     The Consulting Firm specializes in advanced economic, financial and econometric analysis and excels at handling complex matters that require sophisticated empirical analysis.  The Consulting Firm has extensive experience and knowledge in performing the services described in the Application and is widely recognized for its experience and expertise in the provision of such services. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

10.     In addition to other practice areas and areas of expertise, the Consulting Firm has significant experience providing economic analysis and expert testimony in complex antitrust and competition matters. It has played a leading role in many high-profile antitrust matters and presented economic evidence before, and on behalf of, competition enforcement agencies around the world.  The firm specializes in analysis of antitrust liability, causation, and damages arising from alleged anticompetitive conduct including monopolization, exclusive dealing, tying and

---

[3] The Committee may also request the Consulting Firm's assistance with respect to the Committee's evaluation and investigation of the battery markets, including any possible market manipulation or anti-competitive behavior that may have occurred in such markets.

bundling, and price-fixing, issues similar to those for which the Committee seeks to retain the Consulting Firm. Accordingly, the Consulting Firm is well qualified to provide the services described in the Application to the Committee.

## BASIS FOR RELIEF REQUESTED

11. Pursuant to its authority under section 1103(c) of the Bankruptcy Code to investigate, among other things, potential assets of the Debtor's estate, the operation of the Debtor's business and any other matter that is relevant to the case or the formulation of a plan, the Committee seeks the retention of the Consulting Firm to assist the Committee counsel in its investigation of potential price fixing and/or stabilization in the lead market (the "**Lead Pricing Investigation**"), which may have severely damaged the Debtor and its estate.

12. As outlined in more detail below, the Lead Pricing Investigation is a necessary and appropriate step in light of reports that the London Metal Exchange ("**LME**") and metal warehousing companies may have conspired to create artificial delays for the delivery of lead from LME-certified warehouses for the purpose of increasing storage fees and driving-up the market price for lead. These reports come on the heels of the decision by the United States Commodity Futures Trade Commission ("**CFTC**") and Justice Department to open an investigation of the LME and warehouses with respect to their conduct in warehousing of aluminum. Additionally, this step is necessary and appropriate because of manipulation that may have occurred, and may still be occurring, in the lead marketplace, as recent reports reveal that large price swings in metals can sometimes be attributed to price manipulation occurring outside of the LME system through "shadow warehouses."

A. **The Debtor's Reliance Upon Lead in Manufacturing Lead-Acid Batteries.**

13. The Debtor is in the business of manufacturing and selling stored electrical energy solutions and is one of the world's largest manufacturers of lead-acid batteries for transportation and industrial applications. The Debtor's transportation batteries include starting, lighting, and

ignition batteries for cars, trucks, off-road vehicles, agricultural and construction vehicles, marine, and other applications. The Debtor's principal brands include Exide, Exide Extreme, Exide NASCAR Select, Centra, DETA, Orbital, Fulmen, and Tudor. The Debtor also manufactures transportation batteries under private labels. Additionally, the Debtor's industrial segment manufactures batteries with motive power and network power applications. Exide Technologies, Inc. Amended Form 10-K (filed June 17, 2013), p. 5 via Edgar Online, accessed December 2013 (hereinafter, "Exide Form 10-K").

14.     Lead is the primary material used in the manufacture of the Debtor's lead-acid batteries and constitutes 45.5% of the cost of goods sold. Therefore, volatility in the market for lead significantly impacts the Debtor's financial performance. Exide Form 10-K, p. 7.

15.     Lead is priced globally on the LME. Exide Form 10-K, p. 11. The LME describes itself as "the world centre for industrial metal trading and price-risk management. More than 80% of global non-ferrous business is conducted here and the prices discovered in our three trading platforms are used as the global benchmark." Such non-ferrous materials include metals such as lead, aluminum, and copper. London Metal Exchange, http://www.lme.com (last visited Dec. 27, 2013).

