## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>EXIDE TECHNOLOGIES,[1]<br><br>Debtor. | Chapter 11<br><br>Case No.  13-11482 (KJC)<br><br>**Hearing Date: July 22, 2014 at 11:00 a.m. (ET)**<br>**Objections Due: July 15, 2014 at 4:00 p.m. (ET)**<br>**Re: D.I. 1978** |

### LIMITED OBJECTION OF THE OFFICIAL COMMITTEE
### OF UNSECURED CREDITORS TO DEBTOR'S MOTION FOR
### ENTRY OF AN ORDER AUTHORIZING THE DEBTOR TO AMEND
### THE DIP FACILITIES TO OBTAIN ADDITIONAL FINANCING

The Official Committee of Unsecured Creditors (the "Committee") of Exide Technologies (the "Debtor" or "Exide"), the above-captioned Debtor[2] and Debtor-in-Possession, by and through its counsel, submits this limited objection (the "Objection") to the *Debtor's Motion for Entry of an Order Authorizing the Debtor to Amend the DIP Facilities to Obtain Additional Financing* (the "DIP Amendment Motion") [D.I. 1978].  In support of this Objection, the Committee states as follows:

#### PRELIMINARY STATEMENT

1.      Pursuant to the DIP Amendment Motion, the Debtor is seeking authorization to obtain an additional term loan commitment of approximately $65 million (inclusive of fees) (the "Additional Financing") from certain members of the Unofficial Committee of Senior Secured Noteholders (the "UNC") in order to provide the Debtor additional liquidity until it emerges from bankruptcy protection.  The DIP Amendment Motion also seeks certain additional amendments which are memorialized in a combined amendment ("Amendment No. 6") to the DIP Facility (defined herein).  These amendments include an extension of the

---

[1] The last four digits of the Debtor's taxpayer identification number are 2730. The Debtor's corporate headquarters are located at 13000 Deerfield Parkway, Building 200, Milton, Georgia  30004.

[2] Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to them in the DIP Amendment Motion.

maturity of the DIP Facility to December 31, 2014, adjustments to the EBITDA covenant thresholds, elimination of the capital expenditures covenant and an increase to the minimum liquidity covenant.[3]

2.      While the Committee understands that the Debtor may potentially be in need of additional bridge financing to reach a confirmation hearing, the Committee believes that certain provisions of the proposed financing are objectionable and must be stricken or clarified. **First**, there is no reason why the Additional Financing should be tied in any way to the Debtor entering into a plan support agreement with the UNC (the "PSA"), which has yet to be shared with the Committee, filed with the Court and was not referenced in the DIP Amendment Motion, proposed order approving same (the "Proposed DIP Order") or supporting affidavits.  To date, the Debtor has refused to negotiate with the Committee, or, for that matter, any party other than the UNC in connection with the structure of a plan of reorganization and an exit strategy.  The Debtor has also shunned the Committee's efforts to open the plan process to third parties.  Not surprisingly, this refusal and obstinacy culminated in the Debtor's recent June 30, 2014 issuance of a press release (the "Press Release") announcing to the world that it received a plan term sheet from the UNC (the "Plan Term Sheet").  If the Press Release was not sufficient to dissuade other potential parties from trying to participate in the Debtor's reorganization efforts, the Debtor's intended entry into the PSA[4] approximately two weeks before it is required by the UNC to file a plan of reorganization will further chill (if not eliminate) any remaining third party interest in participating in the Debtor's reorganization process.

3.      **Second**, the Committee is in the process of reviewing information provided by the Debtor that the Debtor claims demonstrates that the fees associated with the

---

[3] While the Debtor is seeking Court approval of Amendment No. 6, the Debtor recently also entered into Amendment Nos. 4 and 5 (discussed herein) without Court approval.

[4] Upon information and belief, the PSA will likely be based upon the Plan Term Sheet recently disclosed in the Press Release put out by the Debtor, and referred to in the DIP Amendment Motion as "the likely path the Debtor will follow in order to emerge from chapter 11."  *See* DIP Amendment Motion, at 2.

Additional Financing (approximately $5 million plus J.P. Morgan Securities LLC's ("JP Morgan") arrangement fee)[5] are comparable to other transactions and within market. Despite repeated requests, however, the Debtor only provided this information to the Committee less than 24 hours before the Committee's objection deadline, so the Committee has not had sufficient time to fully analyze the data. At first glance, the fees appear extremely high when compared to the benefits being provided by the amendments. **Third**, the current July 31, 2014 milestone by which the Debtor must file a plan of reorganization should be stricken because the only purpose it serves is to ensure that the Debtor does not open a plan process to third parties, which only benefits the UNC. **Fourth**, the adequate protection provisions included in the DIP Amendment Motion should be clarified to ensure that the UNC is not being granted liens on (including adequate protection liens) or security interests in the Debtor's assets different than or in addition to those previously granted in the Final DIP Order (defined herein).

4.      Accordingly, for the reasons set forth herein, the aforementioned provisions included in Amendment No. 6 and the Proposed DIP Order should be stricken or clarified.

## BACKGROUND

5.      On June 10, 2013 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.

6.      The Debtor continues to operate its business and manage its affairs and properties as a Debtor-in-Possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

7.      On June 18, 2013, the Office of the United States Trustee appointed the Committee pursuant to § 1102 of the Bankruptcy Code.

