IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                            :

In re:                          :     Chapter 11
                            :

EXIDE TECHNOLOGIES,      :     Case No. 13-11482 (KJC)
                            :

           Debtor.[1]      :
                            :
                            :
                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER AUTHORIZING AND APPROVING THE DEBTOR'S: (I) ENTRY INTO A PLAN SUPPORT AGREEMENT AND (II) (A) ENTRY INTO A BACKSTOP COMMITMENT AGREEMENT, (B) PAYMENT OF RELATED FEES AND EXPENSES, AND (C) INCURRENCE OF CERTAIN INDEMNIFICATION OBLIGATIONS**

Exide Technologies (the "Debtor" or "Exide") hereby submits this motion (this "Motion") under sections 105(a) and 363(b) of title 11 of the United States Code (the "Bankruptcy Code") for entry of an order (the "Order") authorizing the Debtor to (i) enter into that certain second amended and restated plan support agreement dated as of January 7, 2015 (as may be amended, supplemented or otherwise modified from time to time, the "PSA"), by and among the Debtor and certain holders of more than a majority of the Debtor's prepetition senior secured notes (together with any transferees who become Permitted Transferees (as defined in the PSA), the "Consenting Creditors"), a copy of which is attached hereto as Exhibit A , and (ii) (a) enter into that certain backstop commitment agreement dated as of January 7, 2015 (as may be amended, supplemented, or otherwise modified from time to time, the "Backstop Commitment Agreement"), by and among the Debtor and certain holders of the Debtor's

---

[1]    The last four digits of the Debtor's taxpayer identification number are 2730.  The Debtor's corporate headquarters are located at 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

prepetition senior secured notes (the "<u>Backstop Parties</u>"), a copy of which is attached hereto as

<u>Exhibit B</u> (b) upon the occurrence of certain conditions, as defined in the Backstop Commitment

Agreement, pay certain fees and expenses, and (c) incur certain indemnification obligations in

connection therewith.  In support of this Motion, the Debtor offers (a) Declaration of Robert M.

Caruso in Support of Debtor's Motion for Entry of an Order Authorizing and Approving the

Debtor's: (I) Entry into a Plan Support Agreement and (II)(A) Entry into a Backstop

Commitment Agreement, (B) Payment of Related Fees and Expenses, and (C) Incurrence of

Certain Indemnification Obligations attached hereto as <u>Exhibit C</u>, and (b) Declaration of Daniel

Aronson in Support of Debtor's Motion for Entry of an Order Authorizing and Approving the

Debtor's (I) Entry into a Plan Support Agreement and (II)(A) Entry into a Backstop Commitment

Agreement, (B) Payment of Related Fees and Expenses, and (C) Incurrence of Certain

Indemnification Obligations attached hereto as <u>Exhibit D</u>.  In further support of this Motion, the

Debtor, by and through its undersigned counsel, respectfully represents as follows:[2]

## PRELIMINARY STATEMENT

The Debtor seeks approval of a Backstop Commitment Agreement and Plan

Support Agreement. The key pillars of the Debtor's plan of reorganization (the "<u>Plan</u>"), pursuant

to which the Debtor intends to emerge from chapter 11 with a right-sized balance sheet that has

been de-levered by more than $600 million.  Pursuant to the Backstop Commitment Agreement,

the Backstop Parties, who hold a substantial amount of both the Debtor's senior secured notes

(the "<u>Senior Notes</u>") and the Debtor's DIP term loans, have committed to backstop the purchase

---

[2]    To the extent that the following summaries or descriptions and the terms of the PSA and Backstop Commitment
Agreement differ from the terms of the agreements themselves, the terms of the PSA and the Backstop
Commitment Agreement, respectively, shall control. Any defined terms used but not defined herein shall have
the meanings ascribed to them in the Plan, the PSA, and the Backstop Commitment Agreement, as applicable,
unless otherwise indicated.

of up to $160 million of New Second Lien Convertible Notes (the "Backstop Commitment") that will be offered to eligible holders of Senior Notes under the Plan pursuant to a $175 million rights offering (the "Rights Offering").  The backstopped Rights Offering provides the Debtor with new capital and allows the Debtor to satisfy its chapter 11 emergence costs and fund its post-emergence business plan – including liquidity and working capital to support its operations, capital improvements, and environmental, health and safety investments and satisfaction of contingent liabilities.

In addition, a majority of holders of the Senior Notes have entered into the PSA. The PSA memorializes the commitment of such holders, absent a material adverse change in circumstances, to vote in favor of and support approval of the Plan.

As is customary, the Backstop Commitment Agreement requires this Court's approval of the Backstop Commitment Agreement and the PSA as a funding condition.  Here, the Debtor's business judgment underlying the decision to enter into both agreements is undeniably sound.  The Backstop Commitment Agreement assures the Debtor that, subject to the satisfaction of the applicable conditions precedent, the Debtor has the necessary new capital committed to fund its Plan, and thus allows the Debtor to move forward with the Plan confirmation process.  By the same token, the Backstop Commitment Agreement provides the Debtor with a fulsome fiduciary-out so that it may continue to pursue alternative transactions, including a sale, to ensure maximization of estate value.  Indeed, the PSA requires the Debtor to test the market by running an asset sale process—a process initiated by the Debtor in mid-October.  Lastly, the fees to be paid to the Backstop Parties are reasonable and market-based and are only payable in the event Exide consummates the transactions contemplated under the PSA

and Backstop Commitment Agreement or otherwise emerges from chapter 11 or consummates an alternative value-maximizing transaction.[3]

From the estate's perspective, the benefits provided by the Debtor's entry into the Backstop Commitment Agreement — including the stability it provides to the Debtor's operations during this longer than anticipated chapter 11 case by providing the Debtor with a clear exit path—greatly outweigh its relatively limited obligations, and, therefore, this Court should approve the Debtor's entry into Backstop Commitment Agreement. Similarly, the Court should also approve the Debtor's entry into the PSA that will facilitate a consensual confirmation process.[4]

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of this case and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The legal predicates for the relief requested herein are Bankruptcy Code sections 105(a) and 363(b).

3.      Pursuant to Local Bankruptcy Rule 9013-1(f), the Debtor consents to the entry of a final judgment or order with respect to this Motion if it is determined that this Court would lack Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

---

[3]    The Debtor will be required to reimburse the Backstop Parties for their professional fees; however, payment of most, if not all, of these fees is required pursuant to the adequate protection granted to the holders of Senior Notes at the outset of this case.

[4]    The Debtor has previously engaged in negotiations with the Creditors' Committee regarding treatment under the Plan, and is hopeful that approval of the PSA and Backstop Commitment Agreement will provide clarity regarding both the reorganization process and value expectations and, thereby, enable these negotiations to be successfully concluded.

