**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| EXIDE TECHNOLOGIES, | : | Case No. 13-11482 (KJC) |
| Debtor.[1] | : | |
| | : | **Related Docket Nos. 3092, 3095, 3096** |

**NOTICE OF (A) APPROVAL OF ADEQUACY OF THE DISCLOSURE STATEMENT, (B) SOLICITATION AND NOTICE PROCEDURES, (C) THE OBJECTION AND VOTING DEADLINES, AND (D) THE HEARING TO CONFIRM THE PLAN OF REORGANIZATION OF EXIDE TECHNOLOGIES**

TO ALL HOLDERS OF CLAIMS AND INTERESTS AND PARTIES IN INTEREST:

1. **Approval of the Disclosure Statement and the Solicitation Procedures.** On February 4, 2015, the United States Bankruptcy Court for the District of Delaware (the "**Court**") entered the *Order (A) Approving the Adequacy of the Debtor's Disclosure Statement with Respect to the Plan of Reorganization of Exide Technologies; (B) Approving Solicitation and Notice Procedures with Respect to Confirmation of the Debtor's Proposed Plan of Reorganization; (C) Approving the Form of Various Ballots and Notices in Connection Therewith; and (D) Scheduling Certain Dates with Respect Thereto* [Docket No. 3092] (the "**Disclosure Statement Order**") that, among other things, (a) approved the adequacy of the *Second Amended Disclosure Statement With Respect to the Second Amended Plan of Reorganization of Exide Technologies* [Docket No. 3095] (as may be further amended from time to time and including all exhibits and supplements thereto, the "**Disclosure Statement**") filed in support of the *Second Amended Plan of Reorganization of Exide Technologies* [Docket No. 3096] (as may be further amended from time to time and including all exhibits and supplements thereto, the "**Plan**") and (b) authorized the above-captioned debtor and debtor in possession (the "**Debtor**") to solicit acceptances or rejections of the Plan from Holders of Impaired Claims who are (or may be) entitled to receive distributions under the Plan.[2]

2. **Voting Record Dates.** The record date for purposes of determining which Holders of Claims in Classes B, D, E and F are entitled to vote on the Plan is February 4, 2015

[1] The last four digits of the Debtor's taxpayer identification number are 2730. The Debtor's corporate headquarters is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan, the Disclosure Statement, or the Disclosure Statement Order, as applicable.

(the "**Voting Record Date**"). The record date for purposes of determining which Holders of Claims in Class A1 and Class A2 are entitled to vote on the Plan is March 11, 2015 (the "<u>Senior Notes</u> **Voting Record Date")**.

3. **Voting Deadline.** The voting deadline for the Plan is **<u>March 11, 2015 at 4:00 p.m. prevailing Eastern Time</u>** (the "**Voting Deadline**"). To be counted as votes to accept or reject the Plan, all Ballots (with the exception of the Class A1 and A2 Master Ballots) must be properly completed, executed, and delivered by: (a) first class mail; (b) courier; or (c) personal delivery so that they are <u>actually received,</u> in any case, no later than the Voting Deadline by the Debtor's notice, claims, and solicitation agent, GCG, Inc. (the "**Administrative Agent**" or "GCG"). Class A1 and A2 Master Ballots must be properly executed, completed, and delivered by (a) first class mail; (b) courier; or (c) personal delivery so that they are <u>actually received,</u> in any case, no later than **<u>March 16, 2015, at 4:00 p.m. prevailing Eastern Time</u>** (the "<u>Senior Notes Master Ballot Deadline</u>") by the Administrative Agent. Any failure to follow the ballot instructions included with the Ballot may disqualify your Ballot and your vote.

