## EXHIBIT A

**FOURTH AMENDED PLAN OF REORGANIZATION OF EXIDE TECHNOLOGIES**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x
                                                            :
In re:                                                      :    Chapter 11
                                                            :
EXIDE TECHNOLOGIES,                                         :    Case No. 13-11482 (KJC)
                                                            :
                                    Debtor.¹               :
                                                            :
                                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x
```

## FOURTH AMENDED PLAN OF REORGANIZATION OF EXIDE TECHNOLOGIES

SKADDEN, ARPS, SLATE, MEAGHER &
   FLOM LLP
Anthony W. Clark
Dain A. De Souza
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: (302) 651-3000

Kenneth S. Ziman
J. Eric Ivester
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000

James J. Mazza, Jr.
155 N. Wacker Dr.
Chicago, Illinois 60606-1720
Telephone: (312) 407-0700

*Attorneys for Debtor and Debtor-in-Possession*

Dated:          March 27, 2015

---

¹    The last four digits of Debtor's taxpayer identification number are 2730.  The Debtor's corporate headquarters
     are located at 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

# TABLE OF CONTENTS

**Page**

Article I DEFINITIONS, RULES OF  INTERPRETATION, AND COMPUTATION OF
TIME .................................................................................................................1

    A.    Scope of Definitions ..............................................................1
    B.    Definitions.............................................................................1
    C.    Rules of Interpretation .......................................................26
    D.    Computation Of Time .........................................................26
    E.    References to Monetary Figures .........................................27
    F.    Exhibits ...............................................................................27

Article II ADMINISTRATIVE EXPENSES AND PRIORITY CLAIMS...................27

    2.1    Administrative Claims ........................................................27
    2.2    DIP Facility Claims.............................................................28
        (a)    DIP ABL Claims.................................................28
        (b)    DIP Term Loan Claims.......................................28
        (c)    DIP Facility Other Claims ..................................29
    2.3    Professional Claims ............................................................30
        (a)    Final Fee Applications ........................................30
        (b)    Payment of Interim Amounts...............................30
        (c)    Holdback Escrow Account ..................................30
        (d)    Post-Confirmation Date Retention......................30
    2.4    Priority Tax Claims.............................................................30
    2.5    Payment of Certain Indenture Trustee Fees........................31

Article III CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND
INTERESTS .....................................................................................................31

    3.1    Classification of Claims and Interests.................................31

Article IV PROVISIONS FOR TREATMENT OF CLAIMS AND INTERESTS.......32

    4.1    Class A – Senior Notes Claims...........................................32
    4.2    Class B – Other Secured Claims.........................................35
    4.3    Class C – Other Priority Claims..........................................36
    4.4    Class D – General Unsecured Claims..................................37
    4.5    Class E – Subordinated Notes Claims..................................37
    4.6    Class F – Vernon Tort Claims .............................................38
    4.7    Class G – Intercompany Claims ..........................................38
    4.8    Class H – Other Subordinated Claims.................................39
    4.9    Class I – Interests in Exide.................................................39

Article V ACCEPTANCE ..............................................................................................39

5.1 Classes Entitled to Vote ....................................................................39
5.2 Acceptance by Impaired Classes ........................................................39
5.3 Elimination of Classes ......................................................................39
5.4 Deemed Acceptance if No Votes Cast ...............................................40
5.5 Cramdown ........................................................................................40

Article VI MEANS FOR IMPLEMENTATION OF THE PLAN ..........................40

6.1 General Settlement of Claims and Interests .......................................40
6.2 Plan Funding. ...................................................................................40
    (a) Exit ABL Revolver Facility ....................................................40
    (b) New First Lien High Yield Notes ...........................................40
    (c) New Second Lien Convertible Notes ......................................40
    (d) Other Plan Funding ...............................................................41
6.3 Authorization and Issuance of Senior Notes Alternative
    Distribution Deferred Payments .......................................................41
6.4 Authorization and Issuance of New Exide Common Stock ..................41
6.5 Exemptions from Securities Act Registration Requirements ..............41
6.6 Cancellation of Old Exide Securities and Agreements ........................42
6.7 Issuance of New Securities; Execution of Plan Documents ................42
6.8 Continued Corporate Existence ........................................................42
6.9 Restructuring Transactions ..............................................................43
6.10 Rights Offering ...............................................................................43
6.11 Reserved ..........................................................................................44
6.12 Certificate of Incorporation and Bylaws ...........................................44
6.13 Directors and Officers of the Reorganized Debtor .............................44
6.14 Corporate Action .............................................................................44
6.15 Effectuating Documents; Further Transactions ..................................44
6.16 Employment, Retirement, Indemnification and Other Agreements
    and Employee Compensation Programs .............................................44
    (a) Employment Agreements ......................................................44
    (b) Employee Compensation Plans ..............................................45
    (c) Other Incentive Plans and Employee Benefits ........................45
    (d) Assumption of Collective Bargaining Agreements ..................46
6.17 Preservation Of Causes Of Action ...................................................46
6.18 Intellectual Property Monetization ...................................................47
6.19 Reservation of Rights .......................................................................47
6.20 Exemption from Certain Transfer Taxes and Recording Fees ............47
6.21 Insured Claims ................................................................................47

Article VII GENERAL UNSECURED CLAIMS TRUST ....................................47

7.1 Execution of GUC Trust Agreement .................................................47
7.2 Tax Treatment .................................................................................48
7.3 GUC Trust Assets ...........................................................................48
7.4 LME Pricing Claims Protocols .........................................................48
7.5 GUC Trust Causes of Action ...........................................................50
7.6 GUC Trust Preference Action Protocols ...........................................50

| | | |
|---|---|---|
| 7.7 | General Unsecured Claims Resolution | 51 |
| 7.8 | Indemnification and Exculpation | 51 |
| 7.9 | Preservation of Privilege and Defenses | 51 |
| 7.10 | No Bonding of GUC Trust Claims | 52 |
| 7.11 | Service of the Senior Notes Indenture Trustee | 52 |
| 7.12 | Delivery of Distributions on Account of Senior Notes Deficiency Claims | 52 |
| 7.13 | Service of the Subordinated Notes Indenture Trustee | 52 |
| 7.14 | Delivery of Distributions on Account of Subordinate Notes Claims | 53 |

**Article VIII VERNON TORT CLAIMS TRUST** ... 53

| | | |
|---|---|---|
| 8.1 | Execution of Vernon Tort Claims Trust Agreement | 53 |
| 8.2 | Assumption of Certain Liabilities | 54 |
| 8.3 | Vernon Tort Claims Trust Assets | 54 |
| 8.4 | Covenant Not to Sue | 54 |
| 8.5 | Delivery of Distributions on Account of Vernon Tort Claims | 55 |
| 8.6 | Vernon Tort Claims Resolution | 55 |
| 8.7 | Dissolution | 55 |
| 8.8 | Indemnification and Exculpation | 55 |

**Article IX UNEXPIRED LEASES AND EXECUTORY CONTRACTS** ... 55

| | | | |
|---|---|---|---|
| 9.1 | Rejection of Executory Contracts and Unexpired Leases | | 55 |
| | (a) | Automatic Rejection | 55 |
| | (b) | Preexisting Obligations to the Debtor Under Executory Contracts and Unexpired Leases | 56 |
| | (c) | Claims Procedures Related to Rejection of Executory Contracts or Unexpired Leases | 56 |
| | (d) | Reservation of Rights | 56 |
| 9.2 | Assumption of Executory Contracts and Unexpired Leases | | 56 |
| | (a) | Modifications, Amendments, Supplements, Restatements, or Other Agreements | 57 |
| | (b) | Proofs of Claim Based on Executory Contracts or Unexpired Leases that Have Been Assumed | 57 |
| 9.3 | Indemnification Obligations | | 57 |
| 9.4 | Insurance Policies | | 57 |
| 9.5 | Cure Procedures and Payments Related to Assumption of Executory Contracts and Unexpired Leases | | 59 |
| | (a) | Cure Notices | 59 |
| | (b) | Cure Objections | 60 |
| | (c) | Hearing with Respect to Objections | 60 |
| | (d) | Reservation of Rights | 60 |
| 9.6 | Contracts, Intercompany Contracts, and Leases Entered into After the Petition Date | | 60 |
| 9.7 | General Reservation of Rights | | 60 |

**Article X PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS** ... 61

10.1    Determination Of Claims and Interests.................................................61
10.2    Claims Administration Responsibility....................................................61
10.3    Objections to Claims.............................................................................62
10.4    Disallowance of Claims.........................................................................62
10.5    Estimation of Claims.............................................................................62
10.6    No Interest on Disputed Claims.............................................................63
10.7    Amendments to Claims..........................................................................63

Article XI PROVISIONS GOVERNING DISTRIBUTIONS.................................................63

11.1    Distributions to Holders of Senior Notes Deficiency Claims,
        Allowed General Unsecured Claims, and Allowed Subordinated
        Notes Claims, and to Vernon Tort Claimants.........................................63
11.2    Time of Distributions............................................................................63
11.3    Distribution Agent.................................................................................64
11.4    Currency................................................................................................64
11.5    Distributions on Account of Claims Allowed as of the Effective
        Date.......................................................................................................64
        (a)    Delivery of Distributions in General...........................................64
        (b)    Delivery of Distributions to Servicers.........................................64
        (c)    Delivery of Distributions on Account of Senior Notes
               Secured Claims............................................................................65
        (d)    Fees and Expenses of Servicers...................................................65
11.6    Distributions on Account of Claims Allowed After the Effective
        Date.......................................................................................................65
        (a)    No Distributions Pending Allowance...........................................65
        (b)    Distributions After Allowance.....................................................65
        (c)    Special Rules for Distributions to Holders of Disputed
               Claims..........................................................................................66
11.7    Delivery Of Distributions.....................................................................66
        (a)    Record Date for Distributions......................................................66
        (b)    Allowed Claims...........................................................................66
        (c)    Undeliverable Distributions.........................................................67
        (d)    Reversion.....................................................................................67
        (e)    De Minimis Distributions............................................................67
        (f)    Fractional Distributions..............................................................67
11.8    Accrual of Dividends and Other Rights.................................................68
11.9    Surrender of Securities or Instruments..................................................68
11.10   Compliance Matters..............................................................................68
11.11   Claims Paid or Payable by Third Parties...............................................69
        (a)    Claims Paid by Third Parties.......................................................69
        (b)    Claims Payable by Insurance Carriers.........................................69
        (c)    Applicability of Insurance Policies..............................................69
11.12   Setoffs..................................................................................................69
11.13   Allocation of Plan Distributions Between Principal and Interest.............70

Article XII EFFECT OF THE PLAN ON CLAIMS AND INTERESTS.....................................70

12.1    Vesting of Assets .................................................................70
12.2    Discharge of the Debtor ........................................................70
12.3    Discharge of Liabilities Related to Vernon Tort Claims ...........................71
12.4    Discharge of Liabilities Related to General Unsecured Claims and the Subordinated Notes Claims.................................................71
12.5    Compromises and Settlements.................................................71
12.6    Release by Debtor ...............................................................72
12.7    Release by Holders of Claims and Interests ...............................72
12.8    Environmental Claims ..........................................................74
12.9    Exculpation and Limitation of Liability .....................................75
12.10   Exclusions and Limitations on Exculpation, Indemnification, and Releases.................................................................75
12.11   Injunction .........................................................................75
12.12   Subordination Rights ...........................................................76
12.13   Protection Against Discriminatory Treatment ...........................76
12.14   Recoupment ......................................................................76
12.15   Release of Liens .................................................................77
12.16   Reimbursement or Contribution .............................................77

Article XIII CONDITIONS PRECEDENT ....................................................77

13.1    Conditions to the Effective Date of the Plan ............................77
13.2    Failure of Conditions Precedent Upon a Sale ...........................78
13.3    Waiver of Conditions Precedent ............................................79
13.4    Notice of Effective Date ......................................................79
13.5    Effect of Non-Occurrence of Conditions to Consummation ..................79

Article XIV RETENTION OF JURISDICTION...............................................79

Article XV MISCELLANEOUS PROVISIONS................................................82

15.1    Binding Effect....................................................................82
15.2    Payment of Statutory Fees ...................................................82
15.3    Payment of Certain Additional Professional Fees ......................82
15.4    Modification and Amendments...............................................82
15.5    Confirmation of the Plan......................................................82
15.6    Additional Documents .........................................................83
15.7    Withholding and Reporting Requirements ...............................83
15.8    Dissolution of Creditors' Committee.......................................83
15.9    Revocation, Withdrawal, or Non-Consummation .......................83
        (a)    Right to Revoke or Withdraw......................................83
        (b)    Effect of Withdrawal, Revocation, or Non-Consummation .........83
15.10   Notices ............................................................................84
15.11   Term of Injunctions or Stays.................................................86
15.12   Governing Law ..................................................................86
15.13   Entire Agreement ...............................................................87
15.14   Severability ......................................................................87
15.15   No Waiver or Estoppel.........................................................87

15.16   Conflicts.................................................................................................87

## EXHIBITS

| | |
|---|---|
| **Exhibit 2.1** | **Administrative Claim Request Form** |
| **Exhibit 6.2(b)** | **Summary of Terms of New First Lien High Yield Notes** |
| **Exhibit 6.2(c)** | **Summary of Terms of New Second Lien Convertible Notes** |
| **Exhibit 6.9** | **Reorganized Debtor Corporate Structure** |
| **Exhibit 6.12** | **Certificate of Incorporation and Bylaws** |
| **Exhibit 6.16** | **Management Incentive Plan** |
| **Exhibit 6.17** | **Retained Causes Of Action** |
| **Exhibit 7.1** | **GUC Trust Agreement** |
| **Exhibit 7.3** | **GUC Trust Causes of Action**[2] |
| **Exhibit 8.1** | **Vernon Tort Claims Term Sheet** |
| **Exhibit 9.1** | **Assumed Executory Contracts and Unexpired Leases** |

---

[2] For the avoidance of doubt, the GUC Trust Causes of Action to be included in this Exhibit 7.3 are those causes of action identified in Article 1.106 of this Plan, and include the GUC Trust Preference Actions, the LME Pricing Claims, and any other actions agreed to among the Debtor, the Creditors' Committee and the Unofficial Noteholder Committee.

## INTRODUCTION

Exide, the debtor and debtor-in-possession in the above-captioned Chapter 11 Case, hereby proposes this fourth amended plan of reorganization for the resolution of outstanding Claims and Interests. Capitalized terms used herein shall have the meanings ascribed to them in Article I.B of this Plan. The Debtor is the proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code. The distributions to be made to Holders of Claims are set forth herein. The Debtor's subsidiaries are not subject to the Chapter 11 Case.

Under section 1125(b) of the Bankruptcy Code, a vote to accept or reject this Plan cannot be solicited from a Holder of a Claim or Interest until a disclosure statement has been approved by the Bankruptcy Court and distributed to Holders of Claims and Interests. The Disclosure Statement relating to this Plan was approved by the Bankruptcy Court on February 4, 2015 and has been distributed simultaneously with this Plan to all parties whose votes are being solicited. The Disclosure Statement contains, among other things, a discussion of the Debtor's history, business, properties and operations, risk factors associated with the business and Plan, a summary and analysis of this Plan, and certain related matters.

ALL HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

Subject to the restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in Article XV of this Plan, the Debtor expressly reserves its rights to alter, amend, modify, revoke, or withdraw this Plan, one or more times, prior to this Plan's substantial consummation.

## ARTICLE I

### DEFINITIONS, RULES OF
### INTERPRETATION, AND COMPUTATION OF TIME

**A.    Scope of Definitions**

For purposes of this Plan, except as expressly provided otherwise or unless the context requires otherwise, all capitalized terms not otherwise defined shall have the meanings ascribed to them in Article I.B of this Plan. Any term used in this Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.

**B.    Definitions**

1.1    "**2002 Bankruptcy Case**" means those certain chapter 11 cases, jointly administered, and styled In re Exide Technologies, et al., Case No. 02-1125 (KJC), filed on April 15, 2002 in the United States Bankruptcy Court for the District of Delaware.

1.2     "**2014 Vernon Stipulation**" means that certain stipulation and order between the CDTSC and the Debtor, approved by the Bankruptcy Court on November 20, 2014 and effective November 21, 2014, as stipulated and ordered by the CDTSC on such date (a copy of which can be found attached to the Bankruptcy Court's order at Docket No. 2651).

1.3     "**Additional Distribution**" means an amount from the net proceeds of GUC Trust Assets, other than GUC Trust Preference Actions, distributable to Holders of Senior Notes Eligible Holder Claims no more than the difference between (a) what the Holders of Senior Notes Alternative Distribution Claims would be entitled to receive under this Plan on account of their Senior Notes Deficiency Claims if net recoveries from GUC Trust Assets were distributed Pro Rata based on the aggregate amount of Allowed Senior Notes Deficiency Claims, Allowed Class D, and Allowed Class E Claims without regard to the GUC Trust Settlement Agreement and the allocation and distribution formulas included therein with respect to such other GUC Trust Assets and (b) what the Holders of Senior Notes Alternative Distribution Claims are entitled to receive under this Plan on account of their Senior Notes Deficiency Claims from such GUC Trust Assets subject to the allocation and distribution formulas included in the GUC Trust Settlement Agreement; provided, however, that the Additional Distribution, together with the Preference Proceeds Distribution, shall not exceed the amount needed to enable Holders of Senior Notes Alternative Distribution Claims to receive on account of their Senior Notes Deficiency Claims what such Holders would have received in (a) of this definition.

1.4     "**Ad Hoc Vernon Tort Claimants Group**" means the ad hoc group of certain Holders of Vernon Tort Claims represented by Brown Rudnick LLP.

1.5     "**Administrative Claim**" means a Claim for payment of an administrative expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(2) of the Bankruptcy Code, including, but not limited to, the actual, necessary costs and expenses, incurred on or after the Petition Date, of preserving the Estate and operating the business of the Debtor, including wages, salaries, or commissions for services rendered after the commencement of the Chapter 11 Case, section 503(b)(9) Claims, Professional Claims, and all fees and charges assessed against the Estate under chapter 123 of title 28 of the United States Code, and all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under section 546(c)(2)(A) of the Bankruptcy Code.

1.6     "**Administrative Claims Bar Date**" means the deadline for filing proofs of or requests for payment of Administrative Claims, which shall be 30 days after the Effective Date, unless otherwise ordered by the Bankruptcy Court, and except with respect to DIP Facility Claims and Professional Claims, which shall be subject to the provisions of Articles 2.2 and 2.3 hereof, as applicable.

1.7     "**Affiliates**" has the meaning ascribed to such term by section 101(2) of the Bankruptcy Code.

1.8     "**Allowed**" means, for distribution purposes, a Claim or Interest, or any portion thereof, or a particular Class of Claims or Interests (a) that has been allowed by a Final Order of the Bankruptcy Court (or such other court as the Reorganized Debtor and the Holder of

such Claim or Interest agree may adjudicate such Claim or Interest and objections thereto), (b) which is not the subject of a proof of Claim timely filed with the Bankruptcy Court and is Scheduled as liquidated and noncontingent, other than a Claim that is Scheduled at zero, in an unknown amount, or as disputed, but only to the extent such Claim is Scheduled as liquidated and noncontingent, (c) for which a proof of Claim in a liquidated amount has been timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, any Final Order of the Bankruptcy Court or other applicable bankruptcy law, and as to which either (i) no objection to its allowance has been filed within the periods of limitation fixed by this Plan, the Bankruptcy Code or by any order of the Bankruptcy Court or (ii) any objection to its allowance has been settled or withdrawn, or has been denied by a Final Order of the Bankruptcy Court, or (d) that is expressly allowed in a liquidated amount pursuant to this Plan. Pursuant to 11 U.S.C. § 503(b)(1)(D), Governmental Units need not file a Claim to request payment of an administrative expense relating to taxes under 11 U.S.C. § 503(b)(1)(B) or (C) as a condition of its being an allowed administrative expense.

1.9     "**Annual Incentive Plan**" means any annual incentive plan maintained by the Debtor in the ordinary course of business to provide incentive compensation to officers and employees based on the achievement of certain metrics, including that program that is the subject of the Annual Incentive Plan Order, and any other annual incentive plan still in effect as of the Effective Date.

1.10    "**Alternative Distribution Cash**" means Cash in the aggregate amount of $500,000.

1.11    "**Annual Incentive Plan Order**" means, collectively, (a) the Final Order that was entered by the Bankruptcy Court on August 15, 2013, confirming the Debtor's authority to implement the Annual Incentive Plan, and (b) any and all orders entered by the Bankruptcy Court authorizing and approving amendments or modifications to, or subsequent versions of, the Annual Incentive Plan or Annual Incentive Plan Order.

1.12    "**Assumption and Rejection Procedures**" means (a) the expedited procedures for the Debtor to assume or reject Executory Contracts pursuant to the Bankruptcy Court's order dated July 11, 2013 (Docket No. 333) and (b) the expedited procedures for the Debtor to assume or reject Unexpired Leases pursuant to the Bankruptcy Court's order dated November 13, 2013 (Docket No. 1079).

1.13    "**Avoidance Actions**" means any and all actual or potential claims and causes of action to avoid a transfer of property or an obligation incurred by the Debtor and its recovery, subordination, or other remedies that may be brought by and on behalf of the Debtor and its estate under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under section 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code.

1.14    "**Backstop Commitment**" has the meaning ascribed to such term in the Backstop Commitment Agreement.

**1.15** "**Backstop Commitment Agreement**" means the Backstop Commitment Agreement by and among Exide and the Backstop Parties that are party thereto, dated as of January 7, 2015, as may be amended from time to time in accordance with the terms therewith.

**1.16** "**Backstop Commitment Agreement Approval Order**" means the Final Order entered by the Bankruptcy Court authorizing the Debtor's entry into and approving the terms of the Backstop Commitment Agreement.

**1.17** "**Backstop Parties**" means those certain Consenting Creditors and other parties, other than the Debtor, that are party to the Backstop Commitment Agreement.

**1.18** "**Bankruptcy Code**" means the Bankruptcy Reform Act of 1978, as amended and codified in title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as in effect on the date hereof but, with respect to amendments to the Bankruptcy Code subsequent to commencement of the Chapter 11 Case, only to the extent that such amendments were made expressly applicable to bankruptcy cases which were filed as of the enactment of such amendments.

**1.19** "**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware or such other court as may have jurisdiction over the Chapter 11 Case.

**1.20** "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, the Federal Rules of Civil Procedure, as amended, as applicable to the Chapter 11 Case or proceedings therein, and the Local Rules of the Bankruptcy Court, as applicable to the Chapter 11 Case or proceedings therein, as the case may be.

**1.21** "**Bar Date**" means the deadlines set by the Bankruptcy Court pursuant to the Bar Date Order or other Final Order for filing proofs of claim in the Chapter 11 Case, as the context may require, which was October 31, 2013, except for Governmental Units, for whom the Bar Date was December 9, 2013, and certain personal injury Claims related to the Vernon Facility, for whom the Bar Date was January 31, 2014.

**1.22** "**Bar Date Orders**" means the orders entered by the Bankruptcy Court on September 13, 2013 (Docket No. 696) and October 24, 2013 (Docket No. 956), which established the Bar Date, and any subsequent order supplementing such orders or relating thereto.

**1.23** "**Business Day**" means any day, excluding Saturdays, Sundays, and "legal holidays" (as defined in Bankruptcy Rule 9006(a)), on which commercial banks are open for business in New York City.

**1.24** "**Cash**" means legal tender of the United States of America and equivalents thereof.

**1.25** "**Causes of Action**" means any and all actions, claims, proceedings, causes of action, suits, accounts, demands, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims, whether known, unknown,

reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, and whether asserted or assertable directly or derivatively, in law, equity or otherwise, including actions brought prior to the Petition Date, actions under chapter 5 of the Bankruptcy Code, including any Avoidance Action, the LME Pricing Claims, and actions against any Entity for failure to pay for products or services provided or rendered by the Debtor, all claims, suits or proceedings relating to enforcement of the Debtor's intellectual property rights, including patents, copyrights and trademarks, and all claims or causes of action seeking recovery of the Debtor's or the Reorganized Debtor's accounts receivable or other receivables or rights to payment created or arising in the ordinary course of the Debtor's or the Reorganized Debtor's businesses, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.

      **1.26**    **"CDTSC"** means the State of California Department of Toxic Substance Control.

      **1.27**    **"Charging Lien"** means any lien or other priority in payment to which the Indenture Trustees are entitled under the applicable Indentures.

      **1.28**    **"Certificate"** means any instrument evidencing a Claim or an Interest.

      **1.29**    **"Certificate of Incorporation and Bylaws"** means the amended and restated certificate of incorporation and bylaws of the Reorganized Debtor substantially in the form attached as Exhibit 6.12.

      **1.30**    **"Chapter 11 Case"** means the chapter 11 case of the Debtor pending in the Bankruptcy Court and being administered under Case No. 13-11482 (KJC).

      **1.31**    **"Claim"** means a claim against the Debtor, whether or not asserted, as defined in section 101(5) of the Bankruptcy Code, or an Administrative Claim, as applicable.

      **1.32**    **"Claims and Solicitation Agent"** means GCG, Inc., 5151 Blazer Parkway, Suite A, Dublin, OH 43017, Attention: Exide Case Administration.

      **1.33**    **"Claims Objection Deadline"** means, as applicable (except for Administrative Claims), (a) the day that is the later of (i) the first Business Day that is at least one (1) year after the Effective Date and (ii) as to proofs of claim filed after the Bar Date, the first Business Day that is at least 180 days after a Final Order is entered deeming the late filed claim timely filed or (b) such later date as may be established by the Bankruptcy Court upon request of the Reorganized Debtor without further notice to parties-in-interest.

      **1.34**    **"Class"** means a category of Holders of Claims or Interests classified together pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code, as described in Article III of this Plan.

      **1.35**    **"Collective Bargaining Agreement"** means any collective bargaining agreement to which the Debtor is a party as of the Effective Date.

**1.36** "**Confirmation**" means the entry, within the meaning of Bankruptcy Rules 5003 and 9012, of the Confirmation Order, subject to all conditions specified having been satisfied or waived.

**1.37** "**Confirmation Date**" means the date on which Confirmation occurs.

**1.38** "**Confirmation Hearing**" means the hearing before the Bankruptcy Court held under section 1128 of the Bankruptcy Code to consider confirmation of the Plan and related matters as such hearing may be adjourned or continued from time to time.

**1.39** "**Confirmation Order**" means the order of the Bankruptcy Court confirming this Plan under section 1129 of the Bankruptcy Code, which order shall be reasonably acceptable to the Required Consenting Creditors and the Requisite Backstop Parties.

**1.40** "**Consenting Creditors**" means those Holders of Senior Notes Claims that are party to the Plan Support Agreement.

**1.41** "**Creditors' Committee**" means the official committee of unsecured creditors appointed pursuant to section 1102(a) of the Bankruptcy Code in the Chapter 11 Case on June 18, 2013, as may be reconstituted from time to time.

**1.42** "**Creditors' Committee Amended Lien Challenge Complaint**" means that certain complaint filed by the Creditors' Committee in the adversary proceeding (Adv. Proc. No. 14-50972) commenced by the Creditors' Committee against Wells Fargo, as Senior Notes Indenture Trustee, a copy of which can be found at Docket No. 2659.

**1.43** "**Creditor**" has the meaning ascribed to such term in section 101(10) of the Bankruptcy Code.

**1.44** "**Cure**" means the payment or other honoring of all obligations required to be paid or honored in connection with assumption of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code, including (a) the cure of any non-monetary defaults to the extent required, if at all, pursuant to section 365 of the Bankruptcy Code, and (b) with respect to monetary defaults, the distribution, within a reasonable period of time following the Effective Date, of Cash, or such other property as may be agreed upon by the parties or ordered by the Bankruptcy Court, with respect to the assumption (or assumption and assignment) of an Executory Contract or Unexpired Lease, pursuant to section 365(b) of the Bankruptcy Code, in an amount equal to all unpaid monetary obligations or such other amount as may be agreed upon by the parties, under such Executory Contract or Unexpired Lease, to the extent such obligations are enforceable under the Bankruptcy Code and applicable non-bankruptcy law.

**1.45** "**Cure Notice**" means the notice of proposed Cure amount provided to counterparties to assumed Executory Contracts or Unexpired Leases pursuant to Article 9.5 of the Plan.

**1.46** "**Cure Objection Deadline**" means the deadline for filing objections to a Cure Notice or proposed Cure, which shall be on or before fourteen (14) days after the applicable counterparty was served with a Cure Notice.

**1.47** "**D&O Insurance**" means insurance maintained by the Debtor which covers, among others, the directors and officers of the Debtor or any of them, including any runoff policies or tail coverage.

**1.48** "**Debtor**" means Exide.

**1.49** "**Debtor-Owned Sites**" means any sites owned by the Debtor in fee simple as of the Effective Date.

**1.50** "**DIP ABL Claim**" means any DIP Facility Claim arising on account of the revolving credit facility under the DIP Credit Agreement.

**1.51** "**DIP Agent**" means JPMorgan Chase Bank, N.A., in its capacity as agent for the DIP Lenders pursuant to the DIP Credit Agreement.

**1.52** "**DIP Agent Claim**" means any Claim for reasonable fees and expenses, including attorneys' fees, incurred by the DIP Agent during the Chapter 11 Case.

**1.53** "**DIP Credit Agreement**" means that certain Amended and Restated Superpriority Debtor-In-Possession Credit Agreement, dated as of July 12, 2013, by and among the Debtor, the DIP Agent, and the DIP Lenders, which was executed by the Debtor in connection with the DIP Facility, as amended, supplemented, or otherwise modified from time to time, and all documents executed in connection therewith.

**1.54** "**DIP Facility**" means the debtor-in-possession secured financing facility, consisting of a revolving credit facility and a term loan facility, provided to the Debtor by the DIP Lenders pursuant to the DIP Credit Agreement as authorized by the Bankruptcy Court pursuant to the DIP Facility Order, as may be amended or modified from time to time.

**1.55** "**DIP Facility Claim**" means any Claim arising under, derived from, based upon, or as a result of the DIP Facility, including, without limitation, any DIP ABL Claim, any DIP Term Loan Claim, any DIP Facility Other Claim, and any DIP Agent Claim.

**1.56** "**DIP Facility Order**" means, collectively, (a) the interim order that was entered by the Bankruptcy Court on June 11, 2013 (Docket No. 79), (b) the final order that was entered by the Bankruptcy Court on July 25, 2013 (Docket No. 427), authorizing and approving the DIP Facility and the agreements related thereto, and (c) any and all orders entered by the Bankruptcy Court authorizing and approving amendments or modifications to the DIP Credit Agreement or either of the orders described in the foregoing clauses (a) and (b).

**1.57** "**DIP Facility Other Claim**" means any DIP Facility Claim that is not a DIP ABL Claim or a DIP Term Loan Claim.

**1.58** "**DIP/First Lien Exchange**" means the exchange of $246.8 million of DIP Term Loan Claims for $259.1 million of New First Lien High Yield Notes, inclusive of an original issue discount of 5% for every $100 of DIP Term Loan Claims exchanged into New First Lien High Yield Notes.

**1.59** "**DIP Lenders**" means the banks and other financial institutions or entities from time to time party to the DIP Credit Agreement as lenders and the Holders of DIP Facility Claims.

**1.60** "**DIP/Second Lien Conversion Backstop Fee**" means the fee to be distributed to the Consenting Creditors that backstop the DIP/Second Lien Conversion Option, which fee shall be 2.0% of the New Exide Common Stock issued on the Effective Date and after giving effect to dilution from the New Second Lien Convertible Notes.

**1.61** "**DIP/Second Lien Conversion Funding Fee**" means the funding fee to be distributed to Holders of DIP Term Loan Claims who elect to participate in the DIP/Second Lien Conversion Option, payable based on such Holders' *pro rata* participation, which fee shall be (a) New First Lien High Yield Notes in the aggregate amount of 5.0% of the DIP Term Loan Claims so exchanged and (b) 3.0% of the New Exide Common Stock issued on the Effective Date and after giving effect to dilution from the New Second Lien Convertible Notes.

**1.62** "**DIP/Second Lien Conversion Option**" means the option of Holders of DIP Term Loan Claims, on the Effective Date, to exchange their Pro Rata portion of up to an aggregate of $100 million of DIP Term Loan Claims for $100 million of New Second Lien Convertible Notes plus the DIP/Second Lien Conversion Funding Fee; provided, the DIP/Second Lien Conversion Option shall be backstopped by certain Consenting Creditors pursuant to Article 2.2(b)(ii)(3) of this Plan and the Plan Support Agreement to the extent there is a DIP/Second Lien Undersubscription.

**1.63** "**DIP/Second Lien Undersubscription**" means the difference between (a) $100 million and (b) that amount of DIP Term Loan Claims that Holders thereof, including Consenting Creditors, have elected to convert into the New Second Lien Convertible Notes pursuant to the DIP/Second Lien Conversion Option.

**1.64** "**DIP Term Loan Claim**" means any DIP Facility Claim arising on account of the term loan under the DIP Credit Agreement.

**1.65** "**DIP Term Loan Refinancing Investment Option**" means the option of Holders of Senior Notes Claims who are Eligible Holders, on a Pro Rata basis based on such Holders share of the aggregate amount of Senior Notes Claims held by Eligible Holders, to purchase for Cash up to the entire amount (the maximum total investment pursuant to such option being $346.8 million) of the consideration that would otherwise be distributed to Holders of DIP Term Loan Claims pursuant to Article 2.2(b); provided, however, that any Holder of Senior Notes Claims that exercises such option shall be deemed to be a Consenting Creditor and shall participate in the DIP/Second Lien Conversion Option and receive its Pro Rata share of the New Second Lien Convertible Notes pursuant to and in accordance with the DIP/Second Lien Conversion Option.

**1.66** "**DIP Term Loan Refinancing Cash Pool**" means the Cash proceeds of the DIP Term Loan Refinancing Investment Option.

**1.67** "**Disallowed**" means (a) a Claim, or any portion thereof, that has been disallowed by a Final Order or a settlement, or as provided in this Plan, (b) a Claim or any

portion thereof that is Scheduled at zero or as contingent, disputed, or unliquidated and as to which a proof of claim bar date has been established but no proof of claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law, or (c) a Claim or any portion thereof that is not Scheduled and as to which a proof of claim bar date has been established but no proof of claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law.

**1.68** "**Disclosure Statement**" means the written disclosure statement or any supplements thereto (including the Plan Supplement and all schedules thereto or referenced therein) that relates to this Plan, as such disclosure statement may be amended, modified, or supplemented from time to time, all as approved by an order of the Bankruptcy Court pursuant to sections 1125 and 1127 of the Bankruptcy Code and Bankruptcy Rule 3017.

**1.69** "**Disclosure Statement Order**" means the Order entered by the Bankruptcy Court approving the Disclosure Statement as containing, among other things, "adequate information" as required by section 1125 of the Bankruptcy Code and solicitation procedures related thereto which order shall be in form and substance reasonably acceptable to the Required Consenting Creditors and Requisite Backstop Parties.

**1.70** "**Disputed**" means with respect to a Claim, (a) any Claim as to which the Debtor or other parties-in-interest in accordance with applicable law have interposed an objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules, or any Claim otherwise disputed by the Debtor, or other parties-in-interest in accordance with applicable law, which objection has not been withdrawn or determined by a Final Order, (b) any Claim scheduled by the Debtor as contingent, unliquidated, or disputed, (c) any Claim which amends a Claim scheduled by the Debtor as contingent, unliquidated, or disputed, or (d) any Claim prior to it having become an Allowed Claim.

**1.71** "**Distribution Agent**" means the Reorganized Debtor, or any Entity selected by the Reorganized Debtor, in its sole discretion, to make or facilitate distributions pursuant to this Plan.

**1.72** "**Distribution Date**" means the date selected by the Reorganized Debtor, in its sole discretion, upon which distributions to Holders of Allowed Claims entitled to receive distributions under this Plan shall commence.

**1.73** "**Distribution Record Date**" means the date for determining which Holders of Allowed Claims are eligible to receive distributions under the Plan, which shall be (a) ten (10) Business Days after entry of the Confirmation Order or (b) such other date as designated by an order of the Bankruptcy Court.

**1.74** "**DTC**" means the Depository Trust Company, and its successors and assigns.

**1.75** "**Effective Date**" means the date on which this Plan shall take effect, which date shall be a Business Day on or after the Confirmation Date on which: (a) no stay of

the Confirmation Order is in effect; and (b) all conditions precedent to the effectiveness of this Plan specified in <u>Article 13.1</u>, have been satisfied, or, if capable of being waived, waived, which date shall be specified in a notice filed by the Reorganized Debtor with the Bankruptcy Court.

**1.76** "**Eligible Holder**" means the Holder of an Allowed Senior Notes Claim, including the Backstop Parties and the Consenting Creditors, that are either (i) certified as an accredited investor as defined in Rule 501(a)(1), (2), (3), or (7) under the Securities Act, which, for the avoidance of doubt, shall exclude any natural person, or (ii) a qualified institutional buyer as defined in Rule 144A of the Securities Act.

**1.77** "**Eligible Holder Certification**" means the certification by a Holder of an Allowed Senior Notes Claim in accordance with the solicitation procedures set forth in the Disclosure Statement Order and/or the Rights Offering Procedures, as applicable, indicating that such Holder is an Eligible Holder.

**1.78** "**Employee Compensation Plans**" means the Annual Incentive Plan, the KEIP, and the MIP.

**1.79** "**Entity**" has the meaning ascribed to such term in section 101(15) of the Bankruptcy Code.

**1.80** "**Environmental Governmental Units**" means the United States; any State, Commonwealth or District in the United States; and any department, agency or instrumentality of the United States or any State, Commonwealth or District in the United States charged with enforcing environmental laws.

**1.81** "**Equity Security**" has the meaning ascribed to such term in section 101(16) of the Bankruptcy Code.

**1.82** "**ERISA**" means the Employee Retirement Income Security Act of 1974.

**1.83** "**Estate**" means the bankruptcy estate of the Debtor created pursuant to section 541 of the Bankruptcy Code.

**1.84** "**Event**" means any event, development, occurrence, circumstance or change.

**1.85** "**Excluded DIP Obligations**" means all of the Debtor's contingent or unliquidated obligations (including, without limitation, indemnification and expense reimbursement obligations) with respect to the DIP Facility (excluding, in each case, the DIP ABL Claims and the DIP Term Loan Claims), to the extent that any such obligations have not been paid in full in Cash on the Effective Date.

**1.86** "**Exculpated Claim**" means any Claim related to any act or omission in connection with, relating to, or arising out of the Debtor's in or out of court restructuring, the Chapter 11 Case, formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the settlement of Claims or renegotiation of Executory Contracts or Unexpired Leases, the negotiation of the Plan, the DIP Credit Agreement, the Rights Offering,

the Backstop Commitment Agreement, the Plan Support Agreement (including the plan term sheet attached thereto), the GUC Trust Settlement Agreement, the Plan Supplement, the Exit Financing, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or Plan, the filing of the Chapter 11 Case, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration, consummation, and implementation of the Plan, the distribution of property under the Plan, or any transaction contemplated by the Plan or Disclosure Statement, or in furtherance thereof.

     **1.87**   **"Exculpated Parties"** means, collectively, each of the following in their respective capacities as such: (a) the Debtor and its Affiliates, and each of their successors and assigns, (b) the Reorganized Debtor, (c) the Backstop Parties, (d) the Consenting Creditors, (e) the DIP Lenders, (f) the DIP Agent, (g) the Unsecured Creditors Committee and each of its members, and (h) the Unofficial Noteholder Committee and each of its members, (i) the Senior Notes Indenture Trustee, (j) the Subordinated Notes Indenture Trustee, and with respect to each of the foregoing parties in clauses (a) through (j), such parties' subsidiaries, affiliates, officers, directors, principals, members, managers, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other representatives and professionals.

     **1.88**   **"Executory Contract"** means any contract to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

     **1.89**   **"Exhibit"** means an exhibit annexed either to this Plan, contained in the Plan Supplement, or annexed as an appendix to the Disclosure Statement.

     **1.90**   **"Exide"** means Exide Technologies, a Delaware corporation, debtor-in-possession in the above-captioned Case No. 13-11482 (KJC) pending in the Bankruptcy Court.

     **1.91**   **"Exit ABL Revolver Facility"** means that certain first-out, first-lien, asset based revolving credit facility in the principal amount of $200 million pursuant to a new credit facility, by and among the Reorganized Debtor, as borrower, and the Exit ABL Revolver Lenders, and all other documents entered into in connection therewith or contemplated thereby.

     **1.92**   **"Exit ABL Revolver Lenders"** means a lender or syndication of lenders, which may include the DIP Lenders, reasonably acceptable to the Debtor and the Consenting Creditors, and each of the financial institutions from time to time party to the Exit ABL Revolver Facility.

     **1.93**   **"Exit Financing"** means the Exit ABL Revolver Facility, the New First Lien High Yield Notes, and the New Second Lien Convertible Notes.

     **1.94**   **"Exit Financing Commitment Agreements"** means the Backstop Commitment Agreement together with other commitment agreements regarding Exit Financing in accordance with this Plan.

     **1.95**   **"Face Amount"** means, (a) when used in reference to a Disputed Claim or Disallowed Claim, the full stated liquidated amount claimed by the Holder of a Claim in any proof of Claim, or amendment thereof in accordance with applicable law, timely filed with the

Bankruptcy Court or otherwise deemed timely filed by any Final Order of the Bankruptcy Court or other applicable bankruptcy law, or the amount estimated for such Claim in an order of the Bankruptcy Court, and (b) when used in reference to an Allowed Claim or Allowed Interest, the allowed amount of such Claim or Interest.  If none of the foregoing applies, the Face Amount of the Claim shall be zero ($0) dollars.

       **1.96**    **"Final Decree"** means a final decree entered by the Court closing the Chapter 11 Case pursuant to Bankruptcy Rule 3022.

       **1.97**    **"Final Order"** means an order or judgment, the operation or effect of which has not been reversed, stayed, modified, or amended, is in full force and effect, and as to which order or judgment (or any reversal, stay, modification, or amendment thereof) (a) the time to appeal, seek certiorari, or request reargument or further review or rehearing has expired and no appeal, petition for certiorari, or request for reargument or further review or rehearing has been timely filed, or (b) any appeal that has been or may be taken or any petition for certiorari or request for reargument or further review or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed, from which certiorari was sought, or to which the request was made, and no further appeal or petition for certiorari or request for reargument or further review or rehearing has been or can be taken or granted; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedures, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order; provided, further, that the Debtor or Reorganized Debtor, as applicable, reserve the right to waive any appeal period for an order or judgment to become a Final Order.

       **1.98**    **"General Unsecured Claim"** means any Claim that is not an Administrative Claim, DIP Facility Claim, Priority Tax Claim, Senior Notes Claim, Other Secured Claim, Other Priority Claim, Subordinated Notes Claim, Vernon Tort Claim, Intercompany Claim, or Other Subordinated Claim.  Without limiting the foregoing, General Unsecured Claims include all (a) Rejection Damages Claims and (b) Reclamation Claims that are not Allowed Section 503(b)(9) Claims.

       **1.99**    **"Governmental Unit"** has the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

       **1.100**  **"GUC Trust"** means the liquidating trust to be established on the Effective Date under the provisions of Article VII of this Plan in accordance with the GUC Trust Agreement.

       **1.101**  **"GUC Trust Trustee"** means the Entity selected by the Creditors' Committee to serve as trustee of the GUC Trust, pursuant to the terms of the GUC Trust Agreement.

       **1.102**  **"GUC Trust Agreement"** means that certain trust agreement by and among the Debtor and the GUC Trust Trustee, substantially in the form contained in Exhibit 7.1 and in accordance with the terms of the GUC Trust Settlement Agreement.

1.103 **"GUC Trust Board"** means the three member oversight board for the GUC Trust, two members of which shall be selected by the Creditors' Committee and one member of which shall be selected by the Unofficial Noteholder Committee.

1.104 **"GUC Trust Assets"** means the assets to be transferred to the GUC Trust on the Effective Date in accordance with the Plan, the GUC Trust Settlement Agreement, and the GUC Trust Agreement. The GUC Trust Assets shall be comprised of: (a) the GUC Trust Cash Contribution, (b) the GUC Trust IP Transaction Proceeds, (c) the GUC Trust LME Pricing Litigation Assets; and (d) the GUC Trust Causes of Action.

1.105 **"GUC Trust Cash Contribution"** means the $3,000,000.00 to be contributed by the Debtor or the Reorganized Debtor to the GUC Trust on the Effective Date to support the GUC Trust's costs and expenses, which amount shall be repaid by the GUC Trust to the Reorganized Debtor from the first $3,000,000.00 in net proceeds from GUC Trust Preference Actions, but which is otherwise not repayable.

1.106 **"GUC Trust Causes of Action"** means (a) the GUC Trust Preference Actions, (b) the LME Pricing Claims, and (c) such other Causes of Action that may be identified and, either (i) agreed to among the Debtor, the Creditors' Committee and the Unofficial Noteholder Committee or (ii) ordered to be contributed to the GUC Trust pursuant to a Final Order of the Bankruptcy Court, prior to the Effective Date, pursuant to and in accordance with the terms of the GUC Trust Settlement Agreement and Article 7.5 of this Plan, and as set forth in Exhibit 7.3, in any case to the extent such Causes of Action are not released pursuant to Article 12.6 or Article 6.17 of this Plan.

1.107 **"GUC Trust IP Transaction Proceeds"** means the 45% of the IP Transaction Proceeds allocable to the GUC Trust, which shall be distributable 55% to Senior Notes Deficiency Claims and 45% to the benefit of all Allowed Other General Unsecured Claims, in accordance with the GUC Trust Settlement Agreement.

1.108 **"GUC Trust LME Pricing Litigation Assets"** means (a) the right to pursue LME Pricing Claims pursuant to and in accordance with the terms of the GUC Trust Settlement Agreement and the net proceeds thereof, which shall be deposited in the GUC Trust, with 45% distributable to the Senior Notes Deficiency Claim and 55% distributable to the benefit of all Allowed Other General Unsecured Claims, in accordance with the terms of the GUC Trust Settlement Agreement and (b) the net cash proceeds arising from any monetary compensation, rights of restitution, or other pecuniary benefits to which the Debtor or Reorganized Debtor, as applicable, is entitled as a result of a public/governmental antitrust enforcement action relating to LME Pricing Claims, which shall be deposited in the GUC Trust for distribution Pro Rata to Allowed General Unsecured Claims and the Senior Notes Deficiency Claim, in accordance with the terms of the GUC Trust Settlement Agreement.

1.109 **"GUC Trust Preference Actions"** means those certain Avoidance Actions arising under section 547 of the Bankruptcy Code, to be transferred to the GUC Trust on the Effective Date, which Avoidance Actions have been agreed among the Debtor, the Creditors' Committee, and the Unofficial Noteholder Committee, pursuant to and in accordance with the GUC Trust Settlement Agreement.

**1.110** **"GUC Trust Settlement Agreement"** means that certain agreement approved by the Bankruptcy Court on February 4, 2015 (Docket No. 3093), as may be amended, supplemented, restated, or otherwise modified from time to time with the written agreement of the parties thereto, which sets forth the terms of the settlement among the Debtor, the Creditors' Committee, and the Unofficial Noteholder Committee.

**1.111** **"Holdback Escrow Account"** means the interest-bearing escrow account into which Cash equal to the Holdback Escrow Amount shall be deposited on the Effective Date for the payment of Allowed Professional Claims to the extent not previously paid or disallowed.

**1.112** **"Holdback Escrow Amount"** means the sum of (a) the aggregate amounts withheld by the Debtor as of the Confirmation Date as a holdback on payment of Professional Claims pursuant to the Professional Fee Order and (b) twenty (20) percent of that portion of the unbilled fees of Professionals estimated pursuant to Article 2.3(b) of the Plan attributable to fees incurred as of the Confirmation Date; provided, however, that if a Professional does not provide an estimate pursuant to Article 2.3(b), the Debtor may estimate the unbilled fees of such Professional incurred as of the Confirmation Date, and the sum of provision (a) above and the total amount so estimated shall comprise the Holdback Escrow Amount.

**1.113** **"Holder"** means a holder of a Claim against or Interest in the Debtor.

**1.114** **"HSR Act"** means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

**1.115** **"Impaired"** means impaired within the meaning of section 1124 of the Bankruptcy Code.

**1.116** **"Indemnification Obligations"** means obligations of the Debtor, if any, to indemnify, reimburse, advance, or contribute to the losses, liabilities, or expenses of an Indemnitee pursuant to the Debtor's certificate of incorporation, bylaws, policy of providing employee indemnification, applicable law, or specific agreement in respect of any claims, demands, suits, causes of action, or proceedings against an Indemnitee based upon any act or omission related to an Indemnitee's service with, for, or on behalf of the Debtor.

**1.117** **"Indemnitee"** means, in each case employed by the Debtor or serving as a director or officer immediately prior to or as of the Effective Date and acting in their respective capacities as such immediately prior to the Effective Date, all directors, officers, or employees of the Debtor who are entitled to assert Indemnification Obligations.

**1.118** **"Indenture Trustees"** means the Senior Notes Indenture Trustee and the Subordinated Notes Indenture Trustee.

**1.119** **"Indentures"** means the Senior Notes Indenture and the Subordinated Notes Indenture.

**1.120** **"Initial Carrier Policy"** means those policies issued by XL listed on Schedule A to the Vernon Tort Claims Term Sheet.

14

1.121 **"Insurance Contract"** has the meaning ascribed to it in <u>Article 9.4</u> of this Plan.

1.122 **"Insured Claims"** has the meaning ascribed to it in <u>Article 9.4</u> of this Plan.

1.123 **"Intercompany Claim"** means a Claim by the Debtor against an Affiliate or by an Affiliate against the Debtor.

1.124 **"Interest"** means (a) the legal, equitable, contractual, and other rights (whether fixed or contingent, matured or unmatured, disputed or undisputed) in any Entity with respect to Old Exide Common Stock, or any other Equity Securities or Other Interests of the Debtor and (b) the legal, equitable, contractual and other rights (whether fixed or contingent, matured or unmatured, disputed or undisputed) of any Entity to purchase, sell, subscribe to, or otherwise acquire or receive (directly or indirectly) any of the foregoing.

1.125 **"IP Advisor"** means M*CAM, Inc., or such other professional selected by the Reorganized Debtor and the GUC Trust Trustee for the purpose of identifying, structuring, and executing IP Transactions pursuant to and in accordance with the terms of the GUC Trust Settlement Agreement.

1.126 **"IP Transaction"** means the monetization of intellectual property through any offset or similar transaction identified by the Reorganized Debtor in its reasonable business judgment and in consultation with the GUC Trust Trustee in accordance with the GUC Trust Settlement Agreement.

1.127 **"IP Transaction Proceeds"** means the net cash proceeds from any IP Transaction (which amount shall be determined by the Reorganized Debtor in its reasonable business judgment and in consultation with the GUC Trust Trustee, after reimbursement to the Reorganized Debtor for the IP Advisor's fees and expenses), which shall be distributed 55% to the Reorganized Debtor and 45% to the GUC Trust, in accordance with the terms of the GUC Trust Settlement Agreement.

1.128 **"KEIP"** means the Key Employee Incentive Plan for certain of Exide's officers and management adopted by Exide's board of directors and approved by a Final Order of the Bankruptcy Court on September 17, 2013.

1.129 **"Law"** means any law (statutory or common), statute, regulation, rule, code or ordinance enacted, adopted, issued, or promulgated by any Governmental Unit.

1.130 **"Legal Proceeding"** means legal, governmental, administrative, judicial, or regulatory investigations, audits, actions, suits, claims, arbitrations, demands, demand letters, notices of noncompliance or violation, or proceedings.

1.131 **"Letter(s) of Credit"** means any letter of credit (singularly or collectively as the case may be) issued pursuant to the DIP Credit Agreement.

1.132 **"Letter of Credit Issuer"** means the issuer of a Letter of Credit under the DIP Credit Agreement.

1.133 **"Lien"** has the meaning ascribed to such term in section 101(37) of the Bankruptcy Code.

1.134 **"LME Pricing Claims"** means any private antitrust action, price competition action, or similar action to the extent permitted by applicable law, whether the foregoing arises under United States law or the laws of foreign jurisdictions, for damages to the Debtor and/or its Subsidiaries or Affiliates resulting from alleged lead price manipulation that is the subject of the investigation conducted by the Creditors' Committee and the Debtor beginning in or about April 2014, pursuant to and in accordance with the terms and conditions of the GUC Trust Settlement Agreement.

1.135 **"MIP"** means that certain management incentive compensation plan to be implemented on or after the Effective Date, as is more specifically described in Exhibit 6.16, by which the Reorganized Debtor shall deliver certain stock options and/or restricted grants in the Reorganized Debtor to certain post-Effective date management and other employees of the Reorganized Debtor and its Affiliates.

1.136 **"New Board"** means the initial board of directors of the Reorganized Debtor.

1.137 **"New Exide Common Stock"** means the shares of new common stock of the Reorganized Debtor.

1.138 **"New Exide Common Stock Allocation"** means the allocation of shares of New Exide Common Stock, after conversion of all the New Second Lien Convertible Notes to New Exide Common Stock on a fully diluted basis, as follows: (a) 80.0% to holders of New Second Lien Convertible Notes; (b) 10.0% to Holders of Senior Notes Secured Claims; (c) 5.0% in payment to the Backstop Parties; (d) 3.0% in payment of the DIP/Second Lien Conversion Option Funding Fee; and (e) 2.0% in payment of the DIP/Second Lien Conversion Option Backstop Fee, all subject to dilution on account of the MIP and any paid-in-kind interest accruing on the New Second Lien Convertible Notes prior to conversion.

1.139 **"New First Lien High Yield Notes"** means those first lien high yield notes to be issued by the Reorganized Debtor pursuant to the terms described in Exhibit 6.2(b).

1.140 **"New Second Lien Convertible Notes"** means those second lien convertible notes to be issued by the Reorganized Debtor pursuant to the terms described in Exhibit 6.2(c).

1.141 **"Noteholder Adequate Protection Obligations"** has the meaning ascribed to such term in the DIP Facility Order.

1.142 **"Old Exide Common Stock"** means shares of common stock of Exide that are authorized, issued, and outstanding prior to the Effective Date, including common stock contained in the reserve established pursuant to the Joint Plan of Reorganization confirmed in the

2002 Bankruptcy Case for issuance to Holders of unsecured prepetition disputed claims in the 2002 Bankruptcy Case.

**1.143 "Old Exide Securities"** means, collectively, the Senior Notes, the Subordinated Notes, and Old Exide Common Stock, and all options, warrants, rights and other instruments evidencing an ownership interest in the Debtor (whether fixed or contingent, matured or unmatured, disputed or undisputed), contractual, legal, equitable, or otherwise, to acquire any of the foregoing.

**1.144 "Ordinary Course Professionals Order"** means the Bankruptcy Court's Order Pursuant to Bankruptcy Code Sections 105(a), 327, 330 and 331 Authorizing the Debtor to Employ and Pay Professionals Utilized in the Ordinary Course of Business (Docket No. 332).

**1.145 "Other General Unsecured Claims"** means all Subordinated Notes Claims and all General Unsecured Claims.

**1.146 "Other Interests"** means all options, call rights, puts, awards, or other agreements to acquire an Equity Security of the Debtor.

**1.147 "Other Priority Claim"** means any Claim, other than an Administrative Claim or Priority Tax Claim, entitled to priority payment as specified in section 507(a) of the Bankruptcy Code.

**1.148 "Other Secured Claim"** means any Secured Claim other than the following: (a) a DIP Facility Claim or (b) a Senior Notes Secured Claim.

**1.149 "Other Secured Claim Interest Rate"** means the interest rate equal to the seven-year treasury yield rate on the Effective Date plus 200 basis points.

**1.150 "Other Subordinated Claim"** means any Claim against the Debtor other than a Subordinated Notes Claim that is subject to subordination under section 510(b) or (c) of the Bankruptcy Code, whether arising from rescission of a purchase or sale of a security of the Debtor or an Affiliate of the Debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim, or otherwise, which Claim shall be subordinated to all Claims or Interests that are senior to or equal to the Claim or Interest represented by such security, except that if such security is Old Exide Common Stock, such Claim has the same priority as Old Exide Common Stock.

**1.151 "PBGC"** means the Pension Benefit Guaranty Corporation.

**1.152 "Pension Plan"** means the Exide Technologies Retirement Plan, and any components thereof, which is the sole defined benefit pension plan sponsored by the Debtor.

**1.153 "Periodic Distribution Date"** means, as applicable, (a) the Distribution Date, as to the first distribution made by the Distribution Agent, and (b) thereafter, such Business Days selected by the Reorganized Debtor in its reasonable discretion.

17

1.154 **"Petition Date"** means June 10, 2013.

1.155 **"Plan"** means this fourth amended plan of reorganization for the resolution of outstanding Claims and Interests in the Chapter 11 Case, as may be modified in accordance with the Bankruptcy Code and Bankruptcy Rules, including the Plan Supplement and all Exhibits, supplements, appendices, and schedules.

1.156 **"Plan Supplement"** means the supplement or supplements to the Plan containing certain Exhibits and documents relevant to the implementation of the Plan, to be filed with the Bankruptcy Court.

1.157 **"Plan Supplement Filing Date"** means the date on which the Plan Supplement shall be filed with the Bankruptcy Court, which date shall be at least seven days prior to the Voting Deadline or such later date as may be approved by the Bankruptcy Court without further notice.

1.158 **"Plan Support Agreement"** means that certain Second Amended and Restated Plan Support Agreement entered into by and among Exide and the Consenting Creditors dated as of January 7, 2015, as may be amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof.

1.159 **"Plan Support Agreement Approval Order"** means the Final Order entered by the Bankruptcy Court authorizing the Debtor's entry into and approving the terms and conditions of the Plan Support Agreement.

1.160 **"Plan Transaction Documents"** means all definitive documents and agreements to which the Debtor will be a party as contemplated by the Plan Support Agreement and the Plan, including (a) the motion to approve the Plan Support Agreement and the Plan Support Agreement Approval Order, (b) the Plan and any documentation or agreements related thereto, (c) the Confirmation Order and pleadings in support of entry thereof, (d) the Backstop Commitment Agreement and any documentation or agreements related thereto, the motion to approve the Backstop Commitment Agreement, and the Backstop Commitment Agreement Approval Order, (e) the Disclosure Statement, the solicitation materials in respect of the Plan, the Rights Offering Procedures, the Rights Offering Procedures Order, the motion to approve the Disclosure Statement, and the Disclosure Statement Approval Order, (f) the Exit Financing Commitment Agreements and any documentation or agreements relating thereto, and (g) all documents that will comprise the Plan Supplements.

1.161 **"Preference Proceeds Distribution"** means an amount from net proceeds of GUC Trust Preference Actions distributable to Holders of Senior Notes Eligible Holder Claims equal to (a) $1.5 million divided by Allowed Class D Claims plus the Allowed Class E Claims multiplied by (b) the Senior Notes Deficiency Claim of Holders of Senior Notes Alternative Distribution Claims.

1.162 **"Prepetition Indemnification Basket"** shall have the meaning ascribed to it in Article 9.3 of this Plan.

**1.163 "Prepetition Indemnification Obligations"** shall have the meaning ascribed to it in <u>Article 9.3</u> of this Plan.

**1.164 "Priority Tax Claim"** means a Claim of a Governmental Unit entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

**1.165 "Pro Rata"** means, with respect to Claims or DIP Facility Claims, at any time, the proportion that the Face Amount of a Claim in a particular Class or Classes or with respect to the DIP Facility Claims, such DIP Facility Claims, bears to the aggregate Face Amount of all Claims (including Disputed Claims, but excluding disallowed Claims) in such Class or Classes or with respect to the DIP Facility Claims, all such kind of DIP Facility Claims at issue.

**1.166 "Professional"** means any Entity retained in the Chapter 11 Case by separate Final Order pursuant to sections 327, 363, and 1103 of the Bankruptcy Code or otherwise (and, for the avoidance of doubt, includes Alvarez & Marsal North America, LLC); <u>provided</u>, <u>however</u>, that Professional does not include any Entity retained pursuant to the Ordinary Course Professionals Order or any professionals the payment of which is authorized under paragraph 15 of the DIP Facility Order.

**1.167 "Professional Claim"** means an Administrative Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses, or other charges and disbursements incurred relating to services rendered or expenses incurred after the Petition Date and prior to and including the Confirmation Date.

**1.168 "Professional Fee Order"** means the order entered by the Bankruptcy Court on July 11, 2013, authorizing the interim payment of Professional Claims subject to the Holdback Escrow Amount.

**1.169 "Reclamation Claim"** means any Claim for the reclamation of goods delivered to the Debtor asserted under section 546(c) of the Bankruptcy Code.

**1.170 "Recovery Litigation"** has the meaning ascribed to it in the Vernon Tort Claims Term Sheet.

**1.171 "Reinstated"** or **"Reinstatement"** means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the Claim Holder so as to leave such Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code, or (b) notwithstanding any contractual provision or applicable law that entitles the Claim Holder to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity of such Claim as such maturity existed before such default; (iii) compensating the Claim Holder for any damages incurred as a result of any reasonable reliance by such Claim Holder on such contractual provision or such applicable law; and (iv) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the Claim Holder; <u>provided</u>, <u>however</u>, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios,

negative pledge covenants, covenants or restrictions on merger or consolidation, "going dark" provisions, and affirmative covenants regarding corporate existence prohibiting certain transactions or actions contemplated by this Plan, or conditioning such transactions or actions on certain factors, shall not be required to be cured or reinstated in order to accomplish Reinstatement.

      1.172 **"Rejection Damages Claim"** means any Claim on account of the rejection of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code or the repudiation of such contract.

      1.173 **"Released Parties"** means, collectively, in each case, solely in their respective capacities as such: (a) except as set forth herein, the Debtor and all of the Debtor's and Reorganized Debtor's current and former officers and directors, principals, employees, agents, subsidiaries, current and former affiliates, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals; (b) the DIP Agent, (c) the DIP Lenders, (d) the Backstop Parties, (e) the Consenting Creditors, (f) all Professionals, (g) the Unofficial Noteholder Committee and each of its members, (h) the Creditors' Committee and each of its members, (i) the Senior Notes Indenture Trustee, (j) the Subordinated Notes Indenture Trustee, (k) solely with respect to Vernon Tort Claimants and the Vernon Tort Claims Trust, XL, solely on account of the Initial Carrier Policies in accordance with the terms of the Vernon Tort Claims Term Sheet; provided, however, that as a condition to such release of XL, XL must release the collateral from which the Debtor will fund the Vernon Tort Claims Trust Assets, and (l) with respect to each of the above-named Entities described in subsections (b) through (k), such Entity's current and former affiliates, subsidiaries, advisors, principals, partners, managers, members, employees, officers, directors, representatives, financial advisors, attorneys, accountants, investment bankers, consultants, agents, and other representatives and professionals, in each case to the extent a claim arises from actions taken or omissions by any such person in its capacity as a related person of one of the parties listed in clauses (b) through (k) and is released as against such party.

      1.174 **"Releasing Parties"** means, collectively, in each case, in their respective capacities as such (a) the Backstop Parties, (b) the Consenting Creditors, (c) the Unofficial Noteholder Committee and the members thereof, (d) the Creditors' Committee and the members thereof, (e) the Senior Notes Indenture Trustee, (f) the Subordinated Notes Indenture Trustee, (g) the Vernon Tort Claimants in accordance with the terms of the Vernon Tort Claims Term Sheet, (h) Holders of Unimpaired Claims, and (i) each Holder of a Claim voting to accept the Plan or abstaining from voting to accept or reject the Plan, unless such Holder elects to opt out of the releases contained in <u>Article 12.7</u> by checking the box on its timely submitted applicable ballot.

      1.175 **"Reorganized Debtor"** means the Debtor or any successor thereto, by merger, consolidation, or otherwise, from and after the Effective Date.

      1.176 **"Required Consenting Creditors"** has the meaning ascribed to such term in the Plan Support Agreement.

      1.177 **"Requisite Backstop Parties"** has the meaning ascribed to such term in the Backstop Commitment Agreement.

**1.178** "**Rights Offering**" means that certain rights offering pursuant to which Eligible Holders shall have the right to exercise Rights Offering Subscription Rights and Rights Offering Oversubscription Rights for the purchase of up to $175.0 million of the New Second Lien Convertible Notes.

**1.179** "**Rights Offering Oversubscription Rights**" has the meaning ascribed to such term in the Rights Offering Procedures.

**1.180** "**Rights Offering Subscription Rights**" has the meaning ascribed to such term in the Rights Offering Procedures.

**1.181** "**Rights Offering Record Date**" has the meaning ascribed to such term in the Rights Offering Procedures.

**1.182** "**Rights Offering Procedures**" means the procedures required to be followed by Holders of Senior Notes Secured Claims to validly exercise their Rights Offering Subscription Rights or Rights Offering Oversubscription Rights, as applicable.

**1.183** "**Rights Offering Procedures Order**" means the Final Order entered by the Bankruptcy Court approving the commencement of the Rights Offering in accordance with the Rights Offering Procedures.

**1.184** "**Rule 2004 Motions**" has the meaning ascribed to it in Article 7.4(c) of this Plan.

**1.185** "**Scheduled**" means, with respect to any Claim, the status, priority, and amount, if any, of such Claim as set forth in the Schedules.

**1.186** "**Schedules**" means the schedules of assets and liabilities and the statements of financial affairs filed in the Chapter 11 Case by the Debtor pursuant to section 521 of the Bankruptcy Code, which incorporate by reference the global notes and statement of limitations, methodology, and disclaimer regarding the Debtor's schedules and statements, as such schedules or statements have been or may be further modified, amended, or supplemented from time to time in accordance with Bankruptcy Rule 1009 or Final Orders of the Bankruptcy Court.

**1.187** "**Section 503(b)(9) Claim**" means any Claim asserted under section 503(b)(9) of the Bankruptcy Code equal to the value of any goods received by the Debtor within 20 days before the Petition Date in which the goods have been sold to the Debtor in the Debtor's ordinary course of business.

**1.188** "**Secured Claim**" means a Claim (a) secured by a Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

**1.189** "**Securities Act**" means the Securities Act of 1933, as now in effect or hereafter amended, and the rules and regulations of the United States Securities and Exchange Commission promulgated thereunder.

**1.190** "**Security**" has the meaning ascribed to such term in section 2(a)(1) of the Securities Act.

**1.191** "**Senior Notes**" means the 8.625% Senior Secured Notes due 2018 issued by Exide under the Senior Notes Indenture.

**1.192** "**Senior Notes A2 Rights Offering**" means the right of Holders of Senior Notes Alternative Distribution Claims to purchase up to $10,863,730 of the New Second Lien Convertible Notes on the same terms as the Rights Offering Subscription Rights by making a Senior Notes A2 Rights Offering Election.

**1.193** "**Senior Notes A2 Rights Offering Election**" means an election made through DTC on or before the Senior Notes Alternative Election Deadline pursuant to which a Holder of Senior Notes Alternative Distribution Claims that completes a Senior Notes A2 Rights Offering Certification may timely and irrevocably elect to receive: in lieu of its Pro Rata share of the Alternative Distribution Cash under Article 4.1(b)(ii)(1)(A) of this Plan, its right to participate in the Senior Notes A2 Rights Offering.

**1.194** "**Senior Notes A2 Rights Offering Certification**" means a certification made through DTC on or before the Senior Notes Alternative Election Deadline by a Holder of an Allowed Senior Notes Alternative Distribution Claim that is making a Senior Notes A2 Rights Offering Election, certifying that such Holder is an "accredited investor" as defined in Rule 501(a)(4), (5), or (6) under the Securities Act.

**1.195** "**Senior Notes Alternative Distribution Claim**" means a Senior Notes Claim that is held by any Holder that is not an Eligible Holder, which shall be Allowed for all purposes under this Plan.

**1.196** "**Senior Notes Alternative Distribution Certification**" means the certification by a Holder of an Allowed Senior Notes Claim in accordance with the solicitation procedures set forth in the Disclosure Statement Order, to be completed by Holders of Senior Notes Alternative Distribution Claims prior to receiving any distribution on account of such Holder's Senior Notes Secured Claims under Article 4.1(b) of this Plan.

**1.197** "**Senior Notes Alternative Distribution Deferred Payments**" means deferred, nontransferable Cash payments by the Debtor to be allocated among Holders of Senior Notes Alternative Distribution Claims that do not make the Senior Notes Stock Election on the following terms: (i) each such Holder shall receive $54.00 for every $1,000.00 of such Holder's Allowed Senior Notes Alternative Distribution Claims to be paid no later than seven years from the Effective Date plus interest accruing at an interest rate equal to the seven-year treasury yield rate on the Effective Date plus 200 basis points; (ii) accrued interest payments shall be made on each one-year anniversary of the Effective Date or the date that all amounts are paid in full if occurring before such one-year anniversary; and (iii) payments shall be secured by liens against the same collateral securing the Senior Notes junior in priority to the liens securing the New First

22

Lien High Yield Notes, the New Second Lien Convertible Notes and the Exit ABL Revolver Facility; provided, however, that the Senior Notes Alternative Distribution Deferred Payments for Senior Notes Alternative Distribution Claims shall not exceed $7,000,000.00; provided, further, however that in no event shall the distribution of Senior Notes Alternative Distribution Deferred Payments result in a recovery greater than the recovery provided to Holders of Senior Notes Eligible Holder Claims under Article 4.1(a)(ii) of the Plan.

**1.198** **"Senior Notes Alternative Election Deadline"** means the date that is thirty (30) days after the Effective Date.

**1.199** **"Senior Notes Claim"** means any and all Claims held by the Senior Secured Noteholders against the Debtor arising under or related to the Senior Notes, including any Senior Notes Deficiency Claim and Senior Notes Secured Claims, which shall be Allowed for all purposes under this Plan.

**1.200** **"Senior Notes Deficiency Claim"** means the portion of the Senior Notes Claim that is unsecured pursuant to section 506(a) of the Bankruptcy Code, which shall be Allowed for all purposes under this Plan in the amount of $659.8 million or such other amount as determined by the Bankruptcy Court; provided, however, the parties to the GUC Trust Settlement Agreement shall not dispute that the $659.8 million Senior Notes Deficiency Claim is the deficiency Claim for purposes of the Plan.

**1.201** **"Senior Notes Eligible Holder Claim"** means a Senior Notes Claim, except a Senior Notes Alternative Distribution Claim, held by a Holder that (a) is an Eligible Holder and (b) certifies that it is an Eligible Holder through an Eligible Holder Certification, which Claim shall be Allowed for all purposes under this Plan.

**1.202** **"Senior Notes Indenture"** means that certain indenture dated as of January 25, 2011 pursuant to which the Senior Notes were issued.

**1.203** **"Senior Notes Indenture Trustee"** means the indenture trustee for the Senior Notes appointed under the Senior Notes Indenture.

**1.204** **"Senior Notes Secured Claim"** means the portion of the Senior Notes Claims that is a Secured Claim, which shall be Allowed for all purposes in the aggregate amount of $696,023,437.50 in principal, and interest accrued as of the Petition Date and all Noteholder Adequate Protection Obligations, less the amount of the Senior Notes Deficiency Claim; provided, however, that no adequate protection consideration received and payable up to and including the Effective Date provided in the DIP Facility Order shall be disgorged or deemed applied first to principal or otherwise in a manner to reduce the Allowed amount of the Senior Notes Secured Claims.

**1.205** **"Senior Notes Stock Election"** means an election made through DTC on or before the Senior Notes Alternative Election Deadline pursuant to which a Holder of Senior Notes Alternative Distribution Claims may timely and irrevocably elect to receive: in lieu of its Pro Rata share of the Senior Notes Alternative Distribution Deferred Payments under to Article 4.1(b)(ii)(1)(C) of this Plan, its Pro Rata portion of New Exide Common Stock distributed to Allowed Senior Notes Eligible Holder Claims.

23