**1.206** **"Senior Secured Noteholder"** means a Holder of a Senior Notes Claim.

**1.207** **"Servicer"** means any indenture trustee, agent, servicer, or other authorized representative of Holders of Claims or Interests recognized by the Debtor.  The Debtor recognizes Wells Fargo Bank, National Association, in its capacity as the Senior Notes Indenture Trustee, as a Servicer.

**1.208** **"Subordinated Noteholder"** means a Holder of Subordinated Notes.

**1.209** **"Subordinated Notes"** means those floating rate convertible senior subordinated notes due September 18, 2013 issued pursuant to the Subordinated Notes Indenture.

**1.210** **"Subordinated Notes Claim"** means a Claim of a Subordinated Notes Holder arising under or as a result of the Subordinated Notes, which Claims shall be Allowed for all purposes under the Plan in the aggregate amount of $51,900,000.00, and which for the avoidance of doubt shall not be subject to any avoidance, reductions, recharacterization, counterclaim, defense, disallowance, impairment, objection, or any challenges under applicable law or regulation.

**1.211** **"Subordinated Notes Indenture"** means that certain indenture for the Subordinated Notes between Exide and the Subordinated Notes Indenture Trustee, dated as of March 18, 2005.

**1.212** **"Subordinated Notes Indenture Trustee"** means U.S. Bank National Association, in its capacity as indenture trustee for the Subordinated Notes pursuant to the Subordinated Notes Indenture.

**1.213** **"Subsidiaries"** means a subsidiary of Exide or any of Exide's subsidiaries.

**1.214** **"Unclaimed Distribution"** means any distribution under the Plan on account of an Allowed Claim to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtor of an intent to accept a particular distribution; (c) responded to the Debtor's or Reorganized Debtor's request for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

**1.215** **"Unexpired Lease"** means a lease of nonresidential real property to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

**1.216** **"Unimpaired"** means, with respect to a Class of Claims, a Class of Claims that is not Impaired.

**1.217** **"Unofficial Noteholder Committee"** means the unofficial committee of unaffiliated holders (which include holders or investment advisors or managers of discretionary accounts) of Senior Notes represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP and Young Conway Stargatt & Taylor, LLP.

**1.218** "**Vernon Facility**" means the Debtor's lead recycling facility and related operations located at 2700 South Indiana Avenue, Vernon, California 90058.

**1.219** "**Vernon Personal Injury Litigation**" means the litigations commenced in California state court as described in Schedule D to the Vernon Tort Claims Term Sheet.

**1.220** "**Vernon Tort Claimants**" means any and all claimants who allege they have a Vernon Tort Claim who timely filed a proof of Claim in the Chapter 11 Case in accordance with the Order entered by the Bankruptcy Court in this Chapter 11 Case at Docket No. 788, and/or who is a plaintiff in any Vernon Personal Injury Litigation.

**1.221** "**Vernon Tort Claims**" means any and all Claims, proofs of Claim, actions, Causes of Action, rights, liabilities and obligations relating to the alleged discharges of lead, arsenic and other alleged contaminants from or in any way related to the Vernon Facility, including but not limited to any Claims for wrongful death; survivor claims; loss of consortium; negligence; negligence per se; absolute liability for ultrahazardous activity; misrepresentation and fraudulent concealment; private permanent nuisance; private continuing nuisance; public permanent nuisance causing special injury; public continuing nuisance causing special injury; permanent trespass; continuing trespass; and unfair business practices under the California state code; provided, however, Vernon Tort Claims do not include any Claims, proofs of Claim, Causes of Action or rights of, or liabilities or obligations owing to Environmental Governmental Units.

**1.222** "**Vernon Tort Claims Term Sheet**" means that certain term sheet and agreement, as may be amended, supplemented, restated, or otherwise modified from time to time with the written agreement of the parties thereto, which sets forth the terms of the settlement among the Debtor and a majority of the Holders of the Vernon Tort Claims, as set forth in Exhibit 8.1 to the Plan.

**1.223** "**Vernon Tort Claims Trust**" means the trust established under the provisions of Article VIII of the Plan in accordance with the Vernon Tort Claims Term Sheet.

**1.224** "**Vernon Tort Claims Trust Agreement**" means that certain trust agreement by and among the Debtor and the Vernon Tort Claims Trustee in accordance with the terms of the Vernon Tort Claims Term Sheet.

**1.225** "**Vernon Tort Claims Trust Assets**" means the assets transferred to the Vernon Tort Claims Trust in accordance with the Plan, the Vernon Tort Claims Term Sheet, and the Vernon Tort Claims Trust Agreement. The Vernon Tort Claims Trust Assets shall be formed and initially funded promptly upon the later of the Bankruptcy Court's approval of the Vernon Tort Claims Trust or the Effective Date with the contribution by the Debtor of Cash in the amount of $2,675,000 currently held as collateral in connection with Initial Carrier Policies; provided, however, that if XL does not release the collateral from which the Debtor will fund the Vernon Tort Claims Trust Assets, the Debtor or the Reorganized Debtor, as the case may be, shall be authorized to contribute Cash to fund the Vernon Tort Claims Trust. The Vernon Tort Claims Trust Assets shall also be comprised of the contributions of additional insurers or XL on

account of additional insurance policies other than the Initial Carrier Policies, or third parties, in accordance with the terms of the Vernon Tort Claims Term Sheet.

1.226    **"Vernon Tort Claims Trustee"** means the Entity selected by the Ad Hoc Vernon Tort Claimants Group, subject to Court approval after notice to other parties, to serve as trustee of the Vernon Tort Claims Trust, pursuant to the terms of the Vernon Tort Claims Term Sheet.

1.227    **"Voting Deadline"** means March 11, 2015 at 4:00 p.m. prevailing Eastern time.

1.228    **"XL"** means XL Specialty Insurance Company, Indian Harbor Insurance Company and/or Greenwich Insurance Company (collectively, and together with their affiliates and subsidiaries).

1.229    **"XL Accommodations Order"** means that certain order entered by the Bankruptcy Court on January 8, 2015 at Docket No. 2899 approving certain accommodations required by XL Specialty Insurance Company, Indian Harbor Insurance Company, Greenwich Insurance Company, and their affiliates in connection with renewal of certain of the Debtor's existing insurance policies.

C.    **Rules of Interpretation**

For purposes of this Plan, unless otherwise provided herein, (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) each pronoun stated in the masculine, feminine, or neuter includes the masculine, feminine, and neuter; (c) any reference in the Plan to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified, or supplemented; (d) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors and assigns; (e) all references in this Plan to Sections, Articles, and Exhibits are references to Sections, Articles, and Exhibits of or to this Plan; (f) the words "herein," "hereunder," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) captions and headings to Articles and Sections inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (h) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (i) to the extent the Disclosure Statement is inconsistent with the terms of this Plan, this Plan shall control; (j) to the extent this Plan is inconsistent with the Confirmation Order, the Confirmation Order shall control; and (k) any immaterial effectuating provision may be interpreted by the Reorganized Debtor in a manner that is consistent with the overall purpose and intent of the Plan without further Final Order of the Bankruptcy Court.

D.    **Computation Of Time**

In computing any period of time prescribed or allowed by this Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.

E.    **References to Monetary Figures**

All references in this Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

F.    **Exhibits**

All Exhibits are incorporated into and are a part of this Plan as if set forth in full herein and, to the extent not annexed hereto, such Exhibits shall be filed with the Bankruptcy Court on or before the Plan Supplement Filing Date. After the Plan Supplement Filing Date, copies of Exhibits may be obtained upon written request to Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036 (Att'n: Elliot A. Ross), or Skadden, Arps, Slate, Meagher & Flom LLP, 155 North Wacker Drive, Suite 2700, Chicago, Illinois 60606 (Att'n: Jennifer Madden), counsel to the Debtor, or by downloading such exhibits from the Debtor's informational website at www.exiderestructuringinfo.com. To the extent any Exhibit is inconsistent with the terms of this Plan and unless otherwise provided for in the Confirmation Order, the terms of the Exhibit shall control as to the transactions contemplated thereby and the terms of this Plan shall control as to any Plan provision that may be required under the Exhibit.

## ARTICLE II

## ADMINISTRATIVE EXPENSES AND PRIORITY CLAIMS

**2.1    Administrative Claims.** Except to the extent that the Debtor (or the Reorganized Debtor) and a Holder of an Allowed Administrative Claim agree to a less favorable treatment, a Holder of an Allowed Administrative Claim (other than a Professional Claim, which shall be subject to Article 2.3 of the Plan) shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim either (a) on the Distribution Date; (b) on the first Periodic Distribution Date occurring after the later of (i) 30 days after the date when an Administrative Claim becomes an Allowed Administrative Claim or (ii) 30 days after the date when an Administrative Claim becomes payable pursuant to any agreement between the Debtor (or the Reorganized Debtor) and the Holder of such Administrative Claim, or (c) if the Allowed Administrative Claim is based on liabilities incurred by the Debtor in the ordinary course of its business after the Petition Date, in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims, without any further action by the Holders of such Allowed Administrative Claims; provided, however, that other than Holders of (i) a DIP Facility Claim, (ii) a Professional Claim, (iii) an Administrative Claim Allowed by an order of the Bankruptcy Court on or before the Effective Date, or (iv) an Administrative Claim that is not Disputed and arose in the ordinary course of business and was paid or is to be paid in accordance with the terms and conditions of the particular transaction giving rise to such Administrative Claim, the Holder of any Administrative Claim shall have filed a proof of Claim form no later than the Administrative Claims Bar Date and such Claim shall have become an Allowed Claim. Except as otherwise provided herein and as set forth in Articles 2.2 or 2.3 of this Plan, all requests for payment of an Administrative Claim must be filed, in substantially the form of the Administrative Claim Request Form

27

contained in Exhibit 2.1, with the Claims Agent and served on counsel for the Debtor or the Reorganized Debtor no later than the Administrative Claims Bar Date. Any request for payment of an Administrative Claim pursuant to this Article 2.1 that is not timely filed and served shall be Disallowed automatically without the need for any objection from the Reorganized Debtor. The Reorganized Debtor may settle an Administrative Claim without further Bankruptcy Court approval. In the event that the Reorganized Debtor objects to an Administrative Claim and there is no settlement, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim.

**2.2     DIP Facility Claims.** Pursuant to the DIP Facility Order, all DIP Facility Claims are Allowed.

(a)     **DIP ABL Claims.** Except to the extent that a Holder of a DIP ABL Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every DIP ABL Claim, Holders of DIP ABL Claims shall be paid in full in Cash on the Effective Date, such payments to be distributed to the DIP Agent for the ratable benefit of the Holders of DIP ABL Claims.

To the extent that any Letter of Credit remains undrawn as of the Effective Date, the Debtor shall (i) cause that Letter of Credit to be replaced with a letter of credit issued under the Exit Financing, (ii) collateralize that Letter of Credit with Cash in an amount equal to 105% of its face amount, (iii) provide a back-to-back letter of credit to the Letter of Credit Issuer on terms and from a financial institution reasonably acceptable to the Letter of Credit Issuer, or (iv) provide such other treatment as the Letter of Credit Issuer shall agree in its sole discretion.

(b)     **DIP Term Loan Claims.** Except to the extent that a Holder of a DIP Term Loan Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every DIP Term Loan Claim, each Holder of an Allowed DIP Term Loan Claim shall receive:

(i)     if such Holder is not a Consenting Creditor, and such Holder agrees:

(1)     its Pro Rata share of the DIP Term Loan Refinancing Cash Pool;

(2)     in exchange for approximately 71.2% of such Holder's DIP Term Loan Claims, its Pro Rata share of New First Lien High Yield Notes issued pursuant to the DIP/First Lien Exchange (reduced on a dollar-for-dollar basis by the New First Lien High Yield Notes issued to participants in the DIP Term Loan Refinancing Investment Option); and

(3)     in exchange for approximately 28.8% of such Holder's DIP Term Loan Claims, such Holder's choice of its Pro Rata share of (A)(i) New Second Lien Convertible Notes and (ii) the DIP/Second Lien Conversion Option Funding Fee or (B) New First Lien High Yield Notes (in each case reduced on a dollar-for-dollar basis by any such consideration issued to participants in the DIP Term Loan Refinancing Investment Option); and

(ii)    if such Holder is a Consenting Creditor:

(1)    its Pro Rata share of the DIP Term Loan Refinancing Cash Pool;

(2)    in exchange for approximately 28.8% of such Holder's DIP Term Loan Claims, pursuant to the DIP/Second Lien Conversion Option, its Pro Rata share of: (A) New Second Lien Convertible Notes exchanged at par and (B) the DIP/Second Lien Conversion Option Funding Fee (in each case reduced on a dollar-for-dollar basis by any such consideration issued to participants in the DIP Term Loan Refinancing Investment Option); and

(3)    in exchange for approximately 71.2% of such Consenting Creditor's DIP Term Loan Claims, its Pro Rata share of the New First Lien High Yield Notes issued pursuant to the DIP/First Lien Exchange (reduced on a dollar-for-dollar basis by the New First Lien High Yield Notes issued to participants in the DIP Term Loan Refinancing Investment Option); provided, however, that in the event of a DIP/Second Lien Undersubscription, Consenting Creditors shall exchange DIP Term Loan Claims that otherwise would be exchanged for New First Lien High Yield Notes pursuant to this Article 2.2(b)(ii)(3), in the aggregate amount of the DIP/Second Lien Undersubscription, for additional New Second Lien Convertible Notes pursuant to and in the percentages set forth in the Plan Support Agreement (in each case reduced on a dollar-for-dollar basis by the New Second Lien Convertible Notes issued to participants in the DIP Term Loan Refinancing Investment Option); and

(4)    such Consenting Creditor's share of the DIP/Second Lien Conversion Option Backstop Fee as set forth in the Plan Support Agreement.

(c)    **DIP Facility Other Claims**.  Except to the extent that a Holder of a DIP Facility Other Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every DIP Facility Other Claim, Holders of DIP Facility Other Claims (other than Excluded DIP Obligations) shall be paid in full in Cash on the Effective Date, such payments to be distributed to the DIP Agent for the ratable benefit of the Holders of DIP Facility Other Claims.

(d)    Upon the Effective Date, all Liens and security interests granted to secure the DIP Facility shall be deemed discharged, cancelled, and released and shall be of no further force and effect; provided, however, that the Excluded DIP Obligations shall survive the Effective Date and shall not be discharged, cancelled or released pursuant to the Plan or the Confirmation Order, notwithstanding any provision hereof or thereof to the contrary, and the payment on such date of the DIP Facility Claims shall in no way affect or impair the obligations, duties and liabilities of the Debtor or the rights of the DIP Agent and the DIP Lenders relating to any Excluded DIP Obligations.  To the extent that the DIP Lenders or the DIP Agent have filed or recorded publicly any Liens and/or security interests to secure the Debtor's obligations under the DIP Facility, the DIP Lenders or the DIP Agent, as the case may be, shall take any commercially reasonable steps requested by the Debtor, at the expense of the Reorganized

Debtor, that are necessary to cancel and/or extinguish such publicly-filed Liens and/or security interests.

### 2.3    Professional Claims.

(a)    **Final Fee Applications**.   All final requests for payment of Professional Claims and requests for reimbursement of expenses of members of the Creditors' Committee must be filed no later than sixty (60) days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules and prior orders of the Bankruptcy Court, the Allowed amounts of such Professional Claims and expenses shall be determined by the Bankruptcy Court.

(b)    **Payment of Interim Amounts**.  Subject to the Holdback Escrow Amount, on the Effective Date, the Debtor or the Reorganized Debtor shall pay all amounts owing to Professionals for all outstanding amounts billed relating to prior periods through the Effective Date as to which no objection has been filed.  In order to receive payment on the Effective Date for unbilled fees and expenses incurred through the Effective Date, no later than two (2) days prior to the Effective Date, the Professionals shall estimate fees and expenses due for periods that have not been billed as of the Effective Date and shall deliver such estimate to counsel for the Debtor.   Within fifteen (15) days after the Effective Date, a Professional receiving payment for the estimated period shall submit a detailed invoice covering such period.

(c)    **Holdback Escrow Account**.  On the Effective Date, the Debtor or the Reorganized Debtor shall fund the Holdback Escrow Account with Cash equal to the aggregate Holdback Escrow Amount for all Professionals.   The Distribution Agent shall maintain the Holdback Escrow Account in trust for the Professionals with respect to whom fees have been held back pursuant to the Professional Fee Order.  Such funds shall not be considered property of the Debtor, the Reorganized Debtor, or the Estate.   The remaining amount of Professional Claims owing to the Professionals shall be paid to such Professionals by the Distribution Agent from the Holdback Escrow Account when such claims are finally Allowed by the Bankruptcy Court.  When all Professional Claims have been paid in full, amounts remaining in the Holdback Escrow Account, if any, shall be paid to the Reorganized Debtor.

(d)    **Post-Confirmation Date Retention**.   Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor shall employ and pay Professionals in the ordinary course of business (including the reasonable fees and expenses incurred by Professionals in preparing, reviewing and prosecuting or addressing any issues with respect to final fee applications).

### 2.4    Priority Tax Claims.  On the Distribution Date, except to the extent that the Debtor (or Reorganized Debtor) and a Holder of an Allowed Priority Tax Claim agree to a less favorable treatment, each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive one of the following treatments on account of such Claim: (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, (b) Cash in an amount agreed to by the Debtor (or the Reorganized Debtor) and such Holder, provided, however, that such parties may further agree for the payment of such Allowed Priority Tax

30

Claim to occur at a later date, or (c) at the sole option of the Debtor, Cash in the aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of not more than five (5) years after the Petition Date pursuant to section 1129(a)(9)(C) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtor and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

**2.5    Payment of Certain Indenture Trustee Fees.** On the Effective Date, the Debtor or Reorganized Debtor shall pay the reasonable, documented fees and expenses (subject to redaction to preserve attorney-client privilege) of the Subordinated Notes Indenture Trustee incurred during the Chapter 11 Case, including all attorneys' fees, in an amount not to exceed $740,000.00; provided, however, nothing herein shall prejudice the Subordinated Notes Indenture Trustee's right under the Subordinated Notes Indenture to assert a Charging Lien for any additional and outstanding fees and expenses incurred prior to and after the Effective Date. Notwithstanding any provisions of the Plan to the contrary, nothing herein shall be deemed to impair or negatively impact the Charging Lien, which Charging Lien is hereby expressly preserved. On the Effective Date, the Debtor or Reorganized Debtor shall pay the reasonable, documented and estimated, unpaid fees and expenses (subject to redaction to preserve attorney-client privilege) of the Senior Notes Indenture Trustee incurred during the Chapter 11 Case, including but not limited to all professionals' fees.

## ARTICLE III

## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

### 3.1    Classification of Claims and Interests.

(a)    Pursuant to sections 1122 and 1123 of the Bankruptcy Code, set forth below is a designation of classes of Claims against and Interests in the Debtor. A Claim or Interest is placed in a particular Class for the purposes of voting on the Plan and, to the extent applicable, receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims of the kinds specified in sections 507(a)(1) and 507(a)(8) of the Bankruptcy Code have not been classified and their treatment is set forth in Article II above.

(b)    Claims and Interests are divided into lettered Classes as set forth below:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| A1 | Senior Notes Eligible Holder Claims | Impaired | Entitled to Vote |
| A2 | Senior Notes Alternative | Impaired | Entitled to Vote |

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
|       | Distribution Claims |      |               |
| B     | Other Secured Claims | Impaired | Entitled to Vote |
| C     | Other Priority Claims | Unimpaired | Presumed to Accept |
| D     | General Unsecured Claims | Impaired | Entitled to Vote |
| E     | Subordinated Notes Claims | Impaired | Entitled to Vote |
| F     | Vernon Tort Claims | Impaired | Entitled to Vote |
| G     | Intercompany Claims | Unimpaired | Presumed to Accept |
| H     | Other Subordinated Claims | Impaired | Deemed to Reject |
| I     | Interests in Exide | Impaired | Deemed to Reject |

## ARTICLE IV

## PROVISIONS FOR TREATMENT
## OF CLAIMS AND INTERESTS

### 4.1    Class A – Senior Notes Claims.

(a)    *Class A1 – Senior Notes Eligible Holder Claims*

(i)    Classification: Class A1 consists of all Senior Notes Eligible Holder Claims.

(ii)    Treatment: In full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class A1 Claim, on the Effective Date or as soon as practicable thereafter, each Holder of an Allowed Class A1 Claim shall receive:

(1)    on account of such Holder's Senior Notes Secured Claims:

(A)    its Pro Rata share, based on the aggregate amount of Allowed Class A1 Claims and Allowed Class A2 Claims that make the Senior Notes Stock Election, of 10.0% of the New Exide Common Stock after giving effect to conversion of the New Second Lien Convertible Notes (prior to dilution on account of the MIP and any paid-in-kind interest accruing on the New Second Lien Convertible Notes prior to conversion);

32

(B)   the right to participate, on a Pro Rata basis, in the Rights Offering; and

(C)   the right to participate, on a Pro Rata basis, in the DIP Term Loan Refinancing Investment Option; provided that such investor's participation shall be capped at its Pro Rata share of its Senior Notes Claims; and

(2)   on account of such Holder's Senior Notes Deficiency Claims, such Holder shall be a beneficiary of the GUC Trust and shall receive its Pro Rata share, based on the aggregate amount of Allowed Senior Notes Deficiency Claims, Allowed Class D, and Allowed Class E Claims, of the net proceeds of the GUC Trust Assets, subject to the allocation and distribution formulas included in the GUC Trust Settlement Agreement; provided, however, to allow for holders of Senior Notes Alternative Distribution Claims to receive GUC Trust Distributions up to what they would have been entitled to receive on a hypothetical pro rata basis absent the GUC Trust Settlement, (i) the Preference Proceeds Distribution shall be allocated and distributed Pro Rata to Holders of Senior Notes Alternative Distribution Claims, after which any additional net proceeds from GUC Trust Preference Actions shall be distributed Pro Rata based on the aggregate amount of Allowed Senior Notes Deficiency Claims, Allowed Class D Claims, and Allowed Class E Claims in accordance with the GUC Trust Settlement Agreement; and (ii) the Additional Distribution shall be allocated and distributed to Holders of Senior Notes Alternative Distribution Claims.

(3)   Each Holder of an Allowed Class A1 Claim shall waive all subordination rights in favor of the Holders of Senior Notes Eligible Holder Claims vis-à-vis the holders of Subordinated Notes, and all such rights to enforce subordination shall be settled, compromised, and released under this Plan.  If for any reason subordination is enforced on or after the Effective Date, Holders of Senior Notes Eligible Holder Claims voting in favor of the Plan shall not enforce or benefit from turnover of any distributions to be made to Holders of Subordinated Notes Claims or shall repay to the Holders of Subordinated Notes Claims any amounts turned over so that the Holders of Subordinated Notes Claims receive the benefit of such waiver.

**In order to receive any distribution on account of a Holder's Class A1 Senior Notes Secured Claim, such Holder must complete an Eligible Holder Certification.**

(iii)   Voting: Class A1 is Impaired and Holders of Allowed Class A1 Claims are entitled to vote to accept or reject the Plan.

(iv)   A vote by a Holder of Senior Notes Eligible Holder Claims to accept the Plan shall also constitute (i) a direction by such Holder to the Senior Notes Indenture Trustee, pursuant to section 6.05 of the Senior Notes Indenture, not to pursue payment of the Noteholder Adequate Protection Obligations beyond any payment provided in the Plan and (ii) a consent by such Holder, pursuant to section 9.02 of the Senior Notes Indenture, to amendments to the Senior Notes Indenture to (a) waive payment of the Noteholder Adequate Protection Obligations beyond any payment provided in the Plan and (b) allow for release of the Lien securing the Noteholder Adequate Protection Obligations. Such amendments to the Senior

Notes Indenture shall become effective as of the Effective Date of the Plan without any further action by any party.

        (b)     *Class A2 – Senior Notes Alternative Distribution Claims.*

        (i)     Classification: Class A2 consists of all Senior Notes Alternative Distribution Claims.

        (ii)     Treatment: In full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class A2 Claim, as soon as practicable after the Senior Notes Alternative Election Deadline, each Holder of a Senior Notes Alternative Distribution Claim shall receive:

        (1)     on account of such Holder's Senior Notes Secured Claims:

        (A)  if such Holder does not make a Senior Notes A2 Rights Offering Election, its Pro Rata share of the Alternative Distribution Cash; or

        (B)  if such Holder makes a Senior Notes A2 Rights Offering Election, the right to participate, on a Pro Rata basis, in the Senior Notes A2 Rights Offering; <u>provided</u> that if a Holder makes a Senior Notes A2 Rights Offering Election, such Holder must also make a Senior Notes Stock Election;

and

        (C)  if such Holder does not make a Senior Notes Stock Election, its Pro Rata share of the Senior Notes Alternative Distribution Deferred Payments; or

        (D)  if such Holder makes a Senior Notes Stock Election, its Pro Rata share, based on the aggregate amount of Allowed Class A1 Claims and Allowed Class A2 Claims that make the Senior Notes Stock Election, of 10.0% of the New Exide Common Stock after giving effect to conversion of the New Second Lien Convertible Notes (prior to dilution on account of the MIP and any paid-in-kind interest accruing on the New Second Lien Convertible Notes prior to conversion); and

        (2)     on account of such Holder's Senior Notes Deficiency Claims, such Holder shall be a beneficiary of the GUC Trust and shall receive its Pro Rata share, based on the aggregate amount of Allowed Senior Notes Deficiency Claims, Allowed Class D Claims, and Allowed Class E Claims, of the net proceeds of the GUC Trust Assets, subject to the allocation and distribution formulas included in the GUC Trust Settlement Agreement; <u>provided</u>, <u>however</u>, to allow for holders of Senior Notes Alternative Distribution Claims to receive GUC Trust Distributions up to what they would have been entitled to receive on a hypothetical pro rata basis absent the GUC Trust Settlement, (i) the Preference Proceeds Distribution shall be allocated and distributed Pro

Rata to Holders of Senior Notes Alternative Distribution Claims, after which any additional net proceeds from GUC Trust Preference Actions shall be distributed Pro Rata based on the aggregate amount of Allowed Senior Notes Deficiency Claims, Allowed Class D Claims, and Allowed Class E Claims in accordance with the GUC Trust Settlement Agreement; and (ii) the Additional Distribution shall be allocated and distributed to Holders of Senior Notes Alternative Distribution Claims.

(3)   Each Holder of an Allowed Class A2 Claim shall waive all subordination rights in favor of the Holders of Senior Notes Alternative Distribution Claims vis-à-vis the holders of Subordinated Notes, and all such rights to enforce subordination shall be settled, compromised, and released under this Plan. If for any reason subordination is enforced on or after the Effective Date, Holders of Senior Notes Alternative Distribution Claims voting in favor of the Plan shall not enforce or benefit from turnover of any distributions to be made to Holders of Subordinated Notes Claims or shall repay to the Holders of Subordinated Notes Claims any amounts turned over so that the Holders of Subordinated Notes Claims receive the benefit of such waiver. For the avoidance of doubt the waiver of subordination rights described in this Article 4.1(b)(ii)(3) shall not include, and not be enforced against, Holders of Senior Notes Alternative Distribution Claims that voted against the Plan; provided further that Holders of Senior Notes Alternative Distribution Claims that voted against the Plan may only enforce their subordination rights vis-à-vis Holders of Subordinated Notes Claims to the extent of their Pro Rata share of any distributions that would otherwise be made to all Holders of Senior Notes, but for the waiver of subordination provided for in this Plan.

**In order to receive any distribution on account of a Holder's Class A2 Senior Notes Secured Claim, such Holder must complete a Senior Notes Alternative Distribution Certification. If such Holder makes a Senior Notes A2 Rights Offering Election, such Holder must complete a Senior Notes Rights Offering Certification.**

(iii)   Voting: Class A2 is Impaired and Holders of Allowed Class A2 Claims are entitled to vote to accept or reject the Plan.

(iv)   A vote by a Holder of Senior Notes Alternative Distribution Claims to accept the Plan shall also constitute (i) a direction by such Holder to the Senior Notes Indenture Trustee, pursuant to section 6.05 of the Senior Notes Indenture, not to pursue payment of the Noteholder Adequate Protection Obligations beyond any payment provided in the Plan and (ii) a consent by such Holder, pursuant to section 9.02 of the Senior Notes Indenture, to amendments to the Senior Notes Indenture to (a) waive payment of the Noteholder Adequate Protection Obligations beyond any payment provided in the Plan and (b) allow for release of the Lien securing the Noteholder Adequate Protection Obligations. Such amendments to the Senior Notes Indenture shall become effective as of the Effective Date of the Plan without any further action by any party.

### 4.2   Class B – Other Secured Claims.

(a)   Classification: Class B consists of all Other Secured Claims.

(b)     Treatment: Except as otherwise provided in and subject to <u>Article 11.6</u> of this Plan, and except to the extent that a Holder of an Allowed Class B Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class B Claim, each such Holder of an Allowed Class B Claim shall, at the sole option of the Debtor or the Reorganized Debtor, as applicable:

(i)     have its Allowed Class B Claim Reinstated and rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the Holder of an Allowed Class B Claim to demand or receive payment of such Allowed Class B Claim prior to the stated maturity of such Allowed Class B Claim from and after the occurrence of a default;

(ii)     be paid in full in Cash in an amount equal to such Allowed Class B Claim, including postpetition interest, if any, on such Allowed Class B Claim required to be paid pursuant to section 506 of the Bankruptcy Code as the case may be, on the first Periodic Distribution Date occurring after the later of (x) the Effective Date and (y) the date such Other Secured Claim becomes an Allowed Class B Claim;

(iii)     receive distributions of Cash payments in equal installments over a period not to exceed seven years from the Effective Date plus interest accruing at the Other Secured Claim Interest Rate, and to the extent, if any, that an Other Secured Claim is entitled to postpetition interest pursuant to section 506 of the Bankruptcy Code for the period between the Petition Date and the Effective Date, such interest shall accrue at the applicable non-default contractual rate or statutory rate, as the case may be, and be included in the Allowed amount of such Other Secured Claim; or

(iv)     receive the collateral securing its Allowed Class B Claim free and clear of Liens, Claims, and encumbrances on the first Periodic Distribution Date occurring after the later of (x) the Effective Date and (y) the date such Other Secured Claim becomes an Allowed Class B Claim; <u>provided</u> that such collateral, as of the day prior to the Effective Date, was property of the Estate.

Nothing in this <u>Article 4.2</u> or elsewhere in this Plan shall preclude the Debtor (or the Reorganized Debtor) from challenging the validity of any alleged Lien or any asset of the Debtor or the value of the property that secures any alleged Lien.

(c)     Voting: Class B is Impaired, and the Holders of Allowed Class B Claims are entitled to vote to accept or reject the Plan.

### 4.3     Class C – Other Priority Claims.

(a)     Classification: Class C consists of all Other Priority Claims.

(b)     Treatment:  Except as otherwise provided in and subject to <u>Article 11.6</u> of this Plan, and except to the extent that a Holder of an Allowed Class C Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class C Claim, each such Holder of an Allowed Class C Claim shall be paid in full in Cash on the first Periodic Distribution Date occurring after the later

of (i) the Effective Date and (ii) the date such Other Priority Claim becomes an Allowed Claim; provided, however, that Other Priority Claims that arise in the ordinary course of the Debtor's business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

(c)     Voting: Class C is Unimpaired, and Holders of Allowed Class C Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Class C Claims are not entitled to vote to accept or reject the Plan.

### 4.4    Class D – General Unsecured Claims.

(a)     Classification: Class D consists of all General Unsecured Claims.

(b)     Treatment: Except to the extent that a Holder of an Allowed Class D Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class D Claim, each Holder of an Allowed Class D Claim shall be a beneficiary of the GUC Trust and shall receive its Pro Rata share, based on the aggregate amount of Allowed Senior Notes Deficiency Claims, Allowed Class D Claims, and Allowed Class E Claims, of the net proceeds of the GUC Trust Assets, subject to the allocation and distribution formulas included in the GUC Trust Settlement Agreement.

(c)     Voting: Class D is Impaired and Holders of Allowed Class D Claims are entitled to vote to accept or reject the Plan.

### 4.5    Class E – Subordinated Notes Claims.

(a)     Classification: Class E consists of all Subordinated Notes Claims.

(b)     Treatment: Except to the extent that a Holder of an Allowed Class E Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class E Claim, each Holder of an Allowed Class E Claim shall be a beneficiary of the GUC Trust and shall receive its Pro Rata share, based on the aggregate amount of Allowed Senior Notes Deficiency Claims, Allowed Class D Claims, and Allowed Class E Claims, of the net proceeds of the GUC Trust Assets, subject to the allocation and distribution formulas included in the GUC Trust Settlement Agreement.  In addition, any subordination rights in favor of Holders of Senior Notes Eligible Holder Claims and/or Senior Notes Alternative Distribution Claims vis-à-vis Holders of Subordinated Notes Claims shall be waived and all such rights to enforce subordination shall be settled, compromised, and released under this Plan.  If for any reason subordination is enforced on or after the Effective Date, Holders of Senior Notes Eligible Holder Claims and/or Senior Notes Alternative Distribution Claims voting in favor of the Plan shall not enforce or benefit from turnover of any distributions to be made to Holders of Subordinated Notes Claims or shall repay to the Holders of Subordinated Notes Claims any amounts turned over so that the Holders of Subordinated Notes Claims receive the benefit of such waiver.

(c)    Voting: Class E is Impaired and Holders of Allowed Class E Claims are entitled to vote to accept or reject the Plan.

**4.6    Class F – Vernon Tort Claims.**

(a)    Classification: Class F consists of all Vernon Tort Claims. Upon the Effective Date of the Plan, the plaintiffs in the Vernon Personal Injury Litigation who are members of the Ad Hoc Vernon Tort Claimants Group and who have not previously filed timely proofs of Claim in the Chapter 11 Case shall be deemed to participate in Class F under the Plan and in the Vernon Tort Trust as if they had filed timely proofs of Claim, and further shall file proofs of Claim as soon as practicable.

(b)    Treatment: Except to the extent that a Holder of an Allowed Class F Claim agrees to a less favorable treatment:

(i)    if Class F votes to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class F Claim, each Holder of an Allowed Class F Claim:

(1)    shall exchange their Claims for their Pro Rata share of beneficial interests in the Vernon Tort Claims Trust; and

(2)    the Vernon Tort Claims Trust shall be authorized to proceed with Claims in accordance with Articles VIII and 12.7 of this Plan and the Vernon Tort Claims Term Sheet; or

(ii)    if Class F does not vote to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code, Holders of Allowed Class F Claims shall not receive any distributions on account of such Allowed Class F Claims.

(c)    Voting: Class F is Impaired and Holders of Allowed Class F Claims are entitled to vote to accept or reject the Plan.

**4.7    Class G – Intercompany Claims.**

(a)    Classification: Class G consists of all Intercompany Claims.

(b)    Treatment: On the Effective Date, all net Allowed Class G Claims (taking into account any setoffs of Intercompany Claims) held by the Debtor between and among any Affiliate of the Debtor shall, at the election of the Reorganized Debtor, be either (i) Reinstated, (ii) released, waived, and discharged, (iii) treated as a dividend, or (iv) contributed to capital or exchanged for equity of a Subsidiary of the Debtor.

(c)    Voting: Class G is Unimpaired, and Holders of Allowed Class G Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed Class G Claims are not entitled to vote to accept or reject the Plan.

38

### 4.8    Class H – Other Subordinated Claims.

(a)    Classification:  Class H consists of all Bankruptcy Code section 510(b) and (c) Claims.

(b)    Treatment: Holders of Allowed Class H Claims shall not receive any distributions on account of such Allowed Class H Claims.

(c)    Voting: Class H is Impaired, and Holders of Allowed Class H Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Allowed Class H Claims are not entitled to vote to accept or reject the Plan.

### 4.9    Class I – Interests in Exide.

(a)    Classification:  Class I consists of all Interests in Exide.

(b)    Treatment: On the Effective Date, Allowed Class I Interests shall be deemed automatically cancelled, released, and extinguished without further action by the Debtor or the Reorganized Debtor and the obligations of the Debtor and the Reorganized Debtor thereunder shall be discharged.

(c)    Voting: Class I is Impaired, and Holders of Allowed Class I Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Allowed Class I Interests are not entitled to vote to accept or reject the Plan.

### ARTICLE V

### ACCEPTANCE

**5.1    Classes Entitled to Vote.**  Classes A1, A2, B, D, E, and F are entitled to vote to accept or reject this Plan.  By operation of law, each Unimpaired Class of Claims is deemed to have accepted this Plan and, therefore, is not entitled to vote.  By operation of law, Classes H and I are deemed to have rejected this Plan and are not entitled to vote.

**5.2    Acceptance by Impaired Classes.**  An Impaired Class of Claims shall have accepted this Plan if, not counting the vote of any Holder designated under section 1126(e) of the Bankruptcy Code, (a) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept this Plan and (b) the Holders of more than one-half in number of the Allowed Claims actually voting in the Class have voted to accept the Plan.

**5.3    Elimination of Classes.**  To the extent applicable, any Class that does not contain any Allowed Claims or any Claims temporarily allowed for voting purposes under Bankruptcy Rule 3018, as of the date of commencement of the Confirmation Hearing, shall be deemed to have been deleted from this Plan for purposes of (a) voting to accept or reject this Plan and (b) determining whether it has accepted or rejected this Plan under section 1129(a)(8) of the Bankruptcy Code.

**5.4    Deemed Acceptance if No Votes Cast.**  If no Holders of Claims eligible to vote in a particular Class vote to accept or reject the Plan, this Plan shall be deemed accepted by the Holders of such Claims in such Class.

**5.5    Cramdown.**  To the extent necessary, the Debtor shall request confirmation of this Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtor reserves the right to modify this Plan with the consent of the Backstop Parties and Consenting Creditors to the extent, if any, that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

## ARTICLE VI

## MEANS FOR IMPLEMENTATION OF THE PLAN

**6.1    General Settlement of Claims and Interests**.  Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provision of the Plan shall constitute good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.

**6.2    Plan Funding.**

(a)    **Exit ABL Revolver Facility**.  On the Effective Date, the Reorganized Debtor shall enter into the Exit ABL Revolver Facility, the final form and substance of which shall be acceptable to the Reorganized Debtor, the Required Consenting Creditors, and the Requisite Backstop Parties.  Confirmation shall be deemed approval of the Exit ABL Revolver Facility (including the transactions contemplated thereby, such as any supplementation or additional syndication of the Exit ABL Revolver Facility, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtor in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein) and authorization for the Reorganized Debtor to enter into and execute the Exit ABL Revolver Facility documents and such other documents as the Exit ABL Revolver Facility Lenders may reasonably require to effectuate the treatment afforded to such lenders pursuant to the Exit ABL Revolver Facility, subject to such modifications as the Reorganized Debtor may deem to be reasonably necessary to consummate such Exit ABL Revolver Facility.

(b)    **New First Lien High Yield Notes**.  On or as soon as reasonably practicable after the Effective Date, the Reorganized Debtor shall issue the New First Lien High Yield Notes, the terms of which are summarized in Exhibit 6.2(b) of this Plan, and the final form of which shall be acceptable to the Reorganized Debtor, the Required Consenting Creditors, and the Requisite Backstop Parties.  The Debtor is authorized to issue the New First Lien High Yield Notes without the need for any further corporate action or without any further action by the Debtor or Reorganized Debtor, as applicable.

(c)    **New Second Lien Convertible Notes**.  On or as soon as reasonably practicable after the Effective Date, the Reorganized Debtor shall issue the New Second Lien Convertible Notes, the terms of which are summarized in Exhibit 6.2(c) of this

Plan, and the final form of which shall be acceptable to the Reorganized Debtor, the Required Consenting Creditors, and the Requisite Backstop Parties. The Debtor is authorized to issue the New Second Lien Convertible Notes without the need for any further corporate action or without any further action by the Debtor or Reorganized Debtor, as applicable.

(d)     **Other Plan Funding**. Other than as set forth in Articles 6.2(a), 6.2(b), and 6.2(c) of this Plan, all Cash necessary for the Reorganized Debtor to make payments required by this Plan shall be obtained from the Debtor's Cash balances then on hand, after giving effect to the transactions contemplated herein.

**6.3     Authorization and Issuance of Senior Notes Alternative Distribution Deferred Payments**. On or as soon as reasonably practicable after the Effective Date, the Reorganized Debtor shall authorize Senior Notes Alternative Distribution Deferred Payments. The Debtor is authorized to make the Senior Notes Alternative Distribution Deferred Payments without the need for any further corporate action or without any further action by the Debtor or Reorganized Debtor, as applicable.

**6.4     Authorization and Issuance of New Exide Common Stock**.

(a)     On the Effective Date, the Reorganized Debtor shall authorize and issue the New Exide Common Stock in accordance with the New Exide Common Stock Allocation. Distribution of New Exide Common Stock hereunder shall constitute issuance of 100% of the New Exide Common Stock and shall be deemed issued on the Effective Date. The issuance of New Exide Common Stock by the Reorganized Debtor, including options for the purchase thereof or other equity awards, if any, providing for the issuance of New Exide Common Stock, is authorized without the need for any further corporate action or without any further action by the Debtor or the Reorganized Debtor, as applicable.

(b)     The New Exide Common Stock issued under this Plan shall be subject to economic and legal dilution from (i) the conversion of New Second Lien Convertible Notes into New Exide Common Stock pursuant on the terms described in Exhibit 6.2(c) (ii) the issuance of New Exide Common Stock pursuant to the exercises of stock options and restricted stock issuable pursuant to the MIP as set forth in Article 6.16(b) of the Plan; (iii) incremental consideration of 10.0% to be paid-in-kind with additional New Second Lien Convertible Notes prior to conversion; and (iv) any other shares of New Exide Common Stock issued after the Effective Date.

(c)     All of the shares of New Exide Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

**6.5     Exemptions from Securities Act Registration Requirements**. The offering, issuance, and distribution of any Securities pursuant to the Plan and any and all settlement agreements incorporated therein will be exempt from the registration requirements of section 5 of the Securities Act pursuant to section 1145 of the Bankruptcy Code, section 4(a)(2) of the Securities Act, or any other available exemption from registration under the Securities Act, as applicable. Section 4(a)(2) of the Securities Act exempts transactions not involving a public offering, and section 506 of Regulation D of the Securities Act provides a safe harbor under

section 4(a)(2) for transactions that meet certain requirements. In addition, under section 1145 of the Bankruptcy Code, if applicable, any Securities issued pursuant to the Plan and any and all settlement agreements incorporated therein will be freely transferable under the Securities Act by the recipients thereof, subject to (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments, (2) the restrictions, if any, on the transferability of such Securities and instruments, including restrictions contained in the Backstop Commitment Agreement, and (3) any other applicable regulatory approval. In reliance upon these exemptions, the offer, issuance, and distribution of Securities will not be registered under the Securities Act or any applicable state Blue Sky Laws, and may not be transferred, encumbered or otherwise disposed of in the absence of such registration or an exemption therefrom under the Securities Act or under such laws and regulations thereunder. Accordingly, the Securities may be subject to restrictions on transfer as set forth in the governing documents to such Securities. New Exide Common Stock will bear a legend relating to the transfer restrictions applicable to such stock. The New First Lien High Yield Notes and the New Second Lien Convertible Notes will bear customary legends on the face thereof.

**6.6    Cancellation of Old Exide Securities and Agreements.** On the Effective Date, except as otherwise specifically provided for herein (a) the Old Exide Securities and any other note, bond, indenture, Certificate, or other instrument or document evidencing or creating any indebtedness or obligation or ownership interest in the Debtor (including the Indentures), shall be cancelled and (b) the obligations of, Claims against, and/or Interests in the Debtor under, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the Old Exide Securities, and any other note, bond, indenture, Certificate, or other instrument or document evidencing or creating any indebtedness or obligation of the Debtor, as the case may be, shall be released and discharged and cancelled; provided, however, that any agreement (including the Indentures) that governs the rights of a Holder of a Claim and that is administered by a Servicer shall continue in effect solely for the purposes of allowing such Servicer to (i) make the distributions on account of such Claims under this Plan as provided for in Article 11.5(d) of this Plan and (ii) maintain and exercise their Charging Lien or other right to priority payment of its fees and expenses under the Indentures.

**6.7    Issuance of New Securities; Execution of Plan Documents.** Except as otherwise provided in the Plan, on or as soon as reasonably practicable after the Effective Date, the Reorganized Debtor shall issue all Securities, notes, instruments, Certificates, and other documents required to be issued pursuant to the Plan.

**6.8    Continued Corporate Existence.**

(a)    Except as otherwise provided in the Plan, the Debtor shall continue to exist after the Effective Date as a separate entity, the Reorganized Debtor, with all the powers of a corporation under applicable law in the jurisdiction in which the Debtor is incorporated and pursuant to its certificate of incorporation and bylaws or other organizational documents in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws or

other organization documents are amended and restated by this Plan, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date. To the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan without any further notice to or action, order, or approval of the Bankruptcy Court or any other court of competent jurisdiction (other than the requisite filings required under applicable state, provincial, or federal law).

(b)      Except as otherwise provided in the Plan, the continued existence, operation, and ownership of Affiliates is a material component of the business of the Debtor and the Reorganized Debtor, as applicable, and, as set forth in Article 12.1 of this Plan, all of the Debtor's equity interests and other property interests in such Affiliates shall vest in the Reorganized Debtor or its successor on the Effective Date.

**6.9      Restructuring Transactions.**

(a)      On or following the Confirmation Date, the Debtor or Reorganized Debtor, as the case may be, shall take such actions as may be necessary or appropriate to effect the relevant restructuring transactions as set forth in the Plan, the Backstop Commitment Agreement, and the Plan Support Agreement, and may take other actions on or after the Effective Date. The anticipated post-Effective Date structure of the Reorganized Debtor is attached hereto as Exhibit 6.9.

(b)      The restructuring transactions may include without limitation (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, or reorganization containing terms that are consistent with terms of the Plan and that satisfy the requirements of applicable law; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, guaranty, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (iii) the filing of appropriate certificates of incorporation, merger, consolidation, or dissolution with the appropriate governmental authorities under applicable law; and (iv) all other actions that the Debtor and Reorganized Debtor determine are necessary or appropriate, including the making of filings or recordings in connection with the relevant restructuring transactions. The form of each restructuring transaction shall be determined by the board of directors of the Debtor or the New Board. Implementation of the restructuring transactions shall not affect distributions under the Plan.

**6.10      Rights Offering.** The Debtor and the Backstop Parties shall implement and conduct the Rights Offering in accordance with the Backstop Commitment Agreement and the Rights Offering Procedures. The Rights Offering shall be open to Eligible Holders and shall consist of a distribution of Rights Offering Eligible Holder Subscription Rights and Rights Offering Eligible Holder Oversubscription Rights to participate in the Rights Offering on a Pro Rata basis in proportion to the principal amount of Senior Notes Claims such Holder holds on the Record Date. The Backstop Parties will, severally, and not jointly, backstop up to $160 million of the Rights Offering and shall receive incremental consideration of: (a) 5.0% to be paid-in-kind with additional First Lien High Yield Notes, (b) 10.0% to be paid-in-kind with New Second Lien Convertible Notes, and (c) 5.0% of New Exide Common Stock.

**6.11   Reserved**.

**6.12   Certificate of Incorporation and Bylaws**.   The Certificate of Incorporation and Bylaws of the Reorganized Debtor, substantially in the form contained in Exhibit 6.12, shall be adopted and amended as may be required so that they are consistent with the provisions of this Plan and otherwise comply with section 1123(a)(6) the Bankruptcy Code. After the Effective Date, the Reorganized Debtor may amend and restate its Certificate of Incorporation and Bylaws and other constituent documents as permitted by applicable state corporation law and its charters and bylaws.

**6.13   Directors and Officers of the Reorganized Debtor**.   On the Effective Date, the term of the current members of the board of directors of Exide shall expire, and the New Board as selected by the majority of the Backstop Parties and the Holders of DIP Term Loan Claims that participate in the DIP/Second Lien Conversion Option, shall be appointed.   On and after the Effective Date, each director or officer of the Reorganized Debtor shall serve pursuant to the terms of the Certificate of Incorporation and Bylaws and applicable state corporation law.

**6.14   Corporate Action**.   Each of the matters provided for under this Plan involving the corporate structure of the Debtor or the Reorganized Debtor or corporate action to be taken by or required of the Debtor or the Reorganized Debtor shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized, approved, and to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by stockholders, creditors, or directors of the Debtor or the Reorganized Debtor.   Such actions may include, without limitation, (a) the adoption and filing of the Certificate of Incorporation and Bylaws, (b) the appointment of the New Board, (c) the adoption and implementation of the MIP, (d) the issuance and distribution of New Exide Common Stock, (e) entry into the Exit ABL Revolver Facility, (f) issuance of the New First Lien High Yield Notes, and (g) issuance of the New Second Lien Convertible Notes.

**6.15   Effectuating Documents; Further Transactions**.   On and after the Effective Date, the Reorganized Debtor, and the officers thereof and members of the New Board, shall be authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of this Plan, or to otherwise comply with applicable law, in the name of and on behalf of the Reorganized Debtor, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

**6.16   Employment, Retirement, Indemnification and Other Agreements and Employee Compensation Programs**.

(a)   **Employment Agreements**.   To the extent that the Debtor intends for any employment, severance (change in control), retirement, indemnification or other agreement with its respective active directors, officers, managing members and employees to remain in place after the Effective Date (the terms of which shall be reasonably satisfactory to the Required Consenting Creditors and the Requisite Backstop Parties), the Debtor will list such

44

agreement on the list of "Assumed Executory Contracts and Unexpired Leases" contained in Exhibit 9.1 of the Plan, and such agreement will be assumed as of the Effective Date. If the Debtor does not list such agreement on the list of "Assumed Executory Contracts and Unexpired Leases" contained in Exhibit 9.1, such agreement shall be deemed rejected. The Debtor shall enter into new employment arrangements and/or change in control agreements with the Debtor's officers who continue to be employed after the Effective Date; provided, however, that to enter into or to obtain the benefits of any such employment agreement, such executive officer must contractually waive and release all pre-existing claims, including those arising from pre-existing employment, change in control or other employment-related agreements and/or benefits under certain pre-existing compensation and benefit arrangements. On the Effective Date, the Reorganized Debtor shall adopt, approve, and authorize the new employment arrangement and/or change in control agreement with respect to such officers of the Reorganized Debtor without further action, order, or approval of the New Board.

(b)     **Employee Compensation Plans**. On the Effective Date, the Employee Compensation Plans shall be deemed adopted, approved, and authorized without further action of the Reorganized Debtor or the New Board, and the Reorganized Debtor shall assume any obligations that remain outstanding as of the Effective Date under any of the Employee Compensation Plans, and anything so implemented shall be reasonably satisfactory to the Required Consenting Creditors and the Requisite Backstop Parties on the Effective Date.

(c)     **Other Incentive Plans and Employee Benefits**. Unless otherwise specified in this Plan, and except in connection and not inconsistent with Articles 6.16(a) and 6.16(b), on and after the Effective Date, the Reorganized Debtor shall have the sole discretion to (a) amend, adopt, assume, and/or honor, in the ordinary course of business or as otherwise provided herein, any contracts, agreements, policies, programs, and plans for, among other things, compensation, pursuant to the terms thereof or hereof, including any incentive plan, 401(k) plan, health care benefits, disability benefits, deferred compensation benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation benefits, life insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of the Debtor who served in such capacity from and after the Petition Date, and (b) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date.

As of the Effective Date, the Reorganized Debtor shall continue the Pension Plan in accordance with, and subject to, their terms, ERISA, and the Internal Revenue Code, and shall preserve all of their rights thereunder. PBGC and the Debtor agree that all proofs of Claim filed by PBGC conditioned upon the termination of the Pension Plan shall be deemed to be withdrawn as of the Plan's Effective Date. Notwithstanding the foregoing, however, PBGC's proof of claim number 2377 shall remain a valid Claim against the Debtor, but only to the extent that it asserts a Claim for flat and variable rate premiums due to PBGC, subject to the rights and defenses of the Debtor or Reorganized Debtor, as applicable, under applicable law.

After the Effective Date, subject to the Reorganized Debtor's rights, if any, under applicable non-bankruptcy law, unless otherwise ordered by the Bankruptcy Court, the Reorganized Debtor shall continue to pay all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of the

Bankruptcy Code, at any time prior to Confirmation, for the duration of the period the Debtor has obligated itself to provide such benefits.

(d)    **Assumption of Collective Bargaining Agreements**.    Unless otherwise specified in this Plan, and unless previously assumed by the Debtor, on the Effective Date, the Debtor, pursuant to section 365 of the Bankruptcy Code, shall assume and continue to perform all obligations required under all Collective Bargaining Agreements (subject to the terms and conditions of any such Collective Bargaining Agreement and, in the event that a Collective Bargaining Agreement expires pursuant to its terms and subject to applicable law, the agreement of the Debtor or Reorganized Debtor and the applicable union on new terms). Notwithstanding any other provision of this Plan, the cure obligations, if any, related to the assumption of each of the Collective Bargaining Agreements, shall be satisfied by the Reorganized Debtor by payment, in the ordinary course, of all obligations arising under the Collective Bargaining Agreements. All proofs of Claim filed by any union for amounts due under any Collective Bargaining Agreement shall be considered satisfied by the agreement and obligation to assume and cure in the ordinary course as provided herein.

**6.17    Preservation Of Causes Of Action**.    In accordance with section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtor shall retain and may (but is not required to) enforce all rights to commence and pursue any and all Causes of Action that are not (a) released pursuant to <u>Article 12.6</u> of this Plan or an order of the Bankruptcy Court or (b) GUC Trust Causes of Action, whether arising before or after the Petition Date, including any actions or categories of actions specifically enumerated in <u>Exhibit 6.17</u>, and such Causes of Action shall vest in the Reorganized Debtor as of the Effective Date. The Debtor or the Reorganized Debtor, in its sole and absolute discretion, shall determine whether to bring, settle, release, compromise, or enforce such Causes of Action (or decline to do any of the foregoing), and shall not be required to seek further approval of the Bankruptcy Court for such action. The Reorganized Debtor or any successors may pursue such litigation claims in accordance with the best interests of the Reorganized Debtor or any successor holding such rights of action. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtor or the Reorganized Debtor will not pursue any and all available Causes of Action against them. The Debtor and the Reorganized Debtor expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or an order of the Bankruptcy Court, the Reorganized Debtor expressly reserves all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or consummation of the Plan; <u>provided, however</u>, solely with respect to Avoidance Actions, only those Avoidance Actions specifically enumerated on <u>Exhibit 6.17</u> shall vest in the Reorganized Debtor and only those Avoidance Actions specifically enumerated on <u>Exhibit 7.3</u> shall vest in the GUC Trust, and all other Avoidance Actions shall be waived. For the avoidance of doubt, GUC Trust Causes of Action shall not include any Causes of Action that were released pursuant to the XL Accommodations Order.

**6.18    Intellectual Property Monetization.**    Pursuant to the GUC Trust Settlement Agreement, the Reorganized Debtor shall continue to pursue monetization of intellectual property through offset or similar transactions that are identified by the Reorganized Debtor (in its reasonable business judgment and in consultation with the GUC Trust Trustee) as enhancing the Reorganized Debtor's profitability or being reasonably likely to yield meaningful realization of value from the intellectual property. After the Effective Date, the Reorganized Debtor shall retain the IP Advisor to advise the Reorganized Debtor and the GUC Trust Trustee on identification, structuring and execution of IP Transactions. The Reorganized Debtor shall pay the IP Advisor for its reasonable fees and expenses until 24 months after the Effective Date (subject to automatic extension to complete any IP Transactions pending consummation). The GUC Trust Trustee shall periodically present the status of IP Transactions to the New Board and shall otherwise have reasonable periodic access to the New Board. On the first anniversary of the Effective Date, the Reorganized Debtor and the GUC Trust Trustee shall meet and confer on the status of the IP Transactions and determine whether or not to continue the retention of the IP Advisor or terminate pursuit of the IP Transactions.

**6.19    Reservation of Rights.**    With respect to any Avoidance Actions that the Debtor abandons in accordance with Article 6.17 of this Plan, the Debtor and the Reorganized Debtor, as applicable, reserve all rights, including the right under section 502(d) of the Bankruptcy Code to use defensively the abandoned avoidance cause of action as a basis to object to all or any part of a claim against any Estate asserted by a creditor which remains in possession of, or otherwise obtains the benefit of, the avoidable transfer.

**6.20    Exemption from Certain Transfer Taxes and Recording Fees.**    Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment to the fullest extent contemplated by section 1146(a) of the Bankruptcy Code, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**6.21    Insured Claims**    Notwithstanding anything to the contrary contained herein, to the extent the Debtor has insurance with respect to any Allowed General Unsecured Claim, the Holder of such Allowed Claim shall (a) be paid any amount from the proceeds of insurance to the extent that the Claim is insured, and (b) receive the treatment provided for in this Plan for Allowed General Unsecured Claims to the extent the applicable insurance policy does not provide coverage with respect to any portion of the Claim.

## ARTICLE VII

## GENERAL UNSECURED CLAIMS TRUST

**7.1    Execution of GUC Trust Agreement.**    On or before the Effective Date, the GUC Trust Agreement, substantially in the form attached as Exhibit 7.1 to this Plan, shall be executed by the Debtor and the GUC Trust Trustee, and all other necessary steps shall be taken

to establish the GUC Trust, including establishment of the GUC Trust Board. The GUC Trust shall be governed and administered in accordance with the GUC Trust Agreement, including, but not limited to (a) distributions to Holders of Allowed General Unsecured Claims, Allowed Subordinated Notes Claims, and the Senior Notes Deficiency Claim, as provided in Articles 4.4(b) and 4.5(b) of this Plan, whether their Claims are Allowed on or after the Effective Date, (b) compensation of the GUC Trust Trustee, and (c) payment of costs and expenses of the GUC Trust, all of which shall be consistent with the terms of this Plan and the GUC Trust Settlement Agreement. The GUC Trust Agreement may provide powers, duties and authority in addition to those explicitly stated herein, but only to the extent that such powers, duties and authority do not conflict with the GUC Trust Settlement Agreement and do not affect the status of the GUC Trust as a liquidating trust for United States federal income tax purposes. In the event of any conflict between the terms of this Article 7.1 and the Terms of the GUC Trust Agreement, the terms of the GUC Trust Agreement shall govern.

      **7.2**    **Tax Treatment.** It is intended that the GUC Trust be classified for federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulations Section 301.7701-4(d) and as a "grantor trust" within the meaning of Sections 671 through 679 of the Internal Revenue Code. In furtherance of this objective, the GUC Trust Trustee shall, in its business judgment, make continuing best efforts not to unduly prolong the duration of the GUC Trust. All assets held by the GUC Trust on the Effective Date shall be deemed for federal income tax purposes to have been distributed by the Debtor or Reorganized Debtor on a Pro Rata share basis to Holders of Senior Notes Deficiency Claims and Holders of Allowed Other General Unsecured Claims and then contributed by such Holders to the GUC Trust in exchange for their interest in the GUC Trust. All Holders shall use the valuation of the assets transferred to the GUC Trust as established by the GUC Trust Trustee for all federal income tax purposes. The beneficiaries under the GUC Trust will be treated as the deemed owners of the GUC Trust. The GUC Trust will be responsible for filing information on behalf of the GUC Trust as grantor trust pursuant to Treasury Regulation Section 1.671-4(a).

      **7.3**    **GUC Trust Assets.** On the Effective Date, pursuant to section 1123(b)(3) of the Bankruptcy Code, the GUC Trust Assets shall be transferred by the Debtor (and deemed transferred) to the GUC Trust free and clear of all Claims, Liens, charges, encumbrances, rights, and interests, without the need for any Entity to take any further action or obtain any approval and the GUC Trust shall be authorized as the representative of the Estate to pursue GUC Trust Causes of Action.

      **7.4**    **LME Pricing Claims Protocols.**

      (a)    Pursuant to the GUC Trust Settlement Agreement, the Reorganized Debtor shall use commercially reasonable efforts to cooperate with the GUC Trust Trustee in connection with investigating and prosecuting any LME Pricing Claims, including, but not limited to, providing documents or communications as required. Notwithstanding the foregoing, the GUC Trust Trustee will seek to preserve and protect all applicable privileges and work-product relating to the LME Pricing Claims. In connection with the LME Pricing Claims, any applicable privilege of the Debtor, the Estate, the Reorganized Debtor, or the Creditors' Committee, including but not limited to any attorney-client privilege or work-product privilege attaching to any documents or communications (whether written or oral) associated with the

LME Pricing Claims, and all defenses, claims, counterclaims and rights of setoff or recoupment shall vest in the GUC Trust and may be asserted by the GUC Trust Trustee. The GUC Trust Trustee's receipt of such information shall not waive such privileges and all such privileges are preserved. The Confirmation Order shall include a provision addressing the transfer and preservation of all such privileges, and shall provide that the Debtor, the Estate, the Reorganized Debtor, the GUC Trust Trustee, or the Creditors' Committee shall have no right to waive any such privileges or disclose material protected by such privileges unless compelled to do so by order of a court or regulatory agency. The Confirmation Order shall also provide that the GUC Trust Trustee and the Creditors' Committee are prohibited from making any assignment or transfer to a third party of any such privileges or information protected by such privileges that is received from the Debtor or Reorganized Debtor. In anticipation of entry of the Confirmation Order governing the disclosure of privileged and/or work-product related material, the Debtor or Reorganized Debtor and the GUC Trust Trustee will confer and agree with regard to the scope of material that relates to the LME Pricing Claims to ensure that the scope of any transfer or disclosure is limited only to the LME Pricing Claims. Material that is not directly related to the LME Pricing Claims will be redacted and/or not disclosed to the GUC Trust Trustee. As soon as reasonably practicable after the Effective Date, the Reorganized Debtor will provide material relating to the LME Pricing Claims to the GUC Trust Trustee. The Debtor's special counsel, King & Spalding, will retain a copy of the disclosed material in the event that it is asked to respond in any subsequent proceeding.

(b)     Pursuant to the GUC Trust Settlement Agreement, additional counsel to continue investigating and/or prosecuting any LME Pricing Claims, if any, may be retained by the GUC Trust on a contingency basis on prevailing market terms for private antitrust actions. Expert witnesses, if any, will be retained on prevailing market terms for private antitrust actions. If fees for any professionals described in this paragraph exceed the funds in the GUC Trust, the entities pursuing the private action must find alternative sources of funding.

(c)     Pursuant to the GUC Trust Settlement Agreement, with respect to LME Pricing Claims, the Reorganized Debtor and the GUC Trust Trustee must agree to any actions against parties not originally identified as potential targets in connection with the Creditor's Committee's motions pursuant to Bankruptcy Rule 2004 filed on December 18, 2014 (Docket Nos. 2787 and 2788) (the "Rule 2004 Motions"), and as identified on the record at the hearing held before the Bankruptcy Court on January 22, 2015, in connection with the Rule 2004 Motions (these parties shall include any affiliates thereof) or otherwise agreed to by the Debtor and the Creditors' Committee prior to the Effective Date. The Debtor or the Reorganized Debtor shall consent to any reasonable request by the Creditors' Committee (prior to the Effective Date) or the GUC Trust Trustee (after the Effective Date) to add any additional parties and the Bankruptcy Court shall resolve any disputes as to whether any actions can be commenced against such additional parties. If the Bankruptcy Court is required to determine whether any additional parties should be added to the investigation, all proceedings relating to such determination shall be confidential and presented in camera to the extent permitted by law.

(d)     To the extent commercially reasonable and permitted by applicable law, the Reorganized Debtor agrees to direct and cause the Reorganized Debtor's Foreign Affiliates to assign their respective LME Pricing Claims to the GUC Trust or to appoint the GUC Trust Trustee as the agent of the Foreign Affiliates to pursue any such claims and otherwise use

commercially reasonable efforts, to the extent permitted by applicable law, to cooperate with the GUC Trust Trustee in connection with investigating and prosecuting any LME Pricing Claims.

### 7.5    GUC Trust Causes of Action.

(a)    GUC Trust Causes of Action shall exclude any action released by the Debtor pursuant to this Plan or an order of the Bankruptcy Court, including, but not limited to, any Causes of Action against current or former, directors, officers or employees.  For the avoidance of doubt, GUC Trust Causes of Action shall not include any Causes of Action that were released pursuant to the XL Accommodations Order.

(b)    The GUC Trust, in its sole and absolute discretion, shall determine whether to bring, settle, release, compromise, or enforce such GUC Trust Causes of Action (or decline to do any of the foregoing), and shall not be required to seek further approval of the Bankruptcy Court for such action.  The GUC Trust or any successors may pursue such litigation claims in accordance with the best interests of the GUC Trust or any successor holding such rights of action.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any GUC Trust Cause of Action against them as any indication that the GUC Trust will not pursue any and all available GUC Trust Causes of Action against them.  The GUC Trust expressly reserves all rights to prosecute any and all GUC Trust Causes of Action against any Entity, except as otherwise provided in the Plan.**  Unless any GUC Trust Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or an order of the Bankruptcy Court, the GUC Trust expressly reserves all GUC Trust Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such GUC Trust Causes of Action upon, after, or as a consequence of Confirmation or consummation of the Plan.

### 7.6    GUC Trust Preference Action Protocols.

(a)    Pursuant to the GUC Trust Settlement Agreement, prior to asserting any claims against certain agreed upon Preference Targets (as defined in the GUC Trust Settlement Agreement), the GUC Trust Trustee shall provide the Reorganized Debtor with a list of such Preference Targets against which the GUC Trust intends to pursue GUC Trust Preference Actions and the Reorganized Debtor shall have the absolute right to direct the GUC Trust Trustee and the GUC Trust not to pursue any such Preference Target, provided, however, the Reorganized Debtor may not designate more than $500,000 in Avoidance Actions (net of defenses) that can be directed not to be pursued.

(b)    The Reorganized Debtor shall use commercially reasonable efforts to cooperate with the GUC Trust Trustee in connection with investigating and prosecuting GUC Trust Preference Actions, including with respect to providing evidence and information as required; provided, however, that to the extent that the Reorganized Debtor's reasonable out-of-pocket costs and expenses incurred in cooperating with the GUC Trust Trustee exceed $250,000, the GUC Trust Trustee shall reimburse any such costs and expenses above $250,000 from the proceeds of the GUC Trust Preference Actions pursued by the GUC Trust.

(c)    The first $3,000,000.00 in net GUC Trust Preference Action proceeds shall be used to reimburse the Debtor or Reorganized Debtor for the funding of the GUC Trust.  The next $1,500,000.00 in net GUC Trust Preference Action proceeds shall be allocated 100% to Allowed Other General Unsecured Claims pursuant to and in accordance with the terms of the GUC Trust Settlement Agreement.  Any additional GUC Trust Preference Action proceeds shall be distributable Pro Rata to Holders of Allowed Other General Unsecured Claims and Holders of Senior Notes Deficiency Claims.

7.7    **General Unsecured Claims Resolution**.  The Reorganized Debtor shall be responsible for (a) all aspects of the General Unsecured Claims reconciliation process (except making distributions to Holders of General Unsecured Claims and Holders of Subordinated Notes Claims), and (b) all of the costs associated with such reconciliation.  The Reorganized Debtor shall consult with the Creditors' Committee (until the Effective Date) and/or the GUC Trust Trustee (after the Effective Date) on a periodic basis as is reasonably requested by the Creditors' Committee and/or the GUC Trust Trustee regarding the Claims reconciliation process.  The Debtor or Reorganized Debtor shall (x) object to General Unsecured Claims and shall provide the Creditors' Committee (until the Effective Date) and/or the GUC Trust Trustee (after the Effective Date) with notice and an opportunity to object to all Claims that the Debtor or Reorganized Debtor seeks to resolve for an amount greater than $20,000, and (y) use commercially reasonable efforts in administering all aspects the Claims reconciliation process.  If the Creditors' Committee or GUC Trust Trustee, as applicable, cannot agree with the Debtor or Reorganized Debtor with respect to resolution of any Claim greater than $20,000, then the Creditors' Committee or GUC Trust Trustee, as applicable, shall be permitted to resolve such Claim.

7.8    **Indemnification and Exculpation**.  The GUC Trust Trustee or the individuals comprising the GUC Trust Trustee, as the case may be, and the GUC Trust Trustee's agents and professionals, shall not be liable for actions taken or omitted in its capacity as, or on behalf of, the GUC Trust Trustee, except those acts arising out of its or their own willful misconduct or gross negligence, and each shall be entitled to indemnification and reimbursement for fees and expenses in defending any and all of its actions or inactions in its capacity as, or on behalf of, the GUC Trust Trustee, except for any actions or inactions involving willful misconduct or gross negligence.  Any indemnification claim of the GUC Trust Trustee (and the other parties entitled to indemnification under this subsection) shall be satisfied solely from the assets of the GUC Trust.  The GUC Trust Trustee shall be entitled to rely, in good faith, on the advice of its retained professionals.

7.9    **Preservation of Privilege and Defenses**.  No action taken by the Debtor or Reorganized Debtor in connection with this Plan, shall be (or be deemed to be) a waiver of any privilege or immunity of the Debtor or Reorganized Debtor, as applicable, including any attorney-client privilege or work-product privilege attaching to any documents or communications (whether written or oral).    The Confirmation Order shall provide that notwithstanding the Reorganized Debtor's providing any privileged information to the GUC Trust Trustee, the GUC Trust, or any party or person associated with the GUC Trust, such privileged information shall be without waiver in recognition of the joint and/or successorship interest in prosecuting the on behalf of the Estate and shall remain privileged.  Except with respect to Article 7.4 of this Plan, the Confirmation Order shall provide that the GUC Trust shall

have no right to waive the attorney-client privilege, work product or other protection of any information received from the Reorganized Debtor. The Debtor (or the Reorganized Debtor) retains the right to waive their own privileges.

   **7.10** **No Bonding of GUC Trust Claims.** There shall be no bonding of the GUC Trust Trustee.

   **7.11** **Service of the Senior Notes Indenture Trustee.** The Senior Notes Indenture Trustee and its respective agents, successors and assigns, and the GUC Trust Trustee shall facilitate the making of the Plan Distributions to the Holders of the Senior Notes Deficiency Claims, in accordance with the Plan and the Senior Notes Indenture, upon completion thereof, shall be discharged of all of its obligations associated with the Senior Notes Deficiency Claims. The GUC Trust Trustee shall be obligated to calculate the distributions to be made to Holders of Allowed Senior Notes Deficiency Claims and shall provide such distribution calculations and related information to the Senior Notes Indenture Trustee at least five (5) business days in advance of the GUC Trustee making distributions on account of Allowed Senior Notes Deficiency Claims. The Senior Notes Indenture Trustee shall only be required to act and make distributions in accordance with the Plan, shall not be required to independently verify or review the calculations prepared by the GUC Trust Trustee with respect to distributions to be made to Holders of Allowed Senior Notes Deficiency Claims, and shall have no liability for actions taken in accordance with the Plan or in reliance upon distribution information and distribution calculations provided by the GUC Trust Trustee, except solely for actions or omissions arising out of the Senior Notes Indenture Trustee's intentional fraud, willful misconduct, gross negligence or criminal conduct. Further, the Senior Notes Indenture Trustee shall have no obligation or liability for distributions under the Plan to any party who does not (i) hold a Claim against the Debtor as of the Distribution Record Date or (ii) otherwise comply with the terms of the Plan, except solely for actions or omissions arising out of the Indenture Trustees' intentional fraud, willful misconduct, gross negligence or criminal conduct.

   **7.12** **Delivery of Distributions on Account of Senior Notes Deficiency Claims.** Upon the occurrence of the Effective Date, the Claims of the Senior Notes Indenture Trustee for the Senior Notes Deficiency Claims shall be, for purposes under the Plan, including without limitation, the right to receive Plan distributions, substituted for all Claims of individual Holders of Allowed Senior Notes Deficiency Claims. Plan Distributions on account of such Senior Notes Deficiency Claims shall be made by the GUC Trust Trustee to (i) the Senior Notes Indenture Trustee or (ii) with the prior written consent of the Senior Notes Indenture Trustee, by means of book-entry exchange through the facilities of DTC in accordance with DTC's customary practices. If a Plan Distribution is made to the Senior Notes Indenture Trustee, the Senior Notes Indenture Trustee, in its capacity as a distribution agent, shall administer the Plan distribution in accordance with the Plan and the applicable Indenture. Nothing herein shall be deemed to impair, waive or extinguish any right of the Senior Notes Indenture Trustee with respect to the Charging Lien against applicable Plan Distributions.

   **7.13** **Service of the Subordinated Notes Indenture Trustee.** The Subordinated Notes Indenture Trustee and its respective agents, successors and assigns, and the GUC Trust Trustee shall facilitate the making of the Plan Distributions to the Holders of the Allowed Subordinated Notes Claims, in accordance with the Plan and the Subordinated Notes

Indenture, and upon completion thereof, shall be discharged of all of its obligations associated with the Subordinated Notes Claims. The GUC Trust Trustee shall be obligated to calculate the distributions to be made to Holders of Allowed Subordinated Notes Claims and shall provide such distribution calculations and related information to the Subordinated Notes Indenture Trustee at least five (5) business days in advance of the GUC Trustee making distributions on account of Allowed Subordinated Notes Claims. The Subordinated Notes Indenture Trustee shall only be required to act and make distributions in accordance with the Plan, shall not be required to independently verify or review the calculations prepared by the GUC Trust Trustee with respect to distributions to be made to Holders of Allowed Subordinated Notes Claims, and shall have no liability for actions taken in accordance with the Plan or in reliance upon distribution information and distribution calculations provided by the GUC Trust Trustee, except solely for actions or omissions arising out of the Subordinated Notes Indenture Trustee's intentional fraud, willful misconduct, gross negligence or criminal conduct. Further, the Subordinated Notes Indenture Trustee shall have no obligation or liability for distributions under the Plan to any party who does not (i) hold a Claim against the Debtor as of the Distribution Record Date or (ii) otherwise comply with the terms of the Plan, except solely for actions or omissions arising out of the Indenture Trustees' intentional fraud, willful misconduct, gross negligence or criminal conduct.

      **7.14  Delivery of Distributions on Account of Subordinate Notes Claims.** Upon the occurrence of the Effective Date, the Claims of the Subordinated Notes Indenture Trustee shall be, for purposes under the Plan, including without limitation, the right to receive Plan distributions, substituted for all Claims of individual Holders of Allowed Subordinated Notes Claims. Plan Distributions on account of such Subordinated Notes Claims shall be made by the GUC Trust Trustee to (i) the Subordinated Notes Indenture Trustee or (ii) with the prior written consent of the Subordinated Notes Indenture Trustee, by means of book-entry exchange through the facilities of DTC in accordance with DTC's customary practices. If a Plan Distribution is made to the Subordinated Notes Indenture Trustee, the Subordinated Notes Indenture Trustee, in its capacity as a distribution agent, shall administer the Plan distribution in accordance with the Plan and the applicable Indenture. Nothing herein shall be deemed to impair, waive or extinguish any right of the Subordinated Notes Indenture Trustee with respect to the Charging Lien against applicable Plan Distributions.

### ARTICLE VIII

### VERNON TORT CLAIMS TRUST

      **8.1  Execution of Vernon Tort Claims Trust Agreement.** The Vernon Tort Claims Trust Agreement shall be executed by the Debtor and the Vernon Tort Claims Trustee, and all other necessary steps shall be taken to establish the Vernon Tort Claims Trust in accordance with the terms of the Vernon Tort Claims Term Sheet, attached as Exhibit 8.1 to this Plan. The Vernon Tort Claims Trust shall be governed and administered in accordance with the terms of the Vernon Tort Claims Trust Agreement, including, but not limited to (a) the allocation of the beneficial interests therein to the Vernon Tort Claimants, as provided in Article 4.6(b) of the Plan, whether their Claims are Allowed on or after the Effective Date; (b) compensation of the Vernon Tort Claims Trustee, and (c) payment and expenses of the Vernon Tort Claims Trust, all of which shall be consistent with the terms of this Plan and the Vernon Tort Claims Term

Sheet. In the event of any conflict between the terms of this Plan or the Confirmation Order and the terms of the Vernon Tort Claims Term Sheet, the terms of the Vernon Tort Claims Term Sheet shall govern in all respects, and the Vernon Tort Claims Trust Agreement shall reflect the terms of the Vernon Tort Claims Term Sheet and this Plan; provided, however, notwithstanding the foregoing or anything to the contrary in the Vernon Tort Claims Term Sheet, if XL does not release the collateral from which the Debtor will fund the Vernon Tort Claims Trust Assets, the Debtor or the Reorganized Debtor, as the case may be, shall be authorized to contribute Cash to fund the Vernon Tort Claims Trust.

**8.2     Assumption of Certain Liabilities**. In consideration of the Vernon Tort Claims Trust Assets transferred to the Vernon Tort Claims Trust under the Plan and in furtherance of the purposes of the Vernon Tort Claims Trust and the Plan, the Vernon Tort Claims Trust shall assume all liability and responsibility for all Vernon Tort Claims, including the administration thereof as described in this Plan and the Vernon Tort Claims Term Sheet, and the Debtor and Reorganized Debtor shall have no further financial or other responsibility or liability therefor. The Vernon Tort Claims Trustee shall be responsible for administering the Vernon Tort Claims on behalf of the Vernon Tort Claimants and, among other things, determine any Claim amounts of, and distributions to, the individual Vernon Tort Claimants. The Vernon Tort Claims Trustee shall also be responsible for and authorized to (a) engage in Recovery Litigation to attempt to augment the funds of the Vernon Tort Claims Trust, (b) prepare and file tax returns and pay for the other reasonable and necessary costs of administering the Vernon Tort Claims Trust, (c) distribute to the beneficiaries of the Vernon Tort Claims Trust, in accordance with the Vernon Tort Claims Trust Agreement, and (d) to satisfy any Ad Hoc Vernon Tort Claimants Group expenses not paid as Administrative Claims in this Chapter 11 Case. The Vernon Tort Claims Trustee shall provide timely notice to Exide with respect to the Vernon Tort Claims Trustee's plans for addressing compliance with and shall so comply with all applicable federal, state, and local laws and regulations regarding settlements with minors, Medicare/Medicaid/Social Security set aside issues and all other similar issues.

**8.3     Vernon Tort Claims Trust Assets**. The Vernon Tort Claims Trust Assets shall be formed and initially funded promptly upon the later of the Bankruptcy Court's approval of the Vernon Tort Claims Trust or the Effective Date with the contribution by the Debtor of Cash in the amount of $2,675,000 currently held as collateral in connection with Initial Carrier Policies; provided, however, that if XL does not release the collateral from which the Debtor will fund the Vernon Tort Claims Trust Assets, the Debtor or the Reorganized Debtor, as the case may be, shall be authorized to contribute Cash to fund the Vernon Tort Claims Trust. The Vernon Tort Claims Trust Assets shall be transferred (and deemed transferred) to the Vernon Tort Claims Trust free and clear of all Liens, Claims, and encumbrances, except to the extent otherwise provided herein. Except as expressly provided in the Vernon Tort Claims Term Sheet, the Debtor shall not have any obligation to provide any further funding to or on behalf of the Vernon Tort Claims Trust.

**8.4     Covenant Not to Sue**. The Vernon Tort Claims Trust shall have the ability to pursue Vernon Tort Claims to the extent set forth in the Vernon Tort Claims Term Sheet. For the avoidance of doubt, the Vernon Tort Claims Trust shall not be entitled to pursue, and releases claims against, the Excluded Parties, as defined in the Vernon Tort Claims Term Sheet.

**8.5    Delivery of Distributions on Account of Vernon Tort Claims**. Distributions to Vernon Tort Claimants pursuant to Articles 4.6 of this Plan shall only be made to those Vernon Tort Claimants that have executed an individual settlement and release of Claims as to the Released Parties in a form agreed to and approved by Exide and the Vernon Tort Claims Trustee.

**8.6    Vernon Tort Claims Resolution.**  With respect to any Vernon Tort Claim that is resolved by the Vernon Tort Claims Trust in accordance with the Vernon Tort Claims Term Sheet and the Vernon Tort Claims Trust Agreement, such resolution shall establish the amount of legal liability against the Vernon Tort Claims Trust.

**8.7    Dissolution.**  The Vernon Tort Claims Trustee and the Vernon Tort Claims Trust shall be discharged or dissolved, as the case may be, in accordance with the terms of the Vernon Tort Claims Trust Agreement.

**8.8    Indemnification and Exculpation.**  The Vernon Tort Claims Trustee or the individuals comprising the Vernon Tort Claims Trustee, as the case may be, and the Vernon Tort Claims Trustee's agents and professionals, shall not be liable for actions taken or omitted in its capacity as, or on behalf of, the Vernon Tort Claims Trustee, except those acts arising out of its or their own willful misconduct or gross negligence, and each shall be entitled to indemnification and reimbursement for fees and expenses in defending any and all of its actions or inactions in its capacity as, or on behalf of, the Vernon Tort Claims Trustee, except for any actions or inactions involving willful misconduct or gross negligence.  Any indemnification claim of the Vernon Tort Claims Trustee (and the other parties entitled to indemnification under this subsection) shall be satisfied solely from the assets of the Vernon Tort Claims Trust.  The Vernon Tort Claims Trustee shall be entitled to rely, in good faith, on the advice of its retained professionals.

**ARTICLE IX**

**UNEXPIRED LEASES AND EXECUTORY CONTRACTS**

**9.1    Rejection of Executory Contracts and Unexpired Leases**.

(a)    **Automatic Rejection.**  Except as otherwise provided herein, each Executory Contract and Unexpired Lease shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired Lease: (a) is listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" contained in Exhibit 9.1 of the Plan; (b) has been previously assumed by the Debtor by Final Order of the Bankruptcy Court or has been assumed by the Debtor by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date; (c) is the subject of a motion to assume or reject pending as of the Effective Date; (d) is an Executory Contract related to any Intercompany Claim; or (e) is otherwise assumed pursuant to the terms herein.

The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective