## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:                                    :
                                          :    Chapter 11
**EXIDE TECHNOLOGIES,**[1]                :
                                          :    Case No. 13-11482 (KJC)
                  Reorganized Debtor.     :    (Re: D.I. 4503, 4505, 4507)
                                          :
_____ :

### OPINION[2]

### BY:    KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

Before the Court is (1) the South Coast Air Quality Management District's (the "District")
Motion for a Determination that it has Alleged a Prima Facie Case for Application of the
11 U.S.C. § 1141(d) Exception to Discharge (the "Discharge Motion");[3] (2) Exide Technologies'
("Exide") Objection pursuant to 11 U.S.C. § 503(b) and Bankruptcy Rule 3007 to the Proof of
Administrative Expense Claim filed by the District (the "Administrative Claims Objection");[4]
and (3) the District's Motion for Entry of an Order Concerning the Timeliness of its General
Unsecured Claims Against Exide (the "Relation Back Motion").[5] For the reasons that follow, the
Discharge Motion will be denied, the Administrative Claims Objection will be sustained, and the
Relation Back Motion will be denied.

---

[1] The last four digits of the Reorganized Debtor's taxpayer identification number are 2730. The mailing
address for the Reorganized Debtor is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.
[2] This Opinion constitutes the findings of fact and conclusions of law required by Fed. R. Bankr. P. 7052,
made applicable here by Fed. R. Bankr. P. 9014(c). This Court has jurisdiction over this matter pursuant to
28 U.S.C. §§ 157(a), 157(b)(1), and 157(b)(2)(A), (B), and (J).
[3] *See* D.I. 4505.
[4] *See* D.I. 4507.
[5] *See* D.I. 4503.

**FACTS**

Exide manufactures lead-acid batteries, including automotive and industrial batteries. The present issues are due to environmental contamination resulting from the operation of Exide's lead-recycling facility in Vernon, California (the "Vernon Facility"). On June 10, 2013, Exide filed for bankruptcy in Delaware under chapter 11 (the "Petition Date"). On September 13, 2013, I entered an order setting December 9, 2013 as the bar date and applicable deadline for governmental units to file proofs of claims (the "Bar Date").[6] On December 9, 2013, the District filed a proof of claim, alleging $38,915,000 in liquidated fines and penalties related to the Vernon Facility (the "Original Proof of Claim"). The Original Proof of Claim listed five specific prepetition notices of violation ("NOVs") as the foundation for the alleged sum. The NOVs are alleged, in short, as follows:

- Failure to file two reports – One NOV alleging that Exide failed to submit its second 2011 semi-annual monitoring report and its 2011 annual compliance certification by applicable deadlines ($4,320,000)
- 13-day emission exceedances – One NOV alleging that from Oct. 29 to Nov. 11, 2012, Exide exceeded the 30-day average lead emission standard of 0.15 micrograms/cm$^3$ at the MID monitor – one of the five air monitors at the Vernon Facility ($325,000)
- 1-day emission exceedance – One NOV alleging that on June 14, 2012, Exide exceeded the standard by 0.003 micrograms/cm$^3$ ($25,000), did not thereafter begin daily air monitoring ($30,000), and failed to implement its compliance plan as a result of exceedance ($40,000)
- Continuous negative pressure – Two NOVs alleging that Exide did not implement "good operating practices" because it did not maintain continuous negative pressure at the Vernon Facility ($34,175,000).[7]

On January 16, 2014, the District filed a complaint for civil penalties against Exide in the Superior Court of the State of California, Los Angeles County, captioned, *People of the State of California, ex rel South Coast Air Quality Management District, a Public Entity v. Exide*

---

[6] *See* D.I. 696.
[7] For a full recitation of each individual NOV, see the Attachment to the Original Proof of Claim, D.I. 4247, Exhibit 7.

*Technologies, Inc.* (respectively, the "Original Complaint" and the "California State Action").[8] The Original Complaint asserts twelve causes of action and alleges entitlement to civil penalties of no less than $40,000,000. Upon receiving notice of the filing, counsel for Exide sent the following letter to counsel for the District:

> Exide is in receipt of the complaint filed by the [District] in the Superior Court of the State of California against Exide seeking civil penalties for the sum of no less than $40 million in connection with Exide's Vernon secondary lead recycling facility… As you are aware, Exide filed for chapter 11 protection on June 10, 2013 and is currently a debtor-in-possession in that proceeding (the "Bankruptcy Case"). Filing of the Bankruptcy Case resulted in the imposition of an automatic stay pursuant to the provisions of 11 U.S.C. § 362(a).
>
> The Complaint involves alleged penalties *virtually mirroring* those in the proof of claim filed in the Bankruptcy Case by [the District] and is clearly an attempt to collect from Exide. Thus, the Complaint and the Litigation violate the automatic stay. To avoid unnecessary expense in connection with this violation, Exide will consider entering into a stipulation permitting the Litigation to proceed provided that [the District] agrees that it will not seek to collect any awards that may be assessed in the Litigation absent further order of the bankruptcy court….[9]

After rounds of drafting and markups, the parties agreed to a stipulation allowing the District to move forward with the California State Action, which was approved by order dated March 6, 2014 (the "Stipulation Order").[10]

Prior to the Stipulation Order, on February 14, 2014, Exide had removed the California State Action to the United States District Court for the Central District of California. Shortly thereafter, on March 14, 2014, the District filed a motion to remand the case to the Superior Court of the State of California for lack of subject matter jurisdiction, due to lack of diversity of citizenship (the "District Remand Motion").[11] Underpinning the District's argument for remand

---

[8] *See* D.I. 4247, Exhibit 8.
[9] D.I. 4247, Exhibit 1 (emphasis added).
[10] *See* D.I. 1510.
[11] *See* D.I. 4604-1, Exhibit A.

was the contention that the penalties sought are, by their character, "quasi-criminal," rather than

"civil" penalties.[12] Specifically, the District noted:

> The civil penalties sought here are... unique and substantial to California because they are quasi-criminal and can preclude California from bringing a criminal prosecution. Criminal prosecutions based on violations of California law can give California unique and substantial relief that is not available to the general public, namely, incarceration and criminal penalties. When the California Legislature decides that California's interest will be protected by allowing civil penalties to substitute for incarceration and criminal penalties, that judgment should be respected, and should be recognized to constitute unique and substantial relief. The statutory language regarding the interplay between civil penalties and criminal prosecution compels the conclusion that the California Legislature intended that either could vindicate California's interest in air pollution matters. Indeed, the Health and Safety Code explicitly requires that the same eight factors be used to determine civil penalties or criminal penalties, which shows that they are intended to vindicate the same interest....[13]

Persuaded by the District's arguments, the Court granted the District Remand Motion.[14]

On March 14, 2014, the same date as the filing of the District Remand Motion, Exide's

Vernon Facility shut down for repairs and subsequently permanently ceased operations.

On August 7, 2014, the District filed an amended complaint in the California State Action

(the "First Amended Complaint").[15] The First Amended Complaint asserts sixteen causes of action

and alleges entitlement to no less than $40,000,000 in civil penalties. Exide stipulated to the

District's filing of the First Amended Complaint, but included the following language:

> Exide denies the allegations of the proposed First Amended Complaint, but recognizes the standard for granting leave to amend a complaint and its ability to challenge the First Amended Complaint subsequently in this litigation... the Parties agree that allowing Plaintiff to file the First Amended Complaint is not an

---

[12] *See id.*

[13] *See id.* at 19:19–28, 20:1–4.

[14] *See* D.I. 4604-2, Exhibit B [hereinafter, the "District Remand Order"]. In its decision, the District Court cited to *People v. Steelcase*, 792 F. Supp. 84, 826 (C.D. Cal. 1992) *abrogated on other grounds as recognized in Cal. ex rel. Lockyer v. Dynergy, Inc.*, 375 F.3d 831 (9th Cir. 2004), which states, "Civil penalties are not damages recovered for the benefit of private parties; they are more akin to a criminal enforcement action and are brought in the public interest."

[15] *See* D.I. 4247, Exhibit 13.

admission by Exide of any allegation contained in the First Amended Complaint and that Exide reserves the right to challenge the First Amended Complaint.[16]

Shortly thereafter, on August 22, 2014, the District filed an amended proof of claim with the Court, which changed the District's claim from "liquidated" to "unliquidated" and incorporated by reference the First Amended Complaint (the "Amended Proof of Claim").[17] On February 5, 2015, Exide filed its second amended disclosure statement with respect to its second plan of reorganization (the "Disclosure Statement").[18] On February 18, 2015, the District filed its second amended complaint in the California State Action (the "Second Amended Complaint").[19] The Second Amended Complaint asserts twenty causes of action and alleges entitlement to no less than $60,000,000 in civil penalties. Exide stipulated to the District's filing of the Second Amended Complaint, including identical language to that contained in the stipulation to the First Amended Complaint's filing.[20]

On March 11, 2015, Exide entered into a Non-Prosecution Agreement with the United States' Attorney's Office (the "NPA").[21] Under the NPA, Exide admitted to knowingly violating, among others, numerous provisions under the federal Resource Conservation and Recovery Act and the federal Hazardous Materials Transportation Act and agreed to immediately and permanently close the Vernon Facility and work with the California Department of Toxic Substances Control (the "DTSC") to remediate the property.[22] In addition, under the NPA, Exide agreed to the following costs:

> The direct costs of Exide's compliance with the terms and conditions of this Agreement are estimated by the parties to be between approximately $108,000,000

---

[16] D.I. 4247-3, Exhibit 12.
[17] *See* D.I. 4247, Exhibit 14.
[18] *See* D.I. 3095.
[19] *See* D.I. 4247, Exhibit 17.
[20] *See* D.I. 4247-5, Exhibit 16.
[21] *See* D.I. 3417, Exhibit A.
[22] *See id.*

and approximately $133,000,000. Facility closure and clean-up costs, including contamination in the Northern and Southern Residential Assessment Areas, is presently estimated to be approximately $50,000,000. Recycling of lead-acid batteries at the Facility generates cost savings for Exide for the raw goods that it uses to manufacture lead-acid batteries (for sale to retail consumers), including metallic lead and plastic needed to mold battery cases. The parties estimate that closure of the Facility will cost Exide between $15,000,000 and $38,000,000 on an annualized basis for the cost of metallic lead and case plastic that must otherwise be purchased from other market sources. Exide also acknowledges that it has invested approximately $35,000,000 since 2010, to upgrade and improve pollution control technology at the Facility. As a result of this Agreement, Exide must demolish and deconstruct such upgrades as part of its permanent closure of the Facility. In addition, Exide acknowledges that compliance with this Agreement will cost an additional $8,000,000 to $10,000,000 for other Facility closure related costs.[23]

I approved the NPA on March 27, 2015 and entered a corresponding order.[24]

I confirmed Exide's fourth plan of reorganization (the "Plan") on March 27, 2015 (the "Confirmation Order").[25] The Confirmation Order established that the administrative bar date would be 30-days after the Plan's effective date. The Plan incorporated the following two provisions regarding the filing of and amendments to proofs of claims:

> Article 10.4: EXCEPT AS OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE DEADLINE FOR FILING SUCH PROOFS OF CLAIM SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO, OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM IS DEEMED TIMELY FILED BY A FINAL ORDER OF THE BANKRUPTCY COURT.
> Nothing herein shall in any way alter, impair, or abridge the legal effect of the Bar Date Order....
>
> ...
>
> Article 10.7: On or after the Effective Date, except as otherwise provided herein, a Claim may not be filed or amended without the authorization of the Bankruptcy Court or the Reorganized Debtor, and, to the extent such authorization is not

---

[23] D.I. 3417, Exhibit A, at 11.
[24] *See* D.I. 3417.
[25] *See* D.I. 3423.

received, any such new or amended Claim filed shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court....[26]

Exide substantially consummated the Plan on April 30, 2015 (the "Effective Date") and emerged from bankruptcy.

On May 28, 2015, the District filed the third amended complaint in the California State Action (the "Third Amended Complaint").[27] The Third Amended Complaint contains 27 causes of action and alleges entitlement to no less than $80,000,000 in civil penalties. The Third Amended Complaint is the first iteration of the complaints that asserts causes of action regarding Exide's alleged misrepresentations and manipulation of emission testing data; the District bases these causes of action upon information uncovered in Exide's admissions of guilt under the NPA.[28] Two days later, on May 30, 2015, the District timely filed an administrative expense claim in connection with the underlying civil penalties alleged in the evolving complaint (the "Administrative Expense Claim").[29]

Up until this point, Exide had stipulated to each of the District's complaint amendments, save for the reservation of rights contained in each. However, on June 3, 2015, Exide filed its motion for entry of an order (i) enforcing the plan injunction under the Confirmation Order and confirmed Plan and (ii) awarding costs and attorney's fees (the "Motion to Enforce").[30] After several related rounds of filings with the Court, on June 23, 2015, I entered an order resolving the Motion to Enforce, which consolidated the Discharge Motion, the Administrative Claims Objection, and the Relation Back Motion into one matter before the Court (the "Resolved Motion

---

[26] D.I. 3423, Exhibit A, at Art. 10.4, 10.7.
[27] *See* D.I. 4247, Exhibit 21.
[28] *See id.*
[29] *See* D.I. 4247, Exhibit 22.
[30] *See* D.I. 4023.

to Enforce").[31] As part of the Resolved Motion to Enforce, the parties agreed to stay the California State Action, pending this Court's disposition of the underlying legal issues.

In the time between the entrance of the Resolved Motion to Enforce and now, the parties attempted to mediate through these legal issues, but, regrettably, were unsuccessful. Accordingly, the Court held oral arguments, and I subsequently took the matter under advisement.

## **DISCUSSION**

I.    Section 1141(d)(6) does not apply to the District's Penalties

At the forefront is the District's contention that the penalties asserted in each iteration of the Complaint should be excepted from discharge under 11 U.S.C. § 1141(d)(6), which provides, in pertinent part:

> (6)    Notwithstanding paragraph (1), the confirmation of a plan does not discharge a debtor that is a corporation from any debt –
>
>    (A)    of a kind specified in paragraph (2)(A) or (2)(B) of section 523(a) that is owed to a domestic governmental unit, or owed to a person as a result of an action filed under subchapter III of chapter 37 of title 31 or any similar State statute; . . . .

The District argues that, based upon Exide's alleged misrepresentations, fraud, and fraud-like activities, Exide incurred penalties, constituting a "debt" under § 523(a)(2)(A). Therefore, the District asserts that, through the application of § 1141(d)(6), which applies to corporate debtors, its claim for penalties should be excepted from Exide's discharge.

The District's argument fails because: (1) the District's claim falls within 11 U.S.C. § 523(a)(7), which is not excepted from a chapter 11 corporation's discharge under 11 U.S.C. § 1141(d)(6); and (2) the discharge exception for claims arising from fraud under 11 U.S.C. § 523(a)(2)(A) is not applicable to the District's claim.

---

[31] *See* D.I. 4414.

1.  The corporate discharge exceptions of 11 U.S.C. § 1141(d)(6) does not include
    noncompensatory penalties that fall within 11 U.S.C. § 523(a)(7).

The District seeks to collect noncompensatory penalties for violations of its regulations.  This

debt falls squarely within 11 U.S.C. § 523(a)(7), which provides:

> (a)    A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this
>        title does not discharge an individual debtor from any debt –
>        . . . .
>    (7)    To the extent such debt is for a fine, penalty, or forfeiture payable
>           to and for the benefit of a governmental unit, and is not
>           compensation for actual pecuniary loss, other than a tax penalty
>           . . . .

Section 523(a)(7) is not incorporated into section 1141(d)(6)'s narrow discharge exceptions for

corporations.  Noncompensatory penalties are excepted from discharge by § 523(a)(7) only in

cases of individual debtors.

The legislative history behind the enactment of § 1141(d)(6) indicates that Congress

specifically intended to allow corporations to discharge § 523(a)(7) penalties.[32]  Congress initially

intended that all nineteen of the § 523(a) discharge exceptions for individual debtors, including

§ 523(a)(7), should also apply to corporate debtors.[33]  However, based on public policy

considerations, Congress ultimately limited the scope of the discharge exceptions for corporate

debtors.[34]

In a 1990 decision, the Supreme Court held that that a chapter 13 debtor's obligation to pay

restitution based upon pleading guilty to welfare fraud was a dischargeable debt because

§ 1328(a)(2) did not include § 523(a)(7) in the exceptions to discharge.[35]  The Supreme Court

---

[32] *See, e.g.,* H.R. 833, 106th Cong. §321(d) (as passed by Senate, Feb. 2, 2000); Roger S. Goldman et al., *Discharging False claims Liability in Bankruptcy, Section 1141(d)(6)(A) of the Bankruptcy Code: An Incentive to Settle FCA Cases?,* ABA J. (2010).

[33] *Id.*

[34] *Id.*

[35] *Pa. Dep't of Public Welfare v. Davenport,* 495 U.S. 552, 562-63 (1990) *superseded by statute,* Criminal Victims Protection Act of 1990, Pub. L. 101-582, § 3, 104 Stat. 2865, as recognized in *Johnson v. Home*

recognized Congressional intent to distinguish between the ability of a chapter 7 debtor and a chapter 13 debtor to discharge § 523(a)(7) noncompensatory fines, penalties or forfeitures owing to governmental units, explaining:

> Congress defined "debt" broadly and took care to except particular debts from discharge where policy considerations so warranted.  Accordingly, Congress secured a broader discharge for debtors under Chapter 13 than Chapter 7 by extending to Chapter 13 proceedings some, but not all, of § 523(a)'s exceptions to discharge. See 5 Collier on Bankruptcy ¶ 1328.01[1][c] (15th ed. 1986) ("[T]he dischargeability of debts in chapter 13 that are not dischargeable in chapter 7 represents a policy judgment that [it] is preferable for debtors to attempt to pay such debts to the best of their abilities over three years rather than for those debtors to have those debts hanging over their heads indefinitely, perhaps for the rest of their lives") (footnote omitted). Among those exceptions that Congress chose *not* to extend to Chapter 13 proceedings is § 523(a)(7)'s exception for debts arising from a "fine, penalty, or forfeiture."[36]

Similarly, § 1141(d)(2) and (6) demonstrate Congress's intent to distinguish between individual debtors and corporate debtors when applying the § 523(a) exceptions to discharge.

The District claims that, notwithstanding § 523(a)(7), its claims are excepted from discharge through § 1141(d)(6)'s incorporation of § 523(a)(2)(A), which renders fraud-based claims nondischargeable. Exide argues that stretching § 523(a)(2)(A) to include noncompensatory penalties and fines would cause § 523(a)(7) to be "mere surplusage," contrary to the Supreme Court's "deep reluctance to interpret a statutory provision so as to render superfluous other provisions in the same enactment."[37]

The District, however, argues that a more recent Supreme Court decision, *Husky International Electronics, Inc. v. Ritz*,[38] recognizes that subsections of § 523(a) may overlap and,

---

*State Bank*, 501 U.S. 78, 83 n. 4 (1991) (noting that Congress overruled the result in *Davenport* by expressly withdrawing the Bankruptcy Court's power to discharge restitution orders under 11 U.S.C. § 1328(a)).

[36] *Pa. Dep't of Public Welfare v. Davenport*, 495 U.S. 552, 562-63 (1990) *superseded by statute,* Criminal Victims Protection Act of 1990, Pub.L. 101-582, § 3, 104 Stat. 2865, as recognized in *Johnson v. Home State Bank*, 501 U.S. 78, 83 n. 4 (1991).

[37] *See Davenport*, 495 U.S. at 562.

[38] 136 S.Ct. 1581 (2016).

therefore, a single debt could be nondischargeable under more than one subsection of § 523(a). In *Husky*, the Supreme Court held that "[t]he term 'actual fraud' in § 523(a)(2)(A) also encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation."[39] The *Husky* Court agreed that its inclusion of fraudulent conveyances in the term "actual fraud" of § 523(a)(2)(A) could cover the same conduct that exempts debts from discharge under § 523(a)(4) or § 523(a)(6).[40] The *Husky* Court noted that, despite some overlap, each subsection also covered distinctive types of claims, and therefore, "given the clear differences between these provisions, we see no reason to craft an artificial definition of 'actual fraud' merely to avoid narrow redundancies in § 523 that appear unavoidable."[41] Whether the District's claim could be exempted from discharge under § 523(a)(2)(A) requires a separate analysis.

2. The District's Claim does not fall within 11 U.S.C. § 523(a)(2)(A)

The District's Complaint alleges that the Debtors knowingly, willfully or intentionally emitted lead and arsenic in excess of permissible levels. Therefore, the District claims that its penalties are nondischargeable under § 523(a)(2)(A), which provides, in pertinent part:

> (a)    A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt –
>    . . . .
>    (2) For money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –
>       (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

To establish a prima facie case for non-dischargeability under § 523(a)(2)(A), five elements must be satisfied:

> (1) the debtor made the misrepresentations or perpetuated fraud,

---

[39] *Id.* at 1586.
[40] Notably, the *Husky* Court does not discuss any relationship between § 523(a)(2)(A) and § 523(a)(7).
[41] *Husky*, 136 S.Ct. at 1588.

(2) the debtor knew at the time that the representations were false,

(3) the debtor made the misrepresentations with the intention and purpose of deceiving the creditor,

(4) the creditor [justifiably] relied upon such misrepresentations, and

(5) the creditor sustained loss and damages as a proximate result of the misrepresentations having been made."[42]

The District's Third Amended Complaint states that a violation of a District rule gives rise to civil penalties of up to $10,000 per day for noncompliance violations, $25,000 per day for negligent emission violations, $40,000 per day for knowing emission violations, and $75,000 per day for willful and intentional emission violations.[43] The sum of the District's penalties in each iteration of its complaints is calculated in accordance with this framework. These penalties do not represent the amount of loss or damages sustained by the District that were cause by any alleged misrepresentation of the Debtors; they are noncompensatory penalties for violating emission standards. Therefore, the District's claim does not satisfy the fifth element of a prima facie case for nondischargeability under § 523(a)(2)(A).

At oral argument, counsel for the District argued that its penalties are compensatory by asserting:

> [W]hen the District receives fines it rolls them back into the community. It uses them to either correct a harm that the community suffered as a result of the conduct, or uses them for an unrelated - - I wouldn't say totally

---

[42] *Webber v. Giarratano (In re Giarratano)*, 299 B.R. 328, 334 (Bankr. D. Del. 2003) (citations omitted). The *Giarratano* Court also noted that the proper measure for reliance is not the objective or "reasonable" standard, but the more demanding "justifiable" reliance standard. *Id.*

[43] Third Amended Complaint, at ¶ 25.

unrelated, but it uses them in such manner that as (sic) a proxy for remediating.[44]

While the District may efficiently and effectively circulate administered penalties back into the community, the District has failed to explain --or present any evidence to show-- how the specific penalties sought here are compensation for any actual pecuniary loss.[45] Predetermined, formulaic penalty amounts based upon levels of fault necessarily cannot be tied directly to any actual loss incurred by the District.

In *Cohen v. de la Cruz*,[46] however, the Supreme Court determined that both compensatory and punitive damages were part of the fraud-based debt that was nondischargeable under § 523(a)(2)(A), writing:

'[A]ny debt . . . for money, property, services, or . . . credit, to the extent obtained by' fraud encompasses any liability arising from money, property, etc. that is fraudulently obtained, including treble damages, attorney's fees, and other relief that may exceed the value obtained by the debtor.[47]

In *Cohen*, the debtor-landlord charged tenants rents above the levels permitted by an ordinance. The Bankruptcy Court found that the debtor-landlord had committed actual fraud because his conduct amounted to an "unconscionable commercial practice" under the New Jersey Consumer Fraud Act and awarded tenants a return of the excess rent charged, plus treble damages and attorney's fees and costs.[48]  In a divided opinion, the Third Circuit Court of Appeals affirmed the

---

[44] Transcript of Oral Argument, D.I. 4966, at 68:2-7.
[45] In its papers, the District argues briefly that it suffered "harm" because, but for Exide's alleged fraud and misrepresentations, the District would have sought an order of abatement to end Exide's operations and would have prevented further high levels of emissions from permeating the environment.  However, the speculative nature of this assertion cannot constitute a concrete, definable harm so as to render the District's penalties compensatory in nature. Accordingly, without a concrete definable harm, the District has no foundation upon which it may assert its satisfaction of the five-factor test in *Giarratano, supra.*
[46] 523 U.S. 213 (1998).
[47] *Id.* at 223.
[48] *Id.* at 215-16.

lower courts' determination that the entire amount was nondischargeable under § 523(a)(2)(A).[49]

The Supreme Court affirmed. "Once it is established that specific money or property has been

obtained by fraud, . . . 'any debt' arising therefrom is excepted from discharge."[50] Based on *Cohen*,

other courts have determined that a nondischargeable debt based on fraud under § 523(a)(2)(A)

includes any noncompensatory statutory penalties awarded as part of the fraudulent debt.[51]

    Exide, however, argues that the District cannot satisfy the threshold requirement of proving

an underlying debt based on money or property obtained by fraud, noting that "the District admits

in its Motion that the regulations at issue in the Third Amended Complaint impose strict-liability

penalties for exceeding lead and arsenic emissions standards."[52] Exide contends that this matter is

on point with the decision by the Court of Appeals for the Ninth Circuit, *In re Sabban*,[53] holding

that the creditor's claim against a debtor for performing home remodeling work without a proper

license was not exempt from discharge under § 523(a)(2)(A) because the creditor's claim was not

based on actual harm resulting from the debtor's misrepresentation about the contractor's license.[54]

---

[49] *Id.* at 216.

[50] *Id.* at 218.

[51] *See, e.g., Kozlowski v. Michigan Unemployment Ins. Agency*, 218 F.Supp.3d 553 (E.D. Mich. 2016) (holding that the entire debt for improperly paid unemployment benefits, including the statutory penalties, was nondischargeable under § 523(a)(2)(A), even though the penalties were also covered by § 523(a)(7)); *In re Wine*, 558 B.R. 438 (Bankr. D. Colo. 2016) (same).

[52] Exide Response, D.I. 4561, at ¶ 23.

[53] *Ghomeshi v. Sabban (In re Sabban)*, 600 F.3d 1219 (9th Cir. 2010).

[54] *Id.* at 1224. The *Sabban* Court noted that the only issue before it was whether the judgment of $123,000 awarded by a state court under the Cal. Bus. & Prof. Code § 7031(b) constitutes "loss and damage" sustained by the creditor "as the proximate result" of the false representation that the home remodeling business was a licensed contractor. *Id.* at 1223

Liability was based on a state statute requiring only that the creditor paid compensation to an unlicensed contractor; fraud and actual harm were irrelevant.[55]

The District argues that Exide benefitted financially from its allegedly fraudulent conduct because, but for its alleged failure to disclose its conduct and violations, the District would have shut down the Vernon facility, preventing Exide from earning any operational revenue from that source. However, these attenuated allegations do not satisfy § 523(a)(2)(A)'s requirement for establishing that Exide fraudulently obtained money, property or services.

Alleging "fraud-like" conduct to prove willful intent and increase the noncompensatory statutory penalties is not the same as an action to recover loss or damages based on false pretenses, a false misrepresentation, or actual fraud under § 523(a)(2)(A). I agree with Exide that this matter is similar to the *Sabban* case. Like *Sabban*, the issue is a close one.[56] At bottom, however, the District's claim is for noncompensatory penalties arising from a violation of emissions standards and does not include any assertion that the District suffered any losses or damages from Exide's alleged fraudulent conduct. The District's claims do not fall within § 523(a)(2)(A) and are not exempt from discharge under § 1141(d)(6). .

II.     The District's Claims are Not Entitled to Administrative Expense Priority.

The second matter before the Court is the Administrative Claims Objection, which challenges the District's request to provide administrative expense priority for any of its claims. 11 U.S.C. § 503(b) states "[a]fter notice and a hearing, there shall be allowed administrative expenses... including . . . the actual, necessary costs and expenses of preserving the estate."

---

[55] *Id.* at 1221. Cal. Bus. & Prof. Code § 7031(b) provides in pertinent part that "a person who utilizes the services of an unlicensed contractor may bring an action in any court of competent jurisdiction in this state to recover all compensation paid to the unlicensed contractor for performance of any act or contract."

[56] *Sabban*, 600 F.3d at 1224 ("Though it is a somewhat close question, we hold that the judgment against Sabban under § 7031(b) is dischargeable.").

In *O'Brien Envt'l Energy, Inc.*, the Third Circuit decided that "for a claim in its entirety to be entitled to first priority under [§ 503(b)(1)(A)], the debt must arise from a transaction with the debtor-in-possession… [and] the consideration supporting the claimant's right to payment [must be] beneficial to the debtor-in-possession in the operation of the business."[57] "A party seeking payment of costs and fees as an administrative expense must… carry the heavy burden of demonstrating that the costs and fees for which it seeks payment provided an actual benefit to the estate and that such costs and expenses were necessary to preserve the value of the estate assets."[58]

For the reasons that follow, I conclude that none of the District's penalties are entitled to administrative expense priority.

1. *Tri-State* Bars Noncompensatory Criminal Penalties from Administrative Expense Priority.

In the *Tri-State* decision, the Third Circuit held that noncompensatory criminal penalties arising from post-petition conduct are not entitled to administrative expense priority because such penalties are not ordinarily incident to the operation of a business.[59] Exide contends that *Tri-State* is dispositive and requires a finding that the District's penalties are not entitled to priority. The question remains: are the District's penalties criminal, civil, or some hybrid ("quasi-criminal")?

All of the District's papers filed in this Court describe an effort to recover civil penalties. Exide, however, directs the Court to the District Remand Motion and the District Remand Order.[60] To support its efforts for remand of the California State Action, the District emphasized the

---

[57] *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 532–33 (3d Cir. 1999) (quoting *Cramer v. Mammoth Mart, Inc., (In re Mammoth Mart, Inc.)*, 536 F.2d 950, 954 (1st Cir. 1976)).

[58] *Id.* at 533. (citations omitted).

[59] *Pa. Dep't Envtl. Res. v. Tri-State Clinical Laboratories, Inc.*, 178 F.3d 685, 698 (3d Cir. 1999) ("We hold that punitive criminal fines arising from post-petition behavior are not administrative expenses under 11 U.S.C. § 503(b), and therefore, are not accorded priority status pursuant to § 507(a)(1).").

[60] *See* D.I. 4604, Exhibit A.

criminal or "quasi-criminal" nature of its penalties.[61] Ultimately, the District succeeded in securing

a remand by persuading the federal court that, while the District's penalties are nominally civil,

they fulfill the same functions as a criminal enforcement action.[62] Now, as Exide points out, the

District has changed course and characterizes to its penalties as "civil." Accordingly, Exide argues

that judicial estoppel should apply and bar the District from recharacterizing the nature of its

claims. Judicial estoppel applies when: (1) a party adopts a position clearly inconsistent with an

earlier position; and (2) the party had succeeded in persuading a court to accept that party's earlier

position, so that judicial acceptance of an inconsistent position in a later proceeding would create

"the perception that either the first or the second court was misled."[63]

> At oral argument, counsel for the District argued:
>
> There's a large difference between referring to something as quasi-criminal and criminal... if we had on the stand the other side's expert and they called him an expert and I called him a quasi-expert, I think no one in the world would fail to grasp the distinction there... 'Quasi' necessarily means not the thing that you're referring to.[64]

Counsel for the District also referenced the differences in the District's authority compared to that

of federal authorities, the United States Attorney's Office, and further generalities regarding the

differences between criminal and civil law.[65]  In response, I initiated a dialog during argument

regarding the definition of "quasi" in the Merriam-Webster Dictionary.

---

[61] *See, e.g.*, D.I. 4604, Exhibit A, at 19. The District Remand Motion uses the words "crime" or "criminal" dozens of times.

[62] *See* District Remand Order, at 2 ("This is fundamentally a law enforcement action."). D.I. 4604, Exhibit B.

[63] *Carlyle Inv. Mgmt. LLC v. Moonmouth Co. SA*, 779 F.3d 214, 221–22 (3d Cir. 2015) (quoting *New Hampshire v. Maine*, 532 U.S. 742 (2001)); *see also Ryan Operations C.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir. 1996) ("The best principle... is that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory.") (internal quotations omitted).

[64] Transcript of Oral Argument, D.I. 4966, at 53:13–25, 54:1–2.

[65] *See id.* at 54:7–19.

The Court: -- in the Merriam-Webster online dictionary...it says, "having some resemblance usually by possession of certain attributes." It seems pretty clear that in the use by the District of quasi-criminal, that's precisely what they intended, that the fines had some resemblance or possess certain attributes that mimicked a criminal fine.[66]

Mr. Pfister: I agree, under the definition of quasi, that there are certain attributes. Right? One of those attributes could be that they're non-compensatory. Right? One of those attributes could be that they are penalties, the root of which is obviously penal. Those are both fair characterizations of civil penalties, but it doesn't make them into criminal--a judgment of criminal conviction.[67]

Counsel for Exide also referred back to the language of the District Remand Motion, which argued, in part, for the federal court's acceptance of the "criminal" or "quasi-criminal" nature of the District's penalties because the "Health and Safety Code explicitly requires the same eight factors be used to determine civil penalties or criminal penalties, which shows that they are intended to vindicate the same interest...."[68]

Based upon the evidence in this record, I conclude that judicial estoppel applies and bars the District from now asserting its penalties are "civil" in nature, as opposed to either "criminal" or "quasi-criminal." Accordingly, under the Third Circuit's holding in *Tri-State*, the District's penalties are not entitled to administrative expense priority.

2. Regardless of Whether the District's Penalties are Civil or Criminal, Third Circuit Law and Public Policy do not Support Administrative Expense Priority

The District asks this Court to follow the Eleventh Circuit's decision in *N.P. Mining*, concluding that noncompensatory civil penalties are entitled to administrative expense priority:

We find that a policy of ensuring compliance by trustees with state law is sufficient justification to place civil penalties assessed for post-petition mining operations in the category of the 'some cases' in which 'costs ordinarily incident to operation of a business' are accorded administrative-expense priority. We agree . . . that in the regulated atmosphere of the strip mining industry, a fine for

---

[66] *Id.* at 54:23-25, 55:1-4.
[67] Transcript of Oral Argument, D.I. 4966, at 55:7-13.
[68] *See supra* note 13 and accompanying text.

the violation of environmental regulations should be considered a cost ordinarily incident to operation of a business."[69]

In *Tri-State*, the Third Circuit rejected the argument by the Pennsylvania Department of Environmental Resources ("DER") that the cost of complying with public safety laws is a necessary cost of doing business:

> We refuse to adopt an analysis of administrative expenses that is based upon the assumption that legitimate businesses engage in a "cost-benefit" analysis to determine if they will comply with criminal laws that protect the very public that the owners and operators of those legitimate businesses are part of. It is neither reasonable nor necessary for a commercial enterprise to violate criminal laws and endanger the public to preserve the estate or to conduct legitimate business operations, and we refuse the DER's invitation to hold otherwise. Rather, we believe Congress intended only for those 'actual necessary costs and expenses' that arise in the context of, or compensate for, legitimate business activity, or the losses resulting therefrom, to be treated as expenses of preserving the state, and accorded priority as an administrative expense.[70]

Although *N.P. Mining* involved civil penalties and *Tri-State* involved criminal penalties, the public policy reasons underlying both decisions apply here to render the District's penalty claims ineligible for administrative priority status.

First, the *N.P. Mining* Court recognized that noncompensatory environmental fines did not constitute a benefit to the estate nor could they be considered actual and necessary:

> Because these punitive penalties will not be used to abate any identified environmental hazard caused by the estate, they should more properly be thought of simply as civil penalties no different from penalties for violating antitrust or securities laws. In short, although this case involves environmental penalties, no policy in favor of environmental protection justifies giving these penalties administrative-expense priority.[71]

---

[69] *Alabama Surface Mining Comm'n v. N.P. Mining Co., Inc. (In re N.P. Mining Co., Inc.)*, 963 F.2d 1449, 1458 (11th Cir. 1992) (citing *Reading Co. v. Brown*, 391 U.S. 471, 484 (1968), and quoting *In re Bill's Coal Co., Inc.*, 124 B.R. 827 (D. Kan. 1991) (internal punctuation omitted)).

[70] *See Tri-State*, 178 F.3d at 692–93.

[71] *Id.* at 1458.

The *Tri-State* Court also distinguished between claims for compensatory post-petition expenses and claims for noncompensatory penalties by reviewing *In re Conroy*, a previous Third Circuit decision.[72] In *Conroy*, the Third Circuit held that a government agency's claim for costs associated with its environmental cleanup of the debtor's property should be afforded administrative expense priority.[73] *Tri-State*, when reviewing that decision, explained:

> We view *Conroy* as supporting the distinction we draw between claims for compensatory expense and those for criminal fines... By cleaning up the site, the DER provided a service to the debtor – a service that the debtor itself would have had to perform during the course of normal operations – and, therefore, the DER was entitled to compensation for that service.[74]

Contrasted with *Conroy*, the District did not engage in any remediation efforts at its own cost on behalf of Exide. Rather, as stated above, Exide agreed to and has already spent tens of millions of dollars in an effort to demolish the Vernon Facility and remediate the property and surrounding neighborhood. Accordingly, Exide rightfully argues that *Conroy* is the quintessential example of Third Circuit law that reimbursement of actual costs to preserve the estate is an essential element for an administrative expense claim.

Moreover, *Tri-State* explains that administrative expense priority for noncompensatory fines is "as unfair as it is impractical," since payment of the penalties does not compensate for any damages resulting from Exide's conduct; instead it merely takes money from the pockets of Exide's innocent and actually-harmed creditors rather than the alleged wrongdoer, Exide.[75]

---

[72] 24 F.3d 568 (3d Cir. 1994).

[73] *Id.* The DER filed a claim for reimbursement for costs incurred in cleaning up hazardous chemicals at a site that the chapter 11 debtors had attempted to abandon. The court determined that if DER had not cleaned up the site, the debtors would have had to arrange for the cleanup post-petition, constituting an administrative expense under §503(b)(1)(A), as the expenses to remove the threat posed by hazardous wastes are necessary to preserve the estate.

[74] *Tri-State*, 178 F.3d at 693.

[75] *Id.* at 692.

Finally, denying administrative expense priority status to the District's penalty claims does not give Exide a financial incentive to violate emission standards. As a consideration for entering into the NPA, Exide was required to undertake closure and remediation projects with the DTSC, which is projected to cost Exide between $108,000,000 and $133,000,000 in direct expenses and lost revenue. Without analyzing whether these projected costs are sufficient to compensate for environmental damages, Exide certainly did not escape significant cost burdens through the bankruptcy process, nor will it thereafter.

The District's formulaic penalties do not serve to abate any identified environmental hazard, nor do they provide a benefit to the estate by bringing the property into compliance with public safety laws. Accordingly, whether the penalties are criminal or civil, they are not compensatory and, therefore, are not entitled to administrative expense priority.

3. <u>Violations Consisting of Postpetition Continuations of Prepetition Conduct are Not Afforded Administrative Expense Priority.</u>

In *N.P. Mining*, the Eleventh Circuit explained, "[W]e exclude from consideration as an administrative expense any penalty assessed postpetition for the failure of the debtor in possession or the trustee to abate a prepetition violation of the statute."[76] The Court explained:

> A requirement that a debtor in possession or a trustee expend funds in the bankruptcy estate for the purpose of abating prior mining violations would deprive the estate of its "new day" beginning and frustrate the purpose of the bankruptcy statute.[77]

The *N.P. Mining* Court also concluded that penalties assessed after the mining operations ceased were not entitled to administrative expense priority.

---

[76] 963 F.2d at 1459; *see also In re Chris-Marine, U.S.A., Inc.*, 321 B.R. 63, 65 (M.D. Fla. 2004) (per diem fines for postpetition conduct continuing from prepetition violations are not entitled to administrative expense priority); *In re Bill's Coal Co., Inc.*, 124 B.R. 827, 829 (D. Kan. 1991) ("Penalties assessed for pre-petition misconduct or the continuing effects of pre-petition misconduct should not be considered an administrative expense.").

[77] *Id.* at 1459.

Although a chapter 11 trustee administered the estate for 10 months, and the operations were not entirely inactive, it appears that the trustee engaged in coal brokering merely to protect an asset of the estate and that the trustee was essentially holding matters in status quo.[78]

Here, the District has asserted penalties for prepetition conduct that continued unabated postpetition. Further, the Vernon Facility ceased operations on March 14, 2014. I find persuasive the reasoning behind the Eleventh Circuit's decision to disallow administrative expense priority to penalties asserted postpetition for conduct originating prepetition and continuing post-petition, and for penalties incurred after the facility ceased operations.

III.    The District's Claims in the Third Amended Complaint Do Not Relate Back Sufficiently to the Original Proof of Claim and Were Therefore Discharged by the Confirmation Order and Plan Injunction

The pertinent timeline regarding the District's filings is as follows:

(i)     On the Bar Date (December 9, 2013), the District timely filed the Original Proof of Claim based on the five NOVs.

(ii)    On January 16, 2014 (six weeks after the Bar Date), the District filed a complaint in California initiating the California State Court Action (the "Original Complaint"). Certain allegations in the Original Complaint mirrored the allegations in the Original Proof of Claim (including a recitation of the five NOVs).

(iii)   On March 6, 2014, this Court entered a Stipulation and Agreed Order resolving the dispute between Exide and the District about the applicability of the automatic stay to the Original Complaint and permitted the District to proceed with the California State Court Action, "provided, however, the District shall not seek to collect any money judgment entered in the Lawsuit absent further order of the Bankruptcy Court."[79]

(iv)    On August 7, 2014, the District filed the First Amended Complaint in the California State Court Action. Exide stipulated to allow the District to file the First Amended Complaint, but with an express reservation of rights to challenge the First Amended Complaint.

---

[78] *Id.* at 1461.
[79] D.I. 1510, ¶ 1.

(v)    On August 22, 2014 (nine months after the Bar Date), the District filed a purported "amended" proof of claim, which changed the amount of the Original Proof of Claim to an unliquidated amount and incorporated the claims asserted in the Original Complaint and the First Amended Complaint.

(vi)   On February 5, 2015, the Debtor filed the Second Amended Disclosure Statement with Respect to the Second Amended Plan of Reorganization of Exide Technologies (D.I. 3095), which this Court approved (D.I. 3092).

(vii)  On February 18, 2015, the District filed the Second Amended Complaint in the California State Court Action. Again, rather than require the District to proceed with a motion to leave to amend, Exide stipulated to allow the District to file the Second Amended Complaint but with an express reservation of rights to challenge the Second Amended Complaint.

(viii) On March 11, 2015, the United States Attorney's Office for the Central District of California and Exide entered into the NPA, which was approved by this Court on March 27, 2015 (D.I. 3417).

(ix)   On March 27, 2015, this Court entered the Order confirming the Plan.

(x)    On April 30, 2015, the Debtor substantially consummated the Plan (the "Plan Effective Date") and emerged from chapter 11 as a newly reorganized company.

(xi)   On May 28, 2015, the District filed the Third Amended Complaint for Civil Penalties and Injunctive Relief in the California State Court Action (the "Third Amended Complaint"), which asserts twenty-seven causes of action (as compared to twelve causes of action in the Original Complaint), and asked for penalties of not less than $80 million (as compared with not less than $40 million of penalties in the Original Complaint and the amount of $38,915,000 in the Original Proof of Claim).

(xii)  On June 15, 2015, the Reorganized Debtor filed a motion to enforce the plan injunction against the District, which was resolved by the Court entering an Order dated July 23, 2015, scheduling the filing of the motions discussed in this Opinion, including the Relation Back Motion.

The confirmed Plan provides that all proofs of claim filed after the applicable bar date are deemed disallowed and expunged as of the Effective Date, unless the late proof of claim was

deemed timely filed by a final order the Bankruptcy Court.[80]  The confirmed Plan also provides

that filing new claims or amending claims without authorization of the Bankruptcy Court or the

Reorganized Debtor are also deemed disallowed and expunged.[81]

The District's Relation Back Motion asks this Court to determine that the District may

pursue all prepetition claims asserted against Exide in the Third Amended Complaint.  The District

argues that its later filings amended the "Original Allegations" that were set forth in the Original

Proof of Claim and the Original Complaint.  However, only the Original Proof of Claim was filed

prior to the bar date.  I do not agree that Exide's stipulation to allow the litigation to proceed in

state court equates to an agreement to amend the Original Claim with the Original Complaint.

From the start, Exide objected to the District's pursuit of its claim in state court as a violation of

the automatic stay, and agreed to allow the litigation to proceed only as long as it was agreed that

the District could not seek to collect any judgment entered in the lawsuit without seeking further

order of the Bankruptcy Court.  The facts indicate that Exide always intended that any further

recovery would be subject to scrutiny by the bankruptcy court about whether any new claims

should be allowed after the bar date.  To be successful, the District must show that all of its claims

in the Third Amended Complaint relate back to the Original Proof of Claim.

The District's Relation Back Motion is based on Fed. R. Civ. P. 15(c)(1)(B), which

provides:

> (1) An amendment to a pleading relates back to the date of the original pleading
> when:
> . . . .
> (B) the amendment asserts a claim or defense that arose out of the conduct,
> transaction, or occurrence set out - - or attempted to be set out - - in the
> original pleading.[82]

---

[80] Plan, Art. 10.4.
[81] Plan, Art. 10.7.
[82] Fed. R. Civ. P. 15(c)(1)(B), made applicable in this proceeding pursuant to Fed.R.Bankr.P. 7015.

"[T]he decision to allow amendments to a proof of claim is within the discretion of the Bankruptcy Court."[83] "An amendment to claim filed post bar date must be scrutinized to assure that it is not an attempt to file a new claim."[84]

The Court of Appeals for the Third Circuit has determined that amendments to proofs of claim should be allowed when "the purpose is to cure defects in a claim as originally filed, to describe a claim with greater particularity, or to plead new theories of recovery on facts set forth in the original claim."[85] Rule 15(c)(1)(B) requires the amendment to relate back to the same "conduct, transaction or occurrence" asserted in the original pleading.[86] "The touchstone for relation back is fair notice because Rule 15(c) is premised on the theory that 'a party who has been notified of litigation concerning a particular occurrence has been given all the notice that statutes of limitations were intended to provide.'"[87]

The District argues that the common core of operative facts in its pleadings is the relation to "Exide's unlawful release of lead and arsenic into the air during the course of its battery-recycling operations in Vernon, California."[88] The District relies, in part, upon a comparison between the case at hand and the Sixth Circuit's decision in *Miller v. American Heavy Lift*

---

[83] *Plains Marketing, L.P. v. Bank of America, N.A. (In re SemCrude, L.P.)*, 443 B.R. 472, 477 (Bankr. D. Del. 2011) (quoting *In re Ben Franklin Hotel Assoc.*, 186 F.3d 301, 309 (3d Cir. 1999)).

[84] *SemCrude*, 443 B.R. at 477 (quoting *Harzel & Buehler, Inc. v. Station Plaza Assoc., L.P.*, 150 B.R. 560, 562 (Bankr. D. Del. 1993)). The District did not file a motion under Fed. R. Bank. P. 9006(b)(1) seeking the Court's permission to file a late proof of claim to assert a new claim after the bar date. A court should grant permission to file a late claim only if the party's failure to file a timely claim was the result of "excusable neglect." *See Pioneer Inv. Serv. Co. v. Brunswick Assoc. Ltd. P'ship*, 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993). I will not consider excusable neglect at this late stage in the case.

[85] *Franklin Hotel*, 186 F.3d 309.

[86] Fed. R. Civ. P. 15(c)(1)(B). "[A]mendments that restate the original claim with greater particularity or amplify the factual circumstances surrounding the pertinent conduct, transaction or occurrence in the preceding pleading fall within Rule 15(c)." *Bensel v. Allied Pilots Ass'n*, 387 F.3d 298, 310 (3d Cir. 2004).

[87] *Glover v. F.D.I.C.*, 698 F.3d 139, 146 (3d Cir. 2012) (quoting *Baldwin Cty. Welcome Ctr. v. Brown*, 466 U.S. 147, 149 n. 3, (1984)). "[T]he court looks to whether the opposing party has had fair notice of the general fact situation and legal theory upon which the amending party proceeds." *Bensel*, 387 F.3d at 310.

[88] Transcript of Oral Argument, D.I. 4966, at 80:9–12.

*Shipping.*[89] In *Miller*, a group of sailors filed complaints against the defendants, alleging damages for injuries caused by exposure to "asbestos and hazardous substances other than asbestos."[90] The representative for the plaintiffs' estates later amended the respective complaints, alleging that the decedents had suffered from leukemia as a result of exposure to benzene and benzene-containing products. Reversing the lower court, the Sixth Circuit held that the amended complaints' operative facts related back to the original pleading because the amended allegations "fit comfortably within the claims of exposure to 'hazardous substances' that [were] alleged in the original pleading"[91] and "[t]he original complaints in this case made clear that the deceased seamen had suffered latent injuries, based upon exposure to toxic substances on board Shippers' vessels, that resulted in their illnesses and eventual deaths."[92] Here, the District analogizes the present circumstance to *Miller* and argues that the operative facts - - lead and arsenic emissions at the Vernon Facility - - have remained steady.

Countering this assertion, Exide argues that the allegations contained in the Amended Proof of Claim are too distinct from those contained in the Original Proof of Claim's NOVs to allow any relation back. In support, Exide cites numerous cases that illustrate ways in which courts have denied relation back under Rule 15 when an amendment differs in time and type from the

---

[89] 231 F.3d 242 (6th Cir. 2000).
[90] *Id.* at 245.
[91] *Id.* at 250.
[92] *Id.* at 251.

original.[93] Particularly, Exide relies upon the Seventh Circuit's decision in *In re Unroe*.[94]    In

*Unroe*, the IRS timely filed a priority claim for 1982 taxes, and then, after the bar date, the IRS

filed a second claim, which it styled as an "amendment," asserting a priority claim for 1983 taxes.[95]

The Seventh Circuit determined that the District Court erred in finding the requisite nexus between

the 1982 and 1983 claims to allow relation back under Fed. R. Civ. P. 15(c), writing:

> The IRS's position would permit the Service to file a claim for one tax year, and
> then, after the bar date, "amend" by right the claim to include any number of
> additional tax years. This would defeat the bankruptcy law's purpose of affording
> the debtor, trustee and court timely notice of claims. Separate years imply
> separate tax claims under Bankr. R. 7015. Examples of amendments permitted
> under Bankr. R. 7015 would include correcting the amount of tax, penalties or
> interest claimed in a timely filed claim. Fed. R. Civ. P. 15(c) therefore does not
> rescue the tardy 1983 claim.[96]

Ultimately, however, the Seventh Circuit concluded that the district court judge did not abuse his

discretion in identifying factors that tilted the equitable balance in the IRS's favor and allowed the

late filed claim, including the fact that the chapter 13 debtor originally included payment of the

1983 taxes in her plan in an amount that was greater than the IRS's late claim.[97]

Although the relation back standards of Rule 15 are applicable when considering whether

to allow the amendment of claim after the bar date, the analysis must be done in the context of the

---

[93] *See, e.g.*, *R.R. Contr. Co. S. Jersey v. JP Rail, Inc.*, 2014 WL 1300015, at *7 (D.N.J. Mar. 31, 2014) ("*Bensel* does not compel relation back in the case at bar because the original claims… are pled with particularity so as to limit the scope of the litigation."); *In re Lenox Healthcare, Inc.*, 343 B.R. 96, 106 (Bankr. D. Del. 2006) (deciding that the trustee's original preference complaint did not provide adequate notice to the defendant that the additional transfers would be attacked when the original complaint did not reference the parties' agreement or specify any facts about the relationship between the debtors and the defendant); *In re Austin Driveway Servs., Inc.*, 179 B.R. 390, 395 (Bankr. D. Conn. 1995) ("When the amended pleading does not rely upon the facts and transactions originally pled or pleaded them more specifically, but rather is based on new facts and different transactions, the proposed amendment will not relate back to the original pleading.").

[94] 937 F.2d 346 (7th Cir. 1991).

[95] The IRS first filed an amendment for 1985 tax liability, but then filed a second amendment which corrected the date of the 1985 tax claim to 1983.  *Id.* at 347.

[96] *Unroe*, 937 F.2d at 349.

[97] *Id.* at 351.

bankruptcy case. "A creditor may not use the claims amendment process to circumvent the claims

bar date."[98]   "The bar date is important to the administration of the case as it brings certainty to a

debtor's case by enabling the debtor and its creditors to know the amount of claims which exist."[99]

"A bar date can be thought of as akin to a statute of limitations and must be followed."[100] The

importance of the bar date has been explained as follows:

> The practical, commercial rationale underlying the need for a bar date are [sic]
> manifest. The creditors and bankruptcy court must be able to rely on a fixed
> financial position of the debtor in order to intelligently evaluate the proposed plan
> of reorganization for plan approval or amendment purpose. After initiating a
> carefully orchestrated plan of reorganization, the untimely interjection of an
> unanticipated claim, particularly a relatively large one, can destroy the fragile
> balance struck by all the interested parties in the plan. Given the time sensitivity
> of such financial undertakings, the consequent delay in reevaluation necessitated
> by the late allowance of the claim may often spell disaster to recovery, even where
> ultimate approval is forthcoming. These considerations and realities militate in
> favor of restraint and caution in allowing untimely claims. [101]

Exide makes a strong public policy argument for the Court to be conscious of this issue:

> Permitting untimely claims – especially under the district's interpretation, which
> arguably would permit it to continue to amend the state court complaint to assert
> increasing amounts and additional causes of action *ad infinitum* – would eviscerate
> the economic basis on which the Plan was negotiated and prejudice the Debtor's
> estate and its creditors....[102]

In this case, not only were most of the District's claims filed after the bar date, but the new

claims in the Third Amended Complaint were filed after the Effective Date of the Plan. "While it

is not impossible to amend a claim after a plan of [re]organization has been confirmed and rendered

---

[98] *SemCrude*, 443 B.R. at 477.
[99] *In re Nortel Networks Inc.*, 573 B.R. 522, 527 (Bankr. D. Del. 2017) (citations omitted).
[100] *Id.*
[101] *SemCrude*, 443 B.R. at 477 (quoting *IT Commercial Fin. Corp. v. Dilkes (In re Analytical Sys., Inc.)*, 933 F.2d 939, 942 n.5 (11th Cir. 1991) *abrogated on other grounds by Pioneer*, 507 U.S. 380, 387 n.3.).
[102] *Id.* at 91:20–25, 92:1.

effective, a party must generally show good cause to do so."[103] Other courts have determined "*res judicata* precludes post-confirmation amendments absent some 'compelling reason.'"[104]

Exide argues that the District's "new claims" asserted after the Original Proof of Claim can be grouped into three categories: (i) new claims based on the NPA, (ii) new violations alleging attempts by Exide to conceal its emission levels from the District or other deceptive and dishonest conduct; and (iii) new violations that occurred on different dates or are based on different regulatory requirements than those included in the Original Proof of Claim. The Original Proof of Claim does not forewarn of potential future claims based on violations of different regulations or based on an expanded timeframe. It is not enough to link the District's new claims generally to "Exide's unlawful release of two toxins." The circumstances of this case do not support a determination that the District's new claims arise out of the same conduct, transaction, or occurrence as listed in the Original Proof of Claim, which was limited and specific.

Further, the damages asserted in the District's Third Amended Complaint more than double the amount in the Original Proof of Claim - - from $38 million to $80 million, plus unliquidated amounts. The District is not asserting increased damages based on the five specific NOVs in the Original Proof of Claim. There are new violations and claims for allegedly fraudulent behavior. There is nothing to indicate that Exide or its creditors had any reason to believe that the District's

---

[103] *CBS Outdoor Inc. v. Nextmedia Group Inc. (In re Nextmedia Group Inc.)*, 2011 WL 4711997, *3 (D. Del. Oct. 6, 2011).

[104] *Id.* (citing *In re Winn-Dixie Stores, Inc.*, 639 F.3d 1053, 1056 (11th Cir. 2011); *Holstein v. Brill*, 987 F.2d 1268 (7th Cir. 1993)). *See also In re G-I Holdings, Inc.*, 514 B.R. 720, 760 (Bankr. D.N.J. 2014) ("The Court finds the *Holstein v. Brill* case particularly instructive, where the Seventh Circuit determined that changes after the milestone of confirmation of the plan 'should be allowed only for compelling reasons.'").

claim would increase by more than $40 million dollars after the bar date, much less after Plan confirmation and the effective date.[105]

Finally, the record before me does not establish any compelling reason so allow such drastic amendment after the confirmation and effective date of the Plan. The Bankruptcy Court should not be a haven for those who violate environmental laws and harm the community. However, the claims asserted in the District's Third Amended Complaint are largely noncompensatory penalties. Payment of penalties does not clean up property or otherwise benefit the community or the bankruptcy estate. Many of the District's new claims were made after Exide entered into the Non-Prosecution Agreement with the United States' Attorney's Office, in which Exide admitted to violating environmental laws and agreed to immediately and permanently close the Vernon Facility and work with the California Department of Toxic Substances Control to remediate the property. Neither Exide nor its creditors should be penalized for entering into that agreement.

For all of the foregoing reasons, I conclude that the District's claims that were asserted post-bar date, post-Plan confirmation, and post- Effective Date should not relate back to and amend the Original Proof of Claim.

---

[105] *Matter of Stavriotis*, 977 F.2d 1202, 1203 (7th Cir. 1992) (deciding, in part, that a bankruptcy court did not abuse its discretion by refusing to allow the IRS to amend its proof of claim, after the bar date, to increase the debtor's liability from $11,132.93 to $2,435,078.39.).

**CONCLUSION**

For the foregoing reasons, the Discharge Motion will be denied; the Administrative Claims Objection will be sustained; and the Relation Back Motion will be denied. An appropriate order follows.

BY THE COURT:

_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT

DATED:  April 30, 2019