## **Exhibit Q**

**AGC Response Letter**



1055 Andrew Drive, Suite A
West Chester, PA 19380-4293
tel 610.840.9100    fax 610.840.9199
www.advancedgeoservices.com

May 16, 2017                                                      2013-3007-12

Peter Ruttan, Project Manager
Department of Toxic Substances Control
Office of Permitting
8800 Cal Center Drive
Sacramento, CA  95826-3200

RE:     Response to DTSC's Comment Letter Dated December 14, 2016
        U.S. EPA ID Number CAD 097854541

Dear Mr. Ruttan:

On behalf of Exide Technologies, Advanced GeoServices submits these responses to four memoranda that are attached to DTSC's letter of December 14, 2016.

The memoranda are as follows:

1.  Engineering and Special Projects Office (ESPO) October 7, 2015 memorandum regarding Statistical Analysis of Soil Lead Concentrations in Vernon, CA dated August 12, 2015 that provides comments on two documents: "Response to DTSC's Comment Letter dated February 17, 2015 regarding *Background Study Work Plan*, prepared by Advanced GeoServices, dated August 12, 2015" and *Statistical Analysis of Soil Lead Concentrations in Vernon, CA*, prepared by Dr. Mitchell Small and Dr. Stephen Rose, dated August 12, 2015.

2.  Geological Services Unit (GSU) December 31, 2015 memorandum presenting its technical review of *Statistical Analysis of Soil Lead Concentrations in Vernon, CA*, prepared by Dr. Mitchell Small and Dr. Stephen Rose, dated August 12, 2015.

3.  Human and Ecological Risk Office (HERO) January 7, 2016 memorandum presenting its review of *Statistical Analysis of Soil Lead Concentrations in Vernon, CA*, prepared by Dr. Mitchell Small and Dr. Stephen Rose, dated August 12, 2015.

4.  Roux Associates (Roux) January 20, 2016 memorandum presenting its review of *Statistical Analysis of Soil Lead Concentrations in Vernon, CA*, prepared by Dr. Mitchell Small and Dr. Stephen Rose, dated August 12, 2015.

For convenience, the comments in the memoranda are provided in bold followed by the responses.



Peter Ruttan, Project Manager
2013-3007-12
May 16, 2017
Page 2 of 59

As an overall comment, Exide will also be conducting an additional off-site residential background study evaluating the concentrations of anthropogenic lead in a residential community with similar:

1.  historic use (including housing age);
2.  proximity to arterial roads and freeways;
3.  proximity to surrounding industrial use.

More information on this additional background study will be presented in a letter to the DTSC to be submitted on May 31, 2017.

In addition to addressing the comments in the memoranda, this letter responds to DTSC's suggestion that the findings of the statistical analysis performed by Drs. Small and Rose, and their "... conclusion may lead one to believe that the Small/Rose Study's interpretations of the data set and the creative use of assumptions appear targeted to fit a desired outcome." (letter from Peter Ruttan to John Hogarth, dated December 14, 2016).  We assume that this inaccurate assertion was due to wording in the Small/Rose report that possibly failed to explain adequately the data-driven methodology with sufficient clarity so that its objectivity would be transparent.  We hope that these responses assist in clarifying the report.  As a first step in this regard, a concise overall explanation of the approach is offered here.

The Small/Rose data analysis identifies the distances beyond which the best statistical estimate of the Exide facility's contribution to the average soil lead concentration becomes statistically indistinguishable from ambient urban background.  In the Small/Rose Study, a maximum influence distance of 1.3 km was determined in the southwest direction.  This estimate follows directly from a regression model of soil lead concentration as a function of modeled ambient air concentration and available indicator variables for other anthropogenic sources of lead.

The principal steps in the calculation include:

1.  Development of a conceptual model in which the contributions to soil lead at any location are calculated to be the additive result of:

    i)   <u>Deposition from historic emissions from the Exide facility</u> – spatial distribution of soil lead concentrations resulting from deposition of historic airborne lead emissions from the Exide facility is derived by establishing the proportionate relationship between soil lead and the average ambient air lead concentration calculated through air modeling using accepted input criteria as specified in AB2588.  The average ambient air concentrations originating from the facility are predicted by the air dispersion model AERMOD, simulating the model over an annual period so that daily and seasonal variations in meteorology are represented.  The regression establishing the relationship between the average ambient air and soil lead concentrations is independent of the emission rate from



the facility because the relationship is linear.  This means that the actual soil lead measurements determine the regression coefficient in direct linear proportion to the calculated ambient air concentration at that location.  Because of this linear relationship, it is the relative shape of the predicted ambient air concentration contours that are important in the regression analysis, not the actual calculated concentration.

To provide a conservative estimate of how far soil lead concentrations indicative of Exide's impact extend, it was assumed that no airborne lead particles were removed by deposition in the air model.  This extends the ambient air concentration contours outward beyond where they would have been predicted and attributes more soil lead to the historic facility emissions, had deposition been considered.

ii)  <u>Deposition from lead associated with other identifiable sources.</u>  Other, non-Exide facility related lead sources may include lead based paint on property structures as determined by the year of housing construction (circa 1940 or before).  Sample location in a drip zone may indicate lead-based paint contribution or enhanced deposition because of rooftop runoff.  Another known source of lead is the historical aerial deposition from leaded gasoline, which is found at locations near major arterial roads or freeways.

If another identifiable source is present at the sample location (e.g., the sample location is within the drip zone), that location is assigned a value of 1 for the regression analysis.  If the other identifiable source is absent at a location (e.g., the sample location is outside the drip zone), that location is assigned a 0 for the regression.  The regression analysis generates fitted regression coefficients that represent an estimate of the average contribution to soil lead for each of the source types for which a statistically significant coefficient is obtained.

iii)  <u>Ambient urban background.</u>  The portion of the soil lead concentrations that is not attributable to deposition from Exide facility emissions as a function of ambient air concentration or to another identifiable source type is representative of average ambient urban background.  This value is not an input parameter but is the y-intercept of the linear regression model when all of the other input variables are zero.

In any regression model, there is a large amount of "unexplained variance", due to the highly variable observed distribution of metals (such as lead) in soils and difficulty in predicting these variations.



As such, the regression model is expected to explain only a portion of the variance in the observed data. Nonetheless, despite the high degree of "noise" observed in soil lead concentration measurements, the fraction of the variance explained, as indicated by the $R^2$ value[1], is relatively high at 0.47.  While the $R^2$ value is indicative of an effective analysis, an even more important question for an analysis of this type is whether the estimated <u>regression coefficients</u> are "statistically significant" as indicated by a $p$ value[2] of less than 0.05.  For this data set, the $p$ values are much less than 0.05 when fitting this regression, in part due to the large available dataset.  In essence, the large dataset allows a set of "signals" (data that is well explained by the regression - in this case representing 47 percent of the total variance) to be identified and verified in the presence of the high amount of "noise" (data that does not fit well into the model).

2.  Once the regression is fit, an estimate of the Exide contribution to the present day soil lead concentration as a function of location can be made.  Following this step, a calculation is made of the distance at which the contribution from the Exide facility becomes so small that it would lie within the measurement error of soil lead concentrations within the dataset when compared to the estimated urban ambient background concentration (excluding the identifiable, non-Exide related contributions to urban soil lead such as house age and proximity to heavily trafficked roadways).  This analysis incorporates objective calculations and assumptions.  The calculated values include the fitted relationship between modeled Exide ambient air concentrations and the observed soil lead concentrations; the fitted estimate of non-impacted, ambient background soil lead concentration; and the estimate of measurement error from duplicate samples in the sampling protocol.  A primary assumption involves the selection of the degree of certainty necessary to conclude that the Exide contribution is distinguishable from the estimated background.  This assumption is often a matter of deliberation among parties, since it goes beyond technical assumptions.  The Small/Rose report uses a $2\sigma$ level of proof, indicative of a 98-98% level of confidence before distinguishability is concluded.

To summarize, we believe that all assumptions and calculations in the Small/Rose analysis were carried out scientifically in an open, objective and technically defensible manner.  There has been (and continues to be) no attempt to build or skew models, model results, or boundaries to correspond with predetermined targets or locations.

---

[1] The $R^2$ value is a statistical measure of how closely the data are to the fitted regression line.  An $R^2$ value of 1 indicates a perfect fit where all of the data fall exactly on the line.

[2] A $p$ value represents the likelihood that the depicted relationship is due to chance.  A $p$ value below 0.05 is typically used as an upper bound of statistical significance. In this model, the $p$ value is used to decide whether or not an explanatory variable remains in the model and as a measure of the significance of the overall regression equation.



Peter Ruttan, Project Manager
2013-3007-12
May 16, 2017
Page 5 of 59

As noted above, the analysis makes conservative assumptions that serve to extend the area of distinguishable impact farther away from the Exide facility and towards the residential area. These conservative assumptions include: 1) all airborne lead from the facility remains suspended in the air which serves to carry more lead farther from the facility; 2) selection of a robust regression algorithm that reduced the influence of outliers and increased the distance at which the Exide contribution is distinguishable from background; and 3) the exclusion of non-Exide related components of urban ambient background when determining the area of impact from the facility. Had the non-Exide related components of urban ambient background been included, the measurement error would be applied to a larger value (the sum of the urban ambient background and the non-Exide related contributions to soil lead), and thus, it takes a higher soil lead concentration for the facility contribution to be distinguishable.

In submitting the Small/Rose report in 2015, Exide had anticipated that the report would stimulate scientifically based discussions with DTSC regarding the analysis and its critical assumptions along with other evaluations that DTSC had performed. Exide still welcomes this discussion with the DTSC and would be happy to answer any clarifying questions. As DTSC noted in its December 14, 2016 cover letter transmitting the above memoranda, "DTSC fully acknowledges that additional scientific evaluations, beyond those methods that have already been employed, are necessary" and then states that the Small/Rose report fails to make a similar acknowledgement. The Small/Rose report is a scientific presentation of the findings from several methods of analysis that have been successfully used at other residential lead sites (Throop, Pennsylvania; Omaha, Nebraska; and Reading, Pennsylvania) to separate the effects of airborne emissions on soil lead concentrations from other, common anthropogenic sources of lead. The report made no claims to be the only way to conduct such an analysis.

DTSC has thus far failed to engage with Exide in its offer for continued discussions made when transmitting the Small/Rose report and has refused to participate in meetings to discuss the differing approaches taken by the various parties. Exide is encouraged by DTSC's statement that additional scientific evaluations are necessary and looks forward to resuming the discussions that DTSC terminated in 2015. To that end, Exide currently intends to submit an addendum to the Small/Rose report that incorporates all of the soil lead data Exide has collected to date in the off-site areas including from 1) the Non-Residential Dust and Dirt sampling program, 2) additional residential properties that were sampled after the analyses in the Small/Rose report were conducted, and 3) schools and parks in the residential area. The addendum would also provide additional sensitivity analyses and documentation requested in these comments as well as additional analyses consistent with DTSC's guidance document. Further, Exide intends to perform an additional background study in a residential area that has properties with housing of similar age and similar proximity to arterial roadways, freeways and historic metals-related industries as the Initial Assessment Areas.

Peter Ruttan, Project Manager
2013-3007-12
May 16, 2017
Page 6 of 59



**ENGINEERING AND SPECIAL PROJECTS OFFICE'S (ESPO'S) OCTOBER 7, 2015
MEMORANDUM REGARDING STATISTICAL ANALYSIS OF SOIL LEAD
CONCENTRATIONS IN VERNON, CALIFORNIA**

**GENERAL COMMENTS**

**Comment 1:**   **The Work Plan title is a misnomer for the following reasons:**

    **a.**   **The proposed work addresses development of a new background data set *and* elements that should be deferred to other cleanup process documents.**

    **b.**   **Rather than focusing on development of a new background data set, the emphasis is on describing techniques that will be used to estimate the extent of Exide's soil lead impacts (i.e., an attribution or apportionment focus).**

    **c.**   **The Work Plan addresses use of the background study data set as a cleanup value, a discussion better deferred to a subsequent phase of the cleanup process.**

    **Facility Response to Comment 1a.  Paragraph 12(d) of the 2014 Order clearly ties establishment of background to establishing a cleanup level, so the Work Plan is consistent with the Stipulation and Order.**

        **DTSC Response.  DTSC disagrees.  The Work Plan should focus solely on the establishment of a new background level.**

Response:   Paragraph 12(d) of the Stipulation and Order states: "Any background level for lead will be developed pursuant to methodologies described in the Department's document titled: "Appendix B Strategies for Establishing and Using Background Estimates of Metals in Soil of Proven Technologies and Remedies Guidance – Remediation of Metals in Soils." Once the additional background study is complete, the Final Clean-up Goal for lead shall be 80 mg/kg (95% UCL) or background, whichever value is higher."  Section 5 in the cited document (referenced as the Guidance in these responses) is titled "Developing Background-Based Cleanup Goals for Metals".  Thus the discussion in the Work Plan about using the background dataset to establish a cleanup level is consistent with both the Guidance and the Stipulation and Order.

    **Facility Response to Comment 1b.  The approach taken in the Work Plan accomplishes both objectives simultaneously, consistent with the definition of background in the Guidance required to be followed by the 2014 Order, which uses background to refer to soil that has not been affected by site releases.**



Peter Ruttan, Project Manager
2013-3007-12
May 16, 2017
Page 7 of 59

**DTSC Response. DTSC disagrees. Estimating the extent of soil lead impacts from the Facility must be segregated from the process of developing a new background data set and estimating new background values.**

Response:    The last sentence in the first paragraph of Section 1.0 in the Guidance states: "for the purposes of the appendix, the general term "background" will be used to refer to soil that has not been affected by site-related releases." The Guidance goes on to state in Section 2:

The ultimate objective of developing background estimates is to enable an "apples to apples" comparison that eliminates unnecessary variability in the comparison between metals concentrations in potentially impacted site soils and unimpacted soils. With this in mind, the ideal approach for establishing site-specific background concentrations is to identify unimpacted areas:

- That are located *as close as possible* [emphasis added] to the potentially impacted areas, and
- With soil characteristics similar to soils that potentially have been impacted by site activities. (see Section 3.0 for further discussion.)

The role of proximity in the background determination is based on the concept that soils located closer to the site will be more representative of site conditions than soils located further away. The range of metals concentrations measured in these nearby soils will more closely reflect the range of metals concentrations in site soils prior to site activities. Soils located further away may have been influenced by different natural processes or other anthropogenic activities than have occurred at the site.

In the Background Study Work Plan, the site is suitably defined as the residential area that has potentially been impacted by facility operations. Consequently, it is necessary to first determine the extent of impact from facility operations prior to a determination of whether any of the soil lead data already collected can be used as a background data set. Once the extent of impact by the Exide facility operations has been determined, the residential properties that are closest to the area of impact should be used to establish background according to the approach defined in the Guidance. The Guidance in Section 3.2, first sentence, allows for the use of existing data collected in previous investigations as the background data set. The approach taken in the Background Study Work Plan to use existing data to both establish the area of impact and, if data on unimpacted soils are available, to use them as a background dataset, is consistent with the Guidance.

Peter Ruttan, Project Manager
2013-3007-12
May 16, 2017
Page 8 of 59



**Facility Response to Comment 1c.  The Work Plan approach is consistent with the 2014 Order.**

> **DSTC Response.  DTSC disagrees.  The 2014 Order requires use of methods described in the Guidance for the establishment of a new background level.  The regression methodology described in the Work Plan is not consistent with the Guidance.**

Response:    The Guidance does not proscribe a methodology to define impacted soils; however, Section 3.1 states that the conceptual site model for fate and transport pathways of site contaminants is a characteristic to be considered in defining the target population for the background dataset.   The regression methodology is a mathematical representation of the conceptual site model as defined in Section 2.2 of the Background Study Work Plan and was used to establish the area of impact.  The air modeling of emissions from Exide, combined with the mathematical analysis of lead deposited by other sources, provide the best definition of fate and transport pathways that define soil lead in a complex urban setting.

As a buffer between the area of distinguishable impact and the background data set, in defining the target population as per Section 3.1 of the Guidance, Exide chose to exclude sample results from the initial assessment areas (i.e. the presumed site as per the Guidance) where Exide conducted soil removal prior to the establishment of the area of distinguishable impact in the Small/Rose study.  The sample results from the Expanded Assessment Areas comprise a suitable background dataset from which a cleanup level can be derived following the procedures outlined in the Guidance.

The characteristics to consider in a background study as defined in Section 3.1 of the Guidance include matching conditions in the unimpacted (background) areas to the impacted areas including the soil types, topography and landforms.  These are all the same throughout the Initial and Expanded Assessment Areas.  Location and source of fill materials is not a characteristic of either the site area or the Expanded Assessment Area.

The Small/Rose report demonstrates that residential properties in the Expanded Assessment Area lie outside the area of distinguishable impact.  Furthermore, the Expanded Assessment Area has experienced very similar historical use as the site properties (the age of housing, proximity to freeways, arterial roadways and non-Exide metals-related industries).  These were identified as the factors that have the potential to influence soil lead concentrations.



The methodology used in the Small/Rose report is consistent with the Guidance and supports the selection of the Expanded Assessment Area soil sample results as the target populations for the background dataset.

Section 3.2 of the Guidance discusses how to develop an appropriate background dataset which can be generated from existing data, new data collected specifically for the purpose of making a background determination, or a combination of new and existing data. The Guidance recommends first plotting the data on a map to identify any clustered or spatially-related concentrations. The kriging plot provided as Figure 1 in the Small/Rose report shows that the soil lead concentrations in the Expanded Assessment Areas have significant variability from location to location with no clustered or spatially-related concentrations. Even DTSC acknowledged that there are no clustered or spatially-related concentrations associated with the facility in the Expanded Assessment Area in a public meeting in June 2015 when it discussed its observations of the soil lead data from the Expanded Assessment Areas. DTSC stated that "the sample results do not show any definite patterns of lead concentrations as they move away from the site." Thus the Expanded Assessment Area dataset satisfies this initial evaluation spelled out in the Guidance.

Section 3.2 of the Guidance further discusses when existing data can be used as a background dataset. Each of the conditions presented therein are met by the Expanded Assessment Areas dataset:

- The data represent the appropriate target population – yes, as described above;
- There are a sufficient number of samples to support the intended statistical comparisons with desired level of statistical power – yes, the Expanded Assessment Area dataset consist of a large data set of 5347 samples from 146 properties, all collected in the same manner.
- The sampling design (e.g. random versus judgmental) and spatial distribution (e.g. no correlated or clustered samples) will support the assumptions of the statistical tests – yes, the properties were selected on a grid, and the same number of samples were collected from similar locations from property to property.
- The conceptual site model of contaminant distribution has remained unchanged since the background sampling (i.e., the background samples were not collected from an area that is now considered to be impacted) – yes, the Small/Rose report demonstrates that the Expanded Assessment Areas are beyond the area of distinguishable impact from the facility.
- The data are of known and acceptable quality – yes, the data were generated by an accredited laboratory, were validated by a qualified scientist and have been submitted to and accepted by DTSC.



The use of the existing dataset from the Expanded Assessment Areas meets the conditions spelled out in Sections 1 through 3.2 of the Guidance.

**Comment 2:**   **The proposed approach for estimating the extent of soil lead impacts from the Exide facility may have merit and may eventually assist with developing a cleanup plan for the facility.  However, such an analysis should be segregated from the process of developing a new background data set and estimating new background values.  *If Exide elects to pursue an attribution study using the regression techniques described in the Work Plan, ESPO can provide comments in a separate memorandum.***

> **Facility Response.  The approach taken in the Work Plan is consistent with the Guidance required to be followed by the 2014 Order.  As stated previously, the approach taken by Dr. Small in the study establishes both objectives of determining the area of impact and estimating the background concentrations simultaneously, consistent with the definition of background in the Guidance as soils that have not been affected by site releases.**

> > **<u>DTSC Response</u>.  DTSC disagrees.  The methods applied are not consistent with the Guidance.  In addition, estimating the extent of soil lead impacts from the Facility must be segregated from the process of developing a new background data set and estimating new background values.**

**Response:**   See the responses to the previous comments that explain in detail how the Small/Rose approach and the selection of the Expanded Assessment Area dataset as a background dataset, following the definition of the area of lead impact, are consistent with the Guidance.

## WORK PLAN COMMENTS

**Comment 3:**   **Data collected as part of the current Interim Measures sampling efforts may be suitable for use in a new background data set.  However, these data are primarily collected in areas along prevailing wind directions.  To support the background study, data also need to be obtained from areas that are not along the prevailing wind directions.**

> **Facility Response.  The Work Plan calls for using all available off-site soil data collected in the Assessment, Expanded, and Step-out sampling areas.  These data were obtained in all wind directions, not just downwind as the comments states.**



> **DTSC Response.** DTSC disagrees. The preponderance of data collected as part of the Interim Measures sampling efforts were collected downwind of the Facility in the Assessment and Expanded Areas. Most data collected in other directions were collected within 3,000 feet of the Facility.

Response:    It is true that the initial assessment areas are located downwind of the facility; however, DTSC's comment is a misrepresentation of the sample locations in the Expanded Assessment Areas. The grid of the Expanded Assessment Areas was laid out in concert with DTSC to gather data from all wind directions within the residential areas that are closest to the facility. Figure RTC-1 shows the relationship between the Expanded Assessment Areas and the downwind and crosswind transects.

**Comment 4:** **DTSC's Guidance (Appendix B, Section 1, Paragraph 1, second sentence) states that:** *Metals concentrations that represent only pristine or natural conditions often are referred to as 'background' concentrations. Metals concentrations that represent a combination of natural levels and non-specific off-site sources are referred to as 'ambient' concentrations....For the purposes of this appendix, the general term 'background' will be used to refer to soil that has not been affected by site-related releases.*

> **By defining background as "soils that have not been affected by site releases", the Work Plan assumes that the objective is to estimate an ambient (anthropogenic) background value. DTSC has not yet determined whether a natural background or anthropogenic background value is appropriate to guide the cleanup activities associated with the Exide facility. The new background study needs to collect the data that would provide the basis for this decision.**

> **Facility Response. The comment is inconsistent with the 2014 Order and the Guidance, as well as past discussions with DTSC as discussed in the general comments at the beginning of this letter. The comment quotes the Guidance but then, objects to using the definition in the Guidance in the Work Plan. Because the Guidance defines "background" as soil that has not been affected by site releases, and the 2014 Order requires Exide to follow the Guidance, DTSC's comments that DTSC has not decided whether natural or anthropogenic background will guide the cleanup activities is inconsistent with the Guidance and in contravention of the 2014 Order. The comment is further inconsistent with the 2014 Order that references the background study conducted by Exide and approved by the Department that established an "ambient" level of lead of less than 80 mg/kg. That background study was based on sampling performed in a residential area in Long Beach, California,**



**clearly not the "natural background" level that DTSC says it now may want to consider. Paragraph 12(d) goes on to say that, if additional information indicates that the "current background level" is not representative of Los Angeles County, Exide may propose a revision to the current [ambient] background number. Again, these 2014 Order Paragraph 12(d) textual statements document that the intent of the background study is not to establish "natural" conditions, but rather, the "ambient" conditions in the residential area where the Interim Measures are taking place.**

> **DTSC Response. DTSC disagrees. The definition from the Guidance is being taken out of context. DTSC has not yet determined whether a natural background or anthropogenic background value is appropriate to guide the cleanup activities with the Exide facility.**

Response:   The definition in the Guidance is not being taken out of context; rather, the reviewer is not considering the context of the Stipulation and Order in making its comment. As discussed in responses to previous comments, the Stipulation and Order makes it clear that anthropogenic background is intended by referencing Long Beach and comparing the established background level to 80 mg/kg. Further, the Guidance refers the reader to three EPA documents for additional discussion about the terms "background" and "ambient." Those documents make a distinction between naturally occurring background and anthropogenic background. The most recent of those cited documents, *Guidance for Comparing Background and Chemical Concentrations in Soil for CERCLA Sites Appendix B - Policy Considerations for the Application of Background Data in Risk Assessment and Remedy Selection,* describes that the CERCLA program does not normally set cleanup levels below anthropogenic background concentrations. In this document, anthropogenic background is defined as "natural and human-made substances present in the environment as a result of human activities (not specifically related to the CERCLA release in question)". This document also cites the National Contingency Plan as a basis for this policy. DTSC statements that it has not yet determined whether a natural or anthropogenic background will guide the cleanup activities are counter to the Stipulation and Order, its own Guidance and the EPA documents on which that Guidance is based.

**Comment 5:   The current Work Plan indicates that the intent is to establish background concentrations of lead in residential soils in the vicinity of the Exide facility. A newly developed background value would be representative of all soil in the vicinity of the Exide facility, regardless of current land use.**

> **Facility Response. This comment is inconsistent with Section 3.1 of the Guidance required to be followed by the 2014 Order, which defines the target population for the background data set as soil with characteristics similar to**



those occurring on the cleanup site. In this application, the residential properties in the Assessment Areas are the cleanup site, and the Work Plan is directed towards establishing a background level consistent with that land use.

> **DTSC Response.** DTSC disagrees that the comment is inconsistent with Section 3.1 of the Guidance which indicates the following should be considered when selecting target populations for data sets used to develop background levels: soil type, topography, landform, mineralogy, vegetation type, and the conceptual site model for fate and transport pathways of site contaminants. These factors are generally consistent throughout the area, other than that some portions of the area are downwind of the Facility.

> **DTSC agrees that section 12(d) of the 2014 Order applies only to residential cleanups. However, any new background level developed in accordance with this section would apply to all cleanup activities, regardless of current land use.**

Response:    DTSC in its comment did not include one of the characteristics for a target population listed in Section 3.1 of the Guidance: similar historical use. Industrial areas surrounding the Exide facility are likely to have a different background concentration for lead due to different anthropogenic contributions from both historic and current industrial uses. A residential background concentration would not apply to the industrial area surrounding the facility or for the facility itself.

Exide would also like to clarify the last sentence in its original response to this DTSC comment: The residential areas in the <u>Initial</u> Assessment Areas are the cleanup site, and the Work Plan is directed towards establishing a background level consistent with that land use.

## WORK PLAN RECOMMENDATIONS

**Recommendation 1:** **ESPO recommends submittal of a background study work plan that focuses solely on developing a new background data set. The work plan scope should be to collect the data needed to develop natural background and anthropogenic background values in the vicinity of the Exide facility. This discrete work plan can then be clearly associated with Item 12(d) of the Stipulation and Order.**

> **Facility Response.** **2014 Order Paragraph 12(d) clearly states that the purpose of a background study is to develop a cleanup level if the background value is higher than the soil screening level of 80 mg/kg.**

Peter Ruttan, Project Manager
2013-3007-12
May 16, 2017
Page 14 of 59



> **The approach suggested in the comment is not consistent with the 2014 Order or with past discussions on this matter with DTSC.**
>
> > **DTSC Response.   DTSC disagrees.   As previously stated, estimating the extent of soil lead impacts from the Facility must be segregated from the process of developing a new background data set and estimating new background values.**

Response:    The Guidance allows for the use of existing data as a background dataset. In order to use existing data, it is necessary to determine whether or not the results have been impacted by site releases.  Consequently, Exide disagrees with DTSC's position in this comment and believes that, at this site, estimating the extent of soil lead impacts is an integral part of establishing a background dataset and is entirely consistent with the Guidance.  The Small/Rose report establishes the area within which the impact from the facility can be distinguished from urban ambient background concentrations.  It establishes that the Expanded Assessment Areas lie outside that area of distinguishable impact from the Exide facility.  As discussed in previous responses and as demonstrated in the Small/Rose report, the Expanded Assessment Areas meet the definition of a target population for the background determination with characteristics matching the characteristics of the cleanup site.  It is further demonstrated that sample results from the Expanded Assessment Areas meet the requirements for a background dataset that can be used to establish a background based cleanup level.  In a separate submission, Exide will propose a background based cleanup level in accordance with the Guidance following exploratory data analysis of the Expanded Assessment Areas dataset in the addendum to the Small/Rose study that Exide currently intends to submit.

Notwithstanding, as previously stated, Exide will be conducting an additional off-site background study (further information to be submitted on May 31, 2017).

**Recommendation 2:**    **Background values should be established for soil, dust, and sediment. The work plan should propose an approach for developing background values specific to dust and sediment.**

> **Facility Response.  Dust and sediment are not the subject of paragraph 12(d) of the 2014 Order and thus are not addressed in the Work Plan. If it is necessary to established background values for dust and sediment for another aspect of work associated with the facility, it can be addressed at that time.**

Peter Ruttan, Project Manager
2013-3007-12
May 16, 2017
Page 15 of 59



**DTSC Response.  Agreed.**

Response:          No further response required.  Exide notes that DTSC's response here is not consistent with the GSU General Comment No. 3.

**Recommendation 3:**   **To ensure that the work plan is a standalone document and provides sufficient context for the reader, the work plan should include a cohesive conceptual site model (CSM) for lead in soil, sediment, and dust.  The CSM narrative should be supported by published literature and should address:  naturally-occurring lead; potential contributions by lead-based paint (LBP), automobile emissions, and fill placement; aerial distribution and pattern of lead associated with ambient sources; processes that would lead to vertical stratification, homogenization, or higher lead concentrations.   Include some detail from published literature regarding the period of highest LBP use and the typical distance from the foundations that the LBP impact would be expected (e.g., within 5 feet).  Roof top dust and lead accumulations on building surfaces should also be discussed as potential contributors to higher lead concentrations near building foundations.   Include some discussion of the typical distance that automobile emissions have been observed to contribute to lead in soil around freeways and major thoroughfares, based on published literature.**

> **Facility Response.  This information can be included in the Residential Area RFI Report to be submitted at a future date.**

> > **DTSC Response.  This comment is only applicable if the Facility develops and implements a background study consistent with the Guidance.  DTSC agrees that a CSM should be included in appropriate documents, such as investigation reports.**

Response:          The Guidance requires that the conceptual site model address fate and transport pathways of site contaminants for the purposes of defining the target population for the determination of background.  The Background Study Work Plan provides that conceptual site model, and the regression analysis performed in the Small/Rose report is a mathematical representation of the conceptual site model laid out in the Background Study Work Plan submitted to the DTSC on December 23, 2014.   Further discussion of the type requested in DTSC's original comment will be included in the Residential Area RFI Report.

Peter Ruttan, Project Manager
2013-3007-12
May 16, 2017
Page 16 of 59



**Recommendation 4:**  **The background study should follow the data quality objective process, and should be conducted in accordance with an approved sampling and analysis plan and an approved quality assurance project plan.**

> **Facility Response.**  **The data were generated in accordance with sampling plans that were approved by DTSC.**

>> **DTSC Response.**  **This comment is only applicable if the Facility develops and implements a background study consistent with the Guidance.**

Response:   As noted above, in the Small/Rose report, Exide has developed a background study consistent with the Guidance and intends to complete the final aspects of that study, the exploratory data analysis and the calculation of the background based cleanup level, in future submissions.

Exide will also be conducting an additional off-site background study evaluating the concentrations of anthropogenic lead in a residential community with similar:

1. historic use (including housing age),
2. proximity to arterial roads and freeways
3. proximity to surrounding industrial use

This background study will be conducted in accordance with an approved quality assurance project plan. More information on this additional background study will be presented in a letter to the DTSC to be submitted on May 31, 2017.

**Recommendation 5:**  **The work plan should present a sampling design that addresses the following:**

> **a.**   **Collection of soil samples along transects originating from the Exide facility and distributed radially from the facility (360°). Initially, these transects should extend three miles beyond the Northern and Southern Assessment Areas, but as needed should be expanded in order to develop a robust background data set.  Figure 1 illustrates the conceptual sampling approach.**

> **Facility Response.  The Work Plan incorporates the Step-Out sampling performed by ENVIRON International Corporation, which utilized transects and extends to 4.5 miles from the facility, beyond the distance recommend in the comment.**



> **DTSC Response.** **This comment is only applicable if the Facility develops and implements a background study consistent with the Guidance.**

Response:      See the responses to previous comments.  The transect sampling that DTSC describes in its comments was conducted as part of the Step Out sampling, and the data have already been included in the Small Rose study.

b.      **Sampling frequency along each transect that is based on probability-based approach, as described in DTSC's Guidance (Section 3.2).**

> **Facility Response.** **The sampling followed the approved work plans, which called for probability based approaches such as grid sampling and concentric ring sampling consistent with the Guidance.**

> **DTSC Response.** **This comment is only applicable if the Facility develops and implements a background study consistent with the Guidance.**

Response:      See the responses to previous comments.

c.      **Adjustment of actual sampling locations to ensure that the study objectives are achieved.   For example, samples obtained from undeveloped areas, cemeteries, and parks would support development of a natural background data set.  Another example would be the use of general yard samples rather than drip zone or downspout samples in the background data set.**

> **Facility Response.** **The sampling protocol on residential properties calls for collection of general yard samples as well as drip zone, downspout, and other exclusion zone samples.  The sample designation allows for separation of the samples based on location within the yard. Because the purpose of the study is to establish background for a residential land use consistent with the Guidance and Paragraph 12(d) of the 2014 Order, other land uses within the residential area are not considered.  Soil samples taken within the industrial area between the facility and the residential area were used as needed to establish patterns as per the Work Plan.**

> **DTSC Response.** **This comment is only applicable if the Facility develops and implements a background study consistent with the Guidance.**

Peter Ruttan, Project Manager
2013-3007-12
May 16, 2017
Page 18 of 59



Response:    See the responses to previous comments. The addendum to the Small/Rose study that Exide currently intends to submit will include data Exide has collected from parks and schools as well as data collected from the industrial areas surrounding the Exide facility

Exide will also be conducting an additional off-site background study evaluating the concentrations of anthropogenic lead in a residential community with similar:

1. historic use (including housing age),
2. proximity to arterial roads and freeways
3. proximity to surrounding industrial use

More information on this additional background study will be presented in a letter to the DTSC to be submitted on May 31, 2017. Exide will consider DTSC's comment in the development of the work plan for the additional background study.

**d.    Collection of soil samples at depth intervals that will allow development of both natural and anthropogenic background values.[3]  Multiple samples should be collected from each location, such as from the following depth intervals:  0-6 inches, 6-12 inches, 12-18 inches, 24-30 inches, 36-42 inches, 48-54 inches, 60-66 inches, and, if appropriate, one to two feet below the base of the fill.[4]**

**Facility Response.    The sample protocol calls for collection of samples to a depth of 18 inches, which is beyond the depth where impacts from aerial deposition of lead are observed.   Collection of deeper samples on residential properties is both unnecessary and impractical.  It is unnecessary because review of the residential soil lead data collected to date shows that at most locations, the concentrations at the 12 to 18 inch depth interval are at or approaching published values of "pristine" (i.e., non-anthropogenic) lead concentrations.  Further, it is impractical because collecting samples at a depth of 66 inches may not be possible using a hand auger necessitating the use of a geoprobe.  The tight configuration of buildings, fences, and walls could preclude access to a geoprobe rig.**

---

[3] Samples obtained within fill or in the upper portion of the soil profile (e.g., upper 18 inches) would typically be more representative of anthropogenic conditions.  Samples collected in native soil would typically represent natural background conditions.  Point source impacts may also be influencing the soil lead concentrations and distribution at a given sampling location.
[4] The depth intervals used to support the natural and anthropogenic background data sets will depend on the thickness of fill materials encountered.  If the fill thickness exceeds 60 inches at a given location, deeper samples should be collected.



> **DTSC Response.** **This comment is only applicable if the Facility develops and implements a background study consistent with the Guidance.**

Response:     See the responses to previous comments

Exide will also be conducting an additional off-site background study evaluating the concentrations of anthropogenic lead in a residential community with similar:

1. historic use (including housing age),
2. proximity to arterial roads and freeways
3. proximity to surrounding industrial use

More information on this additional background study will be presented in a letter to the DTSC to be submitted on May 31, 2017. Exide will consider DTSC's comment in the development of the work plan for the additional background study.

e.    **As appropriate, incorporation of existing data collected under the Interim Measures Work Plan, by ENVIRON, and other efforts.**

> **Facility Response.** **The Work Plan calls for incorporation of available off-site soil data, including the ENVIRON data.**

> **DTSC Response.** **This comment is only applicable if the Facility develops and implements a background study consistent with the Guidance.**

Response:     See the responses to previous comments. The data collected by ENVIRON under the Interim Measures Work Plan were included in the Small/Rose analyses.

f.    **How limited or lack of data collection in hardscape areas and the rail yard will be overcome.**

> **Facility Response.** **This topic would be addressed in a discussion of data gaps if they are identified as significantly affecting the outcome of the analysis.**

> **DTSC Response.** **This comment is only applicable if the Facility develops and implements a background study consistent with the Guidance. However, DTSC notes that the lack of data in the rail yard**

Peter Ruttan, Project Manager
2013-3007-12
May 16, 2017
Page 20 of 59



and hardscape areas is a concern even for Facility extent estimates the *(sic)* presented in Dr. Small's Report.

Response:    Following submission of the Small/Rose report, Exide collected additional soil lead data as part of the Non-Residential Dust and Dirt (NRDD) sampling program that can be used to fill the data gap identified by DTSC. Exide currently intends to submit an addendum to the Small/Rose report that incorporates the NRDD soil sample results into the statistical analysis.

**Recommendation 6:**    **The study should document the characteristics of each soil sampling location (e.g., land use, planter, general yard, proximity to roadways, fill thickness and description, native soil description).**

> **Facility Response.    The sample designation indicates whether the sample is a general yard sample or taken within an exclusion zone. Other information pertinent to the analysis will be collected as necessary.    Sketches are prepared for each property sampled in case additional information is needed.**

> > **DTSC Response.    This comment is only applicable if the Facility develops and implements a background study consistent with the Guidance.**

Response:    Exide currently intends to submit an addendum to the Small/Rose report that provides the information relating to the sample locations that was pertinent to the statistical analysis.    Exide also intends to conduct an additional off-site background study evaluating the concentrations of anthropogenic lead in a residential community with similar:

1. historic use (including housing age),
2. proximity to arterial roads and freeways
3. proximity to surrounding industrial use

More information on this additional background study will be presented in a letter to the DTSC to be submitted on May 31, 2017.  Exide will document the characteristics of each soil sample location in this work.

**Recommendation 7:**    **The work plan should describe the anticipated data evaluation process. The proposed approach for outlier screening, and the decision process for handling outlier and hot spot values, is of particular interest.**



> **Facility Response.  The Work Plan does not describe the data evaluation process.  The intent is to use all data without removing outliers.  If that approach does not yield a statistically significant result, then elimination of outlier will be considered to see whether the analysis is then statistically significant.**
>
> > **DTSC Response.  This comment is only applicable if the Facility develops and implements a background study consistent with the Guidance.**

Response:      Outlier analysis will be addressed in the addendum to the Small/Rose report that Exide currently intends to submit and in the exploratory data analysis for the Expanded Assessment Area dataset in accordance with Section 3.3 of the Guidance.

Exide will also be conducting an additional off-site background study evaluating the concentrations of anthropogenic lead in a residential community with similar:

1.  historic use (including housing age),
2.  proximity to arterial roads and freeways
3.  proximity to surrounding industrial use

More information on this additional background study will be presented in a letter to the DTSC to be submitted on May 31, 2017.  The work plan for the additional background study will describe the data evaluation process to be used, including how outliers will be handled.

**Recommendation 8:  The work plan should identify the interim deliverables that will be provided for regulatory input.  The work plan schedule should include sufficient time for regulatory review.**

> **Facility Response.  The Work Plan included the requested information consistent with the discussion held in October 2014 on the study.**
>
> > **DTSC Response.  This comment is only applicable if the Facility develops and implements a background study consistent with the Guidance.**

Response:      Exide will be conducting an additional off-site background study evaluating the concentrations of anthropogenic lead in a residential community with similar:

Peter Ruttan, Project Manager
2013-3007-12
May 16, 2017
Page 22 of 59



      1.  historic use (including housing age),
      2.  proximity to arterial roads and freeways
      3.  proximity to surrounding industrial use

More information on this additional background study will be presented in a letter to the DTSC to be submitted on May 31, 2017. The work plan for the additional background study will describe the interim submittals to be submitted for regulatory input.

**Recommendation 9:** **The Background Study Report should be a standalone document that provides a detailed discussion that is specific to the activities implemented under the approved work plan (data evaluation and statistical analysis).**

      **Facility Response. See previous response. The Work Plan as drafted contains the recommended information.**

            **DTSC Response. This comment is only applicable if the Facility develops and implements a background study consistent with the Guidance.**

**Response:** The Small/Rose report described the data evaluation and statistical analysis as laid out in the December 23, 2014 Background Study Work Plan

Exide will be conducting an additional off-site background study evaluating the concentrations of anthropogenic lead in a residential community with similar:

      1.  historic use (including housing age),
      2.  proximity to arterial roads and freeways
      3.  proximity to surrounding industrial use

More information on this additional background study will be presented in a letter to the DTSC to be submitted on May 31, 2017. The work plan for the additional background study will describe the data evaluation techniques and statistical analyses to be used.

**COMMENTS ON REPORT**

**Comment:**    **1.**    **The Facility elected to proceed with the work described in the Report without DTSC's input. DTSC never agreed that the approach used by the Report was consistent with Section 12(d) of the 2014 Order, or appropriate for identifying a new background level. DTSC disagrees**



**that the approach presented in the Report is consistent with the Guidance.**

Response:        See the previous responses that demonstrate how the work presented in the Small/Rose report is consistent with the Guidance.

**Comment:    2.    The Report concludes that the extent of Facility impacts ranges from 0.3 to 1.2 kilometers (0.2 to 0.8 miles; 984 to 3,937 feet).  ESPO does not believe that the data set used is adequate to reach this conclusion.  Only 26 sampling locations are available between the Facility perimeter and 3,950 feet from the Facility and limited data are available in downwind directions to the north and south.  These observations are readily apparent from inspection of Figures 2 and 3.  Hence, regardless of the validity of the techniques applied, the data set is inadequate to support the findings.**

Response:        As discussed in the introduction to this letter, the $R^2$ value and the very low $p$ value for the regression analysis indicate that the dataset used in the Small/Rose report are more than adequate for reliable decision-making. Nevertheless, Exide now has soil lead results from 292 sample sites located within 4,000 feet (1.22 km) of the facility that will be incorporated into the statistical analysis and presented in the addendum to the Small/Rose report that Exide currently intends to submit.

**Comment:    3.    Additional data collection is needed to support the estimated extent of the Facility's emissions.   This data collection and analysis should include lines of evidence in addition to lead concentration data (e.g., other metals associated with Facility emissions, speciation techniques).**

Response:        Additional data collection, including analyzing samples for metals other than lead, was performed by Exide as part of the non-residential dust and dirt sampling program.  While other metals were present in the facility emissions, the proportion of those other metals to the lead concentrations are such that the expected concentrations of other metals fall at or below the detection limit for conventional laboratory techniques at the distance of the residential areas from the facility.  The same challenges hold true for speciation techniques.  This leaves analysis of trends in the soil lead concentrations as the most feasible method to establish an area of distinguishable impact from the facility.

Peter Ruttan, Project Manager
2013-3007-12
May 16, 2017
Page 24 of 59



**Comment:    4.    Figure 1.   ESPO does not believe that the zones of soil with concentrations between 0 and 80 mg/kg interpolated by kriging are meaningful because of the limited data available within 4,000 feet to the north and south of the Facility.**

Response:        To demonstrate that the kriging is meaningful, an analysis of the residuals showing how closely the kriged values match the measured values will be provided in the addendum that Exide currently intends to submit.  Exide now has soil lead results from 292 sample sites located within 4,000 feet (1.22 km) of the facility that will be incorporated into an updated analysis and provided in the addendum to the Small/Rose report that Exide currently intends to submit.

**Comment:    5.    In general, the Report should provide additional documentation of the statistical methods and procedures, including interim steps in the evaluation process.   For example, provide further discussion and documentation of the residual analysis for the regression equations.**

Response:        Exide currently intends to submit an addendum to the Small/Rose study that will include additional documentation of the statistical methods and procedures, with particular focus on model diagnostics such an analysis of residuals and prediction errors.

**Comment:    6.    The Report needs to clarify or include the following:**

**a.    The data used in the analysis.  Based on the number of data points listed in Table A-1, it appears that the analysis used data available up to a certain timeframe.**

Response:        The Small/Rose report analyzed data from 407 properties or locations which were the data available as of March 2015.  Since that time, Exide has collected additional soil lead data in both residential and non-residential areas that will be incorporated into the addendum that Exide currently intends to submit.

**b.    Which step-out samples were used.  Figures included in Appendix D do not indicate that sampling locations beyond the Expanded Areas were used.  The figures in this report also suggest that data for residential areas to the east of the Facility were not used in the analysis.**

Peter Ruttan, Project Manager
2013-3007-12
May 16, 2017
Page 25 of 59



Response:              All of the Step-Out soil lead results were used in the statistical analysis,
                       including the data for the residential area to the east of the Facility.

      c.      **Whether "property average" refers to a straight average of all data
              points between 0 and 6 inches or to a depth-weighted average.**

Response:              In the Small/Rose Report, "property average" refers to a straight average of
                       all samples in the 0 – 6 inch depth range; samples were not weighted by
                       depth range.   As shown in Appendix A.1.1, the mean soil lead
                       concentrations in the 1 to 3 inch and 3 to 6 inch depth intervals were about
                       10% higher than the mean soil lead concentration in the 0 to 1 inch interval.
                       The results over each depth interval are similar enough to average them
                       without weighting for the different sample interval thickness.  Use of an
                       averaged concentration over the 6-inch depth interval also reduces the
                       variability in individual sample results and improves the fit of the model.
                       In the addendum that Exide currently intends to submit, the fit of the
                       regression using averaged sample results will be compared to the fit using
                       individual sample results.

      d.      **Definition of arterial roads.**

Response:              Arterial roads were identified as roadways that are used for travel through
                       the neighborhoods.  Arterial roads in the northern assessment area included
                       South Indiana St., Whittier Blvd., Olympic Blvd. and South Downey Road.
                       Arterial roads in the southern area included Atlantic Blvd., Gage Ave., E.
                       Slauson Ave. and S. Maywood Ave.

      e.      **Tabular summary of the variables assigned to each data point used in
              the statistical regression.**

Response:              This tabular summary will be provided for all the data points used in the
                       regression and their associated variable values under separate cover since it
                       contains confidential, property specific information.

      f.      **Whether Figure 6 presents yard data only.**

Response:              Yes, Fig. 6 in the Small/Rose Report, "Boxplots comparing distributions
                       property-averaged soil lead concentrations in different areas," refers to yard
                       data only and omits drip zone data.

Peter Ruttan, Project Manager
2013-3007-12
May 16, 2017
Page 26 of 59



**GEOLOGICAL SERVICES UNIT'S (GSU'S) DECEMBER 31, 2015 MEMORANDUM
REGARDING TECHNICAL REVIEW OF STATISTICAL ANALYSIS OF SOIL LEAD
CONCENTRATIONS IN VERNON, CALIFORNIA REPORT**

**GENERAL COMMMENTS**

Comment:    1.    **Exide's Report is deficient and does not meet our expectations on
delivering a robust background/lead apportionment study that
reasonably identifies and characterizes Exide's lead.**

Response:    Exide disagrees with DTSC's assessment and believes that the approach
followed in the Small/Rose report is the best means to distinguish between
impacts from the Exide facility and the many other sources of lead in the
residential environment.

**According to Exide, the intent of the Report is to "analyze the spatial
pattern of soil lead concentrations measured in the areas extending
outward from the Exide facility in Vernon, California, and to derive an
estimate of the contribution to these concentrations made by the
historic lead emissions from the facility". In their Executive Summary
on page iii, Exide states that "soil lead concentrations in the IAAs
[Initial Assessment Areas} are statistically indistinguishable from
concentrations that "Exide contributions to soil lead concentrations in
these areas is not statistically distinguishable from the ambient urban
background".**

**Overall, Exide presents a very limited analysis.   Moreover, their
'background' study is inadequate since it is based on incomplete data.
Previously, the Department has instructed Exide that a robust study of
their particulate emissions will be required before we could accept any
conclusions regarding Exide's claim on the extent of their emitted
COCs.   Until this occurs, we shall continue to assume that Exide is
responsible for <u>all</u> lead found at sample locations within residential and
industrial areas surrounding the Facility.**

Response:    Exide is unaware of any requirement by DTSC that Exide conduct a robust
study of its particulate emissions prior to conducting the work presented in
the December 23, 2014 Background Study Work Plan.  Exide, including Dr.
Small, met with DTSC on October 23, 2014 to discuss the proposed
approach after providing an outline for DTSC's input in advance of the
meeting.  DTSC then provided comments on the approach, which were
addressed in the Background Study Work Plan and the accompanying



Peter Ruttan, Project Manager
2013-3007-12
May 16, 2017
Page 27 of 59

responses to comments.   A DTSC instruction regarding a required particulate emissions study is not contained in any of these documents nor does Exide recall it being discussed in the October 23, 2014 meeting.  Please provide a specific reference to the document that presents DTSC instructions referenced in the comment.  DTSC's position that Exide is the responsible party for all lead found at sample locations within residential and industrial locations unless particulate emissions studies are submitted is unscientific and dismisses well-known and well-documented non-Exide related sources of lead in the urban environment, and it prevents sound, scientifically based decision-making on complex matters such as ambient urban soil lead background.

**The Stipulation and Order (effective November 21, 2014) defines the background for lead as less than 80 milligrams per kilogram (mg/kg) with the caveat that Exide may propose a revision to the background level provided that any background level for lead is developed pursuant to methodologies described in DTSCs document** *Appendix B Strategies for Establishing and Using Background Estimates of Metals in Soil* **(Guidance), dated August 29, 2008.  We note that the Report fails to include any reference to our Guidance.**

Response:        A reference to DTSC's guidance document is made in the first paragraph of Section 1.1 in the Small/Rose report that states "The November 2014 agreement required that the document *Strategies for Establishing and Using Background Estimates of Metals in Soils (DTSC, August, 2008)* be used as guidance for the purposes of establishing background.  The techniques used in this study are consistent with this guidance document…"

**On February 26, 2015, DTSC submitted a letter and memorandum to Exide with comments and recommendations on their** *Response to DTSC's November 24, 2014 Letter Regarding the Proposed Outline for Background Study Work Plan* **(Workplan), prepared for Exide by AGC. Exide's Workplan was dated December 23, 2014.  One of the main points expressed in DTSC's letter was that the Workplan focused on using soil data close to the Facility to determine an ambient lead concentration that is not related to Exide's emissions rather than following our Guidance document.   We also recommended the collection of soil samples along transects originating outward from the Facility and distributed radially out to three miles, with the sampling frequency determined by a probability-based approach as recommended in the Guidance.  Sampling from undeveloped areas, cemeteries, and parks was also recommended to support the development of an ambient background data set.**

Peter Ruttan, Project Manager
2013-3007-12
May 16, 2017
Page 28 of 59



Response:          Exide provided responses to DTSC's comments on the Background Study
                   Work Plan on August 12, 2015 and has provided further response in this
                   document to the specific comments that ESPO carried forward.  Exide refers
                   DTSC to its previous response of August 12, 2015 and to the responses
                   provided in this letter.

                   **DTSC had also recommended the collection of soil samples at deeper
                   depth intervals (at least to 66 inches below grade or one to two feet
                   below fill) to support the development of native (non-ambient)
                   background values for metals.  None of these recommendations appear
                   to have been followed in their Report.  In fact, the Report fails to
                   include any reference to DTSC's letter/memorandum, or even AGC's
                   Workplan, and seems to be of little value in refining our understanding
                   regarding the nature and extent of Exide's contamination.**

Response:          Exide provided responses to DTSC's comments on the Background Study
                   Work Plan on August 12, 2015 and has provided further response in this
                   document to the specific comments that ESPO carried forward.  Exide refers
                   DTSC to its previous response of August 12, 2015 and to the responses
                   provided in this letter.  A reference to the Background Study Work Plan and
                   DTSC comments was made in the second paragraph of Section 1.1 in the
                   Small/Rose report that stated "A meeting was held at DTSC's offices in
                   Sacramento, CA on October 23, 2014 to introduce DTSC to the proposed
                   methodology.  Subsequent to that meeting, DTSC provided comments on
                   the methodology in a letter dated November 24, 2014 that were incorporated
                   into the work plan titled Background Study Work Plan (Work Plan) and
                   dated December 23, 2014. DTSC provided comments on the Work Plan on
                   February 26, 2015; Exide is providing responses to those comments under
                   separate cover."

                   Exide strongly disagrees with the DTSC reviewer's opinion that the
                   Small/Rose report provides little value in understanding the nature and
                   extent of contamination from the Exide facility.  That was not the position
                   of the agency when the parties met in October 2014 to discuss the approach
                   and in subsequent conversations with the participants at that meeting or
                   during the multiple web meetings that were conducted to present the
                   findings.  The approach followed by Drs. Small and Rose has been used
                   successfully to untangle and define the various contributions to soil lead in
                   similar residential areas and is a key part of addressing the pertinent issues
                   in a scientifically based, systematic manner.



Peter Ruttan, Project Manager
2013-3007-12
May 16, 2017
Page 29 of 59

In the February 26, 2015 letter, DTSC also required that a revised Workplan be submitted in response to the comments and recommendations provided in the letter and the attached memorandum prepared by the Engineering and Special Projects Office (ESPO).  In response to DTSC's letter, Exide submitted both the Small/Rose Report and a letter titled *Response to DTSC's Comment Letter Dated February 26, 2015 and the Engineering and Special Projects Office (ESPO) Memorandum Dated February 17, 2015, Regarding Background Study Work Plan* (Responses), also dated August 12, 2015, but still no revised Workplan.  In response, ESPO submitted a new memorandum, dated October 7, 2015, to Mr. Peter Ruttan, P.G., DTSC Office of Permitting, on Exide's Responses, and also provided comments on the Small/Rose Report.

The GSU concurs with ESPO's comments and recommendations and recommends that Exide revise their Workplan in accordance with this memorandum, and the memorandums submitted by ESPO.

Response:     In addition to these responses to comments, Exide intends to conduct an additional background study and will submit information relating to this study to DTSC by May 31, 2017.

Comment:    2.    Lead is the primary element of concern for risks from ambient air near secondary lead smelters.  Secondary Facility COCs include antimony, arsenic, and cadmium.   Antimony is a component of automobile batteries as an alloy of lead.  Arsenic and cadmium are present in trace amounts in lead alloys.  Data from a 1984 EPA study titled *Secondary Lead Smelter Test of Area Source Fugitive Emissions for Arsenic, Cadmium, and Lead* showed that fugitive lead emissions are generally greater than arsenic by two orders of magnitude and cadmium by three orders of magnitude.

Despite these known associations, Exide not only limits their study to lead but to the spatial distribution of lead.  Our review of the antimony and cadmium data shows higher concentrations within 3,000 feet (ft) of the Facility and that both metals strongly correlate to lead.  Concentrations of cadmium and antimony also diminish with distance away from the Facility; suggesting that the Facility is a major contributor.

Response:     DTSC is incorrect in saying that Exide has not considered metals other than lead.  Soil samples collected in the first sampling effort in the Initial Assessment Areas and Long Beach were tested for five metals: arsenic,



antimony, cadmium, lead and chromium.  Those results showed that, except for lead, the metals concentrations were below screening levels in all three areas.  On this basis, and with DTSC's August 5, 2014 approval of the analytical approach as laid out in the July 26, 2015 revised work plan, further analysis was confined to lead only.  The same is true with the Step-Out sampling; after the initial testing, DTSC agreed with analyzing samples only for lead by approving ENVIRON's  February 7, 2014 sampling work plan on March 11, 2014.

Subsequently, at DTSC's request, 1361 soil samples from the Initial Assessment Areas, Expanded Assessment Areas and Step-Out samples from beyond 7500 feet were analyzed for CAM-17 metals.  Exide agrees with DTSC's statement that lead emissions from a secondary lead smelter are greater than other metals emitted from the facility.  Exide also agrees that the concentrations of antimony and cadmium are elevated close to the facility, and that there is a correlation between the concentration of these metals and lead in the areas closest to the facility with the antimony correlation with lead being stronger than cadmium.

However, examination of the data from the residential areas show that both the relationship with distance and the correlation of antimony and cadmium with lead break down farther from the facility.  This indicates that, as with lead, any association of concentrations of antimony and cadmium with emissions from the Exide facility is no longer discernable.  Consequently, DTSC's conclusion that the facility is a major contributor based on metals correlations cannot be extrapolated to the residential area just because a correlation exists close to the facility.

**Comment:    3.    The Small/Rose Report is also limited to soil, and ignores sediment and dust.  As pointed out to Exide in our memorandum dated July 7, 2015 (General Comment No. 4) on their *Step-out Dust, Sediment and Soil Sampling Report*, dated April, 2015 (prepared for Exide by Environ), the average concentrations of lead in surface dust decrease significantly with distance along the downwind direction lines.  We believe that surface dust is one of the best indicators of relatively recent releases of particulate emissions verses soil data which may contain lead from lead-based paint (LBP) and other sources of lead.**

Response:        As discussed in response to other similar comments, it is inappropriate and inconsistent with the Guidance to combine lead results from different media into an analysis such as this.  Exide notes that ESPO agreed with this position in its October 7, 2015 Work Plan Recommendation #2 provided with DTSC's December 14, 2016 letter.  If it becomes necessary to calculate



background concentrations for surface dust or sediment, that effort will need to be undertaken separately from the soil analysis. Please see the accompanying responses prepared by Ramboll/ENVIRON to DTSC's comments on the April 2015 *Step-Out Dust, Sediment and Soil Sampling Report* for Exide's response on surface dust.

**For surface dust sampled within 500-1,500-feet from Exide, the average lead concentration was 1,138 milligrams per kilogram (mg/kg). Within the 1,500-4,500-foot circle, the average lead concentration was 269 mg/kg. At 4,500-7,500 feet, the average lead concentration was only 138 mg/kg, while out to the 3-mile mark, average lead was only 40 mg/kg. The surface dust data, based on this trend of decreasing concentrations with distance from the Facility, suggests that lead emissions from Exide, while they drop significantly beyond 1,500 feet from the Facility, are not presenting large 'spikes' to indicate other potential sources of lead. Soil and sediment data generally follow this trend, except that soil within the 7,500-foot to 3-mile circle has a slightly greater average result (223 mg/kg) when compared to the 4,500-7,500 data (183 mg/kg). This may suggest influences from other anthropogenic sources such as LBP, historic auto emissions, or automobile brake dust. However, these results are still much lower than average results near the Facility (500-1,500-feet: 810 mg/kg for soil, 824 mg/kg for sediment).**

Response:    This comment is a duplicate of a comment DTSC made on ENVIRON's April 2015 *Step-Out Dust, Sediment and Soil Sampling Report.* Please see the responses to those comments prepared by Ramboll/ENVIRON that accompany this letter.

**We do not discount the likelihood of an 'urban' lead footprint in the Greater Los Angeles area and that some portion (or all) of the lead may not be attributable to fallout from Exide's stack or fugitive dust emissions. However, it is important to note that concentrations of lead found in the Northern and Southern IAAs and in the Northern and Southern EAAs (currently undergoing soil sampling and excavation) conflict with Exide's conclusions made previously that their lead in surface dust does not extend beyond 1,200 feet (1,700 feet in soil) from the Facility (Section 4.1, 'Statistical Analysis of Lead in Dust', *Step-out Dust and Soil Sampling Report*, Environ report dated June, 2014). In fact, archived aerial photographs taken of the Facility in the early 1960's show a single large smokestack extending from the historic smelter building located in the South Yard. This suggests that stack**



Peter Ruttan, Project Manager
2013-3007-12
May 16, 2017
Page 32 of 59

**emissions occurred for several decades, or significantly longer than was previously thought.**

Response:     It is encouraging that the reviewer acknowledges that there are other sources of lead than the facility in the greater Los Angeles area. Exide disagrees with DTSC's unsupported statement that the concentrations of lead in the Northern and Southern IAAs and EAAs are inconsistent with the previous conclusions drawn by ENVIRON in June 2014 that there was not a statistically distinguishable difference in lead concentrations in surface dust beyond 1200 feet from the facility and in soil beyond 1700 feet. The findings presented in the Small/Rose report showing the IAAs and EAAs as outside the area of distinguishable impact are entirely consistent with ENVIRON's earlier conclusion.

The aerial photograph showing a single stack on the smelter building in the South Yard does not affect the lead testing results presented in the Small Rose study. Further, it has been stated many times in numerous documents that smelter operations began in 1922 in the South Yard, and this smelter would have included a smoke stack.

**Due to the multiple uncertainties with the data, the industrial nature of the surrounding area, and complicated Facility history, we reiterate our recommendation to Exide to consider using several fingerprinting techniques to help differentiate sources of lead (background ambient, lead smelter fallout, and other anthropogenic sources) and their other COCs. Metals fingerprinting could potentially support the Facility's contention regarding the spatial extent of their lead.**

Response:     As stated in past correspondence, Exide is not aware of a fingerprinting method that would be effective at the relatively low concentrations of lead observed in the residential area. Concentrations of other metals are even lower, with detection limits making this effort not possible. If DTSC has information that suggests otherwise, Exide respectively requests that DTSC share that information.

## SPECIFIC COMMENTS

Comment:   1.   **Section 3.1, Kriging Interpolation, Pages 3-4:**
**Exide's kriging interpolation is based on an incomplete data set and assigns lead concentrations over large geographical areas that may be inaccurate. According to Appendix B, 'Statistical Methods and Analysis Procedures', Exide used a radius of 500 meters for each actual measured lead result in their kriging, or a radius of approximately**



**1,640 feet. This seems overly large and overly generalized. It is unknown which sample data points Exide used in their kriging, but soil lead concentrations, even within 1,500 feet of the Facility, had average values that ranged from well below 80 mg/kg ('1500NE-13': 41 mg/kg; '1500NW-1': 71 mg/kg) to well over 320 mg/kg ('1500NE-12': 607 mg/kg; '1500NW-6': 647 mg/kg). All data points, and analytical results, used in Exide's statistical analyses should have been identified and listed in the Report.**

Response:         All soil lead data points available at the time were used in the kriging analysis.

A separate tabular data file, a listing of all the data points used in the regression and their associated variable values will be provided under separate cover since it contains confidential, property specific information.

**Regardless, the data shown on Exide's graphs suggests considerable variability, even well within their acknowledged lead-impacted area. The main purpose for kriging is to 'smooth' out the data; which could also mean that potential 'hot spots', or lead contamination above 80 mg/kg, are being overlooked due to the lack of data beyond the cluster of sample locations surrounding the Facility itself (as shown on Figure 4) out to approximately 4,000 feet to the north and south of Exide.**

Response:         Exide agrees that the main purpose of kriging is to smooth out the data, which serves to illustrate spatial trends and patterns; it does not attempt to explain each "hot spot". Other analyses, such as the evaluation of model residuals, will be provided in the addendum that Exide currently intends to submit.

The Guidance Document in Section 3.2 discusses the importance of mapping the data to evaluate spatial trends to aid in the selection of an appropriate background area. The kriging analysis is a tool commonly utilized to conduct such an evaluation of spatial trends and is scientifically appropriate to include in the Statistical Analysis.

**For instance, we note that approximately 1/3rd of the geographical area considered by Exide to be contaminated by their lead dust emissions includes the Union Pacific Rail Road (UP RR) railyard to the north, from which no actual samples were collected. Yet, according to Exide's 'kriged' map, this large area has soil lead at or below 225 mg/kg. Given that this is an active railyard and lies relatively close to the Facility, this seems incongruous and suggests inconsistencies in their kriging.**



Response:    Exide disagrees with DTSC's comment that the modeled concentrations suggest inconsistencies in the kriging; the kriging graphically presents the results of mathematical calculations, and no data were eliminated from the calculations. Soil data from the NRDD study will be used to fill in the spatial gaps between the Exide facility and the residential areas, and the statistical evaluation of this information will be presented in an addendum to the Small Rose study that Exide currently intends to submit.

**Exide's kriging analysis shows soil lead (Figure 1) as above 400 mg/kg in the area immediately surrounding the Facility (shown as dark red). This area of soil lead at or greater than 400 mg/kg is presented as a slightly-ovoid shape with the long-axis oriented east-west. The rationale for this shape or the lateral extent of soil contaminated by lead ≥400 mg/kg is not clear, however, we surmise that this is because no soil sample data exists north of this area of elevated lead, and that soil sample data from a sample location approximately 1,600 feet away was 'kriged' to help 'delineate' the extent of the dark-red ovoid around Exide. The dark-red ovoid is presented on the figure as surrounded by a 'green' halo (soil lead at or greater than 225 mg/kg), which extends to the east before extending northwards as an unbroken, elongate plume towards the Northern IAA and EAA into East Los Angeles. Exide presents isolated 'hot spots' of soil lead in the Northern IAA. To the south, Exide extends the green area as an unbroken, elongate plume towards the Southern IAA into Maywood, which also has an isolated 'hot-spot' of lead. According to Exide, these "hot spots" were not due to emissions from the facility.**

Response:    All data available at the time were included in the kriging analysis and the results presented in the Small/Rose report. No data were eliminated as outliers although certain data points would be defined as outliers and if eliminated, would make the spatial patterns clearer. Physical processes dictate that deposition from airborne emissions decreases monotonically with increasing distance from a source. "Hot spots" showing a sudden increase in concentration several thousand feet from a source cannot be the result of deposition from airborne emissions. They are indicative of a separate, unrelated source or sources.

NRDD soil lead data are being included in an addendum to the Small Rose Report that Exide currently intends to submit.

Peter Ruttan, Project Manager
2013-3007-12
May 16, 2017
Page 35 of 59



**For the area south of Exide, this figure seems somewhat similar to the Theissen polygons shown on Figure 5, 'Concentration of Lead in 0-to1-inch Depth Soil Samples Near the Exide Facility with Wind Direction', presented in Exide's *Step-Out Dust and Soil Sampling Report*, dated June, 2014, prepared by Environ Corp.  The main difference between the Environ and the Small/Rose reports, it would seem, is that Environ limited their analysis to the 0-1 inch depth while the Small/Rose Report averaged out the concentrations for the upper 6-inches (i.e., 0-1, 1-3, 3-6) of soil.  By taking the average of the three depths, the data is likely skewed since the highest concentrations become diluted and could create a Type II (false negative) error.**

Response:        Appendix A.1.1 of the Small/Rose report shows that soil lead concentrations from the 0 – 1", 1 – 3", and 3 – 6" depth ranges are generally consistent for each sampling location and do not decrease with depth. The box plots show that the 1-3" and 3-6" results are somewhat higher than the 0-1" results in contrast to what one would expect to see from soils that have aerial deposition as the source of the lead concentrations.  This means that the depth averaging does not dilute the highest concentrations as DTSC surmised in its comment.  The addendum to the Small/Rose report that Exide currently intends to submit will explore the effect of averaging soil lead concentrations on the fit of the regression analysis.

**Similar to the study conducted by Environ, the Report presented the UP RR area as a 'buffer' (using green in this case instead of blue in the Small/Rose Report) to indicate lead concentrations less than 80 mg/kg. As pointed out in our General Comments, Exide cannot make a case without the data to support it, and there is little to no soil data in the UP RR to the north.  Where there is more soil sample data, as seems to be the case south of the Facility, as shown on Environ's Figure 5, Exide's kriging analysis shows what appears to be an extensive plume of lead, at or greater than 225 mg/kg, spreading downwind from their Facility to the south-west into the residential areas of Maywood and Huntington Park.**

Response:        Exide disagrees with DTSC's characterization of an "extensive plume…spreading downwind from their Facility to the south-west" and notes that the kriged shape that DTSC describes lies to the west of the southerly downwind transect from the facility but is more in-line with the northerly downwind transects from a known lead emitter identified through

Peter Ruttan, Project Manager
2013-3007-12
May 16, 2017
Page 36 of 59



a previous review of a limited set of Sanborn maps[5] (see Figure RTC-2 attached to these responses to comments).  Despite DTSC's assertions to the contrary, the Exide facility is not the only lead-related industry nor the sole contributor to soil lead concentrations above screening levels in Vernon and surrounding areas.  Incorporation of the NRDD soil lead data into the statistical analysis addresses the spatial gap in data that DTSC identifies in its comment.

**For reasons that are not explained in their Report, dust or sediment is not included in the kriging, or any of the other two statistical analyses. Environ's 2014 Report included a figure showing lead dust concentrations.  GSUs memorandum dated October 2, 2014, in response to Exide's findings, pointed out then that lead concentrations in dust (General Comment No. 3) were greater in the downwind directions than in the crosswind directions, at least out to a distance of approximately 1.4 miles (the extent covered at that time).  We recommend that the study authors review Environ's report and our comments.**

Response:     It is not appropriate to combine lead concentrations from different media in a kriging or the regression analyses performed in the Statistical Analysis or for establishing background concentrations.  In Section 2, page B-5 of the Guidance, DTSC cautions against using "sample results that do not represent soil"  when considering possible background data sets.  Each medium would require separate analysis and determination of background. Exide notes that ESPO concurred with Exide's response to its Work Plan Recommendation 2 on this same point.

**Comment:     2.     Section 3.2, Regression Analyses of Soil Lead Concentration vs. Distance, Pages 4-7:**
**Figure 2, 'Soil Lead Concentration as a Function of Distance from the Exide Facility', shows considerable scatter in their data.  Despite this, Exide states that "the fitted regressions and their coefficients are thus statistically significant at a high degree of confidence and indicative of a clear spatial pattern".  This statement does not seem to have any merit.  Exide's regression analysis for soil lead concentration as a function of distance contains a significant amount of variation.  For example, the R squared (R²) value, or the coefficient of determination ('goodness of fit') is only 0.25, which means that the regression line only**

---

[5] This figure presents only a limited analysis of some of the historic site uses in only a portion of the area, which will be updated with a subsequent submittal which includes a more complete historical analysis of metals industries in the entire PIA.

Peter Ruttan, Project Manager
2013-3007-12
May 16, 2017
Page 37 of 59



**fits 25% of the data, indicating a relatively poor fit and suggests that this analysis should not be used with any degree of confidence. Yet, Exide proceeds to draw conclusions using their regression analysis. The randomness of the fit could be due to several outside contributing factors (e.g., lead-based-paint on homes, manufacturing plants, near roads/freeways, other smelters) which cannot be explained by analyzing spatial patterns or performing statistical analysis.**

Response:    The comment correctly notes that there is poor correlation between soil lead concentrations and distance in all directions from the Exide facility. This is because this initial data evaluation does not account for other, non-Exide related contributors to soil lead concentrations such as lead based paint, proximity to freeways or arterial roads, other industry, etc. nor does it factor in wind direction.

The $R^2$ value for the full regression analysis is just under 0.47, that is, explaining nearly half of the total variance, which is an increase in $R^2$ over the 0.25 for the simple soil lead versus distance relationship. This increase in the $R^2$ value with the full regression, capturing the sources of variance in the data, is expected, since the full regression considers key explanatory variables (ambient air concentrations associated with the facility, proximity to leaded paint, major roads, etc.), while the simple distance relationship considers only the single influence of distance.

Any analysis of spatial patterns or distance-concentration relationships without consideration of these contributing effects is incomplete. This is why the report presents the fitted distance relationships as an intermediate step in the development of the more complete model able to explain a higher portion of the observed variance and allows all of the data to be used in a single model.

**Based on their regression modeling, Exide states that the "estimated distances needed to level off at the urban background value ranges from 0.26 km (=0.28-0.023) in the 30º - 90º sector to 1.19 km (=1.01+0.18) in the 150º - 210º sector" and that the urban lead background concentration is 218 mg/kg. As noted above, we believe that their conclusions are based on an overall lack in data and narrowing their study to just lead in soil; thereby resulting in a limited statistical evaluation.**

Response:    Exide disagrees that there is an overall lack of data and that lead results from any medium other than soil should have been included. As previously stated, it is scientifically inappropriate to combine lead concentrations from



different media as DTSC suggests and use that combined data in statistical analyses such as those conducted here.  Exide further notes that ESPO concurred with this position.

Exide would like to point out that on further review of the Small/Rose report, a specific error was found in the directional sector in Fig. 3 that extends to the South (1.01 +/- 0.18 km).  The directional sectors were inadvertently rotated 60º clockwise. The south-pointing sector in Figure 3 should actually point to the southeast. A corrected Figure 3 for the Small/Rose report is attached.

**Comment:** **3.** **Section 3.3, Statistical Analysis of Contributors to Soil Lead Concentrations, Page 8-11:**
**Exide used the calculated mean soil lead concentration in their regression model to compute Exide's contribution to soil lead, with the rationale that average soil lead is reflective of a "conservative, upper bound estimate" (Appendix B.3.2, 'Ambient Air Concentrations of Atmospheric Dispersion Model (AERMOD)').  We do not believe this to be the case.  As suggested above in Specific Comment No. 1, where we presented some examples of soil lead results close to the Facility, soil lead concentrations can vary by an order of magnitude in the same 6-inch sample boring.**

Response:    This comment mis-interprets the text in Appendix B.3.2 of the Small/Rose report. That section of the Appendix states:

The ambient air concentration was computed by the AERMOD model without consideration of plume depletion by deposition.  This is equivalent to assuming 100% resuspension of the deposited lead to the atmosphere for further transport and dispersion around (and downwind) of the site.  Since the ambient air concentration is subsequently used in the regression model to compute the Exide contribution to the soil lead concentrations, this assumption is conservative in terms of the resulting spatial extent of the ambient air concentration profile from the site and its associated impact on the observed soil lead concentrations (in essence, we assume that the same lead particle remains where deposited and resuspends to contribute further downwind deposition).  As the modeled ambient air concentrations provide an upper bound estimate on the extent to which the concentration contours extend away from the site, so too are the subsequent calculated mean soil lead concentrations reflective of a conservative, upper bound estimate of the site influence at increasing distances from the site.



Peter Ruttan, Project Manager
2013-3007-12
May 16, 2017
Page 39 of 59

This passage says that assuming 100% resuspension of lead dust (i.e. no plume depletion by deposition) provides an upper bound estimate on how far contours of a given ambient air concentration extend from the Facility. This passage does not make any claims about the averaging of soil lead concentrations (by depth or by property) leading to conservative, upper-bound estimates.   Nevertheless, the effects of averaging soil lead concentrations on a property on the fit of the regression will be explored further in the addendum that Exide intends to submit.

**Exide states that they did not use the AERMOD lead emission rate of 0.0279 lb/hour (for 2010 and 2012) calculated by Environ with the results shown on Figure B-2, 'Modeled Ambient Air Concentrations of Lead Emitted by the Exide Facility' in Appendix B.3.2. This figure shows Exide's lead emissions (out to the 0.001 µg/m³ average lead concentration isocontour) extending out to nearly two miles in the southwest direction and out to 1.2 miles towards the north and towards the east.**

Response:      DTSC's comment is incorrect.   Appendix B.3.2 states that the constant emission rate from the site of 0.0279 lb/hour for 2010 and 2012 was used in air modeling.

**Exide states that the modeled ambient air concentrations provide "an upper bound estimate on the extent to which the concentration contours extend away from the site" and that "if a different emissions rate were used for the AERMOD simulation (e.g., 100 times larger, 2.79 lb/hr), the computed ambient air concentrations would be (100 times) smaller".   We disagree with this assumption that this provides "an upper bound estimate" as it fails to consider historic lead emissions from the Facility prior to installing modern air pollution/emissions control equipment and negative pressure containerization of process/storage areas to control fugitive dust emissions.**

Response:      As described in the Small/Rose report and above, the purpose of the AERMOD simulation is to provide a spatial pattern of ambient concentration, not absolute values of these concentrations.  The regression model then attributes as much of the current observed soil lead to this spatial pattern as possible, consistent with the measured soil lead concentrations. The key requirement for the AERMOD simulations is that the relative predicted shape be representative, and that relative concentrations extend far enough in the proper directions so that possibilities for impact in these directions are included.   As discussed in the introductory response to



DTSC's cover letter, the conservative assumption that omits particle deposition in the AERMOD simulation causes the relative plume to extend conservatively outward.

**As an example of historic lead emissions from the Facility pre-baghouse era, a Los Angeles Times (LA Times) newspaper article dated January 29, 1949 reported that the pending installation of "two bag houses" at the Facility would result in a recovery rate of 700 lbs./day of lead oxide. Assuming that the baghouses touted back then by Morris P. Kirk (previous Facility owners/operators) were installed soon after this article was published, it is important to note that the Facility had already been in continuous operation for 27 years prior to this time and was emitting at least this much lead at a rate of nearly 30 lb./hr. (or 255,500 lbs. of lead/year).**

**The LA Times article did not say how much lead was being emitted before the Facility was upgraded with baghouses/emissions control equipment but it is highly unlikely that the rate of emissions before baghouses were installed was nearly as low as Exide's emission rates after they were installed, or as they were in 2010 and 2012.**

Response:        As previously stated, the key requirement for the AERMOD simulations is that the relative predicted shape be representative, and that relative concentrations extend far enough in the proper directions so that possibilities for impact in these directions are included.  The magnitude of the emissions is immaterial because the soil lead data provide the scaling needed for the model.   Since the Small/Rose study assumed a linear relationship between the soil lead and ambient air concentrations, if the ambient air concentrations were higher, then the associated regression coefficient fit to the soil lead data would be a smaller number, and the other variables in the analysis would be unchanged.

**Comment:   4.        Section 4, Discussion, Pages 11-15:**
**Exide concludes that soil lead concentrations are "statistically indistinguishable from the ambient urban lead background between 0.3 km and 1.3 km from the Exide facility" or up to maximum distance of approximately 0.75 miles.  The nearest homes to Exide are located approximately 0.8 miles to the north (Northern IAA).  Using their regression analysis, Exide computes the urban lead background concentration to be 218 mg/kg.  As noted above, we do not accept Exide's conclusions regarding the spatial extent of their lead.**



Response:        Since DTSC is stating its disagreement with the Small/Rose report's conclusion, there is no response required.

**Exide's all-too convenient conclusion that the extent of their lead stops just shy of the residential areas aside, their report fails to consider tracking out of Exide's dust, or lead dust loading in sediment and water in the Los Angeles River, of which approximately a ½ mile segment falls within Exide's modeled ambient air concentration of $4.55 \times 10^{-3}$ µg/m³ lead as shown on Figure 4.**

Response:        Dust emissions resulting from vehicular traffic serving the plant is addressed in the dispersion model in a manner consistent with AQMD modeling guidance. The modeling was performed under an approved modeling protocol for AB2588 purposes. To the extent lead-bearing materials were either tracked out by vehicular traffic or deposited from the air onto in-plant roadways and surfaces, the "re-entrainment" of that material into airborne emissions by vehicles moving on those surfaces was included in the modeled emissions. Surface dust loading measurements were collected within the plant property and used in EPA and AQMD-approved procedures to estimate the amount of emissions resulting from traffic moving across those surfaces and "kicking up" the dust present. Dust and surface loadings would presumably be highest within the plant property, nearest any buildings from which materials might have been tracked out. Re-entrainment of dust from surfaces to emissions is not explicitly included in the dispersion modeling framework (again, per an approved protocol). However, the conservative assumptions made in the rest of the modeling structure serve to address the potential for successive re-entrainment of deposited dust that is modeled. In particular, the AERMOD model used to calculate the ambient air concentrations used in the regression analysis makes the conservative assumption that no deposition occurs as the emissions travel outward from the source. This assumption serves to allocate more of the lead-impacted soil to Exide and less to background, making it conservative as it extends the area where Exide's contribution is distinguishable from background farther out into the community. Further, there is no indication that the LA River is a source of elevated soil lead concentrations in the residential areas under study.

**According to Exide, their 'ambient urban background' for average lead range from 129 mg/kg (for a sampling site not near older homes, freeways, and arterial roads) to 242 mg/kg for areas with homes built before 1940 and near arterials. In a study of soil lead concentrations in the Los Angeles area, Wu and others (2010) found lower average urban lead concentrations than Exide in the upper one inch of soil range from**

Peter Ruttan, Project Manager
2013-3007-12
May 16, 2017
Page 42 of 59



> 224 mg/kg next to arterials to 107 mg/kg along roads in primarily residential areas.

Response:    The predicted mean background concentration of 129 ± 10 mg/kg in the Small/Rose report correlates well with Wu's measurement of 107 ± 12 mg/kg for samples taken from properties that are not built before 1940 and were taken away from arterial roads or freeways. The predicted mean lead concentration for a property that is not built before 1940 and is close to arterial roadway is 175 ±18[6] mg/kg while Wu measurements are actually higher at a mean of 224 ±30. The dataset analyzed in the Small/Rose study has too few measurements close to a freeway for meaningful comparison. The greatest difference between the model predictions and the Wu measurements is with the Small/Rose overall background prediction of 241 ±22 mg/kg (sum of the urban ambient background value, the pre-1940 structure contribution and proximity to arterial roads contribution) compared to Wu's measurement of 181 ± 20 mg/kg. This difference is believed to be attributable to differences in the age of housing between the two study areas accentuated by a difference in where the samples were taken relative to structures that may contain lead based paint.

First, the Wu study notes that samples were not taken where it was necessary to obtain access; this means that the samples were not taken from residential properties themselves, only on public spaces within residential areas. Those sampling procedures are most similar to those ENVIRON employed when conducting the step-out sampling. Using the results from the uppermost one inch for step-out samples taken more than 4500 feet from the facility (beyond the area of distinguishable impact established in the Small/Rose study), the lead concentration measured in the step-out samples of 234 ±35 for samples taken close to an arterial road compares well with Wu's measurements of 224 ± 30 mg/kg. The step-out samples differ the most from the Wu results for samples that were taken not near a freeway or artery (i.e., the grid samples) with the step-out samples having a mean lead concentration of 206 ±43 as compared to Wu's measurement of 107 ± 12 mg/kg. This difference is attributed to the difference in the age of housing in the vicinity of where the samples were taken.

Wu et al. concluded that the age of housing within 30 meters of the sample was the primary predictor of soil lead concentrations and explains more than 50% of the variance. The average age of parcels within 30 meters is 55 years making the average year of construction 1949 (after the lead content in exterior paint was reduced by at least 75%) for grid samples taken away

---

[6] The errors are not additive; they are the square root of the sum of individual errors squared.



from freeways or arterial roads while the average year of construction for properties in the Expanded Assessment Areas is 1934 (when paint with very high concentrations of lead was still commonly used). The average year of house construction in the Expanded Assessment Areas is representative of the age of housing within 30 meters of the step-out samples, and this difference in average house age is a significant predictor for higher soil lead. Another study titled "Lead Levels in the Household Environment of Children in Three High-Risk Communities in California" by Sutton et al. (Environmental Research, vol. 68, pps. 45-57, 1995) concluded that soil lead levels were two times more likely to exceed 500 mg/kg for homes built between 1920 to 1950 as homes built after 1950. This study supports the conclusion that the magnitude of difference in mean soil lead concentrations between the step-out samples and the Wu results can be attributed to the difference in ages of housing stock in the vicinity of the sample locations.

**Exide acknowledges that the average year of construction of the residences in the Wu study area is similar to the Southern IAA and the Southern EAA. The mean soil lead concentration for the Southern IAA was 173 mg/kg and 198 mg/kg for the Southern EAA. In their kriged map (Figure 1), Exide shows a soil-lead plume at or greater than 225 mg/kg extending to, and including the Southern IAA. The Wu study also collected very few (if any) samples from within a mile of the Exide facility to avoid any potential influence from Exide's emissions.**

Response:    DTSC's comment fails to consider that the Wu samples were not taken on residential properties but rather were taken some distance away on public property, which would result in lower soil lead concentrations. That difference in sample location relative to the structures on the property notwithstanding, DTSC's mean soil lead concentrations of 173 mg/kg for the Southern IAA and 198 mg/kg for the Southern EAA are consistent with Wu's overall mean lead concentration of 181 mg/kg ± 20, supporting the Small/Rose report conclusion that the soil lead data from the EAAs can be used as a background dataset.

Exide disagrees with DTSC's statement that the kriging map shows a plume at or greater than 225 mg/kg extending to and including the Southern IAA. The kriging actually shows a band of predicted soil lead below 80 mg/kg between the facility and the Southern IAA.

DTSC also does not provide any support for its statement that Wu intentionally did not collect samples within a mile of the Exide facility to avoid any potential influence from Exide's emissions. The Wu study clearly states that the field sampling team avoided locations with physical



barriers, where the soil was disturbed and areas needing owner's permission. No mention is made of avoiding sources of lead emissions of any type. In fact, the report states that lead emissions data from Toxic Release Inventory facilities were collected from the period 1988 to 2004, after the field samples were collected in 2004. Distance from such facilities was analyzed as a potential variable to predict soil lead concentrations but was found to not be statistically significant. There is no reason for the study team to avoid sampling locations that were going to be analyzed to determine if they were predictors of soil lead levels; the opposite would be true. A more likely reason for the lack of samples within a mile of the facility is the lack of soils on public property within that area.

**Median lead for the Wu study was 56 mg/kg (for residential properties). Medial lead computed by Small/Rose for houses surrounding Vernon was more than 2X greater at 157 mg/kg. While Exide's Report acknowledges that their median soil lead concentrations is higher than Wu's, the reasons for this difference, according to the Report's authors, is due to predominant wind directions, and that few, if any, samples were collected in Vernon. The inference here by the study's authors is that all industry in Los Angeles is confined to the City of Vernon, which is clearly incorrect. Also, what Exide has failed to consider was that, as noted above, this was purposely done by Wu et al. because they recognized the potential for data interference from Exide's lead in the industrial and residential areas immediately surrounding the Facility.**

Response:     DTSC mis-characterizes the statements in the Small/Rose study and draws an incorrect inference of the authors' intent. Drs. Small and Rose did not state or infer that all industry in Los Angeles is confined to the City of Vernon. Rather, any reviewer should acknowledge that the City of Vernon, whose motto is "Exclusively Industrial," is heavily industrialized with a high concentration of metals-related industry that has been present since the early 1920's. Consequently, the fact that the assessment areas lie directly adjacent to this highly industrialized area is a relevant item to emphasize. As discussed in the previous comment, a more detailed review of the Wu et al. study show that the finding of that study and those of the Small/Rose study findings are consistent with the major differences attributable to differences in the age of housing in the vicinity of the sample locations. Further, Exide believes that DTSC again mis-characterizes the study approach undertaken by Wu et al. with respect to the Exide facility as discussed in the response to the previous, similar comment.

**Furthermore, the Report seems to contradict their own discussion on historic lead industries and 'hot spots' in Los Angeles (provided in**



> **Appendix C) and the dozens of historic lead-processing facilities spread out over the City of Los Angeles, or well within the Wu study area. It is highly probable that the Wu residential samples were collected close to, or downwind from, former lead industrial sites and that their data reflects in part contributions from historic non-Exide related-lead.**

Response:   The Small/Rose report does not contradict the discussion in Appendix C. As discussed on page 8 of the report, the regression analysis identified a statistically significant relationship between soil lead and proximity to non-Exide historic lead manufacturing facilities ($p$ value of 0.022); however, that source was excluded from the final regression since it reduced the $R^2$ value. The regression showed that there was not a statistically significant relationship between soil lead concentrations and proximity to other historic metals-related or paint manufacturing facilities, similar to what Wu et al. found. As previously discussed, the Wu study also concluded that distance from lead emitters identified in the Toxic Release Inventory was not a statistically significant predictor of soil lead concentrations. While it is logical to conclude that there would be a discernable impact, hence the attempt of the Wu team to discern it from their dataset, it was not possible to distinguish it from the overall variability or noise of the dataset.

> **In Exide's Long Beach background study (LBBS), primarily a residential area, the average lead concentration was 133 mg/kg (rounded up). This value is slightly higher than the Wu study (107 mg/kg) but significantly lower than both the IAAs and the EAAs. Median lead for the LBBS was only 50 mg/kg, whereas the median Northern IAA lead concentration was 237 mg/kg and 166 mg/kg for the Southern IAAs. The highest detection of lead in the LBBS was 195 mg/kg ('SS-BG-08-3') at a residence with a house built in 1929. In contrast, the highest lead detected in the IAAs was 2,030 mg/kg ('SS-MEIR-N-14-6') at a residence with a house that was built in 1922 or not much older that the house in the LBBS with the highest lead result.**

Response:   In its comment, DTSC cites individual sample results that vary from the overall observed trends and uses them to infer conclusions that are not supported by the entirety of the sample results and the conclusions of numerous other researchers. Sutton et al. concluded that soil lead levels were 10 times more likely to exceed 500 mg/kg in a property with a house built in the 1920s than a property with a house built after 1950. For the properties sampled in Long Beach, 50% had houses built in or after 1950 in contrast to the Expanded Assessment Areas. The Northern Expanded Assessment Area has a median year of house construction of 1923 with only 8% of houses built after 1950 while the median year of house construction



in the Southern Expanded Assessment Area was 1929 with only 16% of the homes built after 1950. Based on the Sutton study, properties in the Expanded Assessment Areas are two times more likely to have soil lead levels in excess of 500 mg/kg than those found in the Long Beach study area. The Sutton study further shows that 50% of the properties with houses built in the 1920's will have one or more soil samples with a lead concentration exceeding 500 mg/kg as compared to about 20% for properties with houses built in the 1950's.

To address these differences in housing age, Exide will be conducting an additional off-site background study evaluating the concentrations of anthropogenic lead in a residential community with similar:

1. historic use (including housing age),
2. proximity to arterial roads and freeways
3. proximity to surrounding industrial use

More information on this additional background study will be presented in a letter to the DTSC to be submitted on May 31, 2017.

**The LBBS area was selected by Exide (and approved by DTSC) because it was located in an urban area with similar housing stock, proximity to freeways, railways, and industrial areas, but without any known lead-acid battery recyclers. After the data showed considerably less lead than in the IAAs, Exide argued against their earlier selection by stating that the LBBS is not a true representation of background because the data is skewed by differences in ages in the housing stock, with more homes in the IAAs built before the 1940s or when lead-based-paint (LBP) use was more widespread and the houses in the LBBS were built after 1940.**

Response:     The DTSC recollection of the sequence of events in the selection of Long Beach as a comparable background area fails to acknowledge the historic reality of the Long Beach study area. This has prevented Exide from engaging in a scientific dialogue with DTSC about the merits of Long Beach as a comparable residential area to the assessment area. In fact, the area sampled in Long Beach is not proximate to, and downwind of, an industrial area with a long history of metals related industries, it does not have predominantly pre-1940 housing stock, and there are not as many properties sampled proximate to heavily trafficked arterial roadways. Only 1 property out of the 19 sampled (5%) in Long Beach was within 200 feet of an arterial roadway while in the study areas, 256 out of 848 properties or 30% lie within 200 feet. Furthermore, the Long Beach sampling area is located



upwind of the freeway, not downwind.  Wu et al. found that after parcel age-related variables, traffic related variables explained most of the variability in soil lead concentrations.

To address these differences in the housing stock age, distance from arterial roadways and from metals related industries, Exide is proposing to conduct an alternate background study to the Long Beach assessment.

It is well documented that the year of house construction or age of the house on a residential property is the primary indicator of soil lead concentrations. In its comprehensive report, *Distribution of Soil Lead in the Nation's Housing Stock* (EPA 747-R96-002, May 1996), USEPA discusses soil lead concentrations in private and public housing throughout the United States. USEPA concluded that the strongest statistical predictor of soil lead concentrations was building age (USEPA, 1996).  This study showed that the mean soil lead concentration for properties in the West Census region (which includes California), where the building age was pre-1940, ranged from 205.3 to 265.3 mg/kg depending on where the samples were located on the property.  In contrast, for properties where the house age was from 1950 to 1959 such as in Long Beach, the mean soil lead concentration ranged from 39.4 to 98.2 mg/kg, consistent with the measurements that Exide made.

The impact of house age on lead results is evident beyond the drip line of the house.  The USEPA study separated sample results into three categories: drip line, entryway and remote (away from the structure but still on the property).  While the influence of house age is expected to be seen in the drip line and entryway samples that were taken close to the structure, the influence of house age on soil lead is markedly seen in properties with pre-1940 housing stock.  The mean soil lead concentration for remote sample locations in the West Census region was 265 mg/kg demonstrating that the effects of house age extend well beyond the drip line.

The UC-Irvine study by Dr. Wu et al. also found that house age within 30 meters was the greatest predictor of soil lead concentrations on the parcel tested, predicting 54% of the variance in soil lead for sample results from properties that were not located close to a freeway or arterial roadway.  The average year of construction for the housing on such properties in the Wu study was 1949, also later than in the study areas, which helps account for the somewhat lower soil lead measurements in that study. These two studies support Exide's position that a suitable background area must have housing of similar age as the area of interest, which the Long Beach study area does not.

Peter Ruttan, Project Manager
2013-3007-12
May 16, 2017
Page 49 of 59

## Conclusions and Recommendations

**Comment:**   **Exide Report is deficient and does not meet our expectations on delivering a robust background/lead apportionment study that reasonably identifies and characterizes Exide's lead.**

**As noted above in General Comment No. 1, Exide's Report failed to follow DTSC Guidance and our recommendations on their Workplan.  Instead of submitting a revised Report, we recommend that Exide submit a revised Workplan that addresses DTSC's concerns and follows DTSC Guidance.**

Response:   Exide acknowledges DTSC's recommendation and disagrees with it.  However, as stated previously, Exide intends to conduct an additional background study. More information on the planned background study will be provided by May 31, 2017.

## ERRATA Comment

**Comment:**   **Exide states that three regressions were used to assess lead concentration as a function of distance from the Facility, yet Figure 2, 'Soil Lead Concentration as a Function of Distance from the Exide Facility', presents only two in their 'legend'; 'ogarithmic'[*sic*], presented as a red line, and 'exponential', presented as a green line.  The figures is also missing labels for the x and y-axes.  We note that the figure shown on page 35 does include these missing items.**

Response:   Exide appreciates DTSC bringing these items to its attention.  A revised page 5 of the Small/Rose report is attached.

## HUMAN AND ECOLOGICAL RISK OFFICE'S (HERO) JANUARY 7, 2016 MEMORANDUM REGARDING REVIEW OF A DOCUMENT PRESENTING STATISTICAL ANALYSIS OF SOIL LEAD LEVELS IN VERNON, CALIFORNIA

**Comment:   1.**   **Evaluation of ambient lead levels:  Typically, data used to derive background, ambient or regional levels of a contaminant are collected from areas that have not been affected by site activities or from other areas that are a source of same contaminant.  All data points used in a "background" analysis should be carefully evaluated prior to use in such analysis.  Please see Appendix B of DTSC's 2008 document titled Proven Technologies and Remedies Guidance – Remediation of Metals in Soils.  The 2008 document defines "background" concentrations as "Metals concentrations that represent only pristine or natural conditions" and "ambient" metals concentrations as those "that represent a combination of natural levels and *non-specific* off-site sources".  In this report, soils affected by emissions from the facility, as**

Peter Ruttan, Project Manager
2013-3007-12
May 16, 2017
Page 50 of 59



**well as from various specific sources, such as freeways, lead based paint and other industrial sources, were used to derive "background" soil lead concentrations.**

Response:    In this comment, by calling non-Exide related sources to soil lead concentrations such as freeways and lead-based paint "specific sources", DTSC appears to imply that they are not part of ambient background. This interpretation is a direct contradiction of the Guidance definition that states: "For the purposes of this appendix, the general term "background" will be used to refer to soil that has not been affected by site-related releases."

Exide's position is that the regression model presented in Section 3.3 of the Small/Rose report is the best way to disentangle (to the extent possible) the contributions of multiple, highly variable sources of lead in a location such as the study area. This model statistically controls for non-Exide site related sources in order to estimate the urban ambient background concentration in the Vernon area.

**As recommended by DTSC's guidance document, a typical background analysis includes exploratory data analysis, such as (a) graphical representations (probability plots, box and whisker plots, evaluation of inflection points), (b) tests of data set distributions, (c) interquartile analysis, and (d) outliers identification and removal. Details of such analysis were not presented in the report for DTSC's review.**

Response:    Section 4.1.1 of the Small/Rose report presents the soil lead results for the Expanded Assessment Areas as a background dataset to use as comparison to the results from the initial assessment areas. Figure 5 in the Small/Rose report shows that the age of the houses on the properties and distance to freeways and arterial roadway are comparable and thus meet the Guidance requirement that the target population for the background determination have similar historical use to the site (in this case, the site is the initial assessment areas). Figure 6 in the Small/Rose report presents box and whisker plots for the Expanded Assessment Areas. Further exploratory data analysis on the Expanded Assessment Area dataset will be performed as part of the addendum to the Small/Rose report that Exide currently intends to submit.

**Comment:    2.    Data set used in the analysis: Although the report indicates that data collected from the industrial area around Exide, initial assessment and expanded assessment areas were included in the analysis; these data were not included in the report for DTSC's review. All data employed in the analysis should be included in the report as a separate appendix**



Peter Ruttan, Project Manager
2013-3007-12
May 16, 2017
Page 51 of 59

**(and in electronic format) identified by location, sampling date and depth.**

Response:    A tabular data file, including a listing of all the data points used in the regression and other analyses and their associated variable values used in the Small/Rose report will be submitted under separate cover since it contains confidential, property specific information.

**Comment:    3.    Inclusion of data points not affected by lead sources:  It is unclear whether data collected from parks, cemeteries, or other areas likely to be minimally affected by sources of lead contamination were included in the study.  Such data have been collected from schools in the area, for example, and have much lower concentrations of lead than areas closer to the Exide facility.  At a minimum, a comparison should be provided between the two datasets.**

Response:    The addendum to the Small/Rose report that Exide currently intends to submit will include soil lead results from the schools and parks that Exide has sampled.  Exide has not collected any samples from cemeteries.

**Comment:    4.    Ambient lead levels in the Los Angeles area:  The report acknowledges that soil samples collected from the Long Beach area (as part of a background study), and even from residential areas in the LA area (as presented in the Wu study) result in lower estimates of median lead levels (50 mg/kg and 56 mg/kg) than those presented in this study (157 mg/kg).  However, the higher levels in the Vernon area are attributed to heavy industrial nature of the area.  Our experience evaluating ambient levels of lead in urban areas of LA, in certain site-specific evaluation, indicate that mean or median levels of lead are similar to those estimated in the Wu study and for the Long Beach area.**

Response:    See the responses to previous comments for further comparisons of the Small/Rose findings to both the Wu et al. and the Long Beach studies.  If DTSC has soil lead levels from other residential areas with housing of comparable age to the assessment areas that are also proximate to heavily trafficked arterial roadways and metals-related industries, Exide would be interested in reviewing that information.  Published articles such as those cited previously (EPA, 1996; Sutton et al., 1995) report soil lead concentrations similar to those observed in the assessment areas when the age of the housing stock is comparable.

Peter Ruttan, Project Manager
2013-3007-12
May 16, 2017
Page 52 of 59



## Recommendations and Conclusions

**Comment:**     **Air modeling results should be evaluated by the SCAQMD.  All the data used to determine ambient lead levels in the Vernon area should presented to DTSC for concurrence and approval, prior to conducting a background or 'ambient' analysis.  Guidance provided in DTSC's 2008 document should be followed. Data collected from areas not impacted by specific sources of lead, such as parks and cemeteries, should be included in the analysis.**

Response:     The AERMOD results were presented in the January 2013 AB2588 Health Risk Assessment that was reviewed and approved by SCAQMD  The intent of the statement that all data used should be presented to DTSC for concurrence and approval is unclear.  All of the data used has been provided to DTSC in past reports which were approved by DTSC.  A tabular file including the data used in the Small/Rose study will be provided under separate cover since it contains confidential, property specific information.  The work performed is consistent with DTSC's Guidance.  No cemeteries have been sampled as part of Exide's sampling; an updated statistical analysis incorporating the school and park data obtained by Exide will be included in the addendum that Exide currently intends to submit.

## ADAM H. LOVE, PHD'S JANUARY 20, 2016 LETTER REGARDING "STATISTICAL ANALYSIS OF SOIL LEAD CONCENTRATIONS IN VERNON, CA" REPORT BY M.J. SMALL AND S.M. ROSE

**Comment:**     *Section 3.1  Kriging Interpolation*
**The decision to use a 500-m search radius for the kriging interpolation appears arbitrary, resulting in the clustering of smaller-scale lead concentration trends that may obscure larger scale lead concentration patterns that fit various alternative conceptual site models.  A more useful alternative to presenting only the results from one search radius would have been to present the kriging results for multiple search radii as a sensitivity analysis.  An addition, the rationale for a 500-m search radius is not explained within the context of an empirical graph in Appendix B that shows a monotonically increasing semivariogram out to 2.6 km.**

Response:     A sensitivity analysis for the radius of kriging interpolation will be presented in the addendum to the Small Rose Study that Exide currently intends to submit.

**Small and Rose 2015 do not discuss that the effects of heterogeneities in Exide stack emission transport and fate related to wind, plume screening and capture, depositional surfaces, resuspension, drainage and runoff, etc. could also create soil lead concentration variability on a comparable scale.**

Peter Ruttan, Project Manager
2013-3007-12
May 16, 2017
Page 53 of 59



Response:     A number of the processes mentioned by the reviewer are incorporated in the
              AERMOD model that is used to derive a profile of ambient lead concentration (and
              resulting deposition) that is then scaled to provide a best fit to the observed soil lead
              data.  These include the basic processes of stack emission transport and fate related
              to wind, and resuspension, which is conservatively assumed to be complete (so the
              deposited lead is modeled to both contribute to soil lead concentration at a site and
              be carried further downwind for further deposition).  Other aspects, including
              plume screening and capture, depositional surfaces, and drainage and runoff, are
              not included in the model as the reviewer correctly notes.  In the development of
              any model, some processes are included and some are not.  A strong argument for
              omitting a process can be made when its scientific representations are highly
              uncertain or when the data necessary to accurately represent and model them are
              not available and/or insufficient.  In conducting their analysis, Drs. Small and Rose
              chose models of intermediate complexity (both the physical and statistical models),
              recognizing these constraints and needs.  In the end, the key question is, can a model
              of greater complexity provide more accurate predictions of the observed data?  The
              statistical analysis presented in the Small/Rose report provides a very good level of
              prediction across the Vernon area dataset.  If the reviewer and the DTSC have a
              model or modeling approach that has done better across such a similarly large,
              complex and variable landscape, Exide would appreciate the opportunity to review
              it.

              **Small and Rose 2015 incorrectly argue that a band of lower interpolated soil
              lead concentrations between the area proximal to the Exide facility (impacted
              primarily by fugitive emissions) and the residential properties north and south
              of the facility (impacted primarily from stack emissions) is inconsistent with
              the conceptual site model where Exide emissions have significantly
              contributed to elevated soil lead levels.  Instead, Small and Rose suggest
              "localized zones" of elevated soil lead concentrations can, in some cases, be
              associated with "historical lead sites or lead-associated activities,", although
              other than geographic association they provide no additional assessment of the
              plausibility of these "historical lead sites or lead-associated activities" in terms
              of potential for lead releases and relative contributions compared to the Exide
              facility.  In addition, the majority of the "historical lead sites or lead-associated
              activities" shown in Figure C-1 do not have documented levels of elevated soil
              lead and therefore demonstrate the general weakness in the geographic
              association alone.**

Response:     The AERMOD analysis considers both stack and fugitive dust emissions from
              multiple sources on the facility.  While it is true that fugitive dust emissions are
              higher close to the facility and do not travel as far as stack emissions, the ambient
              air contours do not reflect this bimodal effect that the reviewer hypothesizes, nor



Peter Ruttan, Project Manager
2013-3007-12
May 16, 2017
Page 54 of 59

do they indicate localized areas of high concentration. The ambient air contours show a monotonic decrease in concentrations with increasing distance from the facility. The shape of the contours are somewhat different closer to the facility reflecting the greater impact of fugitive emissions, but there is still a monotonic decrease.

Further, Exide disagrees with the reviewer's statement that the majority of the historic lead processing facilities (shown in red on Figure C-1) do not have documented levels of elevated soil lead associated with them. The Small/Rose report found that there was a statistically significant relationship between soil lead concentration and proximity to a historic lead-processing industry (*p* value of 0.022); however, this source type was not included in the final model because it decreased the variability explained by the regression. Figure C-1 in the Small/Rose report shows contours associated with the lead processing facilities to the east and southwest of Exide; the soil sampling did not extend far enough to capture the effects of lead processing facilities to the west and northwest. The effects of the lead processing facility directly adjacent to the Exide facility cannot be separated because the two facilities are too close relative to the residential area.

**Comment:**      *Section 3.2 Regression Analysis of Soil Lead Concentration vs. Distance*
**Even with drip zone data was excluded from their analysis, there is a huge amount of variability in the soil lead data collected in the vicinity around the Exide facility. Given the observed variability, the regression analyses performed by Small and Rose 2015 do not enable the distance at which the contributions from the Exide facility become statistically indistinguishable from the urban background concentration to be determined with confidence. Best-fit curves should have included 95 percent confidence intervals for the best-fit each regression analyses shown on Figure 2. These would serve to better illustrate the effect of the variability on trend uncertainty at larger distances from the Exide source. Without the confidence intervals, the casual reader is left with the purely visual impression from the regression curves that no trend exists beyond approximately 1 km. Instead, it is expected that the large amount of variability results in very low confidence in the conclusion specifying the distance at which the contributions from the Exide facility become statistically indistinguishable from the urban background concentration.**

Response:      The analysis estimates the standard error for the distance at which the fitted piecewise curves transition from their downward sloping portions to horizontal flat lines, indicative of reaching an urban ambient background concentration that includes the effects from other property-specific anthropogenic sources (such as age of home for leaded paint and proximity to roadway). These estimates of the distance to reach a "locally-impacted" average urban background concentration are



shown in parentheses in Table 2 and 3 of the Small/Rose report. Appendix B.2 presents the standard errors associated with the predicted urban ambient soil lead concentration. Since the $R^2$ value was relatively low albeit with a high degree of statistical confidence, the model was refined by fitting the same models to directional subsets of the data that better account for prevailing wind directions which improved the fit in the downwind directions as demonstrated by the lower standard errors in the corrected vectors shown on the attached, corrected Figure 3. As previously discussed, it is not surprising that a simplistic model comparing soil lead concentrations to only one variable, distance from the Exide facility, would explain only a small amount of the variability in soil lead concentrations. It is a key indicator that other sources of lead are present in the environment where the samples were taken, hence the need for a more sophisticated model that accounts for more of these other sources.

**Comment:**   *Section 3.3  Statistical Analysis of Contributors to Soil Lead Concentrations*
**Small and Rose 2015 multivariable regression analysis attempted to separate the contributions from Exide emissions from other soil lead contributing factors by comparing the pattern of soil lead concentration to the expected impact area from stack emission based on the Environ atmospheric dispersion model using 2010 and 2012 emission rates. While Small and Rose 2015 state that for the regression component representing Exide's modeled stack emissions "all that matters is the relative shape of the ambient air concentration profile and the extent to which this shape explains a portion of the spatial variation in the observed soil lead data," they do not describe how far they allow the shape of the air concentration to extend. Since the 2010 and 2012 emissions were historical lows in Exide facility emissions, historical emissions would have had both higher ambient air concentrations and a larger geographic footprint than is presented in the Environ atmospheric dispersion model output. More details with regards to how the atmospheric plume model shape was implemented would be necessary in order to assess the validity of the methodology for representation the contribution of Exide stack emissions in a multivariate regression application.**

Response:   Details regarding the atmospheric plume model can be found in Exide's AB2588 Health Risk Assessment submission dated January 2013 that was approved by the South Coast Air Quality Management District on March 1, 2013. Key components are summarized in Appendix B.3.2 of the Small/Rose report. As described in the Small/Rose report and above, the purpose of the AERMOD simulation is to provide a spatial pattern of ambient concentration, not absolute values of these concentrations. The key requirement for the AERMOD simulations is that the relative predicted shape be representative, and that relative concentrations extend far enough in the proper directions so that possibilities for impact in these directions are not discounted.



Peter Ruttan, Project Manager
2013-3007-12
May 16, 2017
Page 56 of 59

The extent to which the shape of the modeled plume allows for a statistically fitted Exide contribution is independent of the emission rate used in the AERMOD simulation. The AERMOD model (like many used in environmental applications) is "linear", so that doubling the emission rate from the same source doubles all calculated concentrations at all locations (independent of distance). The shapes and *relative* magnitudes of the contours remain unchanged and, like changing the units of an explanatory variable in a regression model (e.g., from meters to inches) the estimated coefficient and contribution to the dependent variable remains equivalent. As discussed above, omission of particle deposition in the AERMOD simulation causes the relative plume to extend conservatively outward. Also, if as noted in the comment, significant emissions occurred prior to 2010 - 2012, these would have yielded an ambient pattern more tightly distributed around the site. Use of this pattern would thus assign the Exide contributions to current soil lead to locations closer to the site, yielding a less conservative estimate of the spatial extent of impact.

The procedure and assumptions for the AERMOD simulations are described in Appendix B.3.2 of the Small/Rose report.

**Small and Rose 2015 also used a property-averaged soil lead concentration for their multivariate regression instead of each soil measurement, which eliminates the variability in soil lead concentrations observed within each property. The use of property-averages on the regression analysis has the effect of reducing the portion of the site specific soil lead variability that is unattributable to the specific contributions specified. If each discrete data point was used for this multivariate approach, less soil lead would likely end up being attributed to the posited sources and more to background soil lead. Thus, the expected outcome would be that the "background" soil lead, not attributable to the posited lead sources, is more elevated than results from using property-averaged values.**

Response:    In the addendum to the Small/Rose Study that Exide currently intends to submit, the regression model will be fit to individual (i.e. non-averaged) soil samples in addition to using the property averages and the goodness of fit compared.

**As a result, the Small and Rose 2015 multivariate regression approach indicates the amount of Exide emissions that are well-correlated to the specific Exide air emissions patterns presented in the Environ atmospheric dispersion mode is small. Small and Rose 2015 then use the small assessed Exide contribution result to determine the distance at which the contributions from the Exide facility become statistically indistinguishable from the urban background concentration. As expected from their suspect conclusion**



Peter Ruttan, Project Manager
2013-3007-12
May 16, 2017
Page 57 of 59

**regarding a small contribution from Exide emissions, the distance where a small contribution becomes statistically indistinguishable from the urban background concentration based on its correlation to the associate dispersion model is also small. Nonetheless, significant questions and limitations remain based on the methodology Small and Rose 2015 implemented that raise concerns about the reliability of the results.**

Response:    The reviewer mis-characterizes the approach and findings of the Small/Rose report. The size of the dataset allow for the identification of the contributory sources to soil lead concentrations at a high level of statistical confidence. The regression relationship between soil lead concentration and the Exide ambient air concentration has a $p$-value of $5.84 \times 10^{-61}$, $1 \times 10^{59}$ times lower than the standard of 0.05 for statistical confidence. The overall fit of the regression model with all of the variables included has an even higher level of statistical confidence at a $p$ value of $1.08 \times 10^{-83}$. So while there is variability in the statistical analysis that is not explained by the regression equation, the pattern in the soil lead concentrations has been established and provides a rational basis for establishing the area of distinguishable impact from the facility.

**Comment:**    ***Section 4.  Background Discussion***
**Small and Rose's analyses consistently demonstrate that the "background" soil lead levels in the vicinity of the Exide facility are greater than the two other background assessments demonstrate. Small and Rose argue that differences between the median Vernon, CA data set value (157 mg/kg) and the Long Beach and Wu et al. data (50 mg/kg and 57 mg/kg, respectively) are attributable, among other issues, to the other data sets containing biases with respect to freeway and arterial road proximity, collection of samples from drip zones, etc. However, the regression analysis discussed in Section 3.3 attempts to quantify the effects of such biases, resulting in a calculated background lead concentration in the Exide area samples of 129 mg/kg. This concentration is appreciably higher than those presented by the other two data sets. Small and Rose avoid any discussion that the elevated soil lead background levels that remain after subtracting out the effects of freeway and arterial road proximity, collection of samples from drip zones, etc. could result simply from Exide emission that are not well correlated to idealized atmospheric dispersion model output. The lack of correction could result from heterogeneities in Exide stack emission transport and fate related to wind, plume screening and capture, depositional surfaces, resuspension, drainage and runoff, etc. that obscure correlation.**



Response:    In the response to GSU's specific comment #4, soil lead results for Step-Out samples taken more than 4500 feet from the facility (beyond the distance of distinguishable impact) were compared to the Wu et al. study results. Step-Out samples were used because they were obtained from public areas and not on private property, as were the Wu samples. The comparison shows that the results are very similar except for the Wu et al. estimate a mean concentration of 107 mg/kg for "grid" areas not near freeways or arterial roads. The Step-Out samples at least 4,500 ft. from Exide and not near freeways or arterial roads had a mean concentration of 206 mg/kg. However, the Step-out samples were taken from areas with older housing (mean year of construction = 1930) than the areas sampled by Wu et al. (mean year of construction = 1949). The Wu et al. study found that the age of housing within 30 meters explained 54% of the variance in soil lead concentrations, and the 19-year age difference between the sample areas spans the period of time when lead-based paint was largely phased out. Consequently, the difference in the mean concentrations is understandable when the age of housing in the vicinity of the samples is taken into consideration.

**In conclusion, each of the three primary lines of evidence were evaluated to assess the Small and Rose 2015 conclusion that any discernable effect associated with the Exide site is limited to distances less than 1.3 km, depending upon direction. As detailed above, each of the three data analysis approaches utilized by Small and Rose 2015 has significant limitation that impacts the reliability of the conclusion. This report employs a number of assumptions that are either unsupported or, at a minimum, are insufficiently demonstrated to be valid and as a result the conclusions are not reliable.**

Response:    Exide respectfully submits that the Small/Rose report is well supported and the assumptions clearly demonstrated by the data. However, in a separate submission, Exide currently intends to submit an addendum to the Small/Rose report that addresses this comment further. The basis for all assumptions have been provided in the reports, as are the results of all of the calculations. They provide a rational, scientific basis for decision-making in the residential areas.

Peter Ruttan, Project Manager
2013-3007-12
May 16, 2017
Page 59 of 59



If you have any questions, please contact Barbara Forslund at (610) 840-9145 or Paul Stratman at (610) 840-9122.

Sincerely,

ADVANCED GEOSERVICES

Barbara L. Forslund
Consultant

Paul G. Stratman, P.E.
Consultant

5/16/17

BLF:PGS:kk



**RESPONSES TO COMMENTS FIGURES**



## LEGEND

— Downwind
— Crosswind

**Wind Speed (knots)**
- 1 - 4
- 4 - 7
- 7 - 11
- 11 - 17
- 17 - 21
- >= 22

Assessment_Areas
Exide_Site

NORTHERN ASSESSMENT

SOUTHERN ASSESSMENT

0   1,000   2,000        4,000
Feet

**EXIDE TECHNOLOGIES**
VERNON, CALIFORNIA

**WIND TRANSECTS**

**ADVANCED GeoServices**
Engineering for the Environment. Planning for People.

| SCALE: | AS SHOWN |
| DRAWN BY: | ALC |
| CHCKD BY: | BSF |
| PROJ. MGR: | BSF |
| ORG. BY: | ALC |
| PROJ. NO.: | 2013-3007 |
| DWG DATE: | 04/21/2017 |
| SHEET NO.: | 1 OF 1 |
| REV. NO.: | |

**FIGURE RTC-1**



LEGEND

LEAD
METAL (FOUNDRY/MANUFACTURER)
METAL (SCRAP YARD/WAREHOUSE)
PAINT MANUFACTURER
OTHER
(CHEMICAL/RUBBER/FERTILIZER)
OFF-SITE SOIL SAMPLE LOCATIONS

CONTOUR LEGEND

80 mg/kg
320 mg/kg
1000 mg/kg

TRANSECTS LEGEND

DOWNWIND
CROSSWIND

NOTES:
1. BUILDING LOCATIONS ARE APPROXIMATE
2. BACKGROUND IMAGE FROM 1972
3. FACILITIES SHOW ON THE MAP WERE
   IDENTIFIED FROM A REVIEW OF SANBORN
   MAPS COVERING A LIMITED TIME FRAME AND
   GEOGRAPHIC AREA. ADDITIONAL LOCATIONS
   MAY BE IDENTIFIED IN FUTURE SUBMISSIONS.

ADVANCED GeoServices
Engineering for the Environment. Planning for People.™
1055 ANDREW DRIVE, SUITE A
WEST CHESTER, PENNSYLVANIA 19380

EXIDE TECHNOLOGIES
VERNON, CA

KRIGING CONTOURS ON MAP SHOWING
HISTORIC LEAD & METAL CONTRIBUTORS

FIGURE RTC-2

Scale: NTS
Originated By: KEZ
Drawn By: KEZ
Checked By: PGS
Project Mgr: PGS
Project No.: 2013-3007-09
Sheet No.: 1 OF 1
Status: REVIEW



**CORRECTED PAGES FOR SMALL/ROSE REPORT**



determine at what point the transition has effectively occurred. We use these regression analyses to estimate the distance from the Exide facility at which soil lead concentrations reach the ambient urban background level and to estimate the ambient background concentration in the area in and around Vernon, CA. The equations for these regression analyses and additional details are given in Appendix B.2 .

The results, shown in Figure 2 and numerically summarized in Table 2, make it clear that all three analyses give very similar estimates for the distance from the site at which lead concentrations reach a constant value and for the constant value. It is clear from Figure 2 that there is a distinct relationship between lead concentration and distance, with a high level of statistical confidence in the estimated parameters of the fitted regressions (as indicated by the low p-values in Table B-1, Table B-2, and Table B-3).  However, the fitted regressions do not explain a high amount of variation in the data. For example, the $R^2$ value of the piecewise linear regression is 0.25, which means that this regression explains 25% of the variation in the observed soil lead data. The fitted regressions and their coefficients are thus statistically significant at a high degree of confidence and indicative of a clear spatial pattern, but with a large amount of variation around this pattern. The regression analysis in Section 3.3, which uses the modeled air concentration and indicator variables, explains a larger amount of the variation in the data with a comparable degree of confidence.



Figure 2: Soil lead concentration as a function of distance from the Exide facility. Three different fitted regression analyses are overlain on the empirical data. All three estimate similar values for the ambient background soil lead concentration and distances at which the concentrations fall to the ambient background level. Open circles represent data from "non-enhanced" sampling locations, which are not close to freeways, arterial roads, or houses built before 1940. Dots represent sampling sites that have one or more of those factors likely to enhance soil lead concentrations

5