**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EXIDE TECHNOLOGIES, | ) | Case No. 13-11482 (MFW) |
| | ) | |
| Reorganized Debtor. | ) | |
| _____ | ) | |
| | ) | |

**OPINION**[1]

Before the Court is the motion of Exide Technologies
("Exide") to reduce the quarterly fees owed by Exide to the
United States Trustee ("UST") to the fees applicable at the time
its Plan was confirmed.  The UST opposes the motion procedurally,
asserting that Exide's motion seeks declaratory relief that is
only available in an adversary proceeding, and substantively,
contending that the increased fees charged after 2017 are
constitutionally permitted.  The Court will deny Exide's motion
because the increased quarterly fees are constitutional.[2]


I.    BACKGROUND

On June 10, 2013, Exide filed a voluntary petition under
chapter 11 of the Bankruptcy Code.  Exide's plan of

_____

[1]    This Opinion constitutes the findings of fact and
conclusions of law of the Court pursuant to Rule 7052 of the
Federal Rules of Bankruptcy Procedure, as incorporated by Rule
9014(c).

[2]    Because there are no facts in dispute and the Court is
denying Exide's motion on legal grounds, it is not necessary to
address the UST's procedural objections.

reorganization ("the Plan") was confirmed on March 27, 2015, and became effective on April 30, 2015.  The Plan provided that "[t]he reorganized debtor shall continue to pay fees pursuant to section 1930 of title 28 of the United States Code until the Chapter 11 Case is closed by entry of the Final Decree."  (D.I. 3409 at § 15.2.)

More than two years later, on October 26, 2017, Congress amended section 1930 to increase the quarterly fees that chapter 11 debtors pay to the UST (the "2017 Amendment").  Pursuant to the 2017 Amendment, Exide's quarterly fee increased from $30,000 to $250,000 per quarter.

On June 12, 2019, Exide filed its Motion, asserting that the amended fee schedules did not apply to Exide based on several statutory and constitutional arguments.  On July 15, 2019, the UST responded opposing the motion and asserting that Exide's desired relief could only be obtained through an adversary proceeding.  Additional briefs and replies were filed on August 5 and August 30, 2019.  Oral argument was held on September 18, 2019.  The matter is ripe for decision.


II.  <u>JURISDICTION</u>

This Court has jurisdiction over this core matter which involves administration of the bankruptcy case.  28 U.S.C. §§ 1334(b) and 157(a) & (b).

2

III. <u>DISCUSSION</u>

    A.   <u>Applicability of Amendment to Pending Cases</u>

Exide maintains that the increased fees are inapplicable to it because there is no express language in the 2017 Amendment making the increase in fees applicable to pending chapter 11 cases.  Exide contrasts the lack of express language for chapter 11 cases with the express language with respect to chapter 12 cases in that same Amendment.[3]  Exide observes that, "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  <u>Refined Metals Corp. v. NL Indus., Inc.</u>, No. 18-3235, 2019 WL 3955889, at *3 (7th Cir. Aug. 22, 2019) (quoting <u>Russello v. United States</u>, 464 U.S. 16, 23 (1983)).

Further, Exide notes that the 1996 quarterly fee amendment contained express language making the new fees applicable to

---

    [3]    Section 1005 of the 2017 Amendment states: "[t]he amendments made by this section [1005] shall apply to (1) any bankruptcy case that is pending on the date of this Act; in which the plan under chapter 12 of title 11, United States Code, has not been confirmed on the date of enactment of this Act; and relating to which an order of discharge under section 1228 of title 11, United States Code, has not been entered; and (2) any bankruptcy case that commences on or after the date of enactment of this Act."  Pub. L. No. 115-72, § 1005, 131 Stat. 1224, 1232-34 (2017).

pending cases.[4]  Exide argues that the omission of any express

language in the 2017 Amendment making it applicable to pending

post-confirmation cases renders it inapplicable by negative

inference.  See, e.g., In re Life Partners Holdings, Inc., Bankr.

No. 15-40289, 2019 WL 3987707, at *5 (Bankr. N.D. Tex. Aug. 22,

2019).

The UST asserts that the 2017 Amendment applied to all cases

when it went into effect and did not exempt cases filed prior to

fiscal year 2018.  According to the UST, the conduct that

triggers liability under section 1930(a)(6)(B) is the making of a

disbursement of $1 million or more, not the commencement of the

case.

In interpreting a statute, the Court must begin its analysis

with the plain meaning of the statute.  Lamie v. U.S. Trustee,

540 U.S. 526, 534 (2004).  The plain meaning of a statutory

provision "is determined by reference to the language itself, the

specific context in which that language is used, and the broader

context of the statute as a whole."  Robinson v. Shell Oil Co.,

519 U.S. 337, 341 (1997).  "[I]n matters of statutory

interpretation, the plain meaning of statutory language is often

---

[4]    The 1996 quarterly fee amendment explicitly stated:
"fees under 28 U.S.C. § 1930(a)(6) shall accrue and be payable
from and after January 27, 1996, in all cases (including, without
limitation, any cases pending as of that date), regardless of
confirmation status of their plans."  Pub. L. No. 104-208, §
109(d), 110 Stat. 3009, 3009-3019 (1997).

illuminated by considering not only the particular statutory language at issue, but also the structure of the section in which the key language is found, and the design of the statute as a whole and its object." Pellegrino v. United States Transp. Sec. Admin., 896 F.3d 207, 216 n.10 (3d Cir. 2018) reh'g en banc granted, 904 F.3d 329 (3d Cir. 2018).

In this case, the 2017 Amendment changed section 1930(a)(6)(B) to read:

> During the fiscal years 2018 through 2022, if the balance of the United States Trustee System Fund as of September 30 of the most recent full fiscal year is less than $200,000,000, the quarterly fee payable for a quarter in which disbursements equal or exceed $1,000,000 shall be the lesser of 1 percent of such disbursements or $250,000.

28 U.S.C. § 1930(a)(6)(B).

The language of the subsection indicates that the object of the amendment is not cases, but disbursements. As the UST correctly notes, the conduct that triggers liability under that section is the making of a disbursement of $1 million or more. Similarly, the temporal reach of the amendment is also expressly defined, not through case dates, but through fiscal years: 2018 through 2022. The application of the increased fees is not a function of when a case was filed or a plan confirmed; rather, the application of the increased fees is a function of the amount and timing of a disbursement and the health of the UST fund.

The legislative history supports this interpretation. "The amendments made by this section shall apply to quarterly fees payable under section 1930(a)(6) of title 28, United States Code, as amended by this section, for disbursements made in any calendar quarter that begins on or after the date of enactment of this Act." Pub. L. No. 115-72, § 1004(c) (uncodified). Thus, the Court concludes that the 2017 Amendment applies to cases pending at the time of its enactment as well as to cases filed thereafter through 2022.

The fact that the 2017 Amendment provides express language with respect to its application to chapter 12 cases supports this conclusion, rather than refutes it as Exide argues. The express language provides an exception (for chapter 12 cases) to the general rule that the Amendment's increased fees will apply to all pending cases including post-confirmation cases. In this regard, the 2017 Amendment states that "[t]he amendments . . . shall apply to (1) any bankruptcy case that is pending on the date of this Act; in which the plan under chapter 12 of title 11, United States Code, has not been confirmed on the date of enactment of this Act . . . and (2) any bankruptcy case that commences on or after the date of enactment of this Act." Pub. L. No. 115-72, § 1005, 131 Stat. 1224, 1232-34 (2017) (emphasis added). If the 2017 Amendment did not generally apply to pending, post-confirmation cases, as Exide asserts, there would

6

have been no need for Congress to say that it did not apply to

pending, post-confirmation chapter 12 cases.

This conclusion is bolstered by the introduction to section

1930 which states:

> Except as provided in subparagraph (B), in addition to
> the filing fee paid to the clerk, a quarterly fee shall
> be paid to the United States Trustee, for deposit in
> the Treasury, in each case under chapter 11 of title 11
> for each quarter until the case is converted or
> dismissed, whichever occurs first.

28 U.S.C. § 1930(a)(6)(A).  The 2017 Amendment partially

displaced the fee schedules contained in section 1930(a)(6) but

did not amend the introductory sentence.  Thus, the Court

concludes that the increased fees owed under the 2017 Amendment

apply to Exide's case.

    B.   <u>Due Process</u>

Exide asserts that applying the amended fee schedules in its

case violates the Due Process Clause of the Fifth Amendment.

According to Exide, the fee amendment is arbitrary and violates

Due Process Clause because it grossly upended the expectations of

Exide and its creditors of the amount of UST fee liability it

would have post-confirmation.

The UST counters that the 2017 Amendment does not violate

the Due Process Clause because it seeks to achieve a lawful

legislative purpose by rational means.  In addition, the UST

asserts that Exide has failed to meet its burden of proving that

Congress acted in an arbitrary manner when it amended section

7

1930(a)(6).

The Due Process Clause states that "[n]o person shall be deprived of life, liberty, or property without due process of law."  U.S. CONST. amend. V.

1.   Retroactivity

Exide contends that the 2017 Amendment should not apply to it because doing so would violate the presumption against retroactive application of legislation.  While it concedes that the Amendment does not apply the increased fee schedules retroactively to quarters prior to its enactment, Exide asserts that applying the increased fees in this case would constitute "secondary retroactivity" by changing the legal consequences of actions taken before the Amendment's enactment.  Specifically, Exide argues that applying the 2017 Amendment would impair the rights Exide and its creditors possessed at the time they agreed to the Plan by dramatically increasing Exide's liability.

The UST responds that the plain language of the 2017 Amendment indicates that it is strictly prospective.  The conduct that triggers liability for quarterly fees is the making of disbursements after January 1, 2018.  It does not mandate collection of increased fees retroactively to the date a case was filed, the date a plan was confirmed, or from any date prior to its enactment.  The UST argues that a statute does not operate retroactively "merely because it is applied in a case arising

8

from conduct antedating the statute's enactment, or upsets expectations based in prior law." Landgraf v. USI Film Prods., 511 U.S. 244, 269 (1994).

While retroactivity arguments are essentially statutory construction ones, the retroactive application of a statute implicates constitutional principles, including the Due Process Clause. Landgraf, 511 U.S. at 266.

It is a fundamental principle of statutory construction that statutes are presumed not to have retroactive effect. Id. at 265. Courts apply a two-part test to determine whether a new federal statute should apply to pending cases. First, courts inquire "whether Congress has expressly prescribed the statute's proper reach." Id. at 280. Second, if Congress has not expressly prescribed the statute's proper reach, then courts examine whether the statute has an impermissible retroactive effect. Id.

If Congress has expressly stated that the new statute does not apply retroactively, then the legislature's intent controls and it does not offend the presumption against retroactivity. Id. Provisions simply stating a statute's effective date without expressly stating that it is or is not retroactive, however, may not be conclusive. Id. at 257 (where statute did not state it applied retroactively, the Court nonetheless considered textual and other arguments that it was effectively retroactive); Ctr.

9

for Biological Diversity v. U.S. Dept. of Agric., 626 F.3d 1113,
1118 (9th Cir. 2010) (finding effective date provision did not
resolve whether statute applied to pending cases).

If there is no express congressional directive on the
statute's retroactive effect, though, the court must determine
whether the statute does actually have retroactive effect.
Landgraf, 511 U.S. at 280.

> A statute does not operate retroactively merely because
> it is applied in a case arising from conduct antedating
> the statute's enactment, or upsets expectations based
> in prior law.  Rather, the court must ask whether the
> new provision attaches new legal consequences to events
> completed before its enactment.

Id. at 269.

Applying a new law to pending cases has retroactive effect
if the new statute "impair[s] rights a party possessed when he
acted, increase[s] a party's liability for past conduct, or
impose[s] new duties with respect to transactions already
completed."  Id. at 280.  Retroactivity analysis should be guided
by "considerations of fair notice, reasonable reliance, and
settled expectations."  Id. at 270.

In this case, the 2017 Amendment does not state that it
applies retroactively.  Rather, it simply states that the
increased fee will apply to disbursements made after the
Amendment's effective date.  Exide argues though that the
Amendment has retroactive effect where it is applied to pending
cases, such as its case, which have had a plan confirmed on the

10

assumption that the debtor would have to pay only the quarterly
fees set forth in the prior fee schedule.

Retroactive statutory amendments have been held not to
violate the Due Process Clause, however, despite the fact that
the new law upsets settled expectations. Pension Ben. Guar.
Corp., 467 U.S. at 729 (stating that "our cases are clear that
legislation readjusting rights and burdens is not unlawful solely
because it upsets otherwise settled expectations"). Thus, an
individual's reliance on previous law does not automatically
render a statute unconstitutional. See United States v. Carlton,
512 U.S. 26, 33-35 (1994) (upholding retroactive tax amendment
against due process challenge despite taxpayer's lack of advanced
notice of change and reliance on prior statute in engaging in a
stock transaction). "[T]he detrimental reliance [argument] is
not limited to retroactive legislation. An entirely prospective
change in the law may disturb the relied-upon expectations of
individuals, but such a change would not be deemed therefore to
be violative of due process." Id. at 33-34.

Bankruptcy courts are split on whether the 2017 Amendment as
applied to pending cases is impermissibly retroactive. Compare
In re Circuit City Stores, Inc., Case No. 08-35653, 2019 WL
3292293 (Bankr. E.D. Va. July 5, 2019) (holding amended fees are
not impermissibly retroactive) with In re Buffets, LLC, 597 B.R.
588, 596 (Bankr. W.D. Tex. 2019) (holding that applying amended

11

fees to pending case would be impermissibly retroactive because
the debtor had no advance notice and it would adversely affect
the feasibility of the confirmed plan) and Life Partners, 2019 WL
3987707, at *8 (finding that 2017 Amendment violated due process
because of the magnitude of the fee increase which occurred after
plan confirmation).  The Court concludes that neither lack of
notice nor unexpected increases in post-confirmation liability
supports the conclusion that the 2017 Amendment is violative of
due process.  Pension Ben. Guar. Corp., 476 U.S. at 729; Carlton,
512 U.S. at 33-35.  See also U.S. Trustee v. Gryphon at Stone
Mansion, Inc., 166 F.3d 552, 557 (3d Cir. 1999) (finding that
1996 amendment which imposed new post-confirmation quarterly fees
was not unconstitutional despite there being no notice of it
before confirmation).

     The Court agrees with the reasoning of the Circuit City
Court that imposing increased quarterly fees does not attach new
legal consequences to completed transactions.  "A mere increase
in the quarterly UST fee is not substantively retroactive.  It is
more akin to 'taxes arising post confirmation, or any similar
post-confirmation expenses.'"  Circuit City, 2019 WL 3292293, at
*5.

     This conclusion is consistent with courts' interpretation of
the 1996 fee amendment.  Prior to the 1996 amendment, debtors in
chapter 11 cases only had to pay quarterly fees until a plan was

confirmed.  In re A.H. Robins Co., 219 B.R. 145, 146 (Bankr. E.D. Va. 1998).  In 1996, Congress amended section 1930(a)(6) to require chapter 11 debtors to continue paying quarterly fees after a plan was confirmed until the case was dismissed or converted.  Id. at 146-47.  Courts concluded that the 1996 amendment was not impermissibly retroactive.  Id.  See also In re CF & I Fabricators of Utah, Inc., 150 F.3d 1233, 1238 (10th Cir. 1998) (noting that fees only applied prospectively to disbursements made after the effective date and, thus, were no different from post-confirmation taxes and other expenses which might change over time); Gryphon, 166 F.3d at 557 (characterizing post-confirmation fees as administrative claims, similar to post-confirmation taxes).

Consequently, the Court concludes that the 2017 Amendment is not a retroactive statute because it applies only to post-enactment date disbursements of debtors in cases pending on or after the enactment date.  While an increase in the quarterly fees may not have been anticipated by Exide, that is insufficient to find the statute a violation of due process.  Carlton, 512 U.S. at 33-35; Pension Ben. Guar. Corp., 467 U.S. at 729.

       2.   Legitimate Legislative Purpose
           Furthered by Rational Means

Even if the 2017 Amendment were retroactive as applied to Exide, that would not lead inevitably to the conclusion that it violates the Due Process Clause.  Retroactive application of a

federal statute, which impacts a person's property, does not violate the Fifth Amendment "provided that the retroactive application of a statute is supported by a legitimate legislative purpose furthered by rational means." Carlton, 512 U.S. at 30-31 (quoting Pension Ben. Guar. Corp., 467 U.S. at 729).  The party alleging a violation of due process bears the burden of establishing that Congress's actions were arbitrary and irrational.  Eastern Enterprises v. Apfel, 524 U.S. 498, 537 (1998); Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15 (1976).

Even a retroactive statute that imposes liability on conduct that occurred before the statute's enactment has been upheld when challenged on due process grounds, where the statute furthers a rational legislative purpose.  For example, imposition of liability for past transactions may be rational as a cost-spreading measure.  Usery, 428 U.S. at 18 (finding that the imposition of liability on former employers of coal miners was constitutional as a rational means to spread the costs of the miners' disabilities).  See also Pension Ben. Guar. Corp., 467 U.S. at 730 (holding that Congress' decision to apply pension withdrawal liability on employers withdrawing during the five-month period before enactment of the law was supported by a rational legislative purpose because the liability was for employee benefits that had already vested at the time of the

14

employers' withdrawal).   Similarly, preventing significant and
unanticipated revenue loss is a legitimate legislative purpose
justifying retroactive application of a statute.   <u>Carlton</u>, 512
U.S. at 31 (upholding constitutionality of statute amending tax
code to plug unexpected loophole).

Congress originally adopted the fee schedule in section
1930(a)(6) to ensure that the UST Program was self-funded "by the
users of the bankruptcy system – at no cost to the taxpayer."
H.R. Rep. No. 764, 99th Cong. 2d Sess. 26 (1986).   Congress
stated at that time that it would "monitor the self-funding
mechanism as it operates" to ensure that the fees collected were
sufficient to cover the costs.   H.R. Rep. No. 764, 99th Cong. 2d
Sess. 26 (1986).   Since establishing the UST Program in 1986,
Congress has adjusted the quarterly fee schedule several times.
<u>See</u> Pub. L. No. 102-140, tit. I, § 111, 105 Stat. 782, 795 (1991)
(increasing quarterly fees); Pub. L. No. 104-99, § 211, 110 Stat.
26, 37-39 (1996) (requiring quarterly fees from post-confirmation
debtors); Pub. L. No. 104-208, tit. I, 109, 110 Stat. 3009, 3009-
19 (1996) (clarifying that amendment applied in all cases,
including pending cases).

Due to declining bankruptcy filings and fee collections over
the past seven years, Congress amended the fee schedule in 2017.
Immediately prior to the 2017 Amendment, the UST projected that
it would have a $92 million shortfall in fiscal year 2017 and a

15

zero balance by fiscal year 2018.  Thus, the Court concludes that
in enacting the 2017 Amendment Congress had a legitimate
legislative purpose: to prevent revenue loss and preserve the UST
Program's self-funded character.  See Carlton, 512 U.S. at 32.

The Court also concludes that Congress's decision to impose
higher fees on larger pending chapter 11 cases is rationally
related to that goal.  It is logical for Congress to assume that
"larger cases tax the UST system more than smaller cases and that
the size of the case can be determined by the amount of
disbursements made by the particular debtor."  In re Kindred
Healthcare, Inc., No. 99-3199, 2003 WL 22327933, at *4 (Bankr. D.
Del. Oct. 9, 2003) (holding that the 1996 amendment which imposed
quarterly fees on post-confirmation disbursements did not violate
the Takings Clause).  In addition, applying the increased fees to
pending cases, including confirmed cases, is rational as it
spreads the costs among more chapter 11 debtors and allows
Congress's funding goal to be met more quickly.  See Usery, 428
U.S. at 18 (upholding statute which spread cost of coal miners'
disabilities to former employers).

Lastly, the Court concludes that the deposit of 2% of fees
collected into the general fund of the U.S. Treasury is rational.
The increased fees are meant to offset not only the UST
appropriations but also the costs of the 18 new bankruptcy
judgeships created by the 2017 Amendment.  See Bankruptcy

16

Judgeship Act of 2017, Pub. L. No. 115-72, div. B, § 1004(b), 131 Stat. 1224, 1232 (2017); H.R. Rep. No. 115-130, at 7-9.  The efficient administration of justice is a legitimate legislative purpose and creating new judgeships is rationally related to that purpose.

Thus, even if the 2017 Amendment were retroactive, the Court concludes that application of it to Exide does not violate the Due Process Clause because: 1) Congress had a legitimate legislative purpose of preventing revenue loss and preserving the UST Program's self-funded character, and 2) imposing the fees on larger pending confirmed chapter 11 cases is rationally related to this purpose.

C.   Impermissible Taking and Excessive User Fee

Exide also argues that the increased quarterly fees are an excessive user fee, and therefore, constitute a taking of property in violation of the Fifth Amendment.  U.S. CONST. amend. V.  Exide claims that the quarterly fees are excessive user fees because  1) they generate a surplus; 2) post-confirmation debtors, such as Exide, receive no benefits from the UST; 3) only chapter 11 debtors must pay the increased fees even though chapter 11 debtors are not the only beneficiaries of the UST Program; and 4) they generate revenue beyond the government's costs, as evidenced by the fact that 2% of fees collected are remitted to the U.S. Treasury.

17

The UST responds that the quarterly fees are not impermissibly excessive user fees.  In percentage terms, the increased fees are less onerous than user fees that the Supreme Court has upheld as non-excessive.  See United States v. Sperry, 493 U.S. 52, 58 (1989) (upholding 1.5% ad valorem fee imposed on users of Iran-United States Claims Tribunal).  Furthermore, the UST responds that the $200 million floor set by the 2017 Amendment is not a surplus but is in fact less than the annual appropriations for the Program.  The UST contends that the Fund balance is meant to cover shortfalls between fees collected and annual appropriations.

User fees are fees assessed by the government that are intended to reimburse the government for its costs in providing a service.  Sperry, 493 U.S. at 60.  User fees are not takings under the Fifth Amendment unless the fees are so excessive that they do not reflect a "fair approximation of the cost of benefits supplied" by the government.  Id. (quoting Massachusetts v. United States, 435 U.S. 444, 463 n.19 (1978)).

UST quarterly fees are user fees associated with the debtors' use of the bankruptcy system.  Gryphon, 166 F.3d at 554 (noting that section 1930(a)(6) quarterly fees impose the costs of the UST Program on users); Kindred, 2003 WL 22327933, at *4 (holding that quarterly fees are user fees).

The proper inquiry for whether a user fee is excessive is whether the user fee formula adopted by Congress reflects a "fair approximation of the costs of benefits supplied." Sperry, 493 U.S. at 60 (quoting Massachusetts, 435 U.S. at 463). To pass muster, a user fee need not precisely reflect an individual party's use of government services. Sperry, 493 U.S. at 60; Kindred, 2003 WL 22327933, at *5.

In fashioning the "fair approximation" inquiry, the Supreme Court was sensitive to the administrative complexity of imposing user fees on large classes and acknowledged that some users will be charged more or less under its standard than they would if user fees were "precisely calibrated." Sperry, 493 U.S. at 61 (recognizing "that when the Federal Government applies user charges to a large number of parties, it probably will charge a user more or less than it would under a perfect user-fee system, but we declined to impose a requirement that the Government 'give weight to every factor affecting appropriate compensation for . . . use.'") (quoting Massachusetts, 435 U.S. at 468).

The Court concludes that the amended quarterly fees under section 1930(a)(6) are permissible user fees and not excessive. Under the 2017 Amendment, the user fees for debtors making $1 million or more in disbursements is the lesser of 1% of disbursements or $250,000. The Supreme Court has held that a 1.5% ad valorem fee was not so clearly excessive as to constitute

19

an impermissible taking.  <u>Sperry</u>, 493 U.S. at 62.

Exide argues, however, that it should not have to pay the increased fees because, as a post-confirmation debtor, it receives no benefits from the UST.  Exide's contention is really an argument against <u>any</u> imposition of post-confirmation quarterly fees.  This argument was rejected when the 1996 amendment first imposed quarterly fees on post-confirmation debtors.  <u>See</u> <u>Gryphon</u>, 166 F.3d at 557, n.7 (finding Takings Clause challenge to the 1996 amendment's imposition of quarterly fees on post-confirmation debtors was without merit); <u>Kindred</u>, 2003 WL 22327933, at *4-5 (same).  In addition, this argument ignores the benefits that Exide has received (and continues to receive) from the bankruptcy system in its totality.  <u>See</u> <u>A.H. Robins</u>, 219 B.R. at 148, n.8 (holding that debtor had to pay post-confirmation quarterly fees because although the UST had done little in the case post-confirmation, the debtor "benefitted from the Court's continued involvement in this still-open case").  Further, there is no requirement that the UST provide any services to Exide – so long as those services are available to it.  <u>Sperry</u>, 493 U.S. at 395-96 (finding that imposition of tribunal fees on party who settled its claim before tribunal held any proceedings was constitutionally permissible).

Exide also argues that the fees are excessive because they greatly exceed chapter 7 and chapter 13 fees and those fees

20

charged smaller chapter 11 debtors.  The Court rejects this
argument.  It is permissible for Congress to impose higher user
fees on large chapter 11 debtors to reflect both a fair
approximation of the benefits conferred and Congress's assumption
that larger, more complex cases tax the system more than smaller
ones.  <u>Kindred</u>, 2003 WL 22327933, at *4.

The Court also rejects Exide's argument that the creation of
a surplus of $200 million is impermissible.  While Congress
intends for the UST Program to be self-funded, the Program
receives appropriations from Congress every year.  The fees
collected in any year are used to offset those appropriations
from Congress.  As the UST notes, the $200 million floor set by
the 2017 Amendment is not a surplus at all; it is actually less
than the annual appropriations for the UST Program.  <u>See</u>
Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, tit.
II, 132 Stat. 348, 412 (2018) (appropriating $225.9 million for
the UST Program); Consolidated Appropriations Act, 2017, Pub. L.
No. 115-31, tit. II, 131 Stat. 135, 195 (2017) (appropriating
$225.9 million for the UST Program).  Further, if the amounts
collected ever exceed the appropriations for a particular year,
the excess remains in the Fund to offset appropriations in
subsequent years.  28 U.S.C. § 589a(b) & (c).  The Court
concludes that this does not offend constitutional principles.
<u>See</u> <u>Massachusetts</u>, 435 U.S. at 470 n.25 (noting that even if

21

revenues in any one year exceeded outlays, it would not follow that the tax was invalid if "a surplus of revenue over outlays in any one year can be offset against actual deficits of past years and perhaps against projected deficits of future years").

  D.  <u>Bankruptcy Clause</u>

  Exide finally argues that the 2017 Amendment violates the Bankruptcy Clause because the amendment is a non-uniform law "on the subject of bankruptcies." According to Exide, the 2017 Amendment is not uniform because the new quarterly fees were not imposed on debtors in Bankruptcy Administrator ("BA") districts for cases filed prior to October 2018.

  The UST counters that the 2017 Amendment is not a law "on the subject of bankruptcies" and that the fee schedules contained therein are uniform. According to the UST, section 1930 is not a law on the subject of bankruptcies because it does not affect relations between debtors and creditors and it is located in title 28, rather than title 11. The UST also maintains that the fees that BA districts charge under section 1930(a)(7) must be equal to those imposed in UST districts under section 1930(a)(6). Thus, according to the UST, any alleged non-uniformity is not the result of the 2017 Amendments, but the erroneous application of the law in the BA districts.

1.  <u>Historical Context</u>

Before addressing the parties' arguments regarding the uniformity of the amended quarterly fees, it is first necessary to understand the historical context.  In 1978, the UST Program was established as a division within the Department of Justice (the executive branch) on a trial basis in select judicial districts.[5]  In 1986, Congress passed legislation to implement the UST Program nationwide.  The Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986, Pub. L. No. 99-554, §§ 111, 301-311, 100 Stat. 3088, 3090, 3118 (1986).  The program was to be introduced in all judicial districts over a two-year period, except for districts in Alabama and North Carolina.

While Alabama and North Carolina were intended to join the UST Program eventually, the 1986 statute authorized the Judicial Conference of the United States to establish the BA Program in the interim period to perform administrative duties similar to those conducted by the UST.  Pub. L. No. 99-554, § 302(d)(3)(I) 100 Stat. at 3123.  In September of 1987, the Judicial Conference adopted regulations creating the BA Program in Alabama and North

---

[5]    <u>See</u> U.S. Government Accounting Office, Report to the Chairman, Permanent Subcommittee on Investigations, Committee on Governmental Affairs, U.S. Senate, GAO-92-133, at 3-5 (Sept. 1992) (the "GAO Report").  Prior to 1978, administrative tasks were performed by the bankruptcy judges themselves which was felt to create a conflict with their judicial duties.  <u>Id.</u> at 3-4.

Carolina.  See 1987 Report of the Proceedings of the Judicial
Conference of the United States 53-54, 81-82; GAO Report at 4.

Congress initially gave Alabama and North Carolina a
deadline of October 1, 1992, to join the UST Program.  In 1990,
Congress extended the deadline, and in 2000 the deadline was
eliminated.  Federal Courts Improvement Act of 2000, Pub. L. No.
106-518, § 501, 114 Stat. 2410, 2421.  From 1986 until 2000,
section 1930 only required debtors in UST districts to pay
quarterly fees.

In 1994, the Ninth Circuit found that Congress violated the
uniformity requirement when it exempted Alabama and North
Carolina from the UST Program.  St. Angelo v. Victoria Farms,
Inc., 38 F.3d 1525, 1531-32 (9th Cir. 1994).  The debtor in that
case had argued, as Exide does, that the quarterly fees imposed
in UST districts were unconstitutionally non-uniform because they
were not imposed in BA districts.  Instead of striking down those
fees, however, the Ninth Circuit chose to strike down the
provision that excluded Alabama and North Carolina from the UST
Program.[6]

In response to Victoria Farms, the Judicial Conference
requested that Congress amend section 1930 to give the Judicial
Conference authority to implement quarterly fees in BA districts.

_____

[6]    Because the BA Program districts are located in the
Fourth and Eleventh Circuits, the Ninth Circuit's ruling had no
binding legal effect.

In 2000, Congress authorized the Judicial Conference to impose quarterly fees equal to those imposed in UST districts.  28 U.S.C. § 1930(a)(7).  Shortly thereafter, the Judicial Conference mandated the imposition of quarterly fees in BA districts "in the amount specified in 28 U.S.C. § 1930, as those amounts may be amended from time to time."  See 2001 Judicial Conference Report at 45-46.

When Congress amended the quarterly fee schedule in 2017, the amended fees applied in all cases in UST districts pending as of January 1, 2018.  The Judicial Conference, however, imposed the amended fees in BA districts only to cases filed on or after October 1, 2018.

2.  Laws on the Subject of Bankruptcy

The United States Constitution provides Congress with the power to establish "uniform laws on the subject of bankruptcies throughout the United States."  U.S. CONST. art. 1, § 8, cl. 4. To properly enact a law under the Bankruptcy Clause, legislation must meet two criteria: the law must be on the subject of bankruptcies, and the law must be uniform throughout the United States.

The parties disagree on whether the 2017 Amendment is a law enacted under the Bankruptcy Clause at all and thus whether it must be uniform.  Exide contends that it is; the UST asserts that it is not.

The Supreme Court has observed that

> The subject of bankruptcies is incapable of final
> definition.  The concept changes.  It has been
> recognized that it is not limited to the connotation of
> the phrase in England or the States, at the time of the
> formulation of the Constitution.

Wright v. Union Central Life Ins. Co., 304 U.S. 502, 513-14

(1938).  See also Railway Labor Execs.' Ass'n v. Gibbons, 455

U.S. 457, 466 (1982).

Although the "subject of bankruptcies" is a fluid concept

that is incapable of final definition, the Supreme Court has

noted that bankruptcy is "nothing less than the subject of the

relations between an insolvent or nonpaying or fraudulent debtor

and his creditors, extending to his and their relief."  Wright,

304 U.S. at 513-14.  See also Gibbons, 455 U.S. at 466.

The Supreme Court has explained that the bankruptcy power

"extends to all cases where the law causes to be distributed, the

property of the debtor among his creditors."  Hanover Nat'l Bank

v. Moyses, 186 U.S. 181, 186 (1902).  See also Gibbons, 455 U.S.

at 466.  Furthermore, the bankruptcy power "includes the power to

discharge the debtor from his contracts and legal liabilities, as

well as to distribute his property.  The grant to Congress

involves the power to impair the obligation of contracts, and

this the States were forbidden to do."  Moyses, 186 U.S. at 188.

See also Gibbons, 455 U.S. at 466.

Noting the Supreme Court's broad understanding of the
bankruptcy power, courts have held that section 1930 is a law on
the subject of bankruptcies. Victoria Farms, 38 F.3d at 1530;
In re Clinton Nurseries, Inc., Bankr. No. 17-31897, 2019 WL
4072654, at *9-10 (Bankr. D. Conn. Aug. 28, 2019). Cf. Gryphon,
166 F.3d at 556 (concluding that bankruptcy court had core
jurisdiction over UST fees because they had no existence in the
absence of a bankruptcy case).

The Court agrees with this conclusion. The UST's argument
that a law on the subject of bankruptcies is limited to laws that
specifically govern relations between debtors and creditors or
relate to the debtor's discharge is too narrow a reading of the
bankruptcy power. The cases cited by the UST do not support such
a constricted definition. On the contrary, these cases describe
the Bankruptcy Clause's breadth and counsel against a narrow
approach. Gibbons, 455 U.S. at 466 (describing the bankruptcy
power's scope using non-exhaustive language); Wright, 304 U.S. at
513-14 (stating that the subject of bankruptcies is not limited
to connotation of that phrase in England or in the States at the
time that the Constitution was written, and that the meaning of
the phrase changes over time); Cont'l Ill. Nat'l Bank & Tr. Co.
v. Chicago, Rock Island & Pac. Ry. Co., 294 U.S. 648, 668 (1935)
(observing that "[f]rom the beginning, the tendency of
legislation and of judicial interpretation has been uniformly in

27

the direction of progressive liberalization in respect of the operation of the bankruptcy power").

In light of the expansive nature of the inquiry, the Court concludes that section 1930 is a law on the subject of bankruptcies.  Section 1930 fees are only applied in bankruptcy cases, and thus the section's only subject is bankruptcy. Section 1930's codification in title 28 rather than title 11 is not significant.  Whether a law is "on the subject of bankruptcies" does not hinge upon whether the provision is included in the Bankruptcy Code.  See, e.g., Gibbons, 455 U.S. at 465-67 (finding that law codified in title 45 was on the subject of bankruptcies).

### 3.   Requirement of Uniformity

Laws enacted under the Bankruptcy Clause must apply uniformly.  To be uniform for the purposes of the Bankruptcy Clause, laws must apply uniformly to a defined class of debtors and must be geographically uniform.  Gibbons, 455 U.S. at 473; Moyses, 186 U.S. at 188.

### a.   Class of debtors

"To survive scrutiny under the Bankruptcy Clause, a law must at least apply uniformly to a defined class of debtors." Gibbons, 455 U.S. at 473.  Thus, private bankruptcy laws that apply only to one debtor violate the uniformity requirement and are impermissible under the Bankruptcy Clause.  Id. (finding that

28

law violated the uniformity requirement because, by its own

terms, it applied to only one regional bankrupt railroad).

In this case, the law does uniformly apply to a class of

debtors.  The amended fees in section 1930(a)(6)(B) apply to

chapter 11 debtors for disbursements made during the years 2018

to 2022.  Thus, unlike Gibbons, the 2017 Amendment is not a

private bankruptcy law.

### b.   Geographic Reach

In addition to the class uniformity requirement, laws passed

pursuant to Congress's bankruptcy power must be geographically

uniform.  Moyses, 186 U.S. at 188; Vanston Bondholders Protective

Committee v. Green, 329 U.S. 156, 172 (1946) (Frankfurter J.,

concurring).

In upholding the 1898 Bankruptcy Act's incorporation of

state law exemptions, however, the Supreme Court explained that:

> the system is, in the constitutional sense, uniform
> throughout the United States, when the trustee takes in
> each state whatever would have been available to the
> creditor if the bankrupt law had not been passed.  The
> general operation of the law is uniform although it may
> result in certain particulars differently in different
> states.

Moyses, 186 U.S. at 190.  See also Stellwagen v. Clum, 245 U.S.

605, 613 (1918) (holding the Bankruptcy Act's incorporation of

state fraudulent transfer statutes did not violate Bankruptcy

Clause's uniformity requirement).  Thus, the uniformity

requirement does not require that debtors receive identical

29

treatment or outcomes as similarly situated debtors in other states.

In addition, the uniformity requirement does not prohibit Congress from writing laws that apply to a statutorily defined region if the legislation addresses a geographically isolated problem.  <u>Blanchette v. Connecticut General Ins. Corp.</u>, 419 U.S. 102, 160 (1974) (holding that the Rail Act, which applied to a statutorily defined geographic region, was uniform because all bankrupt railroads operating in the United States at that time were located within the defined region and it addressed a geographically isolated problem caused by the railroads' distress).

The core of the dispute between Exide and the UST with respect to the geographic uniformity of amended section 1930(a)(6) centers around the inconsistent imposition of the amended quarterly fees in UST and BA districts.  The discrepancy is two-fold.  First, there was a nine-month delay in applying the fees in the BA districts.  Debtors in UST districts had to pay the amended fees beginning January 1, 2018, while debtors in BA districts did not have to pay the amended fees until October 1, 2018.  Second, the amended fees apply to all pending cases upon the 2017 Amendment's effective date in UST districts, while the amended quarterly fees apply in BA districts only to cases filed after October 1, 2018.

30

The parties dispute whether sections 1930(a)(6) and
1930(a)(7), when read together, result in an unconstitutional
non-uniform law.  Section 1930(a)(6) states "a quarterly fee
shall be paid to the United States trustee," while subsection
1930(a)(7) reads, "the Judicial Conference of the United States
may require the debtor in a case under chapter 11 of title 11 to
pay fees equal to those imposed by paragraph (6) of this
subsection."

Exide argues that the use of the word "may" in section
1930(a)(7) provides the Judicial Conference with discretion over
whether to impose quarterly fees in BA districts and to set the
amount of those fees.  As a result, Exide argues that subsections
1930(a)(6) and 1930(a)(7) create a non-uniform bankruptcy law.

The UST argues that section 1930(a)(7) is not discretionary
and requires the Judicial Conference to collect quarterly fees in
BA districts that are equal to fees in UST districts.  It notes
that the Judicial Conference did exactly that when it initially
imposed quarterly fees which were equal to those in UST
districts.  Further, the Judicial Conference recognized that the
fees were to remain uniform by providing that the fees in BA
districts were to be the same as those in UST districts "as those
amounts may be amended from time to time."  2001 Judicial
Conference Report at 46.  The UST argues that the Judicial
Conference's delay in implementing the 2017 Amendment and the

31

failure to impose the amended fees in pending cases are matters of execution of the law, which do not render the law itself non-uniform.

The Court concludes that the proper focus is whether amended section 1930(a)(6), as enacted by Congress, is uniform.  In this case, the Court finds that section 1930(a)(6) is uniform, because it applies with the same force and effect in every place where the subject of it is found - that is, in all UST districts.  The amended fee schedule addresses a geographically isolated problem that is confined to UST districts, namely the depletion of the UST System Fund.  The quarterly fees collected in the BA districts do not go into the UST System Fund; nor are the funds in the UST System Fund used to support the BA system.[7]  Thus, the decline in the UST System Fund is only a problem in UST districts.  Section 1930(a)(6) applies with the same force and effect in every place where the subject of it is found and it is designed to solve the problem to be remedied.  It was proper for Congress to increase the fees in those districts to solve that problem.  Blanchette, 419 U.S. at 160.

Even if the fees charged in BA districts were relevant, the

---

[7]    See 28 U.S.C. § 1930(a)(7) (quarterly fees collected in BA districts "shall be deposited as offsetting receipts to the fund established under section 1931 of this title and shall remain available until expended."); 28 U.S.C. § 589a (the UST System Fund is funded by section 1930(a)(6) quarterly fees but not by section 1930(a)(7) quarterly fees).

Court concludes that the fees, as enacted by Congress, are
uniform.  Congress, in implementing fees for UST districts,
acknowledged that it could not impose fees for the BA system,
which is part of the judicial branch.  Instead, Congress provided
that if the Judicial Conference did implement any fees for the BA
system, then those fees had to be equal to the fees in UST
districts.  The Judicial Conference acknowledged that uniformity
requirement when it initially imposed BA district fees by stating
that it would impose fees equal to those specified in section
1930(a)(6) "as those amounts may be amended from time to time."
See 2001 Judicial Conference Report at 45-46.  As a result, the
2017 Amendment should have been self-executing in BA districts.
The fact that they were not automatically implemented in BA
districts is not a result of legislative action, but instead the
result of implementation of the statute.  A failure to properly
enforce a portion of a law does not render the law itself non-
uniform.  See Rosenberg v. United States, 72 Fed. Cl. 387, 395-96
(Fed. Cl. 2006); Peony Park v. O'Malley, 121 F. Supp. 690 (D.
Neb. 1954), aff'd 223 F.2d 668 (8th Cir. 1955).

Consequently, the Court concludes that the quarterly fees
imposed on Exide as a result of the 2017 Amendment are uniform
and constitutional.

IV.   <u>CONCLUSION</u>

For the foregoing reasons, the Court will deny the

Reorganized Debtor's motion.

An appropriate Order is attached.


Dated: January 9, 2020          BY THE COURT:

Mary F. Walrath
United States Bankruptcy Judge