16.     In addition to trading, the LME certifies and oversees a network of more than 700 warehouses for the storage of metals. David Kocieniewski, *A Shuffle of Aluminum but to Banks, Pure Gold,* The New York Times (July 20, 2013). The interplay between trading and warehouses is critical to a properly functioning market as Martin Abbott, LME's Chief Executive, has explained: "Its [LME's] global network of storage facilities and the risk of physical delivery ensure that the prices discovered on its markets are reflective of global supply and demand and are, therefore, used the world over as *the* price benchmark." THE OFFICIAL LME GUIDE TO MANAGING METALS PRICE RISK (Philip Crowson & Catherine Markey eds. 2011)

http://www.lme.com/~/media/Files/Education/LME%20book%20-%20look%20inside.pdf    (last visited Dec. 27, 2013) (emphasis in original)

**B.      The LME's and Warehousing Companies' Suspected Manipulation of Aluminum Prices.**

17.      During 2010, financial services and other firms undertook significant acquisitions of warehousing companies in the LME system, including the Goldman Sachs Group, Inc.'s acquisition of Metro International Trade Services LLC in or about February 2010; JPMorgan Chase & Co.'s acquisition of Henry Bath LLC in or about July 2010; and Glencore Xstrata, PLC's acquisition of Pacorini USA and Pacorini BV in or about September 2010.  The five largest warehousing firms, including those that were involved in acquisitions in 2010, own and operate 75% of the 778 LME-certified warehouses.  Tatyana Shumsky, *Millions of Tons of Metal Stashed in Shadow Warehouses*, The Wall Street Journal (December 26, 2013).

18.      Since those acquisitions, manufacturers began to complain about significant delays in obtaining physical delivery of metals from LME-certified warehouses.  Indeed, wait times for aluminum increased from 6 weeks in 2010 to 16 months in 2013.  David Kocieniewski, *U.S. Subpoenas Goldman in Inquiry of Aluminum Warehouses*, The New York Times (August 12, 2013).

19.      As a result of those delays, aluminum owners paid higher storage costs to LME-certified warehouses – a percentage of which was passed along to the LME.  *Id.*  Additionally, because aluminum prices are based on trades occurring on the LME, delays in the delivery of aluminum from warehouses caused prices to be higher than they otherwise would have been under normal market conditions.  Indeed, storage costs are a significant component of the premium added to the price of metals sold on the spot market such that delays result in higher prices for all metals customers.  David Kocieniewski, *A Shuffle of Aluminum but to Banks, Pure Gold,* The New York Times (July 20, 2013).

20.    On July 20, 2013, the New York Times published an article which attributes the lengthy delays in obtaining physical delivery of aluminum from LME-certified warehouses to improper conduct by the warehouse owners.   The article explains that warehouse owners intentionally provided aluminum owners with large financial incentives to store metal there while also allowing for very little metal to exit the warehouses.  This had the effect of creating substantial delays which benefitted the warehouse owners through higher rents.  Perhaps most troubling is the allegation raised in the article that the LME's minimum load-out requirements may have been gamed by warehouse owners moving aluminum from one facility to another rather than delivering it to owners who would take physical delivery for manufacturing purposes. This process was described as "a merry-go-round of metal."  David Kocieniewski, *A Shuffle of Aluminum but to Banks, Pure Gold*, The New York Times (July 20, 2013).

21.    After the New York Times expose, the CFTC issued subpoenas to warehouse owners as part of its investigation into "irregularities" in the aluminum market.  The subpoenas sought all documents regarding the LME and warehouse operations dating back to January 2010 (approximately the date in which the spate of acquisitions of the warehousing firms began). David Kocieniewski, *U.S. Subpoenas Goldman in Inquiry of Aluminum Warehouses*, The New York Times (August 12, 2013).   The Justice Department also commenced an investigation. Jamila Trindle and Tatyana Shumsky, *U.S. Probes Metals Warehouse Firms*, The Wall Street Journal (July 25, 2013)

22.    Additionally, numerous class action lawsuits have been filed throughout the country alleging that the LME and warehouse owners have engaged in conspiracy in restraint of trade in violation of Section 1 of the Sherman Act.  Certain of the complaints also allege that they have also unlawfully monopolized the market in violation of Section 2 of the Sherman Act. On December 16, 2013, the Judicial Panel on Multidistrict Litigation entered an order consolidating the actions in the United States District Court for the Southern District of New

York. *In re Aluminum Warehousing Antitrust Litigation* (MDL No. 2481), Consent Order (J.P.M.L. December 30, 2013)(Docket No. 152).

23.    Since the federal government began its investigation of the LME and warehouse firms, JP Morgan announced its intention to exit the commodities business and Goldman Sachs announced certain actions to decrease the queue for aluminum and the LME.  Steve Hargreaves, *JPMorgan    to    exit    commodities    business*, CNN    Money    (July    26,    2013); http://money.cnn.com/2013/07/26/news/economy/jpmorgan-commodities/ (last viewed Dec. 27, 2013).

24.    Moreover, on January 14, 2014, the Federal Reserve announced a decision to consider further restrictions on banks' trading and warehousing of physical commodities, an apparent reconsideration of the Fed's earlier decision to allow the banks freedom to engage in both those activities, a decision that opened the door to the banks' apparent manipulation of the metals markets.    The Fed's announcement came one day before the Senate Banking Subcommittee on Financial Institutions and Consumer Protection held a hearing titled, "Regulating Financial Holding Companies and Physical Commodities," the second Senate hearing investigating ownership of metals warehouses by banks and holding companies and their relationship with the London Metals Exchange.  Several senators on the Banking Committee sharply criticized the Fed's proposal as "a timid step [that was] too slow in coming" and noted that "there is still too much that we do not know about these activities and investments [by the banks]."    http://www.bloomberg.com/news/2014-01-16/senators-question-fed-s-review-of-u-s-banks-commodities-units.html

C.    **Reports of Price Manipulation for Lead.**

25.    There are further reports that the improper conduct engaged in by the LME and warehouse owners may not be limited to aluminum, but also includes lead.  Reuters reported that:

. . . Glencore recently bought warrants for ownership titles for LME listed in Europe and booked them for delivery with a view to moving the metal to its own warehouses in Vlissingen.

Once the metal arrives, the strategy is to offer the metal back to the market, meaning any LME trader who ends up with Vlissingen warrants would have to pay the Glencore unit rent.

LME data shows that in lead, cancelled warrants or material booked to leave warehouses have risen from around 11,000 tonnes early April to nearly 60,000 tonnes as of Wednesday, with some 18,850 tonnes booked to leave Bilbaoa, Spain this week.

The numbers also show that since the start of this year, copper, nickel and lead stocks have been slowly creeping up in Vlissingen, but very little material has so far been booked for delivery.

"The key point in these (warrant cancellations) are not related to underlying demand, it's to do with material being moved between warehouses for non-industrial reasons," said Guy Wolf, a macro strategist at Marex Spectron.

Maytaal Angel and Melanie Burton, *Glencore profits from metals backlogs in Dutch Port*,

Reuters (April 27, 2012).

26.    Reuters reported again:

"'It's hard to get your hands on (lead) at the moment.  It's all quite tight . . ." a London-based trader said.

Another trader also based in London said "You can't get lead from the LME and producers don't have much in terms of spot supply.  Trafigura say they're moving lead to service the physical market.  I find that hard to believe."

The warehouse logjam is not confined to lead, but extends to copper, zinc and aluminum, where stocks in Vlissingen have all jumped since mid-May and are now backlogged.

. . . Critics say the warehouse delays undermine the exchange's role as a market of last report, where industrial users should be able to always get hold of the metal they need, as well as distorting market balances and inflating premiums.

Maytaal Angel, *Storage play by Glencore, Trafigura pushes up lead costs*, Reuters (September

18, 2013).

27.     Given these reports of delays in obtaining lead from certain warehouses, the increase in lead stockpiles in these warehouses despite demand, and the fact that the LME and warehousing companies are currently being investigated by the CFTC and Justice Department for unlawfully causing those same outcomes in the aluminum market, further investigation by the Committee with the assistance of the Consulting Firm is warranted here to assess and determine, among other things, if the Debtor's estate may have a cause of action against third parties relating to possible lead price manipulation.

28.     Additionally, recent reports by the Wall Street Journal indicate that a second form of manipulation might be occurring with respect to lead through the use of what it described as "shadow warehouses". According the Wall Street Journal, banks, hedge funds and commodity merchants are storing voluminous amounts of metal in "a hidden system of warehouses that span the globe" and "[t]he lack of transparency is making this shadow system increasingly attractive to institutions seeking to profit from information that other buyers and sellers don't have." Tatyana Shumsky, *Millions of Tons of Metal Stashed in Shadow Warehouses*, The Wall Street Journal (December 26, 2013). That is because, as one market insider explained, "[o]nly owners of shadow warehouses and large clients who use those storage facilities will be aware of the extent of their metal holdings . . ." Tatyana Shumsky, *As Shadow Storage Grows, Exchange Inventories Lose Their Usefulness* (December 27, 2013). The Wall Street Journal further explained that "hidden metal stock have moved prices before" and cited examples in occurring in the nickel and copper markets. *Id.*

29.     Moreover, such price manipulation might be facilitated by the very same owners of the LME-certified warehouses who the Wall Street Journal reports all "own shadow facilities as well." Tatyana Shumsky, *Millions of Tons of Metal Stashed in Shadow Warehouses*, The Wall Street Journal (December 26, 2013).

**D.    The Committee Seeks to Retain an Economic Consulting Firm to Assist In Evaluating and Determining Whether, Among Other Things, the Debtor's Estate May Have Potential Claims Against Third Parties Due To Alleged Unlawful Lead Price Manipulation.**

30.    If the LME and warehousing firms engaged in a conspiracy to fix and/or stabilize lead prices (including premiums) at levels that were higher than they would have been in a competitive market or similar such conduct was engaged in by warehousing firms and/or metal owners through shadow warehouses, it could have significantly increased the prices Exide paid for lead during the years that such a cartel operated. If that were the case, Exide would have standing to file antitrust claims against any conspirators, as well as to obtain an injunction. 15 U.S.C. §§ 15(a) and 26. Whether such a claim exists and whether unlawful price manipulation is continuing are issues that certainly may impact the administration of the Debtor's estate, the operation of its business, and the formulation of a plan of reorganization.

31.    Therefore, the Committee believes that it is necessary and appropriate to employ the Consulting Firm to assist Committee counsel in its investigation of whether the LME, warehouse companies and/or certain metals owners engaged in unlawful conduct in the lead market. Among other things, the Consulting Firm would assist in examining Exide's lead purchases (and battery sales) and whether the market prices paid by Exide and other lead purchases were supracompetitive -- that is, higher than what the market prices would have been absent the allegedly unlawful conduct. To elaborate on the proposed analysis to be employed, the Consulting Firm would determine a period during which the alleged cartel conduct did not occur ("**Competitive Price Period**") and examine factors that affect prices and industry dynamics. It would then construct an economic model, based in part upon those factors, that would be used to determine what the competitive price of lead would have been over the period where there are allegations of anticompetitive conduct. If a difference exists between the estimated competitive prices and the actual prices paid by lead purchasers such as Exide, it would suggest that unlawful conduct is the cause.

32.     Additionally, should the findings warrant, the Consulting Firm would be asked to quantify the amount of overcharge that Exide may have paid for lead and thus assess damages that the Debtor and its estate may have suffered from any improper conduct.

33.     At bottom, because the Debtor and its estate may have suffered substantial injuries as a result of potential manipulation of prices including price-fixing and/or stabilization in the lead market, it is critical that the Committee, in furtherance of its fiduciary duty to its constituents, retain an independent economic consultant to advise and assist Committee counsel in its investigation into such alleged wrongdoing.

## SERVICES TO BE PROVIDED

34.     The economic consulting services to be provided by the Consulting Firm, include, but not limited to:[4]

(a)     Assisting Committee counsel with performing an analysis of lead pricing over a time series of the relevant years to examine whether the market price for lead over the relevant years shows anomalies compared to what the price would have been in a market operating under competitive conditions with no artificial manipulation of the market, in order to assess whether the LME, warehouse companies and/or certain metals owners engaged in unlawful conduct in the lead market;

(b)     Assisting Committee counsel in determining whether the market prices paid by the Debtor and other lead purchasers were supracompetitive – that is higher than what the market prices would have been absent the allegedly unlawful conduct;

(c)     Assisting Committee counsel in evaluating potential damages the Debtor and its estate may have suffered from the LME's and warehouse companies' alleged unlawful activity in the lead market; and

(d)     Provide other related services as requested by the Committee counsel.

---

[4] The Application includes a summary of the terms of the Consulting Firm's engagement.  The Engagement Letter, however, shall control in all respects.

## FEES AND TERMS OF RETENTION

35.     The Declaration sets forth in detail the terms and conditions of the Consulting Firm's employment, its staffing and approach, and its billing practices.   Subject to Court approval and the relief requested herein, the Consulting Firm will seek compensation in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, applicable orders of this Court, and guidelines established by the U.S. Trustee.

36.     The Consulting Firm charges based on actual hours expended to perform its services at standard hourly rates established for each employee.  Fees reflect economies resulting from the use of paraprofessional and support personnel to develop schedules and analyses, input computer data, perform research, work on fee applications, and other activities necessary to the efficient administration of a case.  The billing rates for professionals assigned to this engagement in effect as of January 1, 2014, are as follows:

| Professional | Title | Hourly billing rate |
| --- | --- | --- |
| | Partner | $650 |
| | Partner | $600 |
| | Principal | $525 |
| | Manager | $395 |

The project team will include other professional and administrative staff resources as appropriate. Billing rates by staff classification in effect as of January 1, 2014 are listed in the table below:

| | |
| --- | --- |
| Partner | $575 - $1000 |
| Principal | $450 - $600 |
| Manager | $400 - $500 |
| Sr. Economist | $350 - $600 |
| Sr. Consultant | $340 - $400 |
| Economist | $325 - $375 |

| | |
|---|---|
| Consultant II | $300 - $350 |
| Consultant I | $280 |
| Project Coordinator | $200 - $275 |
| Project Assistant | $175 - $200 |
| Research Assistant | $175 |

37.     The Consulting Firm charges for reasonably incurred, out-of-pocket expenses associated with an assignment including, but not limited to, cost of research services used, courier services (such as Federal Express and similar), travel and other case specific charges, and other direct expenses. Billing for time expended for travel expenses will be billed at 50% of normal hourly rates.

38.     The Committee respectfully submits that, because of the nature of the Consulting Firm's retention in this chapter 11 case, public disclosure of the identity of the Consulting Firm or details of the services the firm will perform requires or may require the disclosure of privileged information or information which may reveal confidential litigation strategy.   The Committee seeks to protect against such disclosure.

39.     First, the Committee is seeking relief from Local Rules 2014-1(c), 2016-2(f), and 2016-2(h).

40.     Local Rule 2014-1(c) provides in pertinent part as follows:

Any professional person whose employment is sought pursuant to this Local Rule must disclose its employment, or intended employment, of another professional for whom reimbursement will be requested under Local Rule 2016-2(f); provided, however, that if such disclosure would require the disclosure of privileged information or information which may reveal confidential litigation strategy, such disclosure may be excused by the Court.

Local Rule 2014-1(c).  Local Rule 2016-2(f) provides in pertinent part as follows:

If any entity subject to this Local Rule seeks reimbursement for any payment it made to another professional, such entity must provide, with respect to the services rendered or expenses incurred by such other professional, the information required by paragraphs (c), (d), and (e) hereof, unless a waiver is obtained under paragraph (h) hereof.

Local Rule 2016-2(f).   Local Rule 2016-2(h) provides in pertinent part that "[a]n employed professional person or entity within the scope of this Local Rule may request that the Court waive, for cause, one or more of the information requirements of this Local Rule."   Local Rule 2016-2(h).   The Committee respectfully submits that cause exists to waive the information requirements of Local Rules 2014-1 and 2016-2 insofar as they require disclosure of privileged information or information which may reveal confidential litigation strategy.   The Committee is requesting the Consulting Firm to be retained to assist with, among other things, an investigation with respect to possible litigation.   In particular, the Committee believes that it is necessary and appropriate to employ the Consulting Firm to assist in its investigation of whether the LME, warehouse companies and/or certain metals owners engaged in unlawful conduct in the lead market.   The investigation implicates privileged information or information which may reveal confidential litigation strategy.   Therefore cause exists for waiving the requirements of Local Rules 2014-1 and 2016-2 insofar as the retention and employment of the Consulting Firm requires or may require the disclosure of privileged information or information which may reveal confidential litigation strategy.

41.     Second, the Committee requests that the Consulting Firm's Fee Statements be filed under seal.   Bankruptcy Code sections 107(b) and (c) provide the Court with the power to issue orders to protect entities from potential harm that may result from the disclosure of confidential information.   Section 107(b)(1) of the Bankruptcy Code provides as follows: "[o]n request of a party in interest, the bankruptcy court shall . . . protect an entity with respect to a trade secret or confidential research, development, or commercial information."   11 U.S.C. § 107(b)(1).

42.     Under Bankruptcy Code section 105(a), the Court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. 11 U.S.C. § 105(a).   Further, Bankruptcy Rule 9018 provides that "[o]n motion or on its own initiative, with or without notice, the court may make any order which justice requires . . . to

protect the estate or an entity in respect of a trade secret or other confidential research, development, or commercial information." Fed. R. Bankr. P. 9018. Moreover, Local Rule 9018-1 provides in relevant part, "Any party who seeks to file documents under seal must file a motion to that effect." Bankr. D. Del. L.R. 9018-1(b). The Committee respectfully submits that filing the Fee Statements under seal is appropriate under Rule 9018 and Local Rule 9018-1 insofar as they include privileged information or information which may reveal confidential litigation strategy.

43.     The Committee therefore respectfully requests that, in lieu of a publicly filed fee application, the Consulting Firm should be permitted to prepare a monthly fee statement in the form described below (the "**Fee Statement**") for services rendered and out-of-pocket expenses incurred which will be accompanied by a list of professional, paraprofessional and support personnel providing services, their respective billing rates, the aggregate hours expended by each such person, a general description of the services rendered summarized by discrete project, a detailed description of the services performed by each professional, paraprofessional and support person providing such services, the time expended, by discrete project, by day and a reasonably detailed breakdown of the disbursements incurred. The Fee Statement will be deemed as a supplement to Committee Counsel's periodic fee applications, and shall be delivered to chambers with a copy provided to the Debtor and the United States Trustee, all of which shall be deemed to be filed under seal, pursuant to sections 105(a) and 107(b) of the Bankruptcy Code, as supplemented by Bankruptcy Rule 9018 and Local Rules 2014-1, 2016-2 and 9018-1, until such time that the public disclosure of the Fee Statement would no longer implicate privileged information or confidential litigation strategy, at which time a party in interest may request the disclosure of the Fee Statement, or the Court may order such disclosure. Parties in interest shall have an opportunity to seek the public filing of the Fee Statement via objection; provided, however, that such objection shall affect the Court's approval only of those fees and expenses which have been delivered to chambers under seal and to which the objection relates, and shall

have no effect on the Court's approval of the remaining portion of Committee Counsel's fee application in which fees and expenses have been submitted for Court approval.  Committee Counsel will include the total fees and expenses of the Consulting Firm as a line item in their final fee application in these chapter 11 cases.

<strong><u>THE CONSULTING FIRM'S DISINTERESTEDNESS</u></strong>

44.    The Committee understands, to the best of its knowledge, based on the Declaration, that the Consulting Firm is a "disinterested" person as that term is defined by the Bankruptcy Code and does not represent or hold an interest adverse to the interest of the estate with respect to the matter on which the Consulting Firm is to be employed.  Section 101(14) of the Bankruptcy Code defines "disinterested person" as a person that:

      (A)    is not a creditor, an equity security holder, or an insider;

      (B)    is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and

      (C)    Does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor.

11 U.S.C. § 101(14).

45.    To the best of the Committee's knowledge, based on the information set forth in the Declaration, the Consulting Firm (a) is not a creditor, equity holder or an insider of the Debtor, (b) is not and was not within the relevant time period  a director, officer or employee of the Debtor and (c) neither holds nor represents any interest materially adverse to the interests of the estate or any class of creditors or equity holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtor.

46.    Furthermore, pursuant to Bankruptcy Rule 2014, to the best of the Committee's knowledge, except as may be set forth in the Declaration, the Consulting Firm, does not have any connections with the Debtor, creditors of the Debtor, any other party in interest, their respective

attorneys and accountants, the United States Trustee, or any person employed in the office of the United States Trustee. The Declaration, executed on behalf of the Consulting Firm in accordance with Bankruptcy Rule 2014, is appended hereto Exhibit A and is incorporated herein by reference. The Committee's knowledge, information and belief regarding the matters set forth in this paragraph is based, and made in reliance, upon the Declaration.

47.    The Consulting Firm has indicated that it will promptly update the Declaration, disclosing any material developments regarding the Debtor or any other pertinent relationships that require disclosure in the above-captioned case, if and when any such developments or relationships come to its attention.

## APPLICABLE AUTHORITY

48.    The Committee seeks approval of the engagement and retention of the Consulting Firm pursuant to sections 328 and 1103(a) of the Bankruptcy Code.

49.    In particular, under section 1103(c), a creditors committee is authorized to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business, and any other matter relevant to the case or to the formulation of a plan." *See* 11 U.S.C. § 1103(c)(2). In furtherance of its obligations and rights under section 1103(c), section 1103(a) of the Bankruptcy Code authorizes the Committee to employ "attorneys, accountants, or other agents, to represent of perform services for such committee." *See* 11 U.S.C. § 1103(a). In addition, section 328(a) of the Bankruptcy Code provides that a Committee "with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 . . . on any reasonable terms and conditions of employment . . .." 11 U.S.C. § 328(a).

50.    As outlined in detail above, the retention of the Consulting Firm is reasonable, necessary and appropriate to assist the Committee in connection with the Lead Pricing

Investigation, the outcome of which may, among other things, uncover a potential and valuable asset of the Debtor's estate, impact the operations of the Debtor's business, and have an influence on the formulation of any plan of reorganization.

51.     The services to be provided by the Consulting Firm cannot be performed by any other professional retained by the Committee and is an essential step necessary to the execution of the Committee's statutory duties under section 1103(c) of the Bankruptcy Code.   The Committee therefore respectfully submits that retention of the Consulting Firm pursuant to the terms of this Application and the Engagement Letter is reasonable and necessary to assist the Committee in performing its duties.

52.     Moreover, the Committee submits that the disclosure protections sought herein are justified and satisfy the Bankruptcy Rules and Local Rules, including Local Rules 2014-1(c), 2016-2(f), and 2016-2(h).  Additionally, the request to seal the Consulting Firm's Fee Statements pursuant to sections 105 and 107 of the Bankruptcy Code and Bankruptcy Rule 9018 and Local Rule 9018-1 is consistent with and a required part of the disclosure protections.

## NOTICE

53.     Notice of this Application has been given to the following parties or, in lieu thereof, to their counsel, if known: (i) the Office of the United States Trustee for the District of Delaware; (ii) Counsel to the Debtor; (iii) counsel to the agent under the debtor in possession financing; (iv) counsel to the agent for the Debtor's prepetition secured lenders; (v) the indenture trustee for each of the Debtor's secured and unsecured outstanding bond issuances; (vi) counsel to the unofficial committee of senior secured noteholders; and (vii) those parties requesting notice pursuant to Bankruptcy Rule 2002.  The Committee submits that no other or further notice is necessary or required.

54.     No previous application for relief sought herein has been made to this or any other Court.

WHEREFORE, the Committee respectfully requests that this Court enter an Order, substantially in the form submitted herewith, authorizing the retention and employment of the Consulting Firm as economic consultant, in accordance with and pursuant to the terms and conditions of this Application and the Engagement Agreement, and grant the Committee such other and further relief as the Court deems just or proper.

                                OFFICIAL COMMITTEE OF UNSECURED
                                CREDITORS OF EXIDE TECHNOLOGIES
                                In its capacity as Designated Signatory of the Committee
                                and not in its individual capacity


                                _____
                                Michael Strollo
                                Co-Chairperson of Committee
                                Pension Benefit Guaranty Corporation


                                _____
                                Andrew Sole
                                Co-Chairperson of Committee
                                Esopus Creek Value Series Fund LP-Series "A"

Dated: January 27, 2014

54.     No previous application for relief sought herein has been made to this or any other Court.

**WHEREFORE**, the Committee respectfully requests that this Court enter an Order, substantially in the form submitted herewith, authorizing the retention and employment of the Consulting Firm as economic consultant, in accordance with and pursuant to the terms and conditions of this Application and the Engagement Agreement, and grant the Committee such other and further relief as the Court deems just or proper.

**OFFICIAL COMMITTEE OF UNSECURED**
**CREDITORS OF EXIDE TECHNOLOGIES**
In its capacity as Designated Signatory of the Committee
and not in its individual capacity

_____
Michael Strollo
Co-Chairperson of Committee
Pension Benefit Guaranty Corporation

_____
Andrew Sole
Co-Chairperson of Committee
Esopus Creek Value Series Fund LP-Series "A"

Dated: January 27, 2014