8.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to § 157(b).

---

[5] The amount of JP Morgan's arrangement fee cannot be disclosed because the documents were filed under seal. [D.I. 1980].

## A.    The Debtor's Business

9.    The Debtor, together with approximately 80 direct and indirect subsidiaries, is in the business of manufacturing and selling stored electrical energy solutions and is one of the world's largest producers and recyclers of lead-acid batteries.

10.    The Company operates four (4) business groups, namely Transportation Americas, Transportation Europe and Rest of World ("ROW"), Industrial Energy Americas, and Industrial Energy Europe and ROW.

11.    The Debtor is headquartered in Milton, Georgia, and operates thirteen (13) manufacturing facilities in the United States.  It also operates approximately seventy-four (74) branches throughout North America which sell and distribute other products to customers, battery specialists, retail stores, and OEM Dealers.  The branch locations collect spent batteries for the Debtor's recycling facilities, which include five (5) smelters, three of which are currently active battery and recycling facilities.  The principal raw material used by the Company in making its product is lead.  In the United States, the Debtor has obtained the vast majority of its lead requirements from its own recycling facilities.

12.    The Debtor reports that as of the Petition Date it employed approximately 3,600 employees in the United States, of which 1,100 are salaried and 2,500 work on an hourly basis, including 450 unionized hourly employees.  Globally, the Debtor employs approximately 9,000 individuals.

## B.    The Debtor's Capital Structure

13.    As of the Petition Date, the Debtor reports that it had approximately $990 million of outstanding funded debt consisting of (a) approximately $160 million in secured debt under its prepetition asset based loan facility (the "Prepetition ABL Facility")[6], (b) $675 million in secured debt outstanding under the Senior Secured Notes (defined herein),

---

[6]    The Debtor paid off the Prepetition ABL Facility after the Petition Date and it is no longer part of the Debtor's capital structure

(c) $51.9 million in unsecured debt under the Convertible Notes (defined herein), and (d) $103.5 million in unsecured trade debt.

14. The Senior Secured Notes. Pursuant to an indenture dated as of January 25, 2011, the Debtor issued $675 million in aggregate principal amount of 8.625% senior secured notes with a maturity date of February 1, 2018 (the "Senior Secured Notes"). The members of the UNC hold approximately $535 million of the Senior Secured Notes. *See Third Supplemental Verified Statement of Certain Senior Secured Noteholders Pursuant to Bankruptcy Rule 2019* [D.I. 1931] (the "2019 Statement"). The Senior Secured Notes have a cash coupon interest rate of 8.625% annually, payable semi-annually in arrears in February and August. As of the Petition Date, the Senior Secured Notes had a remaining principal balance of $675 million outstanding, plus accrued and unpaid interest of approximately $20.86 million.

15. The Convertible Notes. Pursuant to an indenture dated as of March 18, 2005, the Debtor issued floating rate convertible senior subordinated notes (the "Convertible Notes") with a maturity date of September 18, 2013. The Convertible Notes bear floating interest at a per annum rate equal to the 3-month LIBOR, adjusted quarterly, minus a spread of 1.5%. The Convertible Notes are unsecured obligations of the Debtor. As of the Petition Date, the Convertible Notes had a remaining principal balance of $51.9 million outstanding, plus accrued and unpaid interest.

16. General Unsecured Debt. As of the Petition Date, the Debtor also has approximately $103.5 million in general unsecured debt primarily consisting of outstanding payments under various contracts and other arrangements for goods and services supporting its operations.

## C.    The Debtor's Original DIP Financing

17. On the Petition Date, the Debtor filed the *Debtor's Motion for Interim and Final Orders (I) Authorizing Debtor (A) To Obtain Post-Petition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and (B) To Utilize Cash*

*Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant To 11 U.S.C. §§ 363, 361, 362, 363 and 364 and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)* (the "<u>DIP Motion</u>") [D.I. 17].

18.     Through the DIP Motion, the Debtor sought approval of a (i) first out superpriority, secured, asset-based revolving facility in principal amount of $225 million (the "<u>DIP ABL Facility</u>"), subject to increase to up to $325 million upon satisfaction of certain terms and conditions; and (ii) second out superpriority, multiple-draw secured term loan in aggregate principal amount of $275 million (the "<u>DIP Term Facility</u>" and together with the DIP ABL Facility, the "<u>DIP Facility</u>").

19.     On July 11, 2013, the Court entered an order approving the DIP Motion on an interim basis ("<u>Interim DIP Order</u>") [D.I. 79].  The Interim DIP Order authorized the Debtor to borrow $170 million under the DIP Term Facility and $225 million under the DIP ABL Facility and to use the proceeds therefor to, among other things, repay the Prepetition ABL Facility.

20.     The Final DIP Order authorized the Debtor to pay the following fees (all capitalized terms included in this paragraph are defined in the credit agreement in connection with the DIP Facility):

(a)     A Letter of Credit fee calculated as the product of (i) daily undrawn amount of all outstanding letters of credit times (ii) 3.25% per annum.

(b)     An unused line fee calculated as the product of (i) 0.50% times (ii) the undrawn amount of the DIP ABL Facility (excluding Swingline Loans).

(c)     An unused commitment fee equal to 0.50% per year on the portion of the DIP Term Facility not provided on an interim basis.

(d)     A 3.5% commitment fee for Term Lenders (defined in the DIP Term Facility) paid in kind.

(e)     A .75% term loan commitment fee.

(f)     Additional fees provided for in a confidential Fee Letter, which was filed under seal.

(g)    The aggregate fees to underwriters, arrangers, and lenders were approximately $23.69 million or 4.7%.

21.    On July 16, 2013, the Committee filed an objection to the DIP Motion [D.I. 359] (the "Committee DIP Objection") arguing, among other things, that the DIP Facility contained overly restrictive case controls and inappropriate milestones as well as provided the lenders inappropriate protections and benefits.

22.    On July 24, 2013, prior to the entry of the Final DIP Order (defined herein), the Debtor, the DIP Lenders (as defined in the credit agreement in connection with the DIP Facility) and the DIP Agent (as defined in the credit agreement in connection with the DIP Facility) entered into Amendment No. 1 to the DIP Facility, which incorporated the resolution of certain issues raised in the Committee DIP Objection.

23.    On July 25, 2013, the Court entered an order approving the DIP Motion on a final basis (the "Final DIP Order").  [D.I. 427].  The Final DIP Order incorporated many of the Committee's proposed changes included in the Committee DIP Objection.  The Final DIP Order included the following relevant milestones:  (i) the filing of an acceptable plan by May 31, 2014; (ii) the commencement of solicitation of acceptances of an acceptable plan by July 22, 2014; and (iii) entry of an order confirming an acceptable plan by September 22, 2014.

24.    According to the 2019 Statement, members of the UNC hold approximately $264 million of DIP Facility claims.

D.    **The DIP Amendments**

25.    On October 9, 2013, the Debtor, the DIP Lenders and the DIP Agent entered into Amendment No. 2 to the DIP Facility, which revised the definition of "Permitted Liens" to permit contractual encumbrances in connection with certain permitted dispositions under the DIP Facility and changed the definition of "Total Adjusted Operating Cash Flow" to exclude the effect of Frisco Escrow Account receipts from "Total Adjusted Operating Cash Flow."

26.     Approximately eight months later, on May 28, 2014, the Debtor, the DIP Lenders and the DIP Agent entered into Amendment No. 3 to the DIP Facility ("Amendment No. 3"), whereby the DIP milestone to file a plan of reorganization was extended from May 31, 2014 to June 30, 2014.  The other DIP milestones were not extended pursuant to the Amendment No. 3, including the July 24, 2014 deadline by which the Debtor had to commence soliciting acceptances of a plan.  The Debtor advised the Committee that the Debtor's estate paid approximately $850,000 for Amendment No. 3.

27.     On May 22, 2014, prior to the Debtor finalizing Amendment No. 3, the Committee sent a letter (the "May 22 Letter") to Debtor's counsel setting forth its concerns about Amendment No. 3, including the exorbitant fees associated with the limited relief being granted. The Committee noted that by only extending the May 31, 2014 plan filing milestone, the Debtor was ignoring additional upcoming milestones, including the July 24, 2014 deadline to commence soliciting acceptances of a plan of reorganization and the September 22, 2014 deadline to obtain an order confirming a plan of reorganization.   Based on the extension of the plan filing deadline, these other deadlines would also inevitably have to be extended, resulting in significant additional fees.  Accordingly, the Committee requested that the Debtor "reconsider paying these fees and go back to [the] Lenders and negotiate something more substantial that addresses ALL of the Debtor's near and mid-term DIP-related issues." (emphasis in original).  A copy of the May 22 Letter is attached hereto as **Exhibit "A"**.  The Debtor did not respond to the May 22 Letter and instead entered into Amendment No. 3.

28.     As predicted in the May 22 Letter, on June 27, 2014, the Debtor, the DIP Lenders and the DIP Agent entered into Amendment No. 4 to the DIP Facility.  Pursuant to Amendment No. 4, among other relief, the DIP milestones were extended to allow the Debtor to file a plan of reorganization until July 31, 2014, and the deadline to commence solicitation of votes with respect to a plan of reorganization was deleted.   If the Debtor had taken the Committee's advice in the May 22 Letter and addressed all impending deadlines in a single

amendment, it likely would have cost the estate significantly less than the combined cost of Amendment No. 3 and Amendment No. 6.

29.     Also on June 27, 2014, the Debtor, the DIP Lenders and the DIP Agent entered into Amendment No. 5 to the DIP Facility in order to extend to August 15, 2014 the date by which the Debtor's annual audited financial statements and related compliance certificate for the fiscal year ending March 31, 2014 must be filed.

## E.     The DIP Amendment Motion

30.     On July 3, 2014, the Debtor filed the DIP Amendment Motion in order to modify the following provisions included in the DIP Facility:

(a)     An extension of the maturity date of the DIP Facility to December 31, 2014.

(b)     An adjustment of the prior trailing-twelve month EBITDA covenant thresholds to address:  (i) the extension of the DIP Facility maturity date through the end of 2014, and (ii) levels of anticipated earnings under the Debtor's business plan projections from July through the extended maturity date.

(c)     Continuing the provision of adequate protection to the Pre-Petition Secured Parties (as defined in the Final DIP Order) with respect to any diminution in the value of their interests in the prepetition collateral resulting from the priming liens and security interests originally granted by the Final DIP Order.

(d)     The elimination of the restrictions included in the DIP Facility on capital expenditures.

(e)     An adjustment of the minimum liquidity requirement included in the DIP Facility from $25 million to $35 million.

31.     The Debtor is seeking approval to pay the following fees associated with the modification of the DIP Facility:

(a)     A 3.50% fee (at least $2.1 million, but as much as $4.5 million) to the UNC based off of the total commitment provided (including the Backstop Commitment). The fee is not being paid in cash, but will be payable in kind or as original issue discount and capitalized as additional principal.

    (b)       A 0.50% amendment fee ($2.5 million) in cash to all DIP Lenders consenting to Amendment No. 6.

    (c)       An arrangement fee payable to JP Morgan that cannot be disclosed as the documentation underlying the fee was filed under seal.

32.      In addition, through Amendment No. 6, the Debtor is seeking approval of the PSA. There was no reference to the PSA in the DIP Amendment Motion, the Proposed DIP Order, or the supporting affidavits. In addition, the PSA has yet to be filed with the Court or provided to the Committee.

## OBJECTION

33.      Debtor-in-possession financing should only be approved if it "is in the best of interests of creditors generally." *In re Roblin Indus., Inc.,* 52 B.R. 241, 244 (Bankr. W.D.N.Y. 1985) (*citing In re Texlon Corp.,* 596 F.2d 1092, 1098-99 (2d Cir. 1979)). In addition, the terms of the proposed financing should only be approved if they are fair and reasonable under the circumstances, comport with basic notions of fairness and equity, and will ultimately inure to the benefit of the debtor's estate. *In re Aqua Associates,* 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991); *In re Ames Department Stores, Inc.,* 115 B.R. 34, 37-40 (Bankr. S.D.N.Y. 1990). A debtor, for the sake of obtaining DIP financing promptly, cannot abrogate its fiduciary duties to its Chapter 11 estate and its creditors. *Ames Department Stores,* 115 B.R. at 38.

34.      Section 364 financing is not a "secured lenders act" allowing a postpetition secured lender to undo the level "playing field" contemplated by the Bankruptcy Code. The Court in *Ames Department Stores* stated:

> Acknowledging that Congress, in Chapter 11 delicately balanced the hope of debtors to reorganize and the expectations of creditors for payment, the courts have focused their attention on proposed terms that would tilt the conduct of the bankruptcy case; prejudice, at an early stage, the powers and rights that the Bankruptcy Code confers for the benefit of all creditors; or leverage the Chapter 11 process . . .

*Id.*; *See also In re Tenney Village Co., Inc.,* 104 B.R. 562, 568 (Bankr. D. N.H. 1989) (financing terms must not "pervert the reorganization process from one designed to accommodate all classes of creditors . . . to one specially crafted for the benefit" of the secured creditor); *In re Mid-State Raceway*, 323 B.R. 40, 59 (Bankr. N.D.N.Y. 2005) ("[B]ankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender").

35.    It is a fundamental policy of bankruptcy law that a debtor in possession has "an affirmative, overarching duty to reorganize and maximize estate assets for the benefit of all creditors," not just a select few. *In re R.H. Macy & Co.*, 170 B.R. 69, 74 (Bankr. S.D.N.Y. 1994) (*citing NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 527 (1984)); *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) ("In Chapter 11 cases where no trustee is appointed, § 1107(a) provides that the debtor-in-possession, i.e., the debtor's management, enjoys the powers that would otherwise vest in the bankruptcy trustee.  Along with those powers, of course, comes the trustee's fiduciary duty to maximize the value of the bankruptcy estate."); *In re Penn Traffic Co.*, 524 F.3d 373, 382 (2d Cir. 2008) ("The interests of the creditors collectively and the bankrupt estate as a whole will not yield easily to the convenience or advantage of one creditor out of many.") (citations omitted).

36.    Certain provisions of Amendment No. 6 and the Proposed DIP Order violate the legal principles set forth above because they inappropriately favor the UNC, are unduly prejudicial to the rights of unsecured creditors, and are not in the best interests of the Debtor's estate.  This prejudice is exacerbated by the fact that the Debtor has actively opposed any third parties (including those recommended by the Committee) from obtaining information and appropriate access that would allow them to make an educated decision as to whether they wanted to participate in the Debtor's reorganization.  Without providing this information and appropriate access, there is no way to determine whether there are alternatives to the

restructuring proposal set forth in the Plan Term Sheet that would be more beneficial to all of the Debtor's creditor constituencies.

### A.  The Debtor has Failed to Publicly Disclose the PSA

37.    "There is a strong presumption in favor of public access to bankruptcy proceedings and records." *Oldco M Corp.,* 466 B.R. 234, 236 (Bankr. S.D.N.Y. 2012) (*citing Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597-98 (1978)); *see also In re Borders Group, Inc.*, 462 B.R. 42, 46 (Bankr. S.D.N.Y. 2011).  The court in *In re Alterra Healthcare Corp.*, 353 B.R. 66, 73 (Bankr. D. Del. 2006), held that "[i]n fact, Congress has codified the historical practice of open access in bankruptcy." (*citing* 11 U.S.C. § 107(a) and *In re Northstar Energy, Inc.*, 315 B.R. 425, 428 (Bankr. E.D. Tex. 2004) ("[Section] 107(a)'s directive for open access flows from the nature of the bankruptcy process - which is heavily dependent upon creditor participation, and which requires full financial disclosure of debtor's affairs.")).

38.    The *Alterra Healthcare* court also held that "[d]uring a chapter 11 reorganization, a debtor's affairs are an open book and the debtor operates in a fish bowl." *Id.* at 73 (*citing* Brad B. Erens & Kelly M. Neff, *Confidentiality in Chapter 11*, 22 Emory Bankr. Dev. J. 47, 49 (2005) ("The proposition that a chapter 11 reorganization proceeding be an open book process, however, is heavily ingrained in bankruptcy jurisprudence. As a result, it is not likely that there will be any effort to modify the openness of such a proceeding anytime in the near future.").

39.    The PSA was not disclosed in the DIP Amendment Motion, the Proposed DIP Order, or the supporting declarations.  To date, unlike other sealed documents, the PSA has not been filed with the Court or provided to the Committee.  In addition, the Debtor has not provided any description of the terms of the PSA to any parties in interest.  As discussed in more detail herein, the PSA would likely not be appropriate because:  (i) it would violate section 1125(b) of the Bankruptcy Code as it would be deemed an improper post-petition solicitation of

acceptances of a chapter 11 plan prior to a court-approved written disclosure statement being provided to the locked-up parties, and (ii) it would be considered an improper sub rosa plan since it would either dispose of all claims against the estate or restrict one or more classes of creditors' right(s) to vote.   Moreover, the PSA will likely restrict the Debtor's ability to exercise its fiduciary duty and improperly grant control over the remainder of the chapter 11 process to the UNC, which has been the role occupied by the UNC since the Petition Date.

**B.   The PSA Likely Violates Section 1125 of the Bankruptcy Code**

40.    The provision in Amendment No. 6 that requires the entry into the PSA should be stricken because the intended PSA likely represents an impermissible attempt to solicit votes to accept a plan in violation of section 1125(b) of the Bankruptcy Code.   Section 1125(b) provides in, pertinent part, that:

> An acceptance or rejection of a plan **may not be solicited after the commencement of the case** under this title from a holder of a claim or interest with respect to such claim or interest, **unless, at the time of or before such solicitation, there is transmitted to such holder the plan or summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court** as containing adequate information.

11 U.S.C. § 1125(b) (emphasis added).

41.    The plain language of section 1125(b) flatly prohibits a party from using a post-petition plan support agreement to solicit the acceptance or rejection of a plan prior to court approval of a disclosure statement.   *See In re NII Holdings, Inc.,* 288 B.R. 356, 367 (Bankr. D. Del. 2002) (disallowing votes of creditors due to improper solicitation and stating during the September 25, 2002 hearing that "I think the better procedure is simply to state that post petition lock-up agreements have no role in a bankruptcy case");[7] *In re Stations Holding Co, Inc.,* 2002 WL 31947022 at * 3, (Bankr. D. Del. Sept. 30, 2002);[8] *see also* Daniel J. DeFranceschi,

---

[7] Transcript of Hearing, at 33:10-25, Case No. 02-10882 (Bankr. D. Del. Sept. 25, 2002).

[8] Although the court confirmed the plan, it was without regard to the votes of the creditors that were party to a restructuring support agreement because the court determined that the postpetition restructuring support agreement constituted the solicitation of votes on a plan

*Delaware Bankruptcy Court Announces Bright-line Rule for Use of Lockup Agreements in Chapter 11 Cases*, Am. Bank. Inst. J. (Feb. 16, 2003) ("[B]ench rulings in two recent cases, <u>In re NII Holdings, Inc.</u>, and <u>In re Stations Holding Co, Inc.</u> ... together establish a bright-line rule for use of lock-up agreements in connection with voting on a chapter 11 plan....[P]ost-petition lock-up agreements violated § 1125(b) of the Bankruptcy Code because they amounted to post-petition solicitation of acceptances of a chapter 11 plan without a court-approved written disclosure statement having been provided in advance to the locked-up parties.").

42.     The effect of the PSA is likely to force the Debtor to file a plan that has been effectively pre-approved by the UNC in the same manner that the court in *Stations Holding* and *NII Holdings* held to be an impermissible violation of section 1125(b).  This Court should not condone or approve such a request especially where the Debtor has yet to file the proposed PSA with the Court or shared with the Committee. "Section 1125 was designed to 'discourage the undesirable practice of soliciting acceptance or rejection at a time when creditors and stockholders were too ill-informed to act capably in their own interests.'" *In re Heritage Org., L.L.C.*, 376 B.R. 783, 794 (Bankr. N.D. Tex. 2007) (*quoting In re Clamp-All Corp.*, 233 B.R. 198, 208 (Bankr. D. Mass. 1999)); *see also In re Dow Corning Corp.,* 227 B.R. 111 (Bankr. E.D. Mich. 1998).  Notwithstanding any inconsistency in the case law on this issue (*see, e.g., In re Indianapolis Downs, LLC,* 486 B.R. 286 (Bankr. D.Del. 2013)),[9] at a minimum, *Stations Holding Co.* and *NII Holdings* stand for the proposition that post-petition plan support agreements that prematurely "lock-up" a debtor are highly disfavored.

---

without a court-approved disclosure statement and therefore designated those votes under section 1126(e) of the Bankruptcy Code.

[9] The facts and circumstances of the restructuring support agreement approved in *Indianapolis Downs* are distinguishable from the expected PSA in the instant case because the *Indianapolis Downs'* restructuring support agreement involved more than one creditor constituency, provided for a "parallel path" approach that sought to market test the debtor's assets, and it did not lock-up the debtor until after a disclosure statement was approved.

43.     Through the PSA, the Debtor will likely compromise its ability to both exercise one of its most important powers and fulfill its statutory duties - *i.e.*, to be the architect of its plan of reorganization.  More specifically, the PSA will likely tie the Debtor's hands by prohibiting the Debtor from negotiating with any of its other major creditor constituencies or amending the PSA in a manner adverse to the UNC.  Essentially, these restrictions will likely give the UNC complete control over the contents of the plan of reorganization, despite the fact that the Debtor is supposed to be the architect of the plan with duties to negotiate with and treat <u>all</u> constituencies fairly.

44.     The PSA at issue will likely be equally, if not more, offensive than the more typical creditor lock-up agreements prohibited under applicable case law because it is the Debtor who will be "locked up" by and subservient to the UNC.  As previously discussed, the power and responsibility of the Debtor to develop a plan to present to the Court is at the heart of the chapter 11 process and the Debtor should be negotiating with all parties-in-interest to develop an acceptable plan that maximizes value for the estate.

45.     Moreover, the Debtor's entry into the PSA at this juncture of the case is also ill advised and completely unnecessary.  Pursuant to the current DIP milestones, the Debtor is already required to file a plan of reorganization by July 31, 2014 (the same date the Debtor's exclusivity period expires), approximately 2 weeks from today.  Accordingly, there appears to be no benefit at all for the Debtor to "lock-up" one creditor constituency at this stage in the case at the expense of the Debtor's fiduciary duties to consider all options to maximize value for all of the Debtor's creditors.  The Court should simply allow the plan negotiations to proceed without tying the Debtor's hands (and in some respects the Court's hands) to a proposed restructuring that overwhelmingly favors one creditor group (the UNC) over all others.  This is especially true where the Debtor already publically announced in the Press Release that it will likely accept the Plan Term Sheet proposed by the UNC and where the Debtor has failed to open a plan process to third parties. As one court noted (in the context of approving a transaction under section 363 of the Bankruptcy Code), it is a debtor's fiduciary obligation to make "an intensive effort to drum

up the best price obtainable for the creditors" by considering all options and avoid a process that "aims to cut off other possible sales." *In re Bidermann Industries U.S.A., Inc.*, 203 B.R. 547, 552 (Bankr. S.D.N.Y. 1997). Otherwise, the sale "[v]iewed as a whole . . . does not reveal the effective exercise of business judgment. . . " *Id.* at 551.

46.     That a single creditor group supports a plan or that the particular plan could lead to a quick emergence from chapter 11 is simply not a sufficient benefit for approving the PSA. This was made very clear in *In re Innkeepers USA Trust*, 442 B.R. 227 (Bankr. S.D.N.Y. 2010). In *Innkeepers USA Trust*, the court denied the debtors' motion seeking the assumption of a plan support agreement. In her decision, Bankruptcy Judge Chapman stated:

> After today, <u>without the burden of the restrictions imposed by the PSA, the Debtors will have a wide berth to fulfill their fiduciary duties to conduct a plan process which maximizes value for all of the estates</u> and treats the various tranches of debt with greater neutrality. And here again I will invoke Adelphia and its substantial teachings regarding the fine art of being a debtor with multiple, separate tranches of debt secured by separate collateral pools. There is a level of neutrality required; I do not believe the process leading to the PSA reflects the more even-handed approach required in this case. <u>To be sure, the Debtors do not have to be paralyzed in an attempt to make everyone happy. If they believe the plan underlying the PSA is a good, confirmable plan, they can and should file it and prosecute it.</u> It will either survive attacks vis-à-vis valuation, new value, substantive consolidation, and whatever else the creditor body asserts—or it will not. And, if Lehman still wants to support the plan, it is free to do so. For the reasons stated above, the Debtors' motion to assume the PSA is denied.

*In re Innkeepers USA Trust*, 442 B.R. at 236 (emphasis added).

47.     The court's decision in *Innkeepers USA Trust* is very instructive. The court determined that the burdens to the debtors of assuming the plan support agreement at issue outweighed any benefits. *Id.* at 234-35. In addition, because the plan support agreement substantially limited the debtors' ability to exercise their fiduciary duties to maximize the value of their estates for their creditors, it was not a good business decision to assume the agreement. *Id.*

48.     Although the proposed PSA has not been filed with the Court, the facts supporting Judge Chapman's arguments in *Innkeepers USA Trust* for denying the motion to assume the plan support agreement could apply, almost in their entirety, to the Debtor's request to enter into the PSA.  Among other similarities, in *Innkeepers US Trust*:  (i) the plan support agreement was tied to the debtors' financing (the use of cash collateral), (ii) the transaction in the plan support agreement was not shopped in the marketplace, (iii) the debtor did not contact any potential investors outside the capital structure or engage in meaningful discussions with other creditors about plan proposals, (iv) the debtor was limited in its ability to discuss other restructuring proposals, (v) the secured creditor had great power in negotiations, (vi) there was no justification for the debtor locking itself into a particular plan without seeking higher or better offers or negotiating with its existing creditors, (vii) there was a lack of transparency, (viii) other creditors did not support the plan support agreement, (ix) the debtor attempted to favor one creditor, and (x) only one creditor group supported the plan support agreement.

49.     Accordingly, striking the requirement in Amendment No. 6 that the PSA be entered will likely open up the negotiations with respect to the Debtor's upcoming plan of reorganization and lead to a fairer process and fairer recoveries for all stakeholders.  *See In re Innkeepers USA Trust*, 448 B.R. 131, 136 (Bankr. S.D.N.Y. 2011) (describing the sale process that followed the court's previous decision denying the debtors' assumption of a plan support agreement as exemplifying "a chapter 11 process at its best").

**C.  The Proposed PSA Could be a Sub Rosa Plan**

50.     The provision in Amendment No. 6 requiring entry into a PSA should also be stricken because although not yet filed with the Court, it is likely tantamount to a *sub rosa* plan.  It is well-settled that a debtor may not short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by proposing a post-petition agreement between debtors and select creditors that has the effect of dictating material terms of a plan of reorganization.  *See In re Decora Industries, Inc.*, 2002 WL 32332749, at *8 (D. Del. May 20, 2002)("A debtor and

the Bankruptcy [C]ourt cannot short circuit the requirements of 11 U.S.C. § 1101 *et seq.* for confirmation of a reorganization plan by establishing the terms of the plan sub rosa in connection with the sale of assets."); *In re Braniff Airways Inc.*, 700 F.2d 935, 940 (5th Cir. 1983*); In re Cajun Electric Power Cooperative, Inc.*, 119 F.3d 349, 355 (5th Cir. 1997) (citing *Braniff* analysis); *In re Shubh Hotels Pittsburgh, LLC*, 439 B.R. 637, 644 (Bankr. W.D. Pa. 2010) ("Where a transaction has the effect of dictating the terms of a prospective chapter 11 plan, it will constitute a prohibited sub rosa plan.").

51.     A transaction is an impermissible *sub rosa* plan if it either "(i) dispose[s] of all claims against the estate or (ii) restrict[s] creditors' rights to vote." *In re Capmark Financial Group Inc.*, 438 B.R. 471, 513 (Bankr. D. Del. 2010). Similarly, any transaction that dictates the essential terms of a future reorganization plan and seeks to short circuit the rights of creditors must go through a plan approval process, which includes at a minimum disclosure requirements as set forth in section 1125 of the Bankruptcy Code, and may include voting requirements under section 1126 of the Bankruptcy Code, the best interest of creditors test under section 1129(a)(7) of the Bankruptcy Code, and the absolute priority rule of section 1129(b)(2)(B) of the Bankruptcy Code. *Id.* ("A settlement constitutes a sub rosa plan when the settlement has the effect of dictating the terms of a prospective chapter 11 plan."); *Braniff Airways, Inc.*, 700 F.2d at 940; *State Dep't of Taxation v. Swallen's, Inc. (In re Swallen's, Inc.)*, 269 B.R. 634, 638 (B.A.P. 6th Cir. 2001) ("At least when a party in interest objects, a bankruptcy court cannot issue orders that bypass the requirements of Chapter 11, such as disclosure statements, voting, and a confirmed plan, and proceed to a direct reorganization on the terms the court thinks best, no matter how expedient that might be."); *In re Defender Drug Stores, Inc.*, 145 B.R. 312, 318 (B.A.P. 9th Cir. 1992) ("When preconfirmation transactions…have the effect of or dictate the terms of a future reorganization plan, some courts have required the debtor to provide creditors with the protection they would have received in the confirmation process."); *In re Cloverleaf Enterprises, Inc.*, 2010 WL 1445487 at *3 (Bankr. D. Md. April 2, 2010) ("When a proposed transaction specifies terms or coerces one result for

adopting a reorganization plan, the parties and the district court must scale the hurdles erected in Chapter 11."); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 885 (Bankr. S.D.N.Y. 1990) ("A transaction which would effect a lock-up of the terms of a plan will not be permitted.").

52.    Case law discussing *sub rosa* plans also makes clear that bankruptcy courts should not approve a transaction that affects the distributions creditors receive under a plan of reorganization especially in a case like this where one class of creditors, through "stealth and momentum," is attempting to strong-arm a debtor in possession and bypass the requirements of chapter 11 to cash out quickly at the expense of other stakeholders in a proceeding that amounts to a reorganization in all but name.  *In re Chrysler LLC,* 576 F.3d 108, 116 (2d Cir. 2009); *vacated as moot, Indiana State Police Pension Trust v. Chrysler LLC*, 130 S. Ct. 1015 (2009).

53.    Amendment No. 6 requires as a condition of effectiveness that "US Borrower and members of the Unofficial Committee of Senior Secured Noteholders holding a majority in principal amount of the Borrower's Senior Secured Notes shall have entered into a customary plan support agreement with respect to an Acceptable Reorganization Plan." Consistent with the Debtor's posture since the Petition Date of solely negotiating with the UNC, the PSA will likely restrict the Debtor's ability to exercise its fiduciary duty and improperly grant control over the remainder of the chapter 11 process to the UNC.  The Debtor and the UNC cannot use section 364 to sidestep the protections offered to creditors in the plan confirmation process.

54.    The Committee submits that by entering into Amendment No. 6, the Debtor is bargaining away it fiduciary duty to its creditors and handing over control of the chapter 11 case to the UNC pursuant to an impermissible *sub rosa* plan.  Therefore, the provision in Amendment No. 6 requiring entry into a PSA should be stricken.

**D.  The Fees Associated with Certain DIP Amendments Appear to be Excessive**

55.      The Committee requested that the Debtor provide information to support its position that the fees associated with DIP Amendment No. 6 and already paid in connection with Amendment No. 3 (which the Debtor did not seek Court approval of) are comparable to other transactions and within market.  However, the Debtor did not provide the comparable fee information until less than 24 hours prior to the objection deadline so the Committee has not had sufficient time to analyze the data.  In addition, at first glance, the fees appear extremely high when compared to the benefits being provided by the amendments.

56.      According to the DIP Amendment Motion, the Debtor will be paying approximately $5 million in fees for Amendment No. 6, which represents approximately 7.7% of the funds being advanced by the UNC.[10]  More specifically, the UNC will receive a 3.5% fee based off the total commitment provided and all DIP Lenders (as defined in the DIP Motion) who consent to entry of Amendment No. 6 will receive a 0.5% fee.  The Debtor claims that the payment of fees to the UNC lenders is appropriate, for, among other reasons, "[t]his is the same percentage as that charged by the DIP Lenders in connection with the initial term loans already approved by this Court under the DIP Order."  *See* DIP Amendment Motion, at ¶ 32.  While factually true, the context in which this statement is used is misleading.  Putting all other differences in the circumstances surrounding the referenced initial term loans aside, the commitment fee paid on such initial term loans of 3.5% was *for a term of 16 months*.  However, here, Amendment No. 6 calls for a term loan period of 4 month, *or 25% the length of the original term loans*.

57.      Moreover, the Debtor has already paid approximately $850,000 to the DIP Lenders with respect to Amendment No. 3, despite the Committee's suggestion in the May 22 Letter that it would likely be more cost-effective to negotiate a single fee for all foreseeable DIP amendments.  When taken together, the proposed amendment fee and the amendment fee paid in

---

[10] This figure does not include the arrangement fee proposed to be paid to JP Morgan, the details of which were filed under seal. [D.I. 1980].

connection with Amendment No. 3, total $3.3 million.  Most significantly, the Debtor, when negotiating Amendment No. 3, never obtained an extension of the July 24, 2014 deadline to commence soliciting acceptances for a plan of reorganization, an impossible deadline to meet in light of the new June 30, 2014 deadline to file a plan.

**E.  The Case Milestones Are Still Restrictive**

58.     The DIP Facility still contains unnecessarily restrictive case milestones. This case involves an extremely large, global and complex business that faces many operational hurdles and moving parts.  There are several critical aspects of the case that remain outstanding and unresolved.  These aspects include the pending lead price investigation, the intellectual property monetization process and the issues impacting the Vernon recycling facility, all of which will likely have a significant impact on the Debtor's valuation and ability to emerge from bankruptcy.  In addition, the Debtor is still analyzing billions of dollars of claims filed by tort claimants and investigating an apparent overstatement of inventory held in its Canon Hollow, Missouri recycling facility.

59.     While the Committee does not oppose the December 31, 2014 deadline to emerge from bankruptcy, the Committee does not believe there is any reason why a plan must be filed by July 31, 2014.  The July 31, 2014 milestone is an artificial deadline that only benefits the UNC by granting them further unfair dominance and control over the most important aspect of any chapter 11 case – the negotiation and development of a plan of reorganization – without opening a plan process to third parties.  If the Debtor's assets are not materially declining in value and if the lenders are adequately protected (as they are including with respect to the Additional Financing), such additional milestones simply are unnecessary, unreasonable, and not in the best interests of the estate as a whole.

**F.  Adequate Protection**

60.     Lastly, the Committee seeks to confirm that nothing in the Proposed DIP Order or Amendment No. 6 grants the UNC additional liens on (including adequate protection

liens) or security interests in the Debtor's assets beyond what was granted in the Final DIP Order.

**CONCLUSION**

WHEREFORE, the Committee respectfully requests that the Court (i) strike or clarify, as the case may be, the provisions included in Amendment No. 6 or the Proposed DIP Order that are identified in this Objection, and (ii) grant such other and further relief as is just and appropriate.

Dated: July 15, 2014

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Eric D. Schwartz*
Robert J. Dehney (No. 3578)
Eric D. Schwartz (No. 3134)
Erin R. Fay (No. 5268)
1201 North Market Street, Suite 1600
Wilmington, DE  19801
Telephone:  (302) 658-9200
Facsimile:  (302) 658-3989

-and-

**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq.
Sharon L. Levine, Esq.
Paul Kizel, Esq.
65 Livingston Avenue
Roseland, NJ  07068
Telephone:  (973) 597-2500
Facsimile:  (973) 597-2400

-and-

Gerald C. Bender, Esq.
1251 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 262-6700
Facsimile:  (212) 262-7402

*Counsel to the Official Committee of Unsecured Creditors*