**BACKGROUND**

**I.      The Chapter 11 Case**

4.      On June 10, 2013 (the "Petition Date"), the Debtor commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case").

5.      The Debtor continues to operate its business and manage its property as debtor and debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      On June 18, 2013, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Creditors' Committee") in the Chapter 11 Case pursuant to Bankruptcy Code section 1102.  No trustee has been appointed in the Chapter 11 Case.

**II.      The Debtor's Business**

7.      The Debtor, Exide, which together with its direct and indirect subsidiaries (collectively, the "Company"), has operations in more than 80 countries, is a global leader in stored electrical energy solutions and one of the world's largest producers and recyclers of lead-acid batteries.

8.      The Company's four global business groups—Transportation Americas (which includes Recycling North America), Transportation Europe and Rest of World ("ROW"), Industrial Energy Americas, and Industrial Energy Europe and ROW—provide a comprehensive range of stored electrical energy products and services for industrial and transportation applications.  Additional factual background information about the Debtor, including its business operations, its corporate and capital structures, its restructuring efforts, and the events leading to the filing of the Chapter 11 Case, is set forth in the Declaration of Phillip A. Damaska in Support of Chapter 11 Petition and First Day Pleadings [Docket No. 3].

### III.    The Backstop Commitment Agreement[5]

9.    The Backstop Commitment is integral to the consummation of the Plan. It ensures that capital required to fund the Plan is committed prior to solicitation on the Plan and the commencement of the Rights Offering. The Rights Offering provides eligible holders of Senior Secured Notes Claims (pursuant to the terms of the Backstop Commitment Agreement) (collectively, "Eligible Holders") the right to purchase their *pro rata* share of $175 million in New Second Lien Convertible Notes.

10.    The following summarizes the key terms of the Backstop Commitment Agreement:[6]

| | |
|---|---|
| Backstop Commitment | The Backstop Parties, on a several but not joint basis, will purchase (i) their pro rata portion of up to $160 million in New Second Lien Convertible Notes based on the percentage of outstanding Senior Notes Claims held by such Backstop Parties and (ii) an additional amount of any unsubscribed New Second Lien Convertible Notes. <br><br>The Backstop Commitment Parties will, severally and not jointly, backstop the Rights Offering up to but no more than $160 million regardless of whether eligible holders of Senior Notes subscribe to an aggregate $175 million of Second Lien Convertible Notes offered pursuant to the Rights Offering. <br><br>See Backstop Commitment Agreement §§ 2.1, 2.2. |
| Backstop Party Default | If a Backstop Party defaults under the Backstop Commitment Agreement, and if the Backstop Parties are otherwise unable to make arrangements for the purchase of the defaulting party's pro rata share of the New Second Lien Convertible Notes, (i) each non-defaulting Backstop Party is obligated to fund its proportional share of any defaulting Backstop Party's Backstop Commitment up to the aggregate amount of such party's Backstop Commitment and (ii) each Backstop Party that has requested Overallotment Notes is obligated to fund its proportional share of any defaulting party's Backstop Commitment with respect to any Overallotment Notes allocated to the defaulting party. <br><br>Any defaulting Backstop Party would forfeit its portion of the Backstop Commitment Fee (defined below). |

---

[5]    Capitalized terms used but not defined in this Section III shall have the meanings ascribed to them in the Backstop Commitment Agreement.

[6]    Any description or summary of the Backstop Commitment Agreement in this Motion is qualified in all respects by reference to the Backstop Commitment Agreement.  To the extent of any inconsistency between this summary and the Backstop Commitment Agreement, the Backstop Commitment Agreement shall govern. Capitalized terms used in this section, but not otherwise defined in the Motion, shall have the meanings set forth in the Backstop Commitment Agreement, unless otherwise indicated.

| | |
|---|---|
| | See Backstop Commitment Agreement § 2.3. |
| **Backstop Commitment Fee** | As consideration for the Rights Offering Commitment, the Backstop Commitment and other agreements of the Backstop Parties in the Backstop Commitment Agreement, Exide shall pay a nonrefundable fee (i) in the form of 5.0% of the New Common Stock issued and outstanding as of the Plan Effective Date (the "Backstop Equity Fee") plus (ii) a payment in an aggregate amount equal to 15.0% of the Aggregate Commitment Amounts (the "Backstop Notes Fee" and together with the Backstop Equity Fee, the "Backstop Commitment Fee.")<br><br>Exide shall satisfy its obligation to pay the Backstop Notes Fee on the Closing Date through issuance of (i) an additional principal amount of New Second Lien Convertible Notes equal to 10.0% of the Aggregate Commitment Amounts and (ii) an additional principal amount of First Lien High Yield Notes equal to 5.0% of the Aggregate Commitment Amounts (collectively, the "Fee Notes") to the Backstop Parties in lieu of any cash payment (the aggregate principal amount of New Second Lien Convertible Notes and the aggregate principal amount of First Lien High Yield Notes to be issued in satisfaction of the Backstop Notes Fee will be equal to $16,000,000 and $8,000,000, respectively).  Alternatively, at the election of a Backstop Party, Exide's obligation to deliver Fee Notes in the form of New Second Lien Convertible Notes may be satisfied by additional original issue discount for the New Second Lien Convertible Notes to be purchased by such Backstop Party; provided, however, that any election to receive original issue discount will in no event reduce the proceeds actually funded to Exide by the Backstop Parties below $160,000,000.<br><br>In the event that the Debtor consummates a Sale or Alternative Transaction, Exide shall pay a Backstop Commitment Fee in cash equal to 3.0% of the Aggregate Commitment Amounts.<br><br>Payment of Fees:  The Backstop Commitment Fee shall be fully earned upon entry of the order approving the Backstop Commitment Agreement and shall be paid either (i) on the Closing Date of the Backstop Commitment in the event the Debtor consummates the Rights Offering, or (ii) upon consummation of any Sale or Alternative Transaction occurring at any time.<br><br>See Backstop Commitment Agreement §§ 3.1, 3.2, and 9.2 |
| **Expense Reimbursement** | The Debtor has agreed to pay the (i) documented reasonable fees and expenses of certain professionals retained by the unofficial committee of senior secured noteholders (the "Unofficial Noteholders' Committee") and Backstop Parties incurred in connection with the negotiation, preparation, and implementation of the Backstop Commitment and Rights Offering, and (ii) all filing fees, if any, required by the Hart-Scott-Rodino Act or any other antitrust law (the "Expense Reimbursement").<br><br>See Backstop Commitment Agreement § 3.3. |
| **Representations & Warranties** | The Backstop Commitment Agreement contains certain customary representations and warranties of the Debtor and Backstop Parties.  Many of the Debtor's representations and warranties are qualified by "Material Adverse Effect" as that term is defined in the Backstop Commitment Agreement, and those that are not qualified by "Material Adverse Effect" are qualified such that immaterial discrepancies would not constitute a breach of the representations and warranties.<br><br>See Backstop Commitment Agreement Articles IV and V. |
| **Debtor Covenants** | The Debtor covenants to, among other things:<br><br>(a)     use reasonable best efforts to obtain entry of orders approving the Backstop Commitment Agreement, the PSA, the Disclosure Statement, and the Rights Offering Procedures, and |

| | |
|---|---|
| | to obtain entry of the order confirming the Plan, each of which shall be in a form and substance reasonably satisfactory to a majority of the Backstop Parties (the "Requisite Backstop Parties"); |
| | (b) continue to conduct its business in the ordinary course, preserve material relationships, and not enter into transactions that would materially adversely affect Exide's business after the effective date of the Plan; |
| | (c) use commercially reasonable efforts to obtain necessary regulatory approvals to consummate the transactions contemplated by the Backstop Commitment Agreement; |
| | (d) furnish the Backstop Parties with certain requested information; |
| | (e) use commercially reasonable efforts to consummate and make effective the transactions contemplated by the Backstop Commitment Agreement; |
| | (f) work in good faith to obtain documentation for the exit revolving financing facility, the First Lien High Yield Notes, and the New Second Lien Convertible Notes; |
| | (g) use commercially reasonable efforts to cause the Emergence Available Liquidity to be no less than $190 million on the Plan Effective Date; and |
| | (h) cooperate with the Requisite Backstop Parties with respect to: (i) the selection of the board of directors and officers of the reorganized Debtor; (ii) environmental and regulatory diligence and compliance; (iii) tax planning; and (iv) developing and implementing regulatory and environmental strategy for the Debtor's Vernon, California and Frisco, Texas facilities. |
| | See Backstop Commitment Agreement Article VI. |
| **Conditions Precedent** | The conditions to the obligations of the parties to the Backstop Commitment Agreement include: |
| | (a) entry of orders by the Court approving the Backstop Commitment Agreement, Disclosure Statement, and Rights Offering Procedures and confirming the Plan; |
| | (b) obtaining the Exit ABL Revolver Financing (as defined in the Backstop Commitment Agreement) and issuing the First Lien Notes to the DIP lenders; |
| | (c) compliance with the terms of the Plan and satisfaction or waiver of the conditions to effectiveness of the Plan; |
| | (d) conducting the Rights Offering; |
| | (e) the following conditions related to senior management: |
| | (i) A Chief Executive Officer reasonably satisfactory to the Requisite Backstop Parties having been identified and the terms and conditions of any employment agreement for the Chief Executive Officer in form and substance reasonably satisfactory to the Requisite Backstop Parties, with the term of employment commencing no later than the Plan Effective Date and |
| | (ii) (x) The identity and employment agreement or other compensation agreement (in form and substance) of each individual to be appointed and/or hired to serve as a member of the senior management of Exide from and after the Closing Date being reasonably satisfactory to the Requisite Backstop Parties, (y) any KEIP or LTIP provided for in the Plan being in form and substance reasonably satisfactory to the Requisite Backstop Parties and (z) any payout under such KEIP or LTIP on the Plan Effective Date being reasonably acceptable to the Requisite Backstop Parties. |
| | (f) compliance with minimum liquidity and cash requirements, such that the Emergence Available Liquidity is $190 million; |

| | |
|---|---|
| | (g)   the absence of any default under the PSA; |
| | (h)   the absence of any default under the DIP Credit Agreement, 100% of the DIP Term Loan Claims having consented to the treatment of the DIP Term Loan Claims set forth in the Plan, and substantially all obligations under the DIP Credit Agreement having been repaid in full; |
| | (i)   the completion of a due diligence review of Exide in form and substance satisfactory to the Requisite Backstop Parties on or before three (3) business days prior to the hearing before the Bankruptcy Court to consider this Motion; |
| | (j)   the Requisite Backstop Parties being reasonably satisfied that the liability of Exide, reorganized Exide, or any of its subsidiaries for fines, penalties or other damages relating to or arising from (w) the AQMD Complaint, (x) the DOJ Investigation, (y) any Vernon Legal Action, or (z) any European antitrust investigation regarding members of local trade associations in the traction/motive power batteries segment of the industry in which Exide and its subsidiaries operate, shall not result in any material postpetition or postconfirmation liability of reorganized Exide or its subsidiaries, taken as a whole and |
| | (k)   the absence of any Material Adverse Effect. |
| | <u>See</u> Backstop Commitment Agreement §§ 7.1, 7.2. |
| **Indemnification Obligations** | The Debtor agrees to indemnify and hold harmless each Backstop Party for certain losses, claims, damages, liabilities, and costs and expenses arising out of the Backstop Commitment Agreement, the Plan, and the transactions contemplated thereby (the "<u>Indemnification Obligations</u>"). The Indemnification Obligations are subject to customary carve-outs for fraud, bad faith, willful misconduct, or gross negligence on the part of the Backstop Parties.<br><br><u>See</u> Backstop Commitment Agreement § 8.1. |
| **Termination Events** | <u>Requisite Backstop Party Termination Events</u>:<br><br>(a)   the Bankruptcy Court does not enter the orders approving the Backstop Commitment Agreement, Disclosure Statement and Rights Offering Procedures, and the Confirmation Order, or the Bankruptcy Court enters such orders in form and substance that in each case is not reasonably satisfactory to the Requisite Backstop Parties, or any such order is not effective upon or after entry, or any such order is reversed or amended after entry in a manner not reasonably satisfactory to the Requisite Backstop Parties, or any such order is not effective upon or after entry(other than as a result of a stay period applicable immediately upon entry of such order pursuant to any federal or local rule of bankruptcy proceeding);<br><br>(b)   an examiner (with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code), or a trustee or receiver or other responsible officer is appointed;<br><br>(c)   the Court, or any other court with appropriate jurisdiction, enters an order materially altering the treatment of the Backstop Parties under the Plan;<br><br>(d)   the Debtor breaches any representation, warranty, or covenant that would result in a failure of certain conditions precedent being satisfied;<br><br>(e)   the PSA is terminated;<br><br>(f)   the Debtors are in default under the DIP Credit Agreement, obligations are accelerated or commitments are terminated under the DIP Credit Agreement, or the modification or amendment of the Final DIP Order is not satisfactory to the Requisite Backstop Parties;<br><br>(g)   any of the Backstop Commitment Agreement, PSA, DIP Credit Agreement, Rights Offering Procedures, Disclosure Statement, Plan, or documents related to the Plan is |

amended in any material respect such that they are not in form and substance reasonably satisfactory to the Requisite Backstop Parties;

(h)    the occurrence and continuing existence of a Material Adverse Effect after a reasonable opportunity for Exide to cure such Material Adverse Effect;

(i)    certain conditions or events concerning the Debtor's Vernon, California and Frisco, Texas facilities occur; or

(j)    if any law or order has been enacted, adopted, or issued by any governmental entity that prohibits the implementation of the Plan or Rights Offering or the transactions contemplated by the Backstop Commitment Agreement or other Plan transaction documents.

Individual Backstop Party Termination Events:

(a)    Exide seeks approval of a Sale that is not satisfactory to each Backstop Party;

(b)    Exide supports a Sale not satisfactory to a Backstop Party or an Alternative Transaction;

(c)    upon Exide or any of its senior management being informed that it will be, or has been, indicted in connection with the DOJ Investigation or any other investigation by any Governmental Entity, or if the DOJ Investigation is not resolved, or is not resolved in a manner that is in form and substance satisfactory to each Backstop Party;

(d)    in the event of a default by a Backstop Party, the non-defaulting Backstop Parties fail to fund the defaulting party's allotment of New Second Lien Convertible Notes and Exide fails to cover the deficiency within the timeframes set forth in the Backstop Commitment Agreement; or

(e)    a Backstop Party terminates its obligations under the PSA pursuant to section 8.05(a) of the PSA;.

Debtor Termination Events:

(a)    subject to the non-defaulting Backstop Parties' rights under the Backstop Commitment Agreement in the event of a Backstop Party default, any Backstop Party breaches its representations, warranties or covenants, or other agreements and such breach would result in the failure of certain conditions precedent being satisfied, or such breach is not otherwise cured within seven days' notice or three days prior to the Backstop Outside Date;

(b)    Exide terminates the PSA in accordance with its fiduciary-out; or

(c)    if any law or order has been enacted, adopted, or issued by any governmental entity that prohibits the implementation of the Plan or Rights Offering or the transactions contemplated by the Backstop Commitment Agreement or other Plan transaction documents.

Mutual Termination: The Backstop Commitment Agreement may be terminated at any time by mutual written consent of the parties.

See Backstop Commitment Agreement § 9.1.

| | |
|---|---|
| **Backstop Outside Date** | Exide or any Backstop Party can terminate the agreement if the closing of the Backstop Commitment has not occurred by 11:59 p.m. New York City time on March 31, 2015 (the "Backstop Outside Date"), subject to certain extensions.<br><br>See Backstop Commitment Agreement |

11.    The Backstop Commitment was the product of arm's length negotiations between Exide and the Backstop Parties.  The Backstop Commitment Agreement is critical to the restructuring transactions contemplated by the PSA and the Plan.  The Debtor has determined that, in the exercise of its business judgment, the Backstop Commitment is vital to the Debtor's ability to preserve the value of its business by permitting it to progress the plan confirmation process and lead to Exide's emergence from chapter 11.  Accordingly, entry into the Backstop Commitment Agreement is necessary and appropriate.

## IV.    The PSA[7]

12.    The PSA  complements the capital commitment to which the Backstop Parties have agreed in the Backstop Commitment Agreement by memorializing the commitment of the Consenting Creditors—who represent a majority of the principal amount of the Senior Notes—to support the Plan and thereby facilitate the Debtor's path to confirmation of the Plan. The PSA is the result of arm's  length negotiations between the Debtor and the Consenting Creditors.  Pursuant to the PSA, the Consenting Creditors have committed to support the Plan and to backstop certain transactions contemplated by the PSA and Plan Term Sheet.

13.    The following is a summary of the key terms of the PSA:[8]

| Commitments Regarding Restructuring Transactions | Consenting Creditors: Among other things, each Consenting Creditor agrees to support the Plan, including by timely voting to accept the Plan and by not taking any action to interfere with acceptance, implementation or consummation of the Plan.  Consenting Creditors also have agreed to not exercise remedies, or to the extent applicable, not direct the Indenture Trustee or DIP Agent to exercise remedies, to enforce claims against Exide C.V.

Additionally holders of DIP Claims have agreed to convert at least a certain portion of their claims into New Second Lien Convertible Notes and to backstop the exchange of DIP Claims into New Second Lien Convertible Notes to ensure that $100 million of DIP Claims convert into |
|---|---|

---

[7]    Capitalized terms used but not defined in this Section IV shall have the meanings ascribed to them in the PSA.

[8]    The summary of the PSA is qualified in its entirety by reference to the provisions of the PSA, the term sheet attached to the PSA (the "Plan Term Sheet"), and Plan, as applicable.  To the extent of any inconsistency between this summary and the PSA, the PSA shall govern.  Capitalized terms used in this section, but not otherwise defined in the Motion, shall have the meanings set forth in the PSA, unless otherwise indicated.

|  | New Second Lien Convertible Notes.  See PSA, § 4.01.<br><br>Debtor: The Debtor has committed to, among other things: (a) use commercially reasonable efforts to obtain orders approving the PSA, the Backstop Commitment Agreement, the Rights Offering procedures (the "Rights Offering Procedures"), and the Disclosure Statement, and an order confirming the Plan (the "Confirmation Order"); (b) take the necessary actions to consummate the restructuring transactions contemplated in the PSA and the  Plan Term Sheet (the "Restructuring Transactions"); (c) effectuate the Restructuring Transactions within the timeframe provided in the PSA; and (d) not take any action materially inconsistent with or likely to interfere with acceptance or implementation of the Restructuring Transactions.  See PSA § 4.02(a). |
|---|---|
| **Fees Related to Restructuring Transactions** | Those Consenting Creditors that have agreed to backstop the conversion of DIP Claims into New Second Lien Convertible Notes will be entitled to receive, as a backstop fee, their proportionate share of up to 2% of the new common stock.<br><br>See PSA § 4.01. |
| **Non-Transferability of Claims** | Subject to certain exceptions, upon entry into the PSA, the Consenting Creditors are not authorized to sell, use, pledge, assign, transfer, permit the participation in, or otherwise dispose of any ownership (including beneficial ownership) in their claims, unless transferring such claims to an entity that otherwise agrees to be bound by the terms of the PSA.<br><br>See PSA §4.03. |
| **Dual-Track Sale Process Commitment** | The Debtor has committed to diligently pursue a sale of substantially all or a portion of its assets (a "Sale") while pursuing a plan of reorganization.<br><br>See PSA § 4.02(c). |
| **Termination Events** | Required Consenting Creditors Termination Events:<br>(a)    the failure to achieve the Milestones set forth below;<br>(b)    the occurrence and continuation of an "Event of Default" under the DIP Credit Agreement;<br>(c)    amendment or modification of the Plan or Disclosure Statement in any manner materially adverse to Consenting Creditors or not reasonably satisfactory to the Required Consenting Creditors;<br>(d)    the termination of the Backstop Commitment Agreement pursuant to its terms or the conditions precedent set forth in the Backstop Commitment Agreement becoming incapable of being satisfied or have not otherwise been waived;<br>(e)    any of the orders approving the PSA, Backstop Commitment Agreement, Disclosure Statement, Rights Offering Procedures, or the Confirmation Order are not entered, are not entered in a form reasonably satisfactory to the Required Consenting Creditors, or do not or cease to become effective;<br>(f)    any of the orders approving the PSA, Backstop Commitment Agreement, Disclosure Statement, Rights Offering procedures, the Confirmation Order, or the final order approving DIP financing is reversed, stayed, dismissed, vacated, reconsidered or materially modified or amended after entry in a manner not reasonably satisfactory to the Required Consenting Creditors;<br>(g)    the Debtor breaches any of the representations, warranties, or covenants in the PSA that would materially and adversely affect the Restructuring Transactions and does not cure |

| | |
|---|---|
| | such breach within seven days of receiving notice; |
| (h) | an examiner (with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code), or a trustee or receiver or other responsible officer is appointed; |
| (i) | the Bankruptcy Court or any other court with appropriate jurisdiction enters an order or ruling, or any governmental authority issues an injunction, judgment, decree, charge, ruling, or order that prevents consummation of or materially and adversely affects the Restructuring Transactions or has a material adverse effect on the recovery of any Consenting Creditor as determined by the Required Consenting Creditors; <u>provided</u>, <u>however</u>, that the Debtor would have 10 days to obtain relief that would allow consummation of the Restructuring Transactions; |
| (j) | any of the documents governing the Restructuring Transactions is materially modified or withdrawn without the prior written consent of the Required Consenting Creditors, such that the document is not in form and substance reasonably satisfactory to the Required Consenting Creditors; |
| (k) | the Bankruptcy Court grants relief terminating or modifying the automatic stay with respect to any material assets of the Debtor or the collateral securing the claims of the Senior Notes Holders or the DIP Lenders, that would materially and adversely affect the Restructuring Transactions, without the prior written consent of the Required Consenting Creditors; or |
| (l) | the occurrence or existence of any event that would materially adversely affect the Restructuring Transactions or the Debtor. |

Individual Consenting Creditor Termination Events:

| | |
|---|---|
| (a) | (x) the Bankruptcy Court has not approved the Solicitation Materials and entered an order approving the Disclosure Statement and the Rights Offering Procedures, each in form and substance reasonably satisfactory to the Required Consenting Creditors, on or before March 2, 2015, or (y) the Debtor has not commenced solicitation of votes for the Plan on or before March 6, 2015 in accordance with the Solicitation Materials and the order approving the Disclosure Statement, or, following such solicitation, the Debtor commences any solicitation of votes for the Plan, unless waived by Consenting Creditors holding at least 80% in principal amount of the Senior Notes Claims and at least 80% of principal amount of the aggregate DIP Claims held by all Consenting Creditors; |
| (b) | the effective date of the Plan has not occurred by 11:59 p.m. New York City time on or before March 31, 2015; |
| (c) | the Plan or any backstop commitment agreement entered into by the Required Consenting Creditors (including the Backstop Commitment Agreement) alters the treatment of Senior Notes Claims or DIP Claims set forth in the Plan Term Sheet in a manner materially adverse to Consenting Creditors; |
| (d) | upon the agreement of the Required Consenting Creditors to support, in writing, an amendment, modification or supplement to the PSA or Plan Term Sheet that adversely affects the economic terms of or participation rights under the PSA, Plan Term Sheet or the documents governing the Restructuring Transactions; |
| (e) | the Debtor pursues a Sale that is not satisfactory to a Consenting Creditor or fails to pursue a Sale that is satisfactory to a Consenting Creditor; |
| (f) | the Debtor pursues an Alternative Transaction or files or supports a Sale that is not acceptable to a Consenting Creditor, or files a motion seeking authority to sell material assets without prior written consent of each Consenting Creditor; or |
| (g) | upon the execution of a purchase agreement for the purchase of some or all of the assets pursuant to credit bid that has the consent of certain DIP lenders regardless of the |

|  | Consenting Creditor's consent thereto. |
|---|---|
|  | <u>Debtor Termination Events</u> |
|  | (a)    the effective date of the Plan has not occurred by the Plan Outside Date; |
|  | (b)    the breach by any of the Consenting Creditors of any material provision set forth in the agreement that remains uncured for seven days; |
|  | (c)    the issuance by any governmental entity of any final, non-appealable ruling or order enjoining the consummation of a material portion of the Restructuring Transactions; or |
|  | (d)    if the Debtor reasonably determines, after consultation with counsel, that the failure to terminate the PSA would be inconsistent with its fiduciary duties under applicable law. |
|  | <u>Mutual Termination</u>: The PSA may be terminated at any time by the mutual written agreement of the Company and the Required Consenting Creditors, and terminates automatically upon the effective date of the Plan.<br><br><u>See</u> PSA §§ 8.01-8.05. |
| **Milestones** | The following deadlines are established by the PSA. In the event that the Debtor fails to meet such deadlines, the Required Consenting Creditors may terminate the PSA. |
|  | (a)    the Bankruptcy Court has not entered the orders approving the PSA and Backstop Commitment Agreement, consistent with the Plan Term Sheet, on or before <u>February 17, 2015</u>; |
|  | (b)    the Bankruptcy Court has not approved the solicitation materials and entered an order approving the Disclosure Statement and the Rights Offering Procedures on or before <u>February 17, 2015</u>; |
|  | (c)    the Bankruptcy Court has not entered the Confirmation Order on or before <u>March 25, 2015</u>; and |
|  | (d)    the effective date of the Plan has not occurred on or before 11:59 p.m., New York City time on or before <u>March 31, 2015</u> (the "<u>Plan Outside Date</u>").<br><br><u>See</u> PSA §8.01 |

## RELIEF REQUESTED

14.    By this Motion, the Debtor respectfully requests that the Court enter the Order authorizing the Debtor to: (i) enter into the PSA, and (ii) (a) enter into the Backstop Commitment Agreement, (b) pay certain fees and expenses in connection therewith, and (c) incur certain indemnification obligations in connection therewith.

## BASIS FOR RELIEF

### A.    Entry into the PSA and Backstop Commitment Agreement is an Exercise of the Debtor's Sound Business Judgment

15.    Section 363(b) of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of

14

business, property of the estate." 11 U.S.C. § 363(b)(1). In the Third Circuit, courts have

authorized the use or sale of property of the estate outside the ordinary course of business when

such use or sale is grounded upon a "sound business purpose" and is proposed in good faith. See

In re Del. & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); Myers v. Martin (In re Martin),

91 F.3d 389, 395 (3d Cir. 1996); Dai-Ichi Kango Bank, Ltd. v. Montgomery Ward Holding Corp.

(In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Decora Indus.,

Inc., No. 00-4459, 2002 WL 32332749, at * 7 (D. Del. May 20, 2002); In re Exaeris, Inc., 380

B.R. 741 (Bankr. D. Del. 2008).

        16.    Once a debtor articulates a valid business justification under section 363

of the Bankruptcy Code, a presumption arises that the debtor's decision was made on an

informed basis, in good faith, and in the honest belief the action was in the best interest of the

company. See Official Comm. of Subordinated Bondholdrs v. Integrated Res., Inc. (In re

Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488

A.2d 858, 872 (Del. 1985)); see also Bridgeport Holdings, Inc. Liquidating Trust v. Boyer (In re

Bridgeport Holdings, Inc.), 388 B.R. 548, 567 (Bankr. D. Del. 2008). Further, once "the debtor

articulates a reasonable basis for its business decisions (as distinct from a decision made

arbitrarily or capriciously), courts will generally not entertain objections to the debtor's

conduct." Comm. Of Asbestos-Related Litigants v. Johns-Manville Corp., (In re Johns-Manville

Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). The business judgment rule has vitality in

chapter 11 cases and shields a debtor's management from judicial second-guessing. See

Integrated Res., 147 B.R. at 656; Johns-Manville, 60 B.R. at 615-16 ("[T]he Code favors the

continued operation of a business by a debtor and a presumption of reasonableness attaches to a

debtor's management decisions."). Thus, if a debtor's actions satisfy the business judgment rule,

15

then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

17.    Under similar circumstances, other courts have authorized entry into plan support agreements and backstop agreements as a valid exercise of a debtor's business judgment. See, e.g., In re Ablest Inc., Case No. 14-10717 (Bankr. D. Del. Apr. 21, 2014) (approving backstop commitment agreement); In re Overseas Shipping Group, Inc., Case No. 12-20000 (Bankr. D. Del. April 7, 2014) (approving plan support agreement); In re AbitibiBowater Inc., Case No. 09-11296 (Bankr. D. Del. Aug. 2, 2010) (approving backstop commitment agreement); In re Visteon Corp., Case No. 09-11786 (Bankr. D. Del. June 17, 2010) (approving plan support agreement and equity commitment agreement); In re NextMedia Group, Inc., Case No. 09-14463, (Bankr. D. Del. Jan. 22, 2010) (authorizing assumption of plan support agreement); In re Spansion, Inc., Case No. 09-10690 (Bankr. D. Del. Jan. 19, 2010) (approving backstop commitment agreement); In re Dayton Superior Corp., Case No. 09-11351 (Bankr. D. Del. Aug. 24, 2009) (approving backstop commitment agreement); In re Dura Automotive Systems, Inc., Case No. 06-11202 (Bankr. D. Del. Oct. 4, 2007) (approving backstop commitment agreement).

18.    The Debtor submits that the relief requested herein is necessary to secure the monetary commitment of the Backstop Parties to provide funding needed for the Plan and ultimately to allow the Debtor to successfully emerge from the Chapter 11 Case.  Here, the Debtor engaged in arms' length negotiations with its Unofficial Noteholders' Committee and its advisors to arrive at the terms of the Plan, as well as the PSA and the Backstop Commitment

Agreement.  The Debtor believes that the terms of the PSA and the Backstop Commitment Agreement are fair and that the agreements are necessary to confirm and consummate the Plan.[9]

19.     The PSA will permit the Debtor to proceed to confirmation of the Plan with the support of the Consenting Creditors.  The Debtor believes the Plan represents the best path forward as it will allow the Debtor to emerge from chapter 11 operating across all of its worldwide business segments.  Additionally, the PSA facilitates the Plan's confirmation by ensuring the support of the Plan by a substantial bloc of senior secured creditors whose class has the right under the Bankruptcy Code to consent to the equitization of their claims.

20.     Moreover, the Backstop Commitment and the Rights Offering it supports helps assure adequate liquidity and financial support for the Debtor's emergence and post-emergence operations.

**B.     The Fees and other Material Provisions Provided Under the Backstop Commitment Agreement are Reasonable and Appropriate**

21.     The Debtor submits that the fees and expenses payable under the Backstop Commitment Agreement, including the Backstop Commitment Fees, Expense Reimbursement, and Indemnification Obligations, are customary and reasonable under the circumstances of this case.  The fees compensate the Backstop Parties for committing funds necessary for the Debtor's emergence from chapter 11 and for tying up the Backstop Parties' substantial financial resources during this time.

22.     Specifically, pursuant to the Backstop Commitment Agreement, the Debtor will pay the Backstop Parties a nonrefundable fee (i) in the form of 5.0% of the New

---

[9]     As contemplated by the PSA, the Debtor has also been diligently pursuant a sale of some or all of  its business units as an alternative to the Plan.  Importantly, the Debtor may terminate its obligations under the PSA and the Backstop Commitment Agreement if required by its fiduciary duties to pursue an Alternative Transaction (defined below).  In such instance, the Debtor would pay the Backstop Parties a customary, market-based fee upon consummation of the Alternative Transaction.

Common Stock issued and outstanding as of the Plan Effective Date (the "Backstop Equity Fee")
plus (ii) a payment in an aggregate amount equal to 15.0% of the Aggregate Commitment
Amounts (the "Backstop Notes Fee" and together with the Backstop Equity Fee, the "Backstop
Commitment Fee.").  Notably, if the Rights Offering is consummated, the Debtor can satisfy the
Backstop Notes Fee by issuing plan currency, more specifically, by issuing (i) an additional
principal amount of New Second Lien Convertible Notes equal to 10.0% of the Aggregate
Commitment Amounts and (ii) an additional principal amount of First Lien High Yield Notes
equal to 5.0% of the Aggregate Commitment Amounts to the Backstop Parties in lieu of any cash
payment (the aggregate principal amount of New Second Lien Convertible Notes and the
aggregate principal amount of First Lien High Yield Notes to be issued in satisfaction of the
Backstop Notes Fee will be equal to $16,000,000 and $8,000,000, respectively).

23.    In the event that the Debtor consummates a Sale or Alternative
Transaction, the Backstop Commitment Fee is reduced to a cash payment equal to 3.0% of the
Commitment Amount, which is well within the range of fees typically paid in similar
circumstances. See, e.g., In re Foamex Int'l Inc., Case No. 09-10560 (KJC) (Bankr. D. Del. 2009)
(approving a 5% break-up fee); In re Key Plastics, Inc., Case No. 08-13324 (MFW) (Bankr. D.
Del. December 17, 2008) (approving an alternate transaction fee of 7.5% of the rights offering
amount); In re Dura Automotive Systems, Inc., Case No. 06-11202 (KJC) (Bankr. D. Del.
August 17, 2007) (approving an alternative transaction fee of 3% of the rights offering amount);
In re K-V Discovery Solutions Inc., Case No. 12-13346 (Bankr. S.D.N.Y. June 7, 2013)
(authorizing a 4.5% breakup fee); In re General Maritime Corporation, Case No. 11-15285 (MG)
(Bankr. S.D.N.Y. Dec. 15, 2011) (approving a 7% breakup fee); In re Tronox Inc., Case No. 09-
10156 (Bankr. S.D.N.Y. Sep. 17, 2010) (approving 6% breakup fee in connection with $185

million rights offering); see also In re Spansion Inc., No. 09-10690 (Bankr. D. Del. Jan. 7, 2010) (approving a cash termination fee in connection with a backstop commitment).

24.     Moreover, the reduced fee payable upon consummation of a Sale or Alternative Transaction means that these fees will not be preclusive of a superior alternative transaction and do not unduly burden the exercise of fiduciary duties  by the Debtor's board of directors.  Accordingly, the reduced alternative transaction fee and fiduciary-out permit the Debtor to continue to explore and evaluate strategic alternatives, thereby ensuring that the Debtor will be able to avail itself of the best alternative available to maximize value for its relevant constituencies.

25.     Meanwhile, the fee is not otherwise payable unless and until the Plan is consummated, in which case, the Backstop Commitment Fee would not be paid in cash, but would take the form of debt and equity instruments issued by the reorganized Debtor. Specifically, upon consummation of the Plan, the Reorganized Debtor may satisfy the Backstop Commitment Fee by issuance to the Backstop Parties of (a) First Lien High-Yield Notes with a face value of approximately 5% of the committed capital, (b) Second Lien Convertible Notes with a face value of approximately 10% of the committed capital, and (c) 5% of the new common equity.  The aggregate principal amount of First Lien High Yield Notes and New Second Lien Convertible Notes to be issued in satisfaction of the Backstop Notes Fee will be $8 million and $16 million respectively. As a result, in this situation, the Debtor does not anticipate paying any cash fees to the Backstop Parties from property of the estate.

26.     The Backstop Commitment Fee was a necessary and integral part of the negotiated arrangement reached regarding the Backstop Commitment Agreement.  The Backstop Parties require the Backstop Commitment Fees to facilitate the transactions contemplated.

Further, the Backstop Commitment Fees, taken together, which will be satisfied in the form of plan consideration, are comparable to fees paid for capital contributions in similar transactions. See, e.g., In re Vertis Holdings Inc., Case No. 10-16170 (Bankr. S.D.N.Y. Dec. 1, 2010) (authorizing a commitment fee of 10% of the equity in the reorganized debtors upon plan consummation); In re Tronox, Inc., No. 10-16170 (Bankr. S.D.N.Y. Sep. 17, 2010) (authorizing payment of commitment fee in equity or cash equal to (a) 6% of the equity commitment and (b) 4.7% of shares outstanding upon plan consummation); In re TCI 2 Holdings, LLC, Case No. 09-13654(JHW) (Bankr. D. N.J. May 7, 2010) (approving commitment fee of 20%, to be paid in stock, on a commitment of $225 million); In re Accuride Corp., Case No. 09-13449 (BLS) (Bankr. D. Del. Dec. 18, 2009) (approving a commitment fee of 11.3%, to be paid in stock, on a commitment of $140 million); In re MagnaChip Semiconductor Finance Co., Case No. 09-12008 (PJW) (Bankr. D. Del. Sept. 25, 2009) (approving a commitment fee of 10%, to be paid in stock, on a commitment of $35 million); In re Wellman, Inc., Case No. 08-10595 (SMB) (Bankr. S.D.N.Y. Jan. 14, 2009) (approving a commitment fee of 14.3%, to be paid in convertible notes, on a commitment of $105 million); see also, In re Visteon Corp., Case No. 09-11786 (Bankr. D. Del. June 17, 2010) (approving backstop fee, 25% of which was payable upon entry of the order).

27.    Payment of the Expense Reimbursement under the Backstop Commitment Agreement is designed to compensate the Backstop Parties for their efforts to date and their expected efforts through the Plan's consummation related to conducting diligence, documenting the Backstop Commitment, and undertaking other actions in support of the Plan and the Rights Offering.  The Expense Reimbursement is reasonable in light of the benefits received from an expeditious confirmation and consummation of the Plan.  Indeed, most, if not all, of the professional fees incurred in connection with the Backstop Commitment Agreement are already

covered by the Debtor's obligation to pay professional fees of the Unofficial Noteholders' Committee as part of the adequate protection obligations under the final order approving the Debtor's DIP financing facility.  Moreover, the Debtor believes that the Expense Reimbursement is also reasonable when compared to those contained in other similar backstop commitment agreements approved by courts in this and other districts.  See, e.g., Visteon (approving expense reimbursement estimated to be $10.4 million); In re Cooper-Standard, Case No. 09-12743 (Bankr. D. Del. Jan. 5, 2010) (approving expense reimbursement); Landsource (same); In re Bally Total Fitness of Greater NY Inc., No. 07-12395 (Bankr. S.D.N.Y. Aug. 21, 2007) (approving expense reimbursement capped at $5.0 million subject to certain conditions in a $90 million rights offering); In re Delphi Corp., Case No. 05-44481 (Bankr. S.D.N.Y. Jan. 12, 2007) (approving expense reimbursement capped at $5.0 million subject to certain conditions).

28.     Similarly, the Debtor's agreement to the Indemnification Obligations is reasonable and appropriate as such Indemnification Obligations were necessary to induce the Backstop Parties to enter into the Backstop Commitment Agreement.  As the Backstop Parties are providing commitments necessary for consummation of the Plan, it is appropriate that the Backstop Parties be protected from claims and litigation arising in connection therewith. Furthermore, the Indemnification Obligations are subject to customary carve-outs for losses arising from an indemnified party's fraud, willful misconduct, or gross negligence, in addition to losses caused by a Backstop Party's default.

29.     Moreover, the Debtor submits that the fees and expenses payable under the Backstop Commitment Agreement, including the Backstop Commitment Fees, Expense Reimbursement, and Indemnification Obligations, constitute "actual, necessary costs and expenses of preserving the estate."  11 U.S.C. § 503(b)(1)(A).  Without the ability to pay these

fees and expenses, the Debtor would be unable to secure the Backstop Parties' commitments to

ensure that the Rights Offering is backstopped up to $160 million.  And without the Backstop

Commitment, the Debtor's ability to confirm and consummate the Plan would be jeopardized,

thereby impairing the value of its estate.  Accordingly, the fees and expenses payable under the

Backstop Commitment Agreement should be awarded administrative expense status pursuant to

section 503(b)(1).

**C.      The PSA Complies with Section 1125 of the Bankruptcy Code**

30.      The Debtor submits that the PSA complies with the requirements of

section 1125 of the Bankruptcy Code.  Section 1125(b) provides that "[a]n acceptance or

rejection of a plan may not be solicited after the commencement of the case under this title . . .

unless, at the time of or before such solicitation, there is transmitted . . . a written disclosure

statement approved, after notice and a hearing, by the court as containing adequate information."

11 U.S.C. § 1125(b).

31.      Courts considering both prepetition and postpetition plan support

agreements have held that such agreements are not "solicitations" if they permit a party to the

agreement to later vote to reject a plan if there are any material deviations from the

representations made at the time of signing the plan support agreement.  See, e.g., In re

Indianapolis Downs, LLC, 486 B.R. 286, 296 (Bankr. D. Del. 2013) (approving a postpetition

plan support agreement over objections that it was an improper solicitation, but noting that if

"the Debtors' proposed Plan differed materially from what was contemplated by the

Restructuring Support Parties, obviously they would not be obliged to vote for it"); In re Internet

Corp., No. 08-11859 (Bankr. D. Del. June 4, 2009); In re Owens Corning, No. 00-03837 (Bankr.

D. Del. June 29, 2006).

32.     Bankruptcy courts generally have rejected a broad reading of "solicitation." See, e.g., Century Glove Inc. v. First American Bank of New York, 860 F.2d 94, 101 (3d Cir. 1988) ("'solicitation' must be read narrowly"); see also Indianapolis Downs, 486 B.R. at 295 (Bankr. D. Del. 2013) ("a narrow construction of 'solicitation' affords [negotiating] parties the opportunity to memorialize their agreements in a way that allows a Chapter 11 case to move forward."). In accordance with this narrow interpretation of "solicitation," Delaware bankruptcy courts regularly have authorized debtors to enter into plan support agreements. See, e.g., In re Overseas Shipholding Group, Case No. 12-20000 (Bankr. D. Del. Apr. 7, 2014); In re Nebraska Book Co., Inc., No. 11-12005 (Bankr. D. Del. Mar. 23, 2012); In re Point Blank Solutions, Inc., No. 10-11255 (Bankr. D. Del. Dec. 10, 2010); In re NextMedia Group, Inc., Case No. 09-14463, (Bankr. D. Del. Jan. 22, 2010); In re Federal-Mogul Global, Inc., Case No. 01-10578 (Bankr. D. Del. Feb. 7, 2007);  In re Owens Corning, Case No. 00-3837 (Bankr. D. Del. June 23, 2006).

33.     Indeed, most recently, in Indianapolis Downs, the Delaware bankruptcy court has upheld the use of postpetition restructuring agreements, noting that when a deal is negotiated in good faith between a debtor and sophisticated parties and is memorialized in a written commitment and promptly disclosed, and if the commitment to vote is limited to a plan conforming to the agreement, after court approval of  an appropriate and conforming disclosure statement, the parties should be entitled to "demand and rely upon assurances that accepting votes would be cast by the parties thereto."  486 B.R. at 296-7.

34.     Here, the PSA was negotiated by sophisticated parties at arm's length. Moreover, under the terms of the PSA, the support of the Consenting Creditors is conditioned upon the disclosure statement being Court approved and in form and substance reasonably

satisfactory to the Required Consenting Creditors.  See PSA, § 3(d).  The votes of the

Consenting Creditors, therefore, will not be secured unless and until a Court approved disclosure

statement is transmitted to the parties, in compliance with section 1125 of the Bankruptcy Code.

Additionally, the Consenting Creditors may terminate the agreement upon the occurrence or

existence of any event that would materially and adversely affect the Restructuring Transactions

or the Debtor.

35.     Thus, the requirement that the Plan and disclosure statement are

reasonably satisfactory to the Consenting Creditors, along with other termination rights described

herein, ensure sufficient flexibility such that entry into the PSA does not constitute the

solicitation of any creditor's vote.   Indeed, the parties have agreed that the automatic stay set

forth in section 362 of the Bankruptcy Code, to the extent applicable, shall not prohibit a

Consenting Creditor from taking any action necessary to effectuate the termination of the PSA

pursuant to its terms.[10]  As a result, the PSA complies with the requirements of section 1125 of

the Bankruptcy Code and relevant precedent in this district.

## WAIVER OF ANY APPLICABLE STAY

36.     The Debtor also requests that the Court waive the stay imposed by

Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of

property other than cash collateral is stayed until the expiration of 14 days after entry of the order,

unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  As described above, the relief that

---

[10]   The Debtor submits that stay modification provisions such as these are ordinary and usual features of plan
support agreements and, in the Debtor's business judgment, are reasonable under the present circumstances.
See, e.g., Overseas Shipping Group, Inc., Case No. 12-20000 (Bankr. D. Del. April 7, 2014) (order providing
for modification of stay); In re NextMedia Group, Inc., Case No. 09-14463, (Bankr. D. Del. Jan. 22, 2010)
(approving plan support agreement that contains provides for modification of stay); Visteon Corp., Case No. 09-
11786 (CSS) (Bankr. D. Del. June 17, 2010) (order providing for modification of stay); In re Chemtura Corp.,
No. 09-11233 (Bankr. S.D.N.Y. Aug. 9, 2010) (approving plan support agreement that provides for
modification of stay).

the Debtor seeks in this Motion is necessary for the Debtor to operate without interruption and to preserve value for its estate. Accordingly, the Debtor respectfully requests that the Court waive the 14-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## NOTICE

37.    Notice of this Motion will be given to: (i) the U.S. Trustee; (ii) counsel to the agent under the debtor in possession financing; (iii) counsel to the agent for the Debtor's prepetition secured lenders; (iv) the indenture trustee for each of the Debtor's secured and unsecured outstanding bond issuances; (v) counsel to the unofficial committee of senior secured noteholders; (vi) counsel to the Creditors' Committee; and (viii) all parties entitled to notice pursuant to Bankruptcy Rules 2002 and 4001. The Debtor submits that no other or further notice need be provided.

**CONCLUSION**

WHEREFORE, the Debtor respectfully requests that the Court enter the Order granting (a) the relief requested herein and (b) such other relief as is appropriate under the circumstances.

Dated:  Wilmington, Delaware
        January 7, 2015

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

/s/ Kristhy M. Peguero
Anthony W. Clark (I.D. No. 2051)
Kristhy M. Peguero (I.D. No. 4903)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: (302) 651-3000
Fax: (302) 651-3001

- and -

Kenneth S. Ziman
J. Eric Ivester
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Fax: (212) 735-2000

- and -

James J. Mazza, Jr.
155 N. Wacker Dr.
Chicago, Illinois 60606
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Counsel for Debtor and Debtor in Possession*