4. **Objections to the Plan.** The Court has established **<u>March 11, 2015 at 4:00 p.m. prevailing Eastern Time,</u>** as the deadline for filing and serving objections to the Confirmation of the Plan (the "**Plan Objection Deadline**"). Any objection to the Plan <u>must:</u> (a) be in writing; (b) conform to the applicable Federal Rules of Bankruptcy Procedure and Local Rules for the United States Bankruptcy Court for the District of Delaware; (c) state the name and address of the objecting party and the amount and nature of the Claim or Interest of such Entity; and (d) state with particularity the basis and nature of any objection and, if practicable, a proposed modification to the Plan that would resolve such objection. **<u>Responses or objections, if any, also must be filed with the Court and served upon each of the following parties so as to be ACTUALLY RECEIVED no later than the Plan Objection Deadline</u>**: (i) Exide Technologies, 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004 (Attn: Phillip A. Damaska), the Debtor; (ii) Skadden, Arps, Slate, Meagher & Flom LLP, One Rodney Square, P.O. Box 636, Wilmington, Delaware 19899-0636 (Attn: Anthony W. Clark, Esq.) <u>and</u> Four Times Square, New York, New York 10036 (Attn: Kenneth S. Ziman, Esq. and J. Eric Ivester, Esq.) <u>and</u> 155 N. Wacker Drive, Chicago, Illinois 60606-1720 (Attn: James J. Mazza, Jr., Esq.), counsel for the Debtor; (iii) Wells Fargo Bank, N.A., 150 East 42nd Street, 40th Floor, New York, New York 10017 (Attn: James R. Lewis) <u>and</u> Foley & Lardner LLP, 321 North Clark Street, Suite 2800, Chicago, Illinois 60654 (Attn: Mark F. Hebbeln, Esq.), the Indenture Trustee for the Debtor's Secured Bond Issuances; (iv) U.S. Bank National Association, Global Corporate Trust Services, 60 Livingston Ave., EP-MN-WS1D, St. Paul, Minnesota 55107 (Attn: Cindy Woodward) <u>and</u> Arent Fox LLP, 1675 Broadway, New York, New York 10019 (Attn: Andrew Silfen, Esq.), the Indenture Trustee for the Debtor's Unsecured Bond Issuances; (v) Office of the United States Trustee for the District of Delaware, Room 2207, Lockbox 35, 844 North King Street, Wilmington, Delaware 19801 (Attn: Mark S. Kenney, Esq.), the Office of the United States Trustee; (vi) Davis, Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017 (Attn: Damian S. Schaible, Esq.) <u>and</u> Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: Mark D. Collins, Esq.), Counsel to the DIP Agent; (vii) Lowenstein Sandler LLP, 65 Livingston Avenue, Roseland, New Jersey 07068 (Attn: Kenneth A. Rosen, Esq. and Sharon L. Levine, Esq.) <u>and</u> 1251 Avenue of the Americas, New York, New York 10020 (Attn: Gerald C. Bender, Esq.) <u>and</u> Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street Suite 1600, Wilmington, Delaware 19801

(Attn: Robert J. Dehney, Esq.), Counsel to the Creditors' Committee; (viii) Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019 (Attn: Alice Belisle Eaton, Esq.) and Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801 (Attn: Pauline K. Morgan, Esq.), Counsel to the Unofficial Committee of Senior Secured Noteholders.

5. **Confirmation Hearing.** A hearing to confirm the Plan (the "**Confirmation Hearing**") will commence on **March 27, 2015 at 10:00 am prevailing Eastern Time** before the Honorable Kevin J. Carey, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware 19801. The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

6. **Paper Copies and Inquiries.** Copies of the Disclosure Statement Order, the Disclosure Statement, and the Plan may be accessed through the Debtor's restructuring information website, http://www.exiderestructuringinfo.com. The applicable Ballots shall be sent in paper form along with this Confirmation Hearing Notice. If you have questions regarding the procedures and requirements for voting on the Plan and/or for objecting to the Plan, or if you would like paper copies of the Disclosure Statement Order, the Disclosure Statement, and the Plan, you may contact the Administrative Agent by: (a) writing to Exide Technologies Balloting Center, c/o GCG, Inc., P.O. Box 9985, Dublin, OH 43017-5985 or (b) calling the Debtor's restructuring hotline at (888) 985-9831 within the U.S. or Canada or, outside of the U.S. or Canada, (614) 763-6120. If the Debtor receives such a request for a paper copy of the documents, the Debtor will send a copy to the requesting party by overnight delivery at the Debtor's expense.

7. **Allowance of Claims for Voting Purposes.** A Holder of a Claim not entitled to vote on the Plan pursuant to the procedures described in the Solicitation Procedures (the "Solicitation Procedures") attached to the Disclosure Statement Order (each such claim, a "Disputed Claim") shall be permitted to vote such claim (or to vote such claim in an amount other than the amount set forth in the Schedules) only if one of the following shall have occurred with respect to such claim at least five (5) Business Days prior to the Voting Deadline (the "Voting Resolution Event Deadline"): (a) an order is entered by the Court allowing such Disputed Claim pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing; (b) a creditor files with the Court a motion for an order pursuant to Bankruptcy Rule 3018(a) temporarily allowing such Disputed Claim in a different amount only for purposes of voting to accept or reject the Plan (a "Rule 3018(a) Motion") that is ultimately approved by the Court after notice and a hearing; (c) a stipulation or other agreement is executed between the Holder of the Disputed Claim and the Debtor resolving such objection and allowing the Holder of such Disputed Claim to vote its Claim in an agreed upon amount; (d) a stipulation or other agreement is executed between the Holder of the Disputed Claim and the Debtor temporarily allowing the Holder of such Disputed Claim to vote its Claim in an agreed upon amount; or (e) the pending objection to the Disputed Claim is voluntarily withdrawn by the Debtor or overruled by the Court (each, a "Resolution Event").

Rule 3018(a) Motions must (i) be made in writing, (ii) comply with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, (iii) set forth the name of the party asserting the Rule 3018(a) Motion, (iv) state with particularity the legal and factual bases for the Rule 3018(a) Motion, (v) be set for hearing at the Confirmation Hearing and (vi) be served so as to be received by the Notice Parties (as defined in the Solicitation Procedures) no later than the Voting Resolution Event Deadline.

No later than two (2) Business Days after a Resolution Event, the Administrative Agent shall distribute a Ballot and a pre-addressed, postage pre-paid envelope to the relevant Holder of the Disputed Claim, which must be returned to the Administrative Agent by no later than the Voting Deadline (unless the Debtor extends the deadline in its sole discretion to facilitate a reasonable opportunity for such creditor to vote upon the Plan). If the Claim is objected to on a reduce and allow and/or reclassify basis, such Entity shall receive a Ballot and be entitled to vote such Claim in the amount and/or classification asserted by the Debtor. If an objection to a Disputed Claim was filed by the Debtor after the Voting Record Date but on or before February 18, 2015 (the "Claims Objection Deadline"), the Ballot of the Holder of such Disputed Claim will not be counted absent a Resolution Event taking place prior to the Confirmation Hearing.

In the event that the Debtor and the Holder of the Disputed Claim are unable to resolve any issues raised by the Rule 3018(a) Motion prior to the Confirmation Hearing, (a) the Debtor may object to the Rule 3018(a) Motion at the Confirmation Hearing (without filing a written objection), (b) the Administrative Agent shall inform the Court at or prior to the Confirmation Hearing whether including such provisional Ballot would affect the outcome of the voting to accept or reject the Plan in the relevant class in which the provisional Ballot was cast and (c) the Court then shall determine whether the provisional Ballot should be counted as a vote on the Plan.

8. **Summary of Plan Treatment of Claims and Interests.** The Plan is based on (i) the Preliminary Terms And Conditions For Proposed Plan Of Reorganization For Exide Technologies (the "Plan Term Sheet"), attached to that certain amended and restated Plan Support Agreement,[3] dated January 7, 2015, amongst the Company and the Holders (the "Consenting Creditors") of a majority of the outstanding principal amount of the Senior Notes and (ii) that certain term sheet outlining the settlement (the "GUC Trust Settlement Agreement") between the Company, the Unofficial Noteholders Committee, and the Creditors' Committee. The Plan provides for the following key economic terms and mechanics:[4]

- Pro Forma Post-Emergence Capital Structure and Equity Ownership. Reorganized Exide's debt at emergence shall comprise: (i) an estimated $225 million Exit ABL Revolver Facility; (ii) $272.1 million of New First Lien High Yield Notes; (iii) between

[3] Capitalized terms not otherwise defined in the Plan Overview and Summary of Distributions shall have the meanings ascribed to the Plan.

[4] These summaries below are qualified in their entirety by reference to the provisions of the Plan. For a more detailed description of the terms and provisions of the Plan, see Article VI below.

$276 and $291 million of New Second Lien Convertible Notes; and (iv) no greater than $7 million of Senior Notes Alternative Distribution Deferred Payments. The Debtor's non-debtor European subsidiaries are also expected to have approximately $23 million, subject to currency fluctuations, in local European debt at the time of the Debtor's emergence from chapter 11. The New Second Lien Convertible Notes shall be convertible into 80% of the New Exide Common Stock on a fully diluted basis. In addition, New Exide Common Stock would be further allocated as follows: 10.0% to Holders of Senior Secured Note Claims after conversion of the New Second Lien Convertible Notes into New Exide Common Stock; 5.0% to the Backstop Parties; 3.0% on account of the DIP/Second Lien Conversion Funding Fee; and 2.0% on account of the DIP/Second Lien Backstop Commitment Fee. The allocation of New Exide Common Stock is subject to further dilution by paid-in-kind (PIK) interest due under the New Second Lien Convertible Notes and the MIP.

- DIP ABL Claims. The Plan provides for the cash repayment of Holders of DIP ABL Claims through the Exit ABL Revolver Facility.

- DIP/First Lien Exchange. If agreed to by each Holder of the DIP Term Loan Claims, the Plan provides that $246.8 million of DIP Term Loan Claims shall be exchanged for $259.1 million of New First Lien High Yield Notes, subject to the DIP Term Loan Refinancing Option (as described below).

- DIP/Second Lien Conversion Option. The Plan provides for the exchange of $100 million in DIP Term Loan Claims for $100 million of New Second Lien Convertible Notes plus the DIP/Second Lien Conversion Funding Fee. As described below, certain of the Consenting Creditors (the "Second Lien Conversion Backstop Parties") have agreed to backstop the $100 million exchange of DIP Term Loan Claims for New Second Lien Convertible Notes.

- Treatment of DIP Term Loan Claims for Holders other than Consenting Creditors. Holders of DIP Term Loan Claims that are not Consenting Creditors, if they agree to such treatment, shall exchange approximately 71.2% of their DIP Term Loan Claims for the New First Lien High Yield Notes and shall have the option to exchange their remaining approximately 28.8% of DIP Term Loan Claims for either (i) New First Lien High Yield Notes or (ii) New Second Lien Convertible Notes plus the DIP Second/Lien Conversion Funding Fee.[5]

- Backstop of the DIP/Second Lien Conversion. Certain Consenting Creditors, in their capacity as DIP Term Loan Lenders, have agreed to exchange approximately 28.8% of their DIP Term Loan Claims to New Second Lien Convertible Notes plus an additional percentage of DIP Term Loan Claims, as specified in the Plan Support Agreement. Upon consummation of the DIP/Second Lien Conversion, up to an aggregate amount of $100

---

5 Allocation of the New First Lien High Yield Notes and New Second Lien Convertible Notes among the Holders of DIP Term Loan Claims depends on the extent to which Non-Backstop Holders of DIP Term Loan Claims elect to receive Second Lien Convertible Notes.

million of all such Consenting Creditors' collective DIP Term Loan Claims will be exchanged into New Second Lien Convertible Notes to the extent that Non-Backstop Holders of DIP Term Loan Claims do not elect to exchange a sufficient amount of their DIP Term Loan Claims. As a result, the total amount of DIP Term Loan Claims exchanged for New Second Lien Convertible Notes will not be less than $100 million.

- DIP Term Loan Refinancing Investment Option. Holders of Senior Notes Claims that are Eligible Holders shall be entitled to invest up to an additional $346.8 million on a Pro Rata basis, the proceeds of which shall be used to purchase for cash the consideration that would otherwise be distributed to Holders of DIP Term Loan Claims. Each applicable Holder's participation in the DIP Term Loan Refinancing Investment Option shall be capped at its Pro Rata share of Senior Note Claims. By purchasing the DIP Term Loan Claims, applicable Holders of Senior Notes Claims shall have consented to and be entitled to the treatment applicable to DIP Term Loan Claims under the Plan.

- $175 Million New Money Investment. Holders of Senior Notes Claims that are Eligible Holders shall be offered the right to purchase $175 million of New Second Lien Convertible Notes (the "New Money Investment"). Pursuant to the Plan Support Agreement, on January 7, 2015, certain Consenting Creditors entered into an agreement to backstop $160 million of the New Money Investment.

- Rights Offering for New Second Lien Convertible Notes. Holders of Senior Notes Claims that are Eligible Holders shall be offered the right to participate in the New Money Investment on a Pro Rata basis provided that such Holder of Senior Notes Claims votes to accept the Plan (the "Rights Offering"). The Backstop Commitment Parties will, severally, and not jointly, backstop the Rights Offering and shall receive incremental consideration of: (a) 5.0% to be paid-in-kind with additional First Lien High Yield Notes, (b) 10.0% to be paid-in-kind with New Second Lien Convertible Notes, and (c) 5.0% of New Exide Common Stock.

- Treatment of Senior Notes Eligible Holder Claims ("Class A1 Treatment"). Holders of Senior Secured Notes Claims that are Eligible Holders shall receive, after submitting the applicable certification required by the Rights Offering Procedures and the Solicitation Procedures, (a) on account of such Holder's Senior Notes Secured Claims, their Pro Rata share of: (i) 10.0% of New Exide Common Stock after dilution by conversion of the New Second Lien Convertible Notes (subject to further dilution on account of the MIP and PIK interest accrued on the New Second Lien Convertible Notes prior to conversion); (ii) the right to participate in the Rights Offering on a Pro Rata basis; and (iii) the right to participate in the DIP Term Loan Refinancing Investment Option; and (b) on account of such Holder's Senior Notes Deficiency Claims, such Holder shall be a beneficiary of the GUC Trust and shall receive its Pro Rata share, based on the aggregate amount of Allowed Senior Notes Deficiency Claims, Allowed General Unsecured Claims, and Allowed Subordinated Notes Claims, of the net proceeds of the GUC Trust Assets, subject to the allocation and distribution formulas included in the GUC Trust Settlement Agreement.

- Treatment of Senior Notes Alternative Distribution Class Claims ("Class A2 Treatment"). Each Holder of a Senior Secured Notes Claim that is not an Eligible Holder, shall receive, after submitting the applicable certification required by the Solicitation Procedures, (a) on account of such Holder's Senior Notes Secured Claims, its Pro Rata share of: (i) the Alternative Distribution Cash and (ii) the Senior Notes Alternative Distribution Deferred Payments; and (b) on account of such Holder's Senior Notes Deficiency Claims, such Holder shall be a beneficiary of the GUC Trust and shall receive its Pro Rata share, based on the aggregate amount of Allowed Senior Notes Deficiency Claims, Allowed General Unsecured Claims, and Allowed Subordinated Notes Claims, of the net proceeds of the GUC Trust Assets, subject to the allocation and distribution formulas included in the GUC Trust Settlement Agreement. An "Eligible Holder" means a Holder of an Allowed Senior Notes Claim, including the Backstop Parties and the Consenting Creditors, that are either (i) certified as an accredited investor as defined in Rule 501(a)(1), (2), (3), or (7) under the Securities Act, which, for the avoidance of doubt, shall exclude any natural person, or (ii) a qualified institutional buyer as defined in Rule 144A of the Securities Act.

- Treatment of Holders of Senior Notes Claims. As set forth above, upon completing the required certification, Holders of Senior Notes Claims shall either receive Class A1 Treatment (defined and described above) or Class A2 Treatment (defined and described above). The Senior Notes Indenture Trustee asserts that in conjunction with the distributions under the Plan, Holders of Senior Notes Claims will be deemed to waive or release, inter alia: (1) their rights to subordinate and receive payment ahead of the Subordinated Notes Claims from any distributions from the GUC Trust Assets; (2) their superiority Adequate Protection Claims (which Senior Notes Indenture Trustee has asserted may exceed $300 million); (3) their right to receive any deficiency amounts on no less than a Pro Rata basis insofar as recoveries from different categories or recoveries under the GUC Trust Settlement Agreement; and (4) their rights to bring/assert claims against almost all categories of non-Debtors. In addition, distributions to Holders of Senior Notes Claims will be subject to Charging Liens asserted by the Senior Notes Indenture Trustee to the extent that there are any unpaid fees and expenses owed to the Senior Notes Indenture Trustee, which the Senior Notes Indenture Trustee currently estimates as upwards of $200,000.

- General Unsecured Claims. Holders of Allowed General Unsecured Claims shall receive their Pro Rata share, based on the aggregate amount of Allowed Senior Notes Deficiency Claims, Allowed General Unsecured Claim, and Allowed Subordinated Notes Claims, of the GUC Trust Assets, subject to the allocation and distribution formulas included in the GUC Trust Settlement Agreement.

- Subordinated Notes Claims. Holders of Allowed Subordinated Notes Claims shall receive their Pro Rata share, based on the aggregate amount of Allowed Senior Notes Deficiency Claims, Allowed General Unsecured Claims, and Allowed Subordinated Notes Claims, of the GUC Trust Assets, subject to the allocation and distribution formulas included in the GUC Trust Settlement Agreement. In addition, any subordination rights in favor of Holders of Senior Notes Eligible Holder Claims and/or Senior Notes Alternative Distribution Class Claims vis-à-vis the holders of Subordinated

Notes Claims shall be waived and all such rights to enforce subordination shall be settled, compromised, and released under the Plan. If for any reason subordination is enforced on or after the Effective Date, Holders of Senior Notes Eligible Holder Claims and/or Senior Notes Alternative Distribution Class Claims voting in favor of the Plan shall not enforce or benefit from turnover of any distributions to be made to Holders of Subordinated Notes Claims or shall repay to the Holders of Subordinated Notes Claims any amounts turned over so that the Holders of Subordinated Notes Claims receive the benefit of such waiver.

- Vernon Tort Claims. If Holders of Vernon Tort Claims vote to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code, provided that substantially all Holders of Vernon Tort Claims are Releasing Parties (subject to Article 4.7(b)(i)(2) of the Plan), in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class F Claim, each Holder of an Allowed Class F Claim: (1) shall receive its Pro Rata share of distributions from the Vernon Tort Claims Trust; and (2) shall be authorized to proceed with Claims against those Released Parties that are the Debtor's and the Reorganized Debtor's current and former officers, directors, or employees; provided, however, that any recovery with respect to such Claim shall be satisfied solely from the proceeds of applicable insurance, if any; and for the avoidance of doubt, no such Claims may be pursued by the Holders of Vernon Tort Claims or the Vernon Tort Claims Trust directly or indirectly from any director, officer, or employee and no recovery from personal assets shall be sought. If Holders of Vernon Tort Claims do not vote to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code, then Holders of Vernon Tort Claims shall not receive any distribution on account of such Vernon Tort Claims.

- Other Subordinated Claims and Equity Interests. Holders of Interests in Exide and Holders of Other Subordinated Claims shall receive no distribution and shall have their Claims discharged in full.

- Plan Support. The Consenting Creditors have agreed to support the Plan pursuant to the Plan Support Agreement and the Backstop Commitment Agreement. In addition, the Plan has the support of the Creditors' Committee pursuant to and in accordance with the terms of the GUC Trust Settlement Agreement. The Plan Support Agreement also requires the Debtor to market its assets and solicit bids for some or all of the Company's assets (a "Sale"). If the Debtor determines during the sale process that, after consultation with the Required Consenting Creditors and the Requisite Backstop Parties, a sale of some or all of the Company or some or all of its assets will generate more value to stakeholders than provided under the Plan, then the Company shall, after consultation with the Required Consenting Creditors and the Requisite Backstop Parties, pursue such a sale either through a plan and section 1123 of the Bankruptcy Code, or as a sale pursuant to section 363 of the Bankruptcy Code.

9. **Discharge, Release, and Injunction Language in the Plan. YOU ARE ADVISED TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THE DISCHARGE, RELEASE, AND INJUNCTION PROVISIONS SET FORTH IN ARTICLE XII OF THE PLAN, AS YOUR RIGHTS MAY BE AFFECTED. THE TEXT**

**OF THE RELEASE, INJUNCTION AND EXCULPATION PROVISIONS OF THE PLAN ARE SET FORTH BELOW.**

**(a) <u>Article 12.6 Release by Debtor.</u> Pursuant to section 1123(b) of the Bankruptcy Code, as of the Effective Date, the Debtor and its Estate, the Reorganized Debtor, and each of their respective current and former Affiliates shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtor's restructuring, the Chapter 11 Case, the DIP Facility, the purchase, sale, or rescission of the purchase or sale of any security of the Debtor or the Reorganized Debtor, including (without limitation) any tender rights provided under any applicable law, rule, or regulation, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the restructuring of Claims and Interests prior to or in the Chapter 11 Case, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, the Plan Support Agreement, the Backstop Commitment Agreement, the Plan Supplement, the Exit Financing, the GUC Trust Agreement, GUC Trust Settlement Agreement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. For the avoidance of doubt, nothing in this paragraph shall in any way affect the operation of <u>Article 12.1</u> of the Plan, pursuant to section 1141(d) of the Bankruptcy Code.**

**(b) <u>Article 12.7 Release by Holders of Claims and Interests.</u> As of the Effective Date, the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived and discharged the Debtor, the Reorganized Debtor, its Estate, non-Debtor Affiliates, and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtor's restructuring, the Chapter 11 Case, the DIP Facility, the purchase, sale, or rescission of the purchase or sale of any security of the Debtor or the Reorganized Debtor, including (without limitation) any tender rights provided under any applicable law, rule, or regulation, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the restructuring of Claims and Interests prior to or in the Chapter 11 Case, the**

**negotiation, formulation, or preparation of the Plan, the Disclosure Statement, the Plan Support Agreement, the Backstop Commitment Agreement, the Plan Supplement, the Exit Financing, the GUC Trust Agreement, the GUC Trust Settlement Agreement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

**Nothing in the Plan, Confirmation Order, or the Bankruptcy Code (and section 1141 thereof) discharges, releases, resolves, exculpates, precludes or enjoins: (i) any environmental liability to an Environmental Governmental Unit that is not a Claim; (ii) any environmental Claim of an Environmental Governmental Unit arising on or after the Effective Date; (iii) any environmental liability to any Environmental Governmental Unit on the part of any entity as the owner or operator of property after the Effective Date; or (iv) any liability to an Environmental Governmental Unit on the part of any Entity other than the Debtor or Reorganized Debtor. Nothing in the Plan divests any tribunal of any jurisdiction it may have under environmental law to interpret the Plan.**

**Nothing in the Debtor's bankruptcy proceedings, Confirmation Order, Plan, the Bankruptcy Code (and section 1141 thereof), or any other document filed in the Debtor's bankruptcy case shall in any way be construed to discharge, release, limit, or relieve any party (except the Debtor and the Estate, in which case the sole recourse available to PBGC and the Pension Plan shall be limited to the provisions of the Plan and Confirmation Order), in any capacity, from any liability or responsibility for fiduciary breach related to the Pension Plan. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility by any of the provisions of the Plan, Confirmation Order, Bankruptcy Code, or any other document filed in the Debtor's bankruptcy case. Notwithstanding the foregoing, the Debtor or Reorganized Debtor, as applicable, retains any and all rights that it has under applicable law with respect to the Pension Plan.**

**For the avoidance of doubt, except as expressly provided herein, nothing in this <u>Article 12.7</u> shall in any way affect the operation of <u>Article 12.1</u> of the Plan, pursuant to section 1141(d) of the Bankruptcy Code.**

    **(c)    <u>Article 12.9 Exculpation and Limitation of Liability.</u> Subject to <u>Article 12.10</u> of this Plan, the Exculpated Parties shall neither have, nor incur any liability to any Entity for any Exculpated Claim; <u>provided</u>, <u>however</u>, that the foregoing "exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct.**

**The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including with regard to the distributions of the New Exide Common Stock pursuant to the**

**Plan and, therefore, are not and shall not be liable at any time for the violations of any applicable, law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

**(d) Article 12.11 Injunction. Subject to Article 12.10 of this Plan, the satisfaction, release, and discharge pursuant to this Article XII shall act as an injunction against any Entity commencing or continuing any action, employment of process, or act to collect, offset, or recover any Claim, Interest, or Cause of Action satisfied, released or to be released, exculpated or to be exculpated, or discharged under this Plan or pursuant to the Confirmation Order to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof.**

10. **Deadline to Assert Setoff Rights.** Unless otherwise ordered by a Final Order, any Holder of a Claim, must assert any setoff rights against a Claim by the Debtor against such Entity by filing an appropriate motion seeking authority to setoff on or before the Confirmation Date or will be deemed to have waived and be forever barred from asserting any right to setoff against a Claim by the Debtor or the Reorganized Debtor, notwithstanding any statement to the contrary in a Proof of Claim or any other pleading or document filed with the Court or delivered to the Debtor.

11. **Executory Contracts and Unexpired Leases.** Pursuant to Article IX of the Plan, and except as provided for therein, the Debtor seeks authority to automatically reject executory contracts and unexpired leases as of the Effective Date, pursuant to Bankruptcy Code sections 365 and 1123, unless any such Executory Contract or Unexpired Lease: (a) is listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" contained in Exhibit 9.1 of the Plan; (b) has been previously assumed by the Debtor by Final Order of the Bankruptcy Court or has been assumed by the Debtor by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date; (c) is the subject of a motion to assume or reject pending as of the Effective Date; (d) is an Executory Contract related to any Intercompany Claim; or (e) is otherwise assumed pursuant to the terms of the Plan. The treatment of executory contracts and unexpired leases is more fully described in Article IX of the Plan.

12. **Preservation of Causes of Action.** In accordance with section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtor shall retain and may (but is not required to) enforce all rights to commence and pursue any and all Causes of Action that are not (a) released pursuant to Article 12.6 of the Plan or (b) GUC Trust Causes of Action, whether arising before or after the Petition Date, including any actions or categories of actions specifically enumerated in Exhibit 6.17, and such Causes of Action shall vest in the Reorganized Debtor as of the Effective Date. The Debtor or the Reorganized Debtor, in its sole and absolute discretion, shall determine whether to bring, settle, release, compromise, or enforce such Causes of Action (or decline to do any of the foregoing), and shall not be required to seek further approval of the Bankruptcy Court for such action. The Reorganized Debtor or any successors may pursue such litigation claims in accordance with the best interests of the Reorganized Debtor or any successor holding such rights of action. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against**

**them as any indication that the Debtor or the Reorganized Debtor will not pursue any and all available Causes of Action against them. The Debtor and the Reorganized Debtor expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or an order of the Bankruptcy Court, the Reorganized Debtor expressly reserves all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or consummation of the Plan; provided, however, solely with respect to Avoidance Actions, only those Avoidance Actions specifically enumerated on Exhibit 6.17 shall vest in the Reorganized Debtor and only those Avoidance Actions specifically enumerated on Exhibit 7.3 shall vest in the GUC Trust, and all other Avoidance Actions shall be waived.

**GUC Trust Causes of Action.** Pursuant to Article 7.5(b) of the Plan, the GUC Trust, in its sole and absolute discretion, shall determine whether to bring, settle, release, compromise, or enforce such GUC Trust Causes of Action (or decline to do any of the foregoing), and shall not be required to seek further approval of the Bankruptcy Court for such action. The GUC Trust or any successors may pursue such litigation claims in accordance with the best interests of the GUC Trust or any successor holding such rights of action. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any GUC Trust Cause of Action against them as any indication that the GUC Trust will not pursue any and all available GUC Trust Causes of Action against them. The GUC Trust expressly reserves all rights to prosecute any and all GUC Trust Causes of Action against any Entity, except as otherwise provided in the Plan.** Unless any GUC Trust Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or an order of the Bankruptcy Court, the GUC Trust expressly reserves all GUC Trust Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such GUC Trust Causes of Action upon, after, or as a consequence of Confirmation or consummation of the Plan.

Dated: Wilmington, Delaware
February 5, 2015

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

/s/ Dain A. De Souza

Anthony W. Clark (I.D. No. 2051)
Dain A. De Souza (I.D. No. 5737)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: (302) 651-3000
Fax: (302) 651-3001

- and -

Kenneth S. Ziman
J. Eric Ivester
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Fax: (212) 735-2000

- and -

James J. Mazza, Jr.
155 N. Wacker Dr.
Chicago, Illinois 60606
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Counsel for Debtor and Debtor in